**APPEAL**

# U.S. Bankruptcy Court
## Northern District of Illinois (Eastern Division)
## Adversary Proceeding #: 25-00168
### Internal Use Only

*Assigned to:* Honorable Judge Jacqueline P. Cox        *Date Filed:* 05/23/25
*Lead BK Case:* 23-07031
*Lead BK Title:* Mubarak H Ibrahim
*Lead BK Chapter:* 7
*Demand:* $12000000000

*Nature[s] of Suit:*   11 Recovery of money/property - 542 turnover of property
                    13 Recovery of money/property - 548 fraudulent transfer
                    14 Recovery of money/property - other
                    91 Declaratory judgment

*Plaintiff*
----------------------
**Gus Paloian, not individually or personally, but**      represented by **Jonathan M. Cyrluk**
**solely in his capacity as the Chapter 7 Trustee of**                     Carpenter Lipps LLP
**Debtor Mubarak Ibrahims Estate,** *Gus Paloian,*                     180 N. LaSalle Street
*not individually or personally, but solely in his*                     Ste. 2880
*capacity as the Chapter 7 Trustee of Debtor*                     Chicago, IL 60601
*Mubarak Ibrahims Estate*                     312-777-4820
                    Email: cyrluk@carpenterlipps.com
                    *LEAD ATTORNEY*

                    **Steve C Moeller**
                    Carpenter Lipps LLP
                    180 N. LaSalle Street
                    Ste. 2880
                    Chicago, IL 60601
                    312-777-4826
                    Email: moeller@carpenterlipps.com

V.

*Defendant*
----------------------
**Sawsan Homsi,** *Sawsan Homsi*             represented by **Sawsan Homsi**
9401 Odell Avenue                               PRO SE
Bridgeview, IL 60455

***Defendant***

**----------------------**

**Badr Ali,** *Badr Ali*
9113 S. 84th Street
Hickory Hills, IL 60457

represented by **Stephen Scallan**
Hahn Loeser & Parks LLP
200 W Madison Street
Suite 2700
Chicago
Chicago, IL 60606
312-637-3045
Email: sdscallan@hahnlaw.com


***Defendant***

**----------------------**

**Petroleum Investment Properties, LLC,**
***Petroleum Investment Properties, LLC***
c/o Nasr Ali
4859 Keeler Avenue
Chicago, IL 60630

represented by **Kurt M. Carlson**
Carlson Dash LLC
216 S. Jefferson St.
Suite 303
Chicago, IL 60661
312-382-1600
Fax : 312-382-1619
Email: kcarlson@carlsondash.com

**Morgan I Marcus**
Carlson Dash LLC
216 S Jefferson St
Ste 303
Chicago, IL 60661
312-382-1600
Email: mmarcus@carlsondash.com

**Mona Naser**
Carlson Dash LLC
216 S Jefferson Street
Suite 303
Chicago, IL 60661
312-382-1600
Fax : 312-382-1619
Email: mnaser@carlsondash.com

**Lina Toma**
Carlson Dash LLC
216 S. Jefferson Street
Suite 504
Chicago, IL 60661
312-382-1600
Fax : 312-382-1619
Email: ltoma@carlsondash.com

***Defendant***
----------------------
**Calumet Fuel, Inc.,** *Calumet Fuel, Inc.*
c/o Nasr Ali
4859 Keeler Avenue
Chicago, IL 60630

represented by **Kurt M. Carlson**
(See above for address)

**Morgan I Marcus**
(See above for address)

**Mona Naser**
(See above for address)

**Lina Toma**
(See above for address)

***Defendant***
----------------------
**Nasr Ali,** *Nasr Ali*
4859 Keeler Avenue
Chicago, IL 60630

represented by **Kurt M. Carlson**
(See above for address)

**Morgan I Marcus**
(See above for address)

**Mona Naser**
(See above for address)

**Lina Toma**
(See above for address)

***Defendant***
----------------------
**Ajomon Joy,** *Ajomon Joy*
11900 S Marshfield Avenue
Calumet Park, IL 60827

represented by **Derek D Samz**
Golan Christie Taglia LLP
70 W. Madison St.
Ste. 1500
Chicago, IL 60602
312-263-2300
Email: ddsamz@gct.law

**Matthew M Showel**
Golan Christie Taglia LLP
70 W Madison Street
Suite 1500
Chicago, IL 60602
312-696-2645
Email: mmshowel@gct.law

**Defendant**
----------------------
**Ahmad Zahdan,** *Ahmad Zahdan*
12345 S. Keeler Avenue
Alsip, IL 60803

represented by **Matthew Luzadder**
Kelley Drye & Warren LLP
333 W Wacker Dr
Suite 2600
Chicago, IL 60606
312 857-7070
Fax : 312 857-7095
Email: mluzadder@kelleydrye.com

**Defendant**
----------------------
**AJ 119th, Inc.,** *AJ 119th, Inc.*
11900 S Marshfield Avenue
Calumet Park, IL 60827

represented by **Derek D Samz**
(See above for address)

**Matthew M Showel**
(See above for address)

**Defendant**
----------------------
**Calumet Park Mobil, LLC,** *Calumet Park Mobil, LLC*
Anderson Registered Agents (Inc.)
205 N. Michigan Avenue
Suite 810
Chicago, IL 60601

represented by **Matthew Luzadder**
(See above for address)

| Filing Date | # | Docket Text |
|---|---|---|
| 05/23/2025 | 1 (32 pgs; 2 docs) | Adversary case 25-00168. (11 (Recovery of money/property - 542 turnover of property)), (13 (Recovery of money/property - 548 fraudulent transfer)), (14 (Recovery of money/property - other)), (91 (Declaratory judgment)): Complaint by Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate against Sawsan Homsi, Badr Ali, Petroleum Investment Properties, LLC, Calumet Fuel, Inc., Nasr Ali, Ajomon Joy, Ahmad Zahdan, AJ 119th, Inc.. Fee Amount $350. Status hearing to be held on 7/8/2025 at 01:00 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Adversary Cover Sheet) (Cyrluk, Jonathan) (Entered: 05/23/2025) |

| 05/23/2025 | 2 (8 pgs) | Summons Issued on Sawsan Homsi Answer Due 06/23/2025; Badr Ali Answer Due 06/23/2025; Petroleum Investment Properties, LLC Answer Due 06/23/2025; Calumet Fuel, Inc. Answer Due 06/23/2025; Nasr Ali Answer Due 06/23/2025; Ajomon Joy Answer Due 06/23/2025; Ahmad Zahdan Answer Due 06/23/2025; AJ 119th, Inc. Answer Due 06/23/2025 (Admin) (Entered: 05/23/2025) |
|---|---|---|
| 05/23/2025 | 3 | Receipt of Complaint( 25-00168) [cmp,cmp] ( 350.00) Filing Fee. Receipt number A49539144. Fee Amount $ 350.00 (Cyrluk, Jonathan) (re:Doc# 1) (U.S. Treasury) (Entered: 05/23/2025) |
| 05/28/2025 | 4 | Request for Issuance of Alias Summons by Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate against Calumet Park Mobil, LLC. (RE: 1 Complaint). Status hearing to be held on 7/8/2025 at 01:00 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Cyrluk, Jonathan) (Entered: 05/28/2025) |
| 05/28/2025 | 5 (1 pg) | Alias Summons Issued on Calumet Park Mobil, LLC Answer Due 06/27/2025 (Admin) (Entered: 05/28/2025) |
| 06/17/2025 | 6 (4 pgs) | Notice of Appearance and Request for Notice for Matthew Luzadder, and Alla M. Taher Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan. (Luzadder, Matthew) (Entered: 06/17/2025) |
| 06/26/2025 | 7 (1 pg) | Proof of Service Acceptance of Service by counsel for parties Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Carlson, Kurt) (Entered: 06/26/2025) |
| 06/26/2025 | 8 (1 pg) | Appearance Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. (Moeller, Steve) (Entered: 06/26/2025) |
| 07/08/2025 | 9 (1 pg) | **PDF Error, Filer Notified to Refile** Proposed Order - ORDER Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 4 Request for Issuance of Alias Summons). (Cyrluk, Jonathan)Modified on 7/9/2025 (ES). (Entered: 07/08/2025) |
| 07/08/2025 | 10 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 08/05/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 07/08/2025) |
| 07/08/2025 | 11 | (E)Hearing Continued (RE: 4 Request for Issuance of Alias Summons). Status hearing scheduled for 08/05/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 07/08/2025) |

| | | |
|---|---|---|
| 07/09/2025 | ⬤ 12 | CORRECTIVE ENTRY: PDF Error, Filer Notified to Refile (RE: 9 Proposed Order). (Sullivan, Elizabeth) (Entered: 07/09/2025) |
| 07/09/2025 | ⬤ 13 (2 pgs) | Order Scheduling (RE: 1 Complaint). Answer or otherwise plead in response to the complaint due by: 8/4/2025. Status hearing to be held on 8/5/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 7/9/2025 (Green, Ron) (Entered: 07/09/2025) |
| 07/31/2025 | ⬤ 14 (1 pg) | Appearance Filed by Derek D Samz on behalf of AJ 119th, Inc., Ajomon Joy. (Samz, Derek) (Entered: 07/31/2025) |
| 07/31/2025 | ⬤ 15 (6 pgs; 2 docs) | Notice of Motion and Motion to Extend Time to Answer Adversary Complaint, in addition to Notice of Motion and Motion to Vacate (related documents 13 Order Scheduling) Filed by Derek D Samz on behalf of AJ 119th, Inc., Ajomon Joy. Hearing scheduled for 8/5/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Proposed Order) (Samz, Derek) Modified on 8/1/2025 to correct docket text **Incorrect Proposed Order, Filer Notified to Refile** (VG). (Entered: 07/31/2025) |
| 07/31/2025 | ⬤ 16 (1 pg) | Appearance for Matthew M. Showel Filed by Derek D Samz on behalf of AJ 119th, Inc., Ajomon Joy. (Samz, Derek) (Entered: 07/31/2025) |
| 08/01/2025 | ⬤ 17 | CORRECTIVE ENTRY to correct docket text - Incorrect Proposed Order, Filer Notified to Refile (RE: 15 Motion to Extend Time, Motion to Vacate). (Gossett, Valerie) (Entered: 08/01/2025) |
| 08/04/2025 | ⬤ 18 (1 pg) | Appearance for Andrew Wood Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan. (Luzadder, Matthew) (Entered: 08/04/2025) |
| 08/05/2025 | ⬤ 19 (1 pg) | Proposed Order - Order Granting Defendants' Motion for an Extension to Answer the Complaint and Vacate Technical Defaults Filed by Derek D Samz on behalf of AJ 119th, Inc., Ajomon Joy (RE: 15 Motion to Extend Time, Motion to Vacate). (Samz, Derek) (Entered: 08/05/2025) |
| 08/05/2025 | ⬤ 20 (1 pg) | Proposed Order - ORDER Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 11 Hearing Motion Continued). (Cyrluk, Jonathan) (Entered: 08/05/2025) |
| 08/05/2025 | ⬤ 21 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 09/02/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 08/05/2025) |
| 08/05/2025 | ⬤ 22 (1 pg) | Order Granting Motion to Extend Time (Related Doc # 15), Granting Motion To Vacate (Related Doc # 15). Response due by 8/20/2025. Signed on 8/5/2025. (Chavez, Baldo) (Entered: 08/06/2025) |

| | | |
|---|---|---|
| 08/05/2025 | ⬤23<br>(2 pgs) | Order- 1. The trustee's oral motion for leave to issue alias summonses to Sawsan Homsi and Badr Ali is granted, and the trustee is granted leave to issue alias summonses to Sawsan Homsi and Badr Ali. 2. This matter is set for status on September 2, 2025 at 1:30 PM. (RE: 1 Complaint, 11 Hearing Motion Continued). Signed on 8/5/2025 (Chavez, Baldo) (Entered: 08/06/2025) |
| 08/06/2025 | ⬤24<br>(29 pgs) | Answer to Complaint Filed by Derek D Samz on behalf of Ajomon Joy. (Samz, Derek) (Entered: 08/06/2025) |
| 08/06/2025 | ⬤25<br>(3 pgs) | Notice of Filing Filed by Derek D Samz on behalf of Ajomon Joy (RE: 24 Answer to Complaint). (Samz, Derek) (Entered: 08/06/2025) |
| 08/06/2025 | ⬤26<br>(29 pgs) | Answer to Complaint Filed by Derek D Samz on behalf of AJ 119th, Inc.. (Samz, Derek) (Entered: 08/06/2025) |
| 08/06/2025 | ⬤27<br>(3 pgs) | Notice of Filing Filed by Derek D Samz on behalf of AJ 119th, Inc. (RE: 26 Answer to Complaint). (Samz, Derek) (Entered: 08/06/2025) |
| 08/07/2025 | ⬤28 | Request for Issuance of Alias Summons by Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate against Badr Ali. (RE: 1 Complaint). Status hearing to be held on 9/16/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Cyrluk, Jonathan) (Entered: 08/07/2025) |
| 08/07/2025 | ⬤29<br>(1 pg) | Alias Summons Issued on Badr Ali Answer Due 09/8/2025 (Admin) (Entered: 08/07/2025) |
| 08/07/2025 | ⬤30 | Request for Issuance of Alias Summons by Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate against Sawsan Homsi. (RE: 1 Complaint). Status hearing to be held on 9/16/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Cyrluk, Jonathan) (Entered: 08/07/2025) |
| 08/07/2025 | ⬤31<br>(1 pg) | Alias Summons Issued on Sawsan Homsi Answer Due 09/8/2025 (Admin) (Entered: 08/07/2025) |
| 08/12/2025 | ⬤32<br>(1 pg) | Appearance Filed by Matthew M Showel on behalf of AJ 119th, Inc., Ajomon Joy. (Showel, Matthew) (Entered: 08/12/2025) |
| 08/15/2025 | ⬤33<br>(17 pgs; 3 docs) | Notice of Motion and Motion to Dismiss Adversary Proceeding Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan. Hearing scheduled for 9/2/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Memorandum of Law in Support # 2 Certificate of Service) (Luzadder, Matthew) (Entered: 08/15/2025) |
| 08/18/2025 | | (private) Email to Matthew Luzadder re: Missing Proposed Order (RE: 33 Motion to Dismiss Adversary Proceeding). (Miller, Marvin) |

| | | (Entered: 08/18/2025) |
|---|---|---|
| 08/20/2025 | 🔘 34<br>(467 pgs; 2 docs) | Notice of Motion and Motion to Dismiss Counts Count I, Count VI, Count VII, Count X, Count XI, and Count XIV of Adversary Proceeding Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. Hearing scheduled for 9/2/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Proposed Order) (Carlson, Kurt) (Entered: 08/20/2025) |
| 09/02/2025 | 🔘 35 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 11/18/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 09/02/2025) |
| 09/02/2025 | 🔘 36 | (E)Response by 10/6/25 Reply by 10/30/25 Hearing Continued (RE: 33 Dismiss Adversary Proceeding). hearing scheduled for 11/18/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 09/02/2025) |
| 09/02/2025 | 🔘 37 | (E)Response by 10/6/25 Reply by 10/30/25 Hearing Continued (RE: 34 Dismiss Certain Counts of Adversary Proceeding). hearing scheduled for 11/18/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 09/02/2025) |
| 09/03/2025 | 🔘 38<br>(1 pg) | **PDF Error, Filer to Refile** Proposed Order - File Response, Reply and Set Status Hearing Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 36 Hearing Motion Continued, 37 Hearing Motion Continued). (Cyrluk, Jonathan)Modified on 9/4/2025 (VG). (Entered: 09/03/2025) |
| 09/04/2025 | 🔘 39 | CORRECTIVE ENTRY PDF Error, Filer to Refile (RE: 38 Proposed Order). (Gossett, Valerie) (Entered: 09/04/2025) |
| 09/05/2025 | 🔘 40<br>(1 pg) | Proposed Order - Setting Briefing Schedule on Motions to Dismiss Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 33 Motion to Dismiss Adversary Proceeding, 34 Motion to Dismiss Certain Counts of Adversary Proceeding). (Cyrluk, Jonathan) (Entered: 09/05/2025) |
| 09/08/2025 | 🔘 41<br>(2 pgs) | Order Setting Briefing Scheduling on Motions to Dismiss (RE: 33 Motion to Dismiss Adversary Proceeding, 34 Motion to Dismiss Certain Counts of Adversary Proceeding). Response due by 10/6/2025. Reply due by: 10/30/2025. Status hearing to be held on 11/18/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 9/8/2025 (Chavez, Baldo) (Entered: 09/09/2025) |

| 09/15/2025 | 42 (1 pg) | **Docketed on Wrong Case, Filer Notified** Appearance Filed by Stephen Scallan on behalf of Badr Ali. (Scallan, Stephen) Modified on 9/16/2025 (CZ). (Entered: 09/15/2025) |
|---|---|---|
| 09/16/2025 | | (private) Remark sent email to atty to refile with adv case number (RE: 42 Appearance). (Molina, Nilsa) (Entered: 09/16/2025) |
| 09/16/2025 | 43 | CORRECTIVE ENTRY Docketed on Wrong Case, Filer Notified (RE: 42 Appearance). (Mendoza, Catherine) (Entered: 09/16/2025) |
| 09/16/2025 | 44 (1 pg) | Proposed Order - Setting Responsive Pleading Date Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 1 Complaint). (Moeller, Steve) (Entered: 09/16/2025) |
| 09/16/2025 | 45 | (E)Hearing Continued (RE: 28 Request for Issuance of Alias Summons). Status hearing scheduled for 10/07/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 09/16/2025) |
| 09/16/2025 | 46 | (E)Hearing Continued (RE: 30 Request for Issuance of Alias Summons). Status hearing scheduled for 10/07/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 09/16/2025) |
| 09/16/2025 | 47 (2 pgs) | Order Scheduling (RE: 1 Complaint). Answer or otherwise plead due by: 10/13/2025. Status hearing to be held on 10/7/2025 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 9/16/2025 (Boyd, Shante) (Entered: 09/17/2025) |
| 10/06/2025 | 48 (12 pgs) | Response to (related document(s): 33 Motion to Dismiss Adversary Proceeding) Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (Cyrluk, Jonathan) (Entered: 10/06/2025) |
| 10/06/2025 | 49 (17 pgs) | Response to (related document(s): 34 Motion to Dismiss Certain Counts of Adversary Proceeding) Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (Cyrluk, Jonathan) (Entered: 10/06/2025) |
| 10/07/2025 | 50 | (E)Hearing Continued (RE: 28 Request for Issuance of Alias Summons). Status hearing scheduled for 11/18/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 10/07/2025) |
| 10/07/2025 | 51 | (E)Hearing Continued (RE: 30 Request for Issuance of Alias Summons). Status hearing scheduled for 11/18/2025 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 10/07/2025) |

| | | |
|---|---|---|
| 10/08/2025 | ⚫[52](1 pg) | Proposed Order - Setting Answer Date for Certain Defendants and Status Hearing Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 45 Hearing Motion Continued, 46 Hearing Motion Continued, 50 Hearing Motion Continued, 51 Hearing Motion Continued). (Moeller, Steve) (Entered: 10/08/2025) |
| 10/15/2025 | ⚫[53](10 pgs; 2 docs) | Notice of Motion and Motion to Dismiss Adversary Proceeding Filed by Stephen Scallan on behalf of Badr Ali. Hearing scheduled for 10/21/2025 at 01:00 PM at Courtroom 680, 219 South Dearborn, Chicago, Illinois 60604. (Attachments: # 1 Attachment Notice of Motion) (Scallan, Stephen) (Entered: 10/15/2025) |
| 10/16/2025 | | (private) Email to Stephen Scallan re: Missing Proposed Order (RE: 53 Motion to Dismiss Adversary Proceeding). (Chavez, Baldo) (Entered: 10/16/2025) |
| 10/16/2025 | ⚫[54](2 pgs) | Proposed Order - Order Setting Briefing Schedule on Motion to Dismiss Filed by Stephen Scallan on behalf of Badr Ali (RE: 53 Motion to Dismiss Adversary Proceeding). (Scallan, Stephen) (Entered: 10/16/2025) |
| 10/21/2025 | ⚫[55](2 pgs) | Proposed Order - Revised Order Setting Briefing Schedule on Motion to Dismiss Filed by Stephen Scallan on behalf of Badr Ali (RE: 53 Motion to Dismiss Adversary Proceeding, 54 Proposed Order). (Scallan, Stephen) (Entered: 10/21/2025) |
| 10/21/2025 | ⚫56 | (E)Response due 0 11-18-25; Reply due 12-9-25, Hearing on 12-16-25 at 2:00 p.m.Hearing Continued (RE: 53 Dismiss Adversary Proceeding). hearing scheduled for 12/16/2025 at 02:00 PM at Courtroom 680 219 South Dearborn, Chicago, IL, 60604. (Green, Josephine) (Entered: 10/21/2025) |
| 10/30/2025 | ⚫[57](12 pgs; 2 docs) | Reply in Support to (related document(s): 33 Motion to Dismiss Adversary Proceeding) Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan (Attachments: # 1 Certificate of Service) (Luzadder, Matthew) (Entered: 10/30/2025) |
| 10/30/2025 | ⚫[58](7 pgs; 2 docs) | Reply in Support to (related document(s): 34 Motion to Dismiss Certain Counts of Adversary Proceeding) Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (Attachments: # 1 Notice of Filing and Certificate of Service) (Carlson, Kurt) (Entered: 10/30/2025) |
| 11/18/2025 | ⚫59 | (E)Hearing Continued (RE: 28 Request for Issuance of Alias Summons). Status hearing scheduled for 01/27/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 11/18/2025) |

| | | |
|---|---|---|
| 11/18/2025 | 60 | (E)Hearing Continued (RE: 30 Request for Issuance of Alias Summons). Status hearing scheduled for 01/27/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 11/18/2025) |
| 11/18/2025 | 61 | (E)Hearing Continued (RE: 41 Scheduling). Status hearing scheduled for 01/27/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 11/18/2025) |
| 11/18/2025 | 62 | (E)Hearing Continued (RE: 1 Complaint). Status hearing scheduled for 01/27/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 11/18/2025) |
| 11/18/2025 | 63 | (E)Hearing Continued (RE: 33 Dismiss Adversary Proceeding). hearing scheduled for 01/27/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 11/18/2025) |
| 11/18/2025 | 64 | (E)Hearing Continued (RE: 34 Dismiss Certain Counts of Adversary Proceeding). hearing scheduled for 01/27/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 11/18/2025) |
| 11/18/2025 | 65 (11 pgs) | Brief Trustee's Response to Badr Ali's Rule 12(b)(6) Motion to Dismiss Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. (Cyrluk, Jonathan) (Entered: 11/18/2025) |
| 11/19/2025 | 66 (1 pg) | Proposed Order - Setting Contested Motion Hearing and Status Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 33 Motion to Dismiss Adversary Proceeding, 34 Motion to Dismiss Certain Counts of Adversary Proceeding). (Cyrluk, Jonathan) (Entered: 11/19/2025) |
| 11/24/2025 | 67 (2 pgs) | Order Setting Contested Hearing (RE: 33 Motion to Dismiss Adversary Proceeding, 34 Motion to Dismiss Certain Counts of Adversary Proceeding). Contested Hearing scheduled for 1/27/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Status hearing to be held on 1/27/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 11/24/2025 (Batson, Nicole) (Entered: 11/24/2025) |
| 12/05/2025 | 68 (5 pgs; 3 docs) | Notice of Motion and Motion to Extend Time to File Reply Brief in Support of Motion to Dismiss. Filed by Stephen Scallan on behalf of Badr Ali. Hearing scheduled for 12/9/2025 at 01:00 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Proposed Order # 2 Attachment Notice of Motion) (Scallan, Stephen) (Entered: 12/05/2025) |

| | | |
|---|---|---|
| 12/09/2025 | 🌐69<br>(1 pg) | Order Granting Motion to Extend Time (Related Doc # 68). Hearing continued on 1/27/2026 at 01:30PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Reply due by: 12/19/2025. Signed on 12/9/2025. (Chavez, Baldo) (Entered: 12/10/2025) |
| 12/18/2025 | 🌐70<br>(9 pgs) | Reply in Support to (related document(s): 53 Motion to Dismiss Adversary Proceeding) Filed by Stephen Scallan on behalf of Badr Ali (Scallan, Stephen) (Entered: 12/18/2025) |
| 02/03/2026 | 🌐71<br>(1 pg) | Proposed Order - on Motions to Dismiss and to Set Status Hearing Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 33 Motion to Dismiss Adversary Proceeding, 34 Motion to Dismiss Certain Counts of Adversary Proceeding, 53 Motion to Dismiss Adversary Proceeding). (Cyrluk, Jonathan) (Entered: 02/03/2026) |
| 02/03/2026 | 🌐72<br>(202 pgs; 3 docs) | **PDF/Event Error, Filer Notified** Notice of Motion and Motion for Temporary Restraining Order Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. Hearing scheduled for 2/10/2026 at 01:30 PM at Courtroom 680, 219 South Dearborn, Chicago, Illinois 60604. (Attachments: # 1 Exhibit Ex 1 # 2 Exhibit Ex 2) (Cyrluk, Jonathan)Modified on 2/4/2026 (GO). (Entered: 02/03/2026) |
| 02/03/2026 | 🌐73<br>(1 pg) | **PDF Error, Filer to Refile** Proposed Order - Granting Chapter 7 Trustee's Motion for Temporary Restraining Order and Preliminary Injunction Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 72 Motion for Temporary Restraining Order). (Cyrluk, Jonathan)Modified on 2/4/2026 (GO). (Entered: 02/03/2026) |
| 02/03/2026 | 🌐74<br>(130 pgs; 4 docs) | **PDF/Event Error, Filer Notified** Notice of Motion Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 72 Motion for Temporary Restraining Order). Hearing scheduled for 2/10/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Proposed Order Ex A - Proposed Order # 2 Exhibit Ex B # 3 Exhibit Ex C)(Cyrluk, Jonathan)Modified on 2/4/2026 (GO). (Entered: 02/03/2026) |
| 02/04/2026 | | (private) Remark sent email to filer to refile with events Temporary Restraining Order and Preliminary Injunction (RE: 72 Motion for Temporary Restraining Order). (Molina, Nilsa) (Entered: 02/04/2026) |
| 02/04/2026 | | (private) Remark sent email to filer to refile due to incorrect event and order has incorrect bk case number and remove proposed (RE: 74 Notice of Motion). (Molina, Nilsa) (Entered: 02/04/2026) |

| | | |
|---|---|---|
| 02/04/2026 | 75 (202 pgs; 3 docs) | Notice of Motion and Motion for Temporary Restraining Order, Notice of Motion and Motion for Preliminary Injunction Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. Hearing scheduled for 2/10/2026 at 01:30 PM at Courtroom 680, 219 South Dearborn, Chicago, Illinois 60604. (Attachments: # 1 Exhibit Ex 1 # 2 Exhibit Ex 2) (Cyrluk, Jonathan) (Entered: 02/04/2026) |
| 02/04/2026 | 76 (1 pg) | Proposed Order - Granting Chapter 7 Trustee's Motion for Temporary Restraining Order and Preliminary Injunction Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Cyrluk, Jonathan) (Entered: 02/04/2026) |
| 02/04/2026 | 77 | CORRECTIVE ENTRY: PDF/Event Error, Filer Notified (RE: 72 Motion for Temporary Restraining Order, 74 Notice of Motion). (Gomez, Denise) (Entered: 02/04/2026) |
| 02/04/2026 | 78 | CORRECTIVE ENTRY: PDF Error, Filer to Refile (RE: 73 Proposed Order). (Gomez, Denise) (Entered: 02/04/2026) |
| 02/05/2026 | 79 (2 pgs) | Order 1. The Badr Ali Motion is GRANTED IN PART and DENIED IN PART, As Against Badr Ali, Count I is DISMISSED WITHOUT PREJUDICE, The Badr Ali Motion is otheriwise DENIED. 2. The Trustee is granted leave to re-plead Count I as against Badr Ali on or before February 18, 2026. 3. The Nasr Ali Parties Motion is DENIED. 4. The Zahdan Parites Motion is DENIED. - Scheduling (RE: 33 Motion to Dismiss Adversary Proceeding, 34 Motion to Dismiss Certain Counts of Adversary Proceeding, 53 Motion to Dismiss Adversary Proceeding). Answer due by: 2/26/2026. Status hearing to be held on 3/10/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 2/5/2026 (Chavez, Baldo) (Entered: 02/06/2026) |
| 02/09/2026 | 80 | Notice of Objection Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (RE: 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Carlson, Kurt) (Entered: 02/09/2026) |
| 02/10/2026 | 81 | (E)Response by 2/27/26; Reply by 3/5/26 Hearing Continued (RE: 75 Temporary Restraining Order; Preliminary Injunction). hearing scheduled for 03/12/2026 at 10:00 AM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 02/10/2026) |

| | | |
|---|---|---|
| 02/11/2026 | ●82<br>(1 pg) | Proposed Order - Setting Briefing Schedule and Hearing on Chapter 7 Trustee's Motion for Temporary Restraining Order and Preliminary Injunction Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Moeller, Steve) (Entered: 02/11/2026) |
| 02/12/2026 | ●83<br>(2 pgs) | Order Setting Briefing Schedule and Hearing - Scheduling (RE: 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). Response due by 2/27/2026. Reply due by: 3/5/2026.Contested Hearing scheduled for 3/12/2026 at 10:00 AM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 2/12/2026 (Chavez, Baldo) (Entered: 02/12/2026) |
| 02/18/2026 | ●84<br>(131 pgs; 3 docs) | Notice of Motion and Motion to Expedite Discovery in Connection with His Motion for Temporary Restraining Order and Preliminary Injunction, Notice of Motion and Motion to Extend Time the Time to Replead Count I of the Complaint Against Badr Ali Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. Hearing scheduled for 3/10/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Exhibit Ex A # 2 Exhibit Ex B) (Moeller, Steve) (Entered: 02/18/2026) |
| 02/18/2026 | ●85<br>(131 pgs; 3 docs) | Notice of Motion and Motion to Expedite Discovery in Connection with His Motion for Temporary Restraining Order and Preliminary Injunction (related documents 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction), Notice of Motion and Motion to Extend Time to Replead Count I of the Complaint Against Badr Ali Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. Hearing scheduled for 3/10/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Exhibit Ex A # 2 Exhibit Ex B) (Moeller, Steve) (Entered: 02/18/2026) |
| 02/18/2026 | ●86<br>(1 pg) | Proposed Order - Authorizing Expedited Discovery in Connection with the Trustee's Motion for Temporary Restraining Order and Preliminary Injunction and Extension of Time to Replead Count I of the Complaint Against Badr Ali Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 85 Motion to Expedite (Other than Hearing), Motion to Extend Time). (Moeller, Steve) (Entered: 02/18/2026) |
| 02/26/2026 | ●87<br>(21 pgs) | Answer to Complaint and Jury Demand Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan. (Luzadder, Matthew) (Entered: 02/26/2026) |

| | | |
|---|---|---|
| 02/27/2026 | 88 (5 pgs) | Response to (related document(s): 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction) Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (Carlson, Kurt) (Entered: 02/27/2026) |
| 02/27/2026 | 89 (59 pgs; 4 docs) | Response to (related document(s): 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction) Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan (Attachments: # 1 Exhibit A - Commercial Sales Contract # 2 Exhibit B - Recorded Mortgage # 3 Exhibit C - Mortgage Payments March 2025 - January 2026) (Luzadder, Matthew) (Entered: 02/27/2026) |
| 03/02/2026 | 90 (2 pgs) | Jury Demand Filed by Stephen Scallan on behalf of Badr Ali. (Scallan, Stephen) (Entered: 03/02/2026) |
| 03/03/2026 | 91 | Notice of Objection Filed by Stephen Scallan on behalf of Badr Ali (RE: 84 Motion to Expedite (Other than Hearing), Motion to Extend Time, 85 Motion to Expedite (Other than Hearing), Motion to Extend Time). (Scallan, Stephen) (Entered: 03/03/2026) |
| 03/04/2026 | 92 (3 pgs; 2 docs) | Notice of Motion and Motion to Extend Time to File His Answer to The Complaint Filed by Stephen Scallan on behalf of Badr Ali. Hearing scheduled for 3/10/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Attachment Notice of Motion) (Scallan, Stephen) (Entered: 03/04/2026) |
| 03/05/2026 | 93 (219 pgs; 5 docs) | Brief Trustee's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. (Attachments: # 1 Exhibit 3 # 2 Exhibit 4 # 3 Exhibit 5 # 4 Exhibit 6) (Moeller, Steve) (Entered: 03/05/2026) |
| 03/09/2026 | 94 (219 pgs; 5 docs) | Brief Trustee's Corrected Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. (Attachments: # 1 Exhibit Exhibit 3 # 2 Exhibit Exhibit 4 # 3 Exhibit Exhibit 5 # 4 Exhibit Exhibit 6) (Moeller, Steve) (Entered: 03/09/2026) |
| 03/10/2026 | 95 (60 pgs; 2 docs) | Notice of Filing Filed by Stephen Scallan on behalf of Badr Ali. (RE: 96 Motion for Withdrawal of Reference) (Attachments: # 1 Exhibit Exhibit 1)(Scallan, Stephen). Modified on 3/10/2026 Creating relationship to document #96 (ES). (Entered: 03/10/2026) |
| 03/10/2026 | 96 (60 pgs; 2 docs) | Motion for Withdrawal of Reference. Fee Amount $199 Filed by Stephen Scallan on behalf of Badr Ali. (Attachments: # 1 Exhibit Exhibit 1) (Scallan, Stephen) (Entered: 03/10/2026) |

| | | |
|---|---|---|
| 03/10/2026 | 97 | Receipt of Motion for Withdrawal of Reference( 25-00168) [motion,mwdref] ( 199.00) Filing Fee. Receipt number A50913707. Fee Amount $ 199.00 (re:Doc# 96) (U.S. Treasury) (Entered: 03/10/2026) |
| 03/10/2026 | ⬤99 | (E)Hearing Continued (RE: 84 Expedite (Other than Hearing); Extend Time). hearing scheduled for 03/12/2026 at 10:00 AM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 03/11/2026) |
| 03/10/2026 | ⬤100 | (E)Hearing Continued (RE: 85 Expedite (Other than Hearing); Extend Time). hearing scheduled for 03/12/2026 at 10:00 AM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 03/11/2026) |
| 03/11/2026 | | (private) Remark-A Motion for Withdrawal of Reference case was opened in the District Court without being docketed on this Adversary case by Attorney. Civil case number 26 cv 02616 assigned to Judge Charles P. Kocoras (RE: 96 Motion for Withdrawal of Reference). (Sims, Lakeysha) (Entered: 03/11/2026) |
| 03/11/2026 | ⬤98 (13 pgs; 3 docs) | Application to Set Hearing on Emergency Motion Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Attachments: # 1 Exhibit A - Proposed Emergency Motion # 2 Exhibit B - Certification) (Carlson, Kurt) (Entered: 03/11/2026) |
| 03/11/2026 | ⬤101 (1 pg) | Order Denying Application to Set Hearing on Emergency Motion (Related Doc # 98). Signed on 3/11/2026. (Batson, Nicole) (Entered: 03/11/2026) |
| 03/12/2026 | ⬤102 (8 pgs) | **PDF/Event Error, see entry [#105]** Notice of Motion and Motion for Protective Order Filed by Morgan I Marcus on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. Hearing scheduled for 3/24/2026 at 01:00 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Marcus, Morgan) Modified on 3/13/2026 (CZ). (Entered: 03/12/2026) |
| 03/12/2026 | ⬤103 (2 pgs) | Proposed Order - granting Defendants' Motion Filed by Morgan I Marcus on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (RE: 102 Motion for Protective Order). (Marcus, Morgan) (Entered: 03/12/2026) |
| 03/12/2026 | ⬤104 | (E)Hearing Continued (RE: 75 Temporary Restraining Order; Preliminary Injunction). hearing scheduled for 03/24/2026 at 02:00 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 03/12/2026) |
| 03/13/2026 | | (private) Motions terminated (RE: 102 Motion for Protective Order). (Sims, Lakeysha) (Entered: 03/13/2026) |

| | | |
|---|---|---|
| 03/13/2026 | 🌑105<br>(10 pgs; 2 docs) | Notice of Motion and Motion for Protective Order, Notice of Motion and Motion for Sanctions against Plaintiff Filed by Morgan I Marcus on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. Hearing scheduled for 3/24/2026 at 01:00 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Proposed Order) (Marcus, Morgan) (Entered: 03/13/2026) |
| 03/13/2026 | 🌑106 | CORRECTIVE ENTRY: PDF/Event Error, see entry [#105] (RE: 102 Motion for Protective Order). (Mendoza, Catherine) (Entered: 03/13/2026) |
| 03/16/2026 | 🌑107<br>(214 pgs; 3 docs) | Supplement Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan (RE: 89 Response). (Attachments: # 1 Exhibit D - ADI Real Estate Valuation Appraisal Report # 2 Exhibit E - JSO Valuation Group, LTD, Appraisal Report) (Luzadder, Matthew) (Entered: 03/16/2026) |
| 03/18/2026 | 🌑108<br>(2 pgs) | Jury Demand Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Carlson, Kurt) (Entered: 03/18/2026) |
| 03/18/2026 | 🌑109<br>(7 pgs; 2 docs) | Motion for Withdrawal of Reference. Fee Amount $199 Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Attachments: # 1 Civil Cover Sheet) (Carlson, Kurt) (Entered: 03/18/2026) |
| 03/18/2026 | 110 | Receipt of Motion for Withdrawal of Reference( 25-00168) [motion,mwdref] ( 199.00) Filing Fee. Receipt number A50955465. Fee Amount $ 199.00 (re:Doc# 109) (U.S. Treasury) (Entered: 03/18/2026) |
| 03/18/2026 | 🌑111<br>(1 pg) | Appearance Filed by Mona Naser on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Naser, Mona) (Entered: 03/18/2026) |
| 03/19/2026 | 🌑112<br>(1 pg) | Transmittal of Record to The US District Court. Civil Case Number: 26 cv 3086 Assigned to District Court Judge: Charles P. Kocoras (RE: 109 Motion for Withdrawal of Reference). (Bowles, Aaron) (Entered: 03/19/2026) |
| 03/19/2026 | 🌑113<br>(1 pg) | Proposed Order - [Trustee's Proposed] Temporary Restraining Order Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 72 Motion for Temporary Restraining Order, 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Moeller, Steve) (Entered: 03/19/2026) |
| 03/19/2026 | 🌑114<br>(1 pg) | Proposed Order - Temporary Restraining Order (Defendants' Form) Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (RE: 72 Motion for Temporary Restraining Order, 75 Motion for Temporary Restraining Order, Motion for Preliminary Injunction). (Carlson, Kurt) (Entered: |

| | | |
|---|---|---|
| | | 03/19/2026) |
| 03/24/2026 | 🔒 ⊕ 115 (94 pgs) | Transcript regarding Hearing Held 03/12/26. Remote electronic access to the excerpt/transcript is restricted until 06/22/2026. The excerpt/transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter D & E Reporting, Telephone number 312-986-1920. (RE: related document(s) 104 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 4/7/2026. Redaction Request Due By 04/14/2026. Redacted Transcript Submission Due By 04/24/2026. Transcript access will be restricted through 06/22/2026. (Doolin, Amy) (Entered: 03/24/2026) |
| 03/24/2026 | ⊕ 116 | (E)Hearing Continued (RE: 105 Protective Order; Sanctions/Damages). hearing scheduled for 03/31/2026 at 01:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 03/24/2026) |
| 03/24/2026 | ⊕ 117 (3 pgs) | Temporary Restraining Order (RE: 72 Motion for Temporary Restraining Order). Signed on 3/24/2026 (Sullivan, Elizabeth) (Entered: 03/24/2026) |
| 03/31/2026 | ⊕ 118 | Hearing Continued (RE: 75 Motion for Temporary Restraining Order). Hearing scheduled for 3/31/2026 at 02:00 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Green, Josephine) (Entered: 03/31/2026) |
| 03/31/2026 | ⊕ 119 (1 pg) | Proposed Order - on status Hearing, Motions, and Initial Disclosures Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 1 Complaint, 92 Motion to Extend Time, 116 Hearing Motion Continued). (Cyrluk, Jonathan) (Entered: 03/31/2026) |
| 03/31/2026 | ⊕ 120 | (E)Hearing Continued (RE: 105 Protective Order; Sanctions/Damages). hearing scheduled for 04/14/2026 at 02:00 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 03/31/2026) |
| 03/31/2026 | ⊕ 121 | (E)Hearing Continued (RE: 75 Temporary Restraining Order; Preliminary Injunction). hearing scheduled for 05/07/2026 at 10:00 AM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 03/31/2026) |
| 03/31/2026 | ⊕ 122 (33 pgs) | Answer to Complaint and Jury Demand Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Carlson, Kurt) (Entered: 03/31/2026) |
| 03/31/2026 | ⊕ 123 (1 pg) | Appearance Filed by Lina Toma on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (Toma, Lina) (Entered: 03/31/2026) |

| | | |
|---|---|---|
| 04/06/2026 | 🌐124<br>(1 pg) | Proposed Order - on Status Hearing and on Motions Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 85 Motion to Expedite (Other than Hearing), Motion to Extend Time, 92 Motion to Extend Time, 102 Motion for Protective Order, 105 Motion for Protective Order, Motion for Sanctions/Damages). (Cyrluk, Jonathan) (Entered: 04/06/2026) |
| 04/06/2026 | 🌐125<br>(1 pg) | Proposed Order - Extending TRO Agreement and Setting Preliminary Injunction Hearing Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 85 Motion to Expedite (Other than Hearing), Motion to Extend Time, 117 Temporary Restraining Order). (Cyrluk, Jonathan) (Entered: 04/06/2026) |
| 04/06/2026 | 🌐126<br>(6 pgs) | Notice of Appeal to District Court. Filed by Kurt M. Carlson on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. Fee Amount $298 (RE: 117 Temporary Restraining Order). Appellant Designation due by 04/20/2026. Transmission of Record Due no later than 05/6/2026. (Carlson, Kurt) (Entered: 04/06/2026) |
| 04/06/2026 | 127 | Receipt of Notice of Appeal( 25-00168) [appeal,ntcapl] ( 298.00) Filing Fee. Receipt number A51039775. Fee Amount $ 298.00 (re:Doc# 126) (U.S. Treasury) (Entered: 04/06/2026) |
| 04/07/2026 | 🌐128<br>(2 pgs) | Certificate of Service (RE: 126 Notice of Appeal). (Bowles, Aaron) (Entered: 04/07/2026) |
| 04/07/2026 | doc<br>(2 pgs) | (private) Remark: letter to filer re: missing civil cover sheet (RE: 126 Notice of Appeal). (Bowles, Aaron) (Entered: 04/07/2026) |
| 04/07/2026 | 🌐129 | Transmittal of Notice of Appeal to District Court (RE: 126 Notice of Appeal). (Bowles, Aaron) (Entered: 04/07/2026) |
| 04/07/2026 | 🌐130<br>(1 pg) | Notice of Docketing Notice of Appeal, to District Court. Case Number 26 cv 3821 Assigned to Judge: Sunil R. Harjani (RE: 126 Notice of Appeal). (Bowles, Aaron) (Entered: 04/07/2026) |
| 04/09/2026 | 🌐131<br>(275 pgs; 6 docs) | Notice of Motion and Motion to Alter or Amend Judgment/Order (related document(s): 117 Temporary Restraining Order) Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan. Hearing scheduled for 4/14/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Exhibit A - Commercial Sales Contract # 2 Exhibit B - Recorded Mortgage # 3 Exhibit C - Mortgage Payments between March 2025 and February 2026 # 4 Exhibit D - Motion for TRO and Preliminary Injunction [ECF 75] # 5 Proposed Order) (Luzadder, Matthew) (Entered: 04/09/2026) |
| 04/10/2026 | 🌐132<br>(2 pgs) | Proof of Service Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan (RE: 131 Motion to Alter or Amend Judgment or Order/New Trial( Rule 9023)). (Luzadder, |

| | | Matthew) (Entered: 04/10/2026) |
|---|---|---|
| 04/13/2026 | 🌐 133 (1 pg) | Order By District Court Judge Sunil R. Harjani, Re: Appeal on Civil Action Number: 1:26-cv-02616, Dated 04/09/2026. In-person motion hearing held. For the reasons stated on the record, Motion to Withdraw Reference [1, 5] are denied without prejudice, and Defendant Badr Ali's Motion to Consolidate Cases 18 is stricken as moot. Civil case terminated. Signed on 4/13/2026 (Cornejo, Roberto). Related document(s) 96 Motion for Withdrawal of Reference. Fee Amount $199 filed by Defendant Badr Ali. Modified on 4/14/2026 Creating relationship to document #96; Removing relationship to document #126(CZ). (Entered: 04/13/2026) |
| 04/13/2026 | 🌐 134 (2 pgs; 2 docs) | Order By District Court Judge Sunil R. Harjani, Re: Appeal on Civil Action Number: 1:26-cv-03086, Dated 04/09/2026. MINUTE entry before the Honorable Sunil R. Harjani: In-person motion hearing held. For the reasons stated on the record, Defendants' Amended Motion to Withdraw Reference 5 is denied without prejudice, and Emergency Motion to Expedite Emergency Hearing on Amended Motion to Withdraw the Reference and for Stay of Bankruptcy Proceedings 12 is granted as to the expedited hearing and denied as moot concerning the stay. Mailed notice (lxs, ). Signed on 4/13/2026 (Attachments: # 1 Accompanying Order) (Cornejo, Roberto). Related document(s) 109 Motion for Withdrawal of Reference. Fee Amount $199 filed by Defendant Nasr Ali, Defendant Petroleum Investment Properties, LLC, Defendant Calumet Fuel, Inc.. Modified on 4/14/2026 Creating relationship to document #109; Removing relationship to document #126(CZ). (Entered: 04/13/2026) |
| 04/14/2026 | 🌐 135 | CORRECTIVE ENTRY: Creating relationship to document #96; Removing relationship to document #126 (RE: 133 Order District Court re: Appeal). (Mendoza, Catherine) (Entered: 04/14/2026) |
| 04/14/2026 | 🌐 136 | CORRECTIVE ENTRY: Creating relationship to document #109; Removing relationship to document #126 (RE: 134 Order District Court re: Appeal). (Mendoza, Catherine) (Entered: 04/14/2026) |
| 04/14/2026 | 🌐 137 | (E)Hearing Continued (RE: 105 Protective Order; Sanctions/ Damages). hearing scheduled for 04/21/2026 at 02:30 PM at Appear in Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604, or Using Zoom - Judge Cox. (Green, Josephine) (Entered: 04/14/2026) |
| 04/16/2026 | 🌐 138 (1 pg) | Proposed Order - EXTENDING TRO BY AGREEMENT AND RE-SETTING PRELIMINARY INJUNCTION HEARING Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 117 Temporary Restraining Order, 132 Proof of Service). (Cyrluk, Jonathan) (Entered: 04/16/2026) |
| 04/16/2026 | 🌐 139 (1 pg) | Proposed Order - STATUS HEARING AND ON MOTIONS Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 85 Motion to Expedite (Other than Hearing), Motion to Extend Time). (Cyrluk, Jonathan) (Entered: |

| | | |
|---|---|---|
| | | 04/16/2026) |
| 04/16/2026 | 🌐140<br>(2 pgs) | Order on Status Hearing Granting Motion Expedite (Related Doc # 85), Granting Motion to Extend Time (Related Doc # 85), Denying in Part, Continuing Motion to Extend Time (Related Doc # 92). Answer due by: 5/21/2026. Rule 7026 due by 4/29/2026. Status hearing to be held on 5/12/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 4/16/2026. (Rodarte, Aida) (Entered: 04/16/2026) |
| 04/16/2026 | 🔒🌐141<br>(19 pgs) | Transcript regarding Hearing Held 03/31/26. Remote electronic access to the excerpt/transcript is restricted until 07/15/2026. The excerpt/ transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter D & E Reporting, Telephone number 312-986-1920. (RE: related document(s) 118 Hearing Motion Continued). Notice of Intent to Request Redaction Deadline Due By 4/30/2026. Redaction Request Due By 05/7/2026. Redacted Transcript Submission Due By 05/18/2026. Transcript access will be restricted through 07/15/2026. (Doolin, Amy) (Entered: 04/16/2026) |
| 04/16/2026 | 🔒🌐142<br>(25 pgs) | Transcript regarding Hearing Held 03/24/26. Remote electronic access to the excerpt/transcript is restricted until 07/15/2026. The excerpt/ transcript may be viewed at the Bankruptcy Court Clerk's Office. For additional information, contact the Court Reporter D & E Reporting, Telephone number 312-986-1920. (RE: related document(s) 115 Transcript). Notice of Intent to Request Redaction Deadline Due By 4/30/2026. Redaction Request Due By 05/7/2026. Redacted Transcript Submission Due By 05/18/2026. Transcript access will be restricted through 07/15/2026. (Doolin, Amy) (Entered: 04/16/2026) |
| 04/16/2026 | 🌐143<br>(1 pg) | Order Setting Status on Mediation Issue (RE: 1 Complaint). Status hearing to be held on 4/21/2026 at 02:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 4/16/2026 (Armstead, Cynthia) (Entered: 04/16/2026) |
| 04/16/2026 | 🌐144<br>(2 pgs) | Order Extending TRO by Agreement and Re-Setting Preliminary Injunction Hearing (RE: 117 Temporary Restraining Order, 132 Proof of Service). Hearing continued on 5/20/2026 at 10:00AM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 4/16/2026 (Armstead, Cynthia) (Entered: 04/16/2026) |
| 04/16/2026 | | (private) Reopen Document (RE: 85 Motion to Expedite (Other than Hearing), Motion to Extend Time). (Green, Ron) (Entered: 04/16/2026) |
| 04/16/2026 | 🌐145<br>(2 pgs) | Order On Status Hearing and on Notions (RE: 74 Notice of Motion, 85 Motion to Expedite (Other than Hearing), Motion to Extend Time). Hearing continued on 4/21/2026 at 02:30PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. Signed on 4/16/2026 (Armstead, Cynthia) (Entered: 04/16/2026) |

| 04/21/2026 | 🔘146<br>(1 pg) | Follow Up Letter to Bankruptcy Judge and Parties (RE: 126 Notice of Appeal). (Sims, Lakeysha) (Entered: 04/21/2026) |
| --- | --- | --- |
| 04/21/2026 | 🔘147<br>(19 pgs; 2 docs) | Proposed Order - Granting Motion for Protective Order Filed by Matthew Luzadder on behalf of Calumet Park Mobil, LLC, Ahmad Zahdan (RE: 105 Motion for Protective Order, Motion for Sanctions/Damages). (Attachments: # 1 Confidentiality Order) (Luzadder, Matthew) (Entered: 04/21/2026) |
| 04/21/2026 | 🔘148<br>(34 pgs; 2 docs) | Proposed Order - Confidentiality Order Filed by Mona Naser on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (RE: 105 Motion for Protective Order, Motion for Sanctions/Damages). (Attachments: # 1 Proposed Confidentiality Order (Redlines)) (Naser, Mona) (Entered: 04/21/2026) |
| 04/21/2026 | 🔘149<br>(14 pgs) | Proposed Order - Confidentiality Order Filed by Jonathan M. Cyrluk on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 105 Motion for Protective Order, Motion for Sanctions/Damages). (Cyrluk, Jonathan) (Entered: 04/21/2026) |
| 04/21/2026 | 🔘150<br>(34 pgs; 2 docs) | Proposed Order - Amended Confidentiality Order Filed by Mona Naser on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC (RE: 105 Motion for Protective Order, Motion for Sanctions/Damages). (Attachments: # 1 Amended Confidentiality Order (Redlined)) (Naser, Mona) (Entered: 04/21/2026) |
| 04/21/2026 | 🔘151<br>(5 pgs) | Appellant Designation of Contents for Inclusion in Record and Statement of Issue On Appeal Filed by Mona Naser on behalf of Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC. (RE: 126 Notice of Appeal). Appellee designation due by 05/5/2026. (Naser, Mona) (Entered: 04/21/2026) |
| 04/22/2026 | 🔘152<br>(14 pgs) | Proposed Order - Confidentiality Order Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 105 Motion for Protective Order, Motion for Sanctions/Damages). (Moeller, Steve) (Entered: 04/22/2026) |
| 04/30/2026 | 🔘153 | Hearing Scheduled for 05/07/2026 is Stricken (RE: 75 Motion for Temporary Restraining Order). (Green, Josephine) (Entered: 04/30/2026) |
| 04/30/2026 | 🔘154<br>(288 pgs; 3 docs) | Notice of Motion and Motion to Compel Badr Ali, Nasr Ali, Calumet Fuel, Inc., Petroleum Investment Properties, LLC, and Calumet Park Mobil, LLC to Respond to Discovery Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. Hearing scheduled for 5/12/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Moeller, Steve) (Entered: 04/30/2026) |

| | | |
|---|---|---|
| 04/30/2026 | 🌐155<br>(1 pg) | Proposed Order - Order on Motion to Compel Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 154 Motion to Compel). (Moeller, Steve) (Entered: 04/30/2026) |
| 04/30/2026 | 🌐156<br>(16 pgs; 3 docs) | Notice of Motion and Motion for Rule to Show Cause Petition for Rule to Show Cause Against Nasr Ali, Calumet Fuel, Inc., and Petroleum Investment Properties, LLC Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate. Hearing scheduled for 5/12/2026 at 01:30 PM at Appear In Courtroom 680, 219 S. Dearborn St, Chicago, IL 60604 or Using Zoom- Judge Cox. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2) (Moeller, Steve) (Entered: 04/30/2026) |
| 04/30/2026 | 🌐157<br>(1 pg) | Proposed Order - Order on Petition for Rule to Show Cause Filed by Steve C Moeller on behalf of Gus Paloian, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of Debtor Mubarak Ibrahims Estate (RE: 156 Motion for Rule to Show Cause). (Moeller, Steve) (Entered: 04/30/2026) |
| 05/01/2026 | 🌐158<br>(14 pgs) | Order Granting Motion For Protective Order (Related Doc # 105). Signed on 5/1/2026. (Mendoza, Laura) (Entered: 05/01/2026) |
| 05/01/2026 | 🌐159<br>(14 pgs) | Order Granting Motion For Protective Order (Related Doc # 105). Signed on 5/1/2026. (Armstead, Cynthia) (Entered: 05/01/2026) |
| 05/05/2026 | 🌐160<br>(33 pgs) | Answer to Complaint and Jury Demand Filed by Stephen Scallan on behalf of Badr Ali. (Scallan, Stephen) (Entered: 05/05/2026) |

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>          Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IB-RAHIM,<br><br>          Plaintiff,<br><br>      v.<br><br>SAWSAN HOMSI, BADR ALI, PETRO-LEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CAL-UMET PARK MOBIL, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>          Defendants. | Adv. No. _____<br><br>Hon. Jacqueline P. Cox |

## COMPLAINT

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), states as follows for his complaint against Sawsan Homsi ("Homsi"), Badr Ali ("Badr Ali"),[1] Petroleum Investment Properties, LLC ("PIP"), Calumet Fuel, Inc. ("Calumet Fuel"), Nasr Ali ("Nasr Ali"), Calumet Park Mobil, LLC ("Calumet Mobil"), Ahmad Zahdan ("Zahdan"), AJ 119th, Inc. ("AJ 119th"), and Ajomon Joy ("Joy").

---

[1] Plaintiff means no disrespect to Defendants Badr Ali and Nasr Ali by using their first names. Plaintiff does so merely to distinguish between the two defendants.

## I.     Introduction

1.      The Debtor owned a gas station and connected retail space located on the real property at 11900 Marshfield Avenue in Calumet Park, Illinois (the "Property").

2.      By 2016, however, it was apparent to the Debtor that he faced significant liabilities in connection with a loan made to the Debtor by Theodore Spyropoulos ("Spyropoulos"). Spyropoulos had died in 2014, but his trust (the "Trust"), which had acquired the promissory note related to the loan, was pressing its claim.

3.      In response to the Trust's collection efforts, the Debtor split ownership and control over the gas station between two entities. In December 2016, the Debtor formed 11900 Marshfield Station Inc. (the "OpCo"), to conduct the business at that location. This complaint will refer to all operations generating revenue at the Property as the "Business." At formation, the Debtor owned 100% of the OpCo. Separately, in December 2016, the Debtor formed the 11900 Marshfield LLC (the "PropCo") to take title to the Property. The OpCo and the PropCo were alter egos of the Debtor.

4.      In 2017, the Spyropoulos Trust filed a suit on the promissory note in state court.

5.      In April 2019, the Illinois Gaming Board issued Video Gaming Establishment License 181002758 (the "Gaming License") to the OpCo. This license entitles the gas station to conduct gambling operations and now produces $400,000-$500,000 in *profit* annually (apart from other business revenues generated at the gas station). The Illinois Gaming Board views a gaming license as running with the associated property. The Business included revenues from activities conducted under the Gaming License.

6.      In November and December 2019, the note case went to trial. On December 4, 2019, the Spyropoulos Trust obtained a judgment against the Debtor for $11,082,995.50.

7. In anticipation of and in response to the judgment, the Debtor fraudulently transferred the OpCo's stock, the Business, and the Property to other Defendants. As a result, the Debtor transferred millions of dollars of assets in fraud of his creditors. The recipients of these transfers, in turn, fraudulently transferred the assets to still other Defendants. The Trustee seeks, in the alternative, to have these assets declared to be assets of the Estate or to avoid these transfers and subsequent transfers or recover the value of the assets (believed to more than $5 million). The chain of transfers for the OpCo, the Business, and the Property are described herein.

## II. Parties and other relevant persons and entities

8. The Debtor is a resident of the Northern District of Illinois. He filed the chapter 7 case identified in the caption on May 28, 2023.

9. The OpCo is an Illinois corporation. It was dissolved but has been reinstated. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. Its registered agent is John Mraibe, 14497 John Humphrey Drive, Suite 200, Orland Park, Illinois, 60462-2632.

10. The PropCo is an Illinois LLC. It was involuntarily dissolved on June 14, 2024. Its principal place of business was 11900 Marshfield Avenue, Calumet Park, Illinois. Its registered agent at dissolution was the Debtor.

11. Defendant Homsi is the Debtor's wife and a resident of the Northern District of Illinois.

12. Defendant Badr Ali is a resident of the Northern District of Illinois.

13. Defendant PIP is an Illinois LLC. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Nasr Ali, who is PIP's registered agent.

14. Defendant Calumet Fuel is an Illinois corporation. Its principal place of business is

3

11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Nasr Ali, who is Calumet Fuel's registered agent.

15. Defendant Nasr Ali is a resident of the Northern District of Illinois. He has been involved in multiple businesses owned, operated, or controlled by the Debtor.

16. "Syed" is Iftekhar Syed, a confederate and longtime employee of the Debtor and his companies.

17. Defendant Calumet Mobil is a Nevada corporation, whose principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Zadan.

18. Defendant Zahdan is a resident of the Northern District of Illinois. On information and belief, he owns Defendant Calumet Mobil.

19. Defendant AJ 119th is a tenant of Defendant Calumet Mobil. It now conducts the business operations at the Property. It has applied for a gaming license.

20. Defendant Joy, on information and belief, is the owner of Defendant AJ 119th.

21. The Spyropoulos Trust is the Debtor's largest creditor.

22. Spyropoulos is the settlor of the Spyropoulos Trust.

### III. Jurisdiction and venue

23. The Court has subject-matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is being heard by the Court pursuant to 28 U.S.C. § 157(a) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

24. This is a core proceeding under 28 U.S.C. § 157(b)(2).

25. If proceedings to avoid and recover fraudulent transfers are found to be core proceedings in which the Bankruptcy Court is unable to constitutionally enter final orders due to the holding in *Stern v Marshall*, 564 U.S. 462 (2011), this matter may be heard by the Bankruptcy

4

Court under 28 U.S.C. § 157(c). *See Exec. Benefits Ins. Agency, Inc. v. Arkinson*, 573 U.S. 25 (2014).

26.     The Trustee consents to the entry of a final order by this Court.

27.     Pursuant to 28 U.S.C. §§ 1408 & 1409, this district is the proper venue for this adversary proceeding. The events from which this case arises occurred in the Northern District of Illinois.

### IV.     Facts applicable to all counts

#### A.  Spyropoulos loaned the Debtor millions, which the Debtor failed to repay.

28.     On January 15, 2010, Spyropoulos loaned the debtor $5,170,299, evidenced by a demand note with 8% annual interest. The note required payment within 30 days of demand on pain of default. The note had a default rate of 10%.

29.     In September 2014, Spyropoulos died.

30.     In or about November 2014, the Spyropoulos Trust demanded performance on the note.

31.     The Debtor defaulted and did not pay within 30 days of demand.

32.     Later, the Spyropoulos Trust continued to demand payment and sought to collect on the note.

#### B.     The Debtor owned a gas station operated on the Property and conveyed the Business and the Property to two alter ego entities, the OpCo and the PropCo.

33.     As of 2016, the Property was owned by an entity called AHM Properties, Inc., which the Trustee believes was owned and controlled by the Debtor and/or was the Debtor's alter ego.

34.     The Trustee also believes the gas station operating at the Property as of 2016 was owned or controlled by the Debtor and managed by Syed.

35. The Debtor, however, had ultimate management and control of the gas station.

36. In December 2016, the Debtor split ownership of the Property and the Business into two separate entities.

37. On or about December 14, 2016, the Debtor formed the OpCo as an Illinois corporation to operate the gas station located at the Property. The OpCo is the entity that would come to own the Gaming License.

38. At formation, the Debtor owned 100% of the shares of the OpCo.

39. After the establishment of the OpCo, the gas station was controlled and managed by Debtor, with the day-to-assistance of Syed, the Debtor's longtime agent and employee.

40. Also on December 14, 2016, the same day the Debtor formed the OpCo, the Debtor formed the PropCo as an Illinois LLC.

41. At formation, the Debtor owned 15%, Hussein Munasser owned 17.5%, Nabil Hussein owned 17.5%, Defendant Nasr Ali owned 35%, and Ali Musa owned 15% of the PropCo.

42. On information and belief, the individuals identified in the preceding paragraph were confederates of the Debtor and did not provide any consideration to the Debtor or AHM Properties, Inc. for their interest in the PropCo.

43. Other than the Debtor, the individuals identified in paragraph 41 did not exercise genuine control over the PropCo.

44. On December 23, 2016, AHM Properties, Inc. conveyed the Property to the PropCo.

45. Several facts regarding the OpCo and the PropCo indicate that the Debtor did not intend these entities to exercise genuine control or authority over the Business or the Property and that both were alter egos of the Debtor from inception:

6

a. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced documents showing that the OpCo was capitalized at formation.

b. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced documents showing that assets were transferred to the OpCo at its formation, either formally via an asset sale agreement or otherwise.

c. The gas station continued to operate without change. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced any documents to show, for example, that supply contracts, business licenses, and the like were amended or updated to reflect that the OpCo now owned the gas station business and would assume the liabilities of any prior operators.

d. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the has not been able to substantiate that $2,500,000 was paid to AHM Properties, Inc. by the purported owners of the PropCo.

e. Neither the OpCo nor the PropCo kept even minimal corporate records and neither respected the corporate form.

f. The Debtor continued to control and manage the gas station as the Property as his personal property, through his longtime employee Syed.

**C.      The Spyropoulos Trust filed suit to enforce the note.**

46.     On March 28, 2017, the Spyropoulos Trust filed suit against the debtor in the Circuit Court of Cook County, seeking to collect on the note.

**D.      Soon after the court in the note action denied summary judgment, the OpCo obtained the Gaming License.**

47.     In March 2019, the Debtor explored the possibility of refinancing the Property.

48.     On March 22, 2019, the court in the note action filed by the Spyropoulos Trust denied summary judgment, making it likely that the case would go to trial.

49.     On April 18, 2019, the Illinois Gaming Board issued the Gaming License to the OpCo.

50.     The OpCo hired a third-party vendor, Accel Entertainment Gaming, LLC ("Accel"), to provide video poker machines and collect revenue.

51.     Accel operated machines, gathered funds, and gave the OpCo its share of video poker profits.

52.     After entering the relationship with Accel, the OpCo began conducting video poker operations on the Property.

53.     The OpCo immediately began realizing substantial profits from gaming operations, which generally increased from year to year.

54.     The OpCo's video poker operations now generate approximately $400,000-$500,000 in profits annually.

55.     The Illinois Gaming Board regards video poker licenses as running with the retail establishment. That is, when an establishment with a video poker license is sold to a new owner, the Illinois Gaming Board regularly reissues the license in the name of the new owner, provided that the new owner is not disqualified from holding a license.

   **E.     Around the same time that the Spyropoulos Trust won a substantial judgment against the Debtor, the Debtor—through his alter egos—began a series of transactions designed to maintain control of the gas station and the Property while hindering, delaying, and defrauding creditors by making it appear that others owned the business and the Property.**

   **1.     The Trust won a judgment.**

56.     In November and December 2019, the note case went to trial.

57.     On December 4, 2019, the Spyropoulos Trust obtained a judgment against the Debtor in the amount of $11,082,995.50.

   **2.     The transfers of the OpCo and the Business**

   **a.     The Debtor purportedly transferred his shares in the OpCo to Defendant Homsi.**

58.     Around November 2019, the Debtor purportedly transferred 100% of the shares of the OpCo to his wife, Defendant Homsi.

8

59.  There was no written agreement, board action, share certificates, or shareholder vote under which the shares were transferred from the Debtor to Defendant Homsi.

60.  As far as the Trustee has been able to discover, the only document reflecting the Debtor-to-Homsi transaction is an unsigned K-1 that was to be attached to the OpCo's 2019 tax return.

61.  Defendant Homsi did not pay any consideration for the shares of the OpCo.

62.  The license paperwork for the Gaming License (which discloses the name of the owner of the licensee) was not changed after the entirety of the stock in the OpCo was purportedly conveyed to Defendant Homsi.

63.  Defendant Homsi did not play any role in the operation or management of the OpCo after the purported transfer.

64.  The gas station continued to operate without change. The Debtor continued to manage the gas station through his longtime employee, Syed.

65.  On December 20, 2019, the OpCo signed a 10-year lease with the PropCo.

66.  Pursuant to the lease, the OpCo agreed to the pay the PropCo monthly rent of $17,500.00, plus additional monthly rent in an "amount which is the equivalent of the monthly revenue of the Lessee for the ATM commissions and Video Gaming." The base rent was to increase by $500.00 each year after that.

### b. Homsi purportedly transferred her interest in the OpCo to Defendant Badr Ali.

67.  At trial in Adversary No. 23-393 (discussed below), Syed testified that around January 2020, Defendant Badr Ali walked into the gas station without prior contact and told Syed that he wanted to buy the Business.

68.  Defendant Badr Ali did not have experience in the gas station business.

9

69.     Defendant Badr Ali did not request any documents about the gas station, the OpCo, its arrangement with the PropCo or the Debtor.

70.     Defendant Badr Ali did not conduct any diligence.

71.     In or about late 2019 or early 2020, Defendant Homsi purportedly transferred 85% of the shares of the OpCo to Defendant Badr Ali for $60,000, to be paid not as cash but over the next two years as wage payments from the OpCo.

72.     Defendant Badr Ali did not immediately pay any cash consideration for the shares of the OpCo.

73.     There was no written agreement, board action, share certificates, or shareholder vote under which shares were transferred from Defendant Homsi to Defendant Badr Ali.

74.     The supposed transaction was completely oral.

75.     In response to numerous Rule 2004 subpoenas issued by the Trustee, the only document produced that reflects the Homsi-to-Badr Ali transaction is the K-1 attached to the OpCo's 2020 tax return.

76.     Defendant Badr Ali did not control the operation or management of the OpCo after the purported transfer.

77.     It appears that the Business continued to operate without change. The Debtor continued to manage the Business through his longtime employee, Syed.

78.     The licensee paperwork (which discloses the owner of the licensee) with the Illinois Gaming Board was not changed to Defendant Badr Ali after the purported transfer of 85% of the shares of the OpCo to Defendant Badr. Instead, the licensee paperwork continued to show the Debtor as the owner of the licensee.

79.     On May 26, 2020, the OpCo signed a new lease with the PropCo.

80.     The new lease purported to change the base rent to $12,500 for June 2020, $15,000 for July 2020, $17,500 from August 1, 2020 to May 31, 2022, and $18,000 from June 1, 2022 to May 31, 2023. Each subsequent year rent rises by $500. The additional rent obligation is equal to the amount of the income derived from the gaming license was deleted.

81.     The lease was signed by Defendant Homsi, Walid Ali, and Ammar Alesayi. It was not signed by Defendant Badr Ali, even though there is a signature line for him.

82.     The second lease was never performed.

83.     The parties acted as if it had not been signed and instead continued under the first lease.

### c.     Ownership of the OpCo is transferred in December 2021.

84.     On December 3, 2021, the OpCo executed an agreement to sell 100% of its shares to Defendant Calumet Fuel—an entity controlled by Defendant Nasr Ali—for a purported price of $400,000 (or less than the annual profit generated by gaming operations).

85.     $400,000 was not a reasonable value for the OpCo or the Business.

86.     Defendant Nasr Ali signed as president of Defendant Calumet Fuel, and Defendant Badr Ali signed as president of the OpCo and Defendant Homsi as its secretary.

87.     Under the sale agreement, Defendant Calumet Fuel supposedly obtained the gas station's inventory and the Gaming License.

88.     Defendant Nasr Ali's testimony in the trial of Adversary No. 23-393 indicates that the Debtor and Defendant Nasr Ali regarded the Gaming License as transferable property.

89.     In May 2023, the Debtor filed this chapter 7 case.

### d.     In February 2025, Calumet Fuel apparently transferred the business operations to Defendant AJ 119th.

90.     On information and belief, on or about February 15, 2024, Defendant Calumet Fuel

transferred the operations of the Business to Defendant AJ 119th, which has occupied the Property under a lease with Defendant Calumet Mobil (which, as described below purportedly acquired the Property) and began conducting the gaming operations.

91. On March 21, 2025, Defendant AJ 119th applied for a gaming license for the Property.

92. To conceal the transfer, Calumet Fuel's purported owner, Nasr Ali, falsely testified on March 26, 2025 at the trial in Adversary No. 23-393 that Calumet Fuel continued to operate the Business and receive the revenues from the gaming license:

```
    Q    And since 20- -- January of 2022, has your
company continued to operate the gas station, operate
the gaming machines, and receive the revenues that
are generated from the State of Illinois from
operating the gaming machines, correct?
    A    Correct.
```

### 3. The transfers of the Property.

93. In 2019, the Debtor acquired the aggregate 50% of the PropCo that was owned by Munasser, Hussein, Musa, and all but 5% of Defendant Nasr Ali's 35% interest in the PropCo. As a result, at the end of 2019, the Debtor owned 95% of the PropCo and Defendant Nasr Ali owned 5% of the PropCo.

94. Neither the Debtor nor any Rule 2004 subpoena respondent has produced a written agreement documenting this transaction or evidence of consideration paid to Munasser, Hussein, Musa and Defendant Nasr Ali for these interests.

95. As far as the Trustee is aware, the only documentation of the transfers is the K-1 attached to the PropCo's 2019 tax return.

12

a. **In 2022, the Debtor caused the PropCo to transfer the Property to PIP.**

96. In late 2021, the Debtor decided to sell the Property to an entity controlled by Defendant Nasr Ali.

97. The contemplated transaction was to be partially funded by a mortgage loan from Ameris Bank.

98. On October 5, 2021, in connection with the planned sale, Ameris Bank obtained an appraiser, who appraisal valuing the Property alone at $9,600,000.

99. Based on the Gaming License alone, however, the value of the Property is significantly higher than $9,600,000.

100. On or about May 2, 2021, the PropCo agreed to sell the Property to Defendant PIP for $5.5 million.

101. On January 27, 2022, Defendant Calumet Fuel and the PropCo executed an addendum to the sale agreement for the Property.

102. The addendum stated that out of $5.5 million sales price, $400,000 would be apportioned to the gas station Business and the rest to the PropCo.

103. The Debtor signed the addendum, even though he supposedly had given away the Business at that point.

104. On January 31, 2022, at the same time as the sale of the shares of the OpCo, the PropCo sold the Property to Defendant PIP for $5,500,000, or $4,100,000 less than its appraised value.

105. $400,000 of the proceeds of the sale were purportedly diverted to the OpCo under the sale agreement with Defendant Calumet Fuel.

106. Not only were the transactions interrelated because of the addendum, Defendant

13

Nasr Ali admitted in testimony in the trial in Adversary No. 23-393 that he regarded the two transactions as a singular transaction.

107. To conceal the fraudulent transfer of the Property and Business from the Trustee, on June 9, 2023, the Debtor's counsel sent a letter to the Trustee trying to explain that certain transactions were not fraudulent, including the transfer of the OpCo's stock to Defendant Calumet Fuel and the Property to PIP.

108. In the letter, the Debtor's counsel cited an appraisal from July 2019 in the amount of $5,535,000 of the Property, plus furniture, fixtures, and equipment, and failed to disclose that the Property had been appraised for $9,600,000 a few months before the January 2022 transactions.

**b.** **In February 2025, PIP subsequently transferred the Property to Calumet Mobil.**

109. In December 2023, the Spyropoulos Trust filed a petition seeking denial of discharge, which was filed as an adversary action in this case under Adversary No. 23-393. The gravamen of the Spyropoulos Trust's complaint was that the Debtor was attempting to fraudulently conceal assets—namely the Property and its associated business—from creditors to frustrate collection of the judgment in the note case.

110. On September 25, 2024, this Court entered an order in Adversary No. 23-393 directing the parties to provide final exhibit lists by March 3, 2025 and setting the final pretrial conference for March 12, 2025.

111. On February 14, 2025, as the Debtor and the Spyropoulos Trust were preparing for trial of Adversary No. 23-393, Defendant PIP purported to sell the Property to Defendant Calumet Mobil.

112. On February 14, 2025, Defendant PIP purported to transfer the Property to Defendant Calumet Mobil for $6,500,000.00 plus a $5,000,000.00 mortgage loan from Defendant Nasr

14

Ali (the owner of the seller in the transaction).

113. The purported sale occurred "as is" and Calumet Mobil has produced documents indicating no inspections of the Property were done before the purported transfer.

114. Defendant PIP did not receive reasonably equivalent value for the Property.

115. Defendant PIP was insolvent at the time of the transfer of the Property or rendered insolvent because of the transfer of the Property.

116. The Spyropoulos Trust filed its exhibit list in Adversary No. 23-393 on February 21, 2025.

117. The Court held the final pretrial conference in Adversary No. 23-393 on March 11, 2025.

118. PIP and Calumet Mobil waited until March 12, 2025 (the day after the final pretrial conference and only 14 days before the trial) to record the sale documents with the Cook County Recorder of Deeds.

119. On information and belief, the recording was delayed with the purpose of hindering, delaying, and defrauding the Debtor's creditors.

## COUNT I

### Declaratory Judgment
### (Against all Defendants)

120. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

121. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th were and are straw purchasers possessing mere naked title to the Business while the Debtor continues to exercise powers and responsibilities associated with the Business.

122. Defendants Nasr Ali, PIP, and Calumet Mobil were and are straw owners possessing mere naked title to the Property while the Debtor continues to exercise power and responsibilities associates with the Property.

123. Under Illinois law when a title holder holds title to property for the benefit of someone else, the title holder holds such property in a resulting trust.

124. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th operate the Business solely for the Debtor's benefit.

125. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th did not pay fair value for the Business.

126. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th advanced no or minimal funds for the Business in comparison to its value.

127. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th's intent was to hold legal title to the Business, while the Debtor continues to retain all equitable interests.

128. Defendants Nasr Ali, PIP, and Calumet Mobil hold the Property solely for the Debtor's benefit.

129. Defendants Nasr Ali, PIP, and Calumet Mobil did not pay fair value for the Property (or a share of ownership of the PropCo).

130. Defendants Nasr Ali, PIP, and Calumet Mobil's intent was and is to hold legal title to the Property, while the Debtor continues to retain all equitable interests.

131. On the Petition Date, the Debtor had equitable interests in the Business and the Property that allowed him to make decisions and receive distributions.

132. Under Section 541 of the Bankruptcy Code, the Business and the Property are property of the Estate.

WHEREFORE, the Trustee requests that the Court enter a judgment declaring that Defendants' interests in the Business and the Property always have been and are property of the Estate under Section 541 of the Bankruptcy Code.

<div align="center">

**COUNT II**

**Avoidance of Actual Fraudulent Transfers Pursuant to
740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
(Against Homsi)**

</div>

133. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

134. In purportedly conveying shares in the OpCo to Homsi through AHM Properties, the Debtor acted with actual intent to hinder, delay, or defraud his creditors. This allegation is supported by the facts that:

    a. the transfer was to his wife (badge 1);

    b. the Debtor retained complete control of the gas station (badge 2);

    c. the transaction was not documented or, apparently, disclosed to the Illinois Gaming Board (badge 3);

    d. the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

    e. the gas station (and proceeds of the gas station) was the only asset the OpCo owned (badge 5);

    f. the Debtor was clearly aware of the danger of a veil-piercing action by his creditors because he transferred the OpCo to his wife so that it could be conveyed to third parties (badge 7);

    g. the Debtor obtained nothing for the transfer (badge 8); and

    h. the Debtor made the purported transfer around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

135. Therefore, any transfer of shares of the OpCo to Homsi was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C.

§ 544, and the Trustee may recover, for the benefit of the Estate, the amount of the transfers if they are avoided under 740 ILCS 160/5 and 11 U.S.C. § 544.

WHEREFORE, the Trustee requests that the Court avoid the transfer to Homsi and enter judgment in his favor for the value of the transfer against Homsi, plus interest and other amounts allowable.

### COUNT III

**Avoidance of Constructive Fraudulent Transfer Pursuant to**
**740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544**
**(Against Homsi)**

136.     The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

137.     Homsi did not provide the Debtor's alter ego,  AHM Properties, with reasonably equivalent (or any) value in exchange for shares of the OpCo.

138.     The Debtor was insolvent at the time of the transfer or became insolvent because of the transfer.

WHEREFORE, the Trustee requests that the Court avoid any transfer to Homsi and enter judgment in his favor for the value of the transfer against Homsi, plus interest and other amounts allowable.

### COUNT IV

**Avoidance of Actual Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(A)(1) and 11 U.S.C. § 544(b)**
**(Against Badr Ali)**

139.     The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

140.     At all relevant times, the OpCo was the alter ego of the Debtor, meaning that any conveyance of shares in the OpCo from Homsi to Badr Ali was the conveyance of property directly

18

from the Debtor.

141.    In the alternative, the transfer of shares in the OpCo from the Debtor to Homsi and from Homsi to Badr Ali did not happen—as a factual matter, under the Business Corporation Act, 802 ILCS 5/, and/or under the Statute of Frauds, 820 ILCS 5/2-201. In all cases, the Debtor remained the owner of 100% of shares in the OpCo.

142.    In all events, in purportedly conveying shares in the OpCo to Badr Ali, the Debtor and/or Homsi acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

> a.    the Debtor retained complete control of the gas station (badge 2);
>
> b.    the transaction was not documented or, apparently, disclosed to the Illinois Gaming Board (badge 3);
>
> c.    the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);
>
> d.    the gas station (and proceeds of the gas station) was the only asset the OpCo owned (badge 5);
>
> e.    the Debtor and Homsi were clearly aware of the danger of a veil-piercing action by his creditors because they transferred the OpCo to third parties (badge 7);
>
> f.    Homsi obtained almost nothing for the transfer in comparison to the value of the gaming license alone (badge 8);
>
> g.    the Debtor and, on information and belief, Homsi were insolvent at the time of the transaction (badge 9); and
>
> h.    the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

143.    Therefore, any transfer to Badr Ali was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

19

144. In the alternative, Badr Ali is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because he took the shares from the initial transferee (Homsi) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of shares to Badr Ali and enter judgment in his favor for the value of the transfer against Badr Ali, plus interest and other amounts allowable.

## COUNT V

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against Badr Ali)

145. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

146. Badr Ali did not provide the Debtor's alter ego with reasonably equivalent value in exchange for shares of the OpCo.

147. Both the Debtor and Homsi were insolvent at the time of the transfer or became insolvent because of the transfer.

148. Badr Ali is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because he took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer to Homsi and enter judgment in his favor for the value of the transfer against Badr Ali, plus interest and other amounts allowable.

20

## COUNT VI

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against Calumet Fuel)

149.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

150.    At all relevant times, the OpCo was the alter ego of the Debtor, meaning that any conveyances of shares in the OpCo from Homsi to Badr Ali and from Badr Ali to Calumet Fuel was the transfer of property directly from the Debtor.

151.    In the alternative, the transfers of shares in the OpCo from the Debtor to Homsi and from Homsi to Badr Ali did not happen—as a factual matter, under the Business Corporation Act, 802 ILCS 5/, and/or under the Statute of Frauds, 820 ILCS 5/2-201. In all cases, the Debtor remained the owner of 100% of shares in the OpCo until the transfer to Calumet Fuel.

152.    In all events, in purportedly conveying shares in the OpCo to Badr Ali, the Debtor and/or Homsi acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

a.    the Debtor retained complete control of the gas station (badge 2);

b.    the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

c.    the gas station business was the only asset owned by the OpCo (badge 5);

d.    the Debtor and Homsi and, on information and belief, Badr Ali were aware of the danger of a veil-piercing action by his creditors because they transferred the OpCo to third parties (badge 7);

e.    Badr Ali obtained very little for the transfer in comparison to the value of the gaming license alone (badge 8);

f.    the Debtor, Homsi, and, on information and belief, Badr Ali were insolvent at the time of the transaction (badge 9); and

21

       g.  the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

153.    Therefore, any transfer to Calumet Fuel was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

154.    In the alternative, Calumet Fuel is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the shares from an initial transferee (Badr Ali) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of shares to Calumet Fuel and enter judgment in his favor for the value of the transfer against Calumet Fuel, plus interest and other amounts allowable.

## COUNT VII

**Avoidance of Constructive Fraudulent Transfer Pursuant to  
740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544  
(Against Calumet Fuel)**

155.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

156.    Calumet Fuel did not provide the Debtor and/or Badr Ali with reasonably equivalent value in exchange for shares of the OpCo.

157.    Both the Debtor and, on information and belief, Badr Ali, were insolvent at the time of the transfer or became insolvent because of the transfer.

158.    Calumet Fuel is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took from the initial transferee with knowledge that the transaction was

fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of shares to Calumet Fuel and enter judgment in his favor for the value of the transfer against Calumet Fuel, plus interest and other amounts allowable.

<div align="center">

**COUNT VIII**

**Avoidance of Actual Fraudulent Transfers Pursuant to
740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
(Against AJ 119th)**

</div>

159. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

160. On information and belief, at all relevant times, Calumet Fuel was the nominee of the Debtor, meaning that any conveyances of the Business operated at the Property or possession of the Property to AJ 119th was the transfer of property directly from the Debtor.

161. In all events, in transferring the business to AJ 119th, the Debtor and/or Calumet Fuel acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

> h. the Debtor retained complete control of the gas station (badge 2);
>
> i. the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);
>
> j. the Business was the only asset owned by the Calumet Fuel (badge 5);
>
> k. the Debtor and, on information and belief, Calumet Fuel were aware of the danger of an action by the Debtor's creditors because they transferred the Business to a third party (badge 7);
>
> l. Calumet Fuel, which was operating under a lease, appears to have obtained nothing for the transfer (badge 8);
>
> m. the Debtor and, on information and belief, Calumet Fuel, were insolvent at the time of the transaction (badge 9); and

<div align="center">23</div>

n. the purported transfer occurred around the time that Adversary No. 23-393 was about to go to trial (badge 10).

162. Therefore, any transfer to AJ 119th was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

163. In the alternative, AJ 119th is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the shares from an initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

WHEREFORE, the Trustee requests that the Court avoid any transfer of the Business or possession of the Property to AJ 119th and enter judgment in his favor for the value of the transfer against AJ 119th, plus interest and other amounts allowable.

## COUNT IX

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against AJ 119th)

164. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

165. AJ 119th did not provide the Debtor and/or Calumet Fuel with reasonably equivalent value in exchange for the Business or possession of the Property.

166. Both the Debtor and, on information and belief, Calumet Fuel, were insolvent at the time of the transfer or became insolvent because of the transfer.

167. AJ 119th is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

24

WHEREFORE, the Trustee requests that the Court avoid any transfer of the Business or possession of the Property to AJ 119th and enter judgment in his favor for the value of the transfer against AJ 119th, plus interest and other amounts allowable.

## COUNT X

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against PIP)

168. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

169. At all relevant times, the PropCo was the alter ego of the Debtor, meaning that any conveyance of the Property from the PropCo to PIP was directly from the Debtor.

170. In all events, in conveying the Property to PIP, the PropCo acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

    a. the transfer was to an insider (PIP was owned by Nasr Ali, who was a part owner of the PropCo) (badge 1)

    b. the Debtor retained complete control of the gas station (badge 2);

    c. the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

    d. the Property was the only asset that the PropCo owned (badge 5);

    e. the Debtor and by extension the PropCo were clearly aware of the danger of a veil-piercing action by his creditors because they transferred the Property to a related third party (Nasr Ali's company) (badge 7);

    f. PIP paid millions less than fair value for the Property (badge 8);

    g. the PropCo was insolvent at the time of the transaction or became insolvent because of the transaction (badge 9); and

    h. the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

171. Therefore, any transfer to PIP was an avoidable transfer within the meaning of 740

ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

172. PIP is also liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (the PropCo) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid the transfer of the Property to PIP and enter judgment in his favor for the value of the transfer against PIP, plus interest and other amounts allowable.

## COUNT XI

### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against PIP)

173. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

174. PIP did not provide the PropCo with reasonably equivalent value in exchange for the Property.

175. The PropCo was insolvent at the time of the transfer or became insolvent because of the transfer.

176. PIP is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (the PropCo) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid any transfer to PIP and enter judgment in his favor for the value of the transfer, plus interest and other amounts allowable.

## COUNT XII

### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against Calumet Mobil)

177. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

178. At all relevant times, PIP was a nominee of the Debtor, meaning that any conveyance of the Property from PIP to Calumet Mobil was the transfer of property directly from the Debtor.

179. In all events, in conveying the Property to Calumet Mobil, PIP with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

    i. the Debtor retained complete control of the gas station (badge 2);

    j. the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

    k. on information and belief, the Property was the only substantial asset that PIP owned (badge 5);

    l. the Debtor and by extension PIP were clearly aware of the danger of an action by the Debtor's creditors because they transferred the Property to a third party (badge 7);

    m. Calumet Mobil paid millions less than fair value for the Property (badge 8);

    n. PIP was insolvent at the time of the transaction or became insolvent because of the transaction (badge 9); and

    o. the purported transfer occurred around the time that Adversary No. 23-393 went to trial, where Defendant Nasr Ali (PIP's owner) testified as a witness (badge 10).

180. Therefore, any transfer to Calumet Mobil was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

181. Calumet Mobil is also liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (PIP) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid the transfer of the Property to Calumet Mobil and enter judgment in his favor for the value of the transfer against PIP, plus interest and other amounts allowable.

## COUNT XIII

### Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against Calumet Mobil)

182. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

183. Calumet Mobil did not provide PIP with reasonably equivalent value in exchange for the Property.

184. PIP was insolvent at the time of the transfer or became insolvent because of the transfer.

185. Calumet Mobil is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (PIP) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

WHEREFORE, the Trustee requests that the Court avoid any transfer to Calumet Mobil and enter judgment in his favor for the value of the transfer, plus interest and other amounts allowable.

28

## COUNT XIV

### Aiding and Abetting Fraudulent Transfer
### (Against Homsi, Badr Ali, Nasr Ali, Joy, and Zahdan)

186.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

187.    Homsi, Badr Ali, Nasr Ali, Ahmad Zahdan, and Ajomon Joy knowingly aided and abetted the Debtor, Badr Ali, Calumet Fuel, and AJ 119th in fraudulently transferring shares of the OpCo and/or the Business or possession of the Property from the Debtor and/or Badr Ali to Calumet Fuel and/or AJ 119th.

188.    Nasr Ali and Ahmad Zahdan knowingly aided and abetted the Debtor, PIP, and Calumet Mobil in fraudulently transferring the Property to PIP and/or Calumet Mobil.

WHEREFORE, the Trustee requests that the Court enter judgment in his favor against Homsi, Badr Ali, Nasr Ali, Joy, and Zahdan in an amount to be proven at trial, plus interest and other amounts allowable.

Dated: May 23, 2025             GUS A. PALOIAN, not individually or personally, but solely in his capacity as the Chapter 7 Trustee of the Debtor's Estate

By:      */s/ Jonathan M. Cyrluk*
           Jonathan M. Cyrluk

*Counsel to Chapter 7 Trustee Gus A. Paloian*

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2105
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck*
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

*\*Admitted Pro hac vice*

30

**B1040 (FORM 1040) (12/24)**

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| | |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | |

| PARTY (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor      □ Other<br>□ Trustee | PARTY (Check One Box Only)<br>□ Debtor        □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor      □ Other<br>□ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(a) – Recovery of Money/Property**
□ 11-Recovery of money/property - §542 turnover of property
□ 12-Recovery of money/property - §547 preference
□ 13-Recovery of money/property - §548 fraudulent transfer
□ 14-Recovery of money/property - other

**FRBP 7001(b) – Validity, Priority or Extent of Lien**
□ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(c) – Approval of Sale of Property**
□ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(d) – Objection/Revocation of Discharge**
□ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(e) – Revocation of Confirmation**
□ 51-Revocation of confirmation

**FRBP 7001(f) – Dischargeability**
□ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
□ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
□ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(f) – Dischargeability (continued)**
□ 61-Dischargeability - §523(a)(5), domestic support
□ 68-Dischargeability - §523(a)(6), willful and malicious injury
□ 63-Dischargeability - §523(a)(8), student loan
□ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
□ 65-Dischargeability - other

**FRBP 7001(g) – Injunctive Relief**
□ 71-Injunctive relief – imposition of stay
□ 72-Injunctive relief – other

**FRBP 7001(h) Subordination of Claim or Interest**
□ 81-Subordination of claim or interest

**FRBP 7001(i) Declaratory Judgment**
□ 91-Declaratory judgment

**FRBP 7001(j) Determination of Removed Action**
□ 01-Determination of removed claim or cause

**Other**
□ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
□ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

B1040 (FORM 1040) (12/24)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR | BANKRUPTCY CASE NO. | |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| **RELATED ADVERSARY PROCEEDING (IF ANY)** | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>Debtor. | Chapter 7<br><br>Case No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>Plaintiff,<br><br>v.<br><br>SAWSAN HOMSI, BADR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CALUMET PARK MOBILE, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>Defendants. | Adv. Pro. No. 25-00168<br><br>Hon. Jacqueline P. Cox |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on **September 2, 2025** at **1:30 p.m.**, the undersigned will appear before the Honorable Jacqueline P. Cox, or any judge sitting in that judge's place, **either** in courtroom 680 of the Everett McKinley Dirksen United States Courthouse, 219 S. Dearborn Street, Chicago, Illinois, 60604, **or** electronically as described below, and present the attached **Motion to Dismiss Adversary Complaint**, a copy of which is hereby served upon you.

**All parties in interest, including the movant, may appear for presentment of the motion either in person or electronically using Zoom for Government.**

You may appear electronically by video or by telephone.

**To appear by video**, use this link: https://www.zoomgov.com/. Then enter the meeting ID and password.

**To appear by telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and password.

**Meeting ID and password.** The meeting ID for this hearing is 161 273 2896 and the

password is 778135. The meeting ID and password can also be found on the judge's page on the court's web site.

**If you object to the Motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without a hearing.

Dated: August 20, 2025.                              By: /s/ *Kurt M. Carlson*
                                                                Kurt M. Carlson

Kurt M. Carlson (ARDC No. 6236568)
Mona Naser (ARDC No. 6278114)
**CARLSON DASH, LLC**
216 S. Jefferson Street, Ste. 303
Chicago, Illinois 60661
Tel: 312-382-1600
kcarlson@carlsondash.com
mnaser@carlsondash.com

**IN THE UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br>MUBARAK H. IBRAHIM,<br><br>Debtor, | Chapter 7<br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br>Plaintiff,<br><br>v.<br><br>SAWSAN HOMSI, BADR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CALUMET PARK MOBILE, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>Defendants. | Adv. No. 25-00168<br><br>Hon. Jacqueline P. Cox |

**MOTION TO DISMISS ADVERSARY COMPLAINT**

Nasr Ali ("Nasr Ali"), Petroleum Investment Properties, LLC ("PIP"), Calumet Fuel, Inc. (individually as "Calumet Fuel" and collectively with Nasr Ali and PIP as the "Ali Defendants"), submit this motion to dismiss Count I, Count VI, Count VII, Count X, Count XI, and Count XIV Gus Paloian, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim ("Trustee") adversary complaint (the "Complaint") pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Bankr. P. 7012(b)(6), and Fed. R. Bankr. P. 7009 state as follows:

**INTRODUCTION**

1

This case is not about secret transfers or hidden assets. It is about arm's-length transactions, in which the parties on each side were represented by their own attorneys and the purchase price was supported by appraisals, where the Ali Defendants paid fair value amounting to many millions of dollars—in addition to the further assumption of substantial known and unknown liabilities for the Property and the Station, as defined below. Under 11 U.S.C. §§ 548(d)(2)(A) and 550(b)(1), assumption of debt is value, and subsequent transferees who act in good faith and without knowledge of avoidability are exempt from fraudulent transfer liability. The Trustee's complaint ignores these settled principles, misstates the consideration paid, and seeks to impose liability where the Bankruptcy Code squarely prohibits it. Because the allegations cannot be cured by amendment, Counts I, VI, VII, X, XI, and XIV should be dismissed with prejudice.

## I.      FACTUAL BACKGROUND

1.      On or around December 14, 2016, 11900 Marshfield, LLC, an Illinois limited liability company ("Marshfield LLC") was formed. The Members of Marshfield LLC were: Nasr Ali holding 35% of the units in Marshfield LLC, Hussein Munassar holding 17.5% of the units in Marshfield LLC, Ali Musa holding 15% of the units in Marshfield LLC, Nabil Hussain holding 17.5% of the units in Marshfield LLC, and Mubarak Ibrahim holding 15% of the units in Marshfield LLC. The Manager of Marshfield LLC was Nasr Ali.

2.      On or around December 23, 2016, Marshfield LLC purchased the real property located at 11900 Marshfield Ave, Calumet Park, Illinois, and all of fixtures located thereon (the "Property") from Standard Bank & Trust Co. as trustee u/t/a dated June 8, 2007 and known as trust number 11973 as the seller for the total purchase price of $4,500,000.00. A copy of the closing statements is attached as **Exhibit A**.

2

3. The Property was a multi-unit commercial center with various businesses operating at the Property including a service station, hair gallery, donut and coffee shop, insurance agency, and a cell phone store, to name a few. The businesses were all separately owned and operated as tenants of the Property.

4. The service station included a gas station, mini-mart, full-service car wash, oil-lube change, and auto repair and tire shop (the "Marshfield Station").

5. In or around 2018, Mubarak Ibrahim purchased all of the limited liability company units of Marshfield LLC from Hussein Munassar, Ali Musa, Nabil Hussain, and 30% of Nasr Ali's interest leaving the Membership interest with Mubarak Ali at 95% and Nasr Ali at 5%, which meant, Mubarak, who already held 15%, purchased an additional 80%. The parties to this transaction agreed to use the 2016 purchase price of $4,500,000.00 because the income of the Property was not performing as originally anticipated.

6. Also, in or around 2020, the full-service car wash was separated from the Marshfield Station with the intention that it would be taken over by Bubbles Splash Car Wash, Inc. (owned and operated by Nasr Ali) as a tenant pursuant to a lease agreement with Marshfield, LLC.

7. Bubbles Splash Car Wash, Inc. ("Bubbles Splash") commenced plans for a complete remodel of the hand car wash to an automated car wash. The remodel was partially financed by Bank of George in the amount of $1,032,000.00 – which loan was personally guaranteed by Nasr Ali. A copy of the Unconditional Guarantee is attached as **Exhibit B**.

8. Bubbles Splash, including the loan, spent over $1,500,000.00 for the development of the car wash and ultimately opened for business around April 2021.

9. While working on Bubbles Splash and recognizing the additional customer traffic the newly renovated car wash would bring, Nasr Ali, commenced negotiating the purchase of all of the interest in the Property and the Marshfield Station wherein PIP would own the Property and Calumet Fuel would own the Marshfield Station.

10. During the pre-contract due diligence, the Parties were privy to 3 different appraisals of the Property:

    a. that certain appraisal completed by Retail Petroleum dated June 13, 2018 estimating the value of the Property - including fueling facility with c-store, car wash (prior to the construction of the same), auto service, and various lease retail spaces and billboard – to be $4,370.000 (the "June 2018 Appraisal"). A copy of which is attached as **Exhibit C**,

    b. that certain appraisal of the same components as the June 2018 Appraisal completed by JLL on May 16, 2019 which indicated that value as of April 10, 2019 was $5,870,000.00 (the "May 2019 Appraisal"). A copy of which is attached as **Exhibit D**, and

    c. that certain appraisal completed by Cushman & Wakefield of the Property – including real estate and F, F, & E – as of July 25, 2019 at $5,535,000.00 (the "July 2019 Appraisal"). A copy of which is attached as **Exhibit E**,

11. In May 2021, Marshfield LLC agreed to sell and PIP agreed to purchase the Property for $5,500,000.00, consistent with valuations derived from all 3 of the prior appraisals. Marshfield LLC hired its own legal team and PIP hired its own legal team to complete the transaction.

12. In December 2021, Badr Ali and Sawsen Homsi agreed to sell all of the authorized and issued stock of 11900 Marshfield Station, Inc. an Illinois Corporation ("11900 Marshfield Inc"), which operated the Marshfield Station, to Calumet Fuel.[1] The purchase price for the shares of 11900 Marshfield Inc. was agreed upon at $400,000.00. In addition to that purchase price, Calumet Fuel assumed the pre-closing obligations of 11900 Marshfield Inc which included but was not limited to an SBA loan in the amount of $500,000—in addition to all other liabilities, known and unknown for a total purchase price of over $900,000.00. Again, the parties to this transaction were represented by separate counsel.

13. The closing for the purchase and sale of the Property and the purchase and sale of the Marshfield Station occurred on January 31, 2022 (the "Closing"). A copy of the settlement statement from the Closing is attached as **Exhibit F**.

14. On May 23, 2023, over a year after the Closing, Mubarak H. Ibrahim ("Debtor") filed a petition under Chapter 7 of the United States Bankruptcy Code known as Case No. 23-07031 (the "Bankruptcy Case").

15. The Trustee, in the Bankruptcy Case, issued various and numerous subpoenas for records including subpoenas issued to the Ali Defendants.

16. The Ali Defendants hired counsel and produced documents believed to be responsive and relevant to the requests made by the Trustee.

17. In December 2023, the Spyropoulos Trust, as a creditor in the Bankruptcy Case, filed a petition seeking denial of discharge as Adversary Case No. 23-393 (the "Spyropoulos Adversary").

---

[1] Originally the transaction was an asset sale purchase between 11900 Marshfield Station, Inc. to Calumet Fuel, however, the gaming license would have taken up to 6 months to transfer which would have required the Marshfield Station to cease operation of the gaming machines, so the parties revised the transaction to a sale of stock instead.

18.     The Spyropoulos Adversary was set for trial and Nasr Ali was called to testify at the trial.  During his testimony, Nasr Ali was asked a series of questions seemingly to determine whether or not any funds generated from the operation of the Marshfield Station, including the gaming license, were issued to Sawsen Homsi – to which Nasr Ali responded in the negative.

19.     On May 23, 2025, the Trustee filed this action alleging: Declaratory Judgment (Against all Defendants) (Count I); Avoidance of Actual Fraudulent Transfers Pursuant to 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544 (Against Homsi) (Count II); Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against Homsi) (Count III); Avoidance of Actual Fraudulent Transfers Pursuant to 740 ILCS 160/5(A)(1) and 11 U.S.C. §544 (Against Badr Ali) (Count IV); Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against Badr Ali) (Count V); Avoidance of Actual Fraudulent Transfers Pursuant to 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544 (Against Calumet Fuel) (Count VI); Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against Calumet Fuel) (Count VII); Avoidance of Actual Fraudulent Transfers Pursuant to 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544 (Against AJ 119th) (Count VIII); Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against AJ 119th) (Count IX); Avoidance of Actual Fraudulent Transfers Pursuant to 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544 (Against PIP) (Count X); Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against PIP) (Count XI); Avoidance of Actual Fraudulent Transfers Pursuant to 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544 (Against Calumet Mobil) (Count XII); Avoidance of Constructive Fraudulent Transfer Pursuant to 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544 (Against Calumet Mobil) (Count XIII); and Aiding and

Abetting Fraudulent Transfer (Against Homsi, Badr Ali, Nasr Ali, Joy, and Zahdan) (Count XIV) (collectively the "Adversary Complaint").

20.     The Ali Defendants bring this motion to dismiss Count I, Count VI, Count VII, Count X, Count XI, and Count XIV of the Adversary Complaint pursuant to Fed. R. Civ. P. 12(b)(6), Fed. R. Bankr. P. 7012(b)(6), and Fed. R. Bankr. P. 7009.

## II.     STANDARD OF REVIEW

A complaint will be dismissed under Rule 7012(b) [incorporating Rule 12(b)(6) of the Federal Rules of Civil Procedure] unless the complaint contains enough factual detail to give the defendant fair notice of the claim under Rule 8(a) with some facts supporting each element of the claim. *In re Albert Speisman*, 495 B.R. 398, 401 (Bkrtcy. N.D.Ill. 2013). In addition, the complaint must state a plausible claim with the Plaintiff allegations rising above a mere speculative level. *Id*.

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, courts must determine whether the plaintiff provided "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The complaint must include "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Id.* at 545. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Twombly*, 550 U.S. at 555).  The alleged facts must do more than merely create a suspicion of a legally cognizable right of action; they must nudge the claim across the line from conceivable to plausible. *Id.* at 555, 570.

## III.     ARGUMENT

Despite the Trustee's 30-page, 119 paragraph Adversary Complaint, the Adversary Complaint fails to state a claim against the Ali Defendants for the reasons that follow.  The crux

of the allegations in the Adversary Complaint against the Ali Defendants seem to rest on the following points: (a) the Ali Defendants did not pay fair value for the Property and the Station, and (b) the Ali Defendants held the Property and the Station for the benefit of Debtor. However, the road to get to these arguments is unpassable.

### A. COUNT I – The Trustee fails to present sufficient evidence to state a claim for Declaratory Judgment against the Ali Defendants

A complaint for a declaratory judgment must allege facts sufficient to establish an actual controversy that is definite and concrete, involving legal relations of parties having adverse legal interests. *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S. Ct. 461, 81 L. Ed. 617 (1937). Thus, declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." E. Borchard, *Declaratory judgments* 299 (2d ed. 1941). *Walden Invs. Grp., LLC v. First Nations Bank (In re Anthony M.)*, 580 B.R. 490, 497.

The allegations in the Adversary Complaint claim that all of the Defendants, including the Ali Defendants were straw owners because the Debtor continues to exercise power and responsibilities over the Property and Station. *See* pars 121 and 122 of the Adversary Complaint. The basis for this position is that the Defendants did not pay fair value for the Station and the Property. With respect to the Property, the allegations start at the creation of the Marshfield LLC to hold the Property wherein Nasr Ali, Hussein Munassar, Ali Musa, Nabil Hussain, the Debtor were the Members. *See* pars. 41-45 of the Adversary Complaint.

1. The Station – Stock Purchase with Assumption of Liabilities

The evidence provided for the position that the Station was not transferred for fair value starts with an <u>initial</u> transfer between the Debtor to Homsi and then a <u>subsequent</u> transfer between

Homsi and Badr Ali. *See* pars 58-83 of the Adversary Complaint. In order to continue the subsequent transactional trail from Homsi and Badr Ali to the Ali Defendants, the Trustee suggests that Calumet Fuel did not pay value when it purchased the Station for $400,000.00. What the Trustee misses, either deliberately or inadvertently is that the consideration for the Station between Calumet Fuel, on the one hand, and Homsi and Badr Ali, on the other hand, was actually a stock purchase, not an asset purchase, with consideration paid of over $900,000.00 ($400,000 for the purchase and the assumption of all liabilities, which included but was not limited to an SBA loan in the amount of $500,000—in addition to all other liabilities, known and unknown). This subsequent good faith transfer for value exempts the transaction from the Trustee's alleged fraudulent transfer claim pursuant to 550(b)(1). This fatal flaw in the Trustee's claim prevents the Trustee from pursuing this claim, and it is such a fatal flaw that no amount of amendment can cure this defect in the Trustee's claims.

If the suggestion is that the initial transaction between Mubarak and Homsi is problematic, that does not flow to, a good faith purchase for value, Calumet Fuel who purchased the Station from Homsi and Badr Ali. Calumet Fuel had no reason to know of any prior transfers that lead to Homsi and Badr Ali holding the shares of 11900 Marshfield Inc. nor would a purchaser be required to search beyond the authority of its seller to sell.

2. The Property

PIP purchased the Property for a price well within the appraised valuations at the time the contract was executed. This purchase of the Property occurred simultaneously with the purchase of The Station, referenced above. The same reasoning applies. The Debtor owned 95% of the Property and one of the Ali Defendants owned 5% of the Property. The Ali Defendants created an entity to purchase 95% of the Property from the Debtor.

9

The Trustee, in making its arguments on the fair value of the Property, refers to an appraisal that was completed by PIP's lender on October 26, 2021 (over 5 months after the execution of the purchase and sale agreement for the Property). The appraised value of the Property was determined to be $9,600.000.00. *See* par. 108 of the Adversary Complaint. 95% of $9,600,000 is $9,120,000.00. However, the appraisal included the business enterprise value of an asset wholly owned by one of Nasr Ali's entities, which is the car wash. The appraisal the Trustee relies on stated a value for the car wash of $1,500,000.00. Therefore, any analysis of value of The Property must necessarily, by operation of logic and law, be reduced by $1,500,000.00 the valuation relied upon by the Trustee. Therefore, the remaining valuation for The Property is at $7,620,000.00. The Ali Defendants purchased the Property for the sum of $5,500,000.00, plus an assumption of: (a) delinquent real estate property taxes of over $174,000.00, (b) equipment leases of approximately $460,000.00, and (c) the aforementioned assumption of all debts and liabilities for the Station.

This good faith transfer for value exempts the transaction from the Trustee's alleged fraudulent transfer claim pursuant to 550(b)(1). This fatal flaw in the Trustee's claim prevents the Trustee from pursuing this claim, and it is such a fatal flaw that no amount of amendment can cure this defect in the Trustee's claims.

For the reasons stated above, Count I of the Adversary Complaint as it is directed to the Ali Defendants should be dismissed with prejudice.

**B. Count VI, Count VII, Count X, Count XI – Avoidance of Fraudulent Transfer (whether actual or constructive) against Calumet Fuel and PIP should be dismissed.**

1. Actual Fraud Claims

Where fraud is alleged, a more rigorous pleading standard comes into play. *In re Jacobs*, 403 *B.R.* 565, 573 (Bankr. N.D. Ill. Apr. 9, 2009). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Id.* (quoting *Fed. R. Civ. P.*

9(b)). "Under Rule 9(b) [incorporated by Bankruptcy Rule 7009], a party 'must state with particularity the circumstances constituting fraud.' Fed.R.Civ.P. 9(b). 'Particularity means the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Id*.

The Illinois Fraudulent Transfer Act ("IFTA"), 740 ILCS 160/5(a)(1), states that a transfer is fraudulent as to a creditor whether the creditor's claim arose before or after the transfer was made (1) if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor, or (2) it was made without receiving a reasonably equivalent value in exchange for the transfer. *Desmond v. Sheehan* (In re Blackrock Burr Ridge, Inc.), 663 B.R. 877, 894 (2024).

Section 5(a)(1) of the UFTA, applies to "fraud in fact" or actual fraud, and the moving party must prove that there was a specific intent to hinder, delay or defraud. *Zeigler*, 320 B.R. at 372 (citing *Lindholm v. Holtz*, 221 Ill. App. 3d 330, 581 N.E.2d 860, 863, 163 Ill. Dec. 706 (Ill. App. Ct. 1991)).

The Trustee failed to plead sufficient facts that there was actual intent to hinder, delay or defraud any creditor and more importantly, that the Debtor did not receive a reasonably equivalent value in exchange for the transfer. As described in great detail above, the Ali Defendants paid fair value for the Property and the Station.

2. Constructive Fraud Claims

Courts consistently hold that under §550(b)(1), a **subsequent transferee** is exempt from fraudulent transfer claims **if they gave value, acted in good faith, and lacked knowledge of the transfer's avoidability.** Cases like *Bonded Financial*, *Bressman*, *Harwell*, and *Sherman* are leading illustrations.

Section § 550(a) of the Bankruptcy Code provides the actual parties from whom avoided transfers can be recovered, *Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 880 (Bankr.

11

N.D. Ill. 2006), and provides, in pertinent part, as follows: "(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from— (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." Official Comm. of Unsecured Creditors of LB Steel, LLC v. Steelcast Ltd. (In re LB Steel, LLC), 644 B.R. 781. 794.

While Calumet Fuel and PIP were subsequent transferees of the Station and Property respectively, the Trustee must connect the fraudulent scheme to avoid the transfers to Calumet Fuel and PIP. *Peterson v. Colony Am. Fin. Lender LLC*, 634 B.R. 1010, 1016 (Bankr. N.D. Ill. 2021). No such evidence has been presented in the Adversary Complaint. The Trustee appears to focus on the fact that the same manager who managed the Station during Mubarak's Tenure, Iftekhar Syed, is the same person who stayed on to manager the Station after Calumet Fuel's purchase. Also, that although Badr Ali sold his interest in the Station, but was still nominally involved in the Station after the sale. That is not evidence of fraud, that is evidence of someone who understands that sometimes continuity for vendors and customers of working with the same people is a good approach for business.

The other premise, and perhaps more notable, is that the Trustee points to one specific question asked of Nasr Ali at the trial of the Spyropoulos Adversary case. *See* par. 92 of the Adversary Complaint. Nasr Ali was called to testify at the trial of the Spyropoulos Adversary case and was asked a series of questions about the Station, the Property, and the gaming license that transferred with the purchase and sale of the Station and the Property. Attached as **Exhibit G** is the entire transcript of Nasr Ali's testimony at the trial (the "Transcript"). The question referenced

12

by the Trustee is found on page 20 of the Transcript. Taken out of context, one might miss the purpose of the question and answer, but with context, it is clear that the basis for the line of questions related to the proceeds of the gaming license was to specifically determine whether any funds were directed to Homsi or Badr Ali. Furthermore, at the time that Nasr Ali took the stand at trial, Calumet Fuel was still in fact receiving the proceeds from the gaming license because Calumet Fuel was still in the process of transferring the license to AJ 119th, Inc., so Nasr Ali did not falsely testify to anything at the trial or otherwise. Trustee's counsel simply failed to lay a proper foundation to establish facts.

Counsel for Spyropoulos tried on multiple occasions to trip up Nasr Ali at trial to say that the Debtor was still involved in the business of the Station and Property after Nasr Ali's companies took over. Here are some excerpts of the testimony starting on page 40 of the Transcript:

Q – And, specifically, on April 9th, 2024, you were communicating with Bard Ali?
A – Correct.
Q – And you were telling Badr Ali to have Mr. Mubarak take care of the slot room at the gas station, correct?
A – No.
Q – It says, "Nasr. The gas station operator needs to take care of the slot room." "Nasr. This was the deal I had with Mubarak in the past." "I do my best, and I did in the security since I came." "Nasr. This is the deal you had with Mubarak." – what was this conversation about?
A – This conversation was about the slot room. I was upset that there were people in there smoking. So I told Badr that – and Badr's the manager of the gas station – that he has – the gas station operator needs to take care of the slot room. And I told him this was the deal that I had with Mubarak in the past. When I was the gas station operator, I had to take care of the slot room as well. And he also, when he was the owner of the gas station, he had to take care of the slot room while he was operating the gas station.
Q – so there was – if you turn to the next page, there's an exchange in reference to Petroleum Investment Properties, LLC. And those are your texts, correct?
A – Correct.
Q – and you stated that there was a – there was money that came in February of 2024, correct?
A – sure
Q – and, specifically there was $29,000?
A – Correct
Q – what was that money?

13

A – That was profits generated from the gas station.
Q – Wasn't that from the gaming?
A – No.
Q – Okay, and why are you saying no need to give it to Ibrahim?
A – Ibrahim is a manager I have at the car wash. His name is Ibrahim Syed. That's his first name.

Counsel's line of questioning was to determine, what if any, involvement the Debtor had with the Station and Property after the transfer. The line of questioning about "Ibrahim" might have confused the situation because the Debtor is Mubarak Ibrahim and the manager employed by Nasr Ali's companies is Ibrahim Saeed. A mistake by counsel, but certainly not evidence of fraud.

Finally, under Section 550(b), a trustee or debtor-in-possession may not recover an avoided transfer from a subsequent transferee who "takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1). In re Chardon, LLC, 536 B.R. 791, 804.

Calumet Fuel took the Station for value ($900,000 which also includes the assumption of debt), in good faith, and without knowledge of the transfers that lead up to Badr Ali and Homsi holding the interest in the Station.

PIP took the Property for value based on 3 different appraisals, in good faith, and without knowledge of the avoidability of transfer because the transfer should not be avoidable.

The good faith transferee defense is statutory and absolute; the Trustee cannot amend our it, therefore Counts VI, VII, X, and XI should be dismissed with prejudice.

C. **COUNT XIV – The Trustee has failed to state a claim upon which relief can be granted because aiding and abetting are not a cause of action**

The issue as to whether or not aiding and abetting a fraudulent transfer is a cause of action has been addressed and the prevailing position is that it is not. That position has been affirmed by subsequent courts including, as mentioned above, by Judge Hollis who dismissed a Trustee's claim

14

on the grounds that, "…there is no such thing as a claim for aiding and abetting a fraudulent transfer". *Audette v. Kasemir (In re Concepts America, Inc.),* Nos. 14 B 34232, 16 A 691, 2018 Bankr. LEXIS 602 (Bankr. N.D. Ill. Mar. 1, 2018).

Further in Gierum, the Court noted that Section 8 of the Illinois Uniform Fraudulent Transfer Act ("IUFTA") "…specifies the remedies a creditor 'may obtain' in an action for relief against a transfer or obligation under this Act.' 740 ILCS 160/8(2014). *Gierum v. Glick* (In re Glick), 568 B.R. 634, 670.  An award of damages against an aider-and-abettor is not one of them." *Id.* At 677-78.

The Trustee's claim of aiding and abetting in the context of fraudulent transfer is not a recognizable cause of action under Illinois and Federal Law, therefore, Count XIV against Nasr Ali should be dismissed with prejudice.

Respectfully submitted,
Nasr Ali, Petroleum Investment Properties, LLC, and Calumet Fuel, Inc.

By: /s/
One of their attorneys

Kurt M. Carlson (IL Bar No. 6236568)
Mona Naser (IL Bar No. 6278114)
**CARLSON DASH, LLC**
216 S. Jefferson Street, Ste. 303
Chicago, Illinois 60661
Tel: 312-382-1600
kcarlson@carlsondash.com
mnaser@carlsondash.com

15

# EXHIBIT A

## SELLER'S STATEMENT

**Date:** December 23, 2016

GFNo: 40028470

**Sale From:** Standard Bank & Trust Co. as trustee under trust
agreement dated June 8, 2007 and known as trust
number 19973
7800 West 95th Street
Hickory Hills, IL 60457

Mubarak Ibraheim

**To:** 11900 Marshfield LLC
11900 South Marshfield Avenue
Calumet Park, IL 60627

**Property:** 11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827

Printed at: 12/23/2016 (04:05 pm)           *Compliments of* **Greater Illinois Title Company**

GFNo: 40028470                                                                                         Page 2

11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

| | | |
|---|---|---|
| Sales Price | | $2,500,000.00 |
| **Reimbursements/Credits** | | |
| Equipment | | $2,000,000.00 |
| **Total Reimbursements/Credits** | | **$2,000,000.00** |
| **Gross Amount Due to Seller** | | **$4,500,000.00** |

| | | |
|---|---|---|
| **Less: Charges and Deductions** | | |
| Filing Fees to Greater Illinois Title Company | | $56.00 |
| Recording Deed | $56.00 | |
| Transfer Taxes to Greater Illinois Title Company | | $3,750.00 |
| County Transfer Tax | $1,250.00 | |
| State Transfer Tax | $2,500.00 | |
| Fees to Greater Illinois Title Company | | $2,750.00 |
| Commercial Escrow fee | $2,450.00 | |
| Wire fee | $90.00 | |
| Commitment fee | $160.00 | |
| Notarial Record | $50.00 | |
| Closing protection letter to Chicago Title Insurance Company | | $50.00 |
| State of Illinois policy fee to Chicago Title Insurance Company | | $3.00 |
| Title Insurance to Greater Illinois Title Company | | $10,350.00 |
| Exam & Insurance | $10,350.00 | |
| Seller Attorney fee to Richard E. Schimmel | | $3,800.00 |
| Attorney fee to Simon PLC Attorneys & Counselors | | $10,400.00 |
| Cross-Collateralized Payoff of Mortgage to Fast Track Ventures | | $4,466,125.01 |
| Security deposit | From 1/1/1900 thru 1/1/1900 | $5,000.00 |
| Rent Credit | From 12/23/2016 thru 12/31/2016 | $3,305.80 |
| Seller Financing | | $410,000.00 |
| **Total Charges and Deductions** | | **$4,915,589.81** |
| **Net Amount Due by Seller** | | **$415,589.81** |

GFNo: 40028470                                                                          Page 3

Seller understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The lender involved may be furnished a copy of this statement.

Seller understands that tax and insurance prorations and reserves were based on figures for the preceding year or supplied by others or estimates for the current year, and in the event of any change for current year, all necessary adjustments must be made between Purchaser and Seller direct.

The undersigned hereby authorizes Greater Illinois Title Company to make expenditure and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement

Greater Illinois Title Company                    Standard Bank & Trust Co. as trustee under trust agreement dated June 8, 2007 and known as trust number 19973

By _____
     Yasmin Torres

                                                  By _____


                                                  By Mubarak Ibraheim


Printed at:  12/23/2016 (04:05 pm)               *Compliments of* **Greater Illinois Title Company**

## PURCHASER'S STATEMENT

**Date:** December 23, 2016

**GFNo:** 40028470

**Sale From:** Standard Bank & Trust Co. as trustee under trust agreement dated June 8, 2007 and known as trust number 19973
7800 West 95th Street
Hickory Hills, IL 60457

Mubarak Ibraheim

**To:** 11900 Marshfield LLC
11900 South Marshfield Avenue
Calumet Park, IL 60627

**Property:** 11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827

Printed at: 12/23/2016 (04:01 pm)

*Compliments of* **Greater Illinois Title Company**

GFNo: 40028470                                                      Page 2

11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

11900 South Marshfield Avenue Calumet Park, IL 60827
11900 South Marshfield Avenue
Calumet Park, IL 60827

| | | |
|---|---|---|
| **Purchase Price** | | $2,500,000.00 |
| **Plus: Charges** | | |
| Filing Fees to Greater Illinois Title Company | | $54.00 |
| Recording Deed | $54.00 | |
| Fees to Greater Illinois Title Company | | $2,670.00 |
| Commercial Escrow fee | $2,450.00 | |
| Later date fee | $160.00 | |
| Record service fee | $15.00 | |
| Wire fee | $45.00 | |
| Closing protection letter to Chicago Title Insurance Company | | $25.00 |
| Buyer Attorney fee to Mraibie and Associates | | $6,000.00 |
| Equipment | | $2,000,000.00 |
| **Total Charges** | | $2,008,749.00 |
| **Gross Amount Due By Purchaser** | | $4,508,749.00 |

| | | | |
|---|---|---|---|
| **Less: Credits** | | | |
| Earnest Money | | | $275,000.00 |
| Security deposit | From 1/1/1900 thru 1/1/1900 | | $5,000.00 |
| Rent Credit | From 12/23/2016 thru 12/31/2016 | | $3,305.80 |
| Seller Financing | | | $410,000.00 |
| **Total Credits** | | | $693,305.80 |
| **Balance Due by Purchaser** | | | $3,815,443.20 |

Purchaser understands the Closing or Escrow Agent has assembled this information representing the transaction from the best information available from other sources and cannot guarantee the accuracy thereof. The lender involved may be furnished a copy of this statement.

Purchaser understands that tax and insurance prorations and reserves were based on figures for the preceding year or supplied by others or estimates for the current year, and in the event of any change for current year, all necessary adjustments must be made between Purchaser and Seller direct.

The undersigned hereby authorizes Greater Illinois Title Companyto make expenditure and disbursements as shown above and approves same for payment. The undersigned also acknowledges receipt of Loan Funds, if applicable, in the amount shown above and a receipt of a copy of this Statement

Printed at: 12/23/2016 (04:01 pm)          *Compliments of* **Greater Illinois Title Company**

**GFNo: 40028470**

Page 3

Greater Illinois Title Company

11900 Marshfield LLC

By _____
Yasmin Torres

By _____

*Compliments of* **Greater Illinois Title Company**

# EXHIBIT B



U.S. Small Business Administration

# UNCONDITIONAL GUARANTEE

| SBA Loan # | 55682784-10 |
|---|---|
| SBA Loan Name | BUBBLES SPLASH CAR WASH INC. |
| Guarantor | 2705 GARY STATION LLC |
| Borrower | BUBBLES SPLASH CAR WASH INC. |
| Lender | Bank of George |
| Date | 02-10-2021 |
| Note Amount | $1,032,000.00 |

## 1. GUARANTEE:

Guarantor unconditionally guarantees payment to Lender of all amounts owing under the Note. This Guarantee remains in effect until the Note is paid in full. Guarantor must pay all amounts due under the Note when Lender makes written demand upon Guarantor. Lender is not required to seek payment from any other source before demanding payment from Guarantor.

## 2. NOTE:

The "Note" is the promissory note dated **02-10-2021** in the principal amount of **One Million Thirty-two Thousand and 00/100 Dollars**, from Borrower to Lender. It includes any assumption, renewal, substitution, or replacement of the Note, and multiple notes under a line of credit.

## 3. DEFINITIONS:

"Collateral" means any property taken as security for payment of the Note or any guarantee of the Note.

"Loan" means the loan evidenced by the Note.

"Loan Documents" means the documents related to the Loan signed by Borrower, Guarantor or any other guarantor, or anyone who pledges Collateral.

"SBA" means the Small Business Administration, an Agency of the United States of America.

## 4. LENDER'S GENERAL POWERS:

Lender may take any of the following actions at any time, without notice, without Guarantor's consent, and without making demand upon Guarantor.

    A. Modify the terms of the Note or any other Loan Document except to increase the amounts due under the Note;

    B. Refrain from taking any action on the Note, the Collateral, or any guarantee;

    C. Release any Borrower or any guarantor of the Note;

    D. Compromise or settle with the Borrower or any guarantor of the Note;

    E. Substitute or release any of the Collateral, whether or not Lender receives anything in return;

    F. Foreclose upon or otherwise obtain, and dispose of, any Collateral at public or private sale, with or without advertisement;

    G. Bid or buy at any sale of Collateral by Lender or any other lienholder, at any price Lender chooses; and

    H. Exercise any rights it has, including those in the Note and other Loan Documents.

These actions will not release or reduce the obligations of Guarantor or create any rights or claims against Lender.

## 5. FEDERAL LAW:

When SBA is the holder, the Note and this Guarantee will be construed and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Guarantee, Guarantor may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

## 6. RIGHTS, NOTICES, AND DEFENSES THAT GUARANTOR WAIVES:

To the extent permitted by law,

    A. Guarantor waives all rights to:

Page 3

**11. GUARANTOR ACKNOWLEDGMENT OF TERMS.**

Guarantor acknowledges that Guarantor has read and understands the significance of all terms of the Note and this Guarantee, including all waivers.

**12. GUARANTOR NAME(S) AND SIGNATURE(S):**

By signing below, each individual or entity becomes obligated as Guarantor under this Guarantee.

GUARANTOR:

X _____

Nasr Ali, Individually

1) Require presentment, protest, or demand upon Borrower;

2) Redeem any Collateral before or after Lender disposes of it;

3) Have any disposition of Collateral advertised; and

4) Require a valuation of Collateral before or after Lender disposes of it.

B. Guarantor waives any notice of:

1) Any default under the Note;

2) Presentment, dishonor, protest, or demand;

3) Execution of the Note;

4) Any action or inaction on the Note or Collateral, such as disbursements, payment, nonpayment, acceleration, intent to accelerate, assignment, collection activity, and incurring enforcement expenses;

5) Any change in the financial condition or business operations of Borrower or any guarantor;

6) Any changes in the terms of the Note or other Loan Documents, except increases in the amounts due under the Note; and

7) The time or place of any sale or other disposition of Collateral.

C. Guarantor waives defenses based upon any claim that:

1) Lender failed to obtain any guarantee;

2) Lender failed to obtain, perfect, or maintain a security interest in any property offered or taken as Collateral;

3) Lender or others improperly valued or inspected the Collateral;

4) The Collateral changed in value, or was neglected, lost, destroyed, or underinsured;

5) Lender impaired the Collateral;

6) Lender did not dispose of any of the Collateral;

7) Lender did not conduct a commercially reasonable sale;

8) Lender did not obtain the fair market value of the Collateral;

9) Lender did not make or perfect a claim upon the death or disability of Borrower or any guarantor of the Note;

10) The financial condition of Borrower or any guarantor was overstated or has adversely changed;

11) Lender made errors or omissions in Loan Documents or administration of the Loan;

12) Lender did not seek payment from the Borrower, any other guarantors, or any Collateral before demanding payment from Guarantor;

13) Lender impaired Guarantor's suretyship rights;

14) Lender modified the Note terms, other than to increase amounts due under the Note. If Lender modifies the Note to increase the amounts due under the Note without Guarantor's consent, Guarantor will not be liable for the increased amounts and related interest and expenses, but remains liable for all other amounts;

15) Borrower has avoided liability on the Note; or

16) Lender has taken an action allowed under the Note, this Guarantee, or other Loan Documents.

## 7. DUTIES AS TO COLLATERAL:

Guarantor will preserve the Collateral pledged by Guarantor to secure this Guarantee. Lender has no duty to preserve or dispose of any Collateral.

## 8. SUCCESSORS AND ASSIGNS:

Under this Guarantee, Guarantor includes heirs and successors, and Lender includes its successors and assigns.

## 9. GENERAL PROVISIONS:

A. ENFORCEMENT EXPENSES. Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to, attorney's fees and costs.

B. SBA NOT A CO-GUARANTOR. Guarantor's liability will continue even if SBA pays Lender. SBA is not a co-guarantor with Guarantor. Guarantor has no right of contribution from SBA.

C. SUBROGATION RIGHTS. Guarantor has no subrogation rights as to the Note or the Collateral until the Note is paid in full.

D. JOINT AND SEVERAL LIABILITY. All individuals and entities signing as Guarantor are jointly and severally liable.

E. DOCUMENT SIGNING. Guarantor must sign all documents necessary at any time to comply with the Loan Documents and to enable Lender to acquire, perfect, or maintain Lender's liens on Collateral.

F. FINANCIAL STATEMENTS. Guarantor must give Lender financial statements as Lender requires.

G. LENDER'S RIGHTS CUMULATIVE, NOT WAIVED. Lender may exercise any of its rights separately or together, as many times as it chooses. Lender may delay or forgo enforcing any of its rights without losing or impairing any of them.

H. ORAL STATEMENTS NOT BINDING. Guarantor may not use an oral statement to contradict or alter the written terms of the Note or this Guarantee, or to raise a defense to this Guarantee.

I. SEVERABILITY. If any part of this Guarantee is found to be unenforceable, all other parts will remain in effect.

J. CONSIDERATION. The consideration for this Guarantee is the Loan or any accommodation by Lender as to the Loan.

## 10. STATE-SPECIFIC PROVISIONS:
NONE

# EXHIBIT C



RETAIL PETROLEUM



**Citgo**
**Fueling Facility with C-Store, Car Wash and Auto Service**
**Leased Retail Spaces and Billboard**
**Excess Land**
**11900 S. Marshfield Avenue**
**Calumet Park, Illinois  60827**

Market Value of the
Leased Fee Going-Concern

As Of
May 29, 2018

Prepared For

Ms. Carrie Beavers
Vice President/Loan Administrator
Business Loan Capital, Inc.
6 Hughes, Suite 200
Irvine, California  92618

   



Retail Petroleum Consultants LLC

// 4464 McGrath Street, Unit 117,
Ventura, California 93001

// 6800 Westgate Boulevard, Suite 132-219,
Austin, Texas 78745

June 13, 2018

Ms. Carrie Beavers
Vice President/Loan Administrator
Business Loan Capital, Inc.
6 Hughes, Suite 200
Irvine, California 92618

Subject:    **Citgo**
                  **Fueling Facility with C-Store, Car Wash and Auto Service**
                  **Leased Retail Spaces and Billboard**
                  **Excess Land**
                  **11900 S. Marshfield Avenue**
                  **Calumet Park, Illinois 60827**

Dear Ms. Beavers:

In accordance with your authorization, we have completed a USPAP compliant appraisal report of the above referenced property. This appraisal is intended to be compliant with FIRREA and Business Loan Capital, Inc. appraisal guidelines. The appraisal reflects our opinion of market value as of May 29, 2018. The report is dated June 13, 2018. The intended user of this appraisal is Business Loan Capital, Inc. and their authorized assignee(s). According to your instructions we have appraised the "as is" market value of the subject's combined fee simple going-concern and leased fee interests.

The subject property is located at southwest corner of Marshfield Avenue and 119th Street, in the city of Calumet Park, Cook County, Illinois. The site is improved with a single 22,024 square foot building housing both owner occupied and leased fee spaces. The fueling station, car wash, auto service and c-store (convenience store) profit centers are owner occupied and contain a total of 15,874 square feet. The adjoining in-line occupied leased spaces include 2,650 square feet occupied by Dunkin Donuts, Boost Mobile, Hair Gallery and an Insurance Office. There is a leased billboard and two vacant spaces with 1,500 and 2,000 square feet respectively. The improvements are situated on a 98,504 square foot improved site. There are two separate area of excess land areas containing 12,919 and 32,151 square feet respectively available for sale and or future expansion.

Going-concern value is defined as the value created by a proven property operation and includes an intangible enhancement of the value of an operating business enterprise which is produced by the assemblage of the land, building, labor, equipment, and marketing operation. The market value of the fee simple going-concern assets includes allocation to the owner occupied real

 805-815-4350     805-669-3939    contact@gasvaluation.com     www.gasvaluation.com

*Retail Petroleum Consultants, LLC*　　　　　*Summary Letter and Conclusions　Page 3*

property assets including fueling improvements, car wash, removable M & E, and business and/or goodwill.  The leased fee assets are considered 100% real estate requiring no allocation.

The report is prepared for Business Loan Capital, Inc. and authorized affiliates for loan underwriting regarding the subject property; it may be used in connection with the acquisition, disposition, or financing of the sale of the property.  The appraisal is intended to conform to the Uniform Standards of Professional Appraisal Practice ("USPAP") as promulgated by the Appraisal Standards Board of the Appraisal Foundation and the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.  It is inappropriate to use this value conclusion or the report for any purpose other than the one stated.

This Appraisal was completed without regard to race, color, religion, national origin, sex, marital status or any other prohibited basis, and does not contain references which could be regarded as discriminatory

The opinions expressed in this appraisal cover letter can only be completely understood by reading the narrative report, exhibits, and other data, which is attached.  The appraisal is subject to the attached general assumptions and limiting conditions.  In addition, this appraisal is subject to the following extraordinary assumptions:

**EXTRAORDINARY ASSUMPTION**

An extraordinary assumption is an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions.  Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property such as market conditions or trends; or about the integrity of data used in an analysis.  An extraordinary assumption may be used in an assignment only if:

- It is required to properly develop credible opinions and conclusions;
- The appraiser has a reasonable basis for the extraordinary assumption;
- Use of the extraordinary assumption results in a credible analysis; and
- The appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions.

**The use of the following extraordinary assumptions may have affected the assignment results.  We reserve the right to revise our opinions if significantly different information comes to light.**

1.  The appraised property is a proposed petroleum marketing facility with operational dispensers and related fueling improvements.  As a condition of this analysis, we assume all fueling improvements to be in complete operational condition and in compliance with current government and EPA regulations "as is".  We note the fueling dispensers are financed and deducted the payoff amount and excluded the related operating expense in our projections.

*Retail Petroleum Consultants, LLC*                    *Summary Letter and Conclusions   Page 4*

2. We have not been provided with a detailed schedule of furniture, fixtures, and equipment (FF & E) items associated with the proposed c-store operations referred to herein as "removable M & E". These items; i.e., cash registers, coffee makers, computers, tools, microwaves, etc., are typically transferred in the sale of a going-concern and included under separate allocation. No fuel, merchandise or other related inventory is included in this analysis unless specified otherwise. All permanently attached fueling improvements and related equipment are considered as real property.

3. We assume that all signage, machinery, and equipment associated with the subject improvements are owned free and clear by the same owner as the land and building and have not considered any lease agreements or rental payments for fueling equipment, building, or land unless specifically identified within the report.

4. All agreements and fuel supply contracts are assumed in-place and transferable to a potential buyer. We have been provided with a fuel supply agreement which is reproduced in our Addenda for review. Our concluded value does not consider any loan repayments if applicable to the supplier(s). Any monies owed to the fuel supplier are to be deducted from our concluded values. We do note a deduct of ($90,000) made to pay off a loan for fueling equipment.

5. This appraisal assumes a clear title (attached in the Addenda) and no unusual easements or encumbrances. The appraisal is based on a 98,504 square foot improved parcel with additional Excess Land Area A having 12,919 square feet and Excess Land Area B having 32,151 square feet. The building has a footprint of 22,024 square feet per documentation provided to the appraiser and verified via on site measurements. We note discrepancies between surveyed building size and reported tenant spaces and further note that none of the leases include an adequate description of leased premises or respective square footages. If site, building size, or leased areas are determined to be materially different than reported, we reserve the right to modify our concluded values.

6. Our allocation to non-business items assumes an operating going-concern. If the business operations cease, our allocation to non-business assets becomes null and void.

7. The subject operates as a Citgo branded station. We were provided with a copy of a fuel supply agreements/franchise agreements. Such agreements are typical for the industry and not considered to have a negative impact on operations so long as the highest and best use of the property remains a fueling facility with additional profit centers. Should differing information come to light, we reserve the right to modify or amend our conclusions of value as stated herein.

*Retail Petroleum Consultants, LLC*                *Summary Letter and Conclusions   Page 5*

Based on the analysis presented in the attached report, it is our opinion that the leased fee and fee simple market value of going-concern, as of May 29, 2018 is summarized as follows:

| VALUE MATRIX | |
|---|---|
| **Value Scenario** | **"As Is"** |
| **Date of Value** | **May 29, 2018** |
| Cost Approach - Fee Simple Assets | $2,870,000 |
| Income Capitalization - Fee Simple Assets | $2,980,000 |
| **Market Value of the Fee Simple Going-Concern** | **$2,980,000** |
| Add: Leased Fee Retail Space and Billboard | $1,030,000 |
| Add: Surplus Land Area | $450,000 |
| Deduct: Dispenser Loan Payoff | ($90,000) |
| **Total Property Value** | **$4,370,000** |

| VALUE ALLOCATION SUMMARY | |
|---|---|
| **Value Scenario** | **"As Is"** |
| **Date of Value** | **May 29, 2018** |
| Real Property Assets | $2,690,000 |
| Removable M & E | $90,000 |
| Business or (Functional Obsolescence) | $110,000 |
| **Market Value of the Going-Concern** | **$2,890,000** |
| Add: Leased Fee Retail Space and Billboard | $1,030,000 |
| Add: Surplus Land Area | $450,000 |
| **Total Property Value** | **$4,370,000** |

*Retail Petroleum Consultants, LLC*          *Summary Letter and Conclusions  Page 6*

---

We have also estimated an insurable value for the proposed property "as is".  According to the definition used herein; "Insurable value is that portion of the value of an asset or asset group that is acknowledged or recognized under the provisions of an applicable loss insurance policy.  It is based on the replacement and/or reproduction cost of physical items that are subject to loss from hazards."  For the purpose of this appraisal, insurable value includes the cost new of real estate, fueling improvements, car wash, and related removable M & E, net of site improvements, indirect costs, entrepreneurial profit, and the underlying land.

| Insurable Value | |
|---|---|
| **Replacement Cost New (RCN)** | |
| Building and Car Wash | $2,588,413 |
| Fueling Improvements & Signage | $744,600 |
| Removable M & E | $350,000 |
| Subtotal | $3,683,013 |
| **Insurable Value Indication (Rounded)** | **$3,680,000** |

The attached report consists of value conclusions, narrative report addressing the property valuation, and exhibit and assumptions and limiting conditions sections.  The opinions expressed in this appraisal transmittal letter can only be completely understood by reading the narrative report, exhibits, and other data that follow.

We have not investigated the title to or any liabilities against the appraised properties.

Respectfully submitted,

**Retail Petroleum Consultants, LLC**

Stephen J. Morse
Illinois Temporary Practice Permit No. 572.004366

## TABLE OF CONTENTS

Cover Page ............................................................................................................ 1
Summary Letter & Conclusions ........................................................................... 2
Table of Contents .................................................................................................. 7

**APPRAISAL DATA**

Executive Summary ............................................................................................... 8
Introduction ......................................................................................................... 10
Regional Economic Overview ............................................................................ 50
Neighborhood Description ................................................................................. 29
Site Description ................................................................................................... 33
Improvement Description ................................................................................... 47
Market Overview ................................................................................................. 50
Highest and Best Use ......................................................................................... 70

**VALUATION**

Valuation Methodology........................................................................................ 71
Cost Approach ..................................................................................................... 72
Sales Comparison Approach .............................................................................. 83
Income Capitalization Approach ........................................................................ 85
Correlation and Conclusion................................................................................ 99

**EXHIBITS**

A  –  Engagement Letter..................................................................................... 101
B  –  Demographics and Traffic Counts............................................................ 105
C  –  Financials and Gallons Sold...................................................................... 109
D  –  Rent Roll/Leases ....................................................................................... 113
E  –  Fuel Supply Agreement (Portion)............................................................. 163
F  –  Qualifications of Appraiser ....................................................................... 171
G  –  Certification of Appraiser......................................................................... 178
H  –  Assumptions and Limiting Conditions .................................................... 180

*Retail Petroleum Consultants, LLC*                              *Executive Summary   Page 8*

---

## EXECUTIVE SUMMARY

| | |
|---|---|
| **Property Location/ID** | Citgo<br>Fueling Station with C-Store, Car Wash and Auto Service<br>Leased Retail Space and Billboard<br>Excess Land<br>11900 S. Marshfield Avenue<br>Calumet Park, Illinois  60827 |
| **Effective Date of Appraisal** | May 29, 2018 |
| **Premise of Appraisal** | "As Is" Market Value |
| **Interest(s) Appraised** | Fee Simple Going-Concern<br>Leased Fee Interest |
| **Highest and Best Use** | "As Is" - Continued Use |
| **Zoning** | I (Industrial / Business) |
| **Intended Use of Appraisal** | Potential Financing (Loan Underwriting) |
| **Land Area** | 98,504 Square Feet - Improved Parcel<br>12,919 Square Feet - Excess Land A<br>32,151 Square Feet - Excess Land B<br>143,574 Square Feet - Total Site Area |
| **Building Improvements** | The subject site is improved with a single  square foot building housing both owner occupied and leased fee spaces. The fueling station, car wash, auto service and c-store (convenience store) profit centers are owner occupied and contain a total of 22,024 square feet.  The adjoining in-line leased spaces include  square feet occupied by Dunkin Donuts, Boost Mobile, Hair Gallery and an Insurance Office. There is a leased billboard and two vacant retail spaces with 1,500 and 2,000 square feet respectively. |
| **Fueling Improvements** | Existing fueling improvements include (6) dispensers with a total of (12) simultaneous fueling positions.  Fuel storage is provided by (2) 12,000-gallon and (2) 8,000-gallon underground storage tanks (USTs).  The tanks are assumed to be of fiberglass construction and assumed in compliance with all EPA specifications and related government programs. There is single digital sign displaying the Citgo logo and gasoline and diesel prices.  A 7,200 square foot canopy covers the fueling improvements. |

## Rent Roll

| Tenant | Start Date | End Date | Size SF | Base Rent | Current Rent | $/SF/Mo. | Lease Type | Comments |
|---|---|---|---|---|---|---|---|---|
| Dunkin Donuts | 9/1/2015 | 8/31/2020 | 200 | $1,515.00 | $1,576.21 | $7.88 | FullService | Rent increaes at 2% annually. Tenant pays utilities.  (2) 5-year options. |
| Boost Mobile | 1/1/2018 | 12/31/2022 | 1,200 | $4,500.00 | $4,500.00 | $3.75 | FullService | Landlord pays utilities. |
| Hair Gallery | 7/1/2016 | 6/30/2021 | 450 | $2,200.00 | $2,400.00 | $5.33 | FullService | Rent increases at $100/Mo. annually. Landlord pays utilities. |
| Insurance | 1/1/2013 | 2/28/2023 | 800 | $3,000.00 | $3,450.00 | $4.31 | FullService | Landlord pays RE Taxes and utilities.  (1) 5-Year option.  Credit to tenant of $3,000 in 4/2019 and 4/2020. |
| Car Wash (Owner Occupied) | - | - | 4,700 | - | - | - | - | Owner Occupied |
| Mechanic/Tire  (Owner Occupied) | - | - | 4,500 | - | - | - | - | Owner Occupied |
| Detail (Owner Occupied) | - | - | 450 | - | - | - | - | Owner Occupied |
| Gas Station/C-Store/QSR (Owner Occupied) | - | - | 4,000 | - | - | - | - | Owner Occupied |
| Billboard | 6/13/2017 | 6/12/1937 | - | $1,308.33 | $1,308.33 | - | Mod Gross | Lease is flat for term, tenant pays own utilities |
| Vacant | - | - | 1,500 | $5,000.00 | $5,000.00 | $3.33 | FullService | Per Listing broker |
| Vacant | - | - | 2,000 | $6,666.67 | $6,666.67 | $3.33 | FullService | Additional space per owner, former Cellular Plus space |
| Storage/Misc. (Owner Occupied) | - | - | 2,224 | - | - | - | - | Owner Occupied |
| Total(s) | | | 22,024 | $24,190.00 | $24,901.21 | | | |

## Annual Fuel Volume

| ANNUAL FUEL VOLUME & MARGIN | | | |
|---|---|---|---|
| Year | Volume | Margin Per Gallon | Fuel Gross Profit |
| NACS 2016 Survey | 1,791,084 | $0.213 | $381,501 |
| 2016 | 870,675 | - | - |
| 2017 | 916,627 | $0.353 | $323,164 |
| "As Is" Projection 2018 - 2019 | 900,000 | $0.250 | $225,000 |

## Value Summary and Allocation

| VALUE MATRIX | |
|---|---|
| Value Scenario | "As Is" |
| Date of Value | May 29, 2018 |
| Cost Approach - Fee Simple Assets | $2,870,000 |
| Income Capitalization - Fee Simple Assets | $2,980,000 |
| **Market Value of the Fee Simple Going-Concern** | **$2,980,000** |
| Add: Leased Fee Retail Space and Billboard | $1,030,000 |
| Add: Surplus Land Area | $450,000 |
| Deduct: Dispenser Loan Payoff | ($90,000) |
| **Total Property Value** | **$4,370,000** |

| VALUE ALLOCATION SUMMARY | |
|---|---|
| Value Scenario | "As Is" |
| Date of Value | May 29, 2018 |
| Real Property Assets | $2,690,000 |
| Removable M & E | $90,000 |
| Business or (Functional Obsolescence) | $110,000 |
| **Market Value of the Going-Concern** | **$2,890,000** |
| Add: Leased Fee Retail Space and Billboard | $1,030,000 |
| Add: Surplus Land Area | $450,000 |
| **Total Property Value** | **$4,370,000** |

## INTRODUCTION

**Property Identification**

The subject property is identified as a Citgo branded fueling facility, c-store, car wash and auto service with leased retail space, leased billboard, and excess land.  The property is located at 11900 S. Marshfield Avenue in Calumet Park, Cook County, Illinois.  The county assessor's office identifies the subject property by APN(s) as summarized below.

| SUBJECT PARCEL SUMMARY | | |
|---|---|---|
| **APN** | **Land SF** | **Use** |
| 2530204001 | 2,426 | Surplus Land A |
| 2530204002 | 1,958 | Surplus Land A |
| 2530204003 | 1,953 | Surplus Land A |
| 2530204004 | 1,956 | Surplus Land A |
| 2530204005 | 1,949 | Surplus Land A |
| 2530204006 | 2,677 | Surplus Land A |
| 2530204046 | 98,504 | Improved Parcel |
| 2530204020 | 3,305 | Surplus Land B |
| 2530204041 | 3,296 | Surplus Land B |
| 2530204022 | 3,180 | Surplus Land B |
| 2530204042 | 3,238 | Surplus Land B |
| 2530204043 | 3,186 | Surplus Land B |
| 2530204021 | 3,266 | Surplus Land B |
| 2530204023 | 3,132 | Surplus Land B |
| 2530204044 | 3,141 | Surplus Land B |
| 2530204024 | 3,213 | Surplus Land B |
| 2530204045 | 3,194 | Surplus Land B |
| Totals | 143,574 | |

**Scope of the Appraisal**

In preparing our analysis of the subject's facility we first expended considerable time in learning about the property itself.  The site was inspected on May 29, 2018 by Edward Olson.  The competing facilities and going-concern Sales were inspected and photographed to identify their most relevant physical and locational characteristics.  The Going-Concern Sale Comparables are presented in summary format to protect the confidential nature of the financial data presented.  This data is contained in its entirety in the appraiser's files and available for verbal review.

We spoke with planning officials to learn of specific details regarding the property's recent history and current land use approvals.  Average daily traffic (ADT) counts for the subject and competing properties were compiled and analyzed.  We also investigated various sources of public records; (ownership, recordation of transactions, surveys, title report, etc.) to further our knowledge of any legal issues that could have an impact on the subject property.

The second phase of our investigation involved gathering of market data from outside the property.  In order to implement relevant valuation techniques, we conducted a market search from which we extrapolated various data to use in the final valuation analysis.  The market data

used was collected from office files, other appraisers, brokers, personal onsite inspections and other persons knowledgeable about the appraised property's marketplace.  We also reviewed our internal confidential database referencing more than 7,500 appraised stations, related market data, volume and sales, and financial statements.  Municipal offices of the city and respective county offices were contacted for various zoning and land use data.  We used and relied upon records from the tax assessor's office, as published through various information services.

Regional, county, city, and neighborhood data were based upon data available in our office library, and various public agencies compiling demographic and economic information.  The neighborhood description is based on an on-site physical inspection of the area and conversations with owners and occupants within that neighborhood.

The final phase in the appraisal process relates to the analysis of the data and comparable properties.  Economic as well as non-economic factors are identified and appropriately considered within the three traditional valuation techniques.  The relationship between income and value is defined, analyzed, and used as a basis for comparable adjustment.

After analyzing the comparative data and the specific property features and business in detail, we applied the appropriate approaches to value.  These approaches were then reconciled into a final value conclusion.  These approaches were then reconciled into a final value conclusion.  Stephen J. Morse performed the valuation analysis with the assistance of Colin Nisbet.

**Date of Value and Report**
This appraisal was made to express our opinion of the market value of the going-concern under the requested valuation scenarios.  The "As Is" value date is as of our inspection on May 29, 2018.  This report is dated June 13, 2018.

**Purpose and Use of Appraisal**
The purpose of the appraisal is to estimate the leased fee market value of the going-concern for potential financing purposes.  The intended users are Business Loan Capital, Inc. and any authorized assignees.  The concluded value is allocated between; a) fee simple real estate consisting of the land, buildings, car wash and fueling improvements, b) removable M & E, c), business and or goodwill, d) leased fee assets, and e) excess land.  The appraisal was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

**Property Rights Appraised**
According to The Dictionary of Real Estate Appraisal, 5th ed. (Chicago: Appraisal Institute, 2010), the following various property rights are defined:

**Fee simple estate** is defined as absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.[1]

---

[1] The Appraisal Institute, *The Dictionary of Real Estate Appraisal, Fifth Edition*, Chicago, IL, The Appraisal Institute, 2010, 78

**Leased fee estate** is defined as a freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e. a lease).[2]

**Leasehold estate** is defined as tenant's possessory interest created by a lease.[3]

The owner occupied space is valued as fee simple going-concern. The remaining in line retail spaces and billboard are separately valued leased fee. The excess land is valued fee simple. In this instance we are appraising combined fee simple and leased fee estates.

*Market Value* is defined as the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(a) buyer and seller are typically motivated;
(b) both parties are well informed or well advised, and each acting in what they consider their own best interests;
(c) a reasonable time is allowed for exposure in the open market;
(d) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and
(e) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

*Going-Concern Value* is defined as; 1) The market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed *the market value of the going-concern.* 2) The value of an operating business enterprise. Goodwill may be separately measured but it is an integral component of going-concern value when it exists and is recognizable.[5]

*Insurable Value* is defined as a type of value for insurance purposes.[6]

*Personal Property* is defined as identifiable tangible objects that are considered by the general public as being "personal"—for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate.[7]

---

[2] Ibid., 111

[3] Ibid., 111

4 Federal Reserve System, 12 CFR Parts 208 and 225, Sec. 225.62; Office of the Comptroller of the Currency, 12 CFR Part 34, Sec. 34.42; FDIC, 12 CFR Part 323, Sec. 323.2; Office of Thrift Supervision, 12 CFR Part 564, Sec. 564.2; National Credit Union Administration, 12 CFR Part 722, Sec. 722.2.

[5] The Appraisal Institute, *The Dictionary of Real Estate Appraisal, Fifth Edition*, Chicago, IL, The Appraisal Institute, 2010, 88

[6] Ibid., 102

*Gross Profit Multiplier (GPM)* is defined as the relationship or ratio of the sale price of a going-concern by the projected or anticipated gross profit and is derived by the division of the going-concern sale price by the gross profit.  Gross Profit is derived by deducting the Cost of Goods Sold (COGS) from projected gross revenues.  This technique is applied by estimating the gross income potential, based on an analysis of historical performance and by a comparison to comparable petroleum retailers and their gross profitability.  A COGS estimate is developed based upon the "spreads" or gross profit margins, which are likely to be achieved, given the branding and the competitive position of the appraised property in the marketplace.

*Furniture Fixtures and Equipment (FF & E), Machinery and Equipment (M & E)* are tangible property that can be physically removed from the property without damaging or disturbing the remaining real property.  Value of FF & E/M & E typically diminishes once separated from the operating assets.  Examples include cash registers, tools, ovens, computer systems, etc.  Typically excludes fueling improvements and or related equipment.

*PMPA – Petroleum Marketing Practices Act* (See 15 U.S.C. §2801-2806) Federal Law enacted June 19, 1978 intended to protect franchised (branded) distributors and retailers of gasoline and diesel motor fuels against arbitrary or discriminatory termination or non-renewal of franchises; i.e., fuel supply agreement or branding.  The law describes reasons when a franchise may be terminated or not renewed.  Purpose of the law is to protect the dealer's business from the oil company selling the property or not renewing their lease and or franchise agreement forcing the loss or forfeit of tenant's business assets.  The law requires lease renewals or sales to be based on market.  In the case of a sale by the Oil Company the tenant is typically granted first right of refusal where the purchase is based on real property assets owned by the Oil Company, not the going-concern value.

*Payment Card Industry (PCI) Data Security Standard* requires fueling station operators with credit card readers to upgrade to the new Triple DES (Data Encryption Standard) by July 1, 2010, now extended.  Older dispensers that cannot support the new system will have to be replaced entirely with costs estimated at $25,000 or more per dispenser including installation.  Modern dispensers can upgrade for about $2,000 per dispenser.  Cash registers will require replacement for an additional $20,000 more or less, depending on the number of registers.  Major Oil Companies such as Arco and 2014 have announced their dealers will no longer be able to process credit cards through their networks if not compliant.

*Enhanced Vapor Recovery (EVR)* California Air Resource Board (CARB) mandated law requiring petroleum marketers to add system that restricts vaporization of gasoline by April 2009.  Bulk plants and card locks are exempt at present.  Non-compliant stations can continue to operate but incur fines each day that lack EVR system.

---

[7] Ibid., 145

---

**EMV** is a new worldwide payment protocol developed by Europay, MasterCard and Visa and administered by EMVCo.  Originally developed in 1994, the standard is now being widely adopted in the United States (it was widely adopted in the European Union by 2005 and in Canada by 2012). While traditional debit/credit cards are read via a magnetic strip with static data, new cards adhering to the EMV standard are "smartcards" with data contained on a small integrated circuit.  This stored data is dynamic (or unique to each transaction) which will help prevent card-skimming and card-transplant fraud.  The major credit card issuers have set a deadline for most merchants to comply with the standard by October 1, 2015.  Automated fueling dispensers are not required to be in compliance until October 1, 2017.  While there are no regulatory penalties for non-compliance as of yet, after the aforementioned dates, any merchant that is not compliant with the EMV protocol will be liable for any counterfeit transactions performed at non-compliant purchase points with an EMV-compliant card.  Payments Source, a payments industry trade group, estimates the cost to bring existing fueling dispensers into compliance at $6,000 to $10,000 each.

**Excess Land** is defined as land not needed to serve or support the existing improvement.  Such land may be separated from the larger site and have its own highest and best use or may allow for future expansion of the existing improvement.

**Surplus Land** is defined as land that is not necessary to support the highest and best use of the existing improvement but, because of physical limitations, building placement, or neighborhood norms cannot be sold off separately.

**Marketing Period** is an opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal.[8]

According to the PwC Korpacz Real Estate Investor Survey, first quarter, 2018, the average marketing time for strip retail centers, the most similar property type, averages near seven months. Marketing times for the multi tenant leased fee comparables analyzed in Sales Comparison section averaged about 24 months.  We conclude an estimated marketing time for the subject property at one year, assuming the property is priced reasonably and actively marketed.

**Exposure Period** is defined as the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal.[9]

Considerate of improving markets trends we estimate exposure time at one year.

---

[8] The Appraisal Institute, The Dictionary of Real Estate Appraisal, Fifth Edition, Chicago, IL, The Appraisal Institute, 2010, 121
[9] Ibid., 73

**Property Ownership and History**

According to the provided title report, the property is owned by Matlock's Country Corner, LLC. We note transfer of assets between related parties in the past three years, but no market sales or listings.  RPC makes no warranties to fee simple ownership of the subject property.



**REGIONAL MAP**

*Retail Petroleum Consultants, LLC*                    *Regional Economic Overview*   **Page 17**

## ECONOMIC OVERVIEW

Economic trends have a direct effect on both business and real property value.  This is especially true for the subject property.  In an effort to address and consider such influences, it is necessary to identify trends that may affect the subject market.  This section of the report examines the national and regional economic trends that influence subject value.

The national and global economies continue to recover from the worst economic downturn of the Post WWII period, known as the Great Recession.  Locally and nationally, low interest rates had prompted a huge increase in home buying and the resulting price appreciation.  Purchases of commercial and industrial property also saw intense stimulation.  Land values rose sharply throughout the country.  Until the second quarter of 2007, a surplus of buyers, easy credit, and decreasing land availability had allowed the housing sector to expand at a record pace, with values reaching unheard of heights.  This appreciation in home values fueled substantial consumer spending, leading to sustained periods of economic growth.

The subsequent collapse of the housing market caused consumers to retrench and pay down their accumulated debt, leading to widespread defaults on mortgage debts, many of which were underwater.  Many lenders and investors had to take multi-billion dollar write-downs on their Commercial and Residential Mortgage Backed Securities (C/RMBS) packages.  With the demand for these securities dropping, lenders cut the supply, issuing far fewer risky sub-prime loans.  Buyers with bad or no credit were no longer able to qualify for these lending vehicles, which effectively curtailed demand for single-family homes in many areas.

Residential home values generally bottomed out between 2010 and 2012, depending on the local market.  Since then, the economy has steadily recovered.  Real estate values in many markets have been steadily increasing over the past few quarters, with home prices rising and inventory declining.  This appreciation has been buoyed by interest from institutional investors buying homes in many markets with the intent of renting these homes out.  Investor demand has made up a substantial portion of buying activity in many markets.  Lending to owner-occupants has begun again, albeit with stricter lending standards than during the prior boom period.  Housing prices in some areas are now back to, or have surpassed, their pre-recession peaks.  Interest rates remain historically low, with the 10-Year Treasury Rate bouncing between 1.5% and 3% since the middle of 2013.  The effective federal funds rate has risen to around 1.0% after the Fed raised the target rate multiple times this year after standing pat during the recession.  Consequently, commercial and industrial real estate markets have also continued to recover, with investors seeking higher yields in a historically low-yield market.  Most market participants are expecting the Fed to raise interest rates again sometime in the coming twelve months.  The following indicators examine the health of the U.S. Economy in general.

*Gross Domestic Product*
Since the official end of the recession in mid-2009, U.S. Gross Domestic Product (GDP) has steadily increased.  After reaching a pre-recession high of $14,996 billion in the third quarter of 2007, GDP steadily declined to $14,357 billion in the second quarter of 2009.  Since then, GDP

**Retail Petroleum Consultants, LLC**                    *Regional Economic Overview*    *Page 18*

has risen to $16,873 billion in the current quarter, an increase of 17.53% from the low and 12.55% higher than the previous high. On average GDP has grown 14.58% from ten years ago, or 1.46% per year. The following graph shows the ten-year history of the Real GDP in the United States. Data provided by the St. Louis Federal Reserve.



*Consumer Price Index*

The national CPI shows current inflation running at 1.76% per year based on information from the prior ten years, with the current index 17.64% above where it was ten years ago, although data from only the last five years shows a lower 0.99% rate of inflation, below the Fed's target of 2%. Similar to GDP, the CPI saw a decline during the recession, dropping from 219.016 to 211.398, a decline of -3.48%. Since then, the CPI has resumed its upward trajectory, reaching a current level of 243.790, or 15.32% above the recession low reached in December 2008. The following graph shows the ten-year history of the National CPI in the United States. Data provided by the St. Louis Federal Reserve.



*National Unemployment Rate*

Non-farm Civilian Unemployment saw a rather large upward spike during the recession, becoming a prominent political talking point and a focus of numerous economic policies of varying degrees and success. The national unemployment rate spiked to 10.00% in October 2009, just after the official end of the recession, after hitting a cyclical low of 4.4% in May 2007. Since the peak, the rate has more or less steadily declined to a current rate of 4.40%. This rate is now below the prior-ten-year average of 6.98% and below the long-term average of 5.80%. The following graph shows the ten-year history of the National Unemployment Rate in the United States. Data provided by the St. Louis Federal Reserve.



*Lending & Banking*

Following the collapse of numerous commercial and investment banks, credit in most forms contracted. Consumer credit has generally been contracting, as banks have tightened lending standards and easy financing has become scarce. Both outstanding commercial and industrial loans and consumer loans are at all-time highs, surpassing the prior peaks set at the end of 2008. Notably, real estate loans have remained relatively flat since the recession ended, averaging $3,878.4 billion over the prior three years. The following graph shows the ten-year history of commercial, real estate, and consumer lending in the United States. Data provided by the St. Louis Federal Reserve.



*Housing*

As mentioned previously, housing played a primary role in the prior recession, fueling massive consumer spending, bank lending, and loan securitization prior to the recession.  When the market collapsed, so did the many other elements of the economy.  Based on data presented by Standard & Poor's and Case Shiller, national home values peaked in the middle of 2006.  They bottomed out in early 2012 and have since begun to stabilize.  Current home prices are currently 5-7% below their peak, but about 45% above their recession lows.  The following graph shows the ten-year history of home values in the United States according to the S&P/Case Shiller Index.



*Commercial/Industrial Real Estate*

The Moody's/REAL Commercial Property Price Index (CPPI) tracks commercial real estate investment property prices, similar to how the S&P/Case-Shiller Index tracks residential real estate market movement. According to Moody's, the index "measure[s] the change in actual transaction prices for commercial real estate assets based on the repeat sales of the same assets at different points in time." The current index shows that all indexes in most markets have surpassed their peaks reached in late 2007/early 2008, with properties in major market faring the best. Properties in non-major markets are 8.83% above their peak, with only retail properties remaining slightly below their peaks. Moreover, most of the indexes have registered gains in the prior year, with markets up between 4.99% and 9.97%, with only retail properties showing a small decline of 2.40%. Major markets have led the way, with the All-Property Major Market Index up 43.52% from the pre-recession peak set in late 2007.



CoStar Group, Inc. produces a similar repeat sales index, known as the Costar Commercial Repeat Sale Indices (CCRSI). The index is described thusly:

> "The CoStar indices are constructed using a repeat sales methodology, widely considered the most accurate measure of price changes for real estate. This methodology measures the movement in the prices of commercial properties by collecting data on actual transaction prices. When a property is sold more than one time, a sales pair is created. The prices from the first and second sales are then used to calculate price movement for the property. The aggregated price changes from all of the sales pairs are used to create a price index."

The survey is broken out by region and property type. Focusing strictly on the western region, the survey shows a continued increase from recession lows. The survey shows western retail properties up 1.96% from the prior quarter and up 8.69% from the prior year. All of the indexes have surpassed their pre-recession peaks, with office values up 0.29%, retail properties up 4.42%, and multi-family properties up 46.19%.



*Summary – National Economy*

In summary, the national economy continues to recover after a grinding recession, with both commercial and residential property values registering gains from the prior few years. Continued increases in GDP, moderate inflation, and increasing home and commercial property values are underpinning the recent growth. In contrast, weakness in the Euro area with a recent vote by Britain to exit, partisan gridlock in Washington D.C., terrorism, volatile energy prices, and general economic uncertainty will likely hamper the recovery on a national and global scale. The major wild card remains the actions of the Federal Reserve and when they will elect to increase interest rates from the current lows, although with inflation still below the 2% target, consensus about the likely date of the increase eludes many observers. Nevertheless, real estate valuations continue to climb, fueling speculation of another property bubble. The trend of modest improvement in economic conditions and increasing property values is expected to continue into the foreseeable future. The prior economic indicators are summarized below.

| US National Economic Indicators Summary | | | | |
|---|---|---|---|---|
| | Current | Last Quarter | Last Year | Ten Years Ago |
| GDP, Billions | $16,872.8 | $16,813.3 | $16,525.0 | $14,726.0 |
| CPI | 243.79 | 243.752 | 239.842 | 207.234 |
| Unemployment | 4.40% | 4.50% | 4.90% | 4.60% |
| Home Values | | | | |
| 　10-City | 210.64 | 206.15 | 200.79 | 218.94 |
| 　20-City | 197.19 | 192.36 | 186.61 | 200.54 |
| Commercial Property Values | | | | |
| 　CPPI, National Index | 218.95 | 214.24 | 204.02 | 169.71 |
| 　CCRSI, West Retail | 219.77 | 215.55 | 202.19 | 203.51 |

**Cook County, Illinois**

The subject property is located within Cook County in Southern Illinois.   Our regional, demographic, and economic analyses are based on data extracted from SiteToDoBusiness.com, U.S. Department of Labor Bureau of Labor Statistics, U.S. Census Bureau and Office of Management and Budget.  This data has been extrapolated from various databases and are the most current available, being updated every quarter.

The combined databases include various economic and demographic variables for the subject's respective county and state.  The SiteToDoBusiness database includes drive time, zip code, and radius population estimates, household income, and related data.  This data is based on 2017 populations with projections through 2022.   The Department of Labor provided county unemployment trends and data specific to the subject's operation including number of facilities, number of employees, and average wage.

*Population*

Population within Cook County is currently indicated at 5,313,828 and is expected to increase to 5,377,519 within five years, an increase of approximately 1.20% over the five year period, or 0.24% per year.  This is higher than population indicated at the 2010 census, which was indicated at 5,194,675 within Cook County.  Population at the previous census in 2000 was 5,376,848, indicating a long-term growth rate from 2000 to 2017 of -0.07% per year.

Households are expected to follow the same trend, with total households within Cook County increasing from 2,014,981 in 2017 to 2,040,831 in 2022, indicating a consistent 2.637 persons per household.  There were 1,974,217 households in 2000 and 1,966,356 households in 2010, indicating a long-term growth rate of 0.12% from 2000 to 2017.

The median age in Cook County is currently indicated at 36.5 years, up from 2010, when the median age was 35.3 years.  The county population is expected to increase in median age to 37.5 years in 2022.  The following chart breaks out current and projected age trends within the county.



*Income*

SiteToDoBusiness reports current median household income at $57,978, which is forecasted to increase to $64,307 by 2022, an increase of 10.92%.  Similarly, per capita income is expected to increase from its current level of $33,208 to $37,564 by 2022, an increase of 13.12%.   The following chart breaks out current and projected income trends within the county divided into income categories.



*Housing*

According to SiteToDoBusiness, there were approximately 2,096,157 housing units in Cook County as of the 2000 census.  That figure increased to 2,180,359 housing units as of the 2010 census.  Current estimates indicate 2,227,236 housing units, an increase of 2.15% from the 2010 census.  Housing units are forecasted to grow to 2,261,004 units in 2022, indicating a growth rate of 1.52% over the five-year period.

The median home value is currently estimated at $247,591 as of 2017 by SiteToDoBusiness.  It is expected to increase to $288,558 by 2022, indicating an annual home appreciate rate of 3.31%. The average home value is currently estimated at $318,665 as of 2017 by SiteToDoBusiness.  It is expected to increase to $367,920 by 2022, indicating an annual home appreciate rate of 3.09%.

Owner-occupied units comprise the majority of the housing stock in the city.  Current estimates indicate that approximately 49.9% of total housing units are owner-occupied, with 40.6% of units occupied by renters.  The balance of the units is vacant.  In 2022, the mix is expected to shift to 49.5% owner-occupied units and 40.8% renter-occupied units.



*Employment*

Cook County is home to approximately 180,774 business employing 2,760,859 workers according to SiteToDoBusiness. The Bureau of Labor Statistics (BLS) reports unemployment in the county at 5.60%, lower than the long-term average of 8.11% since the beginning of 2007. Unemployment peaked in January 2010 at 12.30%. Through 2017, unemployment has averaged , from last year's  average. The long-term unemployment trends in Cook County are presented in the following chart.



The BLS reports approximately 3,832 employees working in 800 gas stations throughout the county as of 2016. Each employee was earning $21,001 per year, indicating total wages attributable to gas stations of $80,475,832 in the most recent year. In comparison to two years ago, employment within the industry is up from 3,708 employees in 2015. The number of facilities has declined from 866 facilities in 2015 to 800 in 2016. Average wages are up from $18,479 per employee to $21,001 in 2016.



| Cook County Gas Station Employment Trends | | | |
|---|---|---|---|
| | # of Employees | # of Stations | Average Annual Pay | Total Wages |
| 2006 | 3,982 | 729 | $18,444 | $73,444,008 |
| 2007 | 3,824 | 720 | $18,441 | $70,518,384 |
| 2008 | 3,761 | 702 | $19,396 | $72,948,356 |
| 2009 | 3,610 | 719 | $19,424 | $70,120,640 |
| 2010 | 3,616 | 745 | $19,837 | $71,730,592 |
| 2011 | 3,878 | 797 | $18,584 | $72,068,752 |
| 2012 | 4,063 | 835 | $18,335 | $74,495,105 |
| 2013 | 3,855 | 838 | $18,058 | $69,613,590 |
| 2014 | 3,736 | 866 | $18,479 | $69,037,544 |
| 2015 | 3,708 | 832 | $19,806 | $73,440,648 |
| 2016 | 3,832 | 800 | $21,001 | $80,475,832 |

*Summary – Cook County*

Overall, Cook County is expected to continue to recover from the prior recession, similar to the rest of the country. Home values are expected to increase modestly, while unemployment will likely continue to decrease. RPC estimates more balanced markets in 2017 and beyond.



**NEIGHBORHOOD MAP**

## NEIGHBORHOOD AREA OVERVIEW

The appraisal of Real Estate, Appraisal Institute, Twelfth Edition, defines neighborhood as "a group of complimentary land uses."  Social, economic, governmental and environmental forces influence property values, which, in turn directly affect the property value of the subject property. "The area of influence is the area within which the forces affect all surrounding properties the same way they affect the property being appraised.  The area most closely surrounding the subject property, whether it contains residential only, commercial only, or a mixture of residential and commercial is the neighborhood."  The subject neighborhood is described as the mixed use corridor along Interstate 57 between 111th street to the north and Vermont Street to the south.

The subject property is located within the incorporated limits of Calumet City Village in the southern portion of Cook County Illinois.  The subject's facility is located approximately 14 miles south of the Chicago (CBD).  Calumet City Village is bordered by the city of Oak Lawn to the north, Alsip to the west, Lansing to the south and East Chicago to the east.  The city encompasses approximately 7 square miles of land area and has an estimated population of 36,000 people.  The city is mostly built out and primarily residential in nature, with industrial and commercial uses along the major corridors and waterways.  Downtown Calumet City Village is located approximately five miles southeast of the subject site.

Calumet City is densely-developed and mostly built-out, having experienced the majority of its expansion in the 1920's and 1930's.  Development has followed a typical urban/suburban auto-oriented grid pattern, with commercial uses located along major thoroughfares and residential uses located within neighborhoods along the smaller interior streets.  Vacant land is available in the subject neighborhood for future development.  There has recently been a purchase of land by RaceTrac in the vicinity of the subject property

A network of Interstates, State Highways and local roadways serve the community.  Interstate 57 is located adjacently east of the property and is the main north – south corridor through Calumet City Village.  Interstate 57 starts approximately 5 miles northeast of the subject where it deviates from Interstate 94.  It travels approximately 15 miles to its ending point where it bisects Interstate 80.  The main east – west roadway through the subject neighborhood is the subjects fronting street of 119th Street.  This mixed use roadway starts two miles east of the subject at S. Michigan Avenue and travels five and one half miles to its ending at S. Kostner Avenue three miles to the west.

The subject property is specifically located at the southwest corner of Marshfield Avenue and 199th Street.  Land use to the north, across 119th Street is a is a Fifth Third Bank that is part of a large shopping mall anchored by retailer such as Target, Petco, and Burlington Coat Factory. South of the subject is a small commercial building and an empty lot used as a parking lot.  To the east, across Interstate 57 is a large place of worship.

The subject is located on a corner on 119th Street and Marshfield Avenue.  which is a primary roadway for east - west traffic and good access to Interstate 57.  In the subject neighborhood, Marshfield Avenue is a one way road that acts as a frontage road to Interstate 57 and travels in a southbound direction.  It is an undivided 40-foot-wide right-of-way that travels in one direction with an asphalt-paved roadbed.  There are two lanes of traffic with both headed in the same direction.  The road is improved with concrete curbs, gutters, and sidewalks, as well as overhead streetlights.  Traffic along Marshfield Avenue in the vicinity of the subject property is estimated at approximately 5,480 ADT cars per day according to the latest traffic count survey from SiteToDoBusiness.

119th Street is a two-way roadway that travels in a east - west direction.  It is an undivided 80-foot-wide right-of-way with an asphalt-paved roadbed.  There are two lanes of traffic in each direction with dedicated center left turn lanes.  The road is improved with concrete curbs, gutters, and sidewalks, as well as overhead streetlights.  Traffic along 119th Street in the vicinity of the subject property is estimated at approximately 20,400 ADT cars per day according to the latest traffic count survey from SiteToDoBusiness.

| MICRO POPULATION TRENDS | | | |
|---|---|---|---|
| **Subject Area** | **2017** | **2022** | **% Growth** |
| 1.0-Mile Radius | 7,464 | 7,636 | 2.30% |
| 3.0-Mile Radius | 52,050 | 53,692 | 3.15% |
| 5.0-Mile Radius | 125,524 | 130,812 | 4.21% |
| 5-Minute Drive | 14,801 | 15,112 | 2.10% |
| 6-Minute Drive | 21,745 | 22,295 | 2.53% |
| 7-Minute Drive | 39,384 | 40,607 | 3.11% |

The subject's immediate area is considered medium density with population increases projected at 2.10% to 4.21% over the next five years.  Population within a 1.0 Mile radius of the subject is 7,464 people and projected to increase to 7,636 people by 2022, a 2.30% growth rate over the 5-year period.  Trends depicted on a "drive time" basis assume the area accessible from the subject site within the respective time frame under normal driving conditions.  For example, the previous chart reflects 21,745 people living within a 3-Minute drive of the subject facility.  Significant population growth is projected for the area.

The subject caters primarily to local residents and shoppers located throughout the surrounding community.  The current operations are well located in a highly-trafficked area with Interstate 57 on and off-ramps located adjacent to the subject.  The subject site and neighborhood should continue to benefit from commercial demands generated by its close proximity to freeways and population base.

*Retail Petroleum Consultants, LLC*                                   *Site Area Overview   Page 31*

**PLAT MAP**



Improved Site – Excess Land Area A – Excess Land Area B

**SITE PLAN**



*Retail Petroleum Consultants, LLC*                                        *Site Area Overview   Page 33*

**SITE PLAN**



## SITE DESCRIPTION

**Aerial Photograph**



<span style="color:red">Improved Site</span> – <span style="color:green">Excess Land Area A</span> – <span style="color:blue">Excess Land Area B</span>

The subject is considered in three parts, the improved site as outlined above in red, and the Excess Land Areas A and B in green and blue respectively.

### Physical Characteristics – Improved Site

The improved site is located at the signalized southwest corner of Marshfield Avenue and 119th Street being adjacently west of Interstate 57 right of way. The site is generally level and is near grade with the fronting streets. The improved site is flag shaped as depicted in red above with a total of five curb cuts. The building is centrally situated on site with auto service and car wash

uses on the western half of the site.  The eastern side of the site is devoted to the leased retail spaces, the c-store, and fueling station.

The fueling dispensers are covered by a single, detached steel canopy at the northeastern corner of the site.  Dispensers are situated in two rows of three dispensers each parallel to 119th Street.  Based on our interpretation of assessor parcel maps, the improved site contains approximately 98,504 square feet.  The site is comprised of a single parcel identified as APN 2530204046.  Asphalt covers 45.0% of the site with concrete paving over 5.00% of the site.   Building improvements cover 22.36% of the site with landscaping/drainage on the remaining 27.64%.  There are spot lights attached to the building in addition to street lights, (15) pole-mounted flood lights, and spotlights under the canopy for site illumination.

| IMPROVED SITE SUMMARY | | | | | |
|---|---|---|---|---|---|
| | **Square Feet** | **% of Site** | | **Size** | **Unit** |
| Site Size | 98,504 | 100.00% | Lighting | 15.0 | Fixtures |
| Asphalt Areas | 44,327 | 45.00% | Access | 5 | Curb Cuts |
| Concrete Areas | 4,925 | 5.00% | Gas Service | 6 | Dispensers |
| Landscaping/Drainage | 27,228 | 27.64% | Curbing | 1,255 | Linear Feet |
| Improvement Coverage | 22,024 | 22.36% | Trash Encl. + | 1 | Misc. |

Soil and drainage are assumed adequate.  The site is served by all utilities, including electricity, water and sewer service, fire and police protection.  Our valuation assumes the site is free of contamination and/or environmental hazards as cited in our general and extraordinary assumptions and limiting conditions.

**Excess Land**
Excess Land Areas A and B contain 12,919 and 32,151 square feet respectively.  Excess Land Area A adjoins the improved site to the north with similar frontage along 119th Street.  The site enjoys a non signalized corner comprised of six APNs with access by a single curb cut along Paulina Street to the west with additional shared access to its east with the improved parcel to the east.  The site essentially vacant excepting pavement and basic grass landscaping.

Excess Land Area B adjoins the improved site to the south with frontage to Pauline Street, Mansfield Road, and 120th Street.  The site enjoys a non signalized corner comprised of 10 APNs with shared access to with the improved parcel to the north.  The site essentially vacant excepting sidewalk, leased billboard, and basic grass landscaping.

**Zoning/Legal Restrictions**
The subject property falls under the jurisdiction of the Village of Calumet Park incorporated area of Cook County and is zoned I for Industrial / Business use.  According to the planner interviewed the subject represents a legal and conforming use of the site.  Any redevelopment or change in development plans would need to be discussed with city planning officials.

**Easements**

We have not been provided with a preliminary title report. Our inspection revealed evidence of typical access and utility easements that usually have little if any impact upon value. This appraisal report assumes no unusual easements or encroachments that would have a negative impact on our concluded value. All taxes levied on the subject's operations are assumed paid in full. Any delinquent taxes owed or related liens are the liability of the buyer and considered a deduction from our concluded value. Please refer to Extraordinary Assumptions.

**Supply Contract and Franchise Agreements**

The subject operates as a Citgo branded fueling station "as is". We have been provided with a copy of a branding or fuel supply agreement, reproduced in the Addenda for review. Such agreements are typical for the industry and not considered to have a negative impact on operations so long as the highest and best use of the site remains as a fueling station with c-store. Any fees owed to the fuel supplier or franchisors are to be deducted from our concluded value.

If the station is not branded as indicated or if incentives are offered, we reserve the right to modify our conclusions as stated herein. Any risks associated with rebates, if applicable, is considered in our selected GPM and not included in our projected fuel margins. We have not considered any other incentives and/or penalties in our valuation. Such agreements are often customary in the retailing petroleum industry, especially for new or re-branding stations and can sometimes affect cash flow and operations. Please refer to Extraordinary Assumptions.

**Flood Hazard**

According to Flood Plain Insurance Rate Maps, Community Panel No. 06107F0934 E, dated June 16, 2009, the subject site is mapped with the majority of the site located in an "X" designated flood area and a small portion located within the "AE" designed flood area. We recommend additional questions be addressed to FEMA (who can be contacted by phone at 800-638-6620).

**FEMA Map**

### ADA Compliance

We were not provided with sufficient detail to accurately determine if the proposed construction and finished interiors are in complete compliance with the Americans with Disabilities Act (ADA). We assume the property will be construction in accord with all governmental requirements. Please refer to the Assumption and Limiting Conditions section.

**Property Taxes**

The subject property is identified by the County Assessor via various APN numbers as summarized below.  The following table details the subject's current assessments and taxes payable per assessor's records for the most recent period available.  No special assessments are noted; please refer to the Extraordinary Assumptions section.

| ASSESSMENT AND TAX INFORMATION 2016 - 2017 | | | | | |
|---|---|---|---|---|---|
| **APN** | **Land** | **Improvements** | **P/P Other** | **Gross Assessed** | **Tax Amount** |
| 2530204001 | $2,880 | $320 | $0 | $3,200 | $1,707.53 |
| 2530204002 | $2,213 | $167 | $0 | $2,380 | $1,270.08 |
| 2530204003 | $2,208 | $166 | $0 | $2,374 | $1,266.85 |
| 2530204004 | $2,196 | $388 | $0 | $2,584 | $1,378.78 |
| 2530204005 | $2,189 | $165 | $0 | $2,354 | $1,256.19 |
| 2530204006 | $2,990 | $332 | $0 | $3,322 | $1,772.63 |
| 2530204046 | $111,366 | $98,759 | $0 | $210,125 | $112,126.23 |
| 2530204020 | $581 | $0 | $0 | $581 | $310.10 |
| 2530204041 | $1,080 | $0 | $0 | $1,080 | $576.22 |
| 2530204022 | $558 | $0 | $0 | $558 | $297.72 |
| 2530204042 | $1,080 | $0 | $0 | $1,080 | $576.22 |
| 2530204043 | $1,080 | $0 | $0 | $1,080 | $576.22 |
| 2530204021 | $581 | $0 | $0 | $581 | $310.10 |
| 2530204023 | $558 | $0 | $0 | $558 | $297.72 |
| 2530204044 | $1,080 | $0 | $0 | $1,080 | $576.22 |
| 2530204024 | $567 | $0 | $0 | $567 | $302.48 |
| 2530204045 | $1,080 | $0 | $0 | $1,080 | $576.22 |
| Totals | $134,288 | $100,296 | $0 | $234,584 | $125,177.51 |

**Retail Petroleum Consultants, LLC** *Site Area Overview* **Page 39**



| | |
|---|---|
| Subject looking south across 119th Street, Excess Land Area A to the right. | Subject building southern elevation. |
| Subject curb cut entry off Mansfield Road looking west. | Subject building western elevation. |

## SUBJECT PHOTOGRAPHS



| 119th Street looking west. | 119th Street looking east. |
| Corner signage | Marshfield Avenue looking south |

## SUBJECT PHOTOGRAPHS



C-Store – cashier's station interior.

C-Store – cashier's station exterior.

C-Store – interior and product racking.

C-Store – interior and product racking.

## SUBJECT PHOTOGRAPHS



| | |
|---|---|
| C-Store – built-in refrigeration and product racking. | Manager's office. |
| Bathroom entry. | Duncan Donuts interior. |

# SUBJECT PHOTOGRAPHS



Equipment Room/Storage.

Interior hallways.

Multi-Product Dispensers (MPDs)

Fueling canopy and dispenser islands.

## SUBJECT PHOTOGRAPHS



New MPD with diesel.

New MPD with E-85.

Owner occupied C-Store and leased Duncan Donuts Exterior.

Leased Boost Mobile and Hair Gallery spaces.

## SUBJECT PHOTOGRAPHS



| | |
|---|---|
| Vacant space available for lease. | Insurance lease space and car wash entry. |
| Auto service bays | Illuminated freeway visible Citgo logo sign. |

## SUBJECT PHOTOGRAPHS



Duncan Donuts signage.

Dunkin Donuts Drive thru.

Excess Land Area B.

Excess Land Area B and leased billboard.

## SUBJECT PHOTOGRAPHS

## IMPROVEMENT DESCRIPTION

The subject improvements are aged with the exception of a portion of the above and below ground fueling improvements which were recently replaced. The original building structure was built in the late 1990's. The leased retail portion of the property has an estimated economic life if new of 40 years with an estimated remaining economic life "as is" of 20 years. The owner occupied portion of the subject property including car wash, auto service bays, c-store and storage has an estimated effective age of 20 years with remaining economic life of 15 years blended, less than the leased retail space due to permanently attached car wash equipment which depreciates at a much faster rate than the building. The fueling system including USTs has an economic life if new of 15 years and remaining economic life of 10 years "as is". The following descriptions are based on information gathered during inspection and data provided the appraiser. A detailed building improvement plan was requested but not provided to us. We were able to verify total building areas but unable to verify tenant spaces and must rely to some extant on data provided the appraiser.

The subject site is improved with a single 22,024 square foot masonry building housing both owner occupied and leased fee spaces. The car wash, auto service bays, and c-store (convenience store) profit centers are owner occupied and contain a total of 15,874 square feet. The adjoining in-line occupied leased spaces include 2,650 square feet occupied by Dunkin Donuts, Boost Mobil, Hair Gallery and an Insurance Office. The vacant spaces include 1,500 and 2,000 square feet.

### C-Store Improvements
The subject's c-store area contains a total of 4,000 square feet according to data provided the appraiser. The c-store includes four separate areas; a cashier's counter, restrooms/storage, sales floor, and food service area. The c-store's customer entrance is a single-swinging door, made of glass with an aluminum frame. The windows are glass with metal frames. The interior floors are covered with ceramic tile. The ceilings are acoustic drop panels with recessed fluorescent light fixtures. The interior walls are painted drywall with tile. There are (11) reach-in refrigeration units and (2) freezer units in the c-store area. The c-store has a separate men's and women's restrooms. A drive-thru window services Duncan Donuts adjacent to the c-store space.

### Car Wash Improvements
The car wash area including tunnel and equipment room contains 4,700 square feet. The tunnel houses a motorized conveyor 190 feet in length. The tunnel is open ended to allow for ventilation and includes a water reclamation and sanitation system. There are roll-up doors for security when not in use. The car wash existing operations are classified as a flex serve. Current operations seem light on line labor inferring a high percentage of exterior only washes.

*Retail Petroleum Consultants, LLC*                  *Improvement Description   Page 48*

---

**Auto Service Improvements**

The subject's auto service area contains (4) bays with a total of 4,950 square feet.  The space is accessible via dual entrances with roll-up doors.  The interior floors are poured concrete, and the ceilings are exposed metal beams with recessed fluorescent light fixtures.  The bays adjoin the western elevation of the car wash tunnel.

An additional 2,224 square feet of building area is classified as "Storage/Misc." and considered as owner occupied and allocated to the car wash area.

**Leased Retail Spaces**

The in-line occupied leased spaces include 2,650 square feet occupied by Dunkin Donuts, Boost Mobile, Hair Gallery and an Insurance Office.  Two additional spaces are reportedly vacant with 1,500 and 2,000 square feet.  These spaces have basic commercial interior finishes with tenants taking space on an "as is" basis without TIs.  The vacant space of 1,500 square feet is offered for $3.33 per square foot per month on a full service basis whereby the landlord is responsible for all operating expenses associated with the property.  The larger space is not being formerly listed and lacks a store front but can be combined with existing space for lease or leased.

**Billboard Improvements**

The billboard improvements are owned by the tenant.  There is a single double sided billboard located on Excess Land Area B.  The illuminated (est. 50' X 16') billboard sits atop a concrete foundation with steel base being approximately 60-feet tall and visible to all fronting streets as well as traffic along Interstate 57.  The billboard is leased long term.  Electricity is separately metered and paid by the tenant.

**Fueling Improvements**

The subject "as is" has (6) raised and formed concrete pump islands holding (6) fueling dispensers with a total of (12) simultaneous fueling positions.  Dispensers are the modern multi-product type each with two hoses per side selling three grades of unleaded gasoline and diesel.  All (6) dispensers sell fuel in a self-serve format with card readers, we recent note replacement of (2) MPDs.  The fueling area is covered by a single detached steel canopy encompassing approximately 7,200 square feet.  Fuel storage is provided by (2) 12,000-gallon and (2) 8,000-gallon underground storage tanks (USTs).  The tanks are assumed to be of fiberglass construction and assumed in compliance with all EPA specifications and related government programs.  One set of USTs were recently replaced.  The owner plans on expanded and renovating existing fueling operations as well as giving the building a facelift.  The reported "as is" value does not consider any proposed construction or value for related permits or approvals.

*Retail Petroleum Consultants, LLC*                    *Improvement Description    Page 49*

There is a single pole mounted illuminated Citgo sign in addition to two digital price boards as well as secondary signage for tenants.  These signs are clearly visible to traffic along the fronting streets.

| "AS IS" FUELING IMPROVEMENTS | |
|---|---|
| Canopy (SF) | 7,200 |
| Islands | 6 |
| Dispensers | 6 |
| Diesel Nozzles | 4 |
| Fuel Nozzles | 12 |
| Fueling Positions | 12 |
| USTs | 4 |
| Fuel Storage (Gal.) | 40,000 |

## MARKET TRENDS AND ANALYSES

The following market analysis is designed to provide a general understanding of the trends and characteristics specific to retail petroleum type properties.  We have included the specific industry segments that best represent the subject facility and respective profit centers.  The sources of data used to prepare this analysis include published reports by NACS (National Association of Convenience Stores), the State Board of Equalization, the Energy Information Administration, Costar, in-house data files, individual interviews with market participants, and related data.

### Service Station Industry Trends

Beginning in the 1980s to the present day, the trend in the gasoline retail market has been towards self-service fueling stations with c-stores.  This shift is in response to the modern-day automobile with less routine maintenance and better dependability than automobiles of 30 years ago.  Cars have become much more complex requiring service beyond the scope of the typical service station mechanic.  The addition of Hybrids and alternative fuel vehicles, including but not limited to electric, CNG (Compressed Natural Gas), and hydrogen powered, will continue to change the service environment with new and increasingly complex technologies.

Often, cars must be serviced at the dealer, since only a dealer can afford expensive diagnostic equipment required to work on today's sophisticated electrical ignition and fuel injection systems. Historically, when service stations were predominantly full-service, customers would often utilize a particular station because they liked the operator and felt that they could trust him to work on their car.

Today, most self-service gasoline stations don't offer any repair service and have become c-stores that sell gas.  Older stations often convert service bays to the sale of food and related merchandise, thus increasing or maximizing the c-store operations, especially when most light industrial and repair related work is performed on less valuable on-corner land.  Stores with older service bay - snack shop configurations often suffer from functional obsolescence due to the inferior net profit realized from the service bays as opposed to in-store merchandise or c-store sales.  The smaller owner/operators often don't have the financial means or required motivation to renovate, remodel, and/or redevelop older service stations to more profitable modern day configurations, without the assistance of financial leverage from a lending institution.  Many older facilities are configured on small sites that limit redevelopment potential and operational performance.

Land values declined during 2009 to 2012 and have generally been increasing since 2013 depending on the relative strength of the local market.  There are certain markets where land values support re-development of the site, but to a higher and better use than as a gas station. Supply agreements can encumber the development potential of the property, often restricting a site to gas station use for 15 to 20 years.  In urban areas, it is not unusual to have site value exceed the value the operating gas station built on top of it.  Such issues as they pertain to the subject property are addressed in the Highest and Best Use section and considered within the individual valuation approaches.

In today's markets, customers typically do not choose a gasoline station because they like the personnel or need their cars serviced. Customer patronage is based on convenience, which makes sites with good access and exposure more desirable. Service has become less of a concern as most vehicles are now serviced at dealerships or specialized automotive centers. Location and convenience are far greater determining factors than the clerk behind the counter. The level of service required for c-store sales is far from intensive.

The market trend in new construction has been to develop high-volume stations located along well trafficked arterials near freeway off-ramps. This high volume business is often achieved through co-branding service stations with fast food or quick-serve restaurants (QSRs), c-stores, and car washes.

Major oil companies are primarily interested in developing, supplying, and operating only high volume sites. The potential for costly environmental concerns and compliance upgrades doesn't warrant continued operations of marginally performing facilities. The risk is too great to the major oil companies to justify maintaining a site that does not sell at least 100,000 to 125,000 gallons per month (1,200,000 to 1,500,000 annually). The oil companies continue to sell real estate assets to existing dealers and in some cases the open market. There continues to be a shift in Major Oil Company operations from retailing to marketing an, though these inventories have diminished with few Major Oil Company owned sites left. Rather than develop new sites themselves, oil companies are likely to subsidize a dealer owned project in return for branding, fueling improvements, rebates, and/or a long-term supply contract.

As time progresses and land values increase, gas stations often do not represent the highest and best use of the underlying land, but their continued operation is required due to oil company supply agreements which have costly cancellation fees, usually based on $0.03 per gallon for every gallon of fuel that would have been sold for the duration of the remaining supply agreement. Given these costs these sites will likely remain in operation until the supply agreements expire at which time the site will be redeveloped, often to non-gas station type uses.

According to market participants, oil companies historically were generally interested in sites with at least 20,000 square feet, preferably 30,000 square feet or more. The shift today has been towards larger sites with 40,000 square feet or more, with the average size of a new urban site in 2015 according to NACS at 80,052 square feet. These larger sites are necessary to serve the various profit centers required at new stations including fueling, c-store, car wash, and food service. This allows for an efficiently sized c-store and enough access and parking area required to achieve a high-volume business. Sites of less than 30,000 square feet are usually not considered viable for a Major Oil companies to develop unless located in very dense urban or extremely high-traffic areas. Smaller sites limit the size of c-stores and the number of dispensers that can pump gas as well as reducing overall site utility and accessibility. Alternative fueling is also becoming a concern as more and more alternative fueling options become available and are accepted by the motoring public, stations will need to re-configure. Some alternative energy sources dispensed on site may require additional area for charging or battery storage.

According to research performed by major oil companies, as much as 70% of consumer's retail gasoline is purchased within a two-mile drive from home. Further research shows that most motorists will purchase fuel and c-store items on their way to work. Major oil companies prefer to operate sites at the far corner locations (the right hand corner site after a stoplight or intersection) rather than the near corner because of better traffic patterns and easier access. Given consumer habits, convenience and location tend to be the most important factors in a successful retail gasoline station or c-store operation. Gas prices will likely continue to increase over the next decade. The future will offer alternatives to gasoline, many of which will likely be sold through existing stations supplied by the Major Oil Companies.

**C-Store Industry Trends**
The National Association of Convenience Stores (NACS) estimates the number of c-stores in the United States at 154,195 in 2014, up 0.9% from the year prior. While c-stores make up more than a third of all brick-and-mortar retail stores, growth in overall store levels has slowed recently. Single-store operators run approximately 63.14% of these stores. NACS defines a c-store as a retail business with primary emphasis placed on providing the public a convenient location to quickly purchase from a wide array of consumable products (predominantly food and gasoline) and services. A c-store is characterized by the following:

1. Typical size is less than 5,000 square feet
2. Off-street parking and or convenient pedestrian access
3. Extended hours of operation, many open 24 hours/seven days
4. A stock of at least 500 Stock Keeping Units (SKUs)
5. Product mix includes grocery type items, and also includes items from the following groups: beverages, snacks, (including confectionery) and tobacco

Industry information from NACS's Annual State of the Industry 2012 - 2017 publications were instrumental in our analysis of store operations. The publication is highly regarded amongst industry professionals and offers "benchmarks" and financial ratios that help measure store operations on a more generalized basis. This data generally relies on national statistics with greatest emphasis to branded operations.

The following information for the most recent year, 2015 references 154,195 single and chain c-stores throughout the United States. The following figures are weighted averages based on the number and size of the companies participating in the survey. Many of the NACS figures do not add up due to values representing the mean of firms reporting that line item. Any adjustments made are not considered material to the overall data analysis.

With some 97,504 stores nationally, the single or independent store operator plays an important role in the industry. These operators rely on their ability to respond quickly to changing market conditions, customer knowledge, lower overhead, and product mix to ensure future profitability. Independent operators can often take advantage of lower market or on-the-spot pricing which often facilitates higher fuel margins. However, volatility in the open supply market creates risks to

an Independent operator that are often offset by a Major Oil Company's flag.  Branding is still very debatable as to which is more profitable in the long run all other factors considered equal.

The c-store industry experienced high profitability during the last half of the 1990s.  The US and World economies began to show serious signs of trouble in late 2008 resulting in reduced profit due primarily to lower fuel volume and c-store and gasoline margins beginning in 2009.  Between 2007 and 2009, the overall number of stores in the US declined.  Growth and profitability has returned with economic recovery, with many facility sales and profitability levels nearing or exceeding their pre-recession peaks.

Average fuel volumes sold have remained relatively stable, increasing from 1,753,944 gallons sold in 2015 to 1,791,084 gallons sold in 2016.  This is well above the recession lows of 1,422,312 gallons sold in 2008.  The high price of fuel in the summer of 2008 likely contributed to this dip, as the average selling price of fuel in 2008 was $3.16 per gallon, far higher than 2009's $2.34 per gallon.  Fuel prices continued to rise from 2009, averaging $3.45 per gallon in 2011 and $3.57 per gallon in 2012.  Average pricing dropped back down to $3.47 per gallon in 2013 remaining elevated in conjunction with high oil costs.  Oil prices dropped in 2014 allowing for increased margins and/or higher volume, with some of the highest margins on record were realized in 2014.  Retail fuel pricing has remained low as crude oil prices have remained relatively low, with 2016 averaging $2.12 per gallon down from 2015's $2.40 per gallon.

NACS is expecting fuel prices to remain relatively stable throughout 2017.  "Although still relatively 'cheap,' prices are expected to be higher than 2016, threatening volumes.  Because margin optimization happens in times of volatility, no outstanding year-over-year margin growth would be expected.  An additional drag on margins will emerge again as fuel margins increase - moving card fees along with them - after declining in total for the last two years."

The highest retail price for gasoline in 2016 was seen in California, followed by Hawaii and then Alaska.  These three states have generally traded the top three spots over the last few years.  The lowest pricing points were observed from the southeastern states with South Carolina and Missouri leading the low priced states.

Motor fuel profit margins showed an increase to $0.225 per gallon nationally in 2014 up from $0.187 per gallon in 2013; however, margins showed a decline in 2015 to $0.217 per gallon and again down to $0.213 per gallon in 2016.  All indications are net of credit card fees and compiled by OPIS and NACS.  These figures reflect national means based on company owned and operated facilities.  The West Coast, upper Mid-West, and Northeast corridor tend to be the most profitable markets with the highest margins, while the gulf states tend to be the least profitable.  Average margins in California were reported at $0.397 in 2015, an increase from $0.355 the year prior.  For 2016 average margins in California were an indicated $0.408 per gallon.  Nevada also saw an increase from $0.205 to $0.212 per gallon.  Arizona saw a decrease, from $0.114 to $0.0091, likely dragged down by the Tucson and Yuma markets, two of three of the least profitable markets in the nation.

Fuel margins can vary dramatically within states. The San Luis Obispo/Paso Robles market had an average 2016 margin of $0.582 per gallon and was the most profitable market in the country, with the San Francisco market ranking 2nd, with an average 2016 fuel margin of $0.556 per gallon. Half of the 50 most profitable markets, including 12 of the top 15, are located in California. Meanwhile, Yuma and Tucson are noted as the least profitable markets as of 2016, with markets in Texas, the Carolinas, Florida, and other southeast and Gulf states making up the majority of the bottom 50. The 50 most and least profitable markets are presented in the chart on the following page.

| | FUEL MARGINS BY MARKET | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Highest-Margin Markets** | | | | **Lowest-Margin Markets** | | |
| **Rank** | **Market** | **Retail Price** | **Margin** | | **Market** | **Retail Price** | **Margin** |
| 1 | San Luis Obispo, CA | $2.910 | $0.582 | | Jacksonville, NC | $2.018 | -$0.045 |
| 2 | San Francisco, CA | $2.852 | $0.556 | | Tucson, AZ | $1.900 | -$0.032 |
| 3 | Kahului-Wailuku-Lahaina, HI | $3.216 | $0.505 | | Yuma, AZ | $2.105 | -$0.031 |
| 4 | Grants Pass, OR | $2.499 | $0.504 | | Elkton, MD | $2.068 | -$0.012 |
| 5 | San Rafael, CA | $2.793 | $0.499 | | Myrtle Beach, SC | $1.883 | $0.021 |
| 6 | Washington DC | $2.322 | $0.480 | | Dover, DE | $2.036 | $0.036 |
| 7 | Napa, CA | $2.741 | $0.475 | | Monroe, LA | $1.870 | $0.038 |
| 8 | Santa Barbara, CA | $2.798 | $0.460 | | El Paso, TX | $1.950 | $0.046 |
| 9 | San Diego, CA | $2.774 | $0.443 | | Milford-Seaford, DE | $2.049 | $0.052 |
| 10 | Hanford-Corcoran, CA | $2.717 | $0.443 | | Phoenix, AZ | $2.035 | $0.057 |
| 11 | Ventura, CA | $2.778 | $0.436 | | Fort Smith, AR | $1.834 | $0.064 |
| 12 | Santa Rosa, CA | $2.703 | $0.435 | | Sherman-Denison, TX | $1.860 | $0.065 |
| 13 | San Jose, CA | $2.718 | $0.432 | | Wilmington, DE | $2.042 | $0.072 |
| 14 | Orange County, CA | $2.782 | $0.422 | | Punta Gorda, FL | $2.046 | $0.072 |
| 15 | Salinas, CA | $2.696 | $0.418 | | New Bern, NC | $2.033 | $0.074 |
| 16 | Medford, OR | *$2.412* | *$0.415* | | Mobile, AL | $1.932 | $0.076 |
| 17 | Los Angeles, CA | $2.797 | $0.415 | | Cheyenne, WY | $1.967 | $0.078 |
| 18 | Oakland, CA | $2.704 | $0.415 | | Fayetteville-Springdale-Rogers, AR | $1.856 | $0.083 |
| 19 | Santa Cruz, CA | $2.667 | $0.414 | | Victoria, TX | $1.875 | $0.085 |
| 20 | San Bernardino, CA | $2.752 | $0.411 | | San Angelo, TX | $1.886 | $0.086 |
| 21 | Bakersfield, CA | $2.729 | $0.405 | | Lubbock, TX | $1.838 | $0.088 |
| 22 | Redding, CA | $2.682 | $0.402 | | Tyler, TX | $1.890 | $0.088 |
| 23 | Riverside, CA | $2.737 | $0.394 | | Jonesboro, AR | $1.901 | $0.088 |
| 24 | Frenso, CA | $2.661 | $0.389 | | Lakeland-Winterhaven, FL | $2.069 | $0.091 |
| 25 | Seattle, WA | $2.564 | $0.389 | | Augusta, GA | $1.989 | $0.092 |
| 26 | Merced, CA | $2.642 | $0.386 | | Cape Coral-Ft. Myers, FL | $2.063 | $0.092 |
| 27 | Portland, OR | $2.357 | $0.369 | | Decatur, IL | $2.025 | $0.093 |
| 28 | Alexander County, IL | $2.285 | $0.368 | | Brownsville-Harlingen, TX | $1.883 | $0.093 |
| 29 | Madera-Chowchilla, CA | $2.634 | $0.367 | | Witchita Falls, TX | $1.868 | $0.093 |
| 30 | White Plains, NY | $2.393 | $0.359 | | Florence-Muscle Shoals, AL | $1.915 | $0.094 |
| 31 | Bellingham, WA | $2.533 | $0.358 | | Catoosa-Dade-Walker, GA | $1.983 | $0.095 |
| 32 | Longview, WA | $2.521 | $0.353 | | Moorhead, MN | $1.950 | $0.096 |
| 33 | Bismarck, ND | $2.156 | $0.352 | | Sarasota-Bradenton, FL | $2.066 | $0.096 |
| 34 | Bend, OR | $2.338 | $0.346 | | Dalton, GA | $1.984 | $0.097 |
| 35 | Flagstaff, AZ | $2.261 | $0.344 | | Valdosta, GA | $2.011 | $0.097 |
| 36 | Eugene, OR | $2.367 | $0.343 | | Corpus Christi, TX | $1.880 | $0.097 |
| 37 | Rapid City, SD | $2.192 | $0.338 | | Goldsboro, NC | $2.028 | $0.098 |
| 38 | Visalia-Porterville, CA | $2.632 | $0.337 | | Wilmington, NC | $2.058 | $0.098 |
| 39 | Tacoma, WA | $2.510 | $0.336 | | Gulfport-Biloxi, MS | $1.903 | $0.098 |
| 40 | Olympia, CA | $2.512 | $0.335 | | Odessa, TX | $1.908 | $0.098 |
| 41 | Bridgeport, CT | $2.328 | $0.334 | | Davenport-Bettendorf, IA | $1.989 | $0.101 |
| 42 | Lincoln, NE | $2.151 | $0.333 | | Warner Robbins, GA | $1.977 | $0.102 |
| 43 | Vallejo-Fairfield, CA | $2.582 | $0.331 | | Hickory-Lenoir-Morgantown, NC | $1.997 | $0.103 |
| 44 | Grand Island, NE | $2.134 | $0.329 | | Killeen-Temple-Fort Hood, TX | $1.884 | $0.104 |
| 45 | Wenatchee, WA | $2.518 | $0.328 | | Orlando, FL | $2.045 | $0.105 |
| 46 | Sacramento, CA | $2.567 | $0.328 | | Clarksville, TN | $1.885 | $0.105 |
| 47 | New York, NY | $2.377 | $0.326 | | Charleston, SC | $1.912 | $0.106 |
| 48 | Salem, OR | $2.296 | $0.323 | | Pueblo, CO | $2.020 | $0.106 |
| 49 | Corvallis, OR | $2.311 | $0.319 | | Texarkana, TX | $1.914 | $0.107 |
| 50 | Albany, OR | $2.305 | $0.314 | | Laredo, TX | $1.918 | $0.107 |

In terms of market share, Shell leads the country with an estimated 12.92% of the petroleum retailing market as of year-end 2016, a decline of 0.4% from the year prior. Exxon jumped to be the second largest brand in the US, the only major brand to show growth. Its market share increased to 6.11% in 2016. Chevron dropped to third nationally, with a national share of 5.90%. BP's market share was fourth at 5.51%, which is a decline of 0.6% from the prior year. Moreover, it is down from an 8.4% in 2011, before the Deepwater Horizon oil spill in April 2010.

Nationwide, Chevron was the fuel profit leader with Chevron stations pricing its pumps $0.0709 per gallon higher than its direct competitors, a 31% increase above its 2014 numbers. Phillips 66/ConocoPhillips 76 was second with $0.0459 per gallon higher than competitors. Private marketer Kum & Go, Shell, and Texaco rounded out the top five premium fuel brands.

Warehouse clubs such as Costco, BJ's, and Sam's Club generally had price discounts from competitors, with Costco leading the pack, pricing it's fuel $0.1975 per gallon below direct competitors on average. These types of facilities are using fueling as a way to drive additional traffic onto their sites which will generally translate into higher traffic through the big-box stores to which the fueling amenities are attached. Reportedly, Costco is happy with the trade-off and is likely to continue.

On an aggregate dollar basis, motor fuel sales are generally declining because of comparatively low oil prices which translate to lower prices at the pump. Nevertheless, according to NACS, overall volume per station increased 2015 to 2016, while margins remained relatively flat. Overall profit margins generally increased, driven by increased inside sales and profitability.

| GROSS PROFIT MARGIN AS A PERCENT OF SALES | | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| Retail Motor Fuel | 5.1% | 5.4% | 6.8% | 9.0% | 10.1% |
| Margin Per Gallon | $0.183 | $0.187 | $0.225 | $0.215 | $0.213 |
| In-Store Total | 32.2% | 32.8% | 32.4% | 33.1% | 33.5% |
| Total Store | 11.1% | 11.7% | 12.7% | 16.5% | 18.0% |

Source: 2013 - 2017 NACS State of the Industry Report

The major profitability wildcard remains the price of oil. Traditionally, as oil prices push up fuel prices, margins become compressed as competition among retailers becomes more intense. However, since retail prices tend to be "sticky," meaning that retailers are quick to raise prices when crude oil becomes more expensive but are slow to lower retail prices when crude oil prices recede, many operators are able to take advantage of these downswings in crude oil, translating to higher profit margins on fuel sales. The following graph demonstrates the historical composition of the cost of a gallon of gas in California, broken down into crude oil costs, refinery costs, state UST fees, state sales taxes, state excise taxes, federal taxes, and distribution costs/profit. Crude oil remains the major driver of motor fuel prices, comprising the majority of the cost of a typical gallon. Distribution costs and profit are a very small portion of the cost,

*Retail Petroleum Consultants, LLC*          *Market Trends and Analyses    Page 56*

accounting for a mere five percent of a typical gallon.  The chart includes only branded fuel; however, unbranded fuel follows the same general ratio and trends, with the exception that profit is generally more volatile, ranging generally between one and fifteen percent.



Fuel prices remain relatively low, compared to the volatility seen between 2008 and 2013, with lower oil prices generally driving the trend downward.  Profit has consistently increased since 2010, averaging $0.42 per gallon in 2017, above the $0.16 per gallon average in 2010. Development of new oil extraction technologies and sources, such shale oil extraction, had been a primary driver of declining in oil prices in late 2014.  These new technologies generally flatten the supply curve, taking pricing power away from traditional suppliers such as OPEC.

Lower cost crude bodes well for the average retail petroleum retailer.  As discussed, prices tend to remain sticky on the upside, as consumers are now more accustomed to paying higher fuel prices to fill up their cars.  As a result, average fuel margins have continued to increase, as the average retail fuel price follows the price of crude oil downward at a slower rate.  Moreover, when combined with the continued economic recovery putting more money into the average consumer's pocketbook, c-store sale trends will likely improve.  As consumers are no longer paying so much to fill up their cars, they may be more likely to purchase a higher-margin c-store good or car wash, which they tended to forgo in the era of high fuel prices.  Nevertheless, significant downside risks remain should oil prices trend back up.  An increase in average fuel prices back up to recession-era highs, or a faltering economic recovery, may put sales volumes and profit margins at risk.

**Retail Petroleum Consultants, LLC**                                    *Market Trends and Analyses*   **Page 57**

| | 2014 | | | 2015 | | | 2016 | | |
|---|---|---|---|---|---|---|---|---|---|
| **NACS INDUSTRY AVERAGES** <br> **UNITED STATES** | | | | | | | | | |
| Annual Fuel Gallons Sold | 1,753,944 | | | 1,745,748 | | | 1,791,084 | | |
| Average Fuel Price/Gal | $3.335 | | | $2.395 | | | $2.118 | | |
| Fuel Margin | $0.225 | | | $0.215 | | | $0.213 | | |
| C-Store and Other Margin | 32.35% | | | 33.05% | | | 33.53% | | |
| **Sales** | $ Amount | % of Sales | % GP | $ Amount | % of Sales | % GP | $ Amount | % of Sales | % GP |
| C-Store & Misc. | $1,772,232 | 23.25% | 183.01% | $1,883,460 | 31.06% | 188.81% | $1,946,136 | 33.90% | 188.23% |
| Fuel Sales | $5,848,848 | 76.75% | 603.98% | $4,180,200 | 68.94% | 419.05% | $3,793,884 | 66.10% | 366.94% |
| **Total Sales** | $7,621,080 | 100.00% | 786.99% | $6,063,660 | 100.00% | 607.86% | $5,740,020 | 100.00% | 555.17% |
| C-Store Costs | $1,198,884 | 15.73% | 123.80% | $1,260,936 | 20.79% | 126.40% | $1,293,552 | 22.54% | 125.11% |
| Fuel Costs | $5,453,808 | 71.56% | 563.18% | $3,805,176 | 62.75% | 381.45% | $3,412,548 | 59.45% | 330.06% |
| **Costs of Goods Sold** | $6,652,692 | 87.29% | 686.99% | $5,066,112 | 83.55% | 507.86% | $4,706,100 | 81.99% | 455.17% |
| **Gross Profit** | $968,388 | 12.71% | 100.00% | $997,548 | 16.45% | 100.00% | $1,033,920 | 18.01% | 100.00% |
| **Operating Expenses[1]** | | | | | | | | | |
| Labor | $293,520 | 3.85% | 35.43% | $315,156 | 5.20% | 38.04% | $337,956 | 5.89% | 40.79% |
| Advertising/Promo | $15,612 | 0.20% | 1.88% | $17,004 | 0.28% | 2.05% | $16,200 | 0.28% | 1.96% |
| Utilities | $39,936 | 0.52% | 4.82% | $40,248 | 0.66% | 4.86% | $40,860 | 0.71% | 4.93% |
| Licensing & Taxes | $19,656 | 0.26% | 2.37% | $21,552 | 0.36% | 2.60% | $22,572 | 0.39% | 2.72% |
| Insurance | $7,536 | 0.10% | 0.91% | $8,148 | 0.13% | 0.98% | $7,476 | 0.13% | 0.90% |
| Equipment Rent | $5,208 | 0.07% | 0.63% | $5,496 | 0.09% | 0.66% | $5,820 | 0.10% | 0.70% |
| Communications | $5,688 | 0.07% | 0.69% | $5,988 | 0.10% | 0.72% | $5,940 | 0.10% | 0.72% |
| Repairs & Maint | $38,952 | 0.51% | 4.70% | $42,768 | 0.71% | 5.16% | $41,640 | 0.73% | 5.03% |
| Credit Card Fees | $89,292 | 1.17% | 10.78% | $82,908 | 1.37% | 10.01% | $81,012 | 1.41% | 9.78% |
| Supplies | $18,924 | 0.25% | 2.28% | $18,900 | 0.31% | 2.28% | $19,212 | 0.33% | 2.32% |
| Cash Short/Over | $1,728 | 0.02% | 0.21% | $2,268 | 0.04% | 0.27% | $2,616 | 0.05% | 0.32% |
| Fuel Drive Offs | $1,464 | 0.02% | 0.18% | $2,076 | 0.03% | 0.25% | $1,344 | 0.02% | 0.16% |
| Other & Security | $62,028 | 0.81% | 7.49% | $64,344 | 1.06% | 7.77% | $75,996 | 1.32% | 9.17% |
| **Total Operating Expenses** | $599,544 | 7.87% | 61.91% | $626,856 | 10.34% | 62.84% | $658,644 | 11.47% | 63.70% |
| **NOI** | $368,844 | 4.84% | 38.09% | $370,692 | 6.11% | 37.16% | $375,276 | 6.54% | 36.30% |

Source: 2015 - 2017 NACS State of the Industry Report

[1]Operating expenses exclude store rent, depreciation, amortization, charitable contributions, and franchise/royalty fees.

**Retail Gasoline Trends**

According to NACS, more than 80% of all c-stores in the United States sold fuel as of 2016. In the West there appears to be a significant decline in lower volume stores as the industry continues to favor high volume locations supporting the closure or re-development of low volume stores. About a third of c-stores sell diesel fuel.

Gasoline is one of the major fuels consumed in the United States with nearly 40 million Americans filling up daily. NACS reported motor fuel sales at $317 billion in 2016, down from $349.0 billion in the previous year, with the decline being attributable mostly to crude oil dropping. Between 2011 and 2014, Americans spent more than $450 billion annually on gasoline. The Energy Information Administration estimates that the US consumed 132 billion gallons of gasoline in 2016, or about 360 million gallons per day. Gasoline is the number one transportation fuel in the US accounting for 55% of all the energy used for transportation, 48% of all petroleum consumption, and 17% of total U.S. energy consumption.



Of this consumption, NACS estimated in 2015 that approximately 87.7% of fuel sold is regular grade, with mid-grade accounting for 2.0% of fuel sales and premium making up the remaining 10.3%, with higher oil prices generally driving the shift towards regular.  The most recent report did not provide updated numbers.  Lower sustained gasoline prices may precede a shift back to a larger share of mid-grade and premium fuel being sold.  Historically, mid-grade fuel was priced $0.10 per gallon above regular, with premium priced $0.10 per gallon above that.  Since 2012 though, this spread has widened considerably, with a $0.49 per gallon spread between regular and premium in 2016.  This widened spread may also be responsible for the loss in market share of premium grade fuel.

Gasoline demand fluctuates predictably throughout the year.  It is typically greatest during the summer driving months beginning in May and ending around Labor Day.  Moreover, some states, including California, require seasonal gasoline formulations, further affecting the supply of gasoline.  As the seasonal temperatures increase, refiners are required to replace cheaper but more evaporative gasoline components with less evaporate but more expensive components.

Gasoline supplies have been adequate throughout the year.  U.S. refineries have been operating near full-capacity capacity in order to meet demand.  However, a new refinery has not been built in many years.  Oil production in the United States is holding steady, and imported oil - which makes up 60% of the oil processed in the United States - is expected to be available in sufficient quantity to meet refinery needs for upcoming years.

Gasoline taxes, on average, add nearly $0.482 on every gallon of gasoline.  Federal taxes make up $0.183 on every gallon and state and local taxes add the rest.  Despite, what seems like a large tax bite, gasoline taxes in the United States are among the lowest in the world.  In countries such as Britain and France, taxes on gasoline are 80% or more of the pump price.  Diesel fuels have slightly higher taxes and Distributing and Marketing Costs than gasoline but lower refining and crude costs.

**Construction Activity**

The availability of capital has generally increased since the bottom of the recession, with more banks willing to lend on speculative going-concern gas station/c-store development than during the depths of the recession.  Still though, those stations that are built in this market typically have cash infusions by the oil supplier to help facilitate the development of an otherwise unfeasible project.  In exchange for 15 to 20-year fuel supply agreements, some oil companies are willing to provide a forgivable loan of $500,000 to $800,000.  The cash incentive is to offset construction costs and pay the dealer for the encumbering supply agreement which reduces the owner's bundle of rights.  This is a one-time cash infusion that benefits the developer; it does not benefit potential buyers as they would have to meet the obligations of the agreement but not receive the cash benefit.  Such agreements are becoming more and more typical for the industry and not considered to have a negative impact on value as long as the highest and best use remains a gas station for the duration of the supply contract.

*Retail Petroleum Consultants, LLC*                    *Market Trends and Analyses    Page 60*

The average urban c-store size has increased slightly to 4,672 square feet, up from 4,594 square feet in 2015. According to NACS' Future Study, the new generation of c-stores will likely be bigger in order to take advantage of economies of scale, buying power, and leveraging investments over a larger base of stores.

The average cost for a new urban store including land, building, fueling equipment and inventory was $4,868,326 for 2016, relatively unchanged from $4,869,614 for 2015. Urban land sites increased significantly in 2015 to an average of 80,052 square feet, up from 69,498 square feet in 2014. Site sizes are similar in 2016, at 79,019 square feet. Rural markets have reflected a similar trend toward larger site sizes, but 2016 data shows a decline from 74,753 square feet in 2014 to 60,708 square feet in 2016. These averages are for the entire nation and may not support certain West Coast markets where costs may be higher and land sites smaller.

Remodeling costs have seen a substantial increase from $409,582 in 2015 to $450,021 in 2016. These costs have generally been increasing since at least 2011. The time between remodeling averages 10 years with about 12% of c-stores remodeling annually.

**Retail Petroleum Consultants, LLC**    *Market Trends and Analyses*   **Page 61**

| | 2012 | | 2013 | | 2014 | | 2015 | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **INVESTMENT PER NEW STORE** | Urban | Rural | Urban | Rural | Urban | Rural | Urban | Rural | Urban | Rural |
| Land | $922,980 | $700,523 | $1,150,875 | $924,082 | $1,355,179 | $991,241 | $1,433,873 | $941,636 | $1,506,344 | $1,110,224 |
| Building | $1,042,563 | $763,476 | $1,201,286 | $957,559 | $1,103,805 | $1,432,993 | $1,374,842 | $1,636,156 | $1,355,048 | $1,563,327 |
| **Equipment** | | | | | | | | | | |
| Foodservice | $197,801 | $151,573 | $150,969 | $131,432 | $265,904 | $330,954 | $322,135 | $248,377 | $333,583 | $265,370 |
| Motor Fuel | $435,993 | $361,743 | $488,114 | $397,313 | $189,986 | $184,318 | $670,520 | $568,535 | $620,515 | $611,428 |
| Merchandise | $187,517 | $179,513 | $176,997 | $238,004 | $543,190 | $714,116 | $260,043 | $324,341 | $276,609 | $223,301 |
| Car Wash | $323,918 | $470,300 | $279,205 | $543,498 | $324,843 | $340,398 | $587,189 | $433,936 | $545,411 | $280,144 |
| Technology | $47,689 | $40,606 | $61,895 | $67,849 | $62,296 | $76,614 | $58,210 | $53,439 | $67,477 | $68,579 |
| Equip. Subtotal | $1,192,918 | $1,203,735 | $1,157,180 | $1,378,096 | $1,386,219 | $1,646,400 | $1,898,097 | $1,628,628 | $1,843,595 | $1,448,822 |
| **Total Land, Bldg., Equip.** | $3,158,461 | $2,667,734 | $3,509,341 | $3,259,737 | $3,845,203 | $4,070,634 | $4,706,812 | $4,206,420 | $4,704,987 | $4,122,373 |
| **Inventory** | | | | | | | | | | |
| Motor Fuel | $64,967 | $77,788 | $84,127 | $75,651 | $80,129 | $177,106 | $75,445 | $57,842 | $67,358 | $56,486 |
| In-Store Inventory | $76,967 | $72,332 | $81,679 | $75,691 | $116,837 | $102,980 | $87,357 | $99,056 | $95,981 | $89,322 |
| **Total Inventory** | $141,934 | $150,120 | $165,806 | $151,342 | $196,966 | $280,086 | $162,802 | $156,898 | $163,339 | $145,808 |
| **New Store Total** | $3,300,395 | $2,817,854 | $3,675,147 | $3,411,079 | $4,042,169 | $4,350,720 | $4,869,614 | $4,363,318 | $4,868,326 | $4,268,181 |
| Average Total Building Size, SF | 4,233 | 5,722 | 4,199 | 4,383 | 4,711 | 4,135 | 4,594 | 4,938 | 4,672 | 4,149 |
| Average Building $/SF | $246.29 | $133.43 | $286.09 | $218.47 | $234.30 | $346.55 | $299.27 | $331.34 | $290.04 | $376.80 |
| Average Site Size, SF | 58,946 | 65,145 | 70,158 | 72,128 | 69,498 | 74,753 | 80,052 | 71,525 | 79,019 | 60,708 |
| Average Site $/SF | $15.66 | $10.75 | $16.40 | $12.81 | $19.50 | $13.26 | $17.91 | $13.17 | $19.06 | $18.29 |

Source: 2013 - 2017 NACS State of the Industry Report

*Retail Petroleum Consultants, LLC*               *Market Trends and Analyses   Page 62*

---

**Removable M & E**

Removable M & E includes items such as food preparation equipment, shelving, gondolas, and other miscellaneous items needed to operate the business of selling merchandise in the c-store.  Repair M & E includes the basic tools and equipment needed to perform the array of services offered by the repair operation.  These items typically wear out much more quickly than the physical structures affixed to the site.  NACS indicates removable M & E of roughly $401,060 in a typical urban c-store as quoted in the food service and technology categories.

Surveys of projects we have appraised generally support these numbers.  Our survey indicates a range of $161,123 to $390,850 in removable M & E in a typical project, with a central tendency of $200,000 to $300,000 depending on the size of the c-store.  Larger c-stores typically have more M & E than smaller ones, resulting in higher overall costs.  Additional profit centers requiring more M & E, such as QSRs or auto repair/quick lube services add to the necessary M & E cost.

Furthermore, car wash equipment can add significant costs to the permanently attached M & E category, depending on the type, length, and complexity of the car wash.  Conveyor washes generally fall in the upper end of the range, costing more than their automatic roll-over counterparts.  As depicted in the following chart, conveyor car wash systems (conveyor, chemical delivery arches, blowers, and related systems) generally cost between $359,556 and $1,879,194, depending on tunnel length with an average of $918,843 or $8,234 per linear foot.  In contrast, automatic roll-over washes typically cost between $140,000 and $338,580, depending on tunnel length and amenities.

**Quick Lube Industry Trends**

The following market analysis is designed to provide an understanding of how the characteristics of the auto repair industry and transaction markets influence probable investors' pricing parameters.  In order to support broader market trends within the auto repair industry, we consulted a national operations survey: National Oil and Lube News survey.  The survey includes a broad sampling of various operations across the nation and provides indications of market and operational trends within the industry.  Other sources of data were Costar, RPC data files, and individual interviews with various brokers, real estate professionals, and market participants.

**NOLN Quick Lube and Automotive Service Data**

The latest National Oil and Lube News survey offers an in-depth analysis of the oil change industry.  Survey data gathered from questionnaires, phone interviews and mailed-in by operators is amassed for national and regional breakouts.  The West Coast region is represented by Alaska, California, Hawaii, Oregon and Washington.  The survey is as follows:

**2016 SURVEY - QUICK LUBE FACILITIES**

| | West Coast | | National | | Oil Change Plus | |
|---|---|---|---|---|---|---|
| | Total | % of Sales | Total | % of Sales | Total | % of Sales |
| Average Lube Price | $41.84 | - | $41.18 | - | $33.06 | - |
| Miscellaneous Repairs | $34.93 | - | $30.18 | - | $122.83 | - |
| Average Revenue Per Lube | $76.77 | - | $71.36 | - | $155.89 | - |
| Annual Lube/Repairs | 13,213 | - | 11,498 | - | 12,885 | - |
| Lubes/Repairs Per Day Open | 37.22 | - | 33.42 | - | 35.79 | - |
| Annual Sales | $660,400 | 100.00% | $646,330 | 100.00% | $2,036,461 | 100.00% |
| Cost of Goods Sold, Per Lube[1] | $30.14 | - | $28.67 | - | $88.83 | - |
| Cost of Goods Sold, Total | $398,221 | 60.30% | $329,628 | 51.00% | $1,144,491 | 56.20% |
| **Gross Profit** | **$262,179** | **39.70%** | **$316,702** | **49.00%** | **$891,970** | **43.80%** |
| *Operational Expenses* | *$101,041* | *15.30%* | *$139,607* | *21.60%* | *$423,584* | *20.80%* |
| Net Operating Income | $161,138 | 24.40% | $177,094 | 27.40% | $468,386 | 23.00% |

The typical number of bays for West Coast region has declined from 2.9 in 2015 to 2.3 in 2016. The average number of oil changes per day is between 30.1 and 33.11 with an average 6.1 days open per week in 2015 saw increase in volume in 2016 to 30.9 to 36.2 with an average of 6.8 days open per week, likely speaking to the health of recovering economies.

There is an indicated 7.2 average number of employees per store with average hourly wage for lube techs at $10.44 and average annual salary paid to managers at $47,478. Ownership salary payments were not tracked for the West Coast in the 2016 survey. The national average is significantly lower at $9.28 per hour, $41,472 manager salary and $61,032 owner salary – these figures are down from 2015 data.

**2015 SURVEY - QUICK LUBE FACILITIES**

| | West Coast | | National | |
|---|---|---|---|---|
| | Total | % of Sales | Total | % of Sales |
| Average Lube Price | $40.07 | - | $38.58 | - |
| Miscellaneous Repairs | $30.10 | - | $30.43 | - |
| Average Revenue Per Lube | $70.17 | - | $69.01 | - |
| Annual Lube/Repairs | 10,364 | - | 10,059 | - |
| Lubes/Repairs Per Day Open | 33.11 | - | 32.14 | - |
| Annual Sales | $727,238 | 100.00% | $694,189 | 100.00% |
| Cost of Goods Sold, Per Lube[1] | $38.59 | - | $37.96 | - |
| Cost of Goods Sold, Total | $399,981 | 55.00% | $381,804 | 55.00% |
| Gross Profit | $327,257 | 45.00% | $312,385 | 45.00% |

[1]Cost of Goods Sold includes Labor

In 2015 annual sales comprised solely of oil change services are 82%. Secondary services elected by customers whom get oil changes in the Western Region include ATF changes

(22.3%), engine filter (21.4%) and cabin filter (10.3%) changes, pour-in fuel injection cleaning (15%) and lightbulb replacement (10.0%).  There is an indicated 7.4 average number of employees per store with average hourly wage for lube techs at $12.33 and average annual salary paid to managers at $45,978 and average annual salary paid to owner at $108,091.  The national average is significantly lower at $11.25 per hour, $37,815 manager salary and $67,490 owner salary in 2015.

It should be noted that generally fueling stations including automotive repair stations are considered older style stations having been built in the 1940s, 1950s and 1960s.  Newer stations focus on larger c-stores with advanced exterior-express car wash tunnels and leased retail spaces.  The sophistication of modern cars creates a barrier to entry for many fueling station operators looking to diversify profit centers for the inclusion of automotive repair/quick lube facility as part of their larger site.  Furthermore, due to the onsite restrictions and limitations of real estate with patrons on site for other goods/services (fueling, c-store, etc.), free-standing dedicated automotive repair and quick lube facilities will average significantly higher revenue and per bay sales.

**Food Service and QSRs**

From 2005 through 2011 the NACS survey considered quick serve restaurants (QSRs) from the seven categories as follows; Burger, Chicken, Mexican, Pizza, Sandwich, Seafood, and Snack.  Category leaders according to brand were McDonald's - burgers, Subway - sandwiches, Noble Roman's Pizza - pizza, and Chester Fried Chicken - chicken.  NACS no longer tracks operations by brand but by food type as summarized below.

| FOOD SERVICE/QSR OPERATIONS[1] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | % Food Service Sales | | Average Store Sales | | GP Margin $ | | GP Margin % | |
| | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 | 2015 | 2016 |
| Prepared Food | 65.80% | 67.10% | $371,842 | $393,515 | $208,780 | $221,852 | 56.15% | 56.38% |
| Commissary | 7.60% | 6.90% | $42,901 | $40,190 | $14,913 | $14,199 | 34.76% | 35.33% |
| Hot Dispensed Beverages | 13.10% | 13.10% | $73,963 | $76,639 | $45,865 | $46,956 | 62.01% | 61.27% |
| Cold Dispensed Beverages | 8.90% | 8.90% | $50,525 | $52,457 | $25,607 | $26,326 | 50.68% | 50.19% |
| Frozen Dispensed Beverages | 4.60% | 4.00% | $26,186 | $23,414 | $16,133 | $15,136 | 61.61% | 64.64% |
| **Total/Average** | **100.00%** | **100.00%** | **$400,780** | **$421,788** | **$213,894** | **$228,850** | **53.37%** | **54.26%** |

[1]Totals do not add based on differing sample size by each line item.

As shown in the prior chart, both annual QSR sales and corresponding profit margin have increased.  NACS reports the most average sales data for 2016 at $421,788 annually, up from $400,780 during the prior year.  Most branded QSRs operate as franchised locations and thus are subject to a combination of fees.  The franchise fee is typically paid upfront as a one-time charge.  Fee can range from $5,000 to $50,000 or more depending on if equipment is included.  In general franchise fees are increasing.  Additional payments paid to the franchiser include advertising and royalties.  Royalties averaged about 5% of gross sales.

Drive-thrus are becoming the standard in modern QSR development for all food categories.  Branded burger, chicken, Mexican, and seafood chains will generally not build units without a

**Retail Petroleum Consultants, LLC**                                **Market Trends and Analyses   Page 65**

drive-thru.   Branded QSR operations are the dominant player in c-store operations.   National brands will generally franchise side by side locations with franchisees running operations.

| QSR 50 RANK | COMPANY | CHANGE IN POSITION | CATEGORY | 2016 U.S. SYSTEMWIDE SALES (MILLIONS) | 2016 U.S. AVERAGE SALES PER UNIT (THOUSANDS) | NUMBER OF FRANCHISED UNITS IN 2016 | NUMBER OF COMPANY UNITS IN 2016 | TOTAL UNITS IN 2016 | TOTAL CHANGE IN UNITS FROM 2015 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | McDonald's* | - | Burger | $36,389.00 | 2,550.00 | $13,046.00 | 1,109 | 14,155 | -104 |
| 2 | Starbucks*1 | - | Snack | $14,795.40 | 1,123.25 | $5,292.00 | 7,880 | 13,172 | 651 |
| 3 | Subway | - | Sandwich | $11,300.00 | 422.52 | $26,744.00 | 0 | 26,744 | -359 |
| 4 | Wendy's | 2 | Burger | $9,930.20 | 1,570.00 | $6,207.00 | 330 | 6537 | 58 |
| 5 | Burger King* | -1 | Burger | $9,749.19 | 1,361.43 | $7,111.00 | 50 | 7161 | 35 |
| 6 | Taco Bell | -1 | Ethnic | $9,353.80 | 1,510.00 | $5,399.00 | 879 | 6278 | 157 |
| 7 | Dunkin' Donuts* | - | Snack | $8,200.00 | 928.86 | $8,828.00 | 0 | 8828 | 397 |
| 8 | Chick-fil-A | - | Chicken | $7,973.50 | 4,407.10 | $1,730.00 | 372 | 2102 | 119 |
| 9 | Pizza Hut | - | Pizza | $5,751.40 | 740 | $7,371.00 | 318 | 7689 | -133 |
| 10 | Domino's* | 1 | Pizza | $5,335.20 | 993.33 | $4,979.00 | 392 | 5371 | 171 |
| 11 | Panera Bread | -1 | Sandwich | $5,200.00 | 2,700.00 | $1,134.00 | 908 | 2042 | 70 |
| 12 | Sonic* | 1 | Burger | $4,504.14 | 1,284.00 | $3,201.00 | 356 | 3557 | 31 |
| 13 | KFC | 1 | Chicken | $4,483.30 | 1,060.00 | $3,966.00 | 201 | 4167 | -103 |
| 14 | Chipotle | -2 | Ethnic | $3,904.38 | 1,868.00 | $0.00 | 2,198 | 2198 | 227 |
| 15 | Carl's Jr./Hardee's* | - | Burger | $3,761.00 | 1,249.00 | $2,774.00 | 237 | 3,011 | 53 |
| 16 | Dairy Queen | 1 | Snack | $3,621.00 | 1,268.05 | $4,515.00 | 2 | 4517 | 6 |
| 17 | Arby's | -1 | Sandwich | $3,600.00 | 1,117.00 | $2,314.00 | 1,044 | 3358 | 17 |
| 18 | Little Caesars* | - | Pizza | $3,523.25 | 815 | $3,809.00 | 514 | 4323 | 65 |
| 19 | Jack in the Box | - | Burger | $3,445.00 | 1,530.00 | $1,838.00 | 417 | 2255 | 6 |
| 20 | Popeyes Louisiana | - | Chicken | $3,140.30 | 1,488.00 | $2,029.00 | 55 | 2084 | 77 |
| 21 | Papa John's | - | Pizza | $3,013.79 | 875.85 | $2,739.00 | 702 | 3441 | 53 |
| 22 | Panda Express | - | Ethnic | $2,903.04 | 1,606.00 | $95.00 | 1,798 | 1893 | 91 |
| 23 | Whataburger | 1 | Burger | $2,181.35 | 2,706.00 | $122.00 | 684 | 806 | 15 |
| 24 | Jimmy John's | -1 | Sandwich | $2,146.60 | 841.7 | $2,584.00 | 63 | 2647 | 242 |
| 25 | Zaxby's* | - | Chicken | $1,891.98 | 2,318.60 | $677.00 | 139 | 816 | 91 |
| 26 | Five Guys | - | Burger | $1,382.01 | 1,038.24 | $914.00 | 507 | 1421 | 101 |
| 27 | Culver's | - | Burger | $1,301.38 | 2,252.20 | $597.00 | 8 | 605 | 46 |
| 28 | Bojangles' | - | Chicken | $1,229.48 | 1,818.43 | $407.00 | 309 | 716 | 54 |
| 29 | Steak n Shake | - | Burger | $1,027.00 | 1,900.00 | $153.00 | 415 | 568 | 17 |
| 30 | Wingstop | 2 | Chicken | $943.30 | 1,113.00 | $977.00 | 21 | 998 | 153 |
| 31 | Papa Murphy's | -1 | Pizza | $884.77 | 592.96 | $1,369.00 | 168 | 1577 | 41 |
| 32 | Checkers/Rally's | 1 | Burger | $837.36 | 1,114.89 | $541.00 | 300 | 841 | 12 |
| 33 | Jersey Mike's Subs* | 7 | Sandwich | $825.00 | 695.03 | $1,134.00 | 53 | 1187 | 139 |
| 34 | Qdoba Mexican Eats | - | Ethnic | $801.00 | 1,179.00 | $332.00 | 367 | 699 | 38 |
| 35 | Church's Chicken | -4 | Chicken | $800.27 | 724 | $838.00 | 238 | 1076 | -55 |
| 36 | El Pollo Loco | -1 | Chicken | $795.44 | 1,988.00 | $259.00 | 201 | 460 | 27 |
| 37 | Del Taco | - | Ethnic | $738.08 | 1,359.00 | $310.00 | 241 | 551 | 7 |
| 38 | White Castle | 1 | Burger | $716.71 | 1,434.52 | $0.00 | 384 | 384 | -6 |
| 39 | Tim Hortons* | -1 | Snack | $713.09 | 1,044.06 | $683.00 | 0 | 683 | -201 |
| 40 | Moe's Southwest | 3 | Ethnic | $688.04 | 1,142.53 | $675.00 | 5 | 680 | 43 |
| 41 | Firehouse Subs | - | Sandwich | $683.53 | 690 | $1,005.00 | 32 | 1037 | 93 |
| 42 | Boston Market* | 2 | Chicken | $659.16 | 1,426.74 | $5.00 | 457 | 462 | 4 |
| 43 | Jason's Deli | -1 | Sandwich | $646.59 | 2,609.00 | $109.00 | 155 | 264 | 4 |
| 44 | In-N-Out Burger* | 1 | Burger | $630.03 | 1,975.00 | $0.00 | 319 | 319 | 6 |
| 45 | Baskin-Robbins* | 1 | Snack | $603.60 | 237.83 | $2,538.00 | 0 | 2538 | 9 |
| 46 | McAlister's Deli | 1 | Sandwich | $591.30 | 1,646.13 | $355.00 | 32 | 387 | 26 |
| 47 | Noodles & Company | 4 | Ethnic | $560.56 | 1,075.00 | $75.00 | 457 | 532 | 44 |
| 48 | Auntie Anne's | 1 | Snack | $548.00 | 493.8 | $1,284.00 | 16 | 1300 | 48 |
| 49 | Captain D's | -1 | Seafood | $544.43 | 1,059.00 | $227.00 | 289 | 516 | 3 |
| 50 | Jamba Juice* | - | Snack | $536.92 | 639.95 | $767.00 | 72 | 839 | 21 |

*INCLUDES FIGURES ESTIMATED BY QSR. 1FRANCHISE FIGURES INCLUDE LICENSED LOCATIONS
1 NUMBERS ARE PROJECTED BY QSR BASED ON PAST PERFORMANCE
2 INCLUDES 2014 UNIT COUNTS

**Retail Petroleum Consultants, LLC**  *Market Trends and Analyses*  **Page 66**

### CHICAGO AREA LEASED RETAIL SALES

| Address | City | Property Type | Tenant | Year Built Renovated | Area, SF Lot | Area, SF Bldg | $/Bldg/SF | Price | Listing Discount | Sale Date | Days On Market | NOI | OAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 600 - 618 E. Sibley Road | Dolton | Single Tenant Retail | CVS | 2008 | 47,463 | 13,013 | $528.63 | $6,879,000 | 3.39% | 06/30/16 | 176 | $405,861 | 5.90% |
| 745 W. 103rd Street | Chicago | Single Tenant Retail | CVS | 2009 | 33,933 | 10,880 | $806.53 | $8,775,000 | 9.70% | 08/26/16 | 210 | $534,398 | 6.09% |
| 11833 S. Western Avenue | Chicago | Single Tenant Retail | Walgreen's | 2003 | 61,855 | 15,120 | $412.04 | $6,230,000 | - | 08/01/16 | 222 | $380,030 | 6.10% |
| 7170 - 7172 W. 159th Street | Orland Park | Multi Tenant Retail | - | 2017 | 35,959 | 7,000 | $584.29 | $4,090,000 | - | 04/03/17 | - | $261,760 | 6.40% |
| 209 E. 103rd Street | Chicago | Single Tenant Retail | Dollar Store | 2017 | 31,494 | 12,500 | $119.32 | $1,491,500 | 5.51% | 11/14/17 | 197 | $96,948 | 6.50% |
| 5400 159th Street | Oak Forest | Single Tenant Retail | Family Dollar | 2017 | 41,818 | 8,353 | $208.63 | $1,742,684 | 1.50% | 12/14/17 | 441 | $113,274 | 6.50% |
| 13235 Cicero Avenue | Crestwood | Multi Tenant Retail | - | 2016 | 52,272 | 6,517 | $702.01 | $4,575,000 | 4.19% | 01/23/17 | 131 | $298,290 | 6.52% |
| 10601 S. Pulaski Road | Chicago | Single Tenant Retail | Dollar Tree | 2015 | 37,470 | 12,300 | $129.27 | $1,590,000 | 0.63% | 06/01/16 | 121 | $110,664 | 6.96% |
| 921 E 162nd Street | South Holland | Single Tenant Retail | O'Reilly Auto Parts | 2014 | 29,621 | 7,225 | $226.74 | $1,638,187 | 0.72% | 12/01/16 | 190 | $119,424 | 7.29% |
| 10257 Harlem Avenue | Chicago Ridge | Single Tenant Retail | Burger King | 1980 | 38,333 | 4,100 | $331.90 | $1,360,805 | - | 12/30/15 | - | $99,203 | 7.29% |
| 12777 - 12801 S. Harlerm Avenue | Palos Heights | Multi Tenant Retail | - | 2014 | 30,178 | 5,661 | $291.47 | $1,650,000 | 5.01% | 12/17/15 | 378 | $125,565 | 7.61% |
| 3401 W. 111th Street | Chicago | Multi Tenant Retail | - | 1965 | 15,120 | 6,127 | $262.53 | $1,608,500 | - | 03/22/18 | - | $122,889 | 7.64% |
| 4060 S. Pulaski Road | Chicago | Single Tenant Retail | Burger King | 1980 | 56,628 | 4,100 | $164.58 | $674,758 | - | 12/30/15 | - | $51,889 | 7.69% |
| 11228 S. Harlerm Avenue | Worth | Multi Tenant Retail | - | 2007 | 14,959 | 6,056 | $70.18 | $425,000 | 37.04% | 10/13/15 | 574 | $34,000 | 8.00% |
| 4742 - 4756 W. Calumet Sag Road | Crestwood | Multi Tenant Retail | - | 2008 | 56,628 | 15,812 | $287.76 | $4,550,000 | 5.62% | 09/09/16 | 333 | $366,275 | 8.05% |
| 11500 S. Pulaski Road | Alsip | Multi Tenant Retail | - | 2013 | 26,820 | 6,831 | $259.84 | $1,775,000 | 3.69% | 12/14/17 | 381 | $142,888 | 8.05% |
| 13845 S. Claire Boulevard | Robbins | Single Tenant Retail | Dollar Tree | 2012 | 59,298 | 7,170 | $170.64 | $1,223,500 | 4.77% | 11/01/16 | 315 | $102,774 | 8.40% |
| 468 E. 147th Street | Harvey | Single Tenant Retail | EZ Pawn | 1980 | 6,970 | 6,885 | $188.07 | $1,294,874 | 0.38% | 12/14/15 | 81 | $110,064 | 8.50% |
| 75 W. Northwest Highway | Palatine | Single Tenant Retail | Burger King | 1985 | 44,867 | 2,943 | $475.51 | $1,399,437 | - | 12/30/15 | - | $122,451 | 8.75% |
| 12610 S. Ashland Avenue | Calumet Park | Single Tenant Retail | Dollar Store | 1970 | 43,399 | 11,000 | $77.95 | $857,500 | 4.19% | 12/16/15 | 187 | $79,833 | 9.31% |
| 13037 S. Western Avenue | Blue Island | Multi Tenant Retail | - | 1924 | 6,251 | 12,000 | $25.00 | $300,000 | 8.81% | 11/22/17 | 2087 | $33,000 | 11.00% |
| 15534 - 15542 Cicero Avenue | Oak Forest | Multi Tenant Retail | - | 1967 | 13,939 | 7,500 | $42.27 | $317,000 | 3.65% | 05/02/17 | 831 | $40,893 | 12.90% |
| 14117 - 14149 Cicero Avenue | Crestwood | Multi Tenant Retail | - | 1975 | 56,602 | 12,600 | $105.16 | $1,325,000 | 8.62% | 09/29/16 | 996 | $172,250 | 13.00% |
| 11101 - 11107 S. Halsted Street | Chicago | Multi Tenant Retail | - | 1999 | 9,365 | 6,370 | $208.01 | $1,325,000 | 8.62% | 09/29/16 | - | $172,250 | 13.00% |
| | | **Multi Tenant Minimum** | | 1924 | 6,251 | 5,661 | $25.00 | $300,000 | 3.65% | - | 131 | $33,000 | 6.40% |
| | | **Multi Tenant Average** | | 1991 | 28,918 | 8,407 | $258.05 | $1,994,591 | 9.47% | - | 714 | $160,915 | 9.29% |
| | | **Multi Tenant Maximum** | | 2017 | 56,628 | 15,812 | $702.01 | $4,575,000 | 37.04% | - | 2,087 | $366,275 | 13.00% |
| | | **Single Tenant Minimum** | | 1970 | 6,970 | 2,943 | $77.95 | $674,758 | 0.38% | - | 81 | $51,889 | 5.90% |
| | | **Single Tenant Average** | | 1999 | 41,011 | 8,891 | $295.37 | $2,704,403 | 3.42% | - | 214 | $178,986 | 7.33% |
| | | **Single Tenant Maximum** | | 2017 | 61,855 | 15,120 | $806.53 | $8,775,000 | 9.70% | - | 441 | $534,398 | 9.31% |
| | | **Average All** | | 1996 | 35,468 | 8,669 | $267.38 | $2,379,073 | 6.45% | - | 436 | $170,703 | 8.23% |

**Chicago Area Leased Retail Market**

Our valuation includes leased retail units.  This warrants analysis of similar leased facilities selling and listed throughout the subject's market.  We surveyed a number of leased single and multi tenant retail facilities throughout the subject and greater Chicago areas for comparable capitalization rates and rents.  Capitalization rates for all properties surveyed ranged from 5.90% to 13.00% with an average of 8.23%.  The single tenant comparables, most of which included credit rated tenants support an average of 7.33%.  The multi tenant facilities support nearly a 200 base point premium in capitalization rates at 6.40% to 13.00 with an average of 9.29%.

Most these properties had NNN leases in place where property expenses are passed through to the tenant.  The subject leases are full service where all expenses are incurred by the landlord.  Few retail properties are leased on a NNN basis making comparisons to the subject difficult.  Our survey or full-service rentals from the subject market are summarized on the following chart.

These rent comparables support building with total sizes from 3,750 to 22,900 square feet with leased units surveyed from 150 to 4,411 square feet.  These ranges bracket the subject building and leased areas.  The size of leased space appears to have the greatest and most consistent effect on rent as supported by the chart below, after elimination of the largest size comp.



Rents ranged from $0.96 to $3.78 per square foot on a full service basis.  It appears the smaller spaces with less 1,000 square feet support significantly higher rents averaging $2.23 per square foot.  The average for the spaces with 1,000 square feet or more is $1.52 per square foot full service.  These data will be used to determine whether or not the subject leases are market supported.

**Retail Petroleum Consultants, LLC**                    *Market Trends and Analyses*   **Page 68**

| Adress | City | Tenant Type | Building Size, SF | Leased Area, SF | Vacancy | Lease Date | $/SF/Mo. | Term | Land:Bldg |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| 17320 S. Torrence Ave. | Lansing | Retail | 10,000 | 1,137 | 11.40% | Available | $1.83 | 3-5 Years | 33.76% |
| 16146 S. State St. | South Holland | Retail | 14,356 | 1,536 | 10.70% | Available | $1.69 | 3 Years | 21.54% |
| 802 E. Sibley Blvd. | Dolton | Retail | 7,125 | 1,321 | 18.50% | Available | $1.63 | 3 Years | 32.71% |
| 801 - 861 W. Maple Ave. | Homewood | Retail | 10,000 | 150 - 200 | 12.40% | Available | $3.78 - $3.30 | Neg. | 12.40% |
| 7163 - 7627 S. Jeffery Blvd. | Chicago | Retail | 11,800 | 1,649 | 14.00% | Available | $1.58 | 2-10 Years | 54.42% |
| 8301 - 8313 S. Pulaski Rd. | Chicago | Office Retail | 3,750 | 500 | 0.00% | May-18 | $1.70 | 1 Year | 95.65% |
| 801 - 861 W. Maple Ave. | Homewood | Office Retail | 10,000 | 860 | 12.40% | Feb-18 | $2.35 | 2 Years 1 Month | 12.40% |
| 820 E. 87th St. | Chicago | Retail | 11,000 | 700 | 6.40% | Dec-17 | $1.33 | - | 72.15% |
| 17941 - 17951 S. Halsted St. | Homewood | Retail | 9,018 | 1,300 | 20.00% | Oct-17 | $1.92 | 1 Year | 23.80% |
| 800 - 810 E. Sibley Blvd. | Dolton | Retail | 7,125 | 1,663 | 18.50% | Aug-17 | $1.63 | 3 Years | 32.71% |
| 5601 - 5603 W. 79th St. | Burbank | Office Retail | 9,337 | 1,000 | 0.00% | Jul-17 | $0.96 | 2 Years | 59.54% |
| 16130 - 16150 S. State St. | South Holland | Retail | 14,356 | 1,300 | 10.70% | May-17 | $1.69 | 3 Years | 21.13% |
| 10400 - 10408 S. Kedzie Ave. | Chicago | Office/Retail | 9,500 | 2,000 | 0.00% | May-17 | $1.05 | 3 Years | 60.58% |
| 12710 - 12736 S. Harlem Ave. | Palos Heights | Retail | 5,388 | 1,450 | 52.90% | Mar-17 | $1.05 | 3 Years | 30.17% |
| 10315 - 10357 S. Halsted St. | Chicago | Office/Retail | 22,900 | 4,411 | 13.10% | Jul-16 | $1.67 | 3 Year | 47.79% |

**RENTAL SURVEY - IN LINE RETAIL - FULL SERVICE**

**Retail Vacancy**

According to a market report issued by CoStar, retail vacancy rates in the Chicago metropolitan market area are estimated to be 6.1% with net positive absorption of 831,858 SF in first quarter 2018. The Rental Survey supports a 13.40% vacancy rate which is skewed by the inclusion of a high amount of listings. The Leased Retail Sales support about 2.0% vacancy. The subject is a multi-tenant facility with odd combination of tenants including retail, office, and owner occupied car wash, auto service and c-store profit centers. The subject is an older facility with portions of the fueling station having been recently renovated. A portion of available retail space lacks a store front. Current subject vacancy, rental spaces only is 57% or including owner occupied space is indicated at 15.89%. We project vacancy at 10.00% "as is" based on available market data. Costs and time to lease up vacant space is not considered material to the overall valuation with any risk thereof considered in our selected overall rate and gross profit multiplier.

**Capitalization Rates**

In terms of capitalization rates, we have considered national surveys, local brokerage market reports, and sales of comparable retail complexes. The most recent first quarter 2018 PwC Korpacz Investor survey indicates capitalization rates in National Net Lease markets ranging from 5.00% to 8.50% with an average of 6.60%, down 20 basis points from the previous quarter. The PwC Korpacz national strip shopping centers currently have a range from 4.00% to 9.50% with an average capitalization rate of 6.36%, down two basis points from the previous quarter. The first quarter 2018 RealtyRates.com survey indicates un-anchored retail capitalization rates ranging from 5.66% to 15.44%, with an average of 9.85%. The local sales range from 5.90% to 13.00% with an average of 8.23%. The subject property is in an unanchored center, with additional risk related to the incorporated gas station, c-store, auto repair, and car wash operation, which must be managed by a potential buyer. The tenant cannot control the gas station operator and vice versa. Therefore, there is additional risk that one may negatively affect the other's business. Consequently, there is more risk than a typical net leased investment in which the landlord simply collects rents. Furthermore, leases are full service without any pass through so that any expense increases are directly incurred by the landlord. There is also minor risk and costs associated with the start-up process of the vacant leased fee components. Costs for brokers commission, lease-up time, incentives and other associated expenditures the landlord would assume are factored into the higher basis points. Given these condition we estimate a capitalization above the average of the surveyed range of the closed sales at 13.00%.

## HIGHEST AND BEST USE

According to the Third Edition of The Dictionary of Real Estate Appraisal, published by the Appraisal Institute, highest and best use is defined as:

> "the reasonably probable and legal use of vacant land or an improved property; which is physically possible, appropriately supported, financially feasible, and that results in the highest value.  The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability."

### Highest and Best Use as if Vacant

The site is zoned I for Industrial-Business use by the Village of Calumet Park.  The subject's corner improved site is flag in shape and useful for a variety of retail, commercial, or related projects.  Among the legally permitted and physically possible uses and based on surrounding improved properties, a retail, service, or mixed use would be expected to be the most financially feasible.

### Highest and Best Use As Proposed

As of the appraisal date, the subject's proposed improvements consist of a partially renovated Citgo c-store with fuel sales and car wash, auto service, and leased assets.  The building improvements are judged to be in average condition.  Fueling improvements consist of (6) fueling dispensers with a total of (12) simultaneous fueling positions.  Fuel storage is provided by (2) 12,000-gallon and (2) 8,000-gallon underground storage tanks (USTs).  The tanks are assumed to be of fiberglass construction and assumed in compliance with all EPA specifications and related government programs.  The improved site contain approximately 98,504 square feet and is considered of a larger size for a fueling facility in the neighborhood.  The subject as developed with leased space represents a legal and conforming use of the underlying site with the appropriate conditional use permit.  The building improvements are considered aged, adequately maintained and functional for their intended use.

### SWOT Analysis

The SWOT analysis analyzes a subject's strengths, weaknesses, opportunities and threats.  This tool helps identify various factor(s) affecting the subject property.  Other macroeconomic factors such as legislation and sociocultural changes can have both positive and negative impacts upon the matric in various forms.

| SWOT ANALYSIS | |
|---|---|
| **Strengths** | **Weaknesses** |
| Strong location next to Interstate 57 | Older improvements in need of renovation |
| Large site with frontage on all sides | Multiple competitors nearby |
| Recognizeable fuel brand | Low barriers to entry |
| **Opportunities** | **Threats** |
| Potential to offer additional profit centers | Potential for existing competitors to modernize |
| Large site with excess land for expansion | Rise in demang for alternative fuels and energy sources |
| Alternative fueling | New Raceway Gas potential one block west |

## VALUATION METHODOLOGY

In appraising the market value of the going-concern, the accepted methods that generally apply to real estate can be used to estimate value as a going-concern.  We will analyze the appraised property using each of the three accepted methods of valuation, the Cost, Sales Comparison, and Income Capitalization Approaches to value.

The Cost Approach estimates replacement cost new (RCN) for building, fueling, site improvements, and removable M & E, less depreciation and obsolescence if present, plus the underlying value in the land.  We include developer's costs supplemented by our own estimates. This approach is particularly useful in our "as is" and "as proposed" valuations and in allocating going-concern assets.

The Sales Comparison Approach develops a value indication for stabilized properties by comparing various physical, volume, and profit relationships as exhibited by market sales with the use of regression analysis.  Stabilized sales of fee simple branded stations selling as going-concerns were used in the Sales Comparison Approach.  Due to the subject's required construction and conditions "as is" and "as proposed" the Sales Comparison Approach using stabilized comparables was not considered a relevant indicator.  We did however employ the Sales Comparison Approach on an "as stabilized" basis.

The Income Capitalization Approach examines the sales potential of the going-concern and observed relationships between expected income and value.  In this instance we rely on a market extrapolated Gross Profit Multiplier (GPM) taken against projected subject gross profit.  This approach is emphasized when valuing stabilized going-concerns.

All three approaches to value rely on actual data regarding branded and unbranded stations selling as going-concerns.  Data regarding similar branded stations operating and selling on a fee simple going-concern basis are verified and contained within the appraiser's files.  Our concluded value employs all three approaches with a final going-concern value allocation to real estate including fueling improvements, removable M & E, and the business inclusive of any goodwill, if present.

*Retail Petroleum Consultants, LLC*                    *Cost Approach   Page 72*

---

**COST APPROACH**

**"As Proposed" Valuation**

The employment of the Cost Approach in the valuation process is based on the principle of substitution.  The principle may be stated as follows:

> "No one is justified in paying more for a property than that amount by which he can obtain, by purchase of a site and construction of a building, without undue delay, a property of equal desirability and utility.  In the case of a building that is not new, the disadvantages or deficiencies of the existing building (as compared with a new building) must be evaluated."

The Cost Approach normally consists of five steps:

1.    *The estimate of the land value as if vacant;*

2.    *The estimate of the current cost of replacing or reproducing the existing improvements;*

3.    *The addition of an applicable entrepreneurial profit and related soft costs;*
4.    *The estimate and deduction of depreciation from all causes, if applicable;*

5.    *The addition of the value of the land and the depreciated value of the improvements.*

**Fee Simple Land Value Estimate**

The subject's local market was surveyed for similar type fee simple land sales.  Several commercial land sales were found and analyzed in the sections to follow.  The sales collected will be compared to the subject site on a price per square foot basis.  A summary of the comparable land sales, map, and adjustment grid are located on the next pages followed by our concluded fee simple land value.

**Retail Petroleum Consultants, LLC**                                                   *Cost Approach   Page 73*

| Comp. No. | Location | Sale Date | Price | Size SF | Corner | Zoning/Use | $ Price/SF |
|---|---|---|---|---|---|---|---|
| | **LAND SALES SUMMARY** | | | | | | |
| Subject | SWC Marshfield & 119th<br>Calumet Park, Illinois | - | - | 98,504 | Corner | I/Fueling Station | - |
| 1 | SWC 119th & Page<br>Calumet Park, Illinois<br>APNs: Various | 5/6/2016 | $885,000 | 174,240 | Corner | I-1/Fueling Station | $5.08 |
| 2 | SEC Vermont & Ashland<br>Calumet Park, Illinois<br>APN: 25-32-105-017 | 4/4/2017 | $920,000 | 111,078 | Corner | Commercial/Fueling Station | $8.28 |
| 3 | SWC Route 6 & Woodlawn<br>South Holland, Illinois<br>APN: 29-23-109-040 | 1/27/2017 | $1,500,000 | 96,830 | Corner | Commercial Fueling Station | $15.49 |
| 4 | SWC Crawford & 159th<br>Markham, Illinois<br>APN: 28-22-201-005 | Listing | $2,500,000 | 152,460 | Corner | Commercial | $16.40 |
| 5 | SWC Cicero & 124th<br>Alsip, Illinois<br>APNs: 24-28-408-005, 006, 007, 029 | 3/13/2017 | $1,750,000 | 103,381 | Corner | Commercial/Hotel | $16.93 |



# LAND SALES MAP

**COMPARABLE LAND SALES ADJUSTMENT GRID**

| COMPARABLE NUMBER | L-1 | | L-2 | | L-3 | | L-4 | | L-5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **SALE PRICE** | $885,000 | | $920,000 | | $1,500,000 | | $2,500,000 | | $1,750,000 | |
| Land Area in SF | 174,240 | | 111,078 | | 96,830 | | 152,460 | | 103,381 | |
| Sale Price/SF | $5.08 | | $8.28 | | $15.49 | | $16.40 | | $16.93 | |
| **PROPERTY RIGHTS CONVEYED** | | | | | | | | | | |
| Adjusted Price per SF/Adjustment | $5.08 | 0% | $8.28 | 0% | $15.49 | 0% | $16.40 | 0% | $16.93 | 0% |
| **FINANCING TERMS** | | | | | | | | | | |
| Adjusted Price per SF/Adjustment | $5.08 | 0% | $8.28 | 0% | $15.49 | 0% | $16.40 | 0% | $16.93 | 0% |
| **CONDITIONS OF SALE** | | | | | | | | | | |
| Adjusted Price per SF/Adjustment | $5.08 | 0% | $8.28 | 0% | $15.49 | 0% | $13.12 | -20% | $14.39 | -15% |
| **MARKET CONDITIONS** | May-16 | | Apr-17 | | Jan-17 | | Listing | | Mar-17 | |
| Adjustment @      3%    Per Year | 6.2% | | 3.5% | | 4.0% | | 0.0% | | 3.6% | |
| Adjusted Price per SF | $5.39 | | $8.57 | | $16.11 | | $13.12 | | $14.91 | |
| **LOCATIONAL &** | | | | | | | | | | |
| **PHYSICAL CHARACTERISTICS** | | | | | | | | | | |
| Overall Location | Inferior | 15% | Inferior | 20% | Superior | -15% | Inferior | 5% | Inferior | 5% |
| Access and Visibility | Inferior | 25% | Inferior | 10% | Inferior | 5% | Inferior | 5% | Comparable | 0% |
| Topography and Offsites (Drainage) | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% |
| Shape and Utility | Inferior | 10% | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% |
| Size | Inferior | 5% | Comparable | 0% | Comparable | 0% | Inferior | 5% | Comparable | 0% |
| Zoning/Use | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% |
| Utilities | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% | Comparable | 0% |
| **ADJUSTED PRICE PER SF** | $8.36 | | $11.14 | | $14.50 | | $15.09 | | $15.66 | |
| **TOTAL ADJUSTMENTS** | 61% | | 33% | | -6% | | -5% | | -6% | |

**Analysis of the Sales**

In estimating the value of the subject site as though vacant, we made direct comparison of the subject site to like kind commercial land sales and also considered listings. Adjustments have been made as necessary to offset differences in various factors affecting value, such as conditions of sale, date of sale, location, size, access, off-sites, topography, etc. In examining the comparable sales, we have applied a subjective adjustment analysis, which includes specific adjustments derived from our experience and consulting with the market participants. All sales were adjusted for and analyzed on the basis of cash equivalent sale prices. Listings are adjusted downward in the conditions of sale category based on observed spreads between asking and selling prices.

**Market Conditions Adjustment**

As mentioned in the Economic Overview section of this report, two commercial properties indices were surveyed which track general market trends across the country and smaller regions. The Moody's/REAL Commercial Property Price Index (CPPI) tracks commercial real estate investment property prices, with properties in non-major markets still remaining -0.05% below their peak. All of the indexes have registered gains in the prior year, with markets up between 10.68% and 17.87%.

The CCRSI survey shows a continued increase from recession lows for properties in the western region. The survey shows western retail properties up 2.10% from the prior quarter and up 11.91% from the prior year. Despite the good showing, many of the indexes are still off their pre-recession peaks, with office values down -10.84%, retail properties down -7.69%, but multi-family properties up 19.23%.

This data is supplemented by a survey of land sales within the Costar Comps database. Based on this information and consumer pricing trends we support a land appreciation rate of 3% and adjusted for time accordingly.

**Improved Site  -  Fee Simple Land Value Conclusion**

The land sales considered are all viable sites for large fueling stations like the subject. Land Sales 1, 2, and 3 were purchased for fueling station development and support adjusted values towards the lower end of the adjusted range. Land Sale 1 is of particular mention being a block west of the subject and purchased by Raceway, a fuel retailer. The site has inferior shape, access, visibility, and is further west from the Interstate lacking visibility. Our review of Land Sale 1 suggests it is a more difficult parcel to develop given some parcels are non-contagious requiring significant upwards adjustments and still being the lowest value indicator. The remaining comparables support a value range from $11.14 to $15.66 per square foot and represent similar freeway oriented sites like the subject. Land Sale 1 is not a freeway orientated site and given less weight. Giving the freeway orientated sites greatest reliance we estimate a value for the subject at $13.00 per square foot. The resulting fee simple value is rounded as follows.

**98,504  SF  X  $13.00/SF  =  $1,280,000  (Rounded)**

**Excess Land Area A  -  Fee Simple Land Value Conclusion**

Excess Land Area A is a small 12,919 square foot site that is legally separate from the improved parcel.  It can be sold off immediately without lot line adjustment.  Compared to the improved parcel Excess Land Area A is much smaller and occupies an inferior corner without traffic signal having only one dedicated curb cut access.  It has similar frontage along 119th Street.  We estimate the small size to offset adjustments for superior access and visibility with a resulting value for the excess land slightly greater than the improved site at $15.00 per square foot.

$$12,919 \text{ SF } X \text{ } \$15.00/\text{SF } = \$190,000 \text{ (Rounded)}$$

**Excess Land Area B  -  Fee Simple Land Value Conclusion**

Excess Land Area B includes 32,151 square feet that is legally separate from the improved parcel.  It can be sold off immediately without lot line adjustment.  Compared to the improved parcel Excess Land Area B is smaller and occupies an inferior corner without traffic signal without dedicated curb cut access "as is".  The excess land has inferior frontage to 120th Street though benefits from frontage along three streets.  Without identity to 119th Street the excess land is far inferior requiring significant downward adjustment from the improved site value.  We estimate a value for the excess land much lower than the improved site at $8.00 per square foot.

$$32,151 \text{ SF } X \text{ } \$8.00/\text{SF } = \$260,000 \text{ (Rounded)}$$

**Replacement Cost New (RCN)**

In the estimation of RCN of the subject improvements, we employ a cost estimation guide as additional support to our own internal cost database.  The cost index used is the Marshall Valuation Service published by Marshall & Swift.  The represented costs are detailed estimates, based on actual cost breakdowns of many actual construction projects.  These costs are then assembled into groups of type and general quality.

A breakout of the components to be valued and their replacement costs are included in the following tables.  In addition to these direct costs, entrepreneurial profit and other indirect costs need to be added.

*Retail Petroleum Consultants, LLC* *Cost Approach* *Page 78*

---

| COST APPROACH PROPERTY SUMMARY | | | | | |
|---|---|---|---|---|---|
| **Citgo** | | | **SWC Marshfield & 119th, Calumet Park, Illinois** | | |
| **IMPROVED SITE SUMMARY** | | | | | |
| | **Square Feet** | **% of Site** | | **Size** | **Unit** |
| Site Size | 98,504 | 100.00% | Lighting | 15.0 | Fixtures |
| Asphalt Areas | 44,327 | 45.00% | Access | 5 | Curb Cuts |
| Concrete Areas | 4,925 | 5.00% | Gas Service | 6 | Dispensers |
| Landscaping/Drainage | 27,228 | 27.64% | Curbing | 1,255 | Linear Feet |
| Improvement Coverage | 22,024 | 22.36% | Trash Encl. + | 1 | Misc. |

| IMPROVEMENT SUMMARY | | | MARSHALL & SWIFT REFERENCE | | |
|---|---|---|---|---|---|
| **Primary Improvements** | **Effective Age** | **Size** | **Section** | **Page** | **Class** |
| In-Line Leased Retail | 20 | 6,150 | 13 | 20 | C |
| Owner Occupied Space | 20 | 15,874 | 64 | 5 | C |
| Canopy | 15 | 7,200 | 64 | 2 | S |

**Entrepreneurial Profit and Indirect Costs** - We interviewed several developers who are, or have been, active in real estate development and could comment as to appropriate entrepreneurial profit in today's market. Based on these discussions and analysis of actual profit made from projects, it was indicated that an average of 8% to 10% profit on direct and indirect costs is appropriate for a service station or c-store in the Calumet Park area. In cases where increasing property values have out-paced construction costs, the entrepreneurial profit may be higher. Conversely, a soft market with an oversupply would tend to indicate lower or diminished profit. This profit assumes the property is sold and/or leased where the developer gets a return on project costs. In a sale situation the developer's return is immediate, if leased the return is spread over time and subject to additional risk.

In the subject's case, the developer is the owner operator. There is no tenant to lease the facility once constructed (excluding leased QSR portion), nor is the facility to be sold once constructed. The risk of generating sufficient cash flow at the property to cover mortgage payments and project costs exists after construction whereas in a sale or lease the return the developer's is more immediate. In this respect we would anticipate developer profit for owner occupied projects to be less than to be sold or leased facilities. If a property were profitable once constructed there may be support for immediate owner developer profit. However, as with most fueling stations, new projects must stabilize over a year or two before showing a profit. In order for developer profit to exist the subject would have to sell for more than its development costs once constructed. This is unlikely given typical stabilization periods and appraised value "as is". Most costs submitted by owner developers have nominal if any entrepreneurial profit. Given current market conditions and owner/developer relationship, we estimate entrepreneurial profit near typical build to suit projects at 10%. This estimate also accounts for any miscellaneous costs, overruns, contingencies, etc.

*Retail Petroleum Consultants, LLC*                    *Cost Approach*   **Page 79**

| ESTIMATED REPLACEMENT COST NEW | | |
|---|---|---|
| **Property Component** | | **Cost New** |
| In-Line Retail Space | | $674,809 |
| Owner Occupied Space | | $1,913,604 |
| Removable M & E | | $350,000 |
| Site Costs | | $324,371 |
| Fueling Improvements | | $744,600 |
| **Total Estimated Direct Costs** | | **$4,007,383** |
| Indirect Costs | 16% | $641,181 |
| Entrepreneurial Incentive | 10% | $464,856 |
| **Estimated Replacement Cost New** | | **$5,113,421** |

Indirect costs include appraisal and consulting fees, permits, plan checks, marketing, project administration, carrying costs, etc. These costs for most commercial real estate construction projects generally range between 10% and 15%. Fueling station indirect costs as contained in our files for proposed projects is much higher at 15% to 20% or more. Given the additional permits and approvals necessary for retail gasoline facilities, large size, and our own survey of indirect costs at comparable projects, we estimate 16% for indirect costs for the subject properties.

**Physical Depreciation Age/Life -** Physical depreciation for the subject properties is estimated based on effective age and remaining economic life. Given industry averages and economic lives observed in the marketplace, we estimate the following for the subject improvements.

| **Property Component** | **Economic Life** |
|---|---|
| Leased Retail | 40 Years |
| Car Wash and C-Store | 35 Years |
| Service Bays | 35 Years |
| Canopy | 20 Years |
| Site Costs | 20 - 35 Years |
| M & E | 10 - 25 Years |

The most common of all the methods in arriving at physical depreciation, is the straight-line method, which is the estimation of the periodic amount of capital recapture or depreciation. This method assumes an equal amount of capital is recaptured each period, and involves dividing the total capital to be recovered by the number of years over which recapture will take place. This is more commonly known as the age/life concept of estimating accrued depreciation. The resulting percentage (effective age/economic life) is applied to the current RCN of the improvement to arrive at the amount of physical depreciation.

**Functional and External Obsolescence -** Functional obsolescence is defined as a loss of value due to characteristics inherent to the structure itself. It results in a decreased capacity of the improvement to perform the function for which it is intended in accordance with current market standards of acceptability. External obsolescence is defined as any impairment of desirability arising

from factors external to the property, such as economic forces or environment changes which affect supply-demand relationships in the market.

In the appraisal of the subject as a going-concern, functional and or external obsolescence is identified when stabilized operations show gross profit (as a percent of total sales), NOI, or fuel volume fall below profitable levels of operation as identified by typical industry profitability ratios. Often this is a function of fuel volume and market share. In the subject's case, fuel and inside sales volumes are considered to be at profitable levels, indicating no functional and or external obsolescence is identified.

Relevant obsolescence is calculated by establishing market value for the subject going-concern in the following Income Approach section (with support by the Sales Comparison Approach section) then backing into the allocation of a business/intangible value by deducting the Cost Approach reconciled and respective opinion of value conclusions. The resultant remainder would be the business/intangible or in the case of a negative resultant; functional and or external obsolescence. Considerations for the subject going-concern; including all tangible and intangible components which make-up the opinion of value, are explored in the multiplier and overall capitalization rate selection discussion(s). These include real property assets in relationship to cash flow, opportunity and upside potential, potential threats, contractual obligations (in place or otherwise) and anticipated or proposed business modeling.

**Building Improvements Valuation**

The following charts address the specific costs associated with the proposed subject improvements. We estimate an effective age of 20 years for the building improvements given their anticipated new condition. Costs for the c-store building new are estimated at $674,809 or approximately $110 per square foot.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Leased Building Cost** | | | | | | | |
| **In-Line Retail Space** | 6,150 | Square Feet X | | $105.00 | | = | $645,750 |
| **Refinement Multipliers** | | **Factor** | | | | | |
| Per./Size Multiplier | | 0.950 | | | | | |
| Height Multiplier | | 1.000 | | | | | |
| Current Cost Mult. | | 1.000 | | | | | |
| Local Cost Mult. | | 1.100 | | | | | |
| **Multiplier Total** | | 1.045 | | | | | |
| **Cost New** | | | | ($110 Per Square Foot) | | | $674,809 |
| Physical Depreciation | | 20 Years Effective Age | / | 40 Years Life Expectancy | = | | ($337,404) |
| **Depreciated Value C-Store** | | | | | | | $337,404 |

*Retail Petroleum Consultants, LLC*      *Cost Approach*   *Page 81*

| Owner Occupied Building Cost | | | | | | |
|---|---|---|---|---|---|---|
| C-Store/QSR[1] | 4,000 | Square Feet X | $130.00 | = | | $520,000 |
| Auto Service | 4,950 | Square Feet X | $80.00 | = | | $396,000 |
| Car Wash Equipment | 190 | Linear Feet | $2,500.00 | = | | $475,000 |
| Car Wash | 4,700 | Square Feet X | $70.00 | = | | $329,000 |
| Storage/Misc. (Owner Occup | 2,224 | Square Feet X | $50.00 | = | | $111,200 |
| **Refinement Multipliers** | | | | | | **$1,831,200** |
| Floor Area Mult. | | 0.950 | | | | |
| Current Cost Mult. | | 1.000 | | | | |
| Local Cost Mult. | | 1.100 | | | | |
| **Multiplier Total** | | **1.045** | | | | |
| **Cost New Car Wash** | | | ($478 Per Square Foot) | | | $1,913,604 |
| Physical Depreciation | | 20 Years Effective Age / 35 Years Life Expectancy = | | | | ($1,093,488) |
| **Depreciated Value Car Wash** | | | | | | **$820,116** |

[1]Cost new is for real estate only, includes built in refrigeration, no other equipment or M & E is included

## Site Costs and Removable M & E

Our site costs includes grading, paving, landscaping, lighting, and any miscellaneous site improvements such as trash enclosures, equipment pads, curbing, retaining walls, fencing, etc. Our indicated site costs per square foot average of $8.26 per square foot. Our findings are summarized in the following chart.

| Site Costs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Size** | **Unit** | **Cost/Unit** | **Cost New** | **Effective Age** | **Economic Life** | **Physical Depreciation** | **Depreciated Value** |
| Demo/Grading/Site Prep | 98,504 | Square Feet X | $0.35 | $34,476 | N/A | N/A | 0.00% | $34,476 |
| Asphalt Areas | 44,327 | Square Feet X | $3.50 | $155,144 | 15 | 20 | 75.00% | $38,786 |
| Concrete Areas | 4,925 | Square Feet X | $5.00 | $24,626 | 15 | 20 | 75.00% | $6,157 |
| Landscaping/Drainage | 27,228 | Square Feet X | $0.90 | $24,505 | N/A | N/A | 0.00% | $24,505 |
| Lighting | 15.0 | Fixtures X | $1,200 | $18,000 | 15 | 20 | 75.00% | $4,500 |
| Misc., Trash Encl. +, Etc. | 1 | Misc. X | $40,000 | $40,000 | 15 | 35 | 42.86% | $22,857 |
| Curbing | 1,255 | Linear Feet X | $22.00 | $27,619 | 15 | 20 | 75.00% | $6,905 |
| **Total Site Costs** | | | | $324,371 | | | 57.40% | $138,186 |

The removable M & E account is a replacement cost estimate of the removable machinery and equipment within the c-store. The estimate accounts for the necessary amount of M & E to operate a typical c-store of the subject's size, quality, and condition. This includes items such as removable shelving, coffee makers, soda machines, cash registers, etc. NACS generally supports this range, at $330,954 in rural c-store food-service M & E and $76,614 in technology M & E. Urban stores, which tend to be slightly smaller, have slightly lower M & E costs per NACS, at $265,904 and $62,296 in foodservice and technology M & E, respectively. As noted in the market overview section, our own surveys of M & E for typical c-stores is $91,800 to $480,000 in removable M & E in a typical project, with a central tendency of $200,000 to $300,000 depending on the size of the c-store. Given the subject's larger size and auto service we account for a correspondingly requirement for removable M & E identified at $350,000 excluding tenant owned removable M & E in the leased retail spaces.

## Fueling Improvements

Costs for the existing fueling improvements, signage, and canopy are estimated in the following chart. The fueling improvements costs are based on actual project costs contained in the appraiser's files with additional support from Marshall Valuation Service as well as actual projected costs.

*Retail Petroleum Consultants, LLC*                    *Cost Approach*    *Page 82*

| Fueling Related Improvements | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Size | Unit | | Avg. Cost/Unit | Cost New | Effective Age | Economic Life | Physical Depreciation | Depreciated Value |
| Canopy | 7,200 | Square Feet | X | $30.00 | $216,000 | 15 | 20 | 75.00% | $54,000 |
| Signage/Trade Dress | 4 | Sign | X | $15,000 | $60,000 | 5 | 20 | 25.00% | $45,000 |
| Fueling Improvements[1] | | | | | $468,600 | 5 | 15 | 33.33% | $312,400 |
| **Total Fueling Related Improvements** | | | | | **$744,600** | | | | **$411,400** |

[1] Fueling Equipment includes dispensers, pumps, USTs and related equipment. Concrete and related site work addressed in site costs.

### Pro-Rata Share of Leased Facilities

The pro-rata share of the leased facilities is deducted from the Cost Approach indication for value allocation purposes. In this case, the leased facilities represent 16.84% of RCN. This equates to a depreciated building value of $430,528 for the leased units. In addition, we add a pro-rata share of site improvements and land value, estimated at 16.84% of the depreciated value for the site improvements at $29,692 and a pro-rata share of land value at $215,541 resulting in a total real estate allocation of $1,673,500 (rounded) for the leased facilities including vacant space.

### Appraiser's Cost Approach Summary

The following chart summarizes the Cost Approach. Our estimate includes land, building, existing fueling improvements, removable M & E, but no business or goodwill.

| "AS Is" COST APPROACH SUMMARY | | |
|---|---|---|
| **Replacement Cost New (RCN)** | | |
| In-Line Leased Retail | | $674,809 |
| Owner Occupied Space | | $1,913,604 |
| Site Costs | | $324,371 |
| Fueling Improvements & Signage | | $744,600 |
| Removable M & E | | $350,000 |
| **Subtotal** | | **$4,007,383** |
| **Indirect Costs and Profit** | | |
| Indirect Costs | 16% | $641,181 |
| Entrepreneurial Profit/Misc. | 10% | $464,856 |
| **RCN** | | **$5,113,421** |
| Less: Functional and/or External Obsolescence | | $0 |
| Less Depreciation From All Sources | 56% | ($2,845,833) |
| **Depreciated Improvements, M & E, FF & E** | | **$2,267,588** |
| Land Value | | $1,280,000 |
| Less: Pro-Rata Leased Fee Space | | ($680,000) |
| | | **$2,867,588** |
| **Fee Simple Value Owner Occupied Real Property** | | **$2,870,000** |

**"As Is" Cost Approach**                                   **$2,870,000**

## Going-Concern Fueling Station Sales

| Comp No. | Brand | City, State | Site Size (SF) | Building (SF) | Car Wash | Sale Date | Price | Annual Fuel Volume | GPM | OAR |
|---|---|---|---|---|---|---|---|---|---|---|
| Subj. | Citgo | Calumet Park, Illinois | 98,504 | 6,150 | Yes | - | - | 900,000 | - | - |
| 1 | Marathon | Terre Haute, Indiana | 35,284 | 2,400 | None | 10/13/2011 | $1,075,000 | - | 4.67 | - |
| 2 | Marathon | Cleveland Heights, Ohio | 21,706 | 2,706 | None | Pending | $1,325,000 | 660,000 | 2.53 | 17.04% |
| 3 | Phillips 66 | St. Louis, Missouri | 17,500 | 427 | None | 12/20/2013 | $400,000 | 526,000 | 1.39 | 24.10% |
| 4 | Independent | Baltimore, Maryland | - | 2,100 | None | Listing | $1,690,000 | 1,080,000 | 3.15 | 13.34% |
| 5 | Independent | Austin, Texas | 17,376 | 1,572 | None | 3/14/2017 | $1,300,000 | 239,061 | 2.92 | 16.98% |
| 6 | Shell | Huntsville, Texas | 245,025 | 11,712 | None | 6/22/2015 | $5,325,000 | 3,293,663 | 4.20 | 11.05% |
| 7 | Citgo | Detroit, Michigan | 14,810 | 2,310 | None | 7/13/2017 | $840,000 | 574,055 | 2.60 | 19.63% |
| 8 | Oceanic | Westminster, Maryland | 21,157 | 1,152 | None | 3/27/2013 | $1,340,000 | 1,200,000 | 3.49 | 10.89% |
| 9 | Speedway | Parchment, Michigan | 20,040 | 1,800 | None | 4/21/2013 | $300,000 | - | 1.67 | 8.67% |
| 10 | Shell | Minneapolis, Minnesota | 10,890 | 2,040 | None | 5/27/2016 | $667,000 | 624,329 | 1.55 | 19.86% |

## SALES COMPARISON APPROACH – FEE SIMPLE

The Sales Comparison Approach estimates the market value of a property by comparing it to the most similar sales available in the market. The adjustment process considers differences in factors including but not limited to interest appraised, sales volumes, conditions of sale, market conditions, and a number of location and physical attributes. Unfortunately, few truly comparable sales are available. The mix of fee simple and leased fee assets further complicates comparisons. A Sales Comparison Approach cannot be performed with any degree of reliability for the subject property as a whole. We do believe the provided comps can be used to convert owners' business fee simple cash flow into going-concern value and will incorporate their use in the following Income Approach.

## INCOME CAPITALIZATION APPROACH – OWNER OCCUPIED PROPERTY ONLY

The Income Capitalization Approach analyzes a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of value.  An investor who purchases income-producing real estate is essentially trading present dollars for the expectation of receiving future dollars (benefits).  The benefits of owning specific rights in income-producing real estate include the right to receive all profits accruing to the real property over the holding period (i.e., the term of ownership) plus the proceeds from the resale or reversion of the property at the termination of the investment.

Since the returns from going-concerns may be realized in a variety of forms, many rates or measures of return are used in capitalization.  Buyers and sellers in the petroleum retailing industry generally base their investment decisions on anticipated income and potential sales volume.  To create a standard unit of value, we analyze two specific economic relationships, described as follows:

> **Gross Profit Multiplier (GPM)** is defined as the relationship or ratio of the total sale price of a going-concern by the projected or anticipated gross profit and is derived by the division of the going-concern sale price by the gross profit.  Gross Profit is derived by deducting the total Cost of Goods Sold (COGS) from total projected gross revenues.

This technique is applied by estimating the subject's gross income potential, based on an analysis of projected performance and comparison to market indicators and other comparable operations.  A COGS estimate will be developed based upon the "spreads" or gross profit margins, which are likely to be achieved, given the station brand, competitive position, and retail pricing strategy.  Gross profit is derived based upon the overall competitive position of the property in the marketplace.

Market participants do not typically employ a DCF technique, and in mirroring the marketplace, the DCF technique is not undertaken in this analysis.  We have focused on specific income characteristics market participants find most relevant.

A leased fee analysis for the retail spaces and billboard follows.  This income is more passive and capitalized differently than owner's fee simple business income.

**Retail Petroleum Consultants, LLC**                                            *Income Capitalization Approach*   **Page 86**

| OPERATIONAL ANALYSIS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **NACS 2016 Survey** | | **2016** | | **2017** | | **"As Is" Projection 2018 - 2019** |
| **Annual Fuel Gallons Sold** | 1,791,084 | | 870,675 | | 916,627 | | 900,000 |
| **Average Fuel Price/Gal** | $2.118 | | $2.634 | | $2.875 | | $3.000 |
| **Fuel Margin** | $0.213 | | - | | $0.353 | | $0.250 |
| **Car Wash Margin** | - | | - | | 94.66% | | 85.00% |
| **Auto Service Margin** | 54.26% | | - | | 68.53% | | 55.00% |
| **C-Store & Misc. Margin** | 33.53% | | - | | 37.39% | | 35.00% |
| **Revenue** | Amount | % Sales | Amount | % Sales | Amount | % Sales | Amount | % Sales |
| Fuel Sales | $3,793,884 | 61.57% | $2,293,643 | 67.97% | $2,635,355 | 65.65% | $2,700,000 | 65.60% |
| Car Wash Sales | - | - | $147,953 | 4.38% | $104,636 | 2.61% | $146,000 | 3.55% |
| Auto Service | $421,788 | 6.85% | $49,812 | 1.48% | $289,413 | 7.21% | $290,000 | 7.05% |
| C-Store & Misc. Sales | $1,946,136 | 31.58% | $883,248 | 26.17% | $984,862 | 24.53% | $980,000 | 23.81% |
| **Total Revenue (Sales)** | $6,161,808 | 100.00% | $3,374,656 | 100.00% | $4,014,266 | 100.00% | $4,116,000 | 100.00% |
| **Costs of Goods Sold (COGS)** | | | | | | | | |
| Fuel Costs | $3,412,383 | 55.38% | - | - | $2,312,191 | 57.60% | $2,475,000 | 60.13% |
| Car Wash Costs | - | - | - | - | $5,590 | 0.14% | $21,900 | 0.53% |
| Auto Service | $192,926 | 3.13% | - | - | $91,067 | 2.27% | $130,500 | - |
| C-Store & Misc. Costs | $1,293,597 | 20.99% | - | - | $616,591 | 15.36% | $637,000 | 15.48% |
| **Total COGS** | $4,898,906 | 79.50% | $2,718,783 | 80.56% | $3,025,439 | 75.37% | $3,264,400 | 79.31% |
| **Gross Profit (GP)** | $1,262,902 | 20.50% | $655,873 | 19.44% | $988,827 | 24.63% | $851,600 | 20.69% |
| **Total Operating Expenses** | $658,644 | 10.69% | $449,370 | 13.32% | $369,799 | 9.21% | $442,832 | 10.76% |
| **Net Opertaing Income (NOI)** | $604,258 | 9.81% | $206,503 | 6.12% | $619,028 | 15.42% | $408,768 | 9.93% |
| **OE as % of Gross Profit** | 52.15% | | 68.51% | | 37.40% | | 52.00% | |

**"AS IS" VALUATION – FEE SIMPLE**

We begin this approach by analyzing the subject's projected sales potential, based on a study of comparable petroleum retailing properties, industry standards, and a review of the subject's historical operational performance. A cost of goods sold (COGS) estimate will be projected and deducted based on a review of historical expenses incurred by comparable properties and industry standards. This results in a projection of the gross profit used in the application of gross profit multiplier (GPM). This GPM is applied to the concluded gross profit.

**Estimated Fuel Volume**

Our initial focus will be on the likely gross sales of the subject's operation, including fuel, c-store, car wash, auto service and other sales income. This does not include the leased assets. We rely on industry standards and comparable data from other operating retail petroleum properties. We have noted projected performance as shown in the Operational Analysis chart and following fuel volume and margin information.

| ANNUAL FUEL VOLUME & MARGIN | | | |
|---|---|---|---|
| Year | Volume | Margin Per Gallon | Fuel Gross Profit |
| NACS 2016 Survey | 1,791,084 | $0.213 | $381,501 |
| 2016 | 870,675 | - | - |
| 2017 | 916,627 | $0.353 | $323,164 |
| "As Is" Projection 2018 - 2019 | 900,000 | $0.250 | $225,000 |

Our projection considers subject historical data as well as volume – margin relationships. No trend data can be realized from historical data. We note potential new competition coming into the market and 2017 margins above the NACS averages. Margins are trending down. NACS supporting a 2016 volume of 1,791,084 gallons on a $0.213 per gallon margin. Given the subject's location, competition, new fueling dispensers/pumps, and our analysis of similar stations, we project stabilized fuel volume for the subject at 900,000 gallons for the "As Is" Projection 2018 - 2019 as supported in the Competing Stations section. This volume assumes a $0.250 per gallon margin. A discount from the estimated margin would result in increased volume. The projected fuel volume is assumed to exceed any supplier's minimum requirements.

**"As Is" Fuel Volume Projection　-　900,000 Gallons Annually**

**Retail Pricing - Fuel**

Retail prices fluctuate for various reasons including but not limited to supply agreements, rebates and incentives, taxes, supply and demand, and crude oil prices. Because of the uncertainty regarding these influences, any estimate for a 12-month period is considered subjective. However, retail pricing has minimal effect in our valuation analysis because of our reliance on fuel margin, which tends to be more stable over a 12-month period. Given historical trends and pricing spreads observed between independent operators and the Major Oil Companies, crude oil fluctuations, and current retail pricing at the comparable properties as discussed in the

Competing Stations section, we estimate the average retail price for all grades at $3.000 per gallon for the 12-month period following our "As Is" date of value.

On this basis, we have concluded that a prospective buyer, based solely on our financial projections and information provided to us, will reasonably project stabilized annual fuel volume of 900,000 gallons with associated gross revenues from fuel sales of $2,700,000 (900,000 gallons x $3.000 per gallon). This pricing is supported by survey of subject and competing stations pricing as of the inspection date. We use this projection in our revenue estimate in the following analysis.

**"As Is" Average Retail Gasoline Price    -    $3.000**

**Projection of C-Store and Other Sales**

We observe that in the subject's immediate area competition for the c-store is moderate with several nearby competing stations, in addition to other convenience, drug, and grocery stores throughout the neighborhood as well as major retail shopping across the street. C-store sales are often a function of fuel sales; the more fuel sales, the more traffic into the c-store. This is true in most cases, unless there are unusual circumstances. Examples of atypical circumstances include rural locations, special or super high volume locations, unusual design features, or extremely large or small facilities.

The average ratio of c-store to total sales observed nationally as indicated by NACS is 23.36% of total sales, up from 22.14% a year prior. This ratio has generally been stable over the previous five years. As oil prices have hit their historic lows, fuel sales give up a bigger portion of the revenue stream. An indication below the national average on a percentage basis is reasonable given the subject's urban location and competing market. On an overall basis, NACS shows average c-store sales across the nation at $1,748,952, or $371.24 per square foot of gross floor area. There is a general relationship between gross c-store sales and fuel volumes sold, since fuel sales are the primary drivers of customers onto the site. There is also a general relationship between building size and sales per square foot, with smaller buildings exhibiting higher sales per square foot than larger buildings.

C-Store and other sales in 2016 were $883,248 annually or $220.81 per square foot increasing to $984,862 or $246.22 per square foot in 2017. Giving historical data greatest weight we estimate stabilized c-store and miscellaneous sales at $980,000 which is $245.00 per square foot.

**Car Wash Valuation Assumptions**

No car count data was provided for the car wash operations. Traffic along 119th Street is estimated at 20,400 cars per day according to SiteToDoBusiness and the appraiser's estimate. The subject's signalized corner location has good access and visibility and the improvements include an older but operating facility with additional complimentary profit centers. The subject includes a motorized conveyor system and offers a variety of car wash services and detailing. Car wash revenue in 2016 was only $147,953 decreasing to $104,636 in 2017.

Given the size of the car wash improvements and available services, we estimate car wash sales revenue at $146,000 which is towards the upper end of the subject historical range. This projection is well below market indicators indicating the car wash in under performing, likely due to aged equipment that is in need of renovation and or replacement.

**"As Is" Annual Car Wash Sales　-　$146,000**

**Auto Service**

Competition for the subject is moderate in terms of modern quick lubes and auto repair facilities in the immediate vicinity of the subject. The subject's existing (4) service bays were operational at the time of inspection. Historical auto service sales for the subject ranged from $49,812 to $289,413 with an increasing trend. The National Survey supports average sales at $660,400 annually for modern facilities with fewer bays. The subject appears to be under performing. Taking into consideration our knowledge of the industry, competition, and our analysis of similar type facilities, we project the annual auto service sales at $290,000. This projection is below the survey average due to the subject's historical sales. Given lower than market c-store and fuel sales volumes, we would expect auto service sales to be below market as well.

**"As Is"　Projection of Auto Service Sales　-　$290,000**

We have utilized a combination of market and industry data to measure gross revenue sources, as summarized in the following chart.

| "As Is" Summary of Gross Income Potential | | | |
|---|---|---|---|
| Component | Annual Volume | Retail Price | Annual Sales |
| Fuel Sales | 900,000 | $3.00 | $2,700,000 |
| C-Store and Other | $980,000 | - | $980,000 |
| Car Wash Sales | $146,000 | - | $146,000 |
| Auto Services | $290,000 | - | $290,000 |
| Total | | | $4,116,000 |

Petroleum and related retailers have two basic levels of expense; Cost of Goods Sold (COGS), which reflects cost of inventory for resale, and operating expenses, reflecting costs associated with operations. COGS is considered in the following analysis by first estimating gross profit margins.

**Gross Profit Margin – Fuel Sales**

In the course of our ongoing practice of petroleum retailing appraisals, we frequently interview station owner/operators to ascertain current gross profit margins. Furthermore, in the course of actual appraisals we are afforded the opportunity to verify actual margins being achieved by a variety of similarly branded petroleum retailers.

*Retail Petroleum Consultants, LLC*       *Income Capitalization Approach*    *Page 90*

Margins for fueling stations and c-stores as reported by NACS averaged $0.213 per gallon nationally in 2016. Historical subject margin in 2017 was $0.353 per gallon. Typically we observe a general inverse relationship between fuel volumes and fuel margins (i.e. higher volume operations typically have lower margins and vice versa). The subject is projected to pump 900,000 gallons "as is". Given market trends, regional and statewide data, and our knowledge of hundreds of appraised fueling stations, we assume most branded wholesale pricing will generally permit the retailer to achieve a margin somewhere within the comparable indications and our own surveyed range. Margins are trending down as retail price increase. We estimate a sustainable margin between market averages and that reported for the subject at $0.250 per gallon.

**"As Is" Fuel Gross Profit Margin   -   $0.250 Per Gallon**

**Gross Profit Margin – C-Store and Other Sales**

We have previously estimated the projected gross revenues for the c-store and other sales revenue category and now "back into" the gross profit margin by first estimating the cost of goods sold (COGS). The profit margins in c-stores are usually a direct function of competition, product type, and volume. For example, some freeway or rural locations are able to achieve profit margins of 40% or more, due to the lack of competition at some more remote sites. Stations with a high percentage of fuel, lottery, and cigarette sales often reflect low profit margins. Within the petroleum retailing industry, the "benchmark" for evaluating c-store margins is routinely quoted at 30.00% to 35.00% for an average operation. NACS reports c-store profit margins in 2016 at 33.53%. Facilities with significant food operations tended to support increased profit margins. The operator is reporting 37.39% c-store margin; which is reasonable given some level of food service and below market sales volume. Given the subject's c-store configuration, locational attributes and competition, we estimate a sustainable gross profit margin for the c-store at 35.00%.

**"As Is" C-Store Gross Profit Margin   -   35.00%**

**Gross Profit Margin – Car Wash Sales**

Our estimated cost of goods sold includes soaps, detergents, waxes and any line labor associated with the car wash. We have considered costs of goods sold and operating expenses for flex-serve car washes. Express-exterior car washes generally exhibit margins in the 75-85% range, with generally higher volumes and smaller labor component. Full- and Flex-Serve car washes have significant labor components and much lower profit ratios in the 50% to 75% range. The subject operator reports profit at 75% in both 2016 and 2017 which is supportive of an in-bay automatic operation with minimal labor. Given increasing labor costs we would expect a greater percentage of express washes going forward which would decrease labor.

In general, the industry has trended towards lower-priced washes with higher profit margins and a greater percentage of express washes. The subject operator did not report any labor for the car wash profit center inferring a focus on automatic operation. We estimate gross profit at 85.00% in-line with market averages for an in-bay automatic car washes with little to no labor.

<div align="center">

**"As Is" Car Wash Gross Profit Margin   -   85.00%**

</div>

### Gross Profit Margin – Auto Service Sales

The auto service facilities operating as part of a fueling facilities in our survey show average operating expenses in the 40.00% to 60.00% range with a 54.00% average. The National survey is at 49.00%. The subject's historical auto service gross profits were 69.53% in 2017. Based on these factors we estimate gross profit for the auto service operations at 55.00%.

<div align="center">

**"As Is"  Auto Service Gross Profit Margin   -   55.00%**

</div>

### "As Is" Summary of Gross Profit and COGS

| Component | Sales | Margin | COGS | Gross Profit |
|---|---|---|---|---|
| Fuel Sales | $2,700,000 | $0.250 | $2,475,000 | $225,000 |
| C-Store and Other | $980,000 | 35.00% | $637,000 | $343,000 |
| Car Wash Sales | $146,000 | 85.00% | $21,900 | $124,100 |
| Auto Services | $290,000 | 55.00% | $130,500 | $159,500 |
| **Total** | **$4,116,000** | **20.69%** | **$3,264,400** | **$851,600** |

In our experience, most successful major branded petroleum retailers will operate with a gross profit between 5% and 20% of sales. This overall margin has increased from prior years as consumers have paid less for fuel, however recent trends are not favorable. We estimate potential stabilized gross profit of $851,600 which equates to 20.69% of the gross sale revenue. The subject has gross profit percentage in excess of market, but conversely below market sales and volumes.

### Gross Profit Multiplier (GPM) Selection

On a macro level, we note that most petroleum retailing going-concerns generally sell on the basis of gross profit multiple from 3.00 to 4.00 with a current average near 3.50. We have presented 10 modern facilities selling on a going-concern basis indicating GPMs from 1.39 to 4.67 with an average of 2.82. These sales occurred from 2011 to 2017 and includes two listings.

*Retail Petroleum Consultants, LLC*          *Income Capitalization Approach    Page 92*

| Comp No. | Brand | City, State | Sale Date | Price | Annual Fuel Volume | Gross Profit | GPM | $R_O$ |
|---|---|---|---|---|---|---|---|---|
| 1 | Marathon | Terre Haute, Indiana | 10/13/2011 | $1,075,000 | - | $230,000 | 4.67 | - |
| 2 | Marathon | Cleveland Heights, Ohio | Pending | $1,325,000 | 660,000 | $522,779 | 2.53 | 17.04% |
| 3 | Phillips 66 | St. Louis, Missouri | 12/20/2013 | $400,000 | 526,000 | $287,760 | 1.39 | 24.10% |
| 4 | Independent | Baltimore, Maryland | Listing | $1,690,000 | 1,080,000 | $536,800 | 3.15 | 13.34% |
| 5 | Independent | Austin, Texas | 3/14/2017 | $1,300,000 | 239,061 | $444,734 | 2.92 | 16.98% |
| 6 | Shell | Huntsville, Texas | 6/22/2015 | $5,325,000 | 3,293,663 | $1,268,897 | 4.20 | 11.05% |
| 7 | Citgo | Detroit, Michigan | 7/13/2017 | $840,000 | 574,055 | $323,046 | 2.60 | 19.63% |
| 8 | Oceanic | Westminster, Maryland | 3/27/2013 | $1,340,000 | 1,200,000 | $384,000 | 3.49 | 10.89% |
| 9 | Speedway | Parchment, Michigan | 4/21/2013 | $300,000 | - | $180,000 | 1.67 | 8.67% |
| 10 | Shell | Minneapolis, Minnesota | 5/27/2016 | $667,000 | 624,329 | $429,509 | 1.55 | 19.86% |

We have used our "as is" projection to support a gross profit indication of   as previously summarized.  This gross profit is multiplied by a market extrapolated GPM using the above sales. The market data considered includes stations that were generally similar in terms of fueling improvements age and condition.

Our on-going discussion with market participants including buyers, sellers and brokers keeps us informed of the health of the market place pulse.  Consumer spending is relatively healthy with low unemployment rate and post-recession recovery leading towards spending and travel.

In this section, we have considered the following factors to determine the appropriate GPM for the subject property.

- Ratio of business value to the overall going-concern value
- Age and condition of the subject's improvements
- Barriers to entry for new competitors in the area
- Recent trends of the subject's financial operation
- Reliability, accuracy and completeness of the provided financial data
- Any other risk associated with the subject property

The gross profit of a particular property and the multiplier it commands in the market place generally has an inverse relationship due to the nature of the relationship of real estate to business value in a going-concern.  As gross profit increases, the value of the real estate itself does not necessarily increase, as the real estate of the going-concern is allocated based on the Cost Approach.  As a result, once the cost to replace the real estate (depreciated improvements plus land value) is covered, business value begins to accrue.  Business value is not tied to a tangible asset.  While the land, bricks, and sticks will always retain some tangible value (highest and best use issues not withstanding), the business is not a secured asset.  Thus, the business value is far riskier, in that it can be threatened by new competition or changing market trends. Moreover, business value is typically more difficult and costly to finance as compared to tangible assets like real estate, which reduces the pool of potential buyers.  These issues therefore will tend to reduce the multiplier (or increase the capitalization rate) for properties which exhibit very high gross profit.

The following table illustrates our view of the risk factors affecting the subject property.



It is of the utmost importance that recent sales of fueling stations with verifiable income and fueling figures be used. Without these crucial data points, the appraisal of a given facility cannot be accurate, for gross profit multipliers cannot be accurately derived. Without actually understanding how many gallons of fuel a station is pumping, an investor cannot ascertain what price he or she should pay for said property. The market data considered above includes sales of stations with verifiable income and fuel volumes.

Furthermore, with so few sales of fueling stations occurring over the past two years, the geographical location of the search area had to be expanded. While this situation is not considered ideal, it is not a significant hurdle to a going-concern valuation, as most investors are more concerned with income potential rather than exact physical location. If an investor can make a given return on a given property, then location, while important, is not as critical as it may otherwise be. This return on and of investment is realized in the income and profit that the investor receives. During 2014 to 2017, fueling stations saw some of the best fuel profit margins in recent history contrary to typical market spikes observed during that time. However, the trend is now downward.

Oil price volatility as dictated in part by the shifting geopolitical dynamics around the world, have a direct impact on retailer operations. Typically, as oil prices fall down from a high, operators are able to best utilize a sticky pricing strategy and benefit from higher margins. If prices remain low it is unlikely operators will be able to realize a maximal per gallon profit margin. Patrons are more

likely to fill their tanks entirely, drive more, and have more spending money for goods inside the c-store.

It is unknown if the market will see such volatility in the macro market place or if current pricing is sustainable.  Analysts suspect crude oil pricing to be increasing throughout the summer of 2018 which would suggest margin compression for operators.

Our projections consider typical margins and a blend of sustainability between volume and margin.  Market spaces are typically satisfied with fuel product availability, it is rare to find an underserved market.  We note the purchase of land a block west of the subject by a fueling competitor and likelihood of increased competition in the foreseeable future.  As a new competitor enters a marketspace, they are taking a portion of sales by syphoning gallons sold from other existing facilities.

GPM selection for the subject considers performance above or below market averages based upon provided financial projections, the subject's location and reasonable performance expectations.  The subject represents a multi-profit center with leased retail space and surplus land, somewhat management intensive compared to a typical gas station with c-store.

Other factors which contribute to risk include the ratio of business (intangible) value to real estate (tangible) value.  The subject indicates a very low business value allocation – indicating the bulk of value is in 'hard' assets.  This is typical for proposed stations as functional and or external obsolescence is observed due to high construction costs, jeopardizing project feasibility.   The subject, "as is", represents an older facility with strong location.  The subject's gross profit in 2018 - 2019 is projected at $851,600 which is within the comparable range near the upper end.  We've seen multipliers increase over the past few years.   The provided financial statements were problematic in terms of verifying individual profit center margins, were lacking in detail and only two years of data available.   The subject improvements are aged with the car wash tunnel equipment near the end of its economic life.  The subject has a strong location adjacent to Interstate 57 and its on- and off-ramps.  As mentioned, GPMs have trended up.  Given these risks, we estimate a GPM from within the comparable average at average at 3.50.  This results in an "as is" market value of the fee simple going-concern at $2,980,000, rounded.   This value excludes the leased fee assets and excess land.

|  |  |
|---|---|
| **"As Is" GPM Market Value Indication** | **$2,980,000** |

**NOI Capitalization**

We projected the subject's operating expenses as shown on the previous Operating Analysis Chart.  We have relied on market indicators when estimating operational expenses for the subject property.  Operational expenses for similar type stations generally run from 50% to 75% of gross profit.  NACS supports a lower but comparable expense ratio of 63.70% of gross profit in 2016. The developer's reports operating expenses at 68.51% in 2016 decreasing to 37.40% in 2017. Given the subject's size, our survey of expenses, ratio of fuel to c-store sales, and anticipated hours of operation and total margins, we estimate 52.00% of gross profit as operational expenses

for a net income of $408,768.  The market sales support an average capitalization rate of 15.73% ranging between 8.67% and 24.10%.  Given risks identified in the GPM approach we support a capitalization rate below the market average at 15.00% for a value indication of $2,730,000 rounded.  This value excludes leased fee assets and excess land.

**"As Is" NOI Capitalization**                                           **$2,730,000**


**"As Stabilized" Income Approach Reconciliation**

The GPM and capitalized NOI approaches indicate reasonable values at $2,980,000 and $2,730,000 respectively.  Greater weight is awarded the GPM indicator given the more subjective nature of estimating future operational expenses.  We conclude to an "as is" fee simple market value of the going-concern at $2,980,000.  This value excludes leased fee assets and excess land.

**"As Is" Market Value Via Income Approach**                          **$2,980,000**

**LEASED ASSET VALUATION**

The purpose of this section is to analyze the subject's lease income potential and expense exposure from the leased facilities.  It would be inappropriate to simply add this income into the subject's gas station and c-store operating analyses.  The two operations have very different risk profiles and operation requirements.  The gas station and c-store with their related profit centers have to be operated as a going-concern.  The operator of this segment needs to be adept at managing labor, inventory, marketing, etc.  If the market declines, gas prices rise or fall markedly, or the business does not perform for any other reason, the owner-operator is on the hook for the lower gross profit from the business.  The leased portion of the property, on the other hand, only requires property management skills.  If the tenant's business and revenues declines, then the tenant is still contractually obligated to make rent payments.  The primary risk is the credit worthiness of the tenant.  Therefore, a typical market participant is going to assign different rates of return to these different assets depending on their risk and management intensity.

In this process we have reviewed all available information on the property as well as relevant market data.  The resulting forecast of net operating income and cash flow will be used to estimate value via the Income Approach.  Our concluded market rental rates and lease assumptions are analyzed in the Market Overview section.  The subject rents are considered to be above market.  We do not anticipate any additional percentage income for the subject retail units.

Gross rental income includes the vacant space leased at $1.50 per square foot per month full service, a significant discount from asking to facilitate quick lease up of the space "as is".  The remaining spaces are included at rates stated in the provided lease documentation from $3.75 to $7.88 per square foot full service for spaces ranging from 200 to 1,200 square feet.  These leases are considered above market.  The billboard is leased at $1,308.00 per month which is deemed reasonable given exposure to Interstate 57 and large size.  Based on provided leases and vacant space at $1.50 per square foot we support annual gross rental income of $221,814 including billboard and excluding excess land and owner occupied profit centers.

**Vacancy and Collection Loss Allowance**

Most investors in the local market will take vacancy and collection loss into consideration on a short-term lease.  Based on market vacancy rates discussed in the Market Overview section and risks to current tenancy we have deducted 10.00% of gross revenue for collection loss and vacancy.

**Operating Expenses**

Operating expenses are entirely the responsibility of the landlord with no pass through to tenants.  These expenses include real estate taxes, Insurance, CAM (Common Area Maintenance), Utilities, Repairs, and Administrative.  Based on similar type strip center properties we have estimated respective expenses for the cited categories.  These expenses are summarized on the following chart and total $65,666 annually being 32.89% of effective gross income.

*Retail Petroleum Consultants, LLC*                    *Income Capitalization Approach*    *Page 97*

**Direct Capitalization Analysis**

The retail units are leased above market with vacant space leased at a discount. The billboard leases is considered at market. The direct capitalization analysis is viewed in a similar manner as would be approached by the most probable buyer or investor. In order to select an appropriate rate for the subject we have considered leased sales from various sources. The overall range in capitalization from local comparable sales is from 5.90% to 13.00% with an average of 8.23% with multi tenant facilities supporting a higher average rate at 9.29%. It should be noted, however, that these facilities are typically freestanding and not tethered or attached to a fueling – car wash facility. These rates also reflect a passive NNN investor, where as the subject buyer must manage and operated a complex fueling station with c-store, car wash, and auto services. The tenants are not credit rated and generally have short term leases at above market rates increasing risk to potential buyers. Provided lease documentation is poor with no legally demised spaces or square footages included in the leases. The subject has significant vacancy with added risk to lease up. These factors support significant risk supported by the upper end of the local sale comparables. Capitalization rates have generally been declining over the last three years as the commercial real estate market continues to strengthen, though these rates have bottomed out and will only increase as interest rates rise. We estimate a capitalization rate towards the upper end of the market range at 13.00%. The following pro forma operating statement incorporates our projected assumptions. Based on this analysis, the indicated value by the Direct Capitalization Approach is $1,030,000, rounded. This value excludes owner occupied property and excess land.

| | |
|---|---|
| **Leased Fee Capitalization Approach** | **$1,030,000** |

**Retail Petroleum Consultants, LLC**     *Income Capitalization Approach*   **Page 98**

---

**LEASED FACILITIES**
**DIRECT CAPITALIZATION**

| Suite | Size SF | Monthly Contract Rent | Annual | $/PSF (Annual) | % of EGI |
|---|---|---|---|---|---|
| Dunkin Donuts | 200 | $1,576.21 | $18,914 | $94.57 | 9.47% |
| Boost Mobile | 1,200 | $4,500.00 | $54,000 | $45.00 | 27.05% |
| Hair Gallery | 450 | $2,400.00 | $28,800 | $64.00 | 14.43% |
| Insurance | 800 | $3,450.00 | $41,400 | $51.75 | 20.74% |
| Billboard | - | $1,308.33 | $15,700 | - | 7.86% |
| Vacant | 3,500 | $5,250.00 | $63,000 | $18.00 | 31.56% |
| **Total** | **6,150** | **$18,484.54** | **$221,814** | **$36.07** | **111.11%** |
| **Vacancy & Credit Loss** | | 10.00% | ($22,181) | ($8.37) | -11.11% |
| **Effective Gross Income** | | | **$199,633** | **$75.33** | **100.00%** |
| **Pro-Rata Share Operating Expense** | | | | | |
| Real Estate Taxes | | | $21,079 | $3.43 | 10.56% |
| Insurance | | | $4,613 | $0.75 | 2.31% |
| CAM & Utilities | | | $15,375 | $2.50 | 7.70% |
| Repairs & Maintenance | | | $18,450 | $3.00 | 9.24% |
| General/Administrative | | | $3,075 | $0.50 | 1.54% |
| Management | | | $3,075 | $0.50 | 1.54% |
| **Total Operating Expenses** | | | **($65,666)** | **($24.78)** | **-32.89%** |
| **NOI - Cash Basis** | | | **$133,967** | **$50.55** | **67.11%** |
| **Overall Capitalization Rate** | | | 12.00% | 13.00% | 14.00% |
| **Indicated Value (Rounded)** | | | $1,120,000 | $1,030,000 | $960,000 |

*Retail Petroleum Consultants, LLC*                    *Correlation and Conclusion    Page 99*

## CORRELATION AND CONCLUSION

This appraisal was made to express the "as is" leased fee market value of the going-concern as of May 29, 2018.  This report is dated June 13, 2018.  Application of the appropriate appraisal methods resulted in the following indications of value under the requested valuation scenarios.

| VALUE MATRIX | |
| --- | --- |
| **Value Scenario** | **"As Is"** |
| **Date of Value** | **May 29, 2018** |
| Cost Approach - Fee Simple Assets | $2,870,000 |
| Income Capitalization - Fee Simple Assets | $2,980,000 |
| **Market Value of the Fee Simple Going-Concern** | **$2,980,000** |
| Add: Leased Fee Retail Space and Billboard | $1,030,000 |
| Add: Surplus Land Area | $450,000 |
| Deduct: Dispenser Loan Payoff | ($90,000) |
| **Total Property Value** | **$4,370,000** |

### Value Conclusions

The "as is" market value assumes the property in its current state as a partially owner occupied and partially leased property.  Most buyers and sellers base fee simple going-concern market value on a multiplier of anticipated profit, net income, or volume.  Leased fee buyers also look to multiples of cash flow to support value.   The Income Approach takes these factors into considerations and renders a supportable market value based on market-extrapolated multipliers. The Income Approach using financial projections based on industry averages and available subject trends and reported lease obligations is considered the best value indicator.  We relied on the Income Approach with market value indications of $2,980,000 and $1,030,000  respectively for fee simple and leased fee assets.  The fee simple value is adjusted ($90,000) for payoff of a fueling dispenser loan.  The Sales Comparison Approach was not considered to be a relevant value indicator.  The excess land value is added to indicate a total market value of the leased fee – fee simple going-concern at $4,370,000 rounded.  Our concluded market values and respective going-concern allocations are summarized on the following chart.

| VALUE ALLOCATION SUMMARY | |
| --- | --- |
| **Value Scenario** | **"As Is"** |
| **Date of Value** | **May 29, 2018** |
| Real Property Assets | $2,690,000 |
| Removable M & E | $90,000 |
| Business or (Functional Obsolescence) | $110,000 |
| **Market Value of the Going-Concern** | **$2,890,000** |
| Add: Leased Fee Retail Space and Billboard | $1,030,000 |
| Add: Surplus Land Area | $450,000 |
| **Total Property Value** | **$4,370,000** |

*Retail Petroleum Consultants, LLC*                 *Correlation and Conclusion   Page 100*

**<u>ADDENDA</u>**

**Exhibit A – Engagement Letter**
**Exhibit B – Demographics and Traffic Counts**
**Exhibit C – Financials and Gallons Sold**
**Exhibit D – Rent Roll/Leases**
**Exhibit E – Fuel Supply Agreement (Portion)**
**Exhibit F – Qualifications of Appraiser**
**Exhibit G – Certification of Appraiser**
**Exhibit H – Assumptions and Limiting Conditions**

*Retail Petroleum Consultants, LLC*                                      *Addenda Exhibit A    Page 101*

**Exhibit A – Engagement Letter**



## Business Loan Capital

### ENGAGEMENT CONTRACT

May 22, 2018

Steve Morse                           Via email steve@gasvaluation.com
**Retail Petroleum Consultants LLC**
4464 McGrath Street, Unit 117
Ventura, CA 93001

Dear Mr. Morse:

Business Loan Capital, Inc. would like to retain you to prepare an appraisal of the property referred to below. You are hereby authorized to proceed under the following parameters:

| | |
|---|---|
| **Property address:** | 11900 S. Marshfield Avenue<br>Calumet Park, IL 60827 |
| **Property type:** | Gas Station/Car Wash/C-Store/Retail |
| **Name of Borrower:** | 11900 Marshfield LLC |
| **Name of Current Owner:** | Same as Above |
| **Property contact:** | Mubarak Ibrahim, owner<br>312-774-2400 mibrahim@petromt.biz |
| **Property rights:** | Fee simple |
| **Information provided:** | Business Loan Capital, Inc. - appraisal guidelines attached |
| **Date ordered:** | May 22, 2018 |
| **Date due:** | On or before June 13, 2018 |
| **Fee amount:** | |
| **Report format:** | Summary Appraisal Report, Complete Appraisal |
| **Date of value:** | Date of Inspection |
| **Value definition:** | All pertinent |
| **Number of copies:** | Electronic copy |

- The appraisal report shall be prepared in accordance with Appraisal Evaluation Guidelines as outlined on the attached.

- The report will include an estimate of replacement cost for insurance purposes and a liquidation value.

- Disclose any sales or listings of the property within the last three years.

- The site contact is to be contacted within three days of receipt of this contract.

- All reports must include a copy of this contract.

6 Hughes, Suite 200 ● Irvine, CA 92618 ● Phone 877-774-4240 ● Fax 949-450-2010

May 22, 2018
Retail Petroleum Consultants LLC
Page Two

- Appraisal must include a statement that the appraiser has acted in an independent capacity and that the assignment is not based on a requested minimum valuation, specific valuation, or the approval of loan.

- While we have attempted to provide you with the information necessary to commence the assignment, we ask that you assist Business Loan Capital, Inc in completing its files on information on the subject property by providing Business Loan Capital, Inc copies of additional documents pertaining to the subject which you obtained in your investigation but which were not provided to you by Business Loan Capital, Inc (e.g. copies of additional financial statements, permits, listing brochures, plans, etc.).

- The appraisal must include your state appraiser license / certification number. Please note that you, as the principal approved appraiser, must sign the report.

- *Business Loan Capital authorizes Pacific Premier Bank to conduct reviews of appraisals performed pursuant to this agreement and may contact the appraiser directly to request changes or modifications to the report without the consent of Business Loan Capital.*

Confidentiality

All documents furnished to the appraiser from Business Loan Capital, Inc are to be considered confidential information to the appraiser pursuant to the disclosure requirements in the confidentiality section of the ethics provision and Statement on Appraisal Standards Number 5 of USPAP. You are not authorized to release information pertaining to the appraisal content or conclusions to any other persons without our prior written approval. Please be aware, however, that the report will be released to the applicant by us upon final disposition of the loan application.

Fee Payment

We will review your submission within ten (10) working days, at which time we will provide you written comments, if any are required. You will be paid as soon as we review your response and the final report is approved by Business Loan Capital, Inc. To expedite payment, please include with the final reports an invoice which states the amount due, as well as the address of the subject property and borrower's name (provided above).

If, during your investigation of the property, you should discover anything that might materially modify the assignment or which would result in a change of terms of this agreement, please contact us immediately.

Business Loan Capital is to be provided one electronic copy (which must be provided in Adobe Acrobat (PDF) format and be text searchable OCR). Please provide to: carrie@blclending.com

May 22, 2018
Retail Petroleum Consultants LLC
Page Three


Upon receipt and agreement, sign and return this engagement via email to the undersigned. Should you have any questions or need additional information to complete this appraisal, please do not hesitate to contact me at 949-450-2000 or 877-774-4240.


Sincerely,
**Business Loan Capital, Inc.**

Carrie Beavers
Vice President / Loan Administrator


**Appraiser Acceptance:**

I agree to the terms of this engagement letter.

_____
(Name)

Date:    5/22/18    _____

6 Hughes, Suite 200 • Irvine, CA 92618 • Phone 877-774-4240 • Fax 949-450-2010

**Exhibit B – Demographics and Traffic Counts**

**Retail Petroleum Consultants, LLC**　　　　　　　　　　　**Addenda Exhibit B　Page 106**



## Market Profile

11900 S Marshfield Ave, Riverdale, Illinois, 60827　　　　　Prepared by Esri
Rings: 1, 3, 5 mile radii　　　　　　　　　　　　　　　Latitude: 41.67688
　　　　　　　　　　　　　　　　　　　　　　　　　Longitude: -87.66248

| | 1 mile | 3 miles | 5 miles |
|---|---|---|---|
| **Population Summary** | | | |
| 2000 Total Population | 22,158 | 188,083 | 449,159 |
| 2010 Total Population | 19,842 | 166,216 | 405,963 |
| 2017 Total Population | 19,519 | 165,789 | 404,306 |
| 2017 Group Quarters | 95 | 1,079 | 4,276 |
| 2022 Total Population | 19,401 | 165,858 | 404,087 |
| 2017-2022 Annual Rate | -0.12% | 0.01% | -0.01% |
| 2017 Total Daytime Population | 16,440 | 135,469 | 356,990 |
| Workers | 4,399 | 35,851 | 115,751 |
| Residents | 12,041 | 99,618 | 241,239 |
| **Household Summary** | | | |
| 2000 Households | 7,318 | 62,552 | 153,233 |
| 2000 Average Household Size | 3.01 | 2.99 | 2.91 |
| 2010 Households | 6,964 | 58,464 | 145,343 |
| 2010 Average Household Size | 2.84 | 2.82 | 2.76 |
| 2017 Households | 6,876 | 58,446 | 145,036 |
| 2017 Average Household Size | 2.82 | 2.82 | 2.76 |
| 2022 Households | 6,838 | 58,484 | 144,973 |
| 2022 Average Household Size | 2.82 | 2.82 | 2.76 |
| 2017-2022 Annual Rate | -0.11% | 0.01% | -0.01% |
| 2010 Families | 4,852 | 40,306 | 99,478 |
| 2010 Average Family Size | 3.44 | 3.46 | 3.39 |
| 2017 Families | 4,755 | 39,924 | 98,372 |
| 2017 Average Family Size | 3.44 | 3.46 | 3.40 |
| 2022 Families | 4,712 | 39,791 | 97,949 |
| 2022 Average Family Size | 3.45 | 3.47 | 3.41 |
| 2017-2022 Annual Rate | -0.18% | -0.07% | -0.09% |
| **Housing Unit Summary** | | | |
| 2000 Housing Units | 7,781 | 66,506 | 162,522 |
| Owner Occupied Housing Units | 66.3% | 65.1% | 66.0% |
| Renter Occupied Housing Units | 27.7% | 29.0% | 28.3% |
| Vacant Housing Units | 6.0% | 5.9% | 5.7% |
| 2010 Housing Units | 7,709 | 65,527 | 161,806 |
| Owner Occupied Housing Units | 57.9% | 57.8% | 59.3% |
| Renter Occupied Housing Units | 32.4% | 31.5% | 30.5% |
| Vacant Housing Units | 9.7% | 10.8% | 10.2% |
| 2017 Housing Units | 7,740 | 66,324 | 163,754 |
| Owner Occupied Housing Units | 54.3% | 54.4% | 55.9% |
| Renter Occupied Housing Units | 34.5% | 33.7% | 32.6% |
| Vacant Housing Units | 11.2% | 11.9% | 11.4% |
| 2022 Housing Units | 7,768 | 66,886 | 165,073 |
| Owner Occupied Housing Units | 54.1% | 53.9% | 55.4% |
| Renter Occupied Housing Units | 33.9% | 33.6% | 32.5% |
| Vacant Housing Units | 12.0% | 12.6% | 12.2% |
| **Median Household Income** | | | |
| 2017 | $43,530 | $49,251 | $48,645 |
| 2022 | $43,925 | $50,348 | $49,624 |
| **Median Home Value** | | | |
| 2017 | $135,601 | $165,416 | $163,761 |
| 2022 | $148,718 | $180,903 | $180,104 |
| **Per Capita Income** | | | |
| 2017 | $21,463 | $23,660 | $23,756 |
| 2022 | $23,737 | $26,071 | $26,116 |
| **Median Age** | | | |
| 2010 | 36.5 | 36.4 | 37.1 |
| 2017 | 37.7 | 37.5 | 38.2 |
| 2022 | 38.5 | 38.3 | 39.1 |

**Data Note:** Household population includes persons not residing in group quarters. Average Household Size is the household population divided by total households. Persons in families include the householder and persons related to the householder by birth, marriage, or adoption. Per Capita Income represents the income received by all persons aged 15 years and over divided by the total population.

**Source:** U.S. Census Bureau, Census 2010 Summary File 1. Esri forecasts for 2017 and 2022 Esri converted Census 2000 data into 2010 geography.

June 04, 2018

©2018 Esri

**Retail Petroleum Consultants, LLC**                    **Addenda Exhibit B    Page 107**



Traffic Count Map - Close Up

11900 S Marshfield Ave, Riverdale, Illinois, 60827
Rings: 1, 3, 5 mile radii

Prepared by Esri
Latitude: 41.67688
Longitude: -87.66246



**Average Daily Traffic Volume**
- Up to 6,000 vehicles per day
- 6,001 - 15,000
- 15,001 - 30,000
- 30,001 - 50,000
- 50,001 - 100,000
- More than 100,000 per day



**Source:** ©2017 Kalibrate Technologies

June 04, 2018

©2018 Esri

Page 1 of 1

**Retail Petroleum Consultants, LLC**    **Addenda Exhibit B    Page 108**



## Market Profile

11900 S Marshfield Ave, Riverdale, Illinois, 60827
Drive Time: 2, 3, 4 minute radii

Prepared by Esri
Latitude: 41.67609
Longitude: -87.66248

| | 2 minutes | 3 minutes | 4 minutes |
|---|---|---|---|
| **Population Summary** | | | |
| 2000 Total Population | 543 | 3,742 | 12,510 |
| 2010 Total Population | 479 | 3,418 | 11,470 |
| 2017 Total Population | 445 | 3,282 | 11,222 |
| 2017 Group Quarters | 0 | 0 | 12 |
| 2022 Total Population | 430 | 3,226 | 11,130 |
| 2017-2022 Annual Rate | -0.68% | -0.34% | -0.16% |
| 2017 Total Daytime Population | 564 | 3,028 | 10,161 |
| Workers | 306 | 1,022 | 3,389 |
| Residents | 258 | 2,006 | 6,772 |
| **Household Summary** | | | |
| 2000 Households | 168 | 1,345 | 4,399 |
| 2000 Average Household Size | 3.23 | 2.78 | 2.84 |
| 2010 Households | 150 | 1,272 | 4,214 |
| 2010 Average Household Size | 3.19 | 2.69 | 2.72 |
| 2017 Households | 140 | 1,230 | 4,139 |
| 2017 Average Household Size | 3.18 | 2.67 | 2.71 |
| 2022 Households | 136 | 1,212 | 4,108 |
| 2022 Average Household Size | 3.16 | 2.66 | 2.71 |
| 2017-2022 Annual Rate | -0.58% | -0.29% | -0.15% |
| 2010 Families | 104 | 862 | 2,898 |
| 2010 Average Family Size | 3.82 | 3.30 | 3.33 |
| 2017 Families | 96 | 829 | 2,825 |
| 2017 Average Family Size | 3.82 | 3.28 | 3.33 |
| 2022 Families | 93 | 816 | 2,797 |
| 2022 Average Family Size | 3.82 | 3.27 | 3.33 |
| 2017-2022 Annual Rate | -0.63% | -0.32% | -0.20% |
| **Housing Unit Summary** | | | |
| 2000 Housing Units | 225 | 1,441 | 4,669 |
| Owner Occupied Housing Units | 44.0% | 59.0% | 65.2% |
| Renter Occupied Housing Units | 30.7% | 34.1% | 29.0% |
| Vacant Housing Units | 25.3% | 6.7% | 5.8% |
| 2010 Housing Units | 228 | 1,447 | 4,661 |
| Owner Occupied Housing Units | 35.1% | 52.8% | 57.9% |
| Renter Occupied Housing Units | 30.7% | 35.1% | 32.5% |
| Vacant Housing Units | 34.2% | 12.1% | 9.6% |
| 2017 Housing Units | 229 | 1,454 | 4,684 |
| Owner Occupied Housing Units | 31.4% | 49.0% | 54.1% |
| Renter Occupied Housing Units | 29.7% | 35.6% | 34.2% |
| Vacant Housing Units | 38.9% | 15.4% | 11.6% |
| 2022 Housing Units | 229 | 1,461 | 4,704 |
| Owner Occupied Housing Units | 31.9% | 48.7% | 53.9% |
| Renter Occupied Housing Units | 27.5% | 34.2% | 33.4% |
| Vacant Housing Units | 40.6% | 17.0% | 12.7% |
| **Median Household Income** | | | |
| 2017 | $29,257 | $39,290 | $44,294 |
| 2022 | $28,452 | $38,935 | $44,691 |
| **Median Home Value** | | | |
| 2017 | $124,306 | $134,211 | $136,550 |
| 2022 | $131,757 | $142,199 | $147,500 |
| **Per Capita Income** | | | |
| 2017 | $14,980 | $19,106 | $21,205 |
| 2022 | $16,193 | $20,920 | $23,388 |
| **Median Age** | | | |
| 2010 | 32.2 | 34.6 | 35.9 |
| 2017 | 33.4 | 35.9 | 37.0 |
| 2022 | 34.3 | 36.9 | 37.8 |

**Data Note:** Household population includes persons not residing in group quarters. Average Household Size is the household population divided by total households. Persons in families include the householder and persons related to the householder by birth, marriage, or adoption. Per Capita Income represents the income received by all persons aged 15 years and over divided by the total population.
**Source:** U.S. Census Bureau, Census 2010 Summary File 1. Esri forecasts for 2017 and 2022 Esri converted Census 2000 data into 2010 geography.

June 04, 2018

©2018 Esri

**Retail Petroleum Consultants, LLC**                    *Addenda Exhibit C    Page 109*

**Exhibit C – Financials and Gallons Sold**

11900 MARSHFIELD STATION, INC     2017
11900 S. MARSHFIELD AVE.
CALUMET PARK, IL 60827

PROFIT & LOSS

| RECEIPTS | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| GAS STATION | $ 272,503.00 | $ 247,175.00 | 303,790.00 | $ 303,945.00 | $ 312,115.00 | $ 300,833.00 | $ 303,024.00 | $ 295,639.00 | $ 329,335.00 | $ 298,765.00 | $ 310,174.00 | $ 304,500.00 | $ 3,581,393.00 |
| LURE SHOP | $ 22,027.00 | $ 24,770.00 | 32,442.00 | $ 21,303.00 | $ 20,367.00 | $ 21,130.00 | $ 20,977.00 | $ 25,965.00 | $ 27,021.00 | $ 25,720.00 | $ 24,871.00 | $ 23,151.00 | $ 289,413.00 |
| CAR WASH | $ 8,048.00 | $ 13,191.00 | 11,373.00 | $ 10,651.00 | $ 10,200.00 | $ 10,193.00 | $ 7,813.00 | $ 6,623.00 | $ 8,265.00 | $ 4,090.00 | $ 4,761.00 | $ 9,620.00 | $ 104,636.00 |
| ATM COMMISSION | $ 1,598.00 | $ 1,775.00 | 2,100.00 | $ 2,028.00 | $ 2,025.00 | $ 2,133.00 | $ 2,133.00 | $ 1,915.00 | $ 1,798.00 | $ 1,785.00 | $ 1,083.00 | $ 1,973.00 | $ 22,921.00 |
| TOBACCO REBATES | $ 154.00 | | $ 676.00 | $ 1,071.00 | $ 480.00 | $ 1,106.00 | $ 1,164.00 | $ 1,459.00 | $ 135.00 | $ 1,798.00 | $ 1,321.00 | $ 1,463.00 | $ 11,727.00 |
| OTHER INCOME | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 348.00 | $ 4,176.00 |
| TOTAL RECEIPTS | $ 304,673.00 | $ 287,269.00 | 350,229.00 | $ 340,246.00 | $ 345,544.00 | $ 335,747.00 | $ 335,439.00 | $ 331,949.00 | $ 366,902.00 | $ 332,806.00 | $ 343,118.00 | $ 341,154.00 | $ 4,014,266.00 |
| | | | | | | | | | | | | | |
| PURCHASES | | | | | | | | | | | | | |
| GAS ONLINE | $ 154,939.00 | $ 168,110.00 | 173,319.00 | $ 183,043.00 | 199,050.00 | $ 172,953.00 | $ 191,835.00 | $ 177,625.00 | $ 176,818.00 | $ 202,233.00 | $ 167,436.00 | $ 144,683.00 | $ 2,155,144.00 |
| STATION MERCHANDISE | $ 58,157.00 | $ 46,658.00 | 58,800.00 | $ 52,291.00 | $ 50,179.00 | $ 53,861.00 | $ 53,951.00 | $ 46,289.00 | $ 47,255.00 | $ 52,289.00 | $ 52,292.00 | $ 49,959.00 | $ 616,591.00 |
| LURE SHOP | $ - | $ 11,072.00 | 4,596.00 | $ 11,153.00 | $ 9,407.00 | $ 7,925.00 | $ 5,185.00 | $ 8,429.00 | $ 10,389.00 | $ 8,096.00 | $ 7,869.00 | $ 6,046.00 | $ 91,067.00 |
| CAR WASH | $ 223.00 | $ 225.00 | 1,334.00 | $ - | $ - | $ 2,559.00 | $ 516.00 | $ 388.00 | | | | $ 345.00 | $ 5,590.00 |
| TOTAL COST OF GOODS SOLD | $ 213,319.00 | $ 225,025.00 | 238,049.00 | $ 246,487.00 | 259,636.00 | $ 237,298.00 | $ 249,487.00 | $ 231,731.00 | $ 236,462.00 | $ 262,718.00 | $ 228,097.00 | $ 242,133.00 | $ 2,868,392.00 |
| | | | | | | | | | | | | | |
| GROSS PROFIT | $ 91,354.00 | 62,134.00 | 114,180.00 | $ 93,755.00 | $ 86,008.00 | $ 98,449.00 | $ 85,952.00 | $ 100,218.00 | 130,440.00 | $ 85,288.00 | $ 115,021.00 | $ 99,021.00 | $ 1,145,874.00 |
| EXPENSES | | | | | | | | | | | | | |
| ALARM | $ - | $ 305.00 | $ - | $ 305.00 | $ - | | $ 305.00 | | | $ 305.00 | | $ 305.00 | $ 1,525.00 |
| MEMBERSHIP | $ 210.00 | $ - | $ - | $ - | $ - | | $ 600.00 | | | $ 100.00 | | | $ 910.00 |
| CITGO POS FEES | $ 71.00 | $ 69.00 | 69.00 | $ 69.00 | $ 69.00 | $ 69.00 | $ 80.00 | $ 69.00 | $ 69.00 | $ 69.00 | $ 69.00 | $ 69.00 | $ 830.00 |
| OFFICE SUPPLIES | $ 107.00 | $ 87.00 | 149.00 | $ 240.00 | $ - | $ - | $ 382.00 | | | | | | $ 965.00 |
| UNIFORMS | $ - | $ 711.00 | 710.00 | $ 1,094.00 | $ 586.00 | $ 719.00 | $ 576.00 | $ 576.00 | $ 576.00 | $ 736.00 | $ 719.00 | $ 579.00 | $ 7,588.00 |
| COM-ED | $ 1,347.00 | $ 2,766.00 | 2,720.00 | $ 2,631.00 | $ 2,332.00 | $ 2,059.00 | $ 3,127.00 | $ 2,652.00 | $ 2,581.00 | $ 2,677.00 | $ 2,539.00 | $ 2,887.00 | $ 31,122.00 |
| NICOR | $ 772.00 | $ 1,815.00 | 1,011.00 | $ 1,156.00 | $ 704.00 | $ 141.00 | $ - | | | $ 730.00 | $ 1,006.00 | | $ 7,135.00 |
| COMCAST | $ 382.00 | $ 382.00 | 382.00 | $ 382.00 | $ 395.00 | $ 334.00 | $ 384.00 | $ 421.00 | $ 421.00 | $ 422.00 | $ 422.00 | | $ 4,377.00 |
| NETWORK FEE | $ 102.00 | $ 102.00 | 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 102.00 | $ 1,224.00 |
| LICENSE & PERMITS | $ - | $ 200.00 | $ - | $ 2,352.00 | $ - | $ - | $ 140.00 | | | $ 75.00 | $ 200.00 | $ 250.00 | $ 3,217.00 |
| | | | | | | | | | | | | | $ - |
| PEST CONTROL | $ 65.00 | $ 65.00 | 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 65.00 | $ 780.00 |
| REPAIR & MAINT. | $ 6,130.00 | $ 5,104.00 | 900.00 | $ 650.00 | $ 2,032.00 | $ 802.00 | $ 2,832.00 | $ 2,064.00 | $ 2,245.00 | $ 1,233.00 | $ 1,457.00 | $ 2,740.00 | $ 28,962.00 |
| JANITORIAL SERVICE | $ 693.00 | $ 458.00 | 550.00 | $ 561.00 | $ 626.00 | $ 626.00 | $ 350.00 | $ 626.00 | $ 626.00 | $ 626.00 | $ 626.00 | $ 626.00 | $ 6,994.00 |
| SALES TAX | $ 12,377.00 | $ 10,083.00 | 12,837.00 | $ 13,751.00 | $ 13,126.00 | $ 13,231.00 | $ 12,412.00 | $ 11,138.00 | $ 14,779.00 | $ 13,086.00 | $ 14,628.00 | $ 15,099.00 | $ 157,047.00 |
| DISPOSAL SERVICE | $ 299.00 | $ 299.00 | 299.00 | $ 305.00 | $ 305.00 | $ 305.00 | $ 305.00 | $ 305.00 | $ 305.00 | | | $ 765.00 | $ 3,492.00 |
| WATER | $ - | $ 1,152.00 | 1,513.00 | $ 1,143.00 | $ 650.00 | $ 639.00 | $ 377.00 | $ 501.00 | $ 703.00 | $ 476.00 | $ 756.00 | $ 1,617.00 | $ 9,377.00 |
| SUBSCRIPTION | $ 159.00 | $ 159.00 | 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 159.00 | $ 1,908.00 |
| RENT | $ 48,000.00 | $ 48,000.00 | 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 48,000.00 | $ 576,000.00 |
| LEASE PAYMENTS | $ 3,160.00 | $ 3,160.00 | 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 3,160.00 | $ 37,920.00 |
| BANK CHARGES | $ 6.00 | $ 330.00 | 258.00 | $ 225.00 | $ 181.00 | $ 72.00 | $ 299.00 | $ 187.00 | $ 335.00 | $ 275.00 | $ 268.00 | $ 282.00 | $ 2,764.00 |
| CREDIT CARD FEES | $ 3,513.00 | $ 2,801.00 | 3,243.00 | $ 3,082.00 | $ 3,881.00 | $ 1,503.00 | $ 4,053.00 | $ 3,505.00 | $ 3,453.00 | $ 3,401.00 | $ 3,374.00 | $ 3,534.00 | $ 42,425.00 |
| PAYROLL EXPENSE | $ 22,378.00 | $ 11,991.00 | 22,414.00 | $ 16,086.00 | $ 10,014.00 | $ 10,104.00 | $ 17,446.00 | $ 11,824.00 | $ 11,830.00 | $ 11,750.00 | $ 11,805.00 | $ 11,912.00 | $ 181,548.00 |
| INSURANCE | $ 2,944.00 | $ 3,162.00 | 2,237.00 | $ 2,278.00 | $ 2,278.00 | $ 2,278.00 | $ 2,278.00 | $ 1,305.00 | $ 1,305.00 | $ 1,305.00 | $ 838.00 | | $ 22,308.00 |
| POSTAGE | | $ 49.00 | $ - | $ 0 | $ 0 | | $ 49.00 | | | | | | $ 98.00 |
| NON EMPLOYEE COMPENSATION 1099 | | | | | | | | | | | | $ 10,250.00 | $ 10,250.00 |
| TOTAL EXPENSES | $ 103,221.00 | $ 93,340.00 | 100,379.00 | $ 98,696.00 | $ 94,665.00 | $ 93,518.00 | $ 97,420.00 | $ 87,349.00 | $ 90,769.00 | $ 88,684.00 | $ 86,497.00 | $ 103,334.00 | $ 1,140,766.00 |
| | | | | | | | | | | | | | |
| NET PROFIT/LOSS | $ [11,867.00] | $ [31,156.00] | 13,801.00 | $ [4,941.00] | $ [8,657.00] | $ 4,931.00 | $ [11,468.00] | $ 12,869.00 | $ 39,671.00 | $ [3,396.00] | $ 28,524.00 | $ [4,313.00] | $ 5,108.00 |

11900 MARSHFIELD STATION, INC.
11900 MARSHFIELD AVE.
CALUMET PARK,IL 60827                    FIRST QUARTER
PROFIT & LOSS FOR THE PERIOD           01/01/2018 TO 03/31/2018

| RECEIPTS | | | | | | |
|---|---|---|---|---|---|---|
| SALES  RECEIPTS FROM GAS STATION | | | | | $ | 860,343.00 |
| SALES RECEIPTS FROM LUBE SHOP & MECHANIC SHOF | | | | | $ | 101,302.00 |
| SALES RECEIPTS FROM CAR WASH | | | | | $ | 50,179.00 |
| ATM COMMISSION | | | | | $ | 4,850.00 |
| TOBACCO REBATES | | | | | $ | 2,869.00 |
| AIR MACHINE | | | | | $ | 4,101.00 |
| TOTAL RECEIPTS | | | | | $ 1,023,644.00 | |
| | | | | | | |
| COST OF GOODS SOLD | | | | | $ | 705,186.00 |
| | | | | | | |
| GROSS PROFIT | | | | | $ | 318,458.00 |
| | | | | | | |
| EXPENSES | | | | | | |
| ALARM | | | | | $ | 305.00 |
| BANK CAHRGES | | | | | $ | 669.00 |
| CITGO POS FEES | | | | | $ | 209.00 |
| CREDIT CARD FEES | | | | | $ | 15,946.00 |
| COMCAST | | | | | $ | 1,314.00 |
| COMED | | | | | $ | 9,110.00 |
| DISPOSAL SERVICE | | | | | $ | 1,678.00 |
| INSURANCE | | | | | $ | 6,491.00 |
| JANITORIAL SERVICE | | | | | $ | 875.00 |
| LICENSE & PERMITS | | | | | $ | 200.00 |
| MEMBERSHIP | | | | | $ | 210.00 |
| NICOR | | | | | $ | 4,668.00 |
| NETWORK FEES | | | | | $ | 309.00 |
| OFFICE SUPPLIES | | | | | $ | 97.00 |
| PEST CONTROL | | | | | $ | 195.00 |
| POSTAGE | | | | | $ | 49.00 |
| PUMPS LEASE PAYMENTS | | | | | $ | 9,540.00 |
| RENT | | | | | $ | 162,750.00 |
| SALES TAX | | | | | $ | 41,924.00 |
| SUBSCRIPTION | | | | | $ | 477.00 |
| UNIFORMS | | | | | $ | 1,877.00 |
| WAGES | | | | | $ | 51,070.00 |
| WATER | | | | | $ | 2,665.00 |
| REPAIR & MAINTENANCE | | | | | $ | 873.00 |
| TOTAL EXPENSES | | | | | $ | 313,501.00 |
| | | | | | | |
| NET PROFIT & LOSS | | | | | $ | 4,957.00 |

*Retail Petroleum Consultants, LLC*                              *Addenda Exhibit C   Page 112*

| Year | Gallons | Revenue for Gas |
|------|---------|-----------------|
| 2018 | 219,638 | $ 652,677.00 |
| 2017 | 916,627 | $2,635,355.00 |
| 2016 | 870,675 | $2,293,643.00 |
| 2015 | 760,370 | $2,098,004.00 |

**Exhibit D – Rent Roll**/Leases

11900 MARSHFIELD LLC
11900 S. MARSHFIELD AVE.     CURRENT RENT ROLL
CALUMET PARK,IL 60827

RENT ROLL     2018

| TENANT NAME | | UNIT | MONTHLY RENT | |
|---|---|---|---|---|
| 1. GRANDSTAND LUBE SHOP | | G | $ | 9,500.00 |
| 2.LOYA INSURANCE | | E | $ | 3,450.00 |
| 3.CELL COMP PLUS | | D | $ | - |
| 4.BARBER SHOP | | C | $ | 2,300.00 |
| 5.BOOST MOBILE | | B | $ | 4,500.00 |
| 6.TIRE SHOP | | H | $ | 2,500.00 |
| 7.GAS STATION GASOLINE | | A | $ | 25,000.00 |
| 8.DUNKIN DONUT | | A | $ | 1,540.00 |
| 9. RESTAURANT | | A | $ | - |
| 10. MECHANIC SHOP | | H | $ | 8,500.00 |
| 11.FULL SERVICE CAR WASH & DETAIL | | F | $ | 8,750.00 |
| TOTAL MONTHLY RENTAL INCOME | | | $ | 66,040.00 |

PROFITS

| BUSINESS NAME | | | MONTHLY PROFIT | |
|---|---|---|---|---|
| 1. DUNKIN DONUTS | | | $ | 3,750.00 |
| 2.ATM COMMISSION | | | $ | 2,200.00 |
| 3.HIGHWAY SIGNAGE | | | $ | 1,308.00 |
| 4. AIR MACHINE | | | $ | 650.00 |
| 5. GAS STATION PROFIT | | | $ | 10,000.00 |
| 6. GAS STATION PROFIT | | | $ | 10,000.00 |
| TOTAL MONTHLY PROFITS | | | $ | 27,908.00 |

RENTS PLUS PROFITS MONTHLY     $     93,948.00

**Retail Petroleum Consultants, LLC**                 *Addenda Exhibit D    Page 115*

| | |
|---|---|
| Total Land size is | 144,000 SF |
| Total building size | 22,800 SF |
| Gas station  C- Store | 2,500 SF |
| Dunkin Donuts | 200 SF |
| Restaurant | 1,500 SF |
| Loya Insurance Store | 800 SF |
| Barber Shop | 450 SF |
| Boost Mobil | 1,200 SF |
| Mechanic and tire shop | 4,500 SF |
| Vacant store | 2,000 SF |
| Car wash | 4,700 SF |
| Detail shop | 450 SF |
| Lube Shop | 2,000 SF |
| Private Offices | 2,500 SF |

Please let me know if you need anything else .
Thanks
Syed.

 Renewal

# COMMERCIAL LEASE

| Landlord | Tenant |
|---|---|
| AHM Properties , Inc. | Brandon Lindsey Hair Gallery |
| 11900 S Marshfield Ave | Brandon M Lindsey |
| Calumet Park, IL 60827 | 1858 High St |
| | Blue Island, IL 60406 |

### PREMISES

11900 S Marshfield Ave Unit #C , Calumet Park, IL 60827

In consideration of the mutual covenants and agreements herein stated Landlord hereby lease and Tenant hereby leases from Landlord solely for the purpose of

Running A hair dresser & Beauty Shop.

The initial term of this lease shall be from

July 1st, 2016 To June 30st , 2021

### RENT

$2,200.00   ( Initial Term ) July 1st ,2016 to June 30st , 2017.

Rent increase will be at a rate of $100 each year Anniversary

All Rents and other payments due from Tenant to Landlord on the 5th day of every month.

DEPOSIT   $0.0

**GAS AND ELECTRIC**

All utilities is the responsibility of the Landlord.

**REPAIRS AND MAINTAINNANCE**

During the term of this lease agreement the Tenant shall maintain and repair any damage to the equipment and premises caused by himself, his employees or his patrons, as well to make all repairs that may be necessary to the premises as well as to leave the premises in clean condition at all times. Further the Tenant shall take no actions upon the premises that are unlawful under the laws of the United States of America, the state of Illinois, the county of Cook, or the village of Calumet Park.

**LIABILITY**

The Tenant agrees to indemnify and to hold harmless the Landlord from all claims for personal injury from any and all parties that may take place on the premises due to the Tenant's negligence.

**SIGNAGE**

The Tenant shall place or maintain no sign upon the premises without the written consent of the Landlord. Tenant is liable for all fees related to the signage.

**ALTERATIONS**

The Tenant shall make no alterations to the premises without the written consent of the Landlord. Further any alterations made by the Tenant to the Premises shall be overseen by a licensed General Contractor. All workers on said alterations shall have coverage for workers compensation and all contractors or laborers on any alterations or repairs shall be covered by general liability insurance with a minimum limit of **$1,000,000.00** per person and **$2,000,000.00** per occurrence and Tenant shall be required to obtain a certificate of the said insurance before any such contractor or laborer is allowed to begin work on the premises. All such insurance shall be from and through a company licensed to do business in Illinois

and the Tenant shall supply the Landlord with the necessary certificates of insurance to prove that the Tenant is in compliance with the insurance terms of this lease at all terms hereunder. Under no circumstances shall Tenant allow or cause a Mechanic's lien to be placed on the subject property due to any repairs or alterations that Tenant shall make to the premises. Should the Tenant aloe or cause such a mechanic's lien to be placed upon the premises Landlord or Landlord may at their discretion pay the lien holder and charge the same to the Tenant due payable from the Tenant immediately upon demand. Further the Landlord may demand that Tenant cause the said lien to be removed within 90 days and the Tenant's failure to cause the removal of said lien shall be sufficient cause for the Landlord to declare this Lease terminated without the Landlord having waived any right or remedy that may have hereunder.

**FIRE AND CASUALTY**

Should the Premises be damaged by Fire or other casualty the Landlord may at its discretion repairs the premises within 60 days and the lease agreement shall continue uninterrupted or should the damage in the Landlord's sole discretion be beyond repair, the Landlord may declare this lease terminated….

**LANDLORD'S REMEDIES**

Should the Tenant allow the premises to closed or vacant through no faults of the Landlord or Landlord for a period in excess of ten days after the termination of this lease or in the event of the Tenant's failure to pay any rental or part thereof reserved by or due to the Landlord within five days of the date the same is due or demanded, or in the event of the Tenant's breech of any of the covenants contained in this lease agreement and failure to correct the same within ten days of notice from the Landlord. Tenant's right to possession of the premises may be terminated by the Landlord to the extent allowed by the law and the Landlord may at their discretion without further notice or demand to the Tenant retake possession of the premises. The mere possession of the Premises after said termination of the right of possession in the Tenant shall constitute a forcible

detainer of the Premises and not a waiver of any rights contained herein by the Landlord. Further the Landlord may reenter the said premises to the extent by law and expel the Tenant from the premises if so allowed by Law upon such a breach of the lease agreement as stated herein above. However the Landlord's failure to reenter and expel the Tenant shall not be construed as a waiver of any right the Landlord may have under this lease agreement. No remedy taken under this paragraph shall be construed as a forfeiture of any rents or damages owed by the Tenant to the Landlord under this lease. The acceptance of further rent by the Landlord or the issuance of any further notices or demands by the Landlord to the Tenant whether or not required by the State, County or Local Statute, Ordinance or Law, or any other act of Landlord, other than an express written waiver of the Landlord's rights, shall not be construed to act as a waiver of any of Landlord's rights to act without further written demand or notice or of any other right or remedy that Landlord may have, or as an election not to further proceed under this lease.

## LAIBILITY

At all times hereunder this lease the Tenant shall solely responsible to INSURANCE maintain public liability insurance coverage upon the premises in an amount equal to $1,000,000.00 per person and $2,000,000.00 per occurrence listing Landlord and Landlord as covered insured. Tenant shall give Landlord written evidence of such insurance and upon request of the landlord provide a certificate from an insurance company licensed to do business in state of Illinois of such insurance. At all times hereunder this lease the Tenant shall be solely responsible to maintain casualty insurance coverage upon the premises in an amount equal to $1,000,000.00 per occurrence listing Landlord as covered insured. The benefits of the said policy shall be paid first to rebuild the structure in case of casualty, then to pay to replace the equipment that was attached to the premises belonging to the Landlord and being allowed for the use of the Tenant under this Lease. Tenant shall give the Landlord written evidence of such insurance and upon request of the Landlord provide a certificate from an insurance company licensed to do business in state of Illinois of such insurance.

Page 4

## CASUALTY

At all times hereunder this lease the Tenant shall solely responsible to maintain casualty coverage upon the premises in an amount equal to **$300,000.00** per occurrence listing Landlord as covered insured. The benefits of the said policy shall be paid first to rebuild the structure in case of casualty, then to pay to replace the equipment that was attached to the premises belonging to the Landlord and being allowed for the use of the Tenant under this lease and lastly to replace and equipment of the tenant. Tenant shall give the Landlord written evidence of such insurance and upon request of the Landlord provide a certificate from an insurance company licensed to do business in Illinois of such insurance.

## NOTICES

Notices may be served upon the Landlord at the premises or at any other address that the Landlord notifies the Tenant of in writing. Notices may be served upon the Tenant at the Premises hereunder. All notices must be served upon the Landlord by United States Mail Certified with Return Receipt Requested. Notices may be served upon the Tenant by United States Mail Certified with Return Receipt Requested or by personal service.

## LICENSES

The Tenant agrees that they will apply and take all measures necessary to acquire all necessary licensing as soon as possible after the signing of this agreement and that further they have made inquiry with all necessary governmental authorities and have knowledge that they can acquire all necessary for the purposes that the Premises are intended to be used under this lease. The Tenant further agrees that they will not do business upon the premises without the necessary and appropriate licenses for all applicable governmental authorities at any time hereunder, said licenses shall include the State of Illinois, County of Cook and Village of Calumet Park.

## BINDING

All promises and covenants contained herein shall be binding upon and inure to the benefit of the Tenant and Landlord respectively and their respective heirs, legatees, agents, legal representatives and assigns.

## GENDER

All pronouns contained herein shall be construed to apply to the appropriate party regardless of the true gender of the appropriate party and further all references to a party in the singular where the plural should apply or to the plural where the singular should apply be construed to and apply to all parties as shall be appropriate.

## SUBORDINATION

At any time as may be necessary hereunder in the sole discretion of the Landlord the Tenant agrees to sign any subordination agreement for the benefit of any lender to help the Landlord or Landlord obtain any financing that they may decide they need. Further this lease shall be subordinate to any mortgage signed by the Landlord or Landlord whether said mortgage is signed in the past, present and future. In the case of sale of the real property that the premises are on the Tenant agrees to sign an Estoppels Certificate as may be needed by the Landlord.

## EMINENT DOMAIN

In the case of any taking of the premises through eminent domain or by any Governmental authority the Landlord may at their discretion declare this lease is terminated and the Tenant shall have no right or claim against any remuneration or compensation received by the Landlord by the party taking the Premises.

## ENVIRONMENTAL

The Tenant agrees to take no action to store, allow being stored, using or allowing to be used any substance that may be hazardous as defined by the United States

Environmental Protection Agency; the Illinois Environmental Protection Agency; the Cook county Environmental Agency.

**SEVERABILITY**

If any clause, phrase, provision or portion of this lease or the application thereof to any person or circumstance shall be invalid or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of this lease, nor any other clause, phrase, provision or portion hereof to other persons or circumstances.

**WITNESS UPON OUR HANDS AND SEALS THIS 1ˢᵗ DAY June , 2016.**

**LANDLORD**                                              **TENANT**

AHM Properties , Inc.                         Brandon Lindsey Hair Gallery

Mubarak Ibrahim                               Brandon M Lindsey

New

## COMMERCIAL LEASE

**Landlord**

11900 Marshfield LLC

11900 S Marshfield Ave

Calumet Park, IL 60827

**Tenant**

Mohanad Ramadan

DBA. Boost Mobil

4553 W 84th PL

Chicago, IL 60652

### PREMISES

11900 S Marshfield Ave Unit B, Calumet Park, IL 60827 .

In consideration of the mutual covenants and agreements herein stated Landlord hereby lease and Tenant hereby leases from Landlord solely **for the purpose of Sales of Boost Mobil cell phones, accessories And Repairs of cell phone, computer sales and repairs.**

### TERMS

The initial term of this Lease shall be from January 1st , 2018 to December 31st , 2022

**Option to extend for additional years will be upon Mutual negotiated agreement 90 days before lease expiration.**

### RENTS

$4,500.00  from Jan 1st , 2018 to Dec 31st, 2019 (initial 2 years)

$4,725.00  from Jan 1st, 2020 to Dec 31st,  2021 ( year 3 and 4)

$5,000.00  from Jan 1st, 2022 to Dec 31st, 2022 ( year 5)

M.I     M.f

**Late Charges**

All Rents and other payments due from Tenant to Landlord on or before the 5th day of every month, delinquent in excess of five (5) days, shall bear a penalty of $100.00 (one hundred) .

**DEPOSIT**

$5000.00.

**GAS AND ELECTRIC**

All utilities included in the said rent.

**SUBLETTING**

The tenant shall not lease or assign their rights under this lease to any ASSIGNMENT party unless they have the written consent and approval from Landlord. The Landlord shall maintain all rights available under the laws of State of Illinois, and the county of Cook, and the city of Calumet Park to reject any lease or assignment at his sole discretion. Should the Tenant enter into a Lease or assignment of their rights under this lease without the prior written consent of the Landlord the Landlord maintains the right to declare the Lease terminated Further should the Tenant be declared a bankrupt or be adjudged to be insolvent the Landlord maintains the right to terminate the lease at their discretion.

**REPAIRS AND MAINTAINNANCE**

During the term of this lease agreement the Tenant shall maintain and repair any damage to the equipment and premises caused by himself, his employees or his patrons, as well to make all repairs that may be necessary to the premises as well as to leave the premises in clean condition at all times. Further the Tenant shall take no actions upon the premises that are unlawful under the laws of the United States of America, the state of Illinois, the county of Cook, or the city of Calumet

Park. The Tenant agrees to permit no use of the Premises involving risk of explosion or fire and to generally take no action which would render the Premises to be uninsurable. Further the Tenant agrees to allow no use of the property which will compete with the Landlord or any other Tenants that he may rent to.

## ACCESS TO THE PREMISES

The Tenant agrees to allow the Landlord access to the Premises at all any times to inspect the premises; make sure that all operations upon the Premises are lawful; make determinations as to necessary repairs and maintenance; make repairs as may be necessary for the safety and welfare of the building and their other tenants in the building. Further the Tenant agrees to allow the Landlord to place for rent or for sale signs upon the premises at such times as the same may be appropriate.

## LIABILITY

The Tenant agrees to indemnify and to hold harmless the Landlord from all claims for personal injury from any all parties that may take place on the premises due to the Tenant's negligence.

## SIGNAGE

The Tenant shall place or maintain no sign upon the premises without the written consent of the Landlord. Tenant is liable for all fees related to the signage.

## ALTERATIONS

The Tenant shall make no alterations to the premises without the written consent of the Landlord. Further any alterations made by the Tenant to the Premises shall be overseen by a licensed General Contractor. All workers on said alterations shall have coverage for workers compensation and all contractors or laborers on any alterations or repairs shall be covered by general liability insurance with a minimum limit of $1,000,000.00 per person and $2,000,000.00 per occurrence and Tenant shall be required to obtain a certificate of the said insurance before any such contractor or laborer is allowed to begin work on the premises. All such insurance shall be from and through a company licensed to do business in Illinois

Page 3

and the Tenant shall supply the Landlord with the necessary certificates of insurance to prove that the Tenant is in compliance with the insurance terms of this lease at all terms hereunder. Under no circumstances shall Tenant allow or cause a Mechanic's lien to be placed on the subject property due to any repairs or alterations that Tenant shall make to the premises. Should the Tenant aloe or cause such a mechanic's lien to be placed upon the premises Landlord or Landlord may at their discretion pay the lien holder and charge the same to the Tenant due payable from the Tenant immediately upon demand. Further the Landlord may demand that Tenant cause the said lien to be removed within 90 days and the Tenant's failure to cause the removal of said lien shall be sufficient cause for the Landlord to declare this Lease terminated without the Landlord having waived any right or remedy that may have hereunder.

## FIRE AND CASUALTY

Should the Premises be damaged by Fire or other casualty the Landlord may at its discretion repairs the premises within 60 days and the lease agreement shall continue uninterrupted or should the damage in the Landlord's sole discretion be beyond repair, the Landlord may declare this lease terminated....

## HOLDOVER

Should the Tenant holdover in possession beyond the term of this lease or any extensions made hereto in writing the Lease shall be liable to the Landlord for use and occupancy in the amount of **$500.00** per day. Further the Tenant shall be responsible to the Landlord for any consequential damages caused to the Landlord by their holding over. Nothing in this paragraph or lease agreement shall be construed as a waiver of the Landlord's rights of reentry to the subject premises upon the termination of this lease agreement.

## ATTORNEY FEES

Tenant upon demand shall pay to the Landlord all costs, charges, expenses, including but not limited to attorney's fees, collection agent's fees and fees of all others retained by Landlord and incurred in the enforcement of any or all of the obligations of Tenant under this lease or in any litigation, negotiation, or

transaction in which Landlord shall without fault become involved in through or on account of this lease.

## LANDLORD'S REMEDIES

Should the Tenant allow the premises to closed or vacant through no faults of the Landlord or Landlord for a period in excess of ten days after the termination of this lease or in the event of the Tenant's failure to pay any rental or part thereof reserved by or due to the Landlord within five days of the date the same is due or demanded, or in the event of the Tenant's breech of any of the covenants contained in this lease agreement and failure to correct the same within ten days of notice from the Landlord. Tenant's right to possession of the premises may be terminated by the Landlord to the extent allowed by the law and the Landlord may at their discretion without further notice or demand to the Tenant retake possession of the premises. The mere possession of the Premises after said termination of the right of possession in the Tenant shall constitute a forcible detainer of the Premises and not a waiver of any rights contained herein by the Landlord. Further the Landlord may reenter the said premises to the extent by law and expel the Tenant from the premises if so allowed by Law upon such a breach of the lease agreement as stated herein above. However the Landlord's failure to reenter and expel the Tenant shall not be construed as a waiver of any right the Landlord may have under this lease agreement. No remedy taken under this paragraph shall be construed as a forfeiture of any rents or damages owed by the Tenant to the Landlord under this lease. The acceptance of further rent by the Landlord or the issuance of any further notices or demands by the Landlord to the Tenant whether or not required by the State, County or Local Statute, Ordinance or Law, or any other act of Landlord, other than an express written waiver of the Landlord's rights, shall not be construed to act as a waiver of any of Landlord's rights to act without further written demand or notice or of any other right or remedy that Landlord may have, or as an election not to further proceed under this lease.

## LAIBILITY

At all times hereunder this lease the Tenant shall solely responsible to INSURANCE maintain public liability insurance coverage upon the premises in an amount equal to **$1,000,000.00** per person and **$2,000,000.00** per occurrence listing Landlord and Landlord as covered insured. Tenant shall give Landlord written evidence of such insurance and upon request of the landlord provide a certificate from an insurance company licensed to do business in state of Illinois of such insurance. At all times hereunder this lease the Tenant shall be solely responsible to maintain casualty insurance coverage upon the premises in an amount equal to **$1,000,000.00** per occurrence listing Landlord as covered insured. The benefits of the said policy shall be paid first to rebuild the structure in case of casualty, then to pay to replace the equipment that was attached to the premises belonging to the Landlord and being allowed for the use of the Tenant under this Lease. Tenant shall give the Landlord written evidence of such insurance and upon request of the Landlord provide a certificate from an insurance company licensed to do business in state of Illinois of such insurance.

## CASUALTY

At all times hereunder this lease the Tenant shall solely responsible to maintain casualty coverage upon the premises in an amount equal to **$300,000.00** per occurrence listing Landlord as covered insured. The benefits of the said policy shall be paid first to rebuild the structure in case of casualty, then to pay to replace the equipment that was attached to the premises belonging to the Landlord and being allowed for the use of the Tenant under this lease and lastly to replace and equipment of the tenant. Tenant shall give the Landlord written evidence of such insurance and upon request of the Landlord provide a certificate from an insurance company licensed to do business in Illinois of such insurance.

## NOTICES

Notices may be served upon the Landlord at the premises or at any other address that the Landlord notifies the Tenant of in writing. Notices may be served upon the Tenant at the Premises hereunder. All notices must be served upon the

Page 6

Landlord by United States Mail Certified with Return Receipt Requested. Notices may be served upon the Tenant by United States Mail Certified with Return Receipt Requested or by personal service.

### LICENSES

The Tenant agrees that they will apply and take all measures necessary to acquire all necessary licensing as soon as possible after the signing of this agreement and that further they have made inquiry with all necessary governmental authorities and have knowledge that they can acquire all necessary for the purposes that the Premises are intended to be used under this lease. The Tenant further agrees that they will not do business upon the premises without the necessary and appropriate licenses for all applicable governmental authorities at any time hereunder, said licenses shall include the State of Illinois, County of Cook and City of Calumet Park.

### BINDING

All promises and covenants contained herein shall be binding upon and inure to the benefit of the Tenant and Landlord respectively and their respective heirs, legatees, agents, legal representatives and assigns.

### GENDER

All pronouns contained herein shall be construed to apply to the appropriate party regardless of the true gender of the appropriate party and further all references to a party in the singular where the plural should apply or to the plural where the singular should apply be construed to and apply to all parties as shall be appropriate.

### SUBORDINATION

At any time as may be necessary hereunder in the sole discretion of the Landlord the Tenant agrees to sign any subordination agreement for the benefit of any lender to help the Landlord or Landlord obtain any financing that they may decide

Page 7

M-J M-t

they need. Further this lease shall be subordinate to any mortgage signed by the Landlord whether said mortgage is signed in the past, present and future. In the case of sale of the real property that the premises are on, the tenant agrees to sign an Estoppels Certificate as may be needed by the Landlord.

## EMINENT DOMAIN

In the event of any taking of the premises through eminent domain or by any Governmental Authority the Landlord may at their discretion declare this lease is terminated and the tenant shall have no right or claim against any remuneration or compensation received by the Landlord from party taking the premises.

## ENVIROMENTAL

The Tenant agrees to take no action to store, allow being stored ,using or allowing to be used any substance that may be hazardous as defined by the United States Environmental Protection Agency; The Cook County Environmental Agency.

## SEVERABILITY

In any clause , phrase, provision or portion of this lease or the application thereof to any person or circumstance shall be invalid or uenforceable  under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of this lease, nor any other clause, phrase, provision or portion hereof to other persons or circumstances.

**WITNESS UPON OUR HANDS AND SEALS THIS 1ST DAY OF NOV,2017.**

**LANDLORD**                                                    **TENANT**

**11900 MARSHFIELD LLC**                              **HUSSAM RAMADAN**

'A'

LESSOR

# RETAIL STORE LEASE

Beginning
September 1, 2010

Ending
August 31, 2015

LESSEE

AHM LLC
1535 West Grand Avenue
Chicago, Illinois 60622

Best Donut & Coffe, Inc
11900 South Marshfield
Calumet Park, Illinois 60827

PREMISES

11900 South Marshfield "A", Calumet Park, Illinois 60827 (200 Sq. Ft. Store Space)

In consideration of the mutual covenants and agreements herein stated Lessor hereby leases to Lessee and Lessee hereby leases from Lessor solely for the purpose of operating a Dunkin Donut Franchise.

RENT

1. The Lessee shall pay to the Lessor or Lessor's agent as and for the rent the sum of $1,400.00 per month for the first year and Two Percent (2%) increase per month on each one year anniversary date. Lessor to pay all property taxes. Rent to begin to become due when the donut business opens for business.

GAS AND
ELECTRIC

2. The Lessor shall be responsible for all gas, electric and water utility charges that may accrue against the Premises and pay the same in a timely manner.

SUBLETTING OR
ASSIGNMENT

3. The Lessee shall not lease or assign their rights under this lease to any other party without the written consent of the Lessor, which shall not be unreasonably withheld. Should the Lessee enter into a lease or assignment of their rights under this lease without the prior written consent of the Lessor the Lessor maintains the right to declare the Lease terminated and there shall be due from the Lessee to the Lessor a sum equal to all rent through the end of the term of this lease agreement. Further should the Lessee be declared a bankrupt or be adjudged to be insolvent the Lessor maintains the right to terminate this lease at their discretion.

LESSEE NOT TO
MISUSE

4. During the term of this lease agreement the Lessee shall maintain and repair any damage to the premises caused by himself, his employees or his patrons, as well as to make all repairs that may be necessary to the premises for routine maintenance and upkeep of the systems of the interior of the premises as well as to leave the premises in clean condition at all times. Further the Lessee shall take no actions upon the premises that are unlawful under the laws of the United States of America, State of Illinois, County of Cook or the Village of Calumet Park. The Lessee agrees to permit no use of the Premises involving risk of explosion or fire and to generally take no action which would render the Premises to be uninsurable.

1

**CONDITION OF PREMISES**

5 The Lessee has inspected the Premises and agrees that all systems therein are in good repair and operating order, including but not limited to the plumbing; electrical heating and air conditioning; ventilation; and fire control. The Lessee further agrees that the Lessor made no representations to the Lessee as to the condition of the premises and agrees to make no claim against the Lessor as to the condition of the premises at the time of the inception of the lease. The Lessee further agrees that any equipment being included in this lease is fit for the particular purpose it is to be used for and expressly waives all warranties of merchantability and fitness for a particular purpose. The Lessee further agrees to hold the Lessor harmless from all cause of action from their use of the Premises and the equipment contained therein. Lessor shall however repair it's own heating, A/C, Plumbing and electrical.

**REPAIRS AND MAINTENANCE**

6. The Lessee agrees that they will make any routine repairs that may be necessary to the inside of the premises and its operating systems, only as it applies to the Lessee's own equipment at the Lessee's expense, as the same may becomenecessary, including but not limited to lighting fixtures and globes; electrical; plumbing; heating; air conditioning; ventilation; fire control and equipment of every kind type or nature. Lessee agrees further to maintain the Premises in safe condition and to keep the inside of the Premises in a condition so as to be in compliance with the Village of Calumet Park Building Code, Cook County laws and regulations and Illinois Revised Statutes and Administrative Rules.

**ACCESS TO THE PREMISES**

7. The Lessee agrees to allow the Lessor access to the Premises at all reasonable times to inspect the premises; make sure that all operations upon the Premises are lawful; make determinations as to necessary repairs and maintenance; make repairs as may be necessary for the safety and welfare of the building and their other tenants in the building. Further the Lessee agrees to allow the Lessor during the, during the final thirty day of the lease, to place for rent or for sale signs upon the premises at such times as the same may be appropriate.

**LIABILITY**

8. The Lessee agrees to indemnify and to hold harmless the Lessor from all claims for personal injury from any and all parties, that may take place on the premises due to the Lessee's use of the Premises, no matter what cause may be claimed with regards to these injuries as to negligence of the Lessee, other than acts or omissions of the lessor, and whether the same are from any condition that may be claimed to exist in or around the Premises.

**SIGNAGE**

9. The Lessee may place or maintain signs upon the premises without the written consent of the Lessor, during the term of this lease. Tenant is allowed one (1) DD sign on north front entrance and one (1) DD sign on east side of building over drive-thru. Tenant is further allowed sign space on new street sign that is to be erected on N/E corner of property. If sign is not erected, tenant will be allowed to re-face Mobil sign on 119th street.

**ALTERATIONS**

10. The Lessee shall make no alterations to the premises without the written consent of the Lessor. Further any alterations made by the Lessee to the Premises shall be overseen by a licensed General Contractor. All workers on said alterations shall have coverage for workers compensation and all contractors or laborers on any alterations or repairs shall be covered by general liability insurance with a minimum limit of $1,500,000.00 per person and $1,000,000.00 per occurrence and Lessee shall be required to obtain a certificate of the said insurance before any such contractor or laborer is allowed to begin work on the

premises. Under no circumstances shall Lessee allow or cause a mechanic's lien to be placed on the subject property due to any repairs or alterations that Lessee shall make to the Premises. Should the Lessee allow or cause such a mechanic's lien to be placed upon the Premises Lessor or Lessor may at their discretion pay the lien holder and charge the same to the Lessee due and payable from the to the Lessee immediately upon demand. Further The Lessor may demand that Lessee cause the said lien to be removed, or insured over on a title policy, within 30 days and the Lessee's failure to cause the removal, or insurance over, of said lien shall be sufficient cause for the Lessor to declare this Lease terminated without the Lessor having waived any right or remedy that they may have hereunder.

**HEAT**

11. The Lessor shall at all times be responsible for maintaining a habitable level of heat in the Premises and further to maintain such heat as may be necessary to prevent damage from occurring to the subject Premises and to allow for a safe and healthful operation of their business.

**FIRE AND CASUALTY**

12. Should the Premises be damaged by Fire or other casualty the Lessor may at its discretion repair the premises within 60 days and the lease agreement shall continue uninterrupted or should the damage in the Lessor's sole discretion be beyond repair, or if the repairs are not completed within the said sixty day period, the Lessor or the Lessee may declare this lease agreement terminated..

**HOLDOVER**

13. Should the Lessee holdover in possession beyond the term of this lease or any extensions made hereto in writing the Lessee shall be liable to the Lessor for use and occupancy in the amount of $75.00 per day; Or at the discretion of the Lessor the Sub Lessee may be construed to have entered into a month to month lease at 125% of the last monthly rental amount due to the Lessor. Nothing in this paragraph or lease agreement shall be construed as a waiver of the Lessor's rights of reentry to the subject premises upon the termination of this lease agreement. Further at the end of this agreement the Lessee agrees to return the premises to the Lessor in substantially the same condition that the premises were in at the inception of this agreement, ordinary wear and tear and losses from casualty excepted.

**ATTORNEY'S FEES**

14. Lessee upon demand shall pay to Lessor all costs, charges, expenses, including but not limited to attorney's fees, collection agent's fees and fees of all others retained by Lessor and incurred in the successful enforcement of any or all of the obligations of Lessee under this lease or in any litigation, negotiation, or transaction in which Lessor shall without fault become involved in through or on account of this lease.

**LESSOR'S REMEDIES** 15. In the event of the Lessee's failure to pay any rental payment or part thereof reserved by or due to the Lessor within five days of notice of default or in the event of the Lessee's breech of any of the covenants contained in this lease agreement and failure to correct the same within thirty days of written notice from the Lessor or Lessor, Lessee's right to possession of the premises may be terminated by the Lessor to the extent allowed by law and the Lessor may at their discretion without further notice or demand to the Lessee retake possession of the premises. The mere possession of the Premises after said termination of the right of possession in the Lessee shall constitute a forcible detainer of the Premises and not a waiver of any of the rights contained herein by the Lessor. Further the Lessor may renter the said premises to the extent allowed by law and expel the Lessee from the premises if so allowed by law upon such a breech of the lease agreement as stated herein above. However the Lessor's failure to renter and expel the Lessee shall not be construed as a waiver of any right the Lessor may have under this lease agreement.

3

No remedy taken under this paragraph shall be construed as a forfeiture of any rents or damages owed by the Lessee to the Lessor under this lease. The acceptance of further rent by the Lessor or the issuance of any further notices or demands by the Lessor to the Lessee whether or not required by State, County or Local Statute, Ordinance or Law, or any other act of Lessor, other than an express written waiver of Lessor's rights, shall not be construed to act as a waiver of any of Lessor's rights to act without further written demand or notice or of any other right or remedy that Lessor may have, or as an election not to further proceed under this lease.

**RIGHT TO RELET**

16. If Lessee's rights to possession of the Premises shall be terminated in any way thePremises may but need not be relet by the Lessor (except as provided by State, County or Local Statute or Ordinance) for the benefit of the parties herein, upon such terms and forsuch rent, to such person or persons, and for such period as the Lessor may deem fit. Lessor shall not be required to accept or receive any tenant offered by Lessee, not to do any act or exercise any diligence what so ever in or about procuring another occupant or tenant for the mitigation of Lessee's damages or otherwise. If the Premises are relet andthe sum collected is not sufficient to satisfy all rent reserved, after paying all costs associated with the same reletting and collection including but not limited to commissions to agents, redecorating, advertising and legal expenses, Lessee hereby expressly agrees to pay any and all deficiencies to Lessor. The acceptance of a new tenant by the Lessor shall not operate as a cancellation of any rights of the Lessor herein or a release of the Lessee from any covenant, promise, or agreement contained herein or a release from any liability created herein to the Lessor or Lessor. Performance by any substitute tenant shall constitute only satisfaction pro tanto of the obligations of Lessee arising hereunder. Lessor shall use commercially reasonable efforts to mitigate damages to the extent required by law. Lessee also agrees that the Cook County Circuit Court First District shall be the proper venue for any controversy involving this lease to be heard and adjudicated.

**INSURANCE**

18. At all times hereunder this lease the Lessee shall be solely responsible to maintain public liability insurance coverage upon the premises in an amount equal to $2,000,000.00 per person and $3,000,000.00 per occurrence listing Lessor and Lessor as covered insured. Lessee shall give Lessor written evidence of such insurance and upon request of the lessor provide a certificate from an insurance company licensed to do business in Illinois of such insurance. In lieu of this the tenant shall have the Dunkin Donut insurance package and name the landlord as an additional loss payee.

**CASUALTY INSURANCE**

19. At all times hereunder the Lessee shall be solely responsible to maintain casualty insurance coverage upon all personal property on the premises naming the Lessor as a certificate holder.

**SECURITY DEPOSIT**

20. At all times hereunder the Lessee need not maintain any amount on deposit with the Lessor as and for security deposit. The Lessee hereby waives the right to interest on said security deposit and expressly agrees to allow said deposit to be used to pay for damage done by the Lessee to the Premises and for any unpaid rents reserved hereunder at the Lessor's sole discretion.

**NOTICES**

21. Notices may be served upon the Lessor at 1535 West Grand Avenue, Chicago, IL 60622 or at any other address that the Lessor notifies the Lessee of in writing. Notices may be served upon the Lessee at the Premises hereunder. All notices must be served upon the Lessor by United States Mail Certified with Return Receipt Requested. Notices may be served upon the Lessee by United States Mail Certified with Return

4

**Retail Petroleum Consultants, LLC**                              **Addenda Exhibit D    Page 135**

---

Receipt Requested or by personal service.

LICENSES                22.  The Lessee  agrees that they will not do business upon the premises without the necessary and appropriate licenses for all applicable governmental authorities at any time hereunder.

BINDING                23.  All promises and covenants contained herein shall be binding upon and inure to the benefit of the Lessee and Lessor respectively and their respective heirs, legatees,  agents, legal representatives and assigns.

GENDER                24.  All pronouns contained herein shall be construed to apply to the appropriate party regardless of the true gender of the appropriate party and further all references to a party in the singular where the plural should apply or to the plural where the hazard.

SUBORDINATION        25.  At any time as may be necessary hereunder in the sole discretion of the Lessor or the Lessor the Lessee agrees to sign any subordination agreement for the benefit of any lender to help the Lessor or Lessor obtain any financing that they may decide they need.  Further this lease shall be subordinate to any mortgage signed by the Lessor or Lessor whether said mortgage is signed in the past present or future.  In the case of a sale of the real property that the premises are on the Lessee agrees to sign an Estoppel Certificate as may be needed by the Lessor or Lessor.

EMINENT DOMAIN        26.  In the case of any taking of the premises through eminent domain or by any governmental authority the Lessor may at their discretion declare this lease terminated and the Lessee shall have no right or claim against any remuneration or compensation received by the Lessor by the party taking the Premises.

ENVIRONMENTAL        27.  The Lessee agrees to take no action to store, allow to be stored, use or allow To be used any substance that may be hazardous as defined by the United States Environmental Protection Agency; the Illinois Environmental Protection Agency or the Illinois State Fire Marshall.  Further should the Lessee cause an environmental hazard to exist on the Premises the Lessee agrees to indemnify and hold harmless the Lessor from any expenses for the clean-up of said hazard and damages caused by the said hazard. to any person or circumstance shall be invalid or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of lease, nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any other clause, phrase, provision or portion hereof to other persons or circumstances

NOTICE                28.  Notice shall be given to the parties by certified mail return receipt requested at the addresses listed on page one above.

OPTION TO RENEW        29.  The Lessee shall have two options of five years each to extend this lease by giving notice to the Lessor at least sixty days before the termination of each lease period.

WITNESS Upon our hands and seals this ___19th___ day of _August_ , 2010

_____                    _____
Lessor                                          Lessee

_____                    _____
Lessor                                          Lessee

## AMENDMENT

This Amendment made to the lease dated September 1, 2010 between Mubarak Ibrahim (AHM LLC), hereafter referred to as Lessor and Best Donuts, LLC, hereafter referred to as Lessee, for the property commonly known as 11900 S. Marshfield Avenue, Calumet Park, Illinois 60827, shall supersede any provision of the lease that may be in conflict with the Lease agreements dated September 1, 2010.

The term of the original lease agreement shall be extended through August 31, 2020.

There shall be only two options to extend this lease and the lease option shall be for five years each extending through August 31, 2030. The rent increase shall stay as stated in original lease of two (2%) percent per year.

The rent shall be changed to $1515.00 monthly per month beginning on 9/1/2015.

Lessor

Terry Markham — Best Donuts, LLC

Lessee

9/1/2015

Date

**Retail Petroleum Consultants, LLC**        *Addenda Exhibit D    Page 137*



## COMMERCIAL LEASE

THIS COMMERCIAL LEASE is executed by and between Mubarak Ibrahim (Land lord) and Fred Loya Insurance Agency, Inc., a Texas Corporation (Tenant) as of this 18 day of JAN 2013.

1.     BASIC LEASE PROVISIONS

      Property and Address:

      11900 S Marshfield Ave,

      Unit "E"

      Calumet Park, IL.60827

    A. Landlord and Address:
      Mubarak Ibrahim
      11900 S Marshfield Ave,
      Calumet Park IL.60827.

    B. Tenant and Address:
      Fred Loya Insurance Agency, Inc.
      188 North Lee Trevino, Suite 201
      El Paso, Texas 79936.
      Attn: Leasing Administration.

    C. Date of Lease: JAN 1ST 2013.
    D. Lease Term: Five (5) year.
    E. Renewal Options : Two (2) Option(s) for five year each upon 90 days prior written notice.
    F. Delivery Date of Term: MARCH 1ST 2013
    G. Expiration Date of Term: FEB 28TH 2018
    H. Lease Purpose: Insurance Products and sales of Insurance Policies.

I.  Monthly Net Rent: $3000.00, Tenant will start paying the rent after the completion of thirty (30) days of the Delivery Date, as provided in section 2.2 hereof.

J.  Advance Rent : $ 6000.00 { These two (2) months of advance rent comprises of the thirteenth (13th) month and twenty fifth (25th) month rental payments.}

2.    PREMISES AND TERMS

2.1    Lease of Premises

Landlord is the owner of the retail center located along and at the southwest corner of 119th street and Marshfield Ave, Calumet Park. Illinois ("Building"). Landlord hereby leases to Tenant and Tenant hereby leases from the Landlord the premises located at 11900 S Marshfield, Unit "E", Calumet Park, Illinois ("Premises"), for the term and upon conditions provided in the ("Lease").

2.2    Term

The term of this lease ("Term") shall commence on the date specified in subsection 1. 1F ( "Delivery Date"). The term shall expire on the date specified in subsection 1.1G   ("Expiration Date").

The " Delivery Date" is the  date Landlord will deliver to Tenant exclusive physical possession of the Premises in sound and water tight condition, including keys, and Landlord's work is completed, as described on  Exhibit A annexed hereto (the "Landlord's Work"), including all updates to the Premises to meet current City and Governmental Building Codes and ADA requirements.

2.3    Option

Provide that Tenant is not in default under this Lease on the date of the exercise and the commencement of the Option Term (hereinafter defined), Tenant shall have an option to renew this Lease for (2) additional terms of (5) year each ("Option Term"). Tenant shall exercise each option ("Option")

I.   <u>Monthly Net Rent</u>: $3000.00, Tenant will start paying the rent after the completion of thirty (30) days of the Delivery Date, as provided in section 2.2 hereof.

J.   <u>Advance Rent</u> : $ 6000.00 { These two (2) months of advance rent comprises of the thirteenth (13th) month and twenty fifth (25th) month rental payments.}

2.     <u>PREMISES AND TERMS</u>

2.1    <u>Lease of Premises</u>

Landlord is the owner of the retail center located along and at the southwest corner of 119th street and Marshfield Ave, Calumet Park. Illinois ("Building"). Landlord hereby leases to Tenant and Tenant hereby leases from the Landlord the premises located at 11900 S Marshfield, Unit "E", Calumet Park, Illinois ("Premises"), for the term and upon conditions provided in the ("Lease").

2.2    <u>Term</u>

The term of this lease ("Term") shall commence on the date specified in subsection 1. 1F ( "Delivery Date"). The term shall expire on the date specified in subsection 1.1G ("Expiration Date").

The " Delivery Date" is the date Landlord will deliver to Tenant exclusive physical possession of the Premises in sound and water tight condition, including keys, and Landlord's work is completed, as described on Exhibit A annexed hereto (the "Landlord's Work"), including all updates to the Premises to meet current City and Governmental Building Codes and ADA requirements.

2.3    <u>Option</u>

Provide that Tenant is not in default under this Lease on the date of the exercise and the commencement of the Option Term (hereinafter defined), Tenant shall have an option to renew this Lease for (2) additional terms of (5) year each ("Option Term"). Tenant shall exercise each option ("Option")

for the respective Option Term by giving ninety (90) days prior to the termination of the current Term or Option Term, as applicable.

Rent will be negotiated between Tenant & Landlord at the time of **"RENEWAL OPTION (S)"** for each term.

3.      Rent

3.1     Monthly Net Rent

Tenant agrees to promptly pay to Landlord at the address set forth in Subsection 1.1B herein, or at such other place designated by the Landlord absolutely net throughout the Lease Term, except or otherwise provided in this Lease. Tenant is authorized to initiate fund transfer deposits on a monthly basis to a bank account designated by Landlord and, upon execution of this Lease, Landlord agrees to promptly furnish Tenant with the necessary information to permit Tenant to initiate such deposits.

4.      SECURITY DEPOSIT

        **NOT APPLICABLE**

5.      UTILITIES AND TAXES.

Landlord agrees to pay (A) the costs of water, sever, gas and electric service to the Premises, which costs are included in the net rent, and (B) all real estate taxes associated with the Shopping Center and Premises without reimbursement by Tenant.

6.      POSSESSION, USE AND ENJOYMENT OF PREMISES

6.1     Possession and use of Premises

Tenant shall be entitled to possession of the premises upon the Delivery date. Tenant shall occupy and use the premises for the purposes set forth in 1.1H only (the "Permitted Use"). Tenant shall not occupy or use the

Premises (or permit the use or occupancy of the Premises) for any purpose or in any manner which : (a) is unlawful or in violation of any applicable legal, governmental or quasi-govern-mental requirement, ordinance or rule relating to the use and occupancy of the Premises; (b) may be dangerous to persons or property.

Landlord represents and warrants that Tenant will be permitted to conduct the Permitted Use at the Premises on the Delivery Date under the applicable municipal zoning code or ordinances. If Tenant is unable to obtain permits from the local municipal officials to conduct the Permitted Use at the Premises, then Tenant may terminate this Lease whereupon Landlord agrees to refund to Tenant any prepaid rent and security deposit, so long as such notice of termination is sent within 60 days of the date of Lease.

6.2   Quiet Enjoyment

So long as Tenant shall be in default under this Lease, Tenant shall be entitled to peaceful and quite enjoyment of the Premises, subject to the terms of this lease.

7.   CONDITION OF PREMISES AND MAINTAINANCE

7.1   Condition

Tenant shall be conclusively deemed to have accepted the Premises in the condition existing on the date Tenant first takes possession, and will be leasing the Premises in its **"AS-IS, WHERE –IS CONDITION'** based solely upon Tenant's inspection. No agreement of Landlord to alter or improve the Premises, and no representation regarding the condition of the Premises has been made by or on behalf of Landlord to Tenant. Tenant agrees to accept possession of the Premises on the date of delivery of possession of the Premises in its present "AS IS" condition and so long as (A) the Premises is free of an latent defects and hazardous or toxic substance, including asbestos, and in compliance with all existing laws, codes, regulations and ordinances, including without limitation the

Americans with Disabilities Act of 1990, 42 USC section 12101 et.seq.,and (B) the heating, ventilating and air-conditioning system, plumbing and electrical systems and doors of the Premises are in good working order and the roof is free of leaks. If Tenant is delayed in opening its business as a result of the failure of Landlord to comply with the provisions of this Section 7.1, then Tenant has no obligation to pay Base Rent or any other sum comprising Rent during the period of time Tenant is delayed in opening its business until Landlord complies with such provisions. During the term of the Lease, Tenant has the right to report to Landlord any latent defects which are in need of repair based upon the obligation of Landlord to do work to the Premises under this Lease.

7.2    Maintenance

(A) Tenant

Tenant shall, at Tenant's sole cost and expense, in respect to the following: (1) to do its own decorating of the interior of the Premises; (2) to maintain in good order and condition the non-structural interior portion of the Premises, including the door and plate glass;(3) to be responsible for normal, routine maintenance and care of the interior of the Premises, such as changing filters and light bulbs, and interior and exterior glass cleaning; and the plumbing, and electrical and mechanical lines and equipment associated therewith.

(B) Landlord

During the Term, Landlord will promptly perform on good and workmanlike manner maintenance, repairs and replacements (1) the structural components of the building, exterior walls, bearing walls, support beams, foundations, columns, floor slab (not floor covering), all the components attached to the structure of the building; (2) assure water tightness of the premises and repairs to the roof, if required to assure the water tightness;(3) all the utility connections including but not limited to the

following: water and service lines, the sever, gas, wiring and public utility connections, and all utility lines and ducts in or passing through the Premises that service other tenants in the Shopping Center or that are located outside the Premises but that serve the Premises; (4) the parking area; and (5) all improvements to the Shopping Center, including walkways, shrubbery and landscaping. Landlord is also responsible to replace and repair the major parts (HVAC ). Landlord warranted for the first 12 months for (HVAC).

### (C) Repair Rights

If the Premises become or are out of repair and not in good condition due to either the failure of Landlord to comply with the terms of this Section 7 or a latent defect, then Landlord shall perform or cause to be performed any and all repairs necessary to restore the Premises to a state of good condition and repair. If such repairs are not completed within 15 days after Landlord has received written notice from Tenant of such state of disrepair or if such repairs cannot reasonably be completed within such 15 day period and Landlord shall fail to commence such repairs within 15 days after notice and proceed diligently thereafter then Tenant may prosecute such repairs against the next maturing monthly installment or installments of Rent due hereunder. In case of an emergency, Tenant has the right to immediately prosecute any and all necessary repairs described in Section 7.2(B) , and if Landlord does not complete such repair work within 48 hours after notice is delivered, Tenant may undertake such necessary  repairs and offset the cost of such repairs against the next maturing monthly installment of installments of rent due hereunder; except that if contemporaneous notice is not practicable, then Tenant shall provide such notice that is reasonably practicable thereafter

8.    ASSIGNMENT AND SUBLETTING

Tenant shall not, without the prior written consent of Landlord, which consent may be withheld in the sole and absolute discretion of Landlord:

(a)  Assign or convey this Lease or any interest under it; or

(b)  Sublet the Premises or any part thereof; or

(c)  Permit the use or occupancy of the Premises or any part thereof by anyone other than the Tenant.

(d)  Permit a change in "control" of Tenant as hereafter defined in this Section 8.

(e)  Tenant may assign this Lease or sublet the whole of the Premise to an entity which (i) is the successor, by merger or otherwise, to all or substantially all the Tenant's assets,(ii) controls is controlled by or is under common control with Tenant, (iii) is engaged in a joint venture with Tenant; or (iv) acquires substantially all of the stock or assets of Tenant, as a going concern, with respect to the business that is being conducted in the Premises(a "Permitted Transfer"). Any entity assigned this Lease under a Permitted Transfer must assume all of Tenant's obligations and liabilities under the Lease and is entitled to all of the rights and privileges of the party named as Tenant in the Lease, including the right to exercise any option to renew the term of the Lease. Tenant agrees to give Landlord a written notice of any Permitted Transfer within 20 days after the effective date thereof. (Failure of Tenant to send such written notice before the end of the aforesaid 20 day period is not deemed a waiver by Tenant's of its permitted assignment rights granted in this Section 8..

9.    LIENS

Tenant shall not permit any lien or claim for any lien of any mechanic, labor or supplier or any other lien to be filed against the Premises, or any part thereof arising out of work performed or, alleged to have been performed by, or at the direction of, or on behalf of Tenant. If any such lien or claim for lien is filed, Tenant shall immediately either have such lien or claim for lien

released of record or shall deliver to Landlord a bond in the form, content, amount, and issued by a surety, satisfactory to Landlord indemnifying Landlord, and others designated by Landlord against all costs and liabilities resulting from such lien or claim for lien and the foreclosure or attempted foreclosure thereof. If Tenant fails to have such lien or claim for lien so released or to deliver such bond to Landlord, Landlord, without investigating the validity of such lien may pay or discharge the same, and Tenant shall reimburse Landlord upon demand for the amount so paid by Landlord, including Landlord's expenses and reasonable attorney's fees.

10     ALTERATIONS, IMPROVEMENTS AND SIGNS

10.1    Tenant Alteration

Tenant is permitted to make interior non structural alterations, additions and improvements without Landlord's prior consent. Tenant agrees to notify the Landlord about the additions and improvements.

10.2    Landlord's Alterations

Landlord shall not be responsible for making any improvements, repairs or replacements to the premises, except as otherwise provided in Section 7.2.

10.3    Signs and Awnings

All signs, awnings, notices and graphics of every kind or character, visible in or from public view or the exterior of the Premises, shall be subject to Landlord's prior written approval, which Landlord shall have the right to withhold in its sole and absolute discretion. Any installation of signs, awnings or graphics permitted under this lease on or about the Premises and Building shall be subject to any applicable governmental laws, ordinances, regulations and to any other requirements imposed by the Landlord. Tenant shall remove all such signs, awnings and graphics within (2) days after the termination of this Lease. Such installations and removals shall be made in such manner as to avoid injury to or defacement of the Premises or Building and any other improvements contained therein, and

Tenant shall repair any injury or defacement including, without limitation, discoloration caused by such installation or removal. Landlord hereby consents to Tenant's trademarked logo, letters and colors of Tenant's signage. Tenant has the right to place exterior signs on all sides of the building in which the Premises are situated in accordance with the maximum signage allowed by the local authority.

11.    WAIVER OF CLAIMS AND INDEMNITY

11.1   Waiver

To the fullest extent now or hereafter permitted by law, Tenant waives all claims, Tenant may have against Landlord and the agents and employees of said parties and for damage to person or property sustained by Tenant or any occupant or other person resulting from the Land, Building or the Premises or any part of the Land, Building or Premises becoming out of repair or resulting from any accident within the Premises or resulting directly or indirectly from any act or omission of Landlord or the agents and employees of Landlord or resulting directly or indirectly from any act or omission of Tenant or any other person while on the Premises or at the Building.

11.2   Indemnification

Tenant agrees to indemnify and hold harmless Landlord and the agents and employees of said parties against any liabilities, obligations, claims, demands, costs and expenses of every kind and nature, including reasonable attorney's fees arising from Tenants occupancy of the Premises (except for claims arising out of the sole or gross negligence or willful misconduct of Landlord, or its agents, contractors or employees) or from any breach or default on the part of Tenant in the performance of any agreement of Tenant to be performed pursuant to the terms of this Lease, or from any acts or neglect of Tenant.

12.  LANDLORD'S REMEDIES

12.1  Events of Default

Each of the following shall constitute a breach of this Lease by Tenant:

(a) Tenant fails to pay any installment of Rent when such installment of Rent shall be due and fails to cure such default within five (5) days after such installment of Rent shall be due.

(b) Tenant fails to observe or perform any of the other covenants, conditions or provisions of this Lease to be observed or performed by Tenant and fails to cure such default within fifteen (15) days after written notice thereof to Tenant.

(c) The interest of Tenant in this Lease is levied upon under execution or other legal process.

(d) A petition is filed by or against Tenant to declare Tenant bankrupt or seeking a plan of re-organization or arrangement under any Chapter of the Bankruptcy Act, or any amendment, replacement or substitution therefor, or to delay payment of, reduce or modify Tenant's capital structure, or upon the dissolution of Tenant.

(e) Tenant is declared insolvent by law or any assignment of Tenant's property is made for the benefit of creditors.

(f) A receiver is appointed for Tenant or Tenant's property.

(g) Tenant assigns or attempts to assign this Lease except pursuant.

(h) Tenant abandons the Premises.

12.2  Landlord's Remedies

In the event of any default of this lease by Tenant, Landlord, at its option, without further notice or demand to Tenant, may, in addition to all other rights and remedies provided in this Lease, at law or in equity:

(a)  terminate this Lease and Landlord shall be entitled to recover (1) all rent due and payable by the Tenant at termination, (2) an amount equal to the then present value of the Rent for the remainder of the Term ( taking into account the time and expense necessary to obtain a replacement

tenant or tenants, including expenses relating to recovery of the Premises, preparation for re-letting and for re-letting itself); (3) the cost of performing any other covenant to be performed by Tenant, and (4) such damages, as provided by law, resulting from Tenant's breach of the Lease; or

(b) Terminate Tenant's right of possession of the Premises without terminating this Lease, in which event Landlord shall make a reasonable attempt to re-let the Premises, or any part thereof for the account of Tenant, for such rent and term and upon such terms and conditions as are acceptable to Landlord. For purposes of such re-letting, Landlord is authorized to decorate, repair, alter and improve the Premises to the extent reasonably necessary. If Landlord is unable , after making a reasonable attempt, to re-let the Premises, or if the Premises are re-let and a sufficient sum is not realized therefrom after payment of all Landlord's expenses of re-letting (including repairs, alterations, improvements, additions, decorations, reasonable legal fees and brokerage commissions) to satisfy the payment when due of Rent reserved under this Lease for any monthly period ( hereinafter " Deficiency"), then Tenant shall pay Landlord a sum equal to the amount of rent due under this Lease for each such monthly period, or if the Premises have been re-let, Tenant shall pay any such Deficiency monthly. Tenant agrees that Landlord may file suit to recover any sums due to Landlord hereunder from time to time and that such suit or recovery of any amount due Landlord hereunder shall not be any defense to any subsequent action brought for any amount not theretofore reduced to judgment in favor of Landlord. In the event Landlord elects, pursuant to this Subsection (b), to terminate Tenant's right of possession only without terminating this Lease, Landlord may, at Landlord's option, enter into the Premises, remove Tenant's signs and other evidences of tenancy, and take and hold possession thereof, as provided in Article 14 hereof; provided, however, that such entry and possession shall not terminate this Lease or release Tenant, in whole or in part, from Tenant's

obligation to pay the Rent reserved hereunder for the full term or from any other obligation of Tenant under this Lease.

12.3     Attorney's Fees

In the event of any action or proceeding between Landlord and Tenant (including an action or proceeding between Landlord and the trustee or debtor in possession while Tenant is a debtor in a proceeding under any bankruptcy law) to enforce any provision of the Lease, the losing party shall pay to the prevailing party all costs and expenses, including, without limitations, reasonable attorney's fees and expenses, incurred in such action and in any appeal in connection therewith by such prevailing party. The "prevailing party" will be determined by the court before whom the action was brought based upon an assessment of which party's major arguments or positions taken in the suit or proceeding could fairly be said to have prevailed over the other party's major arguments or positions on major disputed issues in the court's decision. Notwithstanding the foregoing, however, Landlord shall be deemed the prevailing party in any un-lawful detainer or other action or proceeding instituted by Landlord based upon any default or alleged default of Tenant hereunder if (i) judgment is entered in favor of Landlord, or (ii) prior to trail or judgment Tenant pays all or a material of the rent claimed by Landlord, vacates the Premises, or otherwise cures the default claimed by Landlord.

13.     SURRENDER OF PREMISES

Upon expiration or termination of this Lease or termination of Tenant's right of possession of the Premises, or any part thereof, Tenant shall surrender and vacate the Premises immediately and deliver possession thereof to Landlord is a clean, good and tenantable condition, ordinary wear and tear expected. Upon any termination which occurs than by reason of Tenant's default, Tenant shall be entitled to remove  from the

Premises all movable personal property of Tenant, provided Tenant shall immediately delivered to Landlord or if Tenant shall fail to remove any of such property therefrom without any liability of Tenant, and at Tenant's expense. All movable personal property which may be removed from the Premises by Lease shall be conclusively presumed to have been abandoned by Tenant, and title thereto shall pass to Landlord without any cost or credit therefor, and Landlord may, at its option and at Tenant's expense, store and/or dispose of such property.

14.    HOLDING OVER

Tenant shall pay Landlord an amount equal to (150%) of the rent then applicable for each month or portion thereof, if Tenant retains Possession of the Premises, or any portion thereof, after the expiration or termination of this Lease, and also shall pay all damages sustained by Landlord by reason of such retention of possession. The provisions of this Article shall not constitute a waiver by Landlord of any re-entry rights of Landlord hereinbefore or by law provided. If Tenant retains possession of the Premises, or any part thereof, for ten (10) days after the expiration or termination of this Lease, then at the sole option of Landlord expressed by written notice to Tenant, but not otherwise, such holding over shall constitute a renewal of this Lease for a period of five year on the same terms and conditions, except that the monthly rent shall be fixed in between the Landlord and Tenant prior to exercise the renewal option(s).

15.    DAMAGE BY FIRE OR OTHER CASUALTY

15.1   Substantial Un-tenant-ability

If the Premise are made substantially un-tenantable by fire or other casualty, Landlord may elect either to (i) terminate this Lease as of the date of the fire or other casualty by giving Tenant written notice thereof within thirty (30) days after said date; or (ii) proceed to repair or restore the Premises, other than leasehold improvements and personal property paid

for or installed by Tenant, by giving Tenant written notice thereof within thirty (30) days after said date.

Restoration shall be commenced within Sixty (60) days after such damage shall have occurred and shall be substantially completed with reasonable diligence, due allowance being made for delay in the commencement or completion of restoration occasioned by causes beyond the Landlord's control. Subject to Section 15.3 below, if the Landlord does not commence such restoration within such thirty (30) day period, and proceed therewith with reasonable diligence, due allowance being made for delays occasioned as aforesaid, Tenant may terminate this Lease as of the date of such damage (as its sole and exclusive remedy) by serving notice on the Landlord after the expiration of such period, and while the Landlord (not being delayed in any aforesaid causes) is not dili-gently proceeding with such restoration. Notwithstanding the provisions of this section to the contrary, if Landlord elects to repair damage to the Premises caused by said casualty, and thereafter fails to complete such restoration within one hundred and eighty (180) days from the date of occurrence of said casualty, Tenant has the right to terminate this Lease, so long as (i) Tenant gives Landlord not less than thirty ( 30 ) days prior written notice and (ii) Landlord does not complete the restoration during such thirty (30) day period dili-gently proceeding with such restoration.

15.2    Insubstantial Un-tenant-ability

If the Premises are damaged by fire or other casualty but are not rendered substantially un-tenant-able, then Landlord shall proceed to repair and restore the Premises, other than the leasehold improvements and personal property paid for and installed by Tenant, unless such damage occurs during the last year of the Term, the first Option Period or the second Option Period, as applicable, in which event Landlord shall have the right to terminate this Lease as of the date of such fire or other casualty by giving written notice thereof to Tenant within thirty (30) days after the date of such fire or other casualty.

### 15.3 Property Un-tenant-ability

If, as a result of said casualty, Tenant will be prevented from operating its business in the Premises for more than one hundred eighty (180) days ( as reasonably estimated by the Landlord's architect), Tenant shall have the right to terminate this Lease upon written notice thereof to Landlord within thirty (30) days after the date of said casualty.

### 16. EMINENT DOMAIN

### 16.1 Taking of Whole

In the event the whole or any part of the Premises is taken or condemned by any competent authority for any public use or purpose (including a deed given in Lieu of condemnation), this Lease shall terminate as the date title vests in such authority, and Rent shall be apportioned as of said date.

### 16.2 Compensation

Landlord shall be entitled to receive the entire price or award from any such sale, taking or condemnation without any payment to Tenant, and Tenant hereby assigns to Landlord Tenant's interest, if any, in such award; provided, however, Tenant shall have the right to separately pursue against the condemning authority an award in respect of the loss, if any, to leasehold improvements paid for by Tenant, and for Tenant's cost of relocation without any credit or allowance from Landlord.

### 17. TENANT'S INSURANCE

### 17.1 Insurance

Tenant, at Tenant's expense, agrees to maintain in force during the Term:

(i)     Comprehensive General Liability Insurance on an occurrence basis with minimum limits of liability in an amount of $1,000,000.00 for bodily injury, personal injury or death to any one person and $2,000,000.00 for bodily injury, personal injury or death to more than one person, and $1,000,000.00 with respect to damage to property. (ii) Fire Insurance, with

extended coverage and vandalism and malicious mischief endorsements, in an amount adequate to cover the full replacement value of all leasehold improvements and all fixtures, contents and wall and floor covering in the Premises.

17.2    Required Policy Provisions

The Policies referred to in Section 17.1 shall name Landlord and its agents and employees as additional insured, as their interests may appear. Each policy referred to in Section 17.1 shall be issued by one or more responsible insurance companies reasonably satisfactory to Landlord and shall contain the following provisions and endorsements: (i) that such insurance may not be cancelled or amended without thirty (30) days prior written notice to Landlord: (ii) an express waiver of any right of subrogation by the insurance company against Landlord and its agents and employees: and (iii) that the policy shall not be invalidated should the insured waive in writing prior to a loss, any or all rights of recovery against any other party for losses covered by such policy.

17.3    Release of Rights of recovery

Tenant shall deliver to Landlord certificates of insurance of all policies and renewals thereof to be maintained by Tenant hereunder, not less than ten (10) days prior to the expiration date of each policy

17.4    Insurance

Tenant has no obligation to reimburse Landlord or pay for any insurance premiums charged Landlord for property or liability insurance carried by Landlord.

18.    RULES AND REGULATION

Tenant agree for itself and for its employees, agents, guests and invitees to comply with reasonable rules and regulations which Landlord may from

time to time enact and further will comply with observe the following rules and regulations:

(a) Protecting Premises: Tenant shall be responsible for protecting the Premises from weather, which includes keeping all windows closed and from theft, robbery and pilfering. Before leaving the Premises unattended, Tenant shall close and surely lock all doors or other means of entry to the Premises and shut off all unnecessary utilities in the Premises.

(b) Large Articles: Furniture, freight and other articles may be brought into the building is always the tenant's sole responsibility.

(c) Compliance with Laws: Tenant shall comply with all applicable laws, ordinance, governmental orders or regulations and applicable orders or directions from any public office or body having jurisdiction with respect to the Tenant's use of the Premises.

Any violation by the Tenant of any of the provision of this paragraph maybe restrained by injunction, but whether or not so restrained, the Tenant acknowledges and agrees that it shall be and remain liable for all damages, losses, costs and expenses resulting from any violation by the Tenant of any provision of this Lease. Such violation shall be deemed to constitute an Event of Default or Default under the terms of this Lease. Nothing in this Lease shall be construed to impose upon Landlord any duty or obligation to enforce provisions of this paragraph or any rule or regulation previously or hereafter adopted, or the terms, covenants and conditions of any other lease against any other tenant of the Building and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its employees, agents, visitors, customers, representatives or licensees or by any other person.

19. **NOTICES**

All notices required or permitted to be give hereunder shall be in writing and shall be deemed given and delivered, whether or not received, when deposited in the United States Mail, first class postage prepaid and properly addressed, certified mail, return receipt requested, at the following addresses: (i) Landlord: at the address specified in Subsection 1.1B. (ii) to Tenant: at the address specified in Subsection 1.1C, or such other address as Tenant shall designate by written notice to Landlord. Either Party may change its address for receipt of notices by giving notice of such change to the other party in accordance herewith. Notices and demands from Landlord to Tenant may be signed by Landlord or its agent or attorney.

20. **COMPLIANCE WITH LAWS**

Throughout the Term of this Lease, Tenant, at its own sole and expense, shall promptly comply with all present and future laws, ordinances, orders, rules regulations and requirements of all governmental authorities which may be applicable to the Premises.

21. **MISCELANEOUS**

21.1 **Entire Agreement**

This Lease is the entire agreement between Landlord and Tenant concerning the Premises and there are no other agreements, either oral or written.

21.2 **Late Charges**

All Rents and other payments due from Tenant to Landlord, delinquent in excess of five (5) days, shall bear a penalty of $100.00 (one hundred) .

21.3 **Landlord's Obligation on Sale of Premises**

In the event of any sale or transfer of the Premises, Landlord shall be entirely freed and relieved of all agreements and obligations of Landlord hereunder accruing or to be performed after the date of such sale or transfer, provided such purchaser shall assume all obligations of Landlord occurring from and after the date of such sale or transfer.

21.4    Limitations of Landlord's Liability

It is expressly understood and agreed by Tenant that none of Landlord's covenants, undertakings or agreements are made or intended as personal covenants, undertakings or agreements by Landlord and any liability for damage or breech or nonperformance by Landlord shall be collectible only out of Landlord's interest in the Premises and no personal liability is assumed by, nor at any time may be asserted against, Landlord or of its officers, agents, employees, partners, legal representatives, successors or assigns, all such liability, if any, being expressly waived and released by Tenant.

21.5    Binding Effect

This Lease shall be binding upon and inure to the benefit of Landlord and Tenant and their respective heirs, legal representatives, successors and permitted assigns.

21.6    Force Majeure

Landlord shall not be deemed in default with respect to any of the terms, covenants and conditions of this Lease on Landlord's part to be performed, if Landlord fails to timely perform same and such failure is due in whole or in part to any strike, lockout, labor trouble (whether legal or illegal), civil disorder, inability to procure materials, failure of power, restrictive governmental laws and regulations, riots, insurrections, war, fuel shortages, accidents, casualties, acts of God, acts caused directly or indirectly by

Tenant (or Tenant's agents, employees or invitees) or any other cause beyond the reasonable control of Landlord.

21.7 Captions

The Article and Section captions in this Lease are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope of intent of such Articles and Sections.

21.8 Applicable Law

This Lease shall be construed in accordance with the laws of the State of Illinois without regard to its conflict of law principles.

21.9 Amendments

This Lease may not be amended, modified or terminated, nor may any obligation hereunder be waived orally, and no such amendment, modification, termination or waiver shall be effective unless it is in writing, signed by the party against whom enforcement thereof is sought.

21.10 Riders

All riders attached hereto and executed both by Landlord and Tenant shall be deemed to be part hereof and hereby incorporated herein.

21.11 Severability

If any provision, term or condition of this Lease or any application thereof shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

21.12  Bankruptcy

If Landlord shall not be permitted to terminate this Lease as herein above provided because of the provisions of Title 11 of the United States Code relating to Bankruptcy, as amend ("Bankruptcy Code"), then Tenant as a debtor-in – possession or any trustee for Tenant agrees promptly, within no more than (15) days upon request by Landlord to the Bankruptcy Court, to assume or reject this Lease and Tenant on behalf of itself, and any trustee agrees not to seek or request any extension or adjournment of any application to assume or reject this Lease by Landlord with such Court. In such event, Tenant or any trustee for Tenant may only assume this Lease if (a) it cures or provides adequate assurance that Tenant or trustee will promptly cure any default hereunder,(b) compensates or provides adequate assurance that Tenant will promptly compensate Landlord for any actual pecuniary loss to Landlord resulting from stated term hereof of all the terms, covenants, and provisions of this Lease to be performed by Tenant. In no event after the assumption of this Lease shall any then existing default remain uncured for a period in excess of the earlier of (10) days or the time period set forth herein. Adequate assurance of performance of this Lease, as set forth herein above, shall include, without limitation, adequate assurance (i) of the source of rent reserved hereunder, and (ii) the assumption of this Lease will not breach any provision hereunder. In the event of a filing of a petition under the Bankruptcy Code, Landlord shall have no obligation to provide Tenant with any services or utilities as herein required, unless Tenant shall have paid and be current in all payments of all Rents.

21.13  Waiver of Trail by Jury

IT IS MUTUALLY AGREED BY AND BETWEEN LANDLORD AND TENANT THAT THEY SHALL AND HEREBY DO WAIVE TRAIL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER PARTY HERETO AGAINST THE OTHER ON

**Retail Petroleum Consultants, LLC**                    *Addenda Exhibit D    Page 159*

---

### AMENDMENT

This Amendment made to the lease dated January 1, 2013 between Mubarak Ibrahim, hereafter referred to as Lessor, and Fred Loya Insurance Agency, Inc., hereafter referred to as Lessee, for the property commonly known as 11900 S. Marshfield Avenue, #E, Calumet Park, Illinois 60827, shall supercede any provision of the lease that may be in conflict with the lease agreement dated January 1, 2013.

1. The term of the original lease agreement shall be extended through February 28, 2023.

2. There shall be only one option to extend this lease and that option will be for a Five (5) year extension beginning on March 1, 2023 and extending the lease through February 28, 2028. The base rent for this option period is to be negotiated.

3. The base rent shall be changed to $3,450.00 per month beginning on March 1, 2018 and through February 28, 2023.

4. That the Lessee shall receive from the Lessor a credit in the amount of $3,000.00 towards the base rent in month of April of 2019. The Lessee shall also receive a credit in the amount of $3,000.00 towards the base rent for the month April of 2020.

Lessor _____

Lessee _____

Date ___9/7/17_____

**Retail Petroleum Consultants, LLC**                              *Addenda Exhibit D   Page 160*



Lease No. 01081.918483

## AMENDMENT

THIS LEASE AMENDMENT (the "Amendment") by and between **Mubarak Ibrahim** (the "LESSOR") and **OUTFRONT Media LLC** (the "LESSEE") is made effective as of the 13th day of **June, 2017** (the "Effective Date").

### RECITALS

WHEREAS, LESSOR (as successor in interest to **Grandstand Auto Bath L. P.**) and LESSEE (as successor in interest to **National Advertising Company d/b/a 3M Media**) are parties to that certain Lease Agreement and Special Provisions Addendum To National Advertising Company Lease Agreement Percentage Rent dated August 19, 1996 (together, the "Lease"); and

WHEREAS, LESSEE and LESSOR now desire to amend the Lease pursuant to the terms and conditions of this Amendment

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

### WITNESSETH

1. **Capitalized Terms**. All capitalized terms used herein, unless otherwise defined herein, have the same meanings ascribed to them in the Lease.

2. **Amendments to the Lease:**

Effective August 1, 2017, the term of the lease shall be extended Twenty (20) Years. During the term of the Lease, rent shall be paid according to the following rental schedule:

- **Years 1-20: Fifteen Thousand Seven Hundred ($15,700.00) Dollars paid annually in advance.**

The Lease shall continue in full force and effect for its Term and thereafter for subsequent successive year-to-year terms, unless terminated at the end of such Term, or any successive year-to-year term, upon written notice by the LESSOR or LESSEE sent by certified or registered mail served not less than ninety (90) days before the end of such term or subsequent year-to- year-term. Subsequent year-to-year- term rentals shall be equal to the immediately preceding term rental rate.

*Retail Petroleum Consultants, LLC*                    *Addenda Exhibit D   Page 161*

LESSOR(S) shall not assign its interest under this Lease or any part thereof except to a party who purchases the underlying fee title to the Property LESSEE shall not assign its interest under this Lease or any part thereof except to an entity that controls, is controlled by, or under common control with, LESSEE or to a party who purchases title to the subject Sign Structure(s) provided, however, this sentence shall not preclude a collateral assignment of LESSOR(S)'s or LESSEE's interest under this Lease to an established financial institution as, and part of, a bona fide loan transaction nor shall it preclude an assignment by LESSEE to any entity controlling, controlled by, or under control with, LESSEE.

3.    **Ancillary Use.**  LESSEE, at its sole option shall have the right to add any ancillary use to its structure(s), including but not limited to routing necessary underground lines, telecommunications devices and wifi access points.

4.    **Amendment Controls.**  Except as otherwise set forth herein, all of the terms and conditions of the Lease shall remain in full force and effect. In the event of a conflict between the terms and conditions of this Amendment and the terms and conditions of the Lease, the terms and conditions of this Amendment shall govern.

**REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.
SIGNATURE PAGE FOLLOWS.**

5.    **Counterparts.**  This Amendment may be executed in one or more counterparts and delivered by regular, certified, registered or electronic mail (in pdf format), each of which shall be deemed an original hereof and all of which together shall be deemed to be one and the same instrument.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Amendment to be duly executed as of the date first set forth above.

LESSOR:  Mubarak Ibrahim                         LESSEE: OUTFRONT Media LLC

By: _____                      By: _____
Mubarak Ibrahim                                        General Manager-Michael Wells

_____                          _____
Witness                                              Witness

*Retail Petroleum Consultants, LLC*                              *Addenda Exhibit E    Page 163*

**Exhibit E – Fuel Supply Agreement** (Portion)



## MOTOR FUEL SALES
## PETROLEUM
## SUPPLY AGREEMENT

Between

### GAS DEPOT OIL COMPANY
### 8930 N WAUKEGAN RD, SUITE 230
### MORTON GROVE, IL 60053

And

### GRANDSTAND 3, INC.
### MUBARAK IBRAHIM
### 11900 S MARSHFIELD AVE,CALUMET PARK,IL 60827
### Dated as of January 20, 2016

W:\WORK\269209.DOC

1

**Retail Petroleum Consultants, LLC**                    *Addenda Exhibit E   Page 165*

SUPPLY AGREEMENT

### GAS DEPOT OIL COMPANY MANUFACTURER DEALER
### SUPPLY AGREEMENT

THIS AGREEMENT is made and entered into this 20th day of January 2016 by and between GAS DEPOT INC., an Illinois corporation (Gas Depot Oil Company), and, grandstand 3 INC ,MUBARAK IBRAHIEM. ("Dealer").

WITNESSETH:

WHEREAS, Dealer operates a certain parcel of real property located at 11900 S MARSHFIELD AVE,,CALUMET PARK ,IL 60827 (the "Premises").

WHEREAS, the Premises is to be used by Dealer in connection with the sale at retail to the general public of motor fuel, oils and lubricants and other petroleum products ("Petroleum Products") for use in motor vehicles (such activity being hereinafter called the "Retail Petroleum Business");

WHEREAS, a condition to GAS DEPOT OIL COMPANY agreeing to execute same, Dealer agreed to purchase exclusively from GAS DEPOT OIL COMPANY all Petroleum Products purchased by Dealer for resale from the Premises in connection with the Retail Petroleum Business during the term of the agreement; and

WHEREAS, the parties have agreed that as of the inception of this Agreement, and subject to change as provided herein, GAS DEPOT OIL COMPANY shall supply to Dealer and Dealer shall purchase, Petroleum Products manufactured and/ or supplied by GAS DEPOT OIL COMPANY (the "Supplier") and bearing the Suppliers' brand and trademarks or the brand and trademarks of the Petroleum Products Manufacturer whose products the Supplier provides and under whose trademarks and image the dealer offers the petroleum products purchased hereunder for re-sale. (collectively the "Brand").

NOW, THEREFORE, in consideration of the above, of the execution of the supply agreement and of the terms and conditions below, the parties agree as follows:

1.      **Petroleum Products.**

   (a)      Dealer covenants and agrees that throughout the term of this Agreement, Dealer shall purchase all Petroleum Products to be sold from the Premises in connection with the Retail Petroleum Business exclusively from GAS DEPOT OIL COMPANY hereby agrees to supply all of the Petroleum Products as Dealer shall from time to time order on the terms and conditions, and subject to the limitations set forth herein.

   (b)      Dealer shall use Dealer's good faith and best efforts to maximize the sale of Petroleum Products at the Premises.

   (c)      The Petroleum Products to be sold and delivered hereunder shall be of the kinds, grades, brands and quality generally sold by GAS DEPOT OIL COMPANY, the time of delivery to Dealer.

   (d)      GAS DEPOT OIL COMPANY reserves the following rights, the exercise of any of which shall not in any way relieve Dealer of its obligations hereunder:

      (i)      To change the Brand of the Petroleum Products to those of another Manufacturer, or to sell and supply to Dealer so-called "unbranded" Petroleum Products;

      (ii)      To change the grade, specifications, characteristics, delivery package or other distinctive designation of any Product.

   (e) GAS DEPOT OIL COMPANY also reserves the right to discontinue the marketing of any product(s) or discontinue the marketing of product(s) in a geographic area(s); in either case, GAS DEPOT OIL COMPANY and Dealer shall be relieved of any further obligations herewith with respect to said discontinued product(s) or geographic areas; however, any amounts owed by Dealer to GAS DEPOT OIL

W:\WORK\269209.DOC

2

participate in the Credit Card Program.

11.     **Additional Covenants of Dealer.** Throughout the term of this Agreement, Dealer covenants and agrees:

(a)     At all times comply with all federal, state and municipal laws, rules, regulations and ordinances applicable to the Premises and the Retail Petroleum Business, including, without limitation, all such laws, rules, regulations and ordinances regarding (i) environmental matters, (ii) concerning the receipt, storage and dispensing of Petroleum Products (iii) the disposal of waste materials, and (iv) Dealer's other activities at the Premises.

(b)     Comply with all requirements of the Manufacturer in connection with the handling, advertising and marketing of the Petroleum Products under the Brand and the use of the Brand. Further, dealer agrees to let GAS DEPOT OIL COMPANY perform an audit of fuel purchases, daily fuel inventory reconciliation, and sales tax records when requested.

(c)     Keep the Premises in a good, clean, healthful and presentable position condition and otherwise operate the retail petroleum business in a first-class manner so as to at all times promote the greatest volume of sales of Petroleum Products from the Premises. Location must maintain a "Mystery Shopper" score of 85% or higher monthly.

(d)     At all times keep and observe all of the covenants and requirements of the Supply agreement on the part of the Dealer (as Dealer).

12.     **Hours of Operation.** N/A.

13.  **Terminations and Non-Renewal by GAS DEPOT OIL COMPANY.** In addition to all other rights and remedies available to GAS DEPOT OIL COMPANY, GAS DEPOT OIL COMPANY may, at its option, terminate or not renew this Agreement as the case may be upon ninety (90) days' prior written notice or such shorter period of time as may be reasonable under the circumstances, for any one or more of the following reasons (each of which shall hereinafter be called an "Event of Default"):

(a)     Dealer's failure to comply with any provision of this Agreement.

(b)     Dealer's failure to exert good faith efforts to carry out the provision of this Agreement or any Supply agreement agreement;

(c)     The occurrence of an adverse event which is relevant to the relationship between Dealer and GAS DEPOT OIL COMPANY and as a result of which makes termination both reasonable and permissible, including without limitation the following:

(1)     Fraud or criminal misconduct by Dealer relevant to the operation of the Premises;

(2)     Dealer's declaration of bankruptcy or a judicial determination of insolvency;

(3)     Continuing severe physical or mental disability of Dealer of at least three (3) months duration, which renders Dealer unable to provide for the continued proper operation of Premises;

(4)     GAS DEPOT OIL Company's loss of the right to grant Dealer the right to use Manufacturer trademarks, brand name or other identification if Dealer elects not to comply with or make such improvements as required by manufacturer to maintain brand identity and image standards;

(5)     Condemnation or other taking, in whole or in part, of the Premises pursuant to the power of eminent domain;

(6)     GAS DEPOT OIL Company's loss of the right to grant Dealer the right to use Manufacturer

W:\WORK\269209.DOC

7

trademarks, brand name or other identification;

(7) Destruction of all or a substantial portion of the Premises;

(8) Dealer's failure to pay to GAS DEPOT OIL COMPANY in a timely manner all sums of money to which GAS DEPOT OIL COMPANY is legally entitled to receive;

(9) Dealer's failure to operate the Premises for seven (7) consecutive days, or such lesser period of time such that under the particular facts and circumstances constitutes as an unreasonable period of time;

(10) Dealer's willful adulteration, mislabeling, or misbranding of Manufacturer branded Petroleum Products or other trademark violations by Dealer;

(11) Dealer's knowing failure to comply with any federal, state or local law, rule or regulation relevant to the operation of Premises;

(12) Dealer's conviction of any felony involving moral turpitude; or

(13) The death or dissolution of Dealer;

(d) The failure of the parties to agree to changes or additions to the provisions of this Agreement if such changes or additions are made by GAS DEPOT OIL COMPANY in good faith and in the normal course of business;

(e) The receipt of numerous bona fide complaints by GAS DEPOT OIL COMPANY concerning the Dealer's operation of the Premises so long as Dealer was promptly apprised of the existence and nature of such complaints and such complaints related to the condition of Premises or to the conduct of Dealer or any employee or agent of Dealer, and the Dealer did not promptly take action to cure or correct the basis of such complaints;

(f) A failure by the Dealer to operate the Premises in a clean, safe, and healthful manner, if the Dealer failed to do so on two or more previous occasions and GAS DEPOT OIL COMPANY notified the Dealer of such failures;

(g) A determination made by GAS DEPOT OIL COMPANY in good faith and in the normal course of business that the renewal of the franchise relationship with Dealer would be uneconomical to GAS DEPOT OIL COMPANY despite any reasonable changes or additions to the provision of the franchise which may be acceptable to Dealer; or

14. **Breach by Dealer: Liquidated Damages.**

(a) The length of the term hereunder is a major inducement to the Supplier entering this Agreement and a material part thereof. Dealer expressly acknowledges that any breach of this Agreement by Dealer resulting in its termination before the expiration of its stated term would cause the Supplier to suffer damages the amount of which could not be precisely ascertained. The Parties further agree that the following formula will result in a reasonable estimate of the amount of the probable loss of profits Supplier may be expected to suffer as a result of Dealer's breach of this Agreement::

Average monthly Motor Fuel Petroleum Sales (in gallons) by Dealer over the proceeding 12 months X  $0.02 per gallon multiplied by the remaining number of months in the Term of this Agreement

Plus

The amount of any unamortized branding costs incurred by the Supplier. Dealer acknowledges that the branding costs incurred to bring the marketing premises in with the identification and image requirements of the trademark ("Brand") owner shall amount to between $15,000.00 and $50,000.00 and shall be amortized on a

**Retail Petroleum Consultants, LLC**          **Addenda Exhibit E   Page 168**

---

straight line basis over the term of the contract.

All remedies set forth herein shall be cumulative in nature, and shall be in addition to, and not in lieu of, any other right or remedy available to GAS DEPOT OIL COMPANY hereunder or under Illinois law.

15. **Notices.** Except as otherwise expressly provided in this Agreement, all notices shall be in writing and shall be deemed to have been given to the other party

When delivered personally or when sent by registered or certified United States mail, postage prepaid, addressed to Dealer or GAS DEPOT OIL COMPANY at the following addresses:

If to GAS DEPOT OIL COMPANY:
GAS DEPOT OIL COMPANY
8930 N Waukegan Rd. Suite 230
Morton Grove, IL 60053

If to Dealer:
MUBARAK IBRAHIM
11900 S MARSHFIELD AVE,
CALUMET PARK, IL 60827

16. **Successors-Assigns.** This Agreement shall inure to the benefit of, and be binding upon the heirs, executors, administrators, successors and assigns of the respective parties hereto, but no assignment by Dealer shall be valid without the prior written consent of GAS DEPOT OIL COMPANY, which consent shall not be unreasonably withheld. Dealer shall not sell the retail petroleum business or the subject marketing premises unless the buyer or transferee expressly assumes this Agreement in writing.

Recording of Restriction/Covenant: THIS AGREEMENT SHALL BE RECORDED WITH THE OFFICE OF THE RECORDER OF DEEDS IN THE COUNTY IN WHICH THE MARKETING PREMISES ARE LOCATED.

THE DEALER COVENANTS AND AGREES THAT THIS AGREEMENT RUNS WITH THE LAND AND RESTRICTS THE REAL PROPERTY FROM BEING USED TO MARKET ANY PETROLEUM PRODUCTS AT RETAIL OTHER THAN THOSE SUPPLIED BY GAS DEPOT OIL COMPANY UNDER THE TERMS AND CONDITIONS OF THIS AGREEMENT, ITS SUCCESSORS OR ASSIGNS, FOR THE TERM OF THIS AGREEMENT BY THE DEALER, HIS HEIRS, ASSIGNS, SUCCESSORS IN INTEREST, EXECUTORS OR ADMINISTRATORS

17. **FIRST RIGHT OF REFUSAL.** Dealer Grants Gas Depot Inc. a first right of refusal for purchase of the property. GAS Depot will have 30 days in match said offer. If GAS Depot does not exercise said rights all other terms & conditions of this agreement will be kept in place.

18. **Non-Waiver.** GAS DEPOT OIL Company's failure, or election not to exercise, any of its rights hereunder against or with respect to Dealer, whether or not a breach on the part of Dealer shall have occurred, shall not amount to any waiver or modification of such rights (or of such breach) and shall not be deemed to be a course of performance or dealing modifying or waiving this Agreement or any part hereof.

19. **Entire Agreement.** This Agreement constitute the entire agreement of the parties with respect to the subject matter set forth herein, all other and prior agreements and understandings (whether oral or written) having been merged herein and extinguished hereby.

20. **Modifications or Amendment.** This Agreement may be modified or amended only in writing, executed by both of the parties hereto.

21. **Relationship of the Parties.** Nothing contained herein shall be deemed or construed to create the relationship of principal and agent, of partnership or of joint venture between GAS DEPOT OIL COMPANY and Dealer. Instead, it is agreed and understood that Dealer is an independent business entity and independent contractor, and that the relationship of GAS DEPOT OIL COMPANY and Dealer hereunder is that of Vendor and Purchaser, respectively.

W:\WORK\26920\6 DOC

9

*Retail Petroleum Consultants, LLC*                              *Addenda Exhibit E    Page 169*

22.     **Governing Law.** This Agreement shall be governed and construed in accordance with the laws of the State of Illinois and shall be deemed to have been made and executed in Cook County, Illinois.

23.     **Attorneys' Fees and Venue.** In any action or proceeding between the parties arising out of or in connection with this Agreement or the breach or enforcement hereof (i) venue shall lie in the Circuit Court of Cook County, Illinois, or, if federal jurisdiction is applicable, in the United States District Court for the Northern District of Illinois, Eastern Division, in Chicago, Illinois, and (ii) the party prevailing in such proceeding shall be entitled to recover its costs and expenses (including reasonable attorney's fees) from the nonprevailing party.

24.     **Counterparts.** This Agreement may be executed in any number of counterparts, with each such counterpart being deemed to be one and the same instrument. Additionally, photocopies and reproductions of the signatures on this Agreement (including facsimile transmissions thereof) shall be deemed to be the equivalent of originals.

25.     **Lease/Contract Length.** This Agreement will run concurrent with the terms of the Land Lease.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first written above.

GAS DEPOT OIL COMPANY              (DEALER)

By: _____              By: _____ (Name_____)
                                  GRANDSTAND 3 INC.

                                  By: _____ (Name_____)
                                  MUBARAK IBRAHIM

                                  By: _____ (Name_____)


**AFFIDAVIT**

STATE OF ILLINOIS
COUNTY OF COOK                             SEAL

I, the undersigned, a Notary Public in and for the County of cook and state of Illinois, do hereby certify that MUBARAK IBRAHIM personally known to me to be the same person whose name is subscribed to the foregoing instrument.

_A. Cavstavliy_
Notary Public

> OFFICIAL SEAL
> A CONSTANTIN
> Notary Public - State of Illinois
> My Commission Expires Apr 29, 2017

W:\WORK\2692\9.DOC

10

**Retail Petroleum Consultants, LLC**                    **Addenda Exhibit E    Page 170**

COMPANY for Petroleum Products previously supplied to Dealer hereunder shall be paid by Dealer GAS DEPOT OIL COMPANY upon demand.

(f)  GAS DEPOT OIL COMPANY will have all product delivered and billed through GAS DEPOT OIL COMPANY. Payments for fuel and other associated items will be paid to GAS DEPOT OIL COMPANY via Electronic Funds Transfer.

(g)  In the event Dealer desires to request a change of the Manufactures Brand, GAS DEPOT OIL COMPANY may agree to such change provided they remain the fuel supplier for the new brand.

2.  **Prices and Terms.**

(a)  The price ("Purchase Price") to be paid by Dealer to GASDEPOT OIL COMPANY for all Citgo Petroleum Products purchased by Dealer during the term hereof shall be as follows:

    (i)  For all motor fuel, the price shall be GASDEPOT OIL Company's then current pricing over the daily market rack, plus freight, and all applicable taxes. Retailer shall pay Seller for the Products the price in effect at the time loading commences at the Plant for the place of delivery. Retailer may ascertain Seller's current prices at Seller's offices or at such other place designated by Seller.

(b)  Dealer shall pay to GAS DEPOT OIL COMPANY the entire Purchase Price for all Petroleum Products from time to time purchased by Dealer hereunder in full, within 7 days from date of invoice, via electronic funds transfer, and failing to do so, GAS DEPOT OIL COMPANY shall be entitled to recover interest on the unpaid balance of the Purchase Price outstanding at the rate of 2 1/2% per month. GAS DEPOT OIL COMPANY shall have the right to charge Dealer a transaction fee of not less than $250.00 for each check or bank debit submitted by Dealer to GAS DEPOT OIL COMPANY in payment of the Purchase Price which is dishonored or otherwise disallowed. Additionally, cash discounts, if any, shall not be applicable to amounts due for taxes, freight, charges, or container charges. GAS DEPOT OIL COMPANY may require additional security or change terms if warranted.

(c)  GAS DEPOT OIL COMPANY shall have the right, but not the obligation, to obtain full or partial payment of the Purchase Price from time to time due and owing by Dealer hereunder by setting off such Purchase Price against amounts collected by GAS DEPOT OIL COMPANY with respect to credit card charge sales made by Dealer at the Premises.

(d)  GAS DEPOT OIL COMPANY may extend credit to Dealer on such terms and conditions as GAS DEPOT OIL COMPANY may determine in its sole discretion. At GAS DEPOT OIL Company's request, Dealer shall execute, at any time prior to or during the term of this Agreement, a Security Agreement, UCC Financing Statements and such other documents as GAS DEPOT OIL COMPANY may require so as to grant to GAS DEPOT OIL COMPANY as security for all sums from time to time due and owing by Dealer to GAS DEPOT OIL COMPANY hereunder a continuing first priority security interest in all existing and hereafter acquired (i) Petroleum Products sold and delivered by GAS DEPOT OIL COMPANY to Dealer at the Premises, and in the proceeds of sale of same and (ii) credit card collections emanating from sales of any type (whether for goods or services) made by Dealer at the Premises. **In the event of payment default and/or multiple NSF payments by The Dealer, Gas Depot Oil Company shall retain the right to receive a TWENTY FIVE thousand dollar ($25,000.00) security deposit** to secure the prompt and full payment of the amounts owed pursuant to this Agreement. In the event Dealer defaults in the payment of any indebtedness to GAS DEPOT OIL COMPANY including, but not limited to, indebtedness arising from purchases under this Agreement, or otherwise fails to comply with any credit terms imposed by GAS DEPOT OIL COMPANY, GAS DEPOT OIL COMPANY shall have the right, in addition to any other rights, to immediately suspend deliveries of all Petroleum Products and to apply any security which Dealer may have given to GAS DEPOT OIL COMPANY to the payment of any such indebtedness, and shall have all remedies available to it whether legal or equitable.

W:\WORK\269209.DOC

3

*Retail Petroleum Consultants, LLC*                                    *Exhibit F  Page 171*

**Exhibit F – Qualifications of Appraiser**

**Retail Petroleum Consultants, LLC**  **Exhibit F  Page 172**

 RETAIL PETROLEUM

Retail Petroleum Consultants LLC

4464 McGrath Street, Unit 117,
Ventura, California  93001

6800 Westgate Boulevard, Suite 132-219,
Austin, Texas 78745

California · Texas · New York

   

### QUALIFICATIONS OF STEPHEN J. MORSE

Stephen J. Morse founded Retail Petroleum Consultants, Inc (RPC) in 2003 after providing over 12 years of specialized valuation services for various national firms. Having identified a unique niche, RPC specializes in going--concern valuations of gas stations, convenience stores (c-stores), Quick Serve Restaurants (QSR), and car washes. Since its founding, RPC has performed valuation services for over 6,500 properties in 27 states, including, CA, TX, NY, OR, NV, AZ, NM, WA.  This volume of work has created an extensive cost, sales, and operational data base allowing for the highest level of analyses including support for valuation assignments, feasibility, and expert consultation. Prior to forming RPC, Mr. Morse was Engagement Director of American Appraisal Associates' (AAA) Retail Petroleum Marketing Group. At AAA Mr. Morse was responsible for providing real estate and business consulting services to major oil companies and related petroleum clients throughout the United States. While at PwC and Landauer, Mr. Morse provided and managed appraisal services for a variety of property types. Stephen Morse has appraised more than 4 equivalent special purpose properties within the last 36 months and is an active appraiser, appraising 2 special use properties a month.

### Experience

| 2002-Present Retail Petroleum Consultants Ventura, CA Chief Appraiser/Founder | 2000--2002 American Appraisals Associates (AAA) Irvine, CA Engagement Director | 1999--2000 PriceWaterhouseCoopers (PWC) Newport Beach, CA Senior Consultants | 1998--1999 Landauer Real Estate Counselors Atlanta, GA Manager |
|---|---|---|---|

### Education
California State University - Fresno; Bachelor of Arts in Finance, 1993
Associate Member of the Appraisal Institute

### Licensing
California State Certified General Real Estate Appraiser Certification No. AG021121
Texas State Certified General Real Estate Appraiser Certification No. TX 1331119 G
New York State Certified General Real Estate Appraiser Certification No. 46000051297
Washington State Certified General Real Estate Appraiser Certification No. 1102221
Arizona State Certified General Real Estate Appraiser Certification No. 31989
Nevada State Certified General Real Estate Appraiser Certification No. A.0207452-CG

**Appraisal Institute Courses**
Real Estate Principles
Standards of Professional Practice Basic
Income Capitalization
 Advanced Income Capitalization
Report Writing
Advanced Sales and Cost Approaches
Highest and Best Use Market Analysis
Advanced Applications
Business Practices & Ethics
Valuation of Detrimental Conditions in Real Estate
Appraising Convenience Stores
Analyzing Distressed Real Estate
Eminent Domain and Condemnation
Fundamentals of Separating Real, Personal Property, and Intangible Business Assets

**Other Courses and Seminars**
Standards of Professional Practice (USPAP)
Real Estate Principles
FIRREA URAR Seminar

**Professional Organizations**
Forensic Expert Witness Association (FEWA)
National Association of Convenience Stores (NACS)
California Service Station Automotive Repair Assoc. (CSSARA)

 805-815-4350        805-669-3939         contact@gasvaluation.com          www.gasvaluation.com





Retail Petroleum Consultants LLC

// 4464 McGrath Street, Unit 117,
Ventura, California  93001

// 6800 Westgate Boulevard, Suite 132-219,
Austin, Texas  78745

## QUALIFICATIONS OF COLIN NISBET

Colin Nisbet is a valuation analyst.  He has experience in field inspections, data analysis, and appraisal review.  Mr. Nisbet has assisted the Chief appraiser on more than 4 equivalent special purpose properties.

### Experience

| | | |
|---|---|---|
| 2016 -- Present<br>Retail Petroleum<br>Consultants Ventura, CA | 2015-2014<br>Mendocino County<br>Real Property Appraiser | 2014-2013<br>Joseph Associates<br>Appraiser Trainee |
| 2013-2012<br>APEX Appraisals<br>Appraiser Trainee | 2011-2011<br>Home Management | |

**Education**
Butte Community College

Partial List of Assignment Types Undertaken
USPAP 7 hour Course Update
Cost Approach
Creating Credible Appraisals
Federal and State Laws and Regulations
Real Estate Appraisal Report Writing
Site Valuation
Supervisor – Trainee Course
Statics and Modeling
Analyzing Markets
Analyzing Income Properties
Case Studies in Complex Appraisals
Supervisor – Trainee Course

 805-815-4350      805-669-3939     contact@gasvaluation.com     www.gasvaluation.com

*Retail Petroleum Consultants, LLC*

*Exhibit F  Page 175*



Business, Consumer Services & Housing Agency

BUREAU OF REAL ESTATE APPRAISERS

REAL ESTATE *TRAINEE* APPRAISER LICENSE

Colin Z. Nisbet

has successfully met the requirements for a license as a *Trainee* real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Trainee Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER: AT 037714

Effective Date: June 1, 2017
Date Expires: May 31, 2019

Jim Martin, Bureau Chief, BREA

3035488

THIS DOCUMENT CONTAINS A TRUE WATERMARK - HOLD UP TO LIGHT TO SEE 'CHAIN LINK'

Colin Nisbet has appraised more than 4 equivalent Special purpose properties in the preceding 36 months.



Retail Petroleum Consultants LLC

4464 McGrath Street, Unit 117,
Ventura, California 93001

6800 Westgate Boulevard, Suite 132-219,
Austin, Texas 78745

California · Texas · New York

## RETAIL PETROLEUM

### QUALIFICATIONS OF EDWARD N. OLSON

Edward Olson is a real estate appraiser with over twelve veras of experience in commercial appraisal, residential appraisals, valuations and reviewing appraisal fields.

**Experience**

| AI Valve Appraisals | Advance Appraisal | Retail Petroleum |
|---|---|---|
| General Appraiser | Group | Consultants Inspector |

**Education**
Appraisal Institute
Northeaster University

**Licensing**
Illinois State Certified General Real Estate Appraiser Certification No. 553.001 90 |

**Appraisal Institute Courses**
Real Estate Appraisal
Sales Comparison and Income
Residential Report Writing
Non-Residential Report Writing
Principles and Fundamental
Applications and Methods
Income A
Real Estate Statistics and Valuation Modeling

905-815-4350         805-669-3939         contact@gasvaluation.com         www.gasvaluation.com



*Retail Petroleum Consultants, LLC*                    *Addenda Exhibit G    Page 178*

**Exhibit G – Certification of Appraiser**

**Retail Petroleum Consultants, LLC**                    *Addenda Exhibit G    Page 179*

# CERTIFICATION OF APPRAISER

I certify that, to the best of my knowledge and belief:

− The statements of fact contained in this report are true and correct.

− The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

− I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

− I have performed services, as an appraiser (August 12, 2017), regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

− I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

− My engagement in this assignment was not contingent upon developing or reporting predetermined results.

− My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

− My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.

− Edward Olson made a personal inspection of the subject property on May 29, 2018. Stephen J. Morse has not previously inspected the subject property. Stephen J. Morse performed the valuation analyses with the assistance of Colin Nisbet.

− The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

− The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

Edward Olson
Illinois State General Certified No. 553.001901

Stephen J. Morse
Illinois Temporary Practice Permit No. 572.004366

Colin Nisbet
California Trainee Appraiser No. AT037714
My License Expires May 31, 2019

*Retail Petroleum Consultants, LLC*                    *Addenda Exhibit H    Page 180*

**Exhibit H – Assumptions and Limiting Conditions**

*Retail Petroleum Consultants, LLC*                    *Addenda Exhibit H    Page 180*

# ASSUMPTIONS AND LIMITING CONDITIONS

No responsibility is assumed for matters legal in nature.  No investigation has been made of the title to or any liabilities against the property appraised.  The appraisal presumes, unless otherwise noted, that the owner's claim is valid, that the property rights are good and marketable, and there are no encumbrances that cannot be cleared through normal processes.

To the best of our knowledge, all data set forth in this report is true and accurate. Although gathered from reliable sources, no guarantee is made nor liability assumed for the accuracy of any data, opinions, or estimates identified as being furnished by others that have been used in formulating this analysis.

The market value estimate contained within this report specifically excludes the impact of structural damage or environmental contamination resulting from earthquakes or other causes.  It is recommended that the reader of this report consult a qualified structural engineer and/or industrial hygienist for the evaluation of possible structural/environmental defects, the existence of which could have a material impact on market value.

Land areas and descriptions used in this appraisal were furnished by sources deemed reliable and have not been verified by legal counsel or a licensed surveyor.  The land description is included for identification purposes only and should not be used in a conveyance or other legal document without proper verification by an attorney.

No soil analysis or geological studies were ordered or made in conjunction with this report, nor were any water, oil, gas, coal, or other subsurface mineral and use rights or conditions investigated.

Substances such as asbestos, urea-formaldehyde foam insulation, other chemicals, toxic wastes, or other potentially hazardous materials could, if present, adversely affect the value of the property.  Unless otherwise stated in this report, the existence of hazardous substances, which may or may not be present on or in the property, was not considered by the appraiser in the development of the conclusion of fair market value.  The stated value estimate is predicated on the assumption that there is no material on or in the property that would cause such a loss in value.  No responsibility is assumed for any such conditions, and the client has been advised that the appraiser is not qualified to detect such substances, quantify the impact on values, or develop the remedial cost.

No environmental impact study has been ordered or made.  Full compliance with applicable federal, state, and local environmental regulations and laws is assumed unless otherwise stated, defined, and considered in the report.  It is also assumed that all required licenses, consents, or other legislative or administrative authority from any local, state, or national government or private entity organization either have been or can be obtained or renewed for any use that the report covers.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with unless a nonconformity has been stated, defined, and considered in the appraisal report.  Further, it is assumed that the utilization of the land and improvements is within the boundaries of the property described and that no encroachment or trespass exists unless noted in the report.

The Americans with Disabilities Act ("ADA") became effective January 26, 1992.  We have not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one of more of the requirements of the act.  If

so, this fact could have a negative effect on the value of the property.  Since we have no direct evidence relating to this issue, we did not consider the possible compliance with the requirements of ADA in estimating the value of the property.

A physical inspection was made by individuals generally familiar with real estate and building construction.  However, these individuals are not architectural or structural engineers who would have detailed knowledge of building design and structural integrity.  Accordingly, we do not opine on, nor are we responsible for, the structural integrity of the property including its conformity to specific governmental code requirements, such as fire, building and safety, earthquake, and occupancy, or any physical defects which were not readily apparent to the appraisers during their inspection.

The value or values presented in this report are based upon the premises outlined herein and are valid only for the purpose or purposes stated.

The date of value to which the conclusions and opinions expressed apply is set forth in this report.  Unless otherwise noted, this date represents the last date of our physical inspection of the property.  The value opinion herein rendered is based on the status of the national business economy and the purchasing power of the U.S. dollar as of that date.

Unaudited operating statements were provided for our review.  It is assumed that the furnished data are representative of the operating history of the property.

Testimony or attendance in court or at any other hearing is not required by reason of this appraisal unless arrangements are previously made within a reasonable time in advance thereof.

One or more of the signatories of this appraisal report is a member or candidate of the Appraisal Institute.  The Bylaws and Regulations of the Appraisal Institute require each member and candidate to control the use and distribution of each appraisal report signed by them.

Possession of this report or any copy thereof does not carry with it the right of publication. No portion of this report (especially any conclusion to use, the identity of the appraiser or the firm with which he or she is connected, or any reference to the Appraisal Institute or the American Society of Appraisers, or the designations awarded by these organizations) shall be disseminated to the public through prospectus, advertising, public relations, news, or any other means of communication without the written consent and approval of RPC LLC.

# EXHIBIT D

# 11900 Marshfield Properties Appraisal 5-2019 Part 1

Wednesday, August 07, 2019
4:10 PM



JLL | *Achieve Ambitions*

Appraisal of 11900 Marshfield Property LLC
11900 S Marshfield Ave, Calumet Park, Cook County, IL 60827

Date of Report: May 16, 2019

JLL File Number: 1206-19-148933
Client Reference Number: 19-000365-01-01

*Valuation and Advisory Services*





11900 Marshfield Property LLC
11900 S Marshfield Ave
Calumet Park, IL 60827



200 E. Randolph Street, 47th Floor     Phone: 312-252-8913
Chicago, IL 60601     Fax: 312-252-8914

May 16, 2019

Mr. Timothy Rooney, MAI, SRA
BMO Harris Bank N.A.
111 W. Monroe Street, 4 C/2800
Chicago, IL 60603

Re: Appraisal

11900 Marshfield Property LLC
11900 S Marshfield Ave
Calumet Park, Cook County, IL 60827

File Number: 1206-19-148933
Client Reference #: 19-000365-01-01

Dear Mr. Rooney, MAI, SRA:

At your request, we have prepared an appraisal for the above referenced property, which may be briefly described as follows:

The subject is an existing retail property containing 18,375 square feet of gross leasable area. The property is improved with a gas station/convenience store, car wash, auto repair facility and several small in-line retail spaces. The improvements were constructed in 2000. The subject property underwent light renovation in 2018. Ownership also installed new personal property consisting of two 5,000-gallon underground tanks, one for the diesel pumps and one for the E-85 gasoline pumps, as well as a 20,000-gallon diesel tank, a 6,000-gallon DEF tank, and five diesel pumps at the south end of the subject site. Diesel operations began in 2019. Turbo dryers were installed in the car wash. Ownership estimated the total renovation cost, including costs for personal property, to be $1,200,000. Any future revenue from gaming machines (video lottery terminals or similar machines) are excluded from this analysis. The site area is 3.32 acres or 144,428 square feet. We considered whether to apply a prospective market value at completion and stability; however, all renovation work is complete and the subject is considered stabilized.

The appraisal is intended to conform with the Uniform Standards of Professional Appraisal Practice (USPAP); Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute and the American Society of Appraisers; the appraisal requirements of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), revised June 7, 1994; and applicable state appraisal regulations.

The primary method used to allocate the "As Is" going concern values among the real estate, furniture fixtures, and equipment, and any intangible or business value was the cost approach, with supporting calculations from the income and improved sales comparison approaches.

Based on the appraisal described in the accompanying report, subject to the Limiting Conditions and Assumptions, Extraordinary Assumptions and Hypothetical Conditions (if any), we have made the following value conclusion(s):

## Value Conclusions

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Going Concern Value As Is | Leased Fee | April 10, 2019 | $5,870,000 |

Your attention is directed to the Limiting Conditions and Assumptions section of this report. Acceptance of this report constitutes an agreement with these conditions and assumptions. In particular, we note the following:

## Value Allocation As Is

| Market Value | Leasehold | April 10, 2019 |
|---|---|---|
| As Is Real Estate | | $3,900,000 |
| As Is Furniture, Fixtures, and Equipment | | $1,180,000 |
| As Is Business Value | | $790,000 |
| Total As Is | | $5,870,000 |

## Extraordinary Assumptions & Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions of conclusions.

1. The values are contingent upon no adverse conditions currently existing on the subject site including but not limited to toxic or hazardous wastes. Due to the nature of the subject, there could possibly be some adverse effects to the site from toxic or hazardous waste. Since it is the property owner's obligation to correct any contamination caused by these factors, the appraisers recommend that an environmental site assessment audit be prepared by a qualified professional engineer prior to any decision to purchase or sell the property under analysis. This audit is recommended to identify any potential environmental liabilities and associated remediation costs. The appraisal and value conclusions are contingent upon the site and improvements being free of any hazardous substances.

2. We did not include the ownership position in Dunkin Donuts as part of the going concern value. No profits from this position were included in the estimation of future cash flows.

3. We were not provided with a detailed list of equipment. We relied on the net book value of the property as provided by Syed Iftekhar on May 13, 2019. Any material differences in value of the equipment would have an impact upon concluded value.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.



If you have any questions or comments, please contact the undersigned. Thank you for the opportunity to be of service.

Respectfully submitted,

JLL Valuation & Advisory Services, LLC

Eric Enloe, MAI, CRE, FRICS
Managing Director
Certified General Appraiser
IL Certificate #: 553.001456
Telephone: (312) 252-8913
Email: eric.enloe@am.jll.com

Adam Wood
Senior Vice President
Certified General Appraiser
IL Certificate #: 553.002582
Telephone: (312) 228-2352
Email: Adam.Wood@am.jll.com

Robert S. Wells, ASA
Vice President
Certified General Appraiser
IL Certificate #:553.002074
Telephone: (414) 944-2108
Email: rob.wells@am.jll.com

11900 Marshfield Property LLC Real Estate Appraisal

# Contents

| | |
|---|---|
| Certification Statement | 1 |
| Summary of Salient Facts and Conclusions | 3 |
| Introduction | 5 |
| Ownership and Transaction History | 5 |
| Scope of Work | 7 |
| Applicable Requirements | 8 |
| Client, Intended Use, and User(s) | 8 |
| Purpose of the Appraisal | 8 |
| Approaches to Value | 9 |
| Prior Services | 10 |
| Report Option | 11 |
| Definition of Values | 11 |
| Definition of Property Rights Appraised | 12 |
| Area Demographics and Market Analysis | 14 |
| Chicago MSA Area Demographics | 14 |
| Gross Domestic Product | 18 |
| Market Area Analysis | 22 |
| US Gas Stations with Convenience Stores Market Analysis | 22 |
| Retail Market Area Analysis | 32 |
| Property Description | 44 |
| Site Description | 44 |
| Improvements Description | 47 |
| Assessment and Taxes | 52 |
| Highest and Best Use | 54 |
| Valuation Methodology | 56 |
| Land Valuation | 58 |
| Cost Approach | 63 |
| Sales Comparison Approach | 69 |
| Income Capitalization Approach | 70 |
| Final Reconciliation | 80 |
| Limiting Conditions and Assumptions | 83 |

11900 Marshfield Property LLC Real Estate Appraisal

# Appendices

A. Appraiser Qualifications
B. Definitions
C. Financials and Property Information
D. Comparable Data
E. Engagement Letter

## Certification Statement

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are our personal, impartial, and unbiased professional analyses, opinions and conclusions.
3. We have no present or prospective future interest in the property that is the subject of this report, and have no personal interest with respect to the parties involved.
4. We have no bias with respect to the property that is the subject of this report, or to the parties involved with this assignment.
5. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
6. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP).
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. We certify sufficient competence to appraise this property through education and experience, in addition to the internal resources of the appraisal firm.
11. The appraisers have not performed any prior services regarding the subject within the previous three years of the appraisal date.
12. Eric Enloe, MAI, CRE, FRICS, has made an inspection of the subject property. Adam Wood has made a personal inspection of the property. Robert S. Wells, ASA has not performed an inspection of the subject property.
13. Significant real property appraisal assistance was provided by Josh Watkins and T.J. Dragotta who have not signed this certification.
14. As of the date of this report, Eric Enloe, MAI, CRE, FRICS has completed the continuing education program for Designated Members of the Appraisal Institute.
15. As of the date of this report, Adam Wood has completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

1

16. The American Society of Appraisers has a mandatory reaccreditation program for all of its Designated Members. Robert S. Wells, ASA, is in compliance with that program.


Eric Enloe, MAI, CRE, FRICS
Managing Director
Certified General Appraiser
IL Certificate #: 553.001456
Telephone: (312) 252-8913
Email: eric.enloe@am.jll.com

Adam Wood
Senior Vice President
Certified General Appraiser
IL Certificate #: 553.002582
Telephone: (312) 228-2352
Email: Adam.Wood@am.jll.com


Robert S. Wells, ASA
Vice President
Certified General Appraiser
IL Certificate #:553.002074
Telephone: (414) 944-2108
Email: rob.wells@am.jll.com

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Summary of Salient Facts and Conclusions

| | |
|---|---|
| Property Name | 11900 Marshfield Property LLC |
| Address | 11900 S Marshfield Ave |
| | Calumet Park, Cook County, Illinois 60827 |
| Property Type | Vehicle Related |
| Owner of Record | 11900 Marshfield Property LLC |
| Tax ID | Multiple |
| Land Area | 3.32 acres; 144,428 SF |
| Gross Building Area (SF) | 18,375 SF |
| Rentable Area (SF) | 18,375 SF |
| Year Built | 2000 |
| Year Renovated | 2018 |
| Zoning Designation | C3, Highway Commercial |
| Highest & Best Use - As If Vacant | Retail Use |
| Highest & Best Use - As Improved | Continued Retail Use |
| Exposure Time; Marketing Period | 9 - 12 months; 9 - 12 months |
| Date of Report | May 16, 2019 |

### Value Conclusions

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| Going Concern Value As Is | Leased Fee | April 10, 2019 | $5,870,000 |

The values reported above are subject to definitions, assumptions and limiting conditions set forth in the accompanying report of which this summary is a part. No party other than the client and intended users may use or rely on the information, opinions and conclusions contained in the report. It is assumed that the users of the report have read the entire report, including all of the definitions, assumptions and limiting conditions contained therein.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

3

11900 Marshfield Property LLC Real Estate Appraisal

## Extraordinary Assumptions & Hypothetical Conditions

The value conclusions are subject to the following extraordinary assumptions that may affect the assignment results. An extraordinary assumption is an assignment-specific assumption as of the effective date regarding uncertain information used in the analysis which, if found to be false, could alter the appraiser's opinions of conclusions.

1. The values are contingent upon no adverse conditions currently existing on the subject site including but not limited to toxic or hazardous wastes. Due to the nature of the subject, there could possibly be some adverse effects to the site from toxic or hazardous waste. Since it is the property owner's obligation to correct any contamination caused by these factors, the appraisers recommend that an environmental site assessment audit be prepared by a qualified professional engineer prior to any decision to purchase or sell the property under analysis. This audit is recommended to identify any potential environmental liabilities and associated remediation costs. The appraisal and value conclusions are contingent upon the site and improvements being free of any hazardous substances.

2. We did not include the ownership position in Dunkin Donuts as part of the going concern value. No profits from this position were included in the estimation of future cash flows.

3. We were not provided with a detailed list of equipment. We relied on the net book value of the property as provided by Syed Iftekhar on May 13, 2019. Any material differences in value of the equipment would have an impact upon concluded value.

The value conclusions are based on the following hypothetical conditions that may affect the assignment results. A hypothetical condition is a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

1. None.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

4

# Introduction

The subject is an existing retail property containing 18,375 square feet of gross leasable area. The property is improved with a gas station/convenience store, car wash, auto repair facility and several small in-line retail spaces. The improvements were constructed in 2000. The subject property underwent light renovation in 2018. Ownership also installed new personal property consisting of two 5,000-gallon underground tanks, one for the diesel pumps and one for the E-85 gasoline pumps, as well as a 20,000-gallon diesel tank, a 6,000-gallon DEF tank, and five diesel pumps at the south end of the subject site. Diesel operations began in 2019. Turbo dryers were installed in the car wash. Ownership estimated the total renovation cost, including costs for personal property, to be $1,200,000. Any future revenue from gaming machines (video lottery terminals or similar machines) are excluded from this analysis. The site area is 3.32 acres or 144,428 square feet. We considered whether to apply a prospective market value at completion and stability; however, all renovation work is complete and the subject is considered stabilized.

## Subject Identification

| | |
|---|---|
| Name | 11900 Marshfield Property LLC |
| Address | 11900 S Marshfield Ave, Calumet Park, Cook County, IL 60827 |
| Tax ID | See Site Description Section for a list of parcel numbers |
| Owner of Record | 11900 Marshfield Property LLC |
| Legal Description | See appendix |

## Ownership and Transaction History

The most recent closed sale of the subject is summarized as follows:

## Most Recent Sale (Closed)

| | |
|---|---|
| Grantor: | AHM Properties, Inc. |
| Grantee: | 11900 Marshfield LLC |
| Sale Date: | December 23, 2016 |
| Sale Price: | $2,500,000 |
| Document Number: | 1706846001 |

Our as is market value conclusion of $5,870,000 is 134.8% above the purchase price. We were provided detail on the purchase price. This was a non-arm's-length transaction between related parties involving a buyout of one of the owners. Based on this information, we have not placed any emphasis or credibility toward a market value indication on this sales price. To the best of our knowledge, no other sale or transfer of ownership has taken place within a three-year period prior to the effective appraisal date. Additionally, the property is not subject to an agreement of sale or an option to buy, nor is it listed for sale, as of the effective appraisal date.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

6

11900 Marshfield Property LLC Real Estate Appraisal

## Scope of Work

According to the Uniform Standards of Professional Appraisal Practice, it is the appraiser's responsibility to develop and report a scope of work that results in credible results that are appropriate for the appraisal problem and intended user(s).

Scope of work is the type and extent of research and analyses involved in an assignment. To determine the appropriate scope of work for the assignment, we considered the intended use of the appraisal, the needs of the user, the relevant characteristics of the subject property, and other pertinent factors. Our concluded scope of work is summarized below, and in some instances, additional scope details are included in the appropriate sections of the report.

### Summary

| Research | |
|---|---|
| | • We inspected the property and its environs. Physical information on the subject was obtained from the property owner's representative, public records, and/or third-party sources. |
| | • Regional economic and demographic trends, as well as the specifics of the subject's local area were investigated. Data on the local and regional property market (supply and demand trends, rent levels, etc.) was also obtained. This process was based on interviews with regional and/or local market participants, primary research, available published data, and other various resources. |
| | • Other relevant data was collected, verified, and analyzed. Comparable property data was obtained from various sources (public records, third-party data-reporting services, etc.) and confirmed with a party to the transaction (buyer, seller, broker, owner, tenant, etc.) wherever possible. It is, however, sometimes necessary to rely on other sources deemed reliable, such as data reporting services. |
| Analysis | • Based upon the subject property characteristics, prevailing market dynamics, and other information, we developed an opinion of the property's Highest and Best Use. |
| | • We analyzed the data gathered using generally accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. |
| | • The results of each valuation approach are considered and reconciled into a reasonable value estimate. |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

## Applicable Requirements

This appraisal is intended to conform to the requirements of the following:

- Uniform Standards of Professional Appraisal Practice (USPAP);
- Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute;
- Applicable state appraisal regulations;
- Appraisal requirements of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), revised June 7, 1994;
- Interagency Appraisal and Evaluation Guidelines issued December 10, 2010;
- Appraisal guidelines of BMO Harris Bank N.A.

## Client, Intended Use, and User(s)

Client:
BMO Harris Bank N.A.

Intended Use:
The intended use of the appraisal is for loan underwriting and-or credit decision purposes.

Intended User(s):
The intended users of the appraisal are BMO Harris Bank N.A. and its subsidiaries and affiliates. The appraisal is not intended for any other use or user. No party or parties other than BMO Harris Bank N.A. and its subsidiaries and affiliates may use or rely on the information, opinions, and conclusions contained in this report.

## Purpose of the Appraisal

The purpose of the appraisal is to estimate the Subject's:

| Appraisal Premise | Interest Appraised | Date of Value |
|---|---|---|
| Going Concern Value As Is | Leased Fee | April 10, 2019 |

The date of the report is May 16, 2019. The appraisal is valid only as of the stated effective date or dates.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

3

11900 Marshfield Property LLC Real Estate Appraisal

## Approaches to Value

Appraisers usually consider the use of three approaches to value when developing a market value opinion for real property. These are the cost approach, sales comparison approach, and income capitalization approach. Applicability and utilization of the approaches in this assignment is described as follows.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

9

| Approach | Description | Applicability | Utilization |
|---|---|---|---|
| Cost | A cost approach is most applicable in valuing new or proposed construction when the improvements represent the highest and best use of the land and the land value, cost new and depreciation are well supported. | Applicable | Utilized |
| Sales Comparison | A sales approach is most applicable when sufficient data on recent market transactions is available and there is an active market for the property type. The sales approach is relatively unreliable in an inactive market or in estimating the value of properties for which no real comparable sales data is available. It is also questionable when sales data cannot be verified with the principal parties to the transaction. We examined recent sales of individual gas stations, strip retail centers, and auto repair facilities.  We were unable to find going concern or real property sales that included the combination of property types as the subject; therefore, a limited sales comparison was undertaken and the result was considered a secondary approach to estimate the market value of the real estate and was not used to value the going concern. The sales approach was used in estimating the current market value of the underlying land for asset allocation purposes. | Applicable | Utilized |
| Income | An income approach is most applicable when the subject is an income producing property or has the ability to generate income in the future as an investment. The income approach is also used to analyse the going concern value. | Applicable | Utilized |

## Prior Services

USPAP requires appraisers to disclose to the client any other services they have provided in connection with the subject property in the prior three years, including valuation, consulting, property management, brokerage, or any other services.

- We have not performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

10

11900 Marshfield Property LLC Real Estate Appraisal

## Report Option

Based on the intended users understanding of the subject's physical, economic and legal characteristics, and the intended use of this appraisal, an appraisal report format was used, as defined below.

| Appraisal Report | This is an Appraisal Report as defined by Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2(a). This format provides a summary or description of the appraisal process, subject and market data and valuation analyses. |

## Definition of Values

Market Value — The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well informed or well advised, and acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Source: Code of Federal Regulations, Title 12, Chapter I, Part 34.42[g]; also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77472)

As Is Market Value — The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal's effective date.

Source: Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015); also Interagency Appraisal and Evaluation Guidelines, Federal Register, 75 FR 77449, December 10, 2010, page 77471

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11

11900 Marshfield Property LLC Real Estate Appraisal

## Definition of Property Rights Appraised

Leased Fee estate — A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e, a lease).

Lease — A contract in which rights to use and occupy land or structures are transferred by the owner to another for a specified period of time in return for a specified rent.

Going Concern Premise — Going Concern Premise is defined as, "one of the premises under which the total assets of a business can be valued; the assumption that a company is expected to continue operating well into the future (usually indefinitely). Under the going-concern premise, the value of a business as a going concern is equal to the sum of the value of the tangible assets and the value of the intangible assets, which may include the value of excess profit, where asset values are derived consistently with the going-concern premise."

## Specified Assets Appraised

Convenience Stores and Car Washes assets are generally considered to be business enterprises and may have value in excess of the real estate value. Such assets can be valued based upon the liquidation premise or the going concern premise. The liquidation premise would only be used if the highest and best use of the asset is to sell the component parts separately. This is not the case with the subject, so the subject is valued based upon the going concern premise. The term going concern is defined as follows:

"One of the premises under which the total assets of a business (TAB) can be valued; the assumption that a company is expected to continue operating well into the future (usually indefinitely). Under the going concern premise, the value of a business is equal to the sum of the value of the tangible assets and the value of the intangible assets, which may include the value of excess profit, where asset values are derived consistent with the going concern premise."

Source: The Dictionary of Real Estate Appraisal (Chicago, IL: Appraisal Institute, Fifth Edition)

When a property is valued based upon the going concern premise, the valuation may include real estate, FF&E and intangibles. These assets in total compromise the Total Assets of a Business (TAB), defined as follows: "The tangible property (real property and personal property, including inventory and furniture, fixtures and equipment) and intangible property (cash, workforce, contracts, name, patents, copyrights and other residual intangible assets, to include capitalized economic profit)."

Source: The Dictionary of Real Estate Appraisal (Chicago, IL: Appraisal Institute, Fifth Edition)

When appraised based upon the going concern premise, the Market Value of the Total Assets of the Business (MVTAB) is defined as follows:

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved. 12

"The market value of all of the tangible and intangible assets of a business as if sold in aggregate as a going concern."

Source: The Dictionary of Real Estate Appraisal (Chicago, IL: Appraisal Institute, Fifth Edition)

Definitions of the components that compromise the TAB are as follows:

**Real Property:** All interests, benefits, and rights inherent in the ownership of physical real estate; the bundle of rights with which the ownership of the real estate is endowed. In some states, real property is defined by statute and is synonymous with real estate.

Source: The Dictionary of Real Estate Appraisal (Chicago, IL: Appraisal Institute, Fifth Edition)

**Furniture, Fixtures and Equipment (FF&E):** The movable property of a business enterprise not classified as stock or inventory or leasehold improvements; frequently found in the ownership of hotels or motels, restaurants, assisted living facilities, service stations, car washes, greenhouses and nurseries, and other service intensive properties. Furniture, fixtures and equipment frequently wears out much more rapidly that other components of those properties.

Source: The Dictionary of Real Estate Appraisal (Chicago, IL: Appraisal Institute, Fifth Edition)

**Business Enterprise Value:** A term applied to the concept of the value contribution of the total intangible assets of a continuing business enterprise such as marketing and management skill, an assembled workforce, working capital, trade names, franchises, patents, trademarks, contracts, leases, and operating agreements.

Source: The Dictionary of Real Estate Appraisal (Chicago, IL: Appraisal Institute, Fifth Edition)

However, it should be noted that some of the assets included in the definition of TAB are not commonly included in the value or sale of a car wash asset. Items normally excluded are: cash on hand, working capital, accounts receivable, and accounts payable. As such, our valuation focuses upon the specified assets of the business, which excludes the items noted.

In addition, we have provided an allocation of our concluded value. Note that the allocation is based upon the continuation of the business enterprise. If the business ceases operations, the values of the individual components would likely be different than the value allocated to the components based upon the continuation of the business operation.

## Inspection

Eric Enloe, MAI, CRE, FRICS, performed an inspection on April 28, 2019. Adam Wood performed an inspection on April 10, 2019. Robert Wells did not perform an inspection.

## Significant Appraisal Assistance

It is acknowledged that Josh Watkins and T.J. Dragotta made significant professional contributions to this appraisal, consisting of conducting research on the subject and transactions involving comparable properties, performing appraisal analyses, and assisting in report writing, under the supervision of the persons signing the report.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

# Area Demographics and Market Analysis

## Chicago MSA Area Demographics

The subject is located in the Chicago-Naperville-Elgin, IL-IN-WI Metropolitan Statistical Area, hereinafter called the Chicago MSA, as defined by the U.S. Office of Management and Budget. The Chicago MSA is 7,197 square miles in size, and is the third most populous metropolitan area in the nation.

## Population

The Chicago MSA has an estimated 2018 population of 9,643,624, which represents an average annual 0.2% increase over the 2010 census amount of 9,461,105. Chicago MSA added an average of 22,815 residents per year over the 2010 - 2018 period, and its annual growth rate is greater than that of the state of Illinois.

### Population Trends

|  | 2010 Census | Population 2018 Est. | 2023 Est. | Compound Ann. % Chng 2010 - 2018 | 2018 - 2023 |
|---|---|---|---|---|---|
| Chicago MSA | 9,461,105 | 9,643,624 | 9,758,617 | 0.2% | 0.2% |
| Illinois | 12,830,632 | 12,970,153 | 13,034,049 | 0.1% | 0.1% |

Source: Esri 2019. Compiled by JLL Valuation & Advisory Services, LLC.

Looking forward, the Chicago MSA's population is projected to increase at a 0.2% annual rate from 2018 - 2023, equivalent to the addition of an average of 22,999 residents per year. The Chicago MSA growth rate is expected to exceed that of Illinois, which is projected to be 0.1%.

## Employment

The current estimate of total employment in the Chicago MSA is 4,745,367 jobs. Since 2009, employment grew by 455,417 jobs, equivalent to a 10.6% gain over the entire period. There were gains in employment in eight of the past ten years despite the national economic downturn and slow recovery.

The Chicago MSA's rate of change in employment outperformed the state of Illinois, which experienced an increase in employment of 8.2% or 462,683 over this period.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.                                                                14

11900 Marshfield Property LLC Real Estate Appraisal

## Employment Trends

| Year | Total Employment (Annual Average) | | | | Unemployment Rate (Ann. Avg.) | |
|---|---|---|---|---|---|---|
| | Chicago MSA | Change | Illinois | Change | Chicago MSA | Illinois |
| 2009 | 4,289,950 | | 5,654,717 | | 10.2% | 10.2% |
| 2010 | 4,244,508 | -1.1% | 5,609,608 | -0.8% | 10.6% | 10.4% |
| 2011 | 4,304,758 | 1.4% | 5,674,917 | 1.2% | 9.9% | 9.7% |
| 2012 | 4,376,150 | 1.7% | 5,749,600 | 1.3% | 9.1% | 9.0% |
| 2013 | 4,444,442 | 1.6% | 5,803,600 | 0.9% | 9.1% | 9.0% |
| 2014 | 4,510,900 | 1.5% | 5,878,883 | 1.3% | 7.1% | 7.1% |
| 2015 | 4,596,408 | 1.9% | 5,968,108 | 1.5% | 5.9% | 6.0% |
| 2016 | 4,660,508 | 1.4% | 6,019,017 | 0.9% | 5.8% | 5.8% |
| 2017 | 4,700,625 | 0.9% | 6,063,433 | 0.7% | 4.9% | 4.9% |
| 2018 | 4,745,367 | 1.0% | 6,117,400 | 0.9% | 4.2% | 4.3% |
| **Overall Change 2009-2018** | **455,417** | **10.6%** | **462,683** | **8.2%** | | |
| Avg Unemp. Rate 2009-2018 | | | | | 7.7% | 7.6% |
| Unemployment Rate - Dec 2018 | | | | | 4.0% | 4.4% |

Source: Bureau of Labor Statistics. County employment is from the Quarterly Census of Employment & Wages (QCEW), all other areas use the Current Employment Survey (CES). Unemployment rates use the Current Population Survey (CPS). Data is not seasonally adjusted.

A comparison of unemployment rates is another way of gauging an area's economic health, where a higher unemployment rate is a negative indicator. Over the past decade, the Chicago MSA unemployment rate of 7.7% has been comparable to the Illinois rate; however, in the latter half of the decade the Chicago MSA unemployment has consistently overperformed Illinois. Recent data shows that the Chicago MSA unemployment rate is 4.0%, in comparison to a 4.4% rate for Illinois, a positive sign for the Chicago MSA economy.

## Employment Sectors

The composition of the Chicago MSA job market is illustrated in the chart below, paired with that of Illinois. Total employment for the two areas is stratified by eleven major employment sectors, ranked from largest to smallest based on the percentage of Chicago MSA jobs in each sector.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

15



11900 Marshfield Property LLC Real Estate Appraisal



## Employment Sectors - 2018

Source: Esri 2019. Compiled by JLL Valuation & Advisory Services, LLC.

The Chicago MSA has a greater percentage employment than Illinois in the following categories:

- Leisure, Hospitality - which accounts for 9.6% of Chicago MSA payroll employment compared to 9.1% for Illinois as a whole. This sector includes employment in hotels, restaurants, recreation facilities, and arts and cultural institutions.
- Professional, Business Services - which accounts for 9.0% of Chicago MSA payroll employment compared to 7.9% for Illinois as a whole. This sector includes legal, accounting, and engineering firms, as well as management of holding companies.
- Financial Activities - which accounts for 7.6% of Chicago MSA payroll employment compared to 7.3% for Illinois as a whole. Banking, insurance, and investment firms are included in this sector, as are real estate owners, managers, and brokers.
- Information - which accounts for 1.8% of Chicago MSA payroll employment compared to 1.6% for Illinois as a whole. Publishing, broadcasting, data processing, telecommunications, and software publishing are included in this sector.

The Chicago MSA is underrepresented in the following categories:

- Education, Health Services - which accounts for 22.0% of Chicago MSA payroll employment compared to 23.0% for Illinois as a whole. This sector includes employment in public and private schools, colleges, hospitals, and social service agencies.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

16

11900 Marshfield Property LLC Real Estate Appraisal

- Manufacturing - which accounts for 11.6% of Chicago MSA payroll employment compared to 11.8% for Illinois as a whole. This sector includes all establishments engaged in the manufacturing of durable and nondurable goods.
- Government - which accounts for 3.3% of Chicago MSA payroll employment compared to 3.7% for Illinois as a whole. This sector includes public administration at the federal, state, and county level, as well as other government positions.
- Natural Resources, Mining - which accounts for 0.4% of Chicago MSA payroll employment compared to 1.1% for Illinois as a whole. Agriculture, mining, quarrying, and oil and gas extraction are included in this sector.

## Major Employers

The table below contains major employers in the Chicago MSA.

### Major Employers - Chicago MSA

| | Name | Number of Employees |
|---|---|---|
| 1 | Advocate Health Care System | 18,308 |
| 2 | University of Chicago | 16,197 |
| 3 | Northwestern Memorial Healthcare | 15,317 |
| 4 | JPMorgan Chase & Co. | 14,158 |
| 5 | United Continental Holdings Inc. | 14,000 |
| 6 | Walgreen Co. | 13,006 |
| 7 | Health Care Service Corp. | 13,006 |
| 8 | Presence Health | 10,500 |
| 9 | Abbott Laboratories | 10,000 |
| 10 | Northwestern University | 9,708 |
| 11 | Jewel-Osco Stores | 9,660 |
| 12 | Chicago Transit Authority | 9,510 |
| 13 | University of Illinois | 9,212 |
| 14 | Northern Illinois University | 9,094 |
| 15 | Abbott Laboratories | 9,000 |
| 16 | Naval Station Great Lakes | 9,000 |
| 17 | American Airlines | 8,900 |
| 18 | Rush University Medical Center | 8,273 |
| 19 | AT&T | 8,000 |
| 20 | Allstate Insurance Co. | 7,800 |

Sources(s): Crain's Book of Lists, 2016; DeKalb County Economic Development Corporation, 2017; Go Hammond, 2017; Kenosha Area Business Alliance, 2016; Crain's Chicago, 2015; DeKalb County, 2016; Indiana Workforce Development Department, 2017; Kenosha Area Business Alliance, 2017; Kane County, 2016; Jasper County, 2017; Lake County Partners, 2016

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

17

11900 Marshfield Property LLC Real Estate Appraisal

## Gross Domestic Product

Based on Gross Domestic Product (GDP), the Chicago MSA is the third largest metropolitan area economy in the nation.

Economic growth, as measured by annual changes in GDP, has been somewhat higher in the Chicago MSA than Illinois overall during the past nine years. The Chicago MSA has expanded at a 0.9% average annual rate while the state of Illinois has grown at a 0.7% rate. As the national economy improves, the Chicago MSA continues to outperform Illinois. GDP for the Chicago MSA rose by 1.5% in 2017 while Illinois's grew by 0.4%.

The Chicago MSA has a per capita GDP of $61,170, which is 5.0% greater than Illinois's GDP of $58,217. This means that the Chicago MSA industries and employers are adding relatively more value to the economy than their peers in Illinois.

### Gross Domestic Product

| Year | ($ mil) Chicago MSA | Change | ($ mil) Illinois | Change |
|---|---|---|---|---|
| 2008 | $536,771 | | $699,430 | |
| 2009 | $516,756 | -3.7% | $682,966 | -2.4% |
| 2010 | $522,484 | 1.1% | $694,961 | 1.8% |
| 2011 | $529,860 | 1.4% | $707,060 | 1.7% |
| 2012 | $545,392 | 2.9% | $720,702 | 1.9% |
| 2013 | $543,675 | -0.3% | $724,616 | 0.5% |
| 2014 | $552,838 | 1.7% | $734,218 | 1.3% |
| 2015 | $566,619 | 2.5% | $740,808 | 0.9% |
| 2016 | $574,603 | 1.4% | $742,272 | 0.2% |
| 2017 | $583,137 | 1.5% | $745,292 | 0.4% |
| Compound % Chg (2008-2017) | | 0.9% | | 0.7% |
| GDP Per Capita 2017 | $61,170 | | $58,217 | |

Source: Bureau of Economic Analysis. The release of state and local GDP data has a longer lag time than national data. The data represents inflation-adjusted "real" GDP stated in 2009 dollars.

Gross Domestic Product is a measure of economic activity based on the total value of goods and services produced in a specific geographic area. The figures in the table above represent inflation adjusted "real" GDP stated in 2009 dollars.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

13

## Household Income

The Chicago MSA has a higher level of household income than Illinois. Median household income for the Chicago MSA is $67,062, which is 9.5% higher than Illinois.

### Median Household Income - 2018

| | Median |
|---|---|
| Chicago MSA | $67,062 |
| Illinois | $61,255 |
| **Comparison of Chicago MSA to Illinois** | **9.5%** |

Source: Esri 2019. Compiled by JLL Valuation & Advisory Services, LLC.

The following chart shows the distribution of households across nine income levels.

### Household Income Distribution - 2018



Source: Esri 2019. Compiled by JLL Valuation & Advisory Services, LLC.

The Chicago MSA has a smaller concentration of households in the lower income levels than Illinois. Specifically, 26% of the Chicago MSA households are below the $35,000 level in household income as compared to 29% of Illinois households. A greater concentration of households exists in the higher income levels, as 46% of the Chicago MSA households are at the $75,000 or greater levels in household income versus 42% of Illinois households.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Education and Age

Residents of the Chicago MSA have a higher level of educational attainment than those in Illinois. An estimated 38% of the Chicago MSA residents are college graduates with four-year degrees or higher, while Illinois residents have an estimated 35% with at least a four-year degree. People in the Chicago MSA are younger than their peers in Illinois. The median age of the Chicago MSA is 37 years, while Illinois is 38 years.

### Education & Age - 2018



Source: Esri 2019. Compiled by JLL Valuation & Advisory Services, LLC.

## Conclusion

The Chicago MSA's economy will benefit from a stable to slightly growing population base, and higher income and education levels. The Chicago MSA saw an increase in the number of jobs in the past 10 years, and it can be anticipated that employment growth will continue in the future. Furthermore, the Chicago MSA is well-positioned from being the third most populous metropolitan area in the country and having both a higher rate of GDP growth in the past nine years and a higher level of GDP per capita than Illinois overall. We project that the Chicago MSA's economy will improve and employment will grow, strengthening the demand for real estate overall.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Area Map



Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

21

<div align="right"><span style="color:red">11900 Marshfield Property LLC</span> Real Estate Appraisal</div>

## Market Area Analysis

## US Gas Stations with Convenience Stores Market Analysis

### About the Industry

Industry operators sell automotive fuels such as gasoline and diesel from stations that are collocated with convenience stores or food marts. They may also provide automotive repair services. Major oil producers that franchise out most of their convenience operations are not included, unless they own and operate a significant number of sites.



Products and services segmentation (2019)

- 5.6% Diesel
- 10.0% Groceries
- 12.2% Midgrade and premium gasoline
- 13.2% Other
- 59.0% Regular gasoline

SOURCE: WWW.IBISWORLD.COM

### Industry Performance

The Gas Stations with Convenience Stores industry has experienced volatility over the five years to 2019. Industry revenue is heavily dependent on trends in gasoline sales and prices since it is the industry's primary input. Drastic declines in the world price of crude oil throughout most of the period led industry revenue to fall until 2016. In particular, the world price of crude oil tumbled an estimated 47.2% in 2015. Although the world price of crude oil has since returned to growth, boosting industry revenue, gains have not been substantial enough to completely counteract the declines experienced prior to 2017. As a result, industry revenue is ultimately projected to decline at an annualized rate of 2.7% to $399.2 billion over the five years to 2019. With oil prices expected to only rise marginally in 2019, industry revenue is expected to decline again, falling 5.9%.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

22

11900 Marshfield Property LLC Real Estate Appraisal

Since the majority of the industry's business is generated from consumers rather than commercial businesses, consumer spending plays a major role in determining the industry's performance. Consumer spending has increased over the five years to 2019, boosting spending at industry establishments. Coupled with low oil prices, this trend has also encouraged consumers to trade up to premium grades of vehicle fuel, facilitating profit growth. Moreover, the decline in the world price of crude oil has enabled operators to lower purchase costs without passing on all of the savings to consumers, boosting the average industry profit margin. With storeowners already relying more on convenience store sales because in-store products are more profitable than gasoline, industry profit margins have reached some of their historically highest levels over the past five years.

## Current Performance

Revenue for the Gas Stations with Convenience Stores industry has changed in line with volatile fuel prices over the five years to 2019. The world price of crude oil, disposable income levels and driving habits have strong influences on industry revenue. While total vehicle miles and per capita disposable income have increased during the five-year period, the world price of crude oil, the industry's most-significant revenue driver, has fallen substantially. As a result, industry revenue declined drastically early during the period. Although revenue has increased over the past two years, primarily as the result of oil prices returning to growth in 2017, this growth will not be substantial enough to mitigate the declines experienced early in the period. Consequently, industry revenue is expected to decline at an annualized rate of 2.7% to $399.2 billion during the five-year period.

## Forecast

Demand for retail fuel is expected to grow over the five years to 2024 as the economy continues to grow. However, prices at gasoline pumps are expected to remain comparatively low, resulting in only moderate growth in the retail price of fuel. Volume sales are expected to grow as a result, with falling prices enabling consumers to purchase more gasoline. In addition, some consumers will trade up to higher grades of gasoline as disposable income rises, aiding revenue growth. Nonetheless, the growth of fuel-efficient vehicle purchases in the United States is anticipated to continue to offset higher sales volumes. Overall, revenue is expected to increase at an annualized rate of 2.7% to $455.7 billion over the five years to 2024.

## Profitability

A longstanding challenge for industry operators has been keeping gas prices at the pump low when the price of crude oil rises. Due to declining demand for vehicle fuel, many gas stations were forced to mark down or only marginally increase the price of retail gas even as crude oil prices increased. However, store owners have begun to focus more on their convenience store businesses, by offering a wide variety of goods inside their stores, including prepackaged meals and healthier snack options. These store items are far more profitable compared with gasoline. Declines in the world price of crude oil during the early part of the period have also led to an increase in profitability across the industry. When crude oil prices decline, operators are better able to pass on these costs to consumers. Consequently, the recent decline in the world price of crude oil has led operators' profit margins to increase. In 2018, industry profit margins (measured as earnings before interest and taxes) are expected to reach 2.3% of revenue, up from 1.9% in 2014. However, mounting credit card fees have continued to pressure operators' profit margins. In fact, operators paid a record $11.2 billion in credit and debit card fees (latest data available), according to the National Association of Convenience Stores. Contending with eroding earnings, some store owners have begun offering discounts on purchases made with cash to deter consumers from using credit and debit cards.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

23

11900 Marshfield Property LLC Real Estate Appraisal

## Major Markets



Major market segmentation (2019)

2.7% Other consumers

10.8% Individuals aged 65 and over

12.0% Individuals under age 25

41.0% Individuals aged 35 to 54

16.1% Individuals aged 25 to 34

17.4% Individuals aged 55 to 64

Total $399.2bn

SOURCE: WWW.IBISWORLD.COM

Gas stations with convenience stores are an integral part of most Americans' everyday lives. Many consumers fill up their vehicle's gas tank at least once a week. Consumers also stop by convenience stores for a cup of coffee on their way to work or pick up a gallon of milk or a six-pack of beer before heading home in the evening. Consequently, individual consumers comprise an estimated 97.2% of the market for gas stations with convenience stores. Since only about half of industry operators sell diesel fuel, according to the US Census Bureau, other consumers, such as trucking and transportation companies, account for only 2.8% of this industry's market.

## Competitive Landscape

Concentration in the Gas Stations with Convenience Stores industry is low, with the top two operators accounting for only 16.3% of industry revenue in 2019. Industry concentration has decreased over the past decade as more prominent companies in the industry divested gas stations to concentrate on a few profitable locations. Furthermore, skyrocketing crude oil prices during the recession prompted many oil companies to concentrate on upstream activities such as exploration and production. Despite these trends, Alimentation Couch-Tard's acquisitions of The Pantry in 2015 and CST in 2017 have led to an increase in market share concentration. Additionally, the large size of the US market (both in terms of volume and geographic area) contributes to the low level of concentration. Although some industry participants have national coverage, many smaller operators cover a specific geographic region.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

# Key Statistics

## Industry Data

| | Revenue ($m) | Industry Value Added ($m) | Establishments | Enterprises | Employment | Exports | Imports | Wages ($m) | Domestic Demand |
|---|---|---|---|---|---|---|---|---|---|
| 2010 | 401,379.2 | 20,829.7 | 101,709 | 60,490 | 703,629 | – | – | 14,006.3 | N/A |
| 2011 | 470,257.8 | 23,519.1 | 101,316 | 60,209 | 705,875 | – | – | 13,831.8 | N/A |
| 2012 | 482,131.6 | 22,130.4 | 105,439 | 62,766 | 728,588 | – | – | 14,319.8 | N/A |
| 2013 | 472,596.4 | 23,970.8 | 104,289 | 62,482 | 747,094 | – | – | 14,518.9 | N/A |
| 2014 | 457,352.1 | 27,428.1 | 104,096 | 62,813 | 763,699 | – | – | 15,079.6 | N/A |
| 2015 | 375,314.6 | 28,871.9 | 104,548 | 63,097 | 782,489 | – | – | 15,735.9 | N/A |
| 2016 | 352,159.7 | 28,324.1 | 104,529 | 63,960 | 804,235 | – | – | 16,350.7 | N/A |
| 2017 | 378,761.7 | 28,861.4 | 105,609 | 64,820 | 815,433 | – | – | 16,362.3 | N/A |
| 2018 | 424,288.6 | 30,631.5 | 106,722 | 65,555 | 820,012 | – | – | 16,323.2 | N/A |
| 2019 | 399,222.9 | 29,244.0 | 104,513 | 64,418 | 788,772 | – | – | 15,536.3 | N/A |
| 2020 | 409,434.4 | 30,187.0 | 105,819 | 65,214 | 803,854 | – | – | 15,893.2 | N/A |
| 2021 | 421,624.3 | 31,418.1 | 107,325 | 66,121 | 821,542 | – | – | 16,314.9 | N/A |
| 2022 | 432,898.9 | 32,478.1 | 108,685 | 66,938 | 838,206 | – | – | 16,710.5 | N/A |
| 2023 | 444,344.3 | 33,745.8 | 110,093 | 67,768 | 855,329 | – | – | 17,116.2 | N/A |
| 2024 | 455,729.8 | 35,051.8 | 111,601 | 68,665 | 873,307 | – | – | 17,535.5 | N/A |
| Sector Rank | 5/63 | 7/63 | 7/63 | 9/63 | 7/63 | N/A | N/A | 8/63 | N/A |
| Economy Rank | 21/694 | 110/694 | 76/694 | 102/694 | 46/694 | N/A | N/A | 117/694 | N/A |

## Conclusion

Despite volatile trends in the world price of crude oil over the five years to 2019, positive changes in consumer behavior benefited operators in the Gas Stations with Convenience Stores industry. Unemployment has declined each year during the five-year period, causing total vehicle miles to increase as more people travel to and from work, boosting demand for gasoline. Moreover, per capita disposable income has grown during the current five-year period, enabling these consumers to upgrade to higher fuel grades and make more purchases on goods sold inside industry convenience stores.

However, sales of eco-friendly cars, such as hybrids and electric vehicles, have started to take off during the five-year period. More consumers have invested in these vehicles recently to save on fuel costs as gasoline prices continued to inch up. Although hybrids and electric cars account for less than 4.0% of the total vehicle market in the United States, the growing use of such vehicles is threatening retail gasoline sales, according to the Electric Drive Transportation Association. Fuel efficient vehicles consume less fuel than regular cars and, therefore, help reduce demand for gasoline. Greater adoption and use of these alternative vehicles have caused industry revenue growth to marginally decelerate.

# Car Wash and Auto Detailing Market Analysis

## Summary

According to the latest IBISWorld report published for the car wash and auto detailing industry (August 2018), The Car Wash and Auto Detailing industry has experienced steady growth over the five years to 2018, as the economy continued to grow and industry operators reaped the benefits of rising employment and per capita disposable income. Severe drops in oil prices during a majority of the five-year period have also encouraged more consumers to hit the road, as lower gas prices translated to a greater amount of car use. As a result,

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

25

consumers were more likely to purchase discretionary services, such as car washes and auto detailing. Over the five years to 2018, revenue is anticipated to increase at an annualized rate of 3.6% to $11.4 billion. Continued growth in per capita disposable income will boost industry revenue; however, rising crude oil prices will limit industry growth. As a result, industry revenue is anticipated to grow 2.5% in 2018.

Average industry profit is expected to rise from 14.2% of revenue in 2013 to 16.8% in 2018. In line with rising profit margins, the number of industry enterprises is expected to increase at an annualized rate of 1.8% to 64,714 operators over the five years to 2018. This profit growth stems from changes in product offerings by industry operators. Companies have diversified their offerings to build a stronger customer base, implementing value-added services such as interior cleaning, waxing and rim shining in addition to their more basic packages. Moreover, companies have revamped waiting rooms to offer Wi-Fi, TV and coffee lounges to generate repeat customers.

Demand for services provided by the Car Wash and Auto Detailing industry is expected to continue expanding over the five years to 2023, albeit at a slower pace than the previous five-year period. Consequently, industry revenue is projected to increase at an annualized rate of 2.1% to $12.7 billion. Industry revenue will be bolstered by rising per capita disposable income, which will increase consumers' propensity to spend on discretionary services, such as car washes. Furthermore, environmental awareness of water usage will increase demand for professional car washing because professional services typically use less than one-third of the water used by residential car washing. Nevertheless, rising oil prices will hamper demand somewhat, as more money at the pump will discourage liberal driving habits, resulting in a smaller pool of potential consumers over the next five years.



## Products and services segmentation (2018)

6.1% Hand washing

11.3% Self-service bay

13.1% Detailing

20.0% In-bay automatic car washes

25.2% Exterior only clean (conveyor car washes)

24.3% Full-service clean (conveyor car washes)

Total $11.4bn

SOURCE: WWW.IBISWORLD.COM

## Key External Drivers

### Per Capita Disposable Income
Demand for car wash and detailing services depends on the level of per capita disposable income because these services are generally considered discretionary. Growth in disposable income boosts discretionary

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

spending and demand for industry services. Per capita disposable income is expected to increase in 2018, representing a potential opportunity for the industry.

### Number of Motor Vehicle Registrations

Demand for car washing services positively correlates with growth in the number of US motor vehicles. As the number of vehicles increases, demand for aftermarket services, such as car washes, also increases. The number of motor vehicle registrations is expected to increase in 2018.

### Households earning more than $100,000

Households that earn over $100,000 account for over a quarter of the industry's market. These households are more likely to purchase detailing services and conveyor car washes, which are considerably more costly than other industry services. The number of households earning more than $100,000 is expected to increase in 2018.

### World Price of Crude Oil

Rising gas prices typically encourage consumers to carpool or use public transportation, reducing demand for industry services. Furthermore, as gas prices climb, consumers' disposable incomes fall, reducing their ability to spend on discretionary services such as car washes. The world price of crude oil is expected to increase in 2018, posing a potential threat to the industry.



### Industry Outlook

Over the five years to 2022, revenue for the Car Wash and Auto Detailing industry is forecast to rise at an annualized rate of 1.8% to $11.5 billion. Industry operators will benefit from rising per capita disposable income, which will fuel increased spending on discretionary services, including car washing and auto detailing. However, rising oil and gas prices are expected to hamper industry revenue growth somewhat, as some consumers will reduce driving and return to money-saving habits like carpooling and public transit. Industry operators that offer basic services could therefore experience increased price competition and pressured profit margins over the next five years. Operators may offer discounts for basic car washes in order to sustain demand, slightly diluting the effects of cost-saving measures industry operators have adopted to mitigate increasing operating costs.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved. 27

Nevertheless, per capita disposable income growth is one of the main determinants of demand for this industry's services. As unemployment remains steady, per capita disposable income is expected to grow at an annualized rate of 2.9% over the five years to 2022. Therefore, many consumers are still more likely to spend on discretionary services such as car washing and auto detailing. Furthermore, local regulations prohibiting residential car washing are expected to become more common, generating a larger client base for industry operators. While some industry operators could potentially end up contending over a shrinking pool of potential clientele for the aforementioned reasons, the number of vehicles in use in the United States is projected to rise steadily over the next five years, further expanding the industry's overall customer base.

## Major Markets

Data from the US Census Bureau shows that households are the dominant market segment for the Car Wash and Auto Detailing industry. The household sector will account for an estimated 69.7% of total industry revenue in 2018. The households segment can be further broken down based on several factors, including income, age, geographic location and family structure. Given the discretionary nature of the industry, an indication of major markets can best be inferred on the basis of annual expenditure based on income.

### Households

Car wash customers can be broadly defined as individuals who are older than 16 years and own a driver's license and a car. Household users of car wash services are segmented according to income brackets. According to the Bureau of Labor Statistics, households from the two highest income brackets, or individuals earning over $150,000 a year, are the largest source of demand from households for industry services, accounting for 26.6% of the industry's revenue. These consumers are more likely to purchase detailing services, hand wash services and conveyer-type car washes, which are considerably costlier. Additionally, these individuals tend to have more expensive cars and have a larger incentive to maintain the condition of their vehicle, opting to get their cars washed more frequently.

Conversely, individuals in the three lowest income brackets, or those earning below $40,000, account for the smallest share of demand for the industry's services. Sales to this market make up a total of 11.5% of the industry's revenue. These households are more likely to perform car washing themselves or use self-service facilities, which are considerably less expensive and thus generate less revenue. Furthermore, individuals in this segment are more likely to take advantage of public transportation, minimizing the use of their vehicle or opting out of owning a vehicle altogether.

At the same time, consumers living in apartment buildings are more likely to have their car washed at a professional car wash rather than at home due to space and environmental issues. The same rings true for individuals living in homes without garages as their cars are more likely to get dirty than cars parked in covered or locked garages.

### Vehicle Usage

According to the Bureau of Transportation Statistics and IBISWorld estimates, the number of vehicles in use has increased to 271.5 million in 2017. In terms of new car sales, sales volumes have increased in recent years. Since 2012, new car sales rebounded as consumer and business confidence increased, and per capita disposable incomes grew along with the economic recovery. Households were more willing to make discretionary purchases, including cars and car wash services. This trend has ultimately aided industry revenue during the five-year period.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

Vehicle usage statistics from the Federal Department of Transportation and IBISWorld estimates show that passenger vehicles account for 58.5% of total motor vehicle registrations in the United States and a commensurate share of the total vehicle miles traveled. Four- and six-axle trucks and composite trucks account for 39.0% of total vehicle registrations and 41.0% of total vehicle miles traveled. However, trucks account for a small proportion of industry revenue, as they are more likely to be washed in-house. IBISWorld estimates that about 80.0% of total passenger vehicle miles traveled are by households and the balance principally goes to corporate vehicles. The vast majority of trucks are registered to private sector owners, either general business or freight companies.



Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

29

11900 Marshfield Property LLC Real Estate Appraisal

## Business Locations



Distribution of establishments vs. population

SOURCE: WWW.IBISWORLD.COM

The distribution of car wash establishments is highly correlated with population levels and weather patterns. Regions with a warmer climate and lower rainfall typically have a higher usage of car washing services. Furthermore, the number of vehicles in particular regions also determines the industry's distribution.

### Southeast
The Southeast is the number one destination for industry operators. An estimated 24.1% of car wash establishments are located in the region. This is in line with population levels; 25.7% of the population resides in the area. The region accounts for the largest share of passenger vehicles in the United States, at 23.9% of the total, according to the National Automotive Dealers Association. Florida has the highest share of establishments in the region, with 6.8% of the total. Not only is Florida one of the most populated states in the region, but it also has a warm climate, which generally leads to a higher demand for car washing services.

### Great Lakes
The Great Lakes has the second-largest share (15.3%) of industry operators. Like the Southeast, the Great Lakes region has a high share of the population and, correspondingly, a high share of passenger vehicles, which is estimated at 17.2%. Commercial clients make up a larger share of demand for this region. The Great Lakes is a major destination for used car and new car dealers. The region has the second-highest share of new and used car dealerships in the United States. Car dealerships subcontract with car wash operators for washing, waxing, vacuuming and detailing services.

### West
The West has the third-highest share of industry establishments and is the second-largest generator of revenue for the industry. An estimated 17.1% of the nation's car wash facilities are located in the West. Industry activity is dominated by California; the state alone is responsible for 12.2% of industry revenue. California has a warm climate and low precipitation, which are two key factors in driving growth in the car

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

30

washing business. Furthermore, California has more city-wide regulations prohibiting households from performing their own car washing at their home.

## Market Share Concentration

The Car Wash and Auto Detailing industry has low market share concentration. In 2018, the top four companies combined will generate an estimated 5.1% of industry revenue. The industry is characterized by a large number of small-scale operators, with the majority of companies operating on a local basis and owning just one establishment. Although the number of new companies has increased over the past five years, consolidation is common in this industry, as many prominent industry players undertook a series of acquisitions to improve the size of their customer base. In particular, Mister Car Wash showed substantial growth, largely through its acquisition activity.

## Conclusion

The car wash and auto detailing industry is projected to have continued growth in the near term. Car washes located in the Great Lakes region such as the subject have advantages including a high share of passenger vehicles and weather volatility that leads to more perceived needs for car washings. This area of the country should continue to experience accelerated growth compared to those located elsewhere. Moreover, conveyor car washes have invested in deluxe waiting rooms, Wi-Fi access and even dog washing alongside traditional services. However, the most popular car washes today are express washes, which are less labor-intensive and have more specific cleaning equipment than in-bay automatic washes. Express washes take an average of five minutes (versus 15 minutes for the standard conveyor car wash), enabling industry operators to generate a higher volume of customers.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11

# Retail Market Area Analysis

## Chicago Metro Area Trends and Analysis

The subject is located in the Chicago metro area, as defined by CoStar. Supply and demand metrics, including inventory levels, vacancy, completions, absorption, and rental rates for all classes of space are presented in the following table.

### Chicago Metro Retail Market Trends

| Year | Inventory (Bldgs) | Inventory (SF) | Vacancy (SF) | Vacancy (%) | Completions (Bldgs) | Completions (SF) | Absorption (SF) | Inventory, Under Cons (Bldgs) | Inventory, Under Cons (SF) | Effective Rent ($/SF) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | 46,838 | 573,308,239 | 46,433,069 | 8.10% | 180 | 3,441,166 | 550,970 | 99 | 1,962,847 | $16.72 |
| 2010 | 46,947 | 575,146,345 | 46,768,046 | 8.13% | 85 | 1,209,221 | 1,503,129 | 76 | 1,713,112 | $15.83 |
| 2011 | 47,018 | 576,667,016 | 46,024,501 | 7.98% | 68 | 1,604,899 | 2,264,216 | 67 | 1,337,299 | $15.68 |
| 2012 | 47,069 | 577,792,908 | 45,053,977 | 7.80% | 70 | 1,277,695 | 2,096,416 | 66 | 2,304,633 | $15.18 |
| 2013 | 47,136 | 580,209,242 | 48,096,524 | 8.29% | 96 | 2,419,107 | -626,213 | 90 | 3,180,565 | $15.32 |
| 2014 | 47,211 | 582,736,966 | 43,358,112 | 7.44% | 135 | 3,207,339 | 7,278,136 | 111 | 3,422,317 | $15.32 |
| 2015 | 47,294 | 585,670,336 | 40,727,116 | 6.95% | 148 | 3,249,243 | 5,597,914 | 136 | 3,567,172 | $15.18 |
| 2016 | 47,419 | 588,551,804 | 38,162,406 | 6.48% | 201 | 3,613,428 | 5,584,854 | 153 | 2,634,301 | $15.25 |
| 2017 | 47,601 | 590,574,037 | 34,752,365 | 5.88% | 177 | 2,756,957 | 5,296,871 | 152 | 2,758,446 | $15.58 |
| 2018 | 47,765 | 592,908,415 | 35,351,585 | 5.96% | 49 | 684,140 | 200,974 | 128 | 1,929,741 | $16.01 |
| Q1 2019 | 47,802 | 593,341,181 | 36,064,593 | 6.08% | 32 | 407,028 | -305,980 | 110 | 1,784,499 | $15.88 |
| 2009 - 2018 Average | 47,230 | 582,356,531 | 42,472,770 | 7.30% | 121 | 2,346,320 | 2,974,727 | 108 | 2,481,043 | $15.61 |

Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved. Compiled by JLL Valuation & Advisory Services, LLC.

- Inventory is currently 47,802 buildings. In the past decade, inventory averaged 47,230 buildings annually and rose 2.0%. Over that same time frame, inventory increased from a minimum of 46,838 buildings in 2009 and attained a high of 47,765 buildings in 2018.
- The most recent data shows inventory is 593,341,181 SF. Over the last decade, inventory had an annual average of 582,356,531 SF and rose 3.4%. During the same period, inventory rose from a minimum of 573,308,239 SF in 2009 and attained a high of 592,908,415 SF in 2018.
- Completions are currently 32 buildings. In the past decade, completions averaged 121 buildings annually and decreased 72.8%. Over that same time frame, completions saw a low of 49 buildings in 2018 and attained a high of 201 buildings in 2016.
- The most recent data shows completions are 407,028 SF. Over the last decade, completions had an annual average of 2,346,320 SF and declined 80.1%. During the same period, completions experienced a minimum of 684,140 SF in 2018 and attained a high of 3,613,428 SF in 2016.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal



Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved.

- Currently, vacancy is 36,064,593 SF. During the past decade, vacancy averaged 42,472,770 SF annually and declined 23.9%. Over that same time frame, vacancy experienced a minimum of 34,752,365 SF in 2017 and attained a high of 48,096,524 SF in 2013.
- Vacancy rates are presently 6.08%. Over the past decade, vacancy rates had an annual average of 7.30% and declined 214 bps. During the same period, vacancy rates reached a low of 5.88% in 2017 and achieved a peak of 8.29% in 2013.
- Currently, absorption is -305,980 SF. During the past decade, absorption averaged 2,974,727 SF annually and dropped 63.5%. Over that same time frame, absorption reached a low of -626,213 SF in 2013 and achieved a peak of 7,278,136 SF in 2014.
- Under construction inventory is presently 110 buildings. Over the past decade, under construction inventory had an annual average of 108 buildings and increased 29.3%. During the same period, under construction inventory saw a low of 66 buildings in 2012 and experienced a maximum of 153 buildings in 2016.
- Under construction inventory is currently 1,784,499 SF. In the past decade, under construction inventory averaged 2,481,043 SF annually and declined 1.7%. Over that same time frame, under construction inventory reached a low of 1,337,299 SF in 2011 and experienced a maximum of 3,567,172 SF in 2015.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

33



Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved.

## South Suburban Submarket Cluster Synopsis

The subject is located in the South Suburban submarket cluster, as defined by CoStar. To effectively gauge investor interest in the subject's submarket cluster, we evaluate key supply and demand metrics in comparison to other areas for the Total Retail category in the following table.

**South Suburban Submarket Cluster Overview: Retail Properties**

| Submarket Cluster | Inventory (Bldgs) | Inventory (SF) | Effective Rent ($/SF) | Vacancy (%) | Vacancy (SF) | Completions (SF) | Absorption (SF) | Inventory, Under Cons (SF) |
|---|---|---|---|---|---|---|---|---|
| East/West Corridor | 5,254 | 83,462,229 | $15.62 | 7.15% | 5,965,977 | 30,822 | -36,880 | 212,481 |
| I-39 Corridor/Lee County | 138 | 1,368,624 | $13.38 | 1.08% | 14,731 | 0 | 31,249 | 0 |
| I-39 Corridor/Ogle County | 204 | 1,851,922 | $10.22 | 2.78% | 51,544 | 0 | 70,978 | 11,000 |
| Indiana | 3,742 | 43,784,891 | $12.73 | 5.69% | 2,491,449 | 0 | -56,803 | 63,761 |
| Jasper County | 130 | 1,176,753 | $8.49 | 1.36% | 16,014 | 0 | 5,729 | 0 |
| Kenosha County | 1,082 | 10,667,765 | $11.44 | 2.72% | 290,286 | 3,246 | -16,441 | 5,000 |
| Metro Chicago | 786 | 16,224,404 | $43.61 | 8.59% | 1,394,180 | 84,040 | -602,664 | 35,640 |
| Near West | 2,078 | 20,535,993 | $14.00 | 5.34% | 1,096,592 | 0 | -19,323 | 0 |
| Newton County | 72 | 630,787 | $11.87 | 4.06% | 25,635 | 0 | 1,200 | 0 |
| North | 3,550 | 61,378,619 | $16.64 | 5.90% | 3,620,658 | 15,900 | 143,916 | 177,528 |
| North Chicago | 9,452 | 79,411,983 | $24.42 | 4.15% | 3,295,284 | 99,584 | -70,961 | 512,974 |
| Northwest | 5,540 | 88,585,163 | $15.08 | 6.83% | 6,050,501 | 48,843 | 68,667 | 409,845 |
| OHare | 942 | 12,723,011 | $19.72 | 3.50% | 444,890 | 0 | 55,992 | 4,400 |
| Ottawa/Peru | 812 | 8,292,027 | $8.10 | 6.47% | 536,106 | 15,000 | -6,748 | 8,958 |
| South Chicago | 6,043 | 47,612,207 | $17.40 | 4.75% | 2,263,689 | 65,488 | 119,599 | 203,101 |
| South Suburban | 6,658 | 94,294,414 | $13.92 | 7.49% | 7,059,948 | 31,038 | 74,266 | 127,311 |
| Upper Northwest | 1,319 | 21,340,389 | $9.02 | 6.78% | 1,447,109 | 13,067 | -67,756 | 12,500 |
| **Market Averages/Totals** | **47,802** | **593,341,181** | **$15.88** | **6.08%** | **36,064,593** | **407,028** | **-305,980** | **1,784,499** |

Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved. Compiled by JLL Valuation & Advisory Services, LLC.

- South Suburban accounts for 13.9% of overall building inventory in the metro area, which represents 15.9% of the metro area unit inventory.
- Effective rent in the South Suburban submarket cluster is $13.92/SF, which is 12.3% less than the metro area average of $15.88.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

34

11900 Marshfield Property LLC Real Estate Appraisal

- The submarket cluster's vacancy rate is 7.49%, which is greater than the average of 6.08% across the metro area.
- Vacancy is 7,059,948 SF in South Suburban, which is 19.6% of the total metro area vacancy of 36,064,593 SF.
- The submarket cluster has completions averaging 31,038 SF, which is 7.6% of the metro area total of 407,028 SF.
- Absorption is 74,266 SF in South Suburban, which is 24.3% of the total metro area absorption of -305,980 SF.
- The submarket cluster has under construction inventory averaging 127,311 SF, which is 7.1% of the metro area total of 1,784,499 SF.

## South Suburban Submarket Cluster Trends and Analysis

Supply and demand statistics for all classes of space in the South Suburban submarket cluster are presented in the following table.

### Chicago Metro, South Suburban Submarket Cluster Trends: Retail Properties

| Year | Inventory (Bldgs) | Inventory (SF) | Vacancy (SF) | Vacancy (%) | Absorption (SF) | Completions (Bldgs) | Completions (SF) | Inventory, Under Cons (Bldgs) | Inventory, Under Cons (SF) | Base Rent Overall ($/SF) |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 6,431 | 90,435,511 | 7,501,668 | 8.30% | 568,170 | 28 | 428,988 | 9 | 307,334 | $16.32 |
| 2011 | 6,440 | 90,750,047 | 7,332,777 | 8.10% | 483,427 | 9 | 314,536 | 8 | 110,498 | $15.15 |
| 2012 | 6,453 | 90,927,310 | 7,424,384 | 8.20% | 85,656 | 13 | 177,263 | 12 | 549,917 | $15.02 |
| 2013 | 6,477 | 91,716,242 | 7,868,460 | 8.60% | 344,856 | 24 | 788,932 | 14 | 342,061 | $14.89 |
| 2014 | 6,513 | 92,303,508 | 7,328,359 | 7.90% | 1,127,367 | 36 | 587,266 | 15 | 162,869 | $14.63 |
| 2015 | 6,546 | 92,758,769 | 7,031,256 | 7.60% | 752,364 | 33 | 455,261 | 19 | 764,262 | $14.05 |
| 2016 | 6,589 | 93,821,610 | 7,073,402 | 7.50% | 1,020,695 | 43 | 1,062,841 | 28 | 354,786 | $14.29 |
| 2017 | 6,630 | 94,270,423 | 6,283,529 | 6.70% | 1,226,686 | 40 | 436,813 | 14 | 102,603 | $13.99 |
| 2018 | 6,651 | 94,433,113 | 7,101,674 | 7.50% | -655,455 | 21 | 162,690 | 4 | 31,038 | $13.96 |
| YTD | 6,656 | 94,466,131 | 6,905,832 | 7.30% | 226,880 | 4 | 31,038 | 0 | 0 | $13.65 |
| 2010 - 2018 Average | 6,526 | 92,379,615 | 7,216,168 | 7.82% | 550,418 | 27 | 490,510 | 14 | 302,819 | $14.70 |

Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved. Compiled by JLL Valuation & Advisory Services, LLC. Note: CoStar's Submarket Cluster Performance Trends is derived from CoStar's Property Analytics database which is continuously updated to reflect current market conditions. These updates may result in inconsistencies when compared to CoStar's Submarket Cluster Snapshot data, which is derived from CoStar's Market Reports.

- Inventory is currently 6,656 buildings. In the past nine complete years, inventory averaged 6,526 buildings annually and increased 3.4%. Over that same time frame, inventory increased from a minimum of 6,431 buildings in 2010 and attained a high of 6,651 buildings in 2018.
- The most recent data shows inventory is 94,466,131 SF. Over the last nine complete years, inventory had an annual average of 92,379,615 SF and increased 4.4%. During the same period, inventory rose from a minimum of 90,435,511 SF in 2010 and achieved a peak of 94,433,113 SF in 2018.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.



**Supply and Demand Trends**

Completions (SF)    Absorption (SF)    Vacancy (%)

Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved.

- Absorption is currently 226,880 SF. In the past nine complete years, absorption averaged 550,418 SF annually and decreased 215.4%. Over that same time frame, absorption reached a low of -655,455 SF in 2018 and attained a high of 1,226,686 SF in 2017.
- The most recent data shows completions are 4 buildings. Over the last nine complete years, completions had an annual average of 27 buildings and decreased 25.0%. During the same period, completions experienced a minimum of 9 buildings in 2011 and attained a high of 43 buildings in 2016.
- Currently, completions are 31,038 SF. During the past nine complete years, completions averaged 490,510 SF annually and declined 62.1%. Over that same time frame, completions saw a low of 162,690 SF in 2018 and attained a high of 1,062,841 SF in 2016.



**Vacancy Rate vs. Base Rent Overall**

Base Rent Overall ($/SF)    Vacancy (%)

Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

36

11900 Marshfield Property LLC Real Estate Appraisal

- Currently, vacancy is 6,905,832 SF. During the past nine complete years, vacancy averaged 7,216,168 SF annually and declined 5.3%. Over that same time frame, vacancy experienced a minimum of 6,283,529 SF in 2017 and achieved a peak of 7,868,460 SF in 2013.
- Vacancy rates are presently 7.30%. Over the past nine complete years, vacancy rates had an annual average of 7.82% and decreased 80 bps. During the same period, vacancy rates experienced a minimum of 6.70% in 2017 and experienced a maximum of 8.60% in 2013.
- There was no under construction inventory in the current period. Over the past nine complete years, under construction inventory had an annual average of 14 buildings and decreased 55.6%. During the same period, under construction inventory experienced a minimum of 4 buildings in 2018 and attained a high of 28 buildings in 2016.
- There was no under construction inventory in the current period. In the past nine complete years, under construction inventory averaged 302,819 SF annually and decreased 89.9%. Over that same time frame, under construction inventory experienced a minimum of 31,038 SF in 2018 and experienced a maximum of 764,262 SF in 2015.
- The most recent data shows overall base rent is $13.65/SF. Over the last nine complete years, overall base rent had an annual average of $14.70/SF and decreased 14.5%. During the same period, overall base rent saw a low of $13.96/SF in 2018 and fell from a maximum of $16.32/SF in 2010.

## Near South Cook Submarket Synopsis

The subject is located in the Near South Cook submarket, as defined by CoStar. To effectively gauge investor interest in the subject's submarket, we evaluate key supply and demand metrics in comparison to other areas for the Total Retail category in the following table.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

17

11900 Marshfield Property LLC Real Estate Appraisal

## Chicago Metro Area: Retail Properties

| Submarket | Inventory (Bldgs) | Inventory (SF) | Effective Rent ($/SF) | Vacancy (%) | Vacancy (SF) | Completions (SF) | Absorption (SF) | Inventory, Under Cons (SF) |
|---|---|---|---|---|---|---|---|---|
| Boone County | 149 | 1,602,645 | $11.69 | 3.66% | 58,600 | 0 | -13,524 | 0 |
| Bureau County | 155 | 1,088,031 | $27.27 | 2.65% | 28,840 | 0 | -440 | 0 |
| Central Loop | 37 | 768,500 | $21.11 | 17.71% | 136,135 | 0 | -39,350 | 0 |
| Central North | 1,271 | 24,916,163 | $20.34 | 6.06% | 1,510,702 | 2,900 | 6,404 | 164,488 |
| Central Northwest | 1,032 | 14,306,743 | $13.78 | 5.14% | 735,723 | 6,000 | -23,255 | 241,300 |
| Cicero/Berwyn Area | 1,034 | 10,568,252 | $15.34 | 5.60% | 591,883 | 0 | -31,618 | 0 |
| East Loop | 29 | 2,410,138 | $30.00 | 28.73% | 692,412 | 0 | -656,725 | 0 |
| Eastern East/West Co. | 1,794 | 28,381,968 | $16.46 | 6.58% | 1,866,798 | 3,657 | -138,774 | 27,500 |
| Far North | 920 | 13,825,225 | $10.01 | 6.46% | 893,425 | 0 | -58,059 | 7,500 |
| Far Northwest | 2,436 | 33,232,482 | $14.27 | 6.20% | 2,061,610 | 12,976 | 18,462 | 51,700 |
| Far South | 856 | 11,657,856 | $12.20 | 9.99% | 1,164,731 | 0 | 69,368 | 23,458 |
| Gold Coast/Old Town | 205 | 2,186,148 | $40.73 | 5.18% | 113,163 | 0 | -15,578 | 1,725 |
| Grundy County | 306 | 2,632,254 | $14.83 | 3.65% | 96,204 | 0 | -19,661 | 0 |
| I-39 Corr/LaSalle Co. | 657 | 7,203,996 | $7.88 | 7.04% | 507,266 | 15,000 | -6,308 | 8,958 |
| I-39 Corr/Winnebago. | 1,170 | 19,737,744 | $8.92 | 7.03% | 1,388,509 | 13,067 | -54,232 | 12,500 |
| I-39 Corridor/Lee Co. | 138 | 1,368,624 | $13.38 | 1.08% | 14,731 | 0 | 31,249 | 0 |
| I-39 Corridor/Ogle C. | 204 | 1,851,922 | $10.22 | 2.78% | 51,544 | 0 | 70,978 | 11,000 |
| Indiana | 2,766 | 32,784,936 | $12.37 | 6.69% | 2,194,010 | 0 | -67,624 | 25,761 |
| Jasper County | 130 | 1,176,753 | $8.49 | 1.36% | 16,014 | 0 | 5,729 | 0 |
| Joliet/Central Will | 2,302 | 35,919,772 | $14.48 | 6.02% | 2,160,741 | 26,038 | 138,400 | 58,783 |
| Kenosha East | 937 | 9,910,282 | $11.50 | 2.70% | 267,354 | 3,246 | -16,567 | 5,000 |
| Kenosha West | 145 | 757,483 | $8.33 | 3.03% | 22,932 | 0 | 126 | 0 |
| Lincoln Park | 1,231 | 10,722,743 | $31.64 | 4.82% | 516,634 | 74,707 | 14,668 | 114,307 |
| Melrose Park Area | 545 | 5,989,731 | $11.84 | 6.47% | 387,402 | 0 | 14,967 | 0 |
| Near North | 1,359 | 22,637,231 | $19.37 | 5.37% | 1,216,531 | 13,000 | 195,571 | 5,540 |
| Near South Cook | 2,451 | 29,855,552 | $13.55 | 8.67% | 2,588,231 | 5,000 | -201,412 | 45,070 |
| Newton County | 72 | 630,787 | $11.87 | 4.06% | 25,635 | 0 | 1,200 | 0 |
| North Branch/Goose I. | 267 | 4,787,883 | $30.33 | 5.96% | 285,403 | 0 | -37,536 | 49,270 |
| North DuPage | 611 | 11,807,737 | $15.27 | 8.00% | 944,085 | 0 | -63,300 | 3,520 |
| North Michigan Avenu. | 123 | 5,301,476 | $130.35 | 3.97% | 210,491 | 34,040 | 60,171 | 0 |
| Northwest City | 7,749 | 61,715,209 | $22.11 | 3.86% | 2,380,084 | 24,877 | -32,515 | 347,672 |
| Oak Park Area | 499 | 3,978,010 | $19.11 | 2.95% | 117,307 | 0 | -2,672 | 0 |
| OHare | 942 | 12,723,011 | $19.72 | 3.50% | 444,890 | 0 | 55,992 | 4,400 |
| Porter County | 976 | 10,999,955 | $14.19 | 2.70% | 297,439 | 0 | 10,821 | 38,000 |
| River North | 178 | 2,441,787 | $37.61 | 4.84% | 118,181 | 0 | 7,717 | 0 |
| River West | 313 | 2,914,706 | $47.90 | 5.01% | 146,086 | 50,000 | 11,225 | 10,440 |
| Schaumburg Area | 1,461 | 29,238,201 | $16.38 | 7.90% | 2,309,083 | 29,867 | 136,760 | 113,325 |
| South Chicago | 6,043 | 47,612,207 | $17.40 | 4.75% | 2,263,689 | 65,488 | 119,599 | 203,101 |
| South Loop | 50 | 1,632,622 | $35.69 | 4.00% | 65,271 | 0 | 12,098 | 25,200 |
| South Route 45 | 743 | 14,228,980 | $15.04 | 7.38% | 1,050,041 | 0 | 87,571 | 0 |
| West Loop | 56 | 755,175 | $34.37 | 3.39% | 25,604 | 0 | 2,200 | 0 |
| Western East/West Co. | 3,460 | 55,080,261 | $15.42 | 7.44% | 4,099,179 | 27,165 | 101,894 | 184,981 |
| **Market Averages/Totals** | **47,802** | **593,341,181** | **$15.88** | **6.08%** | **36,064,593** | **407,028** | **-305,980** | **1,784,499** |

Source: ©CoStar, Inc. 2019. Reprinted with the permission of CoStar, Inc. All rights reserved.

- The submarket accounts for 5.1% of overall building inventory in the metro area, which represents 5.0% of the metro area unit inventory.
- The submarket's effective rent is $13.55/SF, which is 14.7% less than the metro area average of $15.88.
- The submarket's vacancy rate is 8.67%, which is greater than the average of 6.08% across the metro area.
- The submarket has vacancy averaging 2,588,231 SF, which is 7.2% of the metro area total of 36,064,593 SF.
- The submarket has completions averaging 5,000 SF, which is 1.2% of the metro area total of 407,028 SF.
- The submarket has absorption averaging 201,412 SF, which is 65.8% of the metro area total of -305,980 SF.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

38

11900 Marshfield Property LLC Real Estate Appraisal

- The submarket has under construction inventory averaging 45,070 SF, which is 2.5% of the metro area total of 1,784,499 SF.

## Retail Marketplace Profile

Retail sales levels in the subject's market are a fundamental indicator of demand. Given their considerable relevance, we have studied a Retail Marketplace Profile obtained from Esri and presented a summary in the following table. The opportunity gap or surplus available represents the difference between demand (retail potential) and supply (retail sales). An opportunity gap for new retail business is present when demand exceeds supply; however, when supply is greater than demand, there is already a surplus of retail volume in the radius analyzed. A positive value in the Opportunity Gap/Surplus column conveys a retail gap, a negative value signifies a surplus. The color-coding in this column is such that the retail group with the lowest value and highest value are assigned pure red and green, respectively, with the pure yellow band indicating the retail category in the 50th percentile of the groups shown. This analysis was performed considering retail sales within a 5-mile radius of the subject.

### Retail Marketplace Profile: 5-mile radius

| Retail Store Type | Demand (Retail Potential) | Supply (Retail Sales) | Opportunity Gap/Surplus |
|---|---|---|---|
| Motor Vehicle & Parts Dealers | $827,014,249 | $471,719,461 | $355,294,788 |
| Furniture & Home Furnishings Stores | $131,417,337 | $91,760,818 | $39,656,519 |
| Electronics & Appliance Stores | $150,925,607 | $118,064,253 | $32,861,354 |
| Bldg Materials, Garden Equip. & Supply Stores | $273,993,843 | $272,826,268 | $1,167,575 |
| Food & Beverage Stores | $660,757,146 | $796,777,454 | -$136,020,308 |
| Health & Personal Care Stores | $266,829,735 | $236,896,904 | $29,932,831 |
| Gasoline Stations | $417,750,083 | $427,540,693 | -$9,790,610 |
| Clothing & Clothing Accessories Stores | $214,133,803 | $125,400,826 | $88,732,977 |
| Sporting Goods, Hobby, Book & Music Stores | $102,810,604 | $35,532,992 | $67,277,612 |
| General Merchandise Stores | $683,318,327 | $605,036,328 | $78,281,999 |
| Miscellaneous Store Retailers | $143,581,722 | $105,005,534 | $38,576,188 |
| Nonstore Retailers | $109,649,769 | $45,044,917 | $64,604,852 |
| Food Services & Drinking Places | $437,833,605 | $417,698,105 | $20,135,500 |
| **Total Retail Sales including Eating & Drinking Places** | **$4,420,015,830** | **$3,749,304,553** | **$670,711,277** |

Source: Esri

- The total retail opportunity gap between demand (retail potential) and supply (retail sales) within a 5 mile radius of the subject property is $670,711,277.
- The Motor Vehicle & Parts Dealers retail category shows the largest opportunity gap within a 5-mile radius of the subject property, equal to total value of $355,294,788.
- The least amount of retail opportunity is seen in the Food & Beverage Stores category, which has a surplus of $136,020,308 within a 5-mile radius of the subject property.
- There were 11 retail store categories with an opportunity gap within a 5 mile radius of the subject property.
- There were 2 retail store categories with a surplus within a 5 mile radius of the subject property.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

39

11900 Marshfield Property LLC Real Estate Appraisal

## Chicago Construction Activity

The ensuing table contains a snapshot of construction activity and average size for all retail properties in the Chicago metro area that are under construction.



The following table shows a summary of recent completions by building size for all retail properties in the Chicago metro area.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

40

**11900 Marshfield Property LLC** Real Estate Appraisal

**RECENT DELIVERIES**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 1 | 549 E 162nd St | ★★★★☆ | 5,000 | 1 | May-2018 | Feb-2019 | - |
| 2 | 96 Point Crossings 9601 S Pulaski Rd | ★★★★☆ | 5,974 | 1 | Jun-2018 | Dec-2018 | FHS Architecture FHS Architecture |
| 3 | Phase V Retail Bldg 13430 Cicero Ave | ★★★★☆ | 6,970 | 1 | Mar-2018 | Aug-2018 | Zipps Jb N Beck Llc |
| 4 | Building L 9500 S Western Ave | ★★★★☆ | 16,480 | 1 | Aug-2017 | Jun-2018 | Lormax Stern Development Com... |
| 5 | 159th/Cicero Oak Forest,... 15850-15852 Cicero Ave | ★★★★☆ | 4,972 | 1 | Aug-2016 | Apr-2018 | Continuum Holdings LLC |

**UNDER CONSTRUCTION**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 1 | 7000 S Harlem Ave | ★★★★☆ | 14,705 | 1 | Jul-2018 | May-2019 | - |
| 2 | 7887-7889 S Archer Ave | ★★★★☆ | 9,500 | 1 | Nov-2018 | Jul-2019 | - Heidner Properties Inc. |
| 3 | BURNHAM PLAZA 13850 Burnham Ave | ★★★★☆ | 9,180 | 1 | Jul-2014 | Jul-2019 | - Horizon Realty Brokers |
| 4 | Building N 9500 S Western Ave | ★★★★☆ | 4,800 | 1 | Jan-2019 | Aug-2019 | - Lormax Stern Development Com... |
| 5 | 9603 S Pulaski Rd | ★★★★☆ | 4,245 | 1 | Jun-2018 | Jul-2019 | FHS Architecture FHS Architecture |
| 6 | 1778 W 119th St | ★★★★☆ | 2,640 | - | Oct-2017 | Sep-2019 | - Marathon Petroleum Company LP |

**PROPOSED**

| | Property Name/Address | Rating | Bldg SF | Stories | Start | Complete | Developer/Owner |
|---|---|---|---|---|---|---|---|
| 1 | Retail A 14724 Oakley Ave | ★★★★☆ | 14,500 | 1 | May-2019 | May-2020 | - - |
| 2 | Retail D 14724-14746 Oakley Ave | ★★★★☆ | 8,325 | - | Jun-2019 | Sep-2019 | - Andres Schcolnik |
| 3 | Outparcel Retail H SWC 95th & Pulaski | ★★★★☆ | 7,794 | - | Jun-2019 | Jun-2020 | - |
| 4 | Cicero Avenue Retail SWC 135th St & Cicero Ave | ★★★★☆ | 5,180 | 1 | Aug-2019 | Feb-2020 | - - |
| 5 | Retail C 14724-14746 Oakley Ave | ★★★★☆ | 4,500 | - | Jun-2019 | Sep-2019 | - Andres Schcolnik |
| 6 | 10255 S Harlem Ave | ★★★★☆ | 3,912 | 1 | Apr-2019 | Aug-2019 | - Pellouchoud, John L |
| 7 | 8714 S Cicero Ave | ★★★★☆ | 2,420 | 1 | Jun-2019 | Dec-2019 | - Robin Companies |

## Retail Market Summary and Conclusions

Based on influential overall market and submarket area trends, construction outlook, and the performance of competing properties we examined the impact on the subject. Macro fundamentals are positive and the subject has above average area linkages providing access to Chicago job centers and surrounding commercial districts.; however, retail has had its challenges including in the subject's own neighborhood. The subject is located across the street from Marshfield Plaza Shopping Center. The center is anchored by Jewel Osco and

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

41

11900 Marshfield Property LLC Real Estate Appraisal

Burlington. The center was previously anchored by Target as well, but Target closed in February 2019, citing weak sales at the location. Burlington is also considered likely to close upon expiration of their lease in 2020. Another large retailer that recently closed in the subject's area was Ultra Foods in 2017. Although a relatively weak area for retail, there has been some interest from national retailers in the face of the closures. Old Navy opened a store in Marshfield Plaza in 2018.

Overall, JLL expects the mix of property fundamentals and economic conditions in the Chicago metro area to have a neutral to slightly positive impact on the subject property's performance in the near-term.

## Surrounding Area Analysis

## Demand Generators

Major employers in the area include Cook County, Chicago Public Schools, and the City of Chicago. The closest major commercial corridors to the subject are W 119th St and W 115th St; providing average supporting retail and entertainment services. The subject is located across the street from Marshfield Plaza Shopping Center. The center is anchored by Jewel Osco and Burlington. The center was previously anchored by Target as well, but Target closed in February 2019, citing weak sales at the location. Burlington is also considered likely to close upon expiration of their lease in 2020. Another large retailer that recently closed in the subject's area was Ultra Foods in 2017. Although a relatively weak area for retail, there has been some interest from national retailers in the face of the closures. Old Navy opened a store in Marshfield Plaza in 2018. Finally, the subject has above average area linkages providing access to Chicago job centers and surrounding commercial districts.

## Development Activity and Trends

Development activity in the immediate area has been predominantly of retail uses. In addition, development has been steady in the last three years.

3914 W 119th St is a new 76,000 square foot industrial self-storage facility. This two-story facility is owner occupied by Banner Storage Group LLC and was completed in December of 2017.

11432 S Halsted is a proposed 68,000 square foot community center known as 115th Mini Mall. The owner, DL3 Realty hopes to have the project completed by late 2020. So far there are no reported tenants that have pre-leased any space in the proposed development. DL3 is looking to lease the space out at around $21.00 per square foot on a triple net basis.

10801 S Western is a proposed office building that is roughly 26,000 square feet in size. The two-floor office building will have decent access to public transportation with close proximity to 107th Street Station, Rock Island Line. The office is reported to be 61.5% preleased as of the date of this report.

## Access and Linkages

Interstate 57 provides access to the subject from the greater Chicago metro area. The subject has above average access to public transportation including CTA "L" and bus service and Metra Rail. The nearest bus stop is located at Marshfield & 117th Street, which is within a one-minute walk from the subject. There is a

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

Metra Rail stop at 119th Street, which is within one mile of the subject. Additionally, the subject has a walk score of 68 indicating an above average walkability factor. The subject is most commonly accessed via car.

The nearest commercial airport is Midway International Airport and is located within 15 miles of the subject property.

## Outlook and Conclusion

The subject's area has experienced moderate recent employment growth and construction activity has been moderate contributing to our conclusion that the subject's area is in the stable stage of its life cycle.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

43

# Property Description

## Site Description

### Aerial Map



## Land Summary

| Parcel Number | Land Area (Sq Ft) | Land Area (Acres) | Topography | Shape |
|---|---|---|---|---|
| 25-30-204-001-0000 | 2,548 | 0.058 | Level | Rectangular |
| 25-30-204-002-0000 | 1,960 | 0.045 | Level | Rectangular |
| 25-30-204-003-0000 | 1,955 | 0.045 | Level | Rectangular |
| 25-30-204-004-0000 | 1,949 | 0.045 | Level | Rectangular |
| 25-30-204-005-0000 | 1,937 | 0.044 | Level | Rectangular |
| 25-30-204-006-0000 | 2,656 | 0.061 | Level | Rectangular |
| 25-30-204-020-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-021-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-022-0000 | 3,192 | 0.073 | Level | Rectangular |
| 25-30-204-023-0000 | 3,192 | 0.073 | Level | Rectangular |
| 25-30-204-024-0000 | 3,242 | 0.074 | Level | Rectangular |
| 25-30-204-041-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-042-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-043-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-044-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-045-0000 | 3,325 | 0.076 | Level | Rectangular |
| 25-30-204-046-0000 | 98,522 | 2.262 | Level | Irregular |
| **Total** | **144,428** | **3.316** | | |

Source: Public Records

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

44

## Land Description

| | |
|---|---|
| Shape | Rectangular |
| Average Depth (Feet) | 555 |
| Average Width (Feet) | 260 |
| Corner Location | Yes |
| Primary Street Frontage | S Marshfield Ave |
| Traffic Volume | 20,400 VPD |
| Access Rating | Average |
| Visibility Rating | Average |
| Functional Utility | Average |
| Topography | Level |
| Landscaping | Average |
| Drainage | No drainage problems were observed or disclosed to us during our inspection. This appraisal assumes that surface water collection is adequate. |
| Soil Conditions | Adequate for development |
| Wetlands/Watershed | No wetlands were observed during our site inspection. |
| Flood Zone Designation | X |
| Flood Zone | The subject is outside the 500-year flood plain. The appraiser is not an expert in this matter and is reporting data from FEMA maps. |
| FEMA Map Number | 17031C0645J |
| FEMA Map Date | August 19, 2008 |
| Utilities | All public utilities are available to the site including public water and sewer, gas, electric, and telephone |
| Utilities Adequacy | The subject's utilities are typical and adequate for the market area. |
| Zoning Jurisdiction | The Village of Calumet Park |
| Zoning Code | C3 |
| Zoning Description | Highway Commercial |
| Permitted Uses | Retail uses up to 40,000 GBA, convenience stores with gasoline sales, gift stores, automobile rental, sales and washes, banquet halls, bed and breakfast, hotels/motels, restaurants |

## Environmental Hazards

An environmental assessment was not provided for review. No environmental hazards other than standard petroleum products and underground tanks of a gas station were apparent from inspection and it is assumed

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

45

the Subject is free and clear of any environmental hazards including, without limitation, hazardous waste, toxic substances and mold.

## Encumbrance/Easements/Restrictions

We were not provided a current official title report to review. We are not aware of any easements, encroachments, or restrictions that would adversely affect value. Our valuation assumes no adverse impacts from easements, encroachments, or restrictions, and further assumes that the subject has clear and marketable title.

## Overall Site Utility

Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses including those permitted by zoning.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

## Improvements Description

The subject is an existing retail property containing 18,375 square feet of gross leasable area. The property is improved with a gas station/convenience store, car wash, auto repair facility and several small in-line retail spaces. The improvements were constructed in 2000. The subject property underwent light renovation in 2018. Ownership also installed new personal property consisting of two 5,000-gallon underground tanks, one for the diesel pumps and one for the E-85 gasoline pumps, as well as a 20,000-gallon diesel tank, a 6,000-gallon DEF tank, and five diesel pumps at the south end of the subject site. Diesel operations began in 2019. Turbo dryers were installed in the car wash. Ownership estimated the total renovation cost, including costs for personal property, to be $1,200,000. Any future revenue from gaming machines (video lottery terminals or similar machines) are excluded from this analysis. The site area is 3.32 acres or 144,428 square feet. We considered whether to apply a prospective market value at completion and stability; however, all renovation work is complete and the subject is considered stabilized.

## Improvements Description

| | Subject |
|---|---|
| **General Description** | |
| Building Name / Type | 11900 Marshfield Property LLC |
| General Property Type | Retail-Commercial |
| Property Type | Vehicle Related |
| Competitive Property Class | C |
| Occupancy Type | Multi-Tenant (Majority Owner-Occupied) |
| Number of Buildings | 1 |
| Stories | 1 |
| Year Built | 2000 |
| Year Renovated | 2018 |
| Construction Class | Class C |
| Construction Type | Masonry |
| Construction Quality | Average |
| Condition | Average |
| **Building Areas and Ratios** | |
| Gross Building Area (SF) | 18,375 |
| Rentable Area (SF) | 18,375 |
| Building Efficiency Ratio | 100% |
| Land Area (SF) | 144,428 |
| Floor Area Ratio (GBA/Land SF) | 0.13 |
| Floor Area Ratio (RA/Land SF) | 0.13 |
| Building Area Source | Lease Documents |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

## Construction Description

| Building Name / Type | Subject |
|---|---|
| **Foundation, Frame, and Exterior** | |
| Foundation | Poured concrete slab |
| Structural Frame | Heavy Steel Frame |
| Exterior | Concrete Block |
| Windows | Fixed Casement |
| Roof/Cover | Flat, rubber membrane |
| **Interior Features** | |
| Interior Layout | Average |
| Lobby/Common Area | Average |
| Floor Cover | Carpet, Linoleum, Tile |
| Walls | Painted drywall |
| Ceilings | Drywall |
| Lighting | A mix of fluorescent and incandescent lighting. |
| Restrooms | Multiple |
| Finish Out Condition | Average |
| **Mechanical Systems** | |
| Heating | Central, Roof Mounted |
| Cooling | Central, Roof Mounted |
| Electrical | Assumed adequate and up to code |
| Plumbing | Assumed adequate and up to code |
| Sprinklers | 100% Wet |
| Security | Key Access |

## Parking

| Building Name / Type | Subject |
|---|---|
| Total Parking Spaces | 25 |
| Parking Type | Surface |
| Source of Parking Count | Appraiser Measurement |
| Parking Spaces/1,000 SF GBA | 1.4 |
| Parking Spaces/1,000 SF RA | 1.4 |
| Parking Condition | Average |
| Parking Adequacy | Average |

## Effective Age and Economic Life

| Building Name / Type | 11900 Marshfield Property LLC |
|---|---|
| Year Built | 2000 |
| Actual Age (Yrs.) | 19 |
| Estimated Effective Age (Yrs.) | 15 |
| Estimated Economic Life (Yrs.) | 45 |
| Remaining Economic Life (Yrs.) | 30 |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

## Improvements Analysis

| | |
|---|---|
| Design & Functional Utility | Typical for property age, class, and location |
| Appeal & Appearance | Consistent with competitive properties |
| Deferred Maintenance | We did not identify any major items of deferred maintenance during our inspection and ownership indicated there were none. |
| Capital Improvements | Based on discussions with management, the diesel installation project has been completed, and there are no further near-term planned capital expenditures. |
| Personal Property | Car wash equipment, fuel dispensers, snow plow, office equipment, lifts, tanks, piping, and miscellaneous |
| Americans With Disabilities Act | Based on our inspection and information provided, we are not aware of any ADA issues. However, we are not expert in ADA matters, and further study by an appropriately qualified professional would be recommended to assess ADA compliance. |

## Improvements Conclusion

On balance, the condition, quality, and functional utility of the improvements are atypical for their age and location. The subject has a mix of uses on-site that, while complementary in nature, present management complexities to the going-concern that we consider in our selection of an appropriate risk rate. The mixture of uses also alters the buyer profile.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Subject Photographs



Subject Exterior
(Photo Taken on April 10, 2019)



Subject Exterior
(Photo Taken on April 10, 2019)



Dunkin Donuts Exterior
(Photo Taken on April 10, 2019)



View from Street
(Photo Taken on April 10, 2019)



CITGO Pumps
(Photo Taken on April 10, 2019)



Subject Interior
(Photo Taken on April 10, 2019)

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

50

11900 Marshfield Property LLC Real Estate Appraisal



Auto Repair
(Photo Taken on April 10, 2019)



Auto Repair Exterior
(Photo Taken on April 10, 2019)



CITGO
(Photo Taken on April 10, 2019)



Car Wash
(Photo Taken on April 10, 2019)



View from Street
(Photo Taken on April 10, 2019)



Subject Interior
(Photo Taken on April 10, 2019)

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

51

11900 Marshfield Property LLC Real Estate Appraisal

## Assessment and Taxes

Real estate tax assessments are administered by Cook County and are estimated by jurisdiction on a county basis for the subject. Real estate taxes in this state and this jurisdiction represent ad valorem taxes, meaning a tax applied in proportion to value. The real estate taxes for an individual property may be determined by multiplying the assessed value for a property by the equalization factor and then multiplying the equalized value by the composite rate. The composite rate is based on a consistent state tax rate throughout this state, in addition to one or more local taxing district rates.

The Cook County Assessor assesses commercial properties at 25% of market value effective for the 2010 tax year and after. The 2017 equalization factor incorporated in the tax calculation to follow is 2.9627. Real estate taxes and assessments for the current tax year are shown in the following table.

## Real Estate Taxes

| Taxing Authority | Cook County |
|---|---|
| Assessment Year | 2017 |

### Real Estate Assessment and Taxes – 2017 Payable 2018

| Tax ID | Land | Improvements | Total Assessment | Equalization Factor | Equalized Total | Tax Rate | Ad Valorem Taxes |
|---|---|---|---|---|---|---|---|
| 25-30-204-001-0000 | $3,185 | $1,128 | $4,313 | 2.9627 | $12,778 | 18.89% | $2,413 |
| 25-30-204-002-0000 | $2,450 | $591 | $3,041 | 2.9627 | $9,010 | 18.89% | $1,702 |
| 25-30-204-003-0000 | $2,443 | $591 | $3,034 | 2.9627 | $8,989 | 18.89% | $1,698 |
| 25-30-204-004-0000 | $2,436 | $1,322 | $3,758 | 2.9627 | $11,134 | 18.89% | $2,103 |
| 25-30-204-005-0000 | $2,421 | $591 | $3,012 | 2.9627 | $8,924 | 18.89% | $1,685 |
| 25-30-204-006-0000 | $3,320 | $1,128 | $4,448 | 2.9627 | $13,178 | 18.89% | $2,489 |
| 25-30-204-020-0000 | $748 | $0 | $748 | 2.9627 | $2,216 | 18.88% | $419 |
| 25-30-204-021-0000 | $748 | $0 | $748 | 2.9627 | $2,216 | 18.88% | $419 |
| 25-30-204-022-0000 | $718 | $0 | $718 | 2.9627 | $2,127 | 18.88% | $402 |
| 25-30-204-023-0000 | $718 | $0 | $718 | 2.9627 | $2,127 | 18.88% | $402 |
| 25-30-204-024-0000 | $729 | $0 | $729 | 2.9627 | $2,160 | 18.89% | $408 |
| 25-30-204-041-0000 | $1,246 | $0 | $1,246 | 2.9627 | $3,692 | 18.89% | $697 |
| 25-30-204-042-0000 | $1,246 | $0 | $1,246 | 2.9627 | $3,692 | 18.89% | $697 |
| 25-30-204-043-0000 | $1,246 | $0 | $1,246 | 2.9627 | $3,692 | 18.89% | $697 |
| 25-30-204-044-0000 | $1,246 | $0 | $1,246 | 2.9627 | $3,692 | 18.89% | $697 |
| 25-30-204-045-0000 | $1,246 | $0 | $1,246 | 2.9627 | $3,692 | 18.89% | $697 |
| 25-30-204-046-0000 | $123,152 | $224,469 | $347,621 | 2.9627 | $1,029,897 | 18.89% | $194,506 |
| **Total** | **$149,298** | **$229,820** | **$379,118** | **2.9627** | **$1,123,213** | **18.89%** | **$212,131** |

Depicted in the ensuing table is the subject property's tax history.

### Tax History

| Assessment Year | Total Assessment | Equalization Factor | Equalized Total | Tax Rate | Ad Valorem Taxes | Per SF GBA | Annual Change |
|---|---|---|---|---|---|---|---|
| 2017 | $379,118 | 2.962700 | $1,123,213 | 18.89% | $212,131 | $11.54 | -100.0% |
| 2016 | $234,584 | 2.803200 | $657,586 | 19.04% | $125,178 | $6.81 | 4.3% |
| 2015 | $234,584 | 2.668500 | $625,987 | 19.17% | $120,008 | $6.53 | -3.4% |
| 2014 | $416,995 | 2.725300 | $1,136,436 | 10.93% | $124,225 | $6.76 | |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

52

11900 Marshfield Property LLC Real Estate Appraisal

## 2018 Assessor Certified Values

| Parcel | Land | Improvements | Total |
|---|---|---|---|
| 25-30-204-001-0000 | $3,185 | $821 | $4,006 |
| 25-30-204-002-0000 | $2,450 | $430 | $2,880 |
| 25-30-204-003-0000 | $2,443 | $430 | $2,873 |
| 25-30-204-004-0000 | $2,436 | $963 | $3,399 |
| 25-30-204-005-0000 | $2,421 | $430 | $2,851 |
| 25-30-204-006-0000 | $3,320 | $821 | $4,141 |
| 25-30-204-020-0000 | $748 | $0 | $748 |
| 25-30-204-021-0000 | $748 | $0 | $748 |
| 25-30-204-022-0000 | $718 | $0 | $718 |
| 25-30-204-023-0000 | $718 | $0 | $718 |
| 25-30-204-024-0000 | $729 | $0 | $729 |
| 25-30-204-041-0000 | $1,246 | $0 | $1,246 |
| 25-30-204-042-0000 | $1,246 | $0 | $1,246 |
| 25-30-204-043-0000 | $1,246 | $0 | $1,246 |
| 25-30-204-044-0000 | $1,246 | $0 | $1,246 |
| 25-30-204-045-0000 | $1,246 | $0 | $1,246 |
| 25-30-204-046-0000 | $123,152 | $163,396 | $286,548 |
| **Total** | **$149,298** | **$167,291** | **$316,589** |

## Assessment Analysis

We have analyzed the assessment and corresponding taxation of competitive properties in the marketplace as a test of reasonableness compared to the subject's current assessment and taxation.

### Tax Comparables

| No. | Name | Property Type | Rentable Area | Year Built | Total Assessment | Assessment per SF | Taxes | Taxes/ Rentable Area |
|---|---|---|---|---|---|---|---|---|
| Subject | 11900 Marshfield Property LLC | Vehicle Related | 18,375 | 2000 | $379,118 | $20.63 | $212,131 | $11.54 |
| 1 | 1750 119th St | Chili's | 5,443 | 2009 | $207,007 | $38.03 | $44,661 | $8.21 |
| 2 | 1654-1658 W 119th St | Vehicle Related | 5,556 | Unk. | $130,739 | $23.53 | $28,206 | $5.08 |
| 5 | 11833 S Western Ave | Walgreens | 15,120 | 2003 | $424,393 | $28.07 | $91,560 | $6.06 |
| 7 | 12255 Western Ave | Retail | 15,315 | 1987 | $180,043 | $11.76 | $81,367 | $5.31 |
| 8 | 12215 Western Ave | ALDI | 19,000 | 2009 | $141,790 | $7.46 | $58,113 | $3.06 |
| | | | | | | **JLL Tax Projection:** | **$234,438** | **$12.76** |

The tax comparables found are individual businesses rather than a multiple-use retail center like the subject. For this reason, the subject's taxes per rentable area being outside of the range of the comparables is not unusual.  It may show, however, that the taxing authorities have limited room to increase the assessment after the recent renovation.   Typically, additions and renovations are not added dollar for dollar to the tax rolls.  Taking into account these factors, we have increased the taxes payable 10% and considered the risk of a higher reassessment in our capitalization rate. We project year 1 taxes in our income capitalization approach at $234,438 or  $ 12.76  per square foot.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.                53

11900 Marshfield Property LLC Real Estate Appraisal

# Highest and Best Use

## Highest and Best Use of the Site

### Legally Permissible

The site is zoned C3, Highway Commercial. To our knowledge, there are no legal restrictions such as easements or deed restrictions that would effectively limit the use of the property. Given prevailing land use patterns in the area, only retail use is given further consideration in determining highest and best use of the site, as though vacant.

### Physically Possible

The physical characteristics of the site do not appear to impose any unusual restrictions on development. Overall, the physical characteristics of the site and the availability of utilities result in functional utility suitable for a variety of uses.

### Financially Feasible

Based on our analysis of the market, there is currently adequate demand for retail use in the subject's area. It appears that a newly developed retail use on the site would have a value commensurate with its cost. Therefore, retail use is considered to be financially feasible.

### Maximally Productive

There does not appear to be any reasonably probable use of the site that would generate a higher residual land value than retail use. Accordingly, it is our opinion that retail use, developed to the normal market density level permitted by zoning, is the maximally productive use of the property.

### Conclusion

Development of the site for retail use is the only use that meets the four tests of highest and best use. Therefore, it is concluded to be the highest and best use of the property as if vacant.

## Highest and Best Use as Improved

The subject site is developed with a vehicle related retail use, which is consistent with the highest and best use of the site as if it were vacant.

A portion of the existing improvements are currently leased and produce a positive cash flow that we expect will continue. Additionally, the owner-occupied portion of the subject provides sufficient utility to the owner-user. Therefore, a continuation of this use is concluded to be financially feasible.

Based on our analysis, there does not appear to be any alternative use that could reasonably be expected to provide a higher present value than the current use, and the value of the existing improved property exceeds the value of the site, as if vacant. For these reasons, continued retail use is concluded to be maximally productive and the highest and best use of the property as improved.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

54

## Most Probable Buyer

Taking into account the size and characteristics of the property and its majority occupancy, the likely buyer is an owner-user. We consider the multiple uses on-site to limit the pool of potential buyers.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Valuation Methodology

Three basic approaches may be applicable and utilized, then reconciled to arrive at an estimate of market value. An approach to value is included or eliminated based on its applicability to the property type being value and the information available. The reliability of each approach depends on the availability and comparability of market data as well as the motivation and thinking of purchasers. Applicable approaches and whether or not they were utilized are summarized below:

### Cost Approach

The Cost Approach is based on the proposition that an informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. In the Cost Approach, the appraiser forms an opinion of the cost of all improvements, depreciation from physical, functional and external causes. The land value, entrepreneurial profit and depreciated improvement costs are then added, resulting in indication of value.

### Sales Comparison Approach

The Sales Comparison Approach compares sales of similar properties with the subject property. Each comparable sale is adjusted for its inferior or superior characteristics. The values derived from the adjusted comparable sales form a range of value for the subject. A gross income multiplier and / or effective gross income multiplier may also be analyzed. By process of correlation and analysis, a final indicated value is derived.

### Income Approach

In the Income Capitalization Approach the income-producing capacity of a property is estimated by using contract rents on existing leases and by estimating market rent from rental activity at competing properties for the vacant space. Deductions are then made for vacancy and collection loss and operating expenses. The resulting net operating income is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the relationship between net operating income and value. This method is referred to as Direct Capitalization.

Related to the Direct Capitalization Method is the Yield Capitalization Method. In this method periodic cash flows (which consist of net operating income less capital costs) and a reversionary value are developed and discounted to a present value using a discount rate or an internal rate of return.

The Income Approach converts the anticipated flow of future benefits (income) to a present value estimate through a capitalization and or a discounting process.

### Final Reconciliation

The appraisal process concludes with the Final Reconciliation of the values derived from the approaches applied for a single estimate of market value. Different properties require different means of analysis and lend themselves to one approach over the others.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

56

11900 Marshfield Property LLC Real Estate Appraisal

## Analyses Applied

Applicability and utilization of the approaches in this assignment is described as follows.

| Approach | Description | Applicability | Utilization |
|---|---|---|---|
| Cost | A cost approach is most applicable in valuing new or proposed construction when the improvements represent the highest and best use of the land and the land value, cost new and depreciation are well supported. | Applicable | Utilized |
| Sales Comparison | A sales approach is most applicable when sufficient data on recent market transactions is available and there is an active market for the property type. The sales approach is relatively unreliable in an inactive market or in estimating the value of properties for which no real comparable sales data is available. It is also questionable when sales data cannot be verified with the principal parties to the transaction. We examined recent sales of individual gas stations, strip retail centers, and auto repair facilities. We were unable to find going concern or real property sales that included the combination of property types as the subject; therefore, a limited sales comparison was undertaken and the result was considered a secondary approach to estimate the market value of the real estate and was not used to value the going concern. The sales approach was used in estimating the current market value of the underlying land for asset allocation purposes. | Applicable | Utilized |
| Income | An income approach is most applicable when the subject is an income producing property or has the ability to generate income in the future as an investment. The income approach is also used to analyse the going concern value. | Applicable | Utilized |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

57

## Land Valuation

The subject's land value has been developed via the sales comparison approach.

The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership. This approach compares sales of similar properties with the subject property. Each comparable sale is adjusted for its inferior or superior characteristics. The values derived from the adjusted comparable sales form a range of value for the subject. By process of correlation and analysis, a final indicated value is derived.

We have researched comparables for this analysis, which are documented on the following pages followed by a location map and analysis grid. All sales have been researched through numerous sources and, when possible, verified by a party to the transaction.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Land Sales Summary

| No. | Name; Address | Sale Date; Status; Prop. Rights | Square Feet; Acres | Zoning | Sale Price; Effective Price | $/SF; $/Acre |
|-----|---------------|----------------------------------|--------------------|--------|------------------------------|--------------|
| 1 | 10339 S Pulaski Rd 10339 S Pulaski Rd Chicago, IL 60655 | 6/2/2017 Closed Sale Fee Simple | 83,261 1.91 | B3 | $800,000 $838,000 | $10.06 $438,743 |

Sale Comments: This 1.91 acres site sold on June 2, 2017 for $800,000. The parcel sold with 7,600 square feet of improvements, as such we have estimated demo costs at $5.00 sf or $38,000.

| 2 | 1073 E. 162nd St. 1073 E. 162nd St. South Holland, IL 60473 | 1/27/2017 Closed Sale Fee Simple | 96,830 2.22 | Commercial | $1,500,000 $1,500,000 | $15.49 $675,676 |
|---|---|---|---|---|---|---|

Sale Comments: This is the sale of 2.22 acres or 96,830 square feet of vacant commercial land for $1,500,000 or $15.49/SF on January 27, 2017. The buyer had plans to develop a gas station at the property.

| 3 | 11833 Southwest Highway 11833 Southwest Hwy. Palos Heights, IL 60463 | 9/28/2016 Closed Sale Fee Simple | 30,766 0.71 | Commercial | $425,000 $425,000 | $13.81 $598,592 |
|---|---|---|---|---|---|---|

Sale Comments: This is the sale of a vacant parcel of land adjacent to a CVS Pharmacy. The proposed use of the site was for a retail or restaurant; however, no construction have been started on the site. The site is zoned commercial. The parcel is located three blocks north of Palos Community Hospital. The vacant parcel includes a small parking lot.

| 4 | 14201 S Cicero Avenue 14201 S Cicero Ave Crestwood, IL 60445 | 8/12/2016 Closed Sale Fee Simple | 56,724 1.30 | Commercial | $650,000 $657,500 | $11.59 $505,769 |
|---|---|---|---|---|---|---|

Sale Comments: 14201 S Cicero Ave sold on August 12, 2016 for $650,000. The parcel sold with 1,500 square feet of improvements, and we have estimated demo costs at $5.00 SF or $7,500.

| 5 | 1778 W 119th Street 1778 W 119th Street Calumet Park, IL 60643 | 5/20/2016 Closed Sale Fee Simple | 174,240 4.00 | M1 / C3 | $885,000 $885,000 | $5.08 $221,250 |
|---|---|---|---|---|---|---|

Sale Comments: On May 20, 2016, the land parcel located at 1778 W 119th Street in Calumet Park, IL, sold for $885,000 or $5.08 per square foot. The site is zoned C3 (Highway Commercial) and M1 (Industrial), which allows for a variety of commercial and industrial uses. It was purchased by Speedway LLC, an operator of gas station/convenience stores. Further, the property has a small roadway running south through it that would need to be abandoned by the City to allow for full development of the site.

| S | 11900 Marshfield Property LLC 11900 S Marshfield Ave Calumet Park, IL 60827 Cook | | 144,428 3.32 | C3 | | |
|---|---|---|---|---|---|---|

*If applicable, prices per SF/unit and capitalization rates and/or income multipliers based on effective sale price.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

59

11900 Marshfield Property LLC Real Estate Appraisal

## Land Sales Map



|  |  |  | Miles From |  |  |
|---|---|---|---|---|---|
| No. | Name | Location | Subject | SF | Price/SF |
| 1 | 10339 S Pulaski Rd | Chicago, IL | 3.5 | 83,261 | $10.06 |
| 2 | 1073 E. 162nd St. | South Holland, IL | 6.5 | 96,830 | $15.49 |
| 3 | 11833 Southwest Highway | Palos Heights, IL | 7.8 | 30,766 | $13.81 |
| 4 | 14201 S Cicero Avenue | Crestwood, IL | 4.8 | 56,724 | $11.59 |
| 5 | 1778 W 119th Street | Calumet Park, IL | 0.2 | 174,240 | $5.08 |
| S | 11900 Marshfield Property LLC | Calumet Park, IL |  | 144,428 |  |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

60

## Land Adjustment Summary

| Adjustment Factor | Accounts For | Comments |
|---|---|---|
| Property Rights | Fee simple, leased fee, leasehold, partial interest, etc. | No adjustments for real property rights were required. |
| Financing | Seller financing, or assumption of existing financing, at non-market terms. | No adjustments for financing terms were required. |
| Conditions of Sale | Extraordinary motivation of buyer or seller, assemblage, forced sale. | No adjustments for conditions of sale were required. |
| Expend. After Sale | Atypical economics of a transaction, such as demolition cost, impact fees, remediation, or other expenditures by buyer at time of purchase. | No adjustments for expenditures after sale were required. |
| Market Trends Through | Changes in the economic environment over time that affect the appreciation and depreciation of real estate. | The land sales took place from May 2016 to June 2017. Market conditions generally have been strengthening over this period through the effective date of value. As a result, we apply upward adjustments of 3.0% per year to account for this trend. |
| Location | Market or submarket area influences on sale price or rental rate; surrounding land use influences. | No adjustments for location were required. |
| Access/Exposure | Convenience to transportation facilities; ease of site access; visibility; traffic counts. | Comparables 1, 2, 3 and 4 have been adjusted downward due to their superior access/exposure when compared to the subject property. Comparable 5 has not been adjusted. |
| Size | Inverse relationship that often exists between parcel size and unit value. | Comparables 1, 2, 3 and 4 have been adjusted downward due to their smaller size when compared to the subject property. Comparable 5 has been adjusted upward due to its larger size when compared to the subject property. |
| Shape/Topography | Primary physical factors that affect the utility of a site for its highest and best use. | Comparable 5 has been adjusted upward due to its inferior shape/topography when compared to the subject property. The remaining four comparables have not been adjusted. |
| Zoning | Government regulations that affect the types and intensities of uses allowable on a site. | No adjustments for zoning were required. |
| Entitlements | The specific level of governmental approvals attained pertaining to development of a site. | No adjustments for entitlements were required. |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

61

11900 Marshfield Property LLC Real Estate Appraisal

## Land Grid

| | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 |
|---|---|---|---|---|---|---|
| Name | 11900 Marshfield Property LLC | | | 11 west way | | |
| Address | 11900 S Marshfield Ave | | | 11 west Hwy. | | |
| City | Calumet Park | Chicago | South Holland | ghts | | Calumet Park |
| County | Cook | Cook | Cook | Cook | Cook | Cook |
| State | IL | IL | IL | IL | IL | IL |
| Date | Apr-2019 | Jun-2017 | Jan-2017 | Sep-2016 | Aug-2016 | May-2016 |
| Price | | $800,000 | $1,500,000 | $425,000 | $650,000 | $885,000 |
| Price Adjustment | | $38,000 | $0 | $0 | $7,500 | $0 |
| Adjusted Price | | $838,000 | $1,500,000 | $425,000 | $657,500 | $885,000 |
| Acres | 3.32 | 1.91 | 2.22 | 0.71 | 1.30 | 4.00 |
| Land SF | 144,428 | 83,261 | 96,830 | 30,766 | 56,724 | 174,240 |
| Land SF Unit Price | | $10.06 | $15.49 | $13.81 | $11.59 | $5.08 |
| Traffic Count | 20,400 | 29,300 | 32,700 | 25,900 | 34,000 | 20,400 |
| Zoning | C3 | B3 | Commercial | Commercial | Commercial | M1 / C3 |
| **Transaction Adjustments** | | | | | | |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| % Adjustment | | – | – | – | – | – |
| Financing | | Conventional | Cash to seller | Cash to seller | Conventional | Cash to seller |
| % Adjustment | | – | – | – | – | – |
| Conditions of Sale | | Normal | Normal | Normal | Normal | Normal |
| % Adjustment | | – | – | – | – | – |
| Market Trends Through | Apr-19    3.0% | 6% | 7% | 8% | 8% | 9% |
| Adjusted Land SF Unit Price | | $10.63 | $16.53 | $14.89 | $12.54 | $5.53 |
| Location | | – | – | – | – | – |
| Access/Exposure | | -5% | -5% | -5% | -5% | – |
| Size | | -5% | -5% | -10% | -10% | 5% |
| Shape/Topography | | – | – | – | – | 15% |
| Zoning | | – | – | – | – | – |
| Entitlements | | – | – | – | – | – |
| Adjusted Land SF Unit Price | | $9.57 | $14.88 | $12.65 | $10.66 | $6.64 |
| Net Adjustments | | -5% | -4% | -8% | -8% | 31% |
| Gross Adjustments | | 16% | 17% | 23% | 23% | 29% |

| Summary Indicators | Range | Average | Median |
|---|---|---|---|
| Comparables - Unadjusted | $5.08 - $15.49 | $11.21 | $11.59 |
| Comparables - Adjusted | $6.64 - $14.88 | $10.88 | $10.66 |
| **Reconciled Unit Value:** | | $10.00 | |

## Land Value Reconciliation

| Premise | Value |
|---|---|
| As Is | April 10, 2019 |
| Indicated Value per Land SF | $10.00 |
| Subject Land SF | 144,428 |
| Indicated Value | $1,444,280 |
| **Rounded Value** | **$1,440,000** |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

62

## Cost Approach

The Cost Approach is based on the principle of substitution - that a prudent and rational person would pay no more for a property than the cost to construct a similar and competitive property, assuming no undue delay in the process. The Cost Approach tends to set the upper limit of value before depreciation is considered. The applied process is as follows:

1. Estimate the land value according to its Highest and Best Use.
2. Estimate the replacement cost of the building, equipment and site improvements.
3. Estimate the physical, functional and/or external depreciation accrued to the improvements.
4. Sum the depreciated value of the improvements with the value of the land for an indication of value.

## Replacement Cost

Replacement cost is the current cost to construct improvements with equivalent utility to the subject, using modern materials and current standards, design, and layout. Estimates of replacement cost for the purpose of developing a market value opinion include three components: direct costs, indirect costs (also known as soft costs) and entrepreneurial profit.

Marshall Valuation Service (MVS), a nationally recognized source for cost data, was utilized as the primary source to estimate direct costs for the subject, which includes expenditures for labor, materials, supervision, contractors' profit and overhead, architects' plans and specifications, sales taxes and insurance. MVS' *Square Foot Commercial Methodology* determines the property's base costs, which are then adjusted, if applicable, for differences in heating/cooling costs, and the presence of sprinklers and elevators. The adjusted base costs are then further adjusted, if applicable, to account for building height, interior wall height, building perimeter, current costs, location variations, and prospective value multipliers. Beyond the base building costs, specialty components or site improvements are provided by the segregated cost sections of the MVS *Commercial Cost Explorer*. In addition to direct costs, MVS includes certain indirect costs such as architectural and engineering fees, and interest on building loan funds during construction. Our direct cost estimate using MVS is shown in the following table. The snow plow was not inspected, and was valued based on similar used vehicles marketed for sale as of the report date in the Chicagoland market rather than M&S.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## Unit Costs

| Name | MVS Sec./Page or Source | MVS Building Type | Construction Class | MVS Quality | Base Cost | Sprinkler |
|---|---|---|---|---|---|---|
| **Building Improvements** | | | | | | |
| Car Wash | 64/4 | Automatic Car Washes | Class C | Average | $122.00 | – |
| Auto Repair | 14/32 | Mini-Lube Garages | Class C | Average | $101.00 | – |
| Convenience Store | 13/22 | Convenience Stores | Class C | Average | $91.00 | – |
| Retail | 13/26 | Retail Stores | Class C | Average | $85.00 | – |
| **Site Improvements** | | | | | | |
| Landscaping | 66/8 | Landscaping | N/A | Average | $25,000.00 | – |
| Parking Spaces | 66/3 | Surface Parking Lots | N/A | Average | $1,449.55 | – |
| **Furniture, Fixtures & Equipment (FF&E)** | | | | | | |
| Car Wash Equipment | 64/6 | Car Wash | | Average | $506,125.00 | – |
| Fuel Dispenser | 64/3 | Service Station | N/A | Average | $14,987.00 | – |
| Snow Plow | N/A | N/A (Direct to Market) | N/A | Average | N/A | – |
| 15 HP Air Compressor | 64/3 | Service Station | N/A | Average | $9,575.00 | – |
| Office Equipment | 64/3 | Service Station | N/A | Average | $17,345.00 | – |
| Heavy-Duty Lifts | 64/3 | Service Station | N/A | Average | $18,450.00 | – |
| Fuel Storage Tank | 61/5 | Service Station | N/A | Average | $36,800.00 | – |
| Dispenser Piping | 64/3 | Service Station | N/A | Average | $1,465.00 | – |
| Tank Piping | 64/3 | Service Station | N/A | Average | $955.00 | – |
| Gas Canopy | 64/4 | Service Station | N/A | Average | $41.75 | – |
| Coolers | 64/3 | Service Station | N/A | Average | $192.00 | – |
| Freezer | 64/3 | Service Station | N/A | Average | $7,500.00 | – |

Source: MVS
March 2019

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

64

11900 Marshfield Property LLC Real Estate Appraisal

## Direct Cost Estimate

| Name | Adjusted Base Cost | Current Multiplier | Local Multiplier | Unit Cost Estimate | Quantity | Units | Direct Cost Estimate |
|---|---|---|---|---|---|---|---|
| Building Improvements | | | | | | | |
| Car Wash | $122.00 | 1.030 | 1.260 | $158.33 | 5,849 | SF | $926,082 |
| Auto Repair | $101.00 | 1.010 | 1.260 | $128.53 | 4,919 | SF | $632,252 |
| Convenience Store | $91.00 | 1.010 | 1.260 | $115.81 | 3,003 | SF | $347,767 |
| Retail | $85.00 | 1.010 | 1.260 | $108.17 | 4,604 | SF | $498,019 |
| **Subtotal- Building Improvements** | | | | | **18,375** | | **$2,404,120** |
| Site Improvements | | | | | | | |
| Landscaping | $25,000.00 | 1.000 | 1.000 | $25,000.00 | 1 | - | $25,000 |
| Parking Spaces | $1,449.55 | 1.000 | 1.000 | $1,449.55 | 25 | Spaces | $36,239 |
| **Subtotal- Site Improvements** | | | | | | | **$61,239** |
| Furniture, Fixtures & Equipment (FF&E) | | | | | | | |
| Car Wash Equipment | $506,125.00 | 1.000 | 1.000 | $506,125.00 | 1 | Wash Line | $506,125 |
| Fuel Dispenser | $14,987.00 | 1.000 | 1.000 | $14,987.00 | 11 | Dispensers | $164,857 |
| Snow Plow | N/A | 1.000 | 1.000 | N/A | 1 | Units | N/A |
| 15 HP Air Compressor | $9,575.00 | 1.000 | 1.000 | $9,575.00 | 5 | Compressors | $47,875 |
| Office Equipment | $17,345.00 | 1.000 | 1.000 | $17,345.00 | 1 | Office | $17,345 |
| Heavy-Duty Lifts | $18,450.00 | 1.000 | 1.000 | $18,450.00 | 5 | Units | $92,250 |
| Fuel Storage Tank | $36,800.00 | 1.000 | 1.000 | $36,800.00 | 4 | Units | $147,200 |
| Dispenser Piping | $1,465.00 | 1.000 | 1.000 | $1,465.00 | 11 | Dispensers | $16,115 |
| Tank Piping | $955.00 | 1.000 | 1.000 | $955.00 | 6 | Tanks | $5,730 |
| Gas Canopy | $41.75 | 1.000 | 1.000 | $41.75 | 3,851 | SF | $160,779 |
| Coolers | $192.00 | 1.000 | 1.000 | $192.00 | 3,003 | SF | $576,576 |
| Freezer | $7,500.00 | 1.000 | 1.000 | $7,500.00 | 3 | Units | $22,500 |
| **Subtotal- FF&E** | | | | | | | **$1,757,352** |
| **Total** | | | | | | | **$4,222,711** |

## MVS Direct Cost Summary

| Type | Cost Estimate |
|---|---|
| Building Improvements | $2,404,120 |
| Site Improvements | $61,239 |
| FF&E | $1,757,352 |
| **Total MVS Direct Costs** | **$4,222,711** |
| **Total MVS Direct Costs per SF** | **$229.81** |

## Indirect Costs

MVS does not include all of the indirect costs (soft costs) that are appropriate in a replacement cost estimate. Therefore, we add an allowance for the following indirect costs that are not contained within our direct cost estimate: taxes and carrying costs on land during construction; legal and accounting fees; and marketing and finance costs prior to stabilization.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

65

11900 Marshfield Property LLC Real Estate Appraisal

## Entrepreneurial Profit

The final component of the replacement cost estimate is entrepreneurial profit, the financial reward that a developer would expect to receive in addition to recovering all direct and indirect costs. This is the expected compensation that would be necessary to motivate a developer to undertake the project.

## Replacement Cost New

The following tables show our replacement cost estimates for the subject building improvements and site improvements.

### Replacement Cost New Estimate

| Name | Direct Cost Estimate | Indirect Costs (%) | Indirect Costs ($) | Replacement Cost + Indirect Cost | Entreprenurial Incentive (%) | Entreprenurial Incentive ($) | Replacement Cost Estimate |
|---|---|---|---|---|---|---|---|
| Building Improvements | | | | | | | |
| Car Wash | $926,082 | 10.00% | $92,608 | $1,018,690 | 10.00% | $101,869 | $1,120,559 |
| Auto Repair | $632,252 | 10.00% | $63,225 | $695,477 | 10.00% | $69,548 | $765,025 |
| Convenience Store | $347,767 | 10.00% | $34,777 | $382,544 | 10.00% | $38,254 | $420,798 |
| Retail | $498,019 | 10.00% | $49,802 | $547,821 | 10.00% | $54,782 | $602,603 |
| **Subtotal- Building Improvements** | **$2,404,120** | **10.00%** | **$240,412** | **$2,644,532** | **10.00%** | **$264,453** | **$2,908,985** |
| Site Improvements | | | | | | | |
| Landscaping | $25,000 | 10.00% | $2,500 | $27,500 | 10.00% | $2,750 | $30,250 |
| Parking Spaces | $36,239 | 10.00% | $3,624 | $39,863 | 10.00% | $3,986 | $43,849 |
| **Subtotal- Site Improvements** | **$61,239** | **10.00%** | **$6,124** | **$67,363** | **10.00%** | **$6,736** | **$74,099** |
| Furniture, Fixtures & Equipment (FF&E) | | | | | | | |
| Car Wash Equipment | $506,125 | 10.00% | $50,613 | $556,738 | 10.00% | $55,674 | $612,411 |
| Fuel Dispenser | $164,857 | 10.00% | $16,486 | $181,343 | 10.00% | $18,134 | $199,477 |
| Snow Plow | N/A | N/A | N/A | N/A | N/A | N/A | $7,500 |
| 15 HP Air Compressor | $47,875 | 10.00% | $4,788 | $52,663 | 10.00% | $5,266 | $57,929 |
| Office Equipment | $17,345 | 10.00% | $1,735 | $19,080 | 10.00% | $1,908 | $20,987 |
| Heavy-Duty Lifts | $92,250 | 10.00% | $9,225 | $101,475 | 10.00% | $10,148 | $111,623 |
| Fuel Storage Tank | $147,200 | 10.00% | $14,720 | $161,920 | 10.00% | $16,192 | $178,112 |
| Dispenser Piping | $16,115 | 10.00% | $1,612 | $17,727 | 10.00% | $1,773 | $19,499 |
| Tank Piping | $5,730 | 10.00% | $573 | $6,303 | 10.00% | $630 | $6,933 |
| Gas Canopy | $160,779 | 10.00% | $16,078 | $176,857 | 10.00% | $17,686 | $194,543 |
| Coolers | $576,576 | 10.00% | $57,658 | $634,234 | 10.00% | $63,423 | $697,657 |
| Freezer | $22,500 | 10.00% | $2,250 | $24,750 | 10.00% | $2,475 | $27,225 |
| **Subtotal- FF&E** | **$1,757,352** | **10.00%** | **$175,735** | **$1,933,087** | **10.00%** | **$193,309** | **$2,133,896** |
| **Total** | **$4,222,711** | **10.00%** | **$422,271** | **$4,644,982** | **10.00%** | **$464,498** | **$5,116,980** |

## Depreciation Analysis

Depreciation may be defined as any loss of value from any cause. It is the difference between the market value of a structural improvement or piece of equipment and its reproduction or replacement cost as of the date of valuation. There are three general areas of depreciation: physical deterioration, functional obsolescence and external obsolescence. Depreciation may be curable or incurable, the test being that money spent to cure the depreciation be gained in value. If the depreciation costs more to fix than will be gained in value, then the depreciation is considered incurable. We do not estimate any depreciation of the subject upon completion/stabilization.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

66

11900 Marshfield Property LLC Real Estate Appraisal

## Functional Obsolescence

This results from a lack of utility or desirability due to design or market perception of the improvements. This type of depreciation may be curable or incurable. Functional obsolescence is a loss in value due to changes in market tastes and standards. In the case of the subject, it is not necessary to make a deduction for additional functional obsolescence over and above that accounted for in the age-life method.

## External Obsolescence

This is due to circumstances outside the property itself, such as industry, demographic and economic conditions or an undesirable proximate use. This type of depreciation is rarely curable. A deduction for external obsolescence is not considered necessary for the subject.

Depreciation and obsolescence are estimated in the following table based on an age life estimation.

### Depreciation Estimate

| Name | Replacement Cost Estimate | Effective Age | Economic Life | Age-Life Depreciation (%) | Subtotal | Functional Obsolescence (%) | External Obsolescence (%) | Total Depreciation (%) | Depreciated Replacement Cost | Depreciated Unit Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| Building Improvements | | | | | | | | | | |
| Car Wash | $1,120,559 | 15 | 45 | 33.3% | $747,039 | – | – | 33.3% | $747,039 | $127.72 |
| Auto Repair | $765,025 | 15 | 45 | 33.3% | $510,016 | – | – | 33.3% | $510,016 | $103.68 |
| Convenience Store | $420,798 | 15 | 45 | 33.3% | $280,532 | – | – | 33.3% | $280,532 | $93.42 |
| Retail | $602,603 | 15 | 45 | 33.3% | $401,736 | – | – | 33.3% | $401,736 | $87.26 |
| Subtotal- Building Improvem | $2,908,985 | | | 33.3% | $1,939,323 | – | – | 33.3% | $1,939,323 | |
| Site Improvements | | | | | | | | | | |
| Landscaping | $30,250 | 2 | 10 | 20.0% | $24,200 | – | – | 20.0% | $24,200 | $24,200.00 |
| Parking Spaces | $43,849 | 2 | 8 | 25.0% | $32,887 | – | – | 25.0% | $32,887 | $1,315.47 |
| Subtotal- Site Improvements | $74,099 | | | 23.0% | $57,087 | – | – | 23.0% | $57,087 | |
| Furniture, Fixtures & Equipment (FF&E) | | | | | | | | | | |
| Car Wash Equipment | $612,411 | 8 | 12 | 66.7% | $204,137 | – | – | 66.7% | $204,137 | $204,137.08 |
| Fuel Dispenser | $199,477 | 7 | 22 | 31.8% | $136,007 | – | – | 31.8% | $136,007 | $12,364.28 |
| Snow Plow | $7,500 | N/A | N/A | N/A | N/A | – | – | N/A | $7,500 | $7,500.00 |
| 15 HP Air Compressor | $57,929 | 8 | 12 | 66.7% | $19,310 | – | – | 66.7% | $19,310 | $3,861.92 |
| Office Equipment | $20,987 | 8 | 12 | 66.7% | $6,996 | – | – | 66.7% | $6,996 | $6,995.82 |
| Heavy-Duty Lifts | $111,623 | 8 | 12 | 66.7% | $37,208 | – | – | 66.7% | $37,208 | $7,441.50 |
| Fuel Storage Tank | $178,112 | 7 | 22 | 31.8% | $121,440 | – | – | 31.8% | $121,440 | $30,360.00 |
| Dispenser Piping | $19,499 | 7 | 22 | 31.8% | $13,295 | – | – | 31.8% | $13,295 | $1,208.63 |
| Tank Piping | $6,933 | 7 | 22 | 31.8% | $4,727 | – | – | 31.8% | $4,727 | $787.88 |
| Gas Canopy | $194,543 | 7 | 22 | 31.8% | $132,643 | – | – | 31.8% | $132,643 | $34.44 |
| Coolers | $697,657 | 7 | 22 | 31.8% | $475,675 | – | – | 31.8% | $475,675 | $158.40 |
| Freezer | $27,225 | 7 | 22 | 31.8% | $18,563 | – | – | 31.8% | $18,563 | $6,187.50 |
| Subtotal- FF&E | $2,133,896 | | | 44.8% | $1,170,000 | – | – | 44.8% | $1,177,500 | |
| Total | $5,116,980 | | | 38.0% | $3,173,910 | – | – | 38.0% | $3,173,910 | |

## MVS Depreciated Replacement Cost Estimate

| Type | MVS Replacement Cost New | Total Depreciation | Total Depreciation % | MVS Depreciated Replacement Cost |
|---|---|---|---|---|
| Building Improvements | $2,908,985 | $969,662 | 33.3% | $1,939,323 |
| Site Improvements | $74,099 | $17,012 | 23.0% | $57,087 |
| Furniture, Fixtures, and Equipment | $2,133,896 | $956,397 | 44.8% | $1,177,500 |
| Total Cost | $5,116,980 | $1,943,070 | 38.0% | $3,173,910 |
| Total Cost per SF | $278.48 | $105.75 | | $172.73 |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

67

11900 Marshfield Property LLC Real Estate Appraisal

## Depreciated Replacement Cost Estimate

| Type | Total Costs | Total Costs per SF |
|---|---|---|
| Reconciled Replacement Cost New | $5,109,480 | $278.07 |
| Total Depreciation % | 38.0% | |
| Total Depreciation | $1,940,222 | $105.59 |
| **Total Depreciated Replacement Cost** | **$3,169,258** | **$172.48** |

## Cost Approach Conclusion

By combining our land value conclusion with the depreciated replacement cost of the subject, we arrive at a value indication by the cost approach as shown in the following table.

## Cost Approach Valuation

| As Is | Projection 1 | Rounded |
|---|---|---|
| Concluded Land Value | $1,440,000 | $1,440,000 |
| Depreciated Cost of Building Improvements | $1,939,323 | $1,940,000 |
| Depreciated Cost of Land Improvements | $57,087 | $60,000 |
| Subtotal Real Property | $3,436,410 | $3,440,000 |
| Depreciated Cost of FF&E | $1,177,500 | $1,180,000 |
| Indicated As Is Value | $4,613,910 | $4,620,000 |
| **Rounded As Is Value** | | **$4,620,000** |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

68

11900 Marshfield Property LLC Real Estate Appraisal

## Sales Comparison Approach

In the sales comparison approach, we analyze the subject based on its separate component parts. We consider these to be the gas station/c-store/car wash, the strip retail tenant spaces and the auto repair portion. We present a range of comparables for each component in the following table and conclude to a value. We consider the age and condition of the subject as it relates to the comparables as well as other characteristics including location. We consider the value of the subject based on this approach to be the sum of the component parts, as indicated.

### Summary of Comparable Sales

| Property Type | Address | Sale Date | Property Rights | Year Built | Size (SF) | Sale Price | Price/SF | Component Value | Rounded |
|---|---|---|---|---|---|---|---|---|---|
| Gas Station/Car Wash | 823 N Western Avenue, Chicago, IL | Under Contract | Leased Fee | 1957 | 3,987 | $1,700,000 | $426.39 | | |
| Gas Station | 2308 E Clairemont Avenue, Eau Claire, WI | Sep-18 | Leased Fee | 1982 | 5,000 | $1,680,000 | $336.00 | | |
| Gas Station | 19901 Masonic Boulevard, Roseville, MI | Nov-17 | Leased Fee | 1999 | 3,114 | $1,515,000 | $486.51 | | |
| Gas Station | N49 W35964 Wisconsin Ave, Oconomowoc, WI | Oct-16 | Leased Fee | 1992 | 3,040 | $1,110,000 | $365.13 | | |
| Gas Station/Car Wash | 21350 W Capitol Drive, Pewaukee, WI | Jul-16 | Leased Fee | 1997 | 3,572 | $1,800,000 | $503.92 | | |
| Range | | | | | | | $336.00 - $503.92 | | |
| Average | | | | | | | $423.59 | | |
| Subject Convenience Store/Car Wash | | | | | 8,852 | | $350.00 | $3,098,200 | |
| Strip Retail | 1934 W 79th Street, Chicago, IL | Aug-17 | Leased Fee | 2009 | 4,788 | $665,000 | $138.89 | | |
| Strip Retail | 4830-4846 W 79th Street, Burbank, IL | Jun-18 | Leased Fee | 1986 | 6,000 | $700,000 | $116.67 | | |
| Strip Retail | 6237 S Union Avenue, Chicago, IL | Apr-18 | Leased Fee | 2005 | 8,000 | $2,250,000 | $281.25 | | |
| Strip Retail | 6048-6052 S Western Avenue, Chicago, IL | Jun-17 | Leased Fee | 2005 | 7,599 | $1,695,000 | $223.06 | | |
| Strip Retail | 6500 S Western Avenue, Chicago, IL | Dec-18 | Leased Fee | 2007 | 7,671 | $657,500 | $85.71 | | |
| Range | | | | | | | $85.71 - $281.25 | | |
| Average | | | | | | | $169.11 | | |
| Subject Strip Retail | | | | | 4,604 | | $120.00 | $552,480 | |
| Auto Repair | 6130 W 159th Street, Oak Forest, IL | Jun-17 | Fee Simple | 1995 | 5,000 | $325,000 | $65.00 | | |
| Auto Repair | 770 Burnham Avenue, Calumet City, IL | Dec-16 | Fee Simple | 1970 | 8,499 | $235,000 | $27.65 | | |
| Auto Repair | 3045 W Columbus Avenue, Chicago, IL | Jul-18 | Fee Simple | 1940 | 4,968 | $199,000 | $40.06 | | |
| Auto Repair | 9121 S Kedzie Avenue, Evergreen Park, IL | Aug-17 | Fee Simple | 1979 | 1,100 | $105,000 | $95.45 | | |
| Range | | | | | | | $27.65 - 95.45 | | |
| Average | | | | | | | $57.04 | | |
| Subject Auto Repair | | | | | 4,919 | | $50.00 | $245,950.00 | |
| **Total** | | | | | **18,375** | | **$212.06** | **$3,896,630** | **$3,900,000** |

The conclusion above represents real property only.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

69

# Income Capitalization Approach

The Income Approach to value is based on the present worth of the future rights to income. This type of analysis considers the property from an investor's point of view, the basic premise being that the amount and quality of the income stream are the basis for value of the property. The market in which the subject property competes is investigated; comparable sales, contracts for sale and current offerings are reviewed.

In this analysis, we use direct capitalization analysis because investors in this property type typically rely on this method.

## Estimate of Gross Income

In order to estimate the potential gross operating revenue of the subject, we place primary reliance on historical operating statements, contract rents in place, retail lease market comparables, and ownership's projections for the subject business.

## Operating Projections

Revenue is split into two categories, rental income from retail space and the business income from the car wash, auto repair, and convenience store.

For this analysis, we have analyzed the subject's recent performance, particularly full year 2018; and projections for future diesel sales. Per client's request, we have excluded any potential future income from gaming machines. As of the appraisal date, no gaming machines were operational, and we have not investigated the potential for implementing such activity. Should this activity be allowed and installed, it may have an impact on the going concern value.

The subject is operated as gas station convenience store with over 83% of the revenue coming from the station and convenience store. The next highest percentage of income is from the oil change shop with about 5% of the revenue, followed by the in-line retail, comprising less than 5% of the revenue. The subject does have approximately 1,728 square feet of vacant former restaurant space, as well as 700 square feet of owner occupied office space that could be leased. We examined the other subject leases as well as market leases of retail stores in order to arrive at an estimate of rent. We concluded a rent on the lower end of the market rates to allow for a small amount of tenant improvements to be included in the rent estimate.

We conducted a search for comparable rentals for the retail space. This grid/info is shown on the following page; the subject retail spaces, in general, are much smaller than typical in-line retail and we rely on in-place contract rents as well as comparable data. The comparable leases are net leases whereas the subject leases are gross leases. Expenses that would be reimbursed on a net basis were estimated at $10.00 per square foot.

In our adjustments, we consider the following factors pertinent to the subject property:

- The subject's auto-related services, fuel service and c-store serves as a quasi-anchor for the retail tenants.

- The subject's parking ratio is artificially low as it counts only the striped spaces in the front of the property and is applied to the entire building. There is a significant area for parking in the rear for the auto-related services, as well as the spaces at each fuel pump. We don't consider the parking ratio to detract from the viability of the retail spaces.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

### Lease Analysis Grid - Retail

| Car Wash | Subject | Comp 1 | Comp 2 | Comp 3 | Comp 4 | Comp 5 | Comp 6 | Comp 7 | Comp 8 |
|---|---|---|---|---|---|---|---|---|---|
| Name | 11900 Marshfield | Stony Creek | The Landings | 1627 E. 95th St. | 1627 E. 95th St. | Evergreen Plaza | Evergreen Plaza | Lake Park Pointe | The Landings |
| Address | 11900 S Marshfield Ave | 10900 S Cicero Ave | 16701-16851 Torrence Ave. | 1627 E. 95th St. | 1627 E. 95th St. | 9500-9730 South Western Ave. | 9500-9730 South Western Ave. | 1300 E. 47th St. | 16701-16851 Torrence Ave. |
| City | Calumet Park | Oak Lawn | Lansing | Chicago | Chicago | Evergreen Park | Evergreen Park | Chicago | Lansing |
| County | Cook | Cook | Cook | Cook | Cook | Cook | Cook | Cook | Cook |
| State | IL | IL | IL | IL | IL | IL | IL | IL | IL |
| Date | Apr-2019 | Dec-2018 | Jun-2018 | May-2018 | Aug-2017 | Jul-2017 | Jul-2017 | Nov-2016 | Aug-2016 |
| Lease Type | | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net |
| Term | | 84 | 60 | 60 | 36 | 120 | 120 | 119 | 60 |
| Year Built | 2000 | 2014 | 1977 to 2000 | 1999 | 1999 | 1950 | 1950 | 1999 | 1977 to 2000 |
| Year Renovated | 2018 | N/A | N/A | Unk | Unk | 2018 | 2018 | N/A | N/A |
| Suite Size | - | 1,809 | 1,087 | 3,500 | 2,765 | 2,300 | 4,500 | 2,522 | 1,587 |
| Tenant | | Nothing Bundt | Top Spa Nails | Happy Nails | America's Best | Potbelly | AT&T | ATI Physical | Insure One |
| Traffic Count | 20,400 | 53,735 | 26,500 | 23,500 | 23,500 | 34,027 | 34,027 | 12,800 | 26,500 |
| Parking Ratio RA | 1.4 | 7.8 | 15.4 | 5.5 | 5.5 | 4.5 | 4.5 | 2.3 | 15.4 |
| Land to Building Ratio | 7.9 | 6.1 | 8.0 | 4.5 | 4.5 | 3.5 | 3.5 | 1.7 | 8.0 |
| Base Rent/SF | | $27.00 | $36.43 | $19.00 | $28.50 | $44.00 | $55.00 | $33.00 | $25.00 |
| **Transaction Adjustments** | | | | | | | | | |
| Expense Structure | | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net | Triple Net |
| $ Adjustment | | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 | $10.00 |
| Conditions of Lease | | Normal | Normal | Normal | Normal | Normal | Normal | Normal | Normal |
| % Adjustment | | - | - | - | - | - | - | - | - |
| Market Conditions | Apr-19 | Dec-18 | Jun-18 | May-18 | Aug-17 | Jul-17 | Jul-17 | Nov-16 | Aug-16 |
| Adjusted Rent | | $37.00 | $46.43 | $29.00 | $38.50 | $54.00 | $65.00 | $43.00 | $35.00 |
| Market Trends/Year | 3.0% | 1% | 2% | 3% | 5% | 5% | 5% | 7% | 8% |
| Adjusted Rent | | $37.39 | $47.51 | $29.82 | $40.47 | $56.91 | $68.50 | $46.21 | $37.90 |
| Location | | - | - | - | 5% | -5% | -5% | -10% | - |
| Access/Exposure | | -15% | - | - | - | -5% | -5% | 5% | - |
| Size | | - | - | - | - | - | - | - | - |
| Building Quality | | 10% | -5% | -10% | -10% | -15% | -15% | - | -5% |
| Age/Condition | | -10% | 5% | - | - | 15% | 15% | - | 5% |
| Economic Characteristics | | - | - | - | - | - | - | - | - |
| Land to Building Ratio | | - | - | 15% | 15% | 15% | 15% | 20% | - |
| Parking Ratio RA | | -15% | -15% | -10% | -10% | -10% | -10% | -5% | -15% |
| Adjusted Rent | | $26.17 | $40.38 | $28.33 | $40.47 | $54.06 | $65.08 | $50.84 | $32.21 |

The adjusted range of comparable rents is $26.17 to $65.08. Based on the above comparable data, we conclude that a reasonable range for market rent for the subject's vacant retail spaces is $40 to $50 per square foot. We consider the in-place contract rents to be generally supported by the market data and note that they are arm's length, executed leases with tenants that have been long-time tenants.

## Potential Gross Income

The following table summarizes the potential gross rent of the subject in terms of rental revenue for the retail space. We have relied upon the rent roll provided by the property owner and assume it is accurate and complete. We have assumed the owner-occupied space and vacant former restaurant space could be leased with minor tenant improvement allowances that has been incorporated into the rent.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

71

11900 Marshfield Property LLC Real Estate Appraisal

## Lease Synopsis

| Tenant Name | Lease Expiration | Space Occupied (sf) | Contract Rent YE 2018 | | | Contract or Market Rent | | |
|---|---|---|---|---|---|---|---|---|
| | | | $ Per Month | $ Per Sq. Ft. Per Yr. | Total Annual Rent | $ Per Month | $ Per Sq. Ft. Per Yr. | Total Annual Rent |
| Car Wash | | 5,849 | | | | | | |
| Auto Repair | | 4,919 | Internal/Not Arm's Length | | | | | |
| Convenience Store | | 3,003 | | | | | | |
| Total Owned | | 13,771 | | | | | | |
| Dunkin Donuts | Aug-20 | 216 | $1,640 | $91.13 | $19,684 | $1,673 | $92.95 | $20,078 |
| Vacant Former Restaurant | N/A | 1,728 | Vacant | | - | $5,760 | $40.00 | $69,120 |
| Boost Mobile | Dec-20 | 750 | $4,500 | $72.00 | $54,000 | $4,575 | $73.20 | $54,900 |
| Hair Salon | Feb-21 | 510 | $2,300 | $54.12 | $27,600 | $2,483 | $58.43 | $29,800 |
| Loya Insurance | Feb-26 | 700 | $3,450 | $59.14 | $41,400 | $3,200 | $54.86 | $38,400 |
| Owner | N/A | 700 | Owner Occupied | | - | $2,625 | $45.00 | $31,500 |
| Billboard Sign (Front Media) | Aug-37 | N/A | | | $15,969 | $1,357 | - | $16,288 |
| **Totals:** | | **18,375** | **$11,890** | | **$158,653** | **$21,674** | | **$260,086** |

In addition to the retail space, income is derived from the auto-related services (car wash and auto repair) as well as the gas station and convenience store. The following items relate to this income:

- Rental income for the convenience store and auto-related services were considered intercompany and to count them would be double-counting since we considered the income derived from the operations.
- Sales revenue from gas station, lube shop, and car wash were based on historical (2018) income adjusted for inflation. The inflation rates were based on an examination of three projections:

### Inflation Rate Projections

| Source | 2019 | 2020 | 2021 |
|---|---|---|---|
| US Congressional Budget Office | 2.00% | 2.10% | 2.10% |
| Board of Govenors of the Federal Reserve | 1.80% | 2.00% | 2.00% |
| Statista | 2.44% | 2.12% | 2.04% |
| **Average (Rounded)** | **2.10%** | **2.10%** | **2.00%** |

- Diesel income was not in the historical statements and is based on the ownership projections resulting from the new diesel station investment of approximately $1.2 million.
- No gaming revenue was included in the projection based on client's request; we note that as of the effective date of value there was no gaming machines in place and the area set aside for future equipment was a relatively small area within the c-store.
- Other minor income including the items below were based on inflating 2018 income figures
  - ATM commissions
  - Tobacco rebates
  - Air machine

## Income & Expenses

To develop projections of operating income and expenses, we analyzed the subject's historical operating statements for 2017 and 2018 shown on the following pages, along with our projections. We note that typical

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

71

11900 Marshfield Property LLC Real Estate Appraisal

ratios applied to COGS and fuel/c-store revenues do not apply given the subject's additional auto-related service income and noting the revenue and expenses are combined, which impedes analysis to the level of specificity typical for more traditional gas station/c-store going concern properties. Furthermore, the subject car wash is also atypical in the market as it is limited service and not actively marketed, relying primarily on repeat/word-of-mouth customers and impulse business derived from the traffic generated by the other uses on-site.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

11900 Marshfield Property LLC Real Estate Appraisal

## History and Projections

| Income | Actual 2017 | Actual 2018 | JLL Projection 1 |
|---|---|---|---|
| Rental Income (Vacant Restaurant Space) | – | – | $69,120 |
| Rental Income (Vacant Office Space) | – | – | $31,500 |
| Rental Income (Fred Loya Insurance) | – | $41,400 | $38,400 |
| Rental Income (Boost Mobile) | – | $54,000 | $54,900 |
| Rental Income (B. Lindsey Hair Gallery) | – | $27,600 | $29,900 |
| Rental Income (Dunkin Donuts) | – | $19,684 | $20,078 |
| Rental Income (Front Media) | – | $15,969 | $16,288 |
| Profits from Dunkin Donuts (not included) | – | – | – |
| Rental Income (includes C-Store interco.) | $754,632 | – | – |
| Sales Revenue (Gas Station) | – | $3,899,643 | $3,981,536 |
| Sales Revenue (Lube Shop) | – | $234,759 | $239,689 |
| Sales Revene (Car Wash) | – | $117,130 | $119,590 |
| Diesel Income | – | – | $192,000 |
| Gaming Income | – | – | – |
| General Revenue | $4,014,266 | – | – |
| **Total General Revenue** | $4,768,898 | $4,410,185 | $4,792,900 |
| | | | |
| Other Income | | | |
| ATM Commissions | – | $17,055 | $17,413 |
| Tobacco Rebates | – | $18,385 | $18,771 |
| Air Machine | – | $6,909 | $7,054 |
| **Total Other Income** | – | $42,349 | $43,238 |
| **Potential Gross Income** | $4,768,898 | $4,452,534 | $4,836,138 |
| Cost of Goods Sold | ($2,854,626) | ($3,020,730) | ($3,084,165) |
| **Effective Gross Income** | $1,914,272 | $1,431,804 | $1,751,973 |
| Expenses | | | |
| Accounting & Bookkeeping | $3,250 | $3,000 | $3,063 |
| Alarm | – | $1,140 | $1,164 |
| Appraisal Services | $2,000 | – | – |
| Bank Charges | $2,799 | $4,233 | $4,322 |
| Credit Card Fees | $42,425 | $51,269 | $52,346 |
| Cito POS Fees | – | $836 | $854 |
| Citgo Network Fees | $1,224 | $1,236 | $1,262 |
| Disposal Service | $3,492 | $4,693 | $4,792 |
| Equipment Rent | $37,920 | – | – |
| Insurance | $22,308 | $23,836 | $24,337 |
| Legal & Profssional Fees | $9,250 | – | – |
| Internet Service | – | $4,873 | $4,975 |
| Janitorial Service | $6,994 | $3,500 | $3,574 |
| License & Permits | – | $1,984 | $2,026 |
| Memeberships | – | $210 | $214 |
| Non-Employee Compensation | $10,250 | – | – |
| Office Supplies | $965 | $1,058 | $1,080 |
| Pest Control | $780 | $780 | $796 |
| Postage | $98 | $49 | $50 |
| Pumps Lease | – | $38,160 | $38,961 |
| Repair & Maintenance | $16,777 | $6,642 | $6,781 |
| Sales Tax | $182,963 | $193,406 | $197,468 |
| Security | $1,525 | – | – |
| Subscription | $3,648 | $1,908 | $1,948 |
| Uniforms | $7,588 | $5,259 | $5,369 |
| Utilities | $52,011 | $53,863 | $54,994 |
| Wages | $181,548 | $215,793 | $220,325 |
| Real Estate Taxes | $125,016 | $213,125 | $234,438 |
| *Ascentium Capital Lease Payments | – | $84,220 | $84,220 |
| *Direct Capital Lease Payments | – | $33,990 | $33,990 |
| *Mortgage Payments BLC | – | $126,824 | – |
| *Bank Charges | – | $180 | – |
| *Woodward Construction | – | $2,365 | – |
| *Homer Paving Company | – | $50,000 | – |
| *MK Construction | – | $10,000 | – |
| *C&J Construction | – | $17,000 | – |
| *Noman Architects | – | $9,950 | – |
| *Antero Group | – | $1,735 | – |
| *Sewer Builders Supplies | – | $10,628 | – |
| *B&K Equipments | – | $3,300 | – |
| **Total Expenses** | $714,831 | $1,181,065 | $983,348 |
| Expense Ratio | 37.3% | 82.5% | 20.5% |
| **Net Operating Income** | $1,199,441 | $250,739 | $768,625 |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

74

The following items relate to historical and projected expenses to convert into a projection of net operating income **(note the Projected NOI differs from the History and Projection due to the addition of various categories including items such as vacancy, management fee, and reserves):**

- Ascentium Capital and Direct Capital expenditures were assumed to be ongoing equipment rental expenses.

- We note that 2018 expense items we understood were related to construction and equipment used during construction were not included in our projections; these are labelled with an asterisk in the chart shown previously.

- One-time items in 2017 such as appraisal fees, memberships, and non-employee compensation were not included in the projection.

- Deductions were made for
    - Vacancy and credit loss on the retail income.
    - Management fees on the retail income.
    - Real property reserves for replacement; we project a relatively high reserves amount on a per square foot basis as it includes multiple use types, equipment and site improvements.

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.                    /5

11900 Marshfield Property LLC Real Estate Appraisal

## NOI Projection

| Income | | Annual |
|---|---|---|
| Rental Income (Vacant Space) | | $69,120 |
| Rental Income (Vacant Space) | | $31,500 |
| Rental Income (Fred Loya Insurance) | | $38,400 |
| Rental Income (Boost Mobile) | | $54,900 |
| Rental Income (B. Lindsey Hair Gallery) | | $29,800 |
| Rental Income (Dunkin Donuts) | | $20,078 |
| Rental Income (Front Media) | | $16,288 |
| Sales Revenue (Gas Station) | | $3,981,536 |
| Sales Revenue (Lube Shop) | | $239,689 |
| Sales Revene (Car Wash) | | $119,590 |
| Diesel Income | | $192,000 |
| Total General Revenue | | $4,792,900 |
| | | |
| Other Income | | |
| ATM Commissions | | $17,413 |
| Tobacco Rebates | | $18,771 |
| Air Machine | | $7,054 |
| Total Other Income | | $43,238 |
| | | |
| **Potential Gross Income before deductions** | | **$4,836,138** |
| Vacancy & Credit Loss (% of retail) | 10.0% | -$24,380 |
| Management (% of retail) | 5.0% | -$12,190 |
| Reserves (per SF) | $ 0.75 | -$13,781 |
| **Potential Gross Income after deductions** | | **$4,785,788** |
| Cost of Goods Sold | | -$3,084,165 |
| **Effective Gross Income** | | **$1,701,622** |
| Expenses | | |
| Accounting & Bookeeping | | $3,063 |
| Alarm | | $1,164 |
| Bank Charges | | $4,322 |
| Credit Card Fees | | $52,346 |
| Cito POS Fees | | $854 |
| Citgo Network Fees | | $1,262 |
| Disposal Service | | $4,792 |
| Insurance | | $24,337 |
| Internet Service | | $4,975 |
| Janitorial Service | | $3,574 |
| License & Permits | | $2,026 |
| Memeberships | | $214 |
| Office Supplies | | $1,080 |
| Pest Control | | $796 |
| Postage | | $50 |
| Pumps Lease | | $38,961 |
| Repair & Maintenance | | $6,781 |
| Sales Tax | | $197,468 |
| Subscription | | $1,948 |
| Uniforms | | $5,369 |
| Utilities | | $54,994 |
| Wages | | $220,325 |
| Real Estate Taxes | | $234,438 |
| Ascentium Capital Lease Payments | | $84,220 |
| Direct Capital Lease Payments | | $33,990 |
| **Total Expenses** | | **$983,348** |
| **Net Operating Income** | | **$718,274** |

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

/6

**The projected net operating income on the previous page differs from the History and Projections table two pages prior due to the inclusion of such categories as vacancy, management, and reserves for replacement. Furthermore, the projected NOI table does not display projections of the construction accounts that are not a part of the income and expense projection into the future.**

## Capitalization Rate

The capitalization rate is the factor that converts the stabilized net operating income (NOI) to a present value. It is the ratio of net income to value or sale price.

NOI ÷ Sale Price = Capitalization Rate

For example, if a property sells for $500,000, and has a stabilized NOI of $50,000, the indicated capitalization rate is 10%.

## Market Extracted Rates

The following table details capitalization rates extracted from the market for similar service businesses.

### Comparable Sale Capitalization Rates

| No. | Property Type/Address | City | State | Rentable Area | Year Built | Price | Price Per RA | Date | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| | **Gas Station** | | | | | | | | |
| | 2308 E Clairemont Avenue | Eau Claire | WI | 5,000 | 1982 | $1,680,000 | $336 | Sep-2018 | 6.87% |
| | 19901 Masonic Boulevard | Roseville | MI | 3,114 | 1999 | $1,515,000 | $539 | Nov-2017 | 8.00% |
| | N49 W35964 Wisconsin Avenue | Oconomoc | WI | 3,040 | 1992 | $1,110,000 | $553 | Oct-2016 | 5.65% |
| | **C-Store** | | | | | | | | |
| | 4830-4846 W 79th Street | Burbank | IL | 6,000 | 1986 | $700,000 | $116.67 | Jun-2018 | 8.50% |
| | 6048-6052 S Western Avenue | Chicago | IL | 7,599 | 2005 | $1,695,000 | $223.06 | Jun-2017 | 9.33% |
| | 6500 S Western Avenue | Chicago | IL | 7,671 | 2007 | $657,500 | $85.71 | Dec-2018 | 8.20% |
| | | | | | | | | **Average (Mean):** | **7.76%** |
| | | | | | | | | **Median:** | **8.10%** |

### Comparable Sale Capitalization Rates

| No. | Name | City | State | Rentable Area | Year Built | Price | Price Per RA | Date | Cap Rate |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Legacy Express Car Wash | Oklahoma City | OK | 4,992 | 2007 | $2,598,877 | $520.61 | Jun-2018 | 12.00% |
| 2 | Car Wash on Pennsylvania | Oklahoma City | OK | 5,240 | 2004 | $1,665,500 | $317.84 | Dec-2017 | 17.10% |
| 3 | Auto Clean Car Wash | Edmond | OK | 4,544 | 2000 | $2,600,000 | $572.18 | Aug-2017 | 13.14% |
| 4 | Xtreme Auto Wash | Oklahoma City | OK | 6,832 | 2003 | $2,600,000 | $380.56 | Aug-2017 | 15.25% |
| 5 | Foam Brite Car Wash | MidwestCity | OK | 4,264 | 2006 | $3,465,000 | $812.62 | Nov-2016 | 10.04% |
| 6 | Jenks Car wash | Jenks | OK | 4,952 | 2004 | $1,240,000 | $250.40 | Jul-2016 | 14.71% |
| 7 | Car Wash | Tulsa | OK | 5,356 | 1998 | $910,000 | $169.90 | Feb-2016 | 10.41% |
| | | | | | | | | **Average (Mean):** | **13.24%** |
| | | | | | | | | **Median:** | **13.14%** |

As shown above, cap rates indicate a range of 5.65 to 8.00% for gas stations, 8.20% to 9.33% for convenience stores, and 10.04% to 17.10% for the car washes. We would expect the subject property to trade above the

Copyright © Jones Lang LaSalle IP, Inc. 2019. All Rights Reserved.

# EXHIBIT E

**CBRE VALUATION & ADVISORY SERVICES**

# APPRAISAL REPORT

CITGO TRAVEL CENTER
11900 SOUTH MARSHFIELD AVENUE
CALUMET PARK, ILLINOIS 60827
CBRE FILE NO. 19-164CH-2178-1
MUBARK IBRAHAM/LOAN#:235078-904995 NBL

CUSHMAN AND WAKEFIELD GLOBAL SERVICES INC. AND
NEWTEK SMALL BUSINESS FINANCE, LLC
CLIENT REFERENCE NUMBER: 19-001590-01-1

**CBRE**

VALUATION & ADVISORY SERVICES



700 Commerce Drive, Suite 550
Oak Brook, Illinois 60523

T  (630) 573-7098
F  (630) 573-7018

www.cbre.com

August 7, 2019


Attn. Clarke Lewis
Cushman and Wakefield Global Services Inc.
Appraisal Management Firm for NEWTEK SMALL BUSINESS FINANCE, LLC
1377 Motor Parkway - Suite 203
Islandia, New York  11749


RE:  Appraisal of the: Citgo Travel Center
     11900 South Marshfield Avenue
     Calumet Park, Cook County, Illinois  60827
     CBRE, Inc. File No. 19-164CH-2178-1
     Client Reference Number: 19-001590-01-1
     Mubark Ibraham/Loan#:235078-904995 NBL


At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property.   Our analysis is presented in the following Appraisal Report (Self-Contained).

The subject is a travel center located at 11900 South Marshfield Avenue in Calumet Park, Cook County, Illinois. The subject is comprised of a 22,021 square foot building demised into convenience store space (3,703 SF), a 125' automatic car was (6,900 SF), auto service/repair space (7,514 SF), and five retail units (3,904 SF total). The building was constructed in 1998 and is situated on a 3.32-acre site. The subject is flagged as a Citgo gas station and is 82.3% owner-occupied with 2,176 SF leased to tenants. The station features six double-sided gasoline dispensers and five diesel dispensers.

Based on the operational characteristics of the facility, it includes an intangible component of business value in addition to the value of the real estate and equipment components. The intangible value is a value enhancement that results from items of intangible personal property such as marketing and management skill, an assembled work force, working capital, trade names, franchises, patents, trademarks, non-realty related contracts or leases, and operating agreements.

Cushman and Wakefield Global Services Inc.
August 7, 2019
Page 2

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSIONS | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is - Going Concern | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $6,375,000 |
| As Is - Real Estate and F,F,& E | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $5,535,000 |
| As Is - Real Estate Only | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $5,190,000 |

Compiled by CBRE

Although a majority of the subject property is owner-occupied, there are several leases in-place to arms-length tenants.

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value.  The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.  It also conforms to Title XI Regulations and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) updated in 1994 and further updated by the Interagency Appraisal and Evaluation Guidelines promulgated in 2010.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report.  No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).



Cushman and Wakefield Global Services Inc.
August 7, 2019
Page 3

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Clayton P. Conn, MAI
Senior Appraiser
State Certified General Real Estate Appraiser
State of Illinois License No. 553.001771
Expiration Date: 9/30/2019

Phone:   630-573-7098
Fax:     630-573-7018
Email:   Clayton.Conn@cbre.com

Lesley J. Linder, MAI, CCIM, MRICS
Senior Managing Director
State Certified General Real Estate Appraiser
State of Illinois License No. 553.001947
Expiration Date: 9/30/2019

Phone:   312-233-8665
Fax:     312-233-8660
Email:   Les.Linder@cbre.com



# Certification

We certify to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

4.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

5.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

7.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice, as well as the requirements of the State of Illinois.

8.  The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

9.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. As of the date of this report, Clayton P. Conn, MAI and Lesley J. Linder MAI, CCIM, MRICS have completed the continuing education program for Designated Members of the Appraisal Institute.

11. Clayton P. Conn, MAI has and Lesley J. Linder MAI, CCIM, MRICS has not made a personal inspection of the property that is the subject of this report.

12. No one provided significant real property appraisal assistance to the persons signing this report.

13. Valuation & Advisory Services operates as an independent economic entity within CBRE, Inc. Although employees of other CBRE, Inc. divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy were maintained at all times with regard to this assignment without conflict of interest.

*Citgo Travel Center, Calumet Park, Illinois*



14. Clayton P. Conn, MAI and Lesley J. Linder MAI, CCIM, MRICS have not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

Clayton P. Conn, MAI
State of Illinois License No. 553.001771
Expiration Date: 9/30/2019

Lesley J. Linder, MAI, CCIM, MRICS
State of Illinois License No. 553.001947
Expiration Date: 9/30/2019

*Citgo Travel Center, Calumet Park, Illinois*

**CBRE**

# Subject Photographs



**Aerial View**

*Citgo Travel Center, Calumet Park, Illinois*







Looking south at the subject

Looking north at the subject





Looking east at the subject

Looking west at the subject





Typical Fuel Pump (MPD)

Typical Fuel Pump (MPD)

*Citgo Travel Center, Calumet Park, Illinois*





Signage



Typical Convenience Store Interior



Typical Convenience Store Interior



Typical Retail Interior



Typical Retail Interior



Typical Auto Service/Repair Space

v

*Citgo Travel Center, Calumet Park, Illinois*





Typical Auto Service/Repair Space



Typical Auto Service/Repair Space



Car Wash Tunnel



Car Wash Equipment Room



Looking east on 119th Street



Looking west on 119th Street

*Citgo Travel Center, Calumet Park, Illinois*



# Executive Summary

| | |
|---|---|
| **Property Name** | Citgo Travel Center |
| **Location** | 11900 South Marshfield Avenue<br>Calumet Park, Cook County, IL 60827 |
| **Client Reference Number** | 19-001590-01-1 |
| **Highest and Best Use** | |
| As If Vacant | Retail |
| As Improved | Retail |
| **Property Rights Appraised** | Leased Fee Interest/Fee Simple Estate |
| **Date of Report** | August 7, 2019 |
| **Date of Inspection** | July 25, 2019 |
| **Estimated Exposure Time** | 12 - 15 Months |
| **Estimated Marketing Time** | 12 - 15 Months |
| **Land Area** | 3.32 AC 144,428 SF |
| **Zoning** | C-3, Highway Commercial District |
| | |
| **Improvements** | |
| Property Type | Retail (Travel Center) |
| Number of Buildings | 1 |
| Number of Stories | 1 |
| Gross Building Area | 22,021 SF |
| Year Built | 1998 Renovated: 2019 |
| Condition | Average |
| **Buyer Profile** | Owner-User |

| VALUATION | Total | Per SF |
|---|---|---|
| Land Value | $1,800,000 | $12.46 |
| **Market Value As Is On**     **July 25, 2019** | | |
| Cost Approach - Real Estate Only | $5,190,000 | $235.68 |
| Cost Approach - Real Estate and F,F,& E | $5,540,000 | $251.58 |
| Sales Comparison Approach - Going Concern | $6,400,000 | $290.63 |
| Income Capitalization Approach - Going Concern | $6,375,000 | $289.50 |

| CONCLUDED MARKET VALUES | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value** |
| As Is - Going Concern | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $6,375,000 |
| As Is - Real Estate and F,F,& E | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $5,540,000 |
| As Is - Real Estate Only | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $5,190,000 |

Compiled by CBRE

*Citgo Travel Center, Calumet Park, Illinois*



## EXTRAORDINARY ASSUMPTIONS

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- CBRE has not observed, yet is not qualified to detect, the existence of potentially hazardous material which may be present on or near the site. The existence of hazardous materials may have an effect on the value of the property. For this appraisal, CBRE has specifically assumed that the property is not affected by any hazardous materials and/or environmental conditions that may be present on or near the property.
- It is an extraordinary assumption of this report that no adverse environmental conditions be present on or near the subject property. The historic sales levels are instrumental to the analysis of the subject property's income generating capability and accordingly, the estimation of the overall going concern value. We were provided with 2017 and 2018 tax return statements. It is a specific assumption of this report that the operating data provided for review, including sales levels, revenue and fuel volume and expenses are true and correct. Any information contrary to that assumed herein could have a material impact on the value estimate(s) set forth within this report.
- The use of these extraordinary assumptions may have affected the assignment results.

## HYPOTHETICAL CONDITIONS

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

---

[1] The Appraisal Foundation, *USPAP, 2018-2019*

[2] The Appraisal Foundation, *USPAP, 2018-2019*

*Citgo Travel Center, Calumet Park, Illinois*



## OWNERSHIP AND PROPERTY HISTORY

| OWNERSHIP SUMMARY | |
|---|---|
| Item | Current |
| Owner: | EMJ Gas & Food Mart Inc. |
| Date Purchased: | Aug 15, 2014 |
| Purchase Price: | $950,000 |
| County/Locality Name: | Cook |
| Pending Sale: | Yes |
| Change of Ownership - Past 3 Years | No |
| Compiled by CBRE | |

Title to the property is currently vested in the name of Kensington Vanguard National Land Services, who have owned the subject property since 2004. According to the subject's ownership, the subject property was renovated in 2019 at a total reported cost of $1,400,000. These renovation costs include: asphalt paving, installation of five new diesel MPD's, one new gasoline MPD, three underground fuel tanks (two 5,000 gallon and one 20,000 gallon fuel tanks), a 1,536 SF canopy, and new signage. The subject property is not currently under contract or listed for sale. To the best of our knowledge, there has been no other ownership transfer or marketing of the property during the previous three years.



## EXPOSURE/MARKETING TIME

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- the opinions of market participants.

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | |
|---|---|---|
| | Exposure/Mktg. (Months) | |
| Investment Type | Range | Average |
| Comparable Sales Data | 12.0 - 26.0 | 16.0 |
| Local Market Professionals | 9.0 - 18.0 | 13.5 |
| **CBRE Exposure Time Estimate** | **12 - 15 Months** | |
| **CBRE Marketing Period Estimate** | **12 - 15 Months** | |
| Source: CBRE National Investor Survey, RealtyRates.com Survey & PwC Real Estate Survey | | |

x

*Citgo Travel Center, Calumet Park, Illinois*



# Table of Contents

Certification ............................................................................................................. i

Subject Photographs.............................................................................................iii

Executive Summary .............................................................................................vii

Table of Contents.................................................................................................xi

Scope of Work....................................................................................................... 1

Area Analysis ........................................................................................................ 5

Neighborhood Analysis ...................................................................................... 11

Site Analysis........................................................................................................ 17

Improvements Analysis....................................................................................... 21

Zoning ................................................................................................................. 24

Tax and Assessment Data .................................................................................. 25

Market Analysis................................................................................................... 27

Highest and Best Use ......................................................................................... 40

Land Value........................................................................................................... 41

Cost Approach .................................................................................................... 45

Insurable Replacement Cost .............................................................................. 50

Sales Comparison Approach .............................................................................. 51

Income Capitalization Approach........................................................................ 57

Reconciliation of Value ....................................................................................... 68

Assumptions and Limiting Conditions ............................................................... 69

ADDENDA

A   Land Sale Data Sheets
B   Improved Sale Data Sheets
C   Legal Description
D   Client Contract Information
E   Qualifications
F   W-9

*Citgo Travel Center, Calumet Park, Illinois*



# Scope of Work

This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rule 2 of USPAP. The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered and analysis is applied.

## INTENDED USE OF REPORT

This appraisal is to be used for loan underwriting and-or credit decisions, and no other use is permitted.

## CLIENT

The client is Newtek Small Business Finance, LLC, Newtek Business Lending, LLC, NBL SPVI, LLC, and Cushman and Wakefield Global Services, Inc.

## INTENDED USER OF REPORT

This appraisal is to be used by Newtek Small Business Finance Inc., Newtek Business Lending, LLC, NBL SPVI, LLC, and Cushman and Wakefield Global Services, Inc. and no other users may rely on our report unless as specifically indicated in the report.

> Intended Users - the intended user is the person (or entity) who the appraiser intends will use the results of the appraisal. The client may provide the appraiser with information about other potential users of the appraisal, but the appraiser ultimately determines who the appropriate users are given the appraisal problem to be solved. Identifying the intended users is necessary so that the appraiser can report the opinions and conclusions developed in the appraisal in a manner that is clear and understandable to the intended users. Parties who receive or might receive a copy of the appraisal are not necessarily intended users. The appraiser's responsibility is to the intended users identified in the report, not to all readers of the appraisal report. [3]

## PURPOSE OF THE APPRAISAL

The purpose of this appraisal is to estimate the market value of the subject property.

---

[3] Appraisal Institute, The Appraisal of Real Estate, 14th ed. (Chicago: Appraisal Institute, 2013), 50.

1

*Citgo Travel Center, Calumet Park, Illinois*



## DEFINITION OF VALUE

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## INTEREST APPRAISED

The value estimated represents the Leased Fee Interest, the Fee Simple Estate, and the Going Concern as defined below:

*Fee Simple Estate* - Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat. [5]

*Leased Fee Interest* - The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [6]

*Going Concern* – An established and operating business having an indefinite future life. [7]

### Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- legal description

---

[4] Interagency Appraisal and Evaluation Guidelines; December 10, 2010, Federal Register, Volume 75 Number 237, Page 77472.

[5] Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015), 90.

[6] *Dictionary of Real Estate Appraisal*, 128.

[7] *Dictionary of Real Estate Appraisal*, 102.

2



### Extent to Which the Property is Inspected

Clayton P. Conn, MAI completed an interior and exterior inspection of the subject property and its surrounding environs on July 25, 2019.

### Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- demographics
- income and expense data
- comparable data

### Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. The steps required to complete each approach are discussed in the methodology section.

### Data Resources Utilized in the Analysis

| DATA SOURCES | |
|---|---|
| *Item:* | *Source(s):* |
| **Site Data** | |
| Size | Plat of Survey, Tax Map, County Assessor |
| **Improved Data** | |
| Building Area | Plat of Survey, Township Assessor |
| No. Bldgs. | Physical Inspection |
| Parking Spaces | Physical Inspection |
| Year Built/Developed | Township Assessor |
| **Economic Data** | |
| Deferred Maintenance: | None noted |
| Renovation Costs: | Ownership |
| Income Data: | Profit and Loss Statements |
| Expense Data: | Profit and Loss Statements |
| **Other** | |
| UST Data | Office of the Illinois State Fire Marshall |
| Compiled by CBRE | |

*Citgo Travel Center, Calumet Park, Illinois*



**APPRAISAL METHODOLOGY**

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

### Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

### Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

### Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

### Methodology Applicable to the Subject

In valuing the subject, all three approaches are applicable and have been utilized.

4



## Area Analysis



The dynamic nature of economic relationships within a market area has a direct bearing on real estate values and the long-term quality of a real estate investment. In the market, the value of a property is not based on the price paid for it in the past or the cost of its creation, but on what buyers and sellers perceive it will provide in the future. Consequently, the attitude of the market toward a property within a specific neighborhood or market area reflects the probable future trend of that area.

Since real estate is an immobile asset, economic trends affecting its location quality in relation to other competing properties within its market area will also have a direct effect on its value as an investment. To accurately reflect such influences, it is necessary to examine the past and probable future trends, which may affect the economic structure of the market and evaluate their impact on the market potential of the subject. This section of the report is designed to isolate and examine the discernible economic trends in the region, which influence and create value for the subject properties.

*Citgo Travel Center, Calumet Park, Illinois*



## GEOGRAPHIC LOCATION

The subject property is located in the geographic area generally referred to as the Chicago metropolitan area, which is centrally located in the Midwestern United States.

| CHICAGO-NAPERVILE-MICHIGAN CITY, IL-IN-WI CSA DEFINITIONS | | |
|---|---|---|
| Metropolitan Statistical Area (MSA) | Metropolitan Divisions (MD) | Counties |
| Chicago-Naperville-Joliet, IL-IN-WI MSA | Chicago-Naperville-Joliet, IL MD | Cook, DeKalb, DuPage, Grundy, Kane, Kandall, McHenry, and Will |
| | Gary, IN MD | Jasper, Lake, Newton, and Porter |
| | Lake County-Kenosha County, IL-WI MD | Lake (IL) and Kenosha (WI) |

Source: Executive Office of the President of the United States, Office of Management and Budget

The Chicago-Naperville-Joliet, IL Metropolitan Division consists of eight counties in northeastern Illinois.  These eight counties are Cook, DeKalb, DuPage, Grundy, Kane, Kendall, McHenry and Will.  Also included within the MSA are the counties found in the Gary, IN Metropolitan Division which are Jasper, Lake (IN), Newton, and Porter as well as the counties found in the Lake County-Kenosha County, IL-WI which are Lake (IL) and Kenosha (WI).  The Michigan City-La Porte, IN MSA and Kankakee-Bradley, IL MSA consist solely of LaPorte and Kankakee Counties respectively.

## POPULATION

Current and historical population figures for the fourteen counties comprising the Chicago Metro Division are summarized in the following table.

*Citgo Travel Center, Calumet Park, Illinois*



**AREA POPULATION STATISTICS**

| County | 2000 Census | 2010 Census | % Change 2000-2010 | 2019 Estimate | % Change 2010-2019 |
|---|---|---|---|---|---|
| Cook | 5,376,741 | 5,194,675 | -3.4% | 5,223,023 | 0.5% |
| DeKalb | 88,969 | 105,160 | 18.2% | 105,718 | 0.5% |
| DuPage | 904,161 | 916,924 | 1.4% | 930,613 | 1.5% |
| Grundy | 37,535 | 50,063 | 33.4% | 51,934 | 3.7% |
| Kane | 404,119 | 515,269 | 27.5% | 546,850 | 6.1% |
| Kendall | 54,544 | 114,736 | 110.4% | 126,916 | 10.6% |
| McHenry | 260,077 | 308,760 | 18.7% | 314,718 | 1.9% |
| Will | 502,266 | 677,560 | 34.9% | 706,224 | 4.2% |
| Jasper County (IN) | 30,176 | 33,478 | 10.9% | 34,292 | 2.4% |
| Lake County (IN) | 484,536 | 496,005 | 2.4% | 495,831 | 0.0% |
| Newton County (IN) | 14,546 | 14,244 | -2.1% | 14,428 | 1.3% |
| Porter County (IN) | 147,164 | 164,343 | 11.7% | 172,246 | 4.8% |
| Lake County (IL) | 648,116 | 703,462 | 8.5% | 706,925 | 0.5% |
| Kenosha County (WI) | 150,092 | 166,426 | 10.9% | 172,048 | 3.4% |
| **Total** | 9,103,042 | 9,461,105 | 3.9% | 9,601,766 | 1.5% |

Source:  United States Census

The population of the fourteen-county region increased 3.9% between 2000 and 2010, highlighted by collar counties including Will, DuPage and Kane.  Cook County, on the other hand, experienced a reduction in growth at -3.4%.  This is indicative of the outward migration pattern within the metropolitan area rather than an outflow of residents to other metropolitan areas.  Overall, the MSA population expanded by 3.9% between 2000 and 2010.

Population growth is expected to remain steady in the near future. The largest estimated growth between 2010 and 2019 is forecasted for Kendall, Kane and Porter (IN) Counties, at 10.6%, 6.1% and 4.8%, respectively.

## TRANSPORTATION

Chicago is one of the primary transportation hubs in the United States.  Its extensive transportation facilities give local firms ready access to national and international markets and suppliers, as well as provide travelers with convenient traveling alternatives.

Several major interconnected expressways and interstate highways pass through the Chicago area.  Interstates 88 and 290 are the main east-west routes, providing access from the central business district to the east and the Quad Cities to the west.  Interstate 55 provides access to the southwestern suburban areas and eventually the city of St. Louis.  Communities to the north and northwest are accessed via Interstates 90 and 94.  North-south travel between the western suburbs is facilitated by Interstates 294 and 355.  With ten interstate freeways consisting of some 630 miles, Chicago is one of the best-connected cities in the nation and a primary hub of the

*Citgo Travel Center, Calumet Park, Illinois*



trucking industry. To the south, Interstate 80 corridor traverses the entire country east to west and is a significant highway for commerce and tourism.

O'Hare International Airport is the second busiest airport in the world serving over 79.8 million domestic and international passengers via over 867,049 flights annually as of 2017. In addition, O'Hare handles nearly 1.9 million tons of cargo per year. Midway Airport, located in Chicago's southwest side, serves as a secondary airport and has become an increasingly popular alternative to O'Hare. Presently, Midway serves nearly 22.4 million passengers through nearly 251,341 flights annually. In addition, a number of smaller private airports dot the suburban areas.

In February of 2018, the city of Chicago announced an expansion of the O'Hare's passenger area, with dozens of new gates and 3 million square feet of terminal space, to be added by 2026. There will be new gates for O'Hare's dominant carriers, American and United, as well as discount carriers, new international space that would allow baggage to go directly to domestic gates, additions to club space for frequent fliers and construction of a 10,000-space employee parking lot on the western edge of the airport. Overall, terminal space will increase from 4.3 million square feet to 7.4 million square feet. The cost of the expansion is estimated at $8.54 billion.

In March of 2018, the Chicago Department of Aviation (CDA) announced that they are implementing a nearly $400 million capital improvement program over the next three years at Midway International Airport that will significantly upgrade the travel experience for years to come. The Midway Modernization Program (MMP) will bring new and expanded concessions, a larger security checkpoint area, and an expanded terminal parking garage.

Chicago has the busiest rail hub in North America. It is the only metro area where six Class-One railroads converge and are able to interchange traffic. Fifty percent of all U.S. rail freight goes through Chicago's rail yards. Chicago is the world's third largest intermodal facilitator with 12.3 million containers annually. Only Hong Kong and Singapore handle greater volume. For reference, the ports of Los Angeles and Long Beach combine to handle 9.6 million containers each year. Over the next 10 years, intermodal container traffic is expected to grow 15 percent annually.

## EMPLOYMENT

The Chicago metropolitan area has a large and well-diversified economic structure, which has allowed it to remain among the strongest economic centers in the nation. Due to its economic diversification, the Chicago metropolitan area tends to experience fewer seasonal and cyclical peaks and valleys than do many single-industry areas. The table below shows employment levels of major industry groups in the eight-county Chicago Metropolitan Division as of May 2019.

*Citgo Travel Center, Calumet Park, Illinois*



| CHICAGO'S LARGEST PUBLICLY TRADED COMPANIES | | | |
|---|---|---|---|
| Rank | Company | Primary Industry | # of Employees |
| 1 | Walgreens Boots Alliance, Inc. | Drugstores, mail-order pharmaceuticals | 354,000 |
| 2 | McDonald's Corporation | Fast-food restaurants | 210,000 |
| 3 | Boeing Company | Aerospace, defense | 153,000 |
| 4 | Caterpillar, Inc. | Construction and mining machinery | 104,000 |
| 5 | Abbott Laboratories | Pharmaceuticals, medical products | 103,000 |
| 6 | United Continental Holdings, Inc. | Airline | 92,000 |
| 7 | Jones Lang Lasalle | Commercial Real Estate | 90,000 |
| 8 | Tenneco Inc | Auto Parts and Equipment | 81,000 |
| 9 | Mondelez International, Inc. | Snacks, beverages, packaged meals | 80,000 |
| 10 | Deere & Company | Construction and farm machinery | 74,413 |
| 11 | Hyatt Hotels Corp. | Hospitality | 54,000 |
| 12 | LKQ Corp. | Auto Parts and Equipment | 51,000 |
| 13 | Cushman & Wakefield | Commercial Real Estate | 51,000 |
| 14 | Baxter International | Medical products and services | 50,000 |
| 15 | Illinois Tool Works | Industrial Machinery | 48,000 |

Source: Crain's Chicago Business, May 20, 2019

The Chicago metropolitan area led the nation in corporate investment and relocation for the fifth straight year in 2017, according to Site Selection magazine. The trade publication for economic development professionals determined the Chicago metro had 402 major projects last year with at least $1 million in investment. While this was down from 424 projects in 2016, it was more than double that of the next closest two metros, Houston and Dallas. The Houston-The Woodlands-Sugar Land metropolitan area had 196 such projects in 2017, while the Dallas-Fort Worth-Arlington metro raked in 192 such investments, according to Site Selection Magazine.

Major projects in the Chicago area were concentrated mostly within city limits and included the relocation of the Munster Whole Foods warehouse to the South Shore Pullman neighborhood, the new GGP headquarters on the Chicago River and The Climate Corp.'s new office on West Fulton Market in Chicago's West Loop. Site Selection magazine cited Chicago's transit options, wealth of young professionals, more than 100 startup incubators, more than 300 corporate R&D centers, addition of 70,000 new housing units over the next 20 years, and affordability compared to coastal cities, especially with office space.

### Education

Chicago is home to fifteen major public and private universities including the highly regarded Northwestern University and University of Chicago. Other major educational institutions include University of Illinois at Chicago, which has the largest local enrollment, as well as Loyola University and DePaul University. These institutions offer a variety of undergraduate and graduate fields of study. The total enrollment of these Chicago area universities is approximately 105,000 students. Prominent MBA programs in the Chicago area include Northwestern University's Kellogg School of Management, University of Chicago's Graduate School of Business and DePaul University's Kellstadt Graduate School of Business.

*Citgo Travel Center, Calumet Park, Illinois*



While in the surrounding areas of Chicago there are a number of private liberal arts colleges and universities including North Central College, Wheaton College, Elmhurst College, North Park University, Benedictine University and Lake Forest College.  Additionally, many of the major universities have established satellite campuses in the suburban areas. DePaul University has suburban campuses located in Naperville, Oak Forest, O'Hare and Rolling Meadows. Northern Illinois University has suburban campuses in Hoffman Estates and Naperville.

The Chicago area also has an extensive community college system comprised of twelve two-year colleges with a total enrollment of 145,000 students.  Courses range from vocational training to classes in liberal arts, science, business and pre-professional studies.  There are also seven City Colleges of Chicago with an enrollment of over 75,000 students.

## CONCLUSION

In summary, the interaction of the environmental, governmental, social, and economic forces has contributed to the economic base of the Chicago metropolitan area.  A central location and transportation advantages such as an airport with direct connections around the globe have made Chicago a hub for travel.  The Chicago economy is showing modest improvement.  A flurry of expansions and relocations will extend tech-related job growth in the urban core.  The dynamic startup culture has drawn venture capital funding that will fuel further gains.  These trends, as well as the economic growth and office expansion in Chicago, bode well for continued corporate travel to Chicago.  Overall, the Chicago economy will strengthen this year, but fiscal pressures and weak demographics pose significant challenges for the city in the long term.

*Citgo Travel Center, Calumet Park, Illinois*



# Neighborhood Analysis



### LOCATION

The subject property is located in Calumet Park, Cook County, Illinois. The neighborhood is approximately fifteen-miles southwest of the Chicago central business district. Calumet Park is bordered by Chicago on the north and east, Posen and Robbins on the south, and Blue Island on the west.  General neighborhood characteristics are summarized below.

| NEIGHBORHOOD CHARACTERISTICS | |
|---|---|
| Location: | Urban |
| Built-Up: | Over 75% |
| Life Cycle Stage | Stability |
| Change in Present Land Use: | Not Likely |
| **Neighborhood Boundaries** | |
| North: | 111th Street |
| South: | 127th Street |
| East: | Halsted Street |
| West: | Western Avenue |
| Source:  CBRE | |

*Citgo Travel Center, Calumet Park, Illinois*



## NEIGHBORHOOD HOUSING TRENDS

The neighborhood housing trends and home prices are summarized as follows:

| NEIGHBORHOOD HOUSING TRENDS | | | |
|---|---|---|---|
| Property Values: | | | Stable |
| Demand/Supply: | | | In Balance |
| Marketing Time: | | | 3 - 6 Months |
| | Low | High | Predominant |
| Price ($000's): | $50 | $1,500 | $160 |
| Age (yrs.): | New | 75+ | 65 |

Source: CBRE

## LAND USE

Land uses within the subject neighborhood consist of a mixture of commercial and residential development. The immediate area surrounding the subject is mainly retail/commercial along 119th Street with residential and industrial surrounding. To the north of the subject is the Marshfield Plaza Shopping Center, to the south is an industrial development, to the east is Interstate-57, and to the west is a retail strip center. Marshfield Plaza is located across the street from the subject and is a 238,932 SF retail power center. Located at the northwest corner of 119th Street and Marshfield Avenue this center contains 238,932 SF that is 88.8% leased. Major tenants include Burlington Coat Factory, Jewel-Osco, Marshalls, Petco, Old Navy and Dollar Tree. The local land use patterns are summarized as follows.

| NEIGHBORHOOD LAND USE | | | |
|---|---|---|---|
| Present Land Use % | | | |
| Single Unit Residential: | 50% | Industrial: | 15% |
| Multi-Housing: | 15% | Agricultural: | 0% |
| Commercial: | 20% | Other: | 0% |
| Commercial Land Use Patterns | | | |
| Primary Commercial Thoroughfares: | | 119th Street, Halsted Street, 127th Street, 111th Street, Western Avenue, and Interstate-57 | |
| Major Commercial Developments: | | Marshfield Plaza, Chili's Grill & Bar, Panda Express, LA Fitness, Fifth Third Bank, Wingstop, Jimmy John's, Walgreens, and McDonald's | |

Source: CBRE

*Citgo Travel Center, Calumet Park, Illinois*



## GROWTH PATTERNS

The subject neighborhood is a mature neighborhood that is largely built-out. Few vacant tracts of land are available for development.  This is particularly true of the densely developed Western Avenue corridor.  Recent development has generally been limited to teardowns/redevelopment projects or renovations of older less functional units.  Therefore, new development has been minimal.  Residential land uses are in a similar stage of development.

## ACCESS

Primary access to the subject neighborhood is provided by Interstate-57.  Interstate-57 runs in a north/south direction and can be accessed from 119th Street east of the subject. Interstate-57 connects the subject neighborhood with downtown Chicago to the northeast (via Interstate 90/94) and Chicago's southern suburbs and Interstate 80 to the south.  Additionally, Interstate 294 (Tri-State Tollway) can be accessed roughly three miles west of the subject.  Interstate 294 provides access to both Interstates 55 and 88 to the north of the subject. Secondary access to the neighborhood is provided by 119th Street, 127th Street, 138th Street, Western Avenue, Ashland Avenue and Halsted Street, which are the major commercial thoroughfares within the neighborhood.

The subject neighborhood is also served by the Metra, which provides train service to downtown Chicago. The Metra-119rd Street station is located approximately one mile west of the subject in Blue Island and provides commuters with an approximately 30-minute ride to downtown Chicago.

*Citgo Travel Center, Calumet Park, Illinois*



## DEMOGRAPHICS

Selected neighborhood demographics in 1-, 2- and 3 mile radii from the subject are shown in the following table:

| SELECTED NEIGHBORHOOD DEMOGRAPHICS | | | |
|---|---|---|---|
| 11900 South Marshfield Avenue Calumet Park, IL 60827 | 1 Mile Radius | 2 Mile Radius | 3 Mile Radius |
| Population | | | |
| 2024 Total Population | 19,217 | 80,252 | 157,809 |
| 2019 Total Population | 19,601 | 81,630 | 160,694 |
| 2010 Total Population | 20,385 | 84,111 | 166,335 |
| 2000 Total Population | 22,669 | 94,308 | 188,032 |
| *Annual Growth 2019 - 2024* | -0.39% | -0.34% | -0.36% |
| *Annual Growth 2010 - 2019* | -0.43% | -0.33% | -0.38% |
| *Annual Growth 2000 - 2010* | -1.06% | -1.14% | -1.22% |
| Households | | | |
| 2024 Total Households | 6,757 | 28,242 | 55,801 |
| 2019 Total Households | 6,888 | 28,713 | 56,803 |
| 2010 Total Households | 7,111 | 29,398 | 58,464 |
| 2000 Total Households | 7,458 | 31,163 | 62,517 |
| *Annual Growth 2019 - 2024* | -0.38% | -0.33% | -0.36% |
| *Annual Growth 2010 - 2019* | -0.35% | -0.26% | -0.32% |
| *Annual Growth 2000 - 2010* | -0.48% | -0.58% | -0.67% |
| Income | | | |
| 2019 Median Household Income | $49,162 | $52,754 | $52,936 |
| 2019 Average Household Income | $63,906 | $71,439 | $72,344 |
| 2019 Per Capita Income | $22,914 | $25,067 | $25,655 |
| 2019 Pop 25+ College Graduates | 2,891 | 14,256 | 28,110 |
| Age 25+ Percent College Graduates - 2019 | 21.7% | 25.7% | 26.1% |
| Source: ESRI | | | |

## CONCLUSION

As shown above, the population within the subject neighborhood exhibited decline from 2000 to 2019. Decline is expected to continue over the next five years. The neighborhood currently has a low-income demographic profile with a 2019 median household income of $49,162, $52,754, and $52,936 within a one, two, and three-mile radius of the subject. The outlook for the neighborhood is for continued stability over the next several years. Generally, the neighborhood is expected to see a similar demographic pattern into the foreseeable future.

*Citgo Travel Center, Calumet Park, Illinois*



## PLAT OF SURVEY



*Citgo Travel Center, Calumet Park, Illinois*

CBRE

## FLOOD PLAIN MAP



*Citgo Travel Center, Calumet Park, Illinois*

**CBRE**

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

| SITE SUMMARY AND ANALYSIS | | |
|---|---|---|
| **Physical Description** | | |
| Gross Site Area | 3.32 Acres | 144,428 Sq. Ft. |
| Net Site Area | 3.32 Acres | 144,428 Sq. Ft. |
| Primary Road Frontage | 119th Street | 265 Feet |
| Secondary Road Frontage | Marshfield Avenue | 541 Feet |
| Additional Road Frontage | 120th Street | 265 Feet |
| Additional Road Frontage | Paulina Street | 541 Feet |
| Shape | Semi-Rectangular | |
| Topography | Generally Level | |
| Primary Traffic Counts (24 hrs.) | 119th Street @ Marshfield Avenue | 20,000 Date: 2018 |
| Secondary Traffic Counts (24 hrs.) | Interstate-57 @ 119th Street | 122,100 Date: 2018 |
| Zoning District | C-3, Highway Commercial District | |
| Flood Map Panel No. & Date | 17031C0645J | 19-Aug-08 |
| Flood Zone | Zone X (Unshaded) | |
| Adjacent Land Uses | Commercial and residential uses | |
| Earthquake Zone | n/a | |
| **Comparative Analysis** | **Rating** | |
| Visibility | Average | |
| Functional Utility | Average | |
| Traffic Volume | Average | |
| Adequacy of Utilities | Assumed adequate | |
| Landscaping | Average | |
| Drainage | Assumed adequate | |
| **Utilities** | **Provider** | **Availability** |
| Water | Municipal | Yes |
| Sewer | Municipal | Yes |
| Natural Gas | Nicor | Yes |
| Electricity | ComEd | Yes |
| Telephone | Various | Yes |
| Mass Transit | METRA | Yes |

| **Other** | **Yes** | **No** | **Unknown** |
|---|---|---|---|
| Detrimental Easements | | | X |
| Encroachments | | | X |
| Deed Restrictions | | | X |
| Reciprocal Parking Rights | | | X |

Source: Various sources compiled by CBRE

*Citgo Travel Center, Calumet Park, Illinois*



## INGRESS/EGRESS

Ingress and egress are available to the site via one curb cut along the south side of 119th Street, two curb cuts along the west side of Marshfield Avenue, and three curb cuts along the east side of Paulina Street.

119th Street, at the subject, is an east/west street that is improved with two lanes of traffic in each direction. Street improvements include asphalt paving, concrete curbs, gutters, and sidewalks. Street parking is not permitted.

Marshfield Avenue, at the subject, is a north/south street that is improved with one lane of traffic in each direction. Street improvements include asphalt paving, concrete curbs, and gutters. Street parking is not permitted.

120th Street, at the subject, is an east/west street that is improved with one lane of traffic in each direction. Street improvements include asphalt paving, concrete curbs, and gutters. Street parking is not permitted.

Paulina Street, at the subject, is a north/south street that is improved with one lane of traffic in each direction. Street improvements include asphalt paving, concrete curbs, and gutters. Street parking is permitted.

## BILLBOARD

There is currently a double-sided lighted billboard on the site with visibility from both northbound and southbound Interstate-57. The billboard is leased to Out Front Media thru July 2037. The current rental rate is $1,308/month or $15,696 annually.

## EASEMENTS AND ENCROACHMENTS

There are no known easements or encroachments impacting the site that are considered to affect the marketability or highest and best use. It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.

## COVENANTS, CONDITIONS AND RESTRICTIONS

There are no known covenants, conditions or restrictions impacting the site that are considered to affect the marketability or highest and best use. It is recommended that the client/reader obtain a copy of the current covenants, conditions and restrictions, if any, prior to making a business decision.



## ENVIRONMENTAL ISSUES

Although CBRE was not provided an Environmental Site Assessment (ESA), a tour of the site did not reveal any obvious issues regarding environmental contamination or adverse conditions.

It should be noted the Office of the Illinois State Fire Marshal reveals the subject facility has a green tag issue date of May 1, 2019. The green tag expiration date is December 31, 2021. No deficiencies or IEMA numbers were reported to be associated with the subject facility.

The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## CONCLUSION

The subject site is well located and afforded average access and visibility from roadway frontages. The site is rectangular in shape with adequate dimensions for development, and there are no known detrimental uses in the immediate vicinity. Overall, there are no known factors which are considered to prevent the site from development to its highest and best use.



**BUILDING PLAN**



*Citgo Travel Center, Calumet Park, Illinois*

**CBRE**

# Improvements Analysis

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Retail | (Travel Center) |
| Number of Buildings | 1 | |
| Number of Stories | 1 | |
| Year Built | 1998 | Renovated: 2019 |
| Gross Building Area | | |
| _Convenience Store/Retail_ | _7,607 SF_ | |
| _Car Wash_ | _6,900 SF_ | |
| _Auto Service/Repair_ | _7,514 SF_ | |
| Total Gross Building Area | 22,021 SF | |
| Canopy 1 Size | 3,500 SF | |
| Canopy 2 Size | 1,536 SF | |
| MPDs | 11 | |
| Underground Storage Tanks (USTs) | | |
| Gasoline | Two 12,000 gallon and one, 5,000 gallon | |
| Kerosene | One, 3,000 gallon | |
| Site Coverage | 15.2% | |
| Land-to-Building Ratio | 6.56 : 1 | |
| Floor Area Ratio (FAR) | 0.15 | |
| Parking Improvements | Surface | |
| Parking Spaces: | 36 | |
| Functional Utility | Typical | |
| Source: Various sources compiled by CBRE | | |

## CONDITION ANALYSIS

The subject was built in 1998 and was renovated in 2019 and has been maintained throughout the years. Overall, the subject is in average to good condition with a mix of older and newer components.

## QUALITY AND STRUCTURAL CONDITION

The overall quality of the facility is average for the neighborhood and age. However, CBRE, Inc. is not qualified to determine structural integrity and it is recommended that the client/reader retain the services of a qualified, independent engineer or contractor to determine the structural integrity of the improvements prior to making a business decision.

## FUNCTIONAL UTILITY

The size of the site is typical for a travel center property and the layout of the improvements allows for functional intra-site traffic flow. Overall, the subject's functional utility is considered average.

_Citgo Travel Center, Calumet Park, Illinois_



## ADA COMPLIANCE

The common areas of the property did not appear to have handicap accessibility. The client/reader's attention is directed to the specific limiting conditions regarding ADA compliance.

## ENVIRONMENTAL ISSUES

Although CBRE was not provided an Environmental Site Assessment (ESA), a tour of the site did not reveal any obvious issues regarding environmental contamination or adverse conditions.

The appraiser is not qualified to detect the existence of any potentially hazardous materials such as lead paint, asbestos, urea formaldehyde foam insulation, or other potentially hazardous construction materials on or in the improvements. The existence of such substances may affect the value of the property. For the purpose of this assignment, we have specifically assumed there are no hazardous materials that would cause a loss in value to the subject.

## DEFERRED MAINTENANCE

No significant items of deferred maintenance were observed at the time of the inspection and not were reported to exist.

## CONCLUSION

The subject is in average overall condition and the improvements are typical for the age and location with regards to design and layout. Overall, there are no known factors that could be considered to adversely impact the marketability of the improvements.

*Citgo Travel Center, Calumet Park, Illinois*



## ZONING MAP



23

*Citgo Travel Center, Calumet Park, Illinois*

**CBRE**

# Zoning

The following chart summarizes the subject's zoning requirements.

| ZONING SUMMARY | |
|---|---|
| Current Zoning | C-3, Highway Commercial District |
| Legally Conforming | Yes |
| Uses Permitted | Retail or commercial uses serving neighborhoods and community needs |
| Zoning Change | Not likely |
| Source:  Planning & Zoning Dept. | |

## ANALYSIS AND CONCLUSION

The improvements represent a legally-conforming use and, if damaged, may be restored without special permit application.  Additional information may be obtained from the appropriate governmental authority.  For purposes of this appraisal, CBRE has assumed the information obtained is correct.

*Citgo Travel Center, Calumet Park, Illinois*



# Tax and Assessment Data

The following summarizes the local assessor's estimate of the subject's market value, assessed value, and taxes, and does not include any furniture, fixtures or equipment.  It is noted that, the subject is approved for Class 8 incentive program which provides a reduction in assessed values for renovation and new construction. The CBRE estimated tax obligation is also shown.

| Parcel | Assessor's Parcel No. | Parcel Description | 2017/2018 | 2018/2019 | Pro Forma |
|---|---|---|---|---|---|
| | **AD VALOREM TAX INFORMATION** | | | | |
| 1 | 25-30-204-001-0000 | | $17,252 | $16,024 | |
| 2 | 25-30-204-002-0000 | | 12,164 | 11,520 | |
| 3 | 25-30-204-003-0000 | | 12,136 | 11,492 | |
| 4 | 25-30-204-004-0000 | | 15,032 | 13,596 | |
| 5 | 25-30-204-005-0000 | | 12,048 | 11,404 | |
| 6 | 25-30-204-006-0000 | | 17,792 | 16,564 | |
| 7 | 25-30-204-020-0000 | | 7,480 | 7,480 | |
| 8 | 25-30-204-021-0000 | | 7,480 | 7,480 | |
| 9 | 25-30-204-022-0000 | | 7,180 | 7,180 | |
| 10 | 25-30-204-023-0000 | | 7,180 | 7,180 | |
| 11 | 25-30-204-024-0000 | | 7,290 | 7,290 | |
| 12 | 25-30-204-041-0000 | | 12,460 | 12,460 | |
| 13 | 25-30-204-042-0000 | | 12,460 | 12,460 | |
| 14 | 25-30-204-043-0000 | | 12,460 | 12,460 | |
| 15 | 25-30-204-044-0000 | | 12,460 | 12,460 | |
| 16 | 25-30-204-045-0000 | | 12,460 | 12,460 | |
| 17 | 25-30-204-046-0000 | | 1,390,484 | 1,146,192 | |
| | Subtotal | | $1,575,818 | $1,325,702 | |
| | Assessed Value @ | | 33% | 24% | |
| | | | $382,725 | $320,067 | |
| | Equalization Factor | | 2.96270 | 2.91090 | |
| | Equalized Value | | $1,133,899 | $931,684 | |
| | General Tax Rate | | 18.88600% | 19.93700% | |
| | **Total Taxes** | | **$214,148** | **$185,750** | **$191,322** |

Source:  Assessor's Office

## DELINQUENCY

None

*Citgo Travel Center, Calumet Park, Illinois*



## CONCLUSION

The total taxes for the subject have been estimated as $191,322 for the base year of our analysis, based upon a 3.0% increase from the 2018 (payable in 2019) real estate tax expense.

For purposes of this analysis, CBRE, Inc. assumes that all taxes are current.



# Market Analysis

## NATIONAL CONVENIENCE STORE OVERVIEW

The following national convenience store industry overview is taken from the National Association of Convenience Stores (NACS) 2019 State of the Industry (SOI) report and Fact Book and the Convenience Store News (CSNews) 2019 Industry Report.

### About the SOI

Published annually by the National Association of Convenience Stores (NACS), the full NACS State of the Industry (SOI) report is widely acknowledged as the most authoritative data collection about the convenience store and petroleum marketing industries.

The SOI has several applications for industry participants.  For retailers, it is the industry's premier benchmarking tool, allowing companies to gauge their performance against industry averages (see the Benchmark Worksheet).  It's also useful in negotiations with lenders, fuel suppliers and other business partners that seek confirmation of a company's potential in the context of the industry's performance.  Suppliers find it useful for measuring category performance and anticipating industry investments in equipment, technology and new profit centers.  Retail analysts and the media use the SOI to analyze the convenience store channel's performance compared to other channels and as background for reporting on the industry.

### Highlights of the Convenience Store Industry's Performance

2018 brought an unfamiliar circumstance to the convenience industry. For the first time since 2009, the NACS/ Nielsen TDLinx store census reported a net decline in total industry store count. However, most of the themes in convenience were familiar ones. Motor fuels showed modest volatility and had a considerable positive impact on the industry's sales revenue. Fuel prices shined a refocused spotlight on a familiar cost of doing business, as increased card fees tracked rising motor fuels prices. Merger and acquisition (M&A) activity and industry consolidation continued in 2018, and the labor market affected retailers' ability to recruit and retain quality employees. The industry strategically resumed its trek toward an improved, more sustainable business model and away from the commodity-driven, fuel-focused model of the past. The result was increased inside sales and profits for the industry, but the gap between the top performers and the industry at large widened even more.

*Citgo Travel Center, Calumet Park, Illinois*



The following table presents a summary of the most updated convenience store industry highlights:

| CONVENIENCE STORE INDUSTRY HIGHLIGHTS | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | % Change from Prior Year | **2017** | % Change from Prior Year | **2018** | % Change from Prior Year |
| INDUSTRY TOTALS | | | | | | |
| Stores | 154,535 | 0.2% | 154,958 | 0.3% | 153,237 | -1.1% |
| Total Sales ($Billion) | $549.9 | -4.3% | $601.1 | 9.3% | $654.3 | 8.9% |
| In-Store Total ($Billion) | $233.0 | 3.2% | $237.0 | 1.7% | $242.2 | 2.2% |
| Motor Fuels ($Billion) | $316.8 | -9.2% | $364.1 | 14.9% | $412.1 | 13.2% |
| Profit Before Taxes ($Billion) | $10.2 | -3.8% | $10.4 | 2.0% | $11.0 | 5.8% |
| Source: 2019 NACS State of the Industry | | | | | | |

The total industry store count declined 1,723 locations in 2018. This result was driven by the closure of 2,198 single stores. The chain store count rose 475 locations over the course of the year. M&A activity remained at the forefront for some of the industry's largest companies: the top three largest chains in the United States each grew by more than 1,000 locations in 2018, representing a combination of both organic and acquisitional growth.

In addition to tracking total retail locations, NACS/Nielsen TDLinx tracks the number of companies with four or more stores. This would occur after the sale of all or some portion of their stores or the closing of some number of their locations. It took nine years for the industry to see 327 of these companies go away, but 244 have done so over the past two years. The composition of the industry began to change as the single store count declined for the first time since 2008, and chains represented 37.7% of the total count, up from 36.9% in 2017.

The industry's total sales reached $654.3 billion in 2018, an 8.9% increase over 2017 and a second year of outstanding sales growth driven primarily by inflated fuel prices. Inside sales generated 2.3% growth to a record $242.2 billion. While fuel volumes decreased by less than half of a percentage point (0.30), the average fuel price grew by 13.6%, resulting in a 13.3% increase in fuel sales revenue to $412.1 billion, the largest amount since 2014.

### Financial Performance

The metrics presented in the 2018 financial performance section use data derived from 149 firms, representing 22,671 stores for the benchmarks and metrics in part one of this chapter. The standard firm-level NACS State of the Industry survey form was used to generate responses that create the basis for the annual comparative results. Same-firm data is produced by using time-period difference screens and is presented on a per store, per month basis.

Additionally, the industry profit and loss statement is examined in-depth. For clarity, logical groupings of data such as sales, gross profit and direct store operating expenses (DSOE) are presented together and analyzed separately. All of the metrics in the same-firm tables represent firms that have provided data for the full years of 2017 and 2018.

*Citgo Travel Center, Calumet Park, Illinois*



Part two of this chapter presents benchmarking data from all firms who participated in the NACS State of the Industry Report of 2018 Data survey only. The aggregated data is broken out by firm classification using the standard NACS firm size categories: A (1-10 stores), B (11-50 stores), C (51-200 stores), D (201-500 stores) and E (more than 500 stores). Separate tables on the profit and loss statement, other operating income and the balance sheet also are provided.

The financial metrics in this chapter are presented from two separate perspectives. NACS prepares them on a same-firm, year-to-year comparison basis for 2017-2018 and on a total sample basis for 2018 only. The difference is that the total sample for 2018 is comprised of all survey respondents' data received for the current report iteration and is segmented into NACS firm size classifications, while the same-firm tables reflect results from firms that submitted data for the last two years.

Many firms wish to benchmark their results or strive for top-quartile performance using the NACS State of the Industry report as a guide. Those firms can reference selected top quartile metrics pertaining to specific sections of the financial chapter elsewhere in the report. (For comprehensive coverage of the top-quartile section, refer to the Top Performers chapter.) The basic financial tools for retailers to assess performance are the income statement, balance sheet and various ratios derived from these financial reports. A11 three of these areas will be examined in detail.

The following table presents a summary of the most updated same store statistics:

| SAME-FIRM SAMPLE PER STORE PER MONTH | | | |
|---|---|---|---|
| | **2017** | **2018** | Change From Prior Year |
| INDUSTRY TOTALS | | | |
| Stores | 154,958 | 153,237 | -1.11% |
| Stores Selling Motor Fuel | 122,552 | 121,998 | -0.45% |
| Sales | | | |
| Motor Fuel | $377,221 | $427,436 | 13.31% |
| Merchandise | $131,547 | $134,227 | 2.04% |
| Foodservice | $38,606 | $39,906 | 3.37% |
| Total Sales | $531,238 | $584,174 | 9.96% |
| Profit | | | |
| Motor Fuel | $34,665 | $37,213 | 7.35% |
| Merchandise | $35,869 | $37,375 | 4.20% |
| Foodservice | $21,281 | $21,844 | 2.65% |
| Total Profit | $94,379 | $99,110 | 5.01% |

* Based on same firm data submitted for both 2017 and 2018 by 149 firms with 22,671 stores. These numbers do not total as they are based on different sample sizes by each line item.

Source:  2019 NACS State of the Industry

*Citgo Travel Center, Calumet Park, Illinois*



### Merchandise

The historic convenience retail model likely has reached its pinnacle over the last decade. Often described as the "gas, Cokes and smokes" model, this concept focused on using motor fuels to drive trips and convert the fuel consumer to an inside shopper to earn profits on higher margin merchandise and food. Many retailers in the top 25% of firms (ranked by store operating profit) have flipped that model and focused on in -store sales as a traffic and profit driver in 2018. These top performers, and the industry at large to a lesser extent, have reaped the rewards. (For more data on retailers in the top 25% ranked by operating profit, see the Top Performers chapter of this report.) Total in-store sales in 2018 grew 2.3% year -over-year, up to $2,078,316annually per store, led by a 3.4% sales increase in foodservice and a 2.0% sales increase in merchandise. Merchandise accounted for 23.0% of total sales in 2018 and remained the largest contributor to gross profit dollars at 37.7%.

2018 was an excellent year for retailers in terms of fuel sales and margins, but other categories were challenged in new ways. Cigarettes continued to feel pressure from increasing state taxes and regulations, as well as the declining smoking rate. New proposed FDA regulations on vapor products may change the way convenience retailers can sell or not sell one of the largest growing subcategories in the store. Furthermore, cannabidiol (CBD) products hit the market across the United States but remain federally illegal to sell. Government regulations have not been able to keep up with product manufacturing rates, leaving retailers unsure if, how and where they could sell CBD in their stores.

Despite the external threats that arose in 2018, one important concept keeps the industry protected to a certain degree. Immediate consumption continues to protect the convenience channel from other channels looking to acquire a portion of these sales. While many consumers have embraced online ordering, grocery pick- up and 30-minute delivery, no company yet has been able to replace the immediacy of grabbing a beverage out of a cold vault, paying for it and then opening it up before leaving the store premises.

### IN-STORE SALES

Inside sales grew 2.3% in 2018, generating $47,129 in incremental annual sales per store. Convenience retailers did an excellent job capitalizing on trips despite a year-over-year total decline and were able to use effective merchandising to drive sales. Merchandise sales alone grew 2.0% or $32,163 in annual sales per store but was eclipsed again by foodservice sales growth, which increased 3.4%, driving more of the sales growth inside the store. Foodservice remained the second largest contributor to in -store sales year-over-year and increased by 0.2 points from 2017. Because of excellent margins, top convenience retailers have put emphasis on developing complex, robust foodservice programs to entice consumers and brand themselves as a food destination.



In terms of total facility sales, the selling price of fuel was up 13.6%, driving total fuel sales dollars up 13.3% year -over-year, which helped fuels account for 70.3% of sales in 2018. Retailers were able to take advantage of increased store sizes and merchandise effectively to increase inside sales per square foot by 2.8% to $53.72. Merchandise sales per square foot also increased 2.6% to $41.64, and foodservice sales per square foot grew to $12.38, an increase of 3.9% over the prior year. Investment into store size and complexity of merchandise offers proved very rewarding in terms of sales dollars for retailers.

The following table illustrates how in-store sales varied across a spectrum of companies:

| FREQUENCY OF IN-STORE SALES PER STORE | | | | |
|---|---|---|---|---|
| | Sales per Store | | % of Companies | |
| Sales: | 2017 | 2018 | 2017 | 2018 |
| Under $800,000 | $710,425 | $643,163 | 5.8% | 6.5% |
| $800,000 to $1,000,000 | $883,112 | $915,131 | 10.9% | 10.1% |
| $1,000,001 to $1,200,000 | $1,113,118 | $1,090,120 | 23.2% | 16.5% |
| Over $1,200,001 | $2,255,079 | $2,083,822 | 60.1% | 66.9% |
| *Industry Average* | *$1,493,490* | *$1,528,027* | *100.0%* | *100.0%* |
| Source: 2019 NACS SOI Survey Data | | | | |

While average in-store sales were $1,528,027 in 2018, more than 83% of the same-firm companies surveyed averaged more than $1,000,000 in annual sales. In 2018, over 93% of same-firm companies sold more than $800,000 annually in merchandise and foodservice. The sample shows an increasing number of stores recording under $800,000 in sales, 6.5% of this year's sample, compared to last year's 5.8%. At the same time, the number of stores with more than $1,200,000 in sales went from 60.1% to 66.9% in 2018.

The following table illustrates how sales per square foot (by in-store sales) can help benchmark and compare operations with different physical footprints:

| SALES PER SQUARE FOOT BY IN-STORE SALES | | | | |
|---|---|---|---|---|
| | Avg. Store SF | | Sales/SF | |
| Sales: | 2017 | 2018 | 2017 | 2018 |
| Under $800,000 | 1,983 | 1,693 | $358 | $380 |
| $800,000 to $1,000,000 | 2,246 | 2,337 | $393 | $392 |
| $1,000,001 to $1,200,000 | 2,704 | 2,753 | $412 | $396 |
| Over $1,200,001 | 3,480 | 3,406 | $648 | $612 |
| *Industry Average* | *3,079* | *3,082* | *$485* | *$495* |
| Source: 2019 NACS SOI Survey Data | | | | |

The average square feet per store went up in 2018 from 3,079 to 3,082 while the average sales per square foot increased from $485 to $495. Sales per square foot for stores selling under $800,000 decreased from $358 to $380 in 2018. At the same time, sales per square foot decreased for stores selling $800,000 to $1,000,000.



### IN-STORE GROSS MARGIN

Overall, merchandise accounted for 37.7% of gross margin contribution, higher than fuels, foodservice or any other operating income. Total in-store gross profit dollars increased 2.5%, bringing retailers $16,620 more gross profit per store over 2017. Gross profit dollars for merchandise outpaced foodservice in 2018, growing 4.2% or $18,066 on average annually per store, while foodservice grew 2.6%. Margins were to blame for the smaller increase in foodservice gross profit, which fell 0.37 points year-over-year. On the other hand, margins for merchandise grew 0.7 points year-over-year, helping in-store merchandise gross profit realize these solid gains.

Merchandise and foodservice combined accounted for 59.2% of total gross margin contribution, a slight decline over the prior year. Foodservice combined with packaged beverages and cigarettes alone accounted for 68.1% of in-store gross margin, proving the importance of those two categories to the bottom line. While only 6.7% of total sales contribution, foodservice represented 21.5% of total gross margin in 2018, and was the No. 1 inT store category in terms of gross margin percentage.

### TOP TEN SALES CATEGORIES SORTED BY GROSS MARGIN CONTRIBUTION

The NACS top ten inside categories are essentially a list of priorities for every convenience retailer. These merchandise categories and foodservice in total represent 93.3% of inside sales according to surveyed firms; 91.8% of inside gross margins are generated by these ten categories.

| TOP 10 SALES CATEGORIES SORTED BY GM CONTRIBUTION | | |
|---|---|---|
| *as a percentage of in-store sales* | | |
| | **2017** | **2018** |
| 1.  Cigarettes | 32.7% | 31.0% |
| 2.  Foodservice | 22.4% | 22.6% |
| 3.  Packaged beverages (non-alcoholic) | 15.0% | 15.3% |
| 4.  Other Tobacco Proucts | 5.6% | 6.7% |
| 5.  Beer | 6.5% | 6.4% |
| 6.  Salty Snacks | 3.7% | 4.1% |
| 7.  Candy | 3.2% | 3.1% |
| 8.  Alternative Snacks | 1.3% | 1.6% |
| 9.  Packaged Sweet Snacks | 1.7% | 1.6% |
| 10. General Merchandise | 1.0% | 1.0% |
| Source:  2019 NACS State of the Industry | | |

*Citgo Travel Center, Calumet Park, Illinois*



## Foodservice

In the ever-evolving landscape of convenience, foodservice has offered retailers a great platform for growth. Among major gross profit drivers, food service continued to play a key role in supporting sustainable convenience business models that depend less on fuels and emphasize driving traffic into the store to solicit high margin purchases. In 2018, foodservice represented 6.7% of total sales mix and 21.5% of gross margin contribution. Inside the store, foodservice was the second largest sales vehicle at 22.6%, after cigarettes at 31.0% and before packaged beverages at 15.3%. Moreover, foodservice continued to be the top in-store profit contributor at 36.4% of gross profit dollars.

Competition for consumer food dollars heightened in 2018. Although food trends seem to have converged to the better-for-you space, mobile technologies are making frictionless payments, on line ordering and delivery a must-have expectation for consumers when buying a meal. Nevertheless, convenience retailers have proved capable of adaptation in difficult times.

According to Datassential's Menu Adoption Cycle, a food trend analysis aimed at predicting where and when food trends will proliferate, most convenience store food staples have reached maturity and become mainstream. Yet the group suggests that the constant evolution of consumer tastes and preferences, combined with the adoption of mobile technologies, are shortening the time it takes for a food trend to reach the convenience channel. Convenience retailers have begun to venture into new food trends and hope for gains in return. The challenge for retailers lies in identifying such trends and investing accordingly so that consumers can recognize their brand as a destination for any meal or snack occasion.

Besides leveraging food trends, retailers across all channels focused on providing increased convenience to consumers in 2018. Some fast-casual restaurants made online ordering and delivery available, while others increased the number of self-service kiosks. Whether through a delivery partnership or frictionless payment addition, competition for meeting consumers' high expectations provided another challenge for the convenience industry in 2018.

*Citgo Travel Center, Calumet Park, Illinois*



## Motor Fuel

In 2018, crude oil prices experienced the most volatility they had seen since the first quarter of 2015. In 2017, the range of price volatility spanned $5.38 per barrel from the high to the low. Just one year later, that range was $21.46 per barrel. In 2018, crude oil prices experienced the most volatility they had seen since the first quarter of 2015. Volatility usually favors retail margins, but since 2014, crude has seen limited pricing swings, and margins have essentially stabilized-even though the average margin in 2018 (23.39 cents per gallon) was the highest annual average margin in history. The lowest average over the last five years was 2016's 21.69 cents per gallon, which is still excellent when compared to pre- 2014 annual margins.

| MOTOR FUEL PERFORMANCE | | |
|---|---|---|
| | 2017 | 2018 |
| Gallons Per Month Per Store | 159,551 | 159,121 |
| Average Margin (cpg) | 21.73 | 23.39 |
| Gross Margin Dollars Per Month Per Store | $34,665 | $37,213 |
| Selling Price Per Gallon | $2.36 | $2.69 |
| Source: 2019 NACS State of the Industry | | |

## Store Development / Barriers to Entry

The NACS/TDLinx Official Industry Store Count reported a decline in 2018, as the industry decreased by a -1.11% to a total of 153,237 store locations. This represents the first decline since 2008.

| STORE COUNTS AND DEVELOPMENT | | | | | | |
|---|---|---|---|---|---|---|
| | Industry Store Count | | | Rate of Growth | | |
| Year | Total Stores | Single Stores | Chain Stores | Total Stores | Single Stores | Chain Stores |
| 2009 | 144,541 | 90,049 | 54,492 | 100 | 100 | 100 |
| 2010 | 146,341 | 91,815 | 54,526 | 101 | 102 | 100 |
| 2011 | 148,126 | 93,209 | 54,917 | 102 | 104 | 101 |
| 2012 | 149,220 | 93,819 | 55,401 | 103 | 104 | 102 |
| 2013 | 151,282 | 95,056 | 56,226 | 105 | 106 | 103 |
| 2014 | 152,794 | 96,318 | 56,476 | 106 | 107 | 104 |
| 2015 | 154,195 | 97,359 | 56,836 | 107 | 108 | 104 |
| 2016 | 154,535 | 97,504 | 57,031 | 107 | 108 | 105 |
| 2017 | 154,958 | 97,643 | 57,315 | 107 | 108 | 105 |
| 2018 | 153,237 | 95,445 | 57,792 | 106 | 106 | 106 |

Rate of growth indexed to 2009

Source: 2019 NACS State of the Industry

*Citgo Travel Center, Calumet Park, Illinois*



## Square Foot Analysis

The all firms survey average of store square footage presented a slight drop of 0.3%, from 2,998 square feet in 2017 to 2,988 square feet in 2018. D- and E-size firms contributed to this decline, with 9.7% and 1.7%, respectively. However, C-size firms continued to gain area year-over-year, achieving a five-year high of 3,119 square feet in 2018. Despite challenges in labor productivity in 2018, retailers were able to capitalize on merchandising and maximize growth in sales per square foot. The all firms survey average of square foot analysis in 2018 showed an increase in total inside sales per square foot from $53.19 in 2017 to $54.77 in 2018. E-size firms were the top performers, maximizing a smaller average footprint to generate $59.37 of inside sales per square foot. Direct store operating expenses (DSOE) growth continued to impact retailers, with expenses per square foot growing 5.0% year-over-year, from $16.61 to $17.44. E-size firms also reported a considerably higher DSOE per square foot of $18.40, which is $2.21 higher than the next highest classification, the C-size operators ($16.19).

## Owned/Leased

The decrease of owned stores versus leased stores continued in 2018, with 66.4% of stores owned, a five-year low. Consequently, leased stores were at a five-year record high at 33.6% across all stores.

Similarly, the percentage of new stores owned dropped to a five-year low of 41.9%. This highlights increaes land and construction costs across the United States, making leasing a favorable option for company growth. Retailers have chosen to remodel or renovate their existing stores instead of incurring the monumental charges associated with building a new store.

Regarding new store investments, urban settings saw higher total investments than their rural counterparts throughout 2018. However, compared to the last five years, total rural investment per new store was at a record high of $4.7 million, 4.7% greater than the five-year low in 2016. Total investment per new urban store decreased by 7.7% year-over-year, from $5.72 million in 2017 to $5.28 million in 2018. In both urban and rural new construction, the average square footage decreased from the prior year's average.

Supporting the theme of higher construction costs, the average cost per remodel in 2018 reached a five-year high of $480,574, 14.7% higher than the five-year average cost.

*Citgo Travel Center, Calumet Park, Illinois*



| NEW STORES, URBAN | | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| Investment Per New Store | | | | | |
| Land | $1,355,179 | $1,433,873 | $1,506,344 | $1,758,815 | $1,671,133 |
| Building | $1,103,805 | $1,374,842 | $1,355,048 | $1,901,959 | $1,826,994 |
| Equipment | | | | | |
| Foodservice | $265,904 | $322,135 | $333,583 | $339,212 | $280,745 |
| Motor Fuels | $189,986 | $670,520 | $620,515 | $663,974 | $550,411 |
| Merchandise | $543,190 | $260,043 | $276,609 | $280,574 | $307,198 |
| Car Wash | $324,843 | $587,189 | $545,411 | $511,933 | $414,809 |
| Technology | $62,296 | $58,210 | $67,477 | $87,241 | $62,324 |
| Inventory (At Cost) | | | | | |
| Motor Fuels | $80,129 | $75,445 | $67,358 | $83,325 | $71,843 |
| Merchandise | $116,837 | $87,357 | $95,981 | $95,512 | $98,177 |
| Total Cost | $4,042,169 | $4,869,614 | $4,868,327 | $5,722,544 | $5,283,634 |
| New Store Size (SF) | | | | | |
| Average Sales Area | 3,070 | 3,271 | 3,320 | 3,559 | 3,357 |
| Average Non-Sales Area | 1,641 | 1,668 | 1,555 | 1,585 | 1,319 |
| Average Total Area | 4,711 | 4,594 | 4,672 | 4,856 | 4,582 |
| Average Site Size | 69,498 | 80,052 | 79,019 | 87,571 | 72,502 |

Source: 2019 NACS State of the Industry

| NEW STORES, RURAL | | | | | |
|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** |
| Investment Per New Store | | | | | |
| Land | $991,241 | $941,636 | $1,110,224 | $1,149,516 | $1,098,826 |
| Building | $1,432,993 | $1,636,156 | $1,563,327 | $1,628,853 | $1,654,454 |
| Equipment | | | | | |
| Foodservice | $330,954 | $248,377 | $265,370 | $280,147 | $316,260 |
| Motor Fuels | $184,318 | $568,535 | $611,428 | $600,819 | $536,315 |
| Merchandise | $714,116 | $324,341 | $223,301 | $203,583 | $331,928 |
| Car Wash | $340,938 | $433,936 | $280,144 | $360,507 | $335,070 |
| Technology | $76,614 | $53,439 | $68,579 | $59,940 | $55,554 |
| Inventory (At Cost) | | | | | |
| Motor Fuels | $177,106 | $57,842 | $56,486 | $64,405 | $72,317 |
| Merchandise | $102,980 | $99,056 | $89,322 | $86,633 | $69,961 |
| Total Cost | $4,351,261 | $4,363,319 | $4,268,179 | $4,434,404 | $4,470,686 |
| New Store Size (SF) | | | | | |
| Average Sales Area | 2,710 | 3,627 | 3,004 | 3,662 | 3,422 |
| Average Non-Sales Area | 1,425 | 1,521 | 1,415 | 1,713 | 1,480 |
| Average Total Area | 4,135 | 4,938 | 4,149 | 4,994 | 4,824 |
| Average Site Size | 74,753 | 71,525 | 60,708 | 89,221 | 71,823 |

Source: 2019 NACS State of the Industry

Survey respondents stated that 12.9% of the total number of stores were remodeled in 2018 as compared to a five-year average of 13.8%. Firms that participated in the survey in 2016 remodeled 19.2% of their locations in that year. In 2018, surveyed firms reported that 20.7% of their stores have been remodeled in the past five years. Average time between remodels was 10.3 years. The five-year average is 11.5 years. Surveyed firms made a considerable investment of $480,574 per remodel.



| AVERAGE REMODEL COST PER STORE | | | | | | |
|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **Avg.** |
| Interval Between Remodels (YRS) | 13 | 10 | 12.2 | 11.9 | 10.3 | 11.5 |
| % of Stores Remodeled | 9.9% | 12.0% | 19.2% | 15.0% | 12.9% | 13.8% |
| % of Stores Remodeled in Last 5 YRS | 28.2% | 26.0% | 29.4% | 30.1% | 20.7% | 26.9% |
| Average Cost Per Remodel | $346,104 | $409,582 | $450,021 | $408,055 | $480,574 | $418,867 |
| Source: 2019 NACS State of the Industry | | | | | | |

## SUBJECT'S MARKET POSITION - GAS STATION/CONVENIENCE STORE

### Trade Area

A trade area is the geographical region in which the subject store competes for business. The industry considers the trade area for a typical convenience store to be a two-mile radius in urban areas. In rural communities with less dense populations, the trade area may cover a broader region including a major portion or entire city. For convenience stores located adjacent to state or interstate highways, the trade area may cover several miles along a traffic route.

Trade area analysis most often involves ring studies or more sophisticated drive-time studies. Drive-time studies take into consideration accessibility to the subject over the existing traffic routes. Physical barriers such as rivers, mountains, and railroad tracks are factors in drive-time studies. Three-, five- and seven-minute driving times to the subject are estimated along various traffic routes. Generally, the convenience industry considers a three-minute drive time to be primary market. Regarding the location of the subject, a 2-mile radius is considered an appropriate radius.

The trade area analysis provides the geographic area, in which the subject competes, but does not indicate how well the subject may or may not perform within the given trade are. Use of the location quotient helps measure supply and demand within the predetermined trade area.

The national population to-store ratio was traditionally about 3,000:1. The threshold has slipped to about 2,600:1 in today's market which may be an indication of a national over-supply. The convenience industry has traditionally believed that 3,000 residents per store was the minimum for a successful operation.

The location quotient is a measure of the tendency of a particular type of business or industry to locate in a geographic area. A simple calculation widely used in various regional economic applications, the location quotient is well suited to analyzing the local convenience store market. The two numbers needed to measure the location quotient are the number of convenience stores near the subject (the number of competitors) and the broad-based measure of demand (the population count).

*Citgo Travel Center, Calumet Park, Illinois*



There are eighteen gas stations/convenience stores, including the subject, located within a 2-mile radius of the subject.



Given that the five-minute drive time falls within the 2-mile radius we have utilized the population and store count within the 2-mile radius as the basis for our supply and demand study utilizing the location quotient. The population within a two-mile radius is 81,630. Therefore, there are 4,535 people for every gas station within 2 miles.

A quotient below 1.0 indicates an oversupply in the market, a quotient above 1.0 indicates an under supply while a location quotient equal to 1.0 means that the subject market is in equilibrium. The subject's location quotient equates to 1.74 rounded, representing a market that is currently under-supplied based upon population. Below is a summary of our findings:

| Suppy/Demand | |
|---|---|
| Population (2019) | 81,630 |
| Station/2-Mile | 18 |
| Population/Station | 4,535 |
| Population Threshold | 2,600 |
| Location Quotient | 1.74 |
| **Market Indication** | |



Although population plays an important role in determining the demand for a gas station/convenience store, it can be a misleading measurement when factors such as traffic counts and daytime population are not taken into account. Many gas station/convenience store developers indicate 4,000 vehicles per day would be the minimum threshold for development of a store. The following chart illustrates the subject's traffic counts:

| | | |
|---|---|---|
| Primary Traffic Counts (24 hrs.) | 119th Street @ Marshfield Avenue | 20,000 Date: 2018 |
| Secondary Traffic Counts (24 hrs.) | Interstate-57 @ 119th Street | 122,100 Date: 2018 |

The subject's traffic counts are estimated at 20,000 vehicles per day with an additional 122,100 along I-57. As indicated, the subject location far exceeds industry standards utilizing traffic counts within the trade area.

## POTENTIAL PURCHASER

Based on discussions with local market participants, the most likely buyer is an owner-user. However, corporate operators with a portfolio of locations (larger than the typical owner-user/operator), is a viable potential purchaser as well.

## CONCLUSION

The subject is in average overall condition with an average location in close proximity to the City of Chicago and Interstate-57. The neighborhood demographics indicate an under-supply with respect to gas stations in the trade area. In addition, the high traffic counts and location near Interstate-57 are positive influences to the site. It is believed that the subject will continue to be well received in the trade area.

*Citgo Travel Center, Calumet Park, Illinois*



# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based. The four criteria the highest and best use must meet are:

- Legal permissibility;
- Physical possibility;
- Financial feasibility; and
- Maximum productivity.

The highest and best use analysis of the subject is discussed below.

## AS VACANT

The property is zoned for a variety of retail, service-related commercial, and residential developments and is of sufficient size to accommodate various types of development. The immediate area includes various commercial uses, including local businesses. Considering the surrounding land uses, location attributes, legal restrictions and other factors, it is our opinion that a retail-related use would be reasonable and appropriate. Therefore, it is our opinion that the highest and best use would be for a retail-related use, time and circumstances warranting.

## AS IMPROVED

As improved, the subject involves a retail-oriented service facility. The current use is legally permissible and physically possible. The improvements continue to contribute value to the property and based on our analysis, the existing use is financially feasible and maximally productive. Therefore, it is our opinion that the highest and best use of the subject, as improved, is for continued retail related, service use.

Based on discussions with local market participants, the most likely buyer is an owner-user. However, corporate operators with a portfolio of locations (larger than the typical owner-user/operator), is a viable potential purchaser as well.

*Citgo Travel Center, Calumet Park, Illinois*



## Land Value

The following map and table summarize the comparable data used in the valuation of the subject site.  A detailed description of each transaction is included in the addenda.



### SUMMARY OF COMPARABLE LAND SALES

| No. | Property Location | Transaction Type | Date | Zoning | Actual Sale Price | Adjusted Sale Price [1] | Size (SF) | Price Per SF |
|-----|-------------------|------|------|--------|------------|-----------|-----------|--------------|
| 1 | 11120 S. Ridgeland Avenue (SWC Ridgeland & 111th) Worth, IL 60482 | Sale | Apr-19 | B-2, General Business | $1,100,000 | $1,100,000 | 65,340 | $16.84 |
| 2 | 14840 Western Avenue Posen, IL 60469 | Sale | Dec-18 | G, Industrial District | $3,350,000 | $3,350,000 | 436,907 | $7.67 |
| 3 | 16178 Chicago Road South Holland, IL 60473 | Sale | Aug-17 | TCD | $520,000 | $520,000 | 40,032 | $12.99 |
| 4 | 1111 East 162nd Street South Holland, IL 60473 | Sale | Jan-17 | GB | $1,500,000 | $1,500,000 | 96,829 | $15.49 |
| Subject | 11900 South Marshfield Avenue, Calumet Park, Illinois | --- | --- | C-3, Highway Commercial District | --- | --- | 144,428 | --- |

[1] Adjusted sale price for cash equivalency and/or development costs (where applicable)
Compiled by CBRE

*Citgo Travel Center, Calumet Park, Illinois*



**DISCUSSION/ANALYSIS OF LAND SALES**

### Land Sale One

This comparable represents a 1.50-acre redevelopment site located at the southwest corner of Ridgeland Avenue and 111th Street in Worth, Illinois. The site is irregular and zoned B-2, General Business The site is situated at a signalized intersection with traffic counts of 29,700 vehicle per day. This property sold in May 2019 for $1,100,000 or $16.84 per square foot. The reported buyer will develop a gas station/c-store.

### Land Sale Two

This is a 10.03-acre commercial/industrial land parcel located at 14840 South Western Avenue in Posen, Cook County, Illinois. The site is irregular shaped, has all utilities available, and is zoned G (Industrial) by Posen. This property sold in December 2018 for $3,350,000 or $7.67/SF. Reportedly, the site will be redeveloped with a Thorntons travel center/gas station.

### Land Sale Three

This 0.92-acre site at the NE corner of 162nd and South Park Avenue (16178 Chicago Road is corner mailing address) in South Holland, IL sold for $520,000 or $12.99 per SF on August 11, 2017. The site was "L" shaped and vacant at the time of sale.

### Land Sale Four

This 2.22 acre land parcel at 1111 East 162nd Street in South Holland, IL sold on January 27, 2017 for $1,500,000 or $15.49 per SF. The site was purchased by Thorton's for the construction of a new gas station.

*Citgo Travel Center, Calumet Park, Illinois*



## SUMMARY OF ADJUSTMENTS

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| LAND SALES ADJUSTMENT GRID | | | | | |
|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | Subject |
| Transaction Type | Sale | Sale | Sale | Sale | --- |
| Transaction Date | Apr-19 | Dec-18 | Aug-17 | Jan-17 | --- |
| Zoning | B-2, General Business | G, Industrial District | TCD | GB | C-3, Highway Commercial |
| Actual Sale Price | $1,100,000 | $3,350,000 | $520,000 | $1,500,000 | --- |
| Adjusted Sale Price [1] | $1,100,000 | $3,350,000 | $520,000 | $1,500,000 | --- |
| Size (Acres) | 1.50 | 10.03 | 0.92 | 2.22 | 3.32 |
| Size (SF) | 65,340 | 436,907 | 40,032 | 96,829 | 144,428 |
| Price Per SF | $16.84 | $7.67 | $12.99 | $15.49 | --- |
| Price ($ PSF) | $16.84 | $7.67 | $12.99 | $15.49 | |
| Property Rights Conveyed | 0% | 0% | 0% | 0% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | |
| Conditions of Sale | 0% | 0% | 0% | 0% | |
| Market Conditions (Time) | 1% | 1% | 4% | 5% | |
| Subtotal | $17.01 | $7.75 | $13.51 | $16.26 | |
| Size | -10% | 15% | -10% | -5% | |
| Shape | 0% | 0% | 0% | 0% | |
| Corner | 0% | 0% | 0% | 0% | |
| Frontage | 0% | 0% | 0% | 0% | |
| Topography | 0% | 0% | 0% | 0% | |
| Location | -15% | 30% | 0% | -15% | |
| Zoning/Density | 0% | 0% | 0% | 0% | |
| Utilities | 0% | 0% | 0% | 0% | |
| Highest & Best Use | 0% | 0% | 0% | 0% | |
| Total Other Adjustments | -25% | 45% | -10% | -20% | |
| **Value Indication for Subject** | **$12.76** | **$11.23** | **$12.16** | **$13.01** | |
| *Absolute Adjustment* | *26%* | *46%* | *14%* | *25%* | |

[1] Adjusted sale price for cash equivalency and/or development costs (where applicable)

Compiled by CBRE

All of the comparables were sold at times with inferior pricing and upward adjustments are necessary. Comparables 1, 3, and 4 are smaller in size and Comparable 2 is larger in size and adjustment are required for the differences with the subject. Comparables 1 and 4 are superior in location and Comparable 2 is inferior in location and adjustments are needed for the differences with the subject.

*Citgo Travel Center, Calumet Park, Illinois*



## CONCLUSION

Based on the preceding analysis, Comparables 3 and 4 were the most representative of the subject site and warranted greatest consideration because they had the least amount of adjustments. The following table presents the valuation conclusion:

| CONCLUDED LAND VALUE | | | | |
|---|---|---|---|---|
| **$ PSF** | | **Subject SF** | | **Total** |
| $12.00 | x | 144,428 | = | $1,733,136 |
| $13.00 | x | 144,428 | = | $1,877,564 |
| **Indicated Value:** | | | | **$1,800,000** |
| | | (Rounded $ PSF) | | $12.46 |
| Compiled by CBRE | | | | |

*Citgo Travel Center, Calumet Park, Illinois*



# Cost Approach

In estimating the replacement cost new for the subject, the following methods/data sources have been utilized (where available):

- the comparative unit method, utilizing the Marshall Valuation Service (MVS) cost guide, published by Marshall and Swift, LLC;
- the subject's actual construction costs (where available); and
- actual/budget construction cost figures available for comparable properties.

## MARSHALL VALUATION SERVICE

### Direct Cost

Salient details regarding the direct costs are summarized in the Cost Approach Conclusion at the end of this section. The MVS cost estimates include the following:

1. average architect's and engineer's fees for plans, plan check, building permits and survey(s) to establish building line;
2. normal interest in building funds during the period of construction plus a processing fee or service charge;
3. materials, sales taxes on materials, and labor costs;
4. normal site preparation including finish grading and excavation for foundation and backfill;
5. utilities from structure to lot line figured for typical setback;
6. contractor's overhead and profit, including job supervision, workmen's compensation, fire and liability insurance, unemployment insurance, equipment, temporary facilities, security, etc.;
7. site improvements (included as lump sum additions); and
8. initial tenant improvement costs are included in MVS cost estimate. However, additional lease-up costs such as advertising, marketing and leasing commissions are not included.

Base building costs (direct costs) are adjusted to reflect the physical characteristics of the subject. Making these adjustments, including the appropriate local and current cost multipliers, the direct building cost is indicated. The subject property includes typical FF&E (MPDs, tanks, etc.). In order to estimate the value of the FF&E, we have also relied upon information contained in the Marshall Valuation Service Cost Manual and from industry standards.

### Additions

Items not included in the direct building cost estimate include parking and walks, signage, landscaping, and miscellaneous site improvements. Site improvement costs are estimated at $3.00 per square foot of land area (excluding building footprint) or $471,952 (including multipliers). Any other applicable costs were also added.

*Citgo Travel Center, Calumet Park, Illinois*



### Indirect Cost Items

Several indirect cost items are not included in the direct building cost figures derived through the MVS cost guide. These items include developer overhead (general and administrative costs), property taxes, legal and insurance costs, local development fees and contingencies, lease-up and marketing costs and miscellaneous costs. Research into these cost items indicates that an average property requires an allowance of about 10% to 20% of the total direct costs.

## ENTREPRENEURIAL PROFIT

Entrepreneurial profit represents the return to the developer and is separate from contractor's overhead and profit. This line item, which is a subjective figure, tends to range from 10% to 20% of total direct and indirect costs for this property type, based on discussions with developers active in this market.

## ACCRUED DEPRECIATION

There are essentially three sources of accrued depreciation:

1. physical deterioration, both curable and incurable;
2. functional obsolescence, both curable and incurable; and
3. external obsolescence.

### Physical Deterioration

Curable deterioration affecting the improvements results from deferred maintenance and, if applicable, was previously discussed. With regard to incurable deterioration, the subject improvements are considered to have deteriorated due to normal wear and tear associated with natural aging. We were not provided with exact ages of the equipment and we have estimated the effective ages below. In order to estimate the depreciated value of the FF&E (identified in a following table), we have again relied upon the Marshall Valuation Service depreciation schedule for fixtures and equipment. In this analysis, we have assumed an average life expectancy of 10 to 45 years, and a salvage value per component ranging from  to .

*Citgo Travel Center, Calumet Park, Illinois*



The following chart provides a summary of the remaining economic life for the subject's components. If the component if fully depreciated, we have used the salvage value in the analysis. The following chart provides a summary of the remaining economic life.

| DEPRECIATION SUMMARY | | | | |
|---|---|---|---|---|
| Component | Effective Age | Economic Life | Depreciation % | Salvage Value |
| Gas Station Mini-Mart Convenience Store | 15 | 45 | 33.3% | 0.0% |
| Auto Service/Repair | 15 | 45 | 33.3% | 0.0% |
| Car Wash | 13 | 40 | 32.5% | 0.0% |
| Site Improvements | 8 | 15 | 53.3% | 0.0% |
| Canopy 1 | 10 | 20 | 50.0% | 0.0% |
| Canopy 2 | 0 | 20 | 0.0% | 0.0% |
| Pumps/MPDs (New / 6) | 0 | 15 | 0.0% | 15.0% |
| Pumps/MPDs (Old / 5) | 5 | 15 | 33.3% | 15.0% |
| Signage | 5 | 10 | 50.0% | 15.0% |
| Underground 12,000-Gallon Tanks | 15 | 35 | 42.9% | 15.0% |
| Underground 20,000-Gallon Tank | 0 | 35 | 0.0% | 15.0% |
| Underground 5,000-Gallon Tanks | 0 | 35 | 0.0% | 15.0% |
| Car Wash Equipment | 7 | 15 | 46.7% | 15.0% |
| Start-Up F,F,& E (Soda Machines/Coolers, etc.) | 5 | 15 | 33.3% | 5.0% |
| Compiled by CBRE | | | | |

## Functional Obsolescence

Based on a review of the design and layout of the improvements, no forms of curable functional obsolescence were noted. Because replacement cost considers the construction of the subject improvements utilizing modern materials and current standards, design and layout, functional incurable obsolescence is not applicable.

## External Obsolescence

Based on a review of the local market and neighborhood, no forms of external obsolescence affect the subject.



## COST SCHEDULE

The following chart details the depreciated value of the subject.

| | Size/ Units | Cost/Unit | Multipliers Current | Local | Base Cost | Indirect Costs | Total Direct/Indirect | Developer** Profit | Total Cost New | Depreciation % | Depreciation $ | Depreciated Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Component | | | | | | | | | | | | |
| Gas Station Mini-Mart Convenience Store | 7,607 | $113.00 | 1.01 | 1.26 | $1,093,916 | $164,087 | $1,258,003 | $188,700 | $1,446,703 | 33.3% | $482,234 | $964,469 |
| Auto Service/Repair | 7,514 | $57.50 | 1.01 | 1.26 | $549,833 | $82,475 | $632,308 | $94,846 | $727,154 | 33.3% | $242,385 | $484,770 |
| Car Wash | 6,900 | $90.50 | 1.02 | 1.26 | $802,543 | $120,381 | $922,925 | $138,439 | $1,061,363 | 32.5% | $344,943 | $716,420 |
| Site Improvements | 122,407 | $3.00 | 1.02 | 1.26 | $471,952 | $70,793 | $542,745 | $81,412 | $624,157 | 53.3% | $332,884 | $291,273 |
| Canopy 1 | 3,500 | $28.00 | 1.02 | 1.26 | $125,950 | $18,892 | $144,842 | $21,726 | $166,568 | 50.0% | $83,284 | $83,284 |
| Canopy 2 | 1,536 | $28.00 | 1.02 | 1.26 | $55,274 | $8,291 | $63,565 | $9,535 | $73,100 | 0.0% | $0 | $73,100 |
| Pumps/MPDs (New / 6) | 6 | $29,625 | 1.02 | 1.26 | $228,444 | $34,267 | $262,711 | $39,407 | $302,118 | 0.0% | $0 | $302,118 |
| Pumps/MPDs (Old / 5) | 5 | $29,625 | 1.02 | 1.26 | $190,370 | $28,556 | $218,926 | $32,839 | $251,765 | 33.3% | $83,922 | $167,843 |
| Signage | 2 | $30,000 | 1.02 | 1.26 | $77,112 | $11,567 | $88,679 | $13,302 | $101,981 | 50.0% | $50,990 | $50,990 |
| Underground 12,000-Gallon Tanks | 1 | $56,750 | 0.99 | 1.26 | $70,790 | $10,618 | $81,408 | $12,211 | $93,620 | 42.9% | $40,123 | $53,497 |
| Underground 20,000-Gallon Tank | 1 | $86,250 | 0.99 | 1.26 | $107,588 | $16,138 | $123,726 | $18,559 | $142,285 | 0.0% | $0 | $142,285 |
| Underground 5,000-Gallon Tanks | 1 | $36,100 | 0.99 | 1.26 | $45,031 | $6,755 | $51,786 | $7,768 | $59,554 | 0.0% | $0 | $59,554 |
| Car Wash Equipment | 1 | $320,000 | 1.02 | 1.26 | $411,264 | $61,690 | $472,954 | $70,943 | $543,897 | 46.7% | $253,818 | $290,078 |
| Start-Up F,F,& E (Soda Machines/Coolers, etc.) | 1 | $50,000 | 1.02 | 1.26 | $64,260 | $9,639 | $73,899 | $11,085 | $84,984 | 33.3% | $28,328 | $56,656 |
| **Total** | | | | | **$4,294,328** | **$644,149** | **$4,938,477** | **$740,772** | **$5,679,248** | **34.2%** | **$1,942,911** | **$3,736,337** |

## COST APPROACH CONCLUSION

The value estimate is calculated as follows.

| COST APPROACH SUMMARY | |
|---|---|
| Depreciated Replacement Cost | $3,736,337 |
| Land Value | $1,800,000 |
| As Is Value Indication | $5,536,337 |
| **Rounded** | **$5,540,000** |
| **Value Per MPD** | **$503,636** |
| Compiled By CBRE (Excluding Business Enterprise Value) | |

The following chart summarizes the allocation between land, improvements, and equipment.

| COST APPROACH ALLOCATION | | |
|---|---|---|
| **Component** | **Category** | **Depreciated Value** |
| Gas Station Mini-Mart Convenience Store | Real Estate | $964,469 |
| Auto Service/Repair | Real Estate | $484,770 |
| Car Wash | Real Estate | $716,420 |
| Site Improvements | Real Estate | $291,273 |
| Canopy 1 | Perminant Equipment | $83,284 |
| Canopy 2 | Perminant Equipment | $73,100 |
| Pumps/MPDs (New / 6) | Perminant Equipment | $302,118 |
| Pumps/MPDs (Old / 5) | Perminant Equipment | $167,843 |
| Signage | Perminant Equipment | $50,990 |
| Underground 12,000-Gallon Tanks | Perminant Equipment | $53,497 |
| Underground 20,000-Gallon Tank | Perminant Equipment | $142,285 |
| Underground 5,000-Gallon Tanks | Perminant Equipment | $59,554 |
| Car Wash Equipment | F,F,& E | $290,078 |
| Start-Up F,F,& E (Soda Machines/Coolers, etc.) | F,F,& E | $56,656 |
| Total Real Estate Including perminant equipment | | $3,389,603 |
| Total F,F,& E | | $346,734 |
| Total | | $3,736,337 |
| **Rounded** | | **$3,740,000** |
| **Plus: Land Value** | | **$1,800,000** |
| **As Is Total (Excluding Business Enterprise Value)** | | **$5,540,000** |
| Compiled by CBRE | | |

*Please note that the value indication above does not consider business/intangible value.*



A summary of these allocations is outlined below:

| MARKET VALUE ALLOCATIONS | |
| --- | --- |
| Component | Depreciated Value |
| Gas Station and Site Improvements | $2,456,932 |
| Permanent Equipment (Conopy, Sign, Tanks, and Pumps) | $932,671 |
| Land Value | $1,800,000 |
| Total Real Estate | $5,190,000 |
| F,F,& E | $345,000 |
| As Is - Real Estate and F,F,& E | $5,535,000 |
| **As Is - Real Estate and F,F,& E (Rounded)** | **$5,540,000** |
| Compiled by CBRE | |

*Citgo Travel Center, Calumet Park, Illinois*



# Insurable Replacement Cost

Insurable Replacement Cost is defined as follows:

1. the value of an asset or asset group that is covered by an insurance policy; can be estimated by deducting costs of noninsurable items (e.g., land value) from market value.
2. The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). [8]

CBRE, Inc. has followed traditional appraisal standards to develop a reasonable calculation based upon industry practices and industry-accepted publications such as the Marshall Valuation Service. The methodology employed is a derivation of the cost approach and is not reliable for Insurable Replacement Cost estimates. Actual construction costs and related estimates can vary greatly from this estimate.

The Insurable Replacement Cost estimate presented herein is intended to reflect the value of the destructible portions of the subject, based on the replacement of physical items that are subject to loss from hazards (excluding indestructible items such as basement excavation, foundation, site work, land value and indirect costs). In the case of the subject, this estimate is based upon the base building costs (direct costs) as obtained via the Marshall Valuation Service cost guide, with appropriate deductions.

This analysis should not be relied upon to determine proper insurance coverage as only consultants considered experts in cost estimation and insurance underwriting are qualified to provide an Insurable Replacement Cost. It is provided to aid the client/reader/user as part of their overall decision-making process and no representations or warranties are made by CBRE, Inc. regarding the accuracy of this estimate. It is strongly recommended that other sources be utilized to develop any estimate of Insurable Replacement Cost.

| INSURABLE REPLACEMENT COST | | |
|---|---|---|
| **Base Building Cost** | *(via Marshall Valuation Service cost data)* | $3,235,221 |
| **Insurable Exclusions** | 10.0% of Total Building Cost | ($323,522) |
| **Indicated Insurable Replacement Cost (Improvements)** | | **$2,911,699** |
| **Replacement Cost (Perminant Equipment)** | | **$1,190,990** |
| **Replacement Cost (F,F,&E)** | | **$628,880** |
| **Total Insurable Value** | | **$4,731,569** |
| **Rounded** | | **$4,750,000** |
| **Value Per SF** | | **$215.70** |

Compiled by CBRE

---

[8] Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 6th ed. (Chicago: Appraisal Institute, 2015), 119.

*Citgo Travel Center, Calumet Park, Illinois*



## Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject.  A detailed description of each transaction is included in the addenda.



### SUMMARY OF COMPARABLE RETAIL SALES

| No. | Property Name | Transaction Type | Transaction Date | YOC / Reno'd | GLA (SF) | Actual Sale Price | Adjusted Sale Price [1] | Price Per SF [1] | Gross Profit | GPM | NOI Per SF | OAR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Lake Station Travel Center, 1201 Ripley Street Lake Station, IN 46405 | Sale | Jan-19 | 1988 | 31,884 | $15,120,000 | $15,120,000 | $474.22 | n/a | n/a | n/a | n/a |
| 2 | Shell Gas Station/Convenience Store/Car Wash, 17100 West Laraway Road Joliet, IL 60433 | Sale | Dec-18 | 1998 / 2006 | 8,776 | $5,836,862 | $5,836,862 | $665.09 | $1,765,746 | 3.31 | n/a | n/a |
| 3 | O'Hare BP/Car Wash, 4111 N. Mannheim Schiller Park, IL 60176 | Sale | Jan-15 | 2010 | 7,283 | $6,000,000 | $6,000,000 | $823.84 | $1,990,000 | 3.02 | n/a | n/a |
| 4 | Circle K/ Shell, 11900 Route 59 Plainfield, IL 60585 | Sale | Mar-17 | 2007 | 15,207 | $6,300,000 | $6,300,000 | $414.28 | n/a | n/a | $29.97 | 7.23% |
| 5 | Goetz Truck Stop, N5800 Kinney Road Portage, WI 53901 | Sale | Aug-17 | 1986 | 28,875 | $8,120,000 | $8,120,000 | $281.21 | $2,500,000 | 3.25 | $31.17 | 11.08% |
| 6 | TravelCenters of America- Wilmington, 24225-24263 W Lorenzo Rd Wilmington, IL 60481 | Sale/Lease back | Jun-16 | 2016 | 23,024 | $22,300,000 | $22,300,000 | $968.55 | n/a | n/a | $82.52 | 8.52% |
| Subj. Pro Forma | Citgo Travel Center, 11900 South Marshfield Avenue Calumet Park, IL 60827 | --- | --- | 1998 / 2019 | 22,021 | --- | --- | --- | $1,996,556 | --- | --- | --- |

[1] Adjusted sale price for cash equivalency, lease-up and/or deferred maintenance (where applicable)
Compiled by CBRE

51



The comparables include five closed sales within Illinois, Indiana, and Wisconsin. For purposes of comparison, the subject has a combined traffic count of 142,100[9] vehicles per day.

## DISCUSSION/ANALYSIS OF IMPROVED SALES

### Improved Sale One

On January 15, 2019, the travel center located at 1201 Ripley Street in Lake Station, Indiana sold for confirmed sale price of 15,120,000. The asset was purchased by Travel Centers of America from Hospitality Properties Trust. The building is a total of 31,884 SF and includes a c-store, a dine-in restaurant, a Popeyes Chicken, and truck service center with six repair bays. The property has four regular fuel dispensers and fifteen diesel fuel dispensers. The entire center sits on 23.22-acres. The site is just south of site right off the Interstate-90 exit with average traffic counts of 32,024 VPD.

### Improved Sale Two

This 8,776 Shell Gas Station/C-Store/Car Wash sold in December 2018 for $5,836,862. The station was comprised of 6,685 SF c-store and a 2,091 square foot car wash. The station included 8 double sided gasoline MPD's and 3 diesel MPD's. The gross profit at the time of sale was $1,765,746 (rd) for a GPM of 3.31. The c-store included a Subway and there is a small garden center on-site.

### Improved Sale Three

This 7,238 BP Gas Station/Car Wash sold in January, 2015 for $6,000,000. The station was comprised of 4,953 SF c-store, a 1170 square foot office area (not included in GBA) and a 2332 square foot car wash. The station included 12 double sided MPD's. The seller reportedly had an alternate offer for $6,300,000 but sold the property for $6,000,000 to one of the principal members. The gross profit at the time of sale was $1,990,000 (rd) for a GPM for a GPM of 3.02. The c-store included a Dunkin Donuts and Subway. Surrounding improvements include hotel properties such as Four Points by Sheraton to the northeast, O'Hare Inn & Suites and Candlewood Suites Chicago-O'Hare International to the south of the subject. A new 1,200 car parking garage is under construction to the east of the subject, providing for additional Airport parking. O'Hare Blue Sky Parking is located just west of the subject and Easy Airport Parking is located southwest. There is also rental car agencies located nearby such as Thrifty and Ace.

---

[9] Data obtained from the Illinois Department of Transportation (IDOT).

*Citgo Travel Center, Calumet Park, Illinois*



### Improved Sale Four

This Circle K/ Shell at 11900 Route 59 in Plainfield, IL sold on March 10, 2017 for $6,300,000. The property is managed by a regional Circle K operator and guaranteed by Shell Oil Company. The property is one of Shell's "multi-brand concept builds", constructed in 2007, and includes a freestanding Firestone Complete Auto Care facility, a Dunkin Donuts with a drive thru, and a Circle K convenience store with gas service. The Dunkin Donuts and Firestone are sublease tenants to the Shell Oil Company lease. The landlord holds zero responsibilities under the Shell Oil Company guaranteed lease. The property has seven years of base term remaining on a 15 year lease, with five, five-year options. In June of 2017 the base rent will increase by 15 percent, increasing the Cap Rate to 7.42 percent, in addition to 10 percent bumps each option period. The property has non-recourse debt in place, at a rate of five percent, which balloons November of 2022, and will need to be assumed by a new purchaser. The station had 6 double sided, MPD's and average traffic counts of 46,950 VPD. The offering price was $6,510,000.

### Improved Sale Five

On August 2, 2017, the truck stop located at N5800 Kinney Rd in Portage WI sold for confirmed sale price $8.12 million. The asset was purchased by Travel Centers of America from local investor or had owned the truck stop for over 30 years. The building includes single story c-store/restaurant that totals 17,375 sqft and single story repair building that totals 11,500 sqft allowing with pumping stations. The entire center sits on 28 acres. The site sits right off the I90/94 exit with average traffic counts of 33,100 VPD.

### Improved Sale Six

This newly constructed travel center in Wilmington, Illinois sold as part of a sale leaseback scenario for $22,300,000 or $968.55. According to the SEC filing, the annual rent was $1,900,000 indicating a cap rate of 8.52%. This property was built in 2016 and includes 229 angled and generously sized truck parking spaces and over 120 car parking spaces; Eight diesel lanes, all equipped to pump bulk DEF, and 12 Shell-branded gasoline fueling points; a five-bay Petro:Lube facility, and RoadSquad™ emergency roadside service, available 24/7/365; a 140-seat Iron Skillet® full-service restaurant with a buffet and StayFit® menu options; an 18-seat Charleys Philly Steak® quick-service restaurant; A 4,900 square-foot Minit Mart® travel store stocked with driver merchandise, Minit Mart's refreshing Cool Cup® fountain beverages, World Blends® Coffee, and to-go offerings featuring fried chicken, pizza and a variety of healthy options, prepared fresh daily on site; Nine driver showers operated by a fully automated reservation system, also accessible through the TA/Petro TruckSmart® mobile app; a FREE StayFit® fitness room (free to professional drivers who are UltraONE® Driver Rewards Program members) and an outdoor walking trail for continued dedication to fitness and a laundry facility with machines that accept credit/debit card payments. This travel center is located off of I-55.

*Citgo Travel Center, Calumet Park, Illinois*



## SUMMARY OF ADJUSTMENTS

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

| RETAIL SALES ADJUSTMENT GRID | | | | | | | |
|---|---|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | 5 | 6 | Subj. Pro Forma |
| Transaction Type | Sale | Sale | Sale | Sale | Sale | Sale/Leaseback | --- |
| Transaction Date | Jan-19 | Dec-18 | Jan-15 | Mar-17 | Aug-17 | Jun-16 | --- |
| Year Built/Renovated | 1988 | 1998 / 2006 | 2010 | 2007 | 1986 | 2016 | 1998 |
| GLA (SF) | 31,884 | 8,776 | 7,283 | 15,207 | 28,875 | 23,024 | 22,021 |
| Actual Sale Price | $15,120,000 | $5,836,862 | $6,000,000 | $6,300,000 | $8,120,000 | $22,300,000 | --- |
| Adjusted Sale Price [1] | $15,120,000 | $5,836,862 | $6,000,000 | $6,300,000 | $8,120,000 | $22,300,000 | --- |
| Price Per SF [1] | $474.22 | $665.09 | $823.84 | $414.28 | $281.21 | $968.55 | --- |
| OAR | n/a | n/a | n/a | 7.23% | 11.08% | 8.52% | --- |
| Adj. Price Per SF | $474.22 | $665.09 | $823.84 | $414.28 | $281.21 | $968.55 | |
| Property Rights Conveyed | 0% | 0% | 0% | -15% | -15% | -15% | |
| Financing Terms [1] | 0% | 0% | 0% | 0% | 0% | 0% | |
| Conditions of Sale | 0% | 0% | 0% | 0% | 0% | 0% | |
| Market Conditions (Time) | 2% | 2% | 14% | 7% | 6% | 9% | |
| Subtotal - Price Per SF | $483.70 | $678.39 | $939.18 | $376.79 | $253.37 | $897.36 | |
| Location | -15% | -25% | -45% | 0% | 15% | 0% | |
| Size | 5% | -20% | -20% | -5% | 0% | -25% | |
| Age/Condition | 0% | -10% | 0% | -15% | 0% | 0% | |
| Quality of Construction | 0% | 0% | 0% | 0% | 0% | 0% | |
| Traffic Counts/Exposure | 0% | 0% | 0% | 0% | 0% | 0% | |
| Parking | 0% | 0% | 0% | 0% | 0% | 0% | |
| Fuel Dispensers | -10% | 0% | 0% | 0% | 0% | -10% | |
| Amenities | -20% | 0% | -5% | 0% | 0% | -30% | |
| Total Other Adjustments | -40% | -55% | -70% | -20% | 15% | -65% | |
| **Indicated Value Per SF** | **$290.22** | **$305.28** | **$281.75** | **$301.43** | **$291.38** | **$314.08** | |
| *Absolute Adjustment* | 52% | 57% | 84% | 42% | 36% | 89% | |

[1] Adjusted for cash equivalency, lease-up and/or deferred maintenance (where applicable)

Compiled by CBRE

Comparables 1, 4, and 5 were given greatest consideration because they had the least amount of adjustments.

On an adjusted basis, the sales range from $281.75 to $314.08 per square foot of building area. After adjustments, the sales result in an average value indication of $297.36 per square foot.

*Citgo Travel Center, Calumet Park, Illinois*



## GROSS PROFIT MARGIN ANALYSIS

To further support the estimated value of the subject, we have utilized a secondary analysis utilizing a Gross Profit Margin (GPM) multiplier will be performed. The Gross Profit Margin (GPM) generated by the comparable sales will be compared to the subject's GPM as estimated in the Income Capitalization Approach. In general, it is a fundamental assumption that the physical characteristics of a property (e.g., location, access, design/appeal, condition, etc.) are reflected in the net operating income being generated, and the resultant price per square foot paid for a property has a direct relationship to the GPM being generated.

Valuation of the subject property utilizing the Gross Profit Margin multipliers (GPMM) from the comparable properties accounts for the disparity of the Gross Profit Margins ($GPM's) between the comparables and the subject. Within this technique, each of the adjusted GPMM's are multiplied by the $GPM per square foot of the subject, which produces an adjusted value indication for the subject. The gross profit margin for the subject property is typically calculated as the first year of the holding period. Details of this analysis can be found in the Income Capitalization Approach section. This methodology represents an attempt to isolate the economic reasoning of the buyers.

The equation for the gross profit margin multiplier (GPMM) is calculated as follows:

$$\text{GPMM} = \text{Sales Price/Gross Profit Margin}$$

The following chart depicts the calculations involved in developing adjustment factors to be applied to the respective price per square foot indications developed from the comparables employed.

| GROSS PROFIT MARGIN ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sale No. | Price | | Gross Profit | | GPMM | | Subject GPMM/SF | | Indicated Price |
| 2 | $5,836,862 | ÷ | $1,765,746 | = | 3.31 | x | $90.67 | = | $299.71 |
| 3 | $6,000,000 | ÷ | $1,990,000 | = | 3.02 | x | $90.67 | = | $273.36 |
| 5 | $8,120,000 | ÷ | $2,500,000 | = | 3.25 | x | $90.67 | = | $294.48 |
| Low | | | $1,765,746 | | 3.02 | | | | $273.36 |
| High | | | $2,500,000 | | 3.31 | | | | $299.71 |
| Average | | | $2,085,249 | | 3.19 | | | | $289.18 |

Compiled by CBRE

On an adjusted basis, the indicated value range is from $273.36 to $299.71 per square foot of building area, with an average indication of $289.18 per square foot.

*Citgo Travel Center, Calumet Park, Illinois*



## SALE PRICE PER SQUARE FOOT CONCLUSION

The adjusted sales resulted in a range from $281.75 to $314.08 per square foot of building area. After adjustments, the sales result in an average value indication of $297.36 per square foot. The GPM analysis resulted in an average indication of $289.18 per square foot. The subject's indicated value is then within the range of $285.00 to $295.00 per square foot of gross building area. The following chart presents the valuation conclusion for the subject property:

| SALES COMPARISON APPROACH | | | | |
|---|---|---|---|---|
| GLA/GBA (SF) | X | Value Per SF | = | Value |
| 22,021 | X | $285.00 | = | $6,275,985 |
| 22,021 | X | $295.00 | = | $6,496,195 |
| **VALUE CONCLUSION** | | | | |
| **As Is Going-Concern Value** | | | | **$6,400,000** |
| **Rounded** | | | | **$6,400,000** |
| **Value Per SF** | | | | **$290.63** |
| Compiled by CBRE | | | | |

*Citgo Travel Center, Calumet Park, Illinois*



# Income Capitalization Approach

In providing a market value of the subject we have analyzed the property as a non-traditional income generating property. As such, we have analyzed the property based on the projected operating income statements, with secondary support from industry publications. To arrive at a going-concern value we have utilized a gross profit multiplier.

## OPERATING HISTORY

The chart below summarizes our projection of the subject property's income over the next twelve months. We have based our projections upon the owner's statements and upon the operations of similar service stations. Our assumptions are discussed in more detail in the following sections.

The following table presents the historical operating data for the subject as well as our estimate.

| OPERATING HISTORY & FORECAST | | | |
|---|---|---|---|
| Year | 2017 | 2018 | CBRE Estimate |
| | Total | Total | Total [2] |
| **Gross Revenue** | | | |
| Fuel Sales - Gasoline | - | - | $3,542,400 |
| Gasoline Fuel Gallons Sold | - | - | 1,080,000 |
| Avg. Gasoline Fuel Price/Gallon | - | - | $3.28 |
| Gasoline Fuel Margin (Per Gal) | - | - | $0.20 |
| Fuel Sales - Diesel | - | - | 1,062,000 |
| Diesel Fuel Gallons Sold | - | - | 360,000 |
| Avg. Diesel Fuel Price/Gallon | - | - | $2.95 |
| Diesel Fuel Margin (Per Gal) | - | - | $0.40 |
| C-Store Gross Sales | - | - | $1,320,000 |
| C-Store Margin | - | - | 30% |
| Car Wash Gross Sales | $104,636 | $117,130 | $120,644 |
| Car Wash Margin | 95% | N/A | 90% |
| Miscellaneous Income | $208,516 | $212,041 | $358,696 |
| **Total Gross Revenue** | $4,222,782 | $4,505,922 | $6,403,740 |
| **Expenses** | | | |
| Cost of Goods Sold (Gasoline) | - | - | ($2,833,920) |
| Cost of Goods Sold (Diesel) | - | - | ($637,200) |
| Cost of Goods Sold (C-Store) | - | - | (924,000) |
| Cost of Goods Sold (Car Wash) | - | - | (12,064) |
| **Total Cost of Goods Sold** | (2,868,392) | (3,020,730) | (4,407,184) |
| Cost of Goods Ratio | 67.93% | 67.04% | 68.82% |
| **Gross Profit** | **$1,354,390** | **$1,485,192** | **$1,996,556** |
| Source: Operating statements | | | |

It is noted that, in June 2019 the subject's site was improved with a new diesel truck fueling area with five new diesel MPDs and a canopy. In addition, In April 2019 gaming was added to the subject building.



## DISCUSSION OF OPERATING DATA

2017 and 2018 data was provided by the client, but was limited to total revenues, cost of goods (COG's), car wash gross sales, and miscellaneous income displayed on tax returns and the profit and loss statements. Our proforma was modeled based on the owner's reported fuel volume of 90,000-100,000 gallons per month of gasoline and 30,000 gallons of diesel per month.

Projected fuel revenue was estimated based on the projected fuel volume and the T-12 fuel price ($3.23 gallon for gas and $2.95 gallon for diesel) reported by the U.S. Energy Information Administration for the Chicago/Midwest (PADD 2) area.

With respect to fuel margins, the range of industry standards is generally between $0.05 to $0.30 per gallon. According to the Lundberg Survey reports in CSP Daily News on June 10, 2019, "With tight gasoline supply having coincided with higher crude-oil prices in early spring, wholesale and retail gasoline prices surged. At retail, the U.S. average regular-grade price raced 65.6 cents per gallon (CPG) higher from January 2019 to May 2019, according to the most recent Lundberg survey of U.S. fuel markets. Then it flipped: Lower crude-oil prices plus a gasoline supply comeback, a bit later in the year than usual, have now exerted down price pressure. This is being abetted by woefully weak gasoline demand. The national pump price is 12.69 cents lower since the May 2019 peak. More price cutting is likely. As to retail gasoline margin gain, it has been a wonderful 14.59 cents since May 2019. The national average June 2019 margin may seem giddy-making, perched at 33.46 cents, but that terrible one thin dime during the month of March 2019 is not forgotten and is eating into year-to-date business profits. Chances are strong that retailers, and refiners too for that matter, will see gasoline margin shrinkage in the near future."

According to NACS daily (nacsdaily@convenience.org), fuel margins average $0.239 per gallon as of May 24, 2019, which reflects a decrease of $0.029 from the previous week.

Retail Fuel Margin (OPIS)

**$ 0.239 / gal**

↓ -0.029 since last Friday

According to the National Association of Convenience Stores (NACS) 2018 State of the Industry (SOI), "the industry's total sales reached $601.1 billion in 2017, a monumental 9.3% year-over-year increase. Inside sales generated just 1.7% growth at $237.0 billion, while fuel sales grew an outstanding 14.9%. Motor fuels experienced a rare combination of increased gallon volume (1.9%) and a considerable rise in retail fuel prices (12.8%). The result was total motor fuel sales of $364.1 billion, the largest amount since 2014."

The industry enjoyed a fourth consecutive year of pretax profits greater than $10 million in 2017. While considerable headwinds existed, conditions aligned in a positive manner again for retailers and delivered growth in sales and profits. While favorable economic conditions and high

*Citgo Travel Center, Calumet Park, Illinois*



consumer confidence would result in forecasts for strong inside growth, motor fuels were the driving force behind most of the industry growth in 2017.

Volatility in crude oil pricing was, as expected, minimal in 2017, but retailers were still able to grow motor fuel margins by 9.6% over 2016. At 22.02 cents per gallon, margins rivaled 2014's average of 22.76 cents per gallon, when pricing bottomed out and retails went from an average of $3.65 per gallon in May to $2.62 per gallon in December of 2014. Nationally, average margins over 20.00 cents per gallon were unheard of until 2014, and certainly not expected in a year that saw rising fuel prices and little volatility. Increased sales volumes drove fuel gross profit dollars 11.7% higher than 2016 to compound the positive impact fuels had on 2017's financial results.

Gross profit dollars generated inside the stores comprised a smaller percentage of the contribution mix in 2017, genera ting just 72.6% of total gross profit dollars as compared to 75.0% in 2016. Slowed growth of inside gross profit dollars, paired with increased operating expenses, resulted in less pretax income and a considerably higher breakeven pool margin in 2017, a trait indicative of the historic fuels-driven business model.

Gross profit dollars on the inside grew by 2.5%, which outpaced sales growth, indicating better overall gross margin percentage. Merchandise gross profit dollars grew by 1.9%, a net dollar gain of $8,358 per store, year-over-year. Foodservice gross profit dollars were up 4.5% and provided a net dollar gain of $9,852 per year due to margins that were 22.47 points higher than merchandise. Overall inside gross margin percentage was 34.47% in 2017, 0.29 percentage points higher than 2016, which helped drive more gross profit dollars to the retailer's bottom line in 2017.

Merchandise and foodservice accounted for 69.6% of gross margin contribution in 2016, and declined by 2.4 points to 67.2% in 2017. Fuel increased its contribution to gross margin percentage due to higher volumes and strong pool margins, effectively pushing down contribution from the inside. Foodservice was a critical component of in-store gross profits. Foodservice contributed 33.9% of gross margin inside the store, which, combined with packaged beverages, equaled more than half the total inside gross profit dollar generation. The general range for c-store margins is 25% to 40%.

This approach estimates the subject's gross sales potential, based on a study of comparable petroleum retailing properties, industry standards, and a review of the subject's historical operational performance. A COGS estimate will be projected and deducted. This results in a projection of the gross profit used in the application of gross profit multiplier (GPM.) Applicable operating expenses are estimated based on a review of expenses incurred by comparable properties, industry standards, and the subject's actual performance history.

Gross sales of the subject's operation, including fuel, C-store, and other sales income is estimated using industry standards and comparable data.



## ESTIMATED FUEL VOLUME

Retail prices fluctuate for various reasons including but not limited to supply agreements, rebates and incentives, taxes, supply and demand, and crude oil prices. Because of the uncertainty regarding these influences, any estimate for a 12-month period is considered subjective.

According to the U. S. Energy Information Administration's Short-Term Energy Outlook dated August 2018, the "EIA estimates that U.S. crude oil production averaged 10.8 million barrels per day (b/d) in July, up 47,000 b/d from June. EIA forecasts that U.S. crude oil production will average 10.7 million b/d in 2018, up from 9.4 million b/d in 2017, and will average 11.7 million b/d in 2019."

## FUEL VOLUME

Based combined average traffic counts, the renovations and addition of five diesel pumps, and the number of total fuel dispensers (11), fuel volume was estimated at 90,000 gallons per month for gasoline and 30,000 gallons per month for diesel. This is consistent with the owner's averages/projections.

| GASOLINE FUEL GALLONS SOLD | | |
|---|---|---|
| Year | Per Month | Total |
| **CBRE Estimate (Gasoline)** | **30,000** | **360,000** |
| **CBRE Estimate (Diesel)** | **90,000** | **1,080,000** |
| Compiled by CBRE | | |

## FUEL MARGIN

| GASOLINE FUEL MARGINS | |
|---|---|
| Year | Per Gallon |
| **CBRE Estimate (Gasoline)** | **$0.20** |
| **CBRE Estimate (Diesel)** | **$0.40** |
| Compiled by CBRE | |

Based upon the range of industry standards (between $0.05 to $0.30 per gallon for gasoline and $0.35 to $0.45 per gallon for diesel), the fuel margins were projected at $0.20 per gallon for gasoline and $0.40 per gallon for diesel.

*Citgo Travel Center, Calumet Park, Illinois*



## C-STORE REVENUE

Although not reflected by the operating statements provided, the owner's stated c-store revenues were $100,000-$110,000 per month ($324/SF to $356/SF). The C-store sales were stabilized at $110,000 per month or $1,320,000 annually. This projection is in-line with industry standards for in-store sales.

| C-STORE GROSS SALES | | |
|---|---|---|
| Year | Total | $/SF |
| **CBRE Estimate (Diesel)** | **$1,320,000** | **$356** |
| Compiled by CBRE | | |

## C-STORE MARGIN

| C-STORE MARGIN | |
|---|---|
| Year | Margin |
| **CBRE Estimate (Diesel)** | **30%** |
| Compiled by CBRE | |

Based on the reported cost of goods in 2017 and 2018 (67.93% to 67.04%), our projections are in-line with the industry range and with the historical cost of goods.

## CAR WASH REVENUE

| CAR WASH REVENUE | |
|---|---|
| Year | Total |
| 2017 | $104,636 |
| 2018 | $117,130 |
| **CBRE Estimate** | **$120,644** |
| Compiled by CBRE | |

## CAR WASH MARGIN

| CAR WASH MARGIN | |
|---|---|
| Year | Total |
| 2017 | 5% |
| 2018 | - |
| **CBRE Estimate** | **10%** |
| Compiled by CBRE | |

*Citgo Travel Center, Calumet Park, Illinois*



## MISCELLANEOUS INCOME

### Billboard Income

There is currently a double-sided lighted billboard on the site with visibility from both northbound and southbound Interstate-57. The billboard is leased to Out Front Media thru July 2037. The current rental rate is $1,308/month or $15,696 annually. This rate is in-line with comparable billboard rentals and considered to be appropriate.

### Retail Units

Presented below is the subject's current rent roll.

| | | Lease | Size (GLA) | | Market | Contract Rent | |
|---|---|---|---|---|---|---|---|
| Use | Tenant/Occupant | Expiration | SF | % Total | Expense Basis | $/SF/Yr. | $/Yr. |
| C-Store | Owner | - | 3,703 | 16.8% | - | N/A | N/A |
| Auto Service/Repair | Owner | - | 7,514 | 34.1% | - | N/A | N/A |
| Car Wash | Owner | - | 6,900 | 31.3% | - | N/A | N/A |
| Retail | Dunkin Donuts | Aug-30 | 216 | 1.0% | Gross | $115.74 | $25,000 |
| Retail | Boost Mobile | Dec-22 | 750 | 3.4% | Gross | $80.00 | $60,000 |
| Retail | Hair Gallery | Jun-21 | 510 | 2.3% | Gross | $54.12 | $27,600 |
| Retail | Loya Insurance | Feb-28 | 700 | 3.2% | Gross | $59.14 | $41,400 |
| Retail | Vacant | N/A | 1,728 | 0.0% | Gross | - | $0 |
| Property Totals - Contract Rent | | | 22,021 | 100.0% | | | $154,000 |

*RENT ROLL ANALYSIS FOR CITGO TRAVEL CENTER*

Compiled by CBRE

It is noted that, the average retail rental rate is $70.77/SF gross. In addition, we have not leased up the vacant space at market and have used it as a market vacancy allowance.

### SUMMARY OF COMPARABLE RETAIL RENTALS

| No. | Location | YOC / Reno'd | Unit Size (SF) | Rental Rate | Expense Basis |
|---|---|---|---|---|---|
| 1 | 12822 Western Avenue Blue Island, IL | 1893 | 200 | $54.00 PSF | Gross |
| 2 | 9521-9529 S Western Avenue Chicago, IL | 2008 | 1,207 | $48.00 PSF | Gross |
| 3 | 12735 S. Halsted Street Chicago, IL | 1955 | 3,000 | $40.00 PSF | Gross |
| 4 | 10423 S Cicero Avenue Oak Lawn, IL | 1990 | 1,730 | $32.00 PSF | Gross |

Compiled by CBRE

After review of the comparable sales, the average rental rate is above the range of the comparables. However, we have estimated the subject's contract rental rates to be at market due to the small unit sizes and its location across the street from the Marshfield Plaza Shopping Center. The total pro forma retail rental income is estimated at $154,000 annually.

62



## Gaming Income

In April 2019, five video gaming machines were added to the subject building. According to the Illinois Gaming Board, the June 2019 monthly revenue was $12,368. We have stabilized this income at $12,000/month or $144,000 annually in our pro forma estimate.

## Miscellaneous

The subject includes additional income from rebates, ATM, lottery and air/vacuum machine revenue or commissions. The 2017 miscellaneous revenue was $38,824 and the 2018 figure was $42,349. The other miscellaneous revenue was stabilized at $45,000.

## Total Miscellaneous Income

| MISCELLANEOUS INCOME | | |
|---|---|---|
| Year | Total | $/SF |
| 2017 | $208,516 | $9.47 |
| 2018 | $212,041 | $9.63 |
| **CBRE Estimate** | **$358,696** | **$16.29** |
| Compiled by CBRE | | |

There is a significant increase in our pro forma estimate due to the addition of the gaming income ($144,000), which was added to the subject property in 2019.

*Citgo Travel Center, Calumet Park, Illinois*



## GROSS PROFIT MULTIPLIER SUMMARY

A Gross Profit Multiplier (GPM) is defined as the relationship or ratio of the total sale price of a going-concern by the projected or anticipated gross profit and is derived by the division of the going-concern sale price by the gross profit.

## GOING CONCERN SALES

The gross profit multiplier is affected by the perceived stability of the gross revenue income stream. Generally, a higher gross profit multiplier will be seen at properties that have a revenue stream that can be enhanced by new ownership. Conversely, properties that have maximized gross revenue opportunities will have lower revenue multipliers, especially in instances where the possibility of additional competition may reduce available margins. Gross profit multipliers for the comparable sales are illustrated in the following table.

| GROSS PROFIT MARGIN ANALYSIS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Sale No. | Price | | Gross Profit | | GPMM | | Subject GPMM/SF | | Indicated Price |
| 2 | $5,836,862 | ÷ | $1,765,746 | = | 3.31 | x | $90.67 | = | $299.71 |
| 3 | $6,000,000 | ÷ | $1,990,000 | = | 3.02 | x | $90.67 | = | $273.36 |
| 5 | $8,120,000 | ÷ | $2,500,000 | = | 3.25 | x | $90.67 | = | $294.48 |
| Low | | | $1,765,746 | | 3.02 | | | | $273.36 |
| High | | | $2,500,000 | | 3.31 | | | | $299.71 |
| Average | | | $2,085,249 | | 3.19 | | | | $289.18 |

Compiled by CBRE

The GPM's ranged from 3.02 to 3.31 for the data set with an average of 3.19. Additional gross profit multipliers for alternate sales and active listings of gas station/convenience stores are illustrated in the following table.

| GROSS PROFIT/MULTIPLIER COMPARABLES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Property | Sale/Listing | Date | Age | GBA | Sale Price | Price / SF | Gross Profit | GPM |
| 3401 University, Madison, WI | Contract | Dec-18 | 1995 | 3,232 | $2,200,000 | $680.69 | $567,931 | 3.87 |
| Marathon, 2474 Thatcher, River Grove, IL | Sale | Jan-19 | 1990/2010 | 1625 | $1,350,000 | $830.77 | $442,148 | 3.05 |
| Mobil, 810 N. Roselle, Hoffman Estates, IL | Sale | Jan-18 | 1980 | 1,871 | $800,000 | $427.58 | $278,000 | 2.88 |
| Citgo, 2950 N. Cicero, Chicago | Sale | Nov-18 | 1963 | 1,769 | $1,400,000 | $791.41 | $410,000 | 3.41 |
| Mobil, 157 S. York, Bensenville, IL | Sale | Apr-16 | 1979 | 2,179 | $1,500,000 | $688.39 | $440,000 | 3.41 |
| Grand Prix, 3325-27 W. Howard | Sale | Aug-18 | 2001 | 4,204 | $1,659,000 | $394.62 | $472,643 | 3.51 |
| BP Fuel Plaza, 1469 S. Randall Road, Algonquin, IL | Sale | Jul-18 | 2001 | 5,407 | $2,700,000 | $499.35 | $760,000 | 3.55 |
| BP, 5200 W. Addison, Chicago, IL | Sale | Nov-17 | 1990 | 2,100 | $1,475,000 | $702.38 | $450,000 | 3.28 |
| 8575 W. Dempster, Niles, IL | Sale | Oct-16 | 2008 | 3,000 | $2,000,000 | $666.67 | $575,000 | 3.48 |
| 2231 Maple, Downers Grove, IL | Sale | Apr-16 | 1988 | 1,196 | $1,050,000 | $877.93 | $302,000 | 3.48 |
| BP, 902 Grand Ave., Waukegan, IL | Sale | Sep-16 | 1983 | 2,500 | $1,400,000 | $560.00 | $394,000 | 3.55 |
| BP Fuel Plaza, 3325 Hart, Dyer, IN | Sale | Feb-16 | 2001 | 5,233 | $2,900,000 | $554.18 | $1,065,000 | 2.72 |
| Goetz Truck Stop, N5800 Kinney, Portage, WI | Sale | Aug-17 | 1986 | 28,875 | $8,120,000 | $281.21 | $2,500,000 | 3.25 |
| BP, 1935 Boughton Rd, Woodridge, IL | Sale | Dec-16 | 2000 | 4,323 | $3,375,000 | $780.71 | $933,700 | 3.61 |
| New Lisbon Plaza, 1700 E. Bridge, New Lisbon, WI | Sale | Nov-17 | 1997 | 22,000 | $1,900,000 | $86.36 | $650,000 | 2.92 |
| JD's Truck Stop, 1655 Mayflower, Niles, MI | Listing | Mar-18 | 1983 | 21,382 | $1,450,000 | $67.81 | $510,000 | 2.84 |
| Confidential, Truck Plaza, Will County, IL | Contract | Mar-18 | 1986 | 25,175 | $3,750,000 | $148.96 | $1,174,816 | 3.19 |
| Phillip's 66, 4455 Sandy Hill Road, Rockford, IL | Sale | Mar-18 | 1989 | 2,783 | $1,700,000 | $610.85 | $843,773 | 2.01 |
| Citgo, 1799 Cor W US 30, Hanna, IN | Listing | Current | 1980/2015 | 4,915 | $1,899,000 | $386.37 | $732,000 | 2.59 |
| 9660 Golf, Des Plaines, IL | Listing | Current | 2011 | 6,050 | $2,300,000 | $380.17 | $600,000 | 3.83 |
| | | | | | | Low | $278,000 | 2.01 |
| | | | | | | High | $2,500,000 | 3.87 |
| | | | | | | Median | $571,466 | 3.34 |
| | | | | | | Average | $705,051 | 3.22 |

*Citgo Travel Center, Calumet Park, Illinois*



These GPM's ranged from 2.01 to 3.87 for the data set for an average of 3.22 and a median of 3.34.

The subject was built in 1998 with a renovation in 2019 and features above-average amenities. The subject also benefits from its location along a primary roadway and right off Interstate-57. As such, we have projected a GPM near the middle of the primary comparable range, based on the following risk factors:

- Urban, "hard" corner location.
- Above-Average amenities.
- Strong traffic counts.
- Competent Management.

Given the data presented, a GPM between 3.15 and 3.25 is judged reasonable.

## GROSS PROFIT CONCLUSION

| GROSS PROFIT | |
| --- | --- |
| Year | Total |
| 2017 | $1,354,390 |
| 2018 | $1,485,192 |
| **CBRE Estimate** | **$1,996,556** |
| Compiled by CBRE | |

The subject's pro forma gross profit is 34.4% higher than the 2018 gross profit. This is due to the addition of the diesel fuel pumps, the new video gaming income, and the anticipated increase in overall sales from the recent renovation and is considered reasonable.



## GROSS PROFIT CALCULATION

| GROSS PROFIT CALCULATION | |
|---|---:|
| **Effective Gasoline Fuel Revenue** | |
| Gasoline Fuel Gallons Sold | $3,542,400 |
| Gasoline Fuel Margin (Per Gal) | $0.20 |
| **Subtotal** | $708,480 |
| **Effective Diesel Fuel Revenue** | |
| Diesel Fuel Gallons Sold | 1,062,000 |
| Diesel Fuel Margin (Per Gal) | $0.40 |
| **Subtotal** | $424,800 |
| **Effective C-Store Revenue** | |
| C-Store Gross Sales | $1,320,000 |
| C-Store Margin | 30% |
| **Subtotal** | $396,000 |
| **Effective Car Wash Revenue** | |
| Car Wash Gross Sales | $120,644 |
| Car Wash Margin | 90% |
| **Subtotal** | $108,580 |
| **Miscellaneous Revenue** | $358,696 |
| **GROSS PROFIT** | $1,996,556 |
| **Gross Profit Per Square Foot** | $90.67 |
| Compiled By CBRE | |

| GROSS PROFIT MULTIPLIER | | |
|---|---|---|
| **Gross Profit** | **Multiplier Range** | **Value** |
| $1,996,556 | 3.15 | $6,289,150 |
| $1,996,556 | 3.25 | $6,488,805 |
| | | |
| Value Conclusion (Going Concern) | | $6,375,000 |
| Indicated Gross Profit Multiplier | | 3.19 |
| Compiled by CBRE | | |

*Citgo Travel Center, Calumet Park, Illinois*



## CONCLUSION OF GOING CONCERN VALUE

The conclusions via the valuation methods employed for the going concern values are as follows:

| GOING CONCERN VALUES | |
|---|---|
| Sales Comparison Approach | $6,400,000 |
| Income Approach | $6,375,000 |
| Reconciled Value | $6,375,000 |
| Compiled by CBRE | |

The Income and Sales Comparison Approach were utilized in determining the going concern value of the subject. Weighted emphasis was placed on the Income Approach in the Going Concern Value conclusion.

## BUSINESS VALUE

The estimate of value for the business interest component of the going concern value is considerably more subjective than the personal property value estimate. This is due to the intangible nature of the business interest. A gas station is a retail-type business that depends on customer acceptance and highly specialized management skills. A poor reputation spreads rapidly and can have an immediate effect on profitability. Therefore, it is difficult to determine exactly where income attributed to the business stops and income from real estate begins. In the appraisal assignment where the market value encompasses the entire property (in this case, a gas station facility), the business is part of a going-concern value and is not separated from the real estate. However, some insurance laws, condemnation proceedings, appraisals done under FIRREA regulations, and property tax assessments require a stand-alone real property value, which necessitates treating business value as a separate component.

In this case, the business value is allocated by subtracting the market value of the real property, concluded earlier in Cost Approach. In addition, a deduction of the depreciated value of FF&E (as determined earlier) from the going-concern value concluded in the Income Capitalization Approach results in the residual being the estimated value attributable to the business enterprise.

| VALUE ALLOCATION | |
|---|---|
| Total Real Estate Value | $5,190,000 |
| Contributory F,F,& E | $345,000 |
| **Total Real Estate and F,F,& E** | $5,535,000 |
| *Contributory Business Enterprise Value* | $840,000 |
| **As Is Going Concern Value** | $6,375,000 |
| Compiled by CBRE | |

*Citgo Travel Center, Calumet Park, Illinois*



# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

| SUMMARY OF VALUE CONCLUSIONS | |
|---|---|
| Land Value | $1,800,000 |
| Cost Approach - Real Estate Only | $5,190,000 |
| Cost Approach - Real Estate and F,F,& E | $5,535,000 |
| Sales Comparison Approach - Going Concern | $6,400,000 |
| Income Capitalization Approach - Going Concern | $6,375,000 |
| Reconciled Value - Going Concern | $6,375,000 |
| Reconciled Value - Real Estate and F,F,& E | $5,535,000 |
| Reconciled Value - Real Estate Only | $5,190,000 |
| Compiled by CBRE | |

The subject is a special-use property and as such, the cost approach is a relevant indicator of value for the subject property. However, because the cost approach does not account for the contributory value of the business enterprise, it is primarily utilized as tool for allocating the various components of a going concern.

In the sales comparison approach, the subject is compared to similar properties that have recently sold or directly reflect the current actions of market participants. The analysis includes numerous comparables for which detailed information was available. Ultimately, secondary emphasis is placed upon the results derived from the sales comparison approach.

The income approach is a similarly relevant approach to value when analyzing the market value of a going concern. The forecasted gross profit is based upon a thorough and well-supported analysis. The greatest emphasis is placed upon the results derived from the income approach as it best reflects the actions of market participants.

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSIONS | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is - Going Concern | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $6,375,000 |
| As Is - Real Estate and F,F,& E | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $5,535,000 |
| As Is - Real Estate Only | Leased Fee Interest/Fee Simple Estate | July 25, 2019 | $5,190,000 |
| Compiled by CBRE | | | |

The breakout/allocation of going concern valuation components is as follows:

| VALUE ALLOCATION | |
|---|---|
| Total Real Estate Value | $5,190,000 |
| Contributory F,F,& E | $345,000 |
| **Total Real Estate and F,F,& E** | $5,535,000 |
| *Contributory Business Enterprise Value* | $840,000 |
| **As Is Going Concern Value** | $6,375,000 |
| Compiled by CBRE | |

*Citgo Travel Center, Calumet Park, Illinois*



# Assumptions and Limiting Conditions

1. CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property.  However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property.  Therefore, no representation is made as to such matters.

2. The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date.  The Report is subject to change as a result of fluctuations in any of the foregoing.  CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.

3. Unless otherwise expressly noted in the Report, CBRE has assumed that:

   (i) Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property.  Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

   (ii) Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements.  CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements.  CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible.  It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

   (iii) Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

   (iv) Hazardous materials are not present on the subject property.  CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

   (v) No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred.  CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

   (vi) There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

   (vii) All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, nor national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

   (viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently or super-efficiently.

   (ix) The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

   (x) The subject property is in full compliance with the Americans with Disabilities Act (ADA).  CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

*Citgo Travel Center, Calumet Park, Illinois*



(xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist.  CBRE has neither undertaken any survey of the boundaries of the subject property nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property.  If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report.  Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report.  CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them.  Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4.  CBRE has assumed that all documents, data and information furnished by or behalf of the client, property owner, or owner's representative are accurate and correct, unless otherwise expressly noted in the Report.  Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data.  Any error in any of the above could have a substantial impact on the Report. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report.  The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5.  CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including without limitation any termite inspection, survey or occupancy permit.

6.  All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7.  Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report.  Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future.  Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions.  Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections.

8.  The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property.  Other appraisers may reach different conclusions as to the value of the subject property.  Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property.  The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9.  No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers.  Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance.  An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report.  It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions.  CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.



13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.

14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.

15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

*Citgo Travel Center, Calumet Park, Illinois*



**ADDENDA**

**Addendum A**

# LAND SALE DATA SHEETS

| Sale | Land - Retail / Commercial | No. 1 |
|------|----------------------------|-------|

**Property Name** Commercial Land
**Address** 11120 S. Ridgeland Avenue (SWC Ridgeland & 111th)
Worth, IL 60482
United States

**Government Tax Agency** Cook
**Govt./Tax ID** Multiple

**Site/Government Regulations**



| | Acres | Square feet |
|---|---|---|
| Land Area Net | 1.500 | 65,340 |
| Land Area Gross | 1.500 | 65,340 |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Irregular |
| Topography | Level, At Street Grade |
| Utilities | Available |

| | |
|---|---|
| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| | | |
|---|---|---|
| Frontage Distance/Street | N/A | Ridgeland Ave |
| Frontage Distance/Street | N/A | 11th St |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | B-2, General Business |
| Entitlement Status | N/A |

**Sale Summary**

| | | | |
|---|---|---|---|
| Recorded Buyer | NNN Worth, LLC | Marketing Time | 12 Month(s) |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | Kapco LLC | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Buyer's broker and county records |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 4/9/2019 |
| Proposed Use | N/A | Sale Price | $1,100,000 |
| Listing Broker | Caton Commercial Real Estate | Financing | N/A |
| Selling Broker | N/A | Cash Equivalent | $1,100,000 |
| Doc # | 1914017047 | Capital Adjustment | $0 |
| | | Adjusted Price | $1,100,000 |

**Transaction Summary plus Five-Year CBRE View History**

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 04/2019 | Sale | NNN Worth, LLC | Kapco LLC | $1,100,000 | $733,333 / $16.84 |



## Sale — Land - Retail / Commercial — No. 1

### Units of Comparison

| | |
|---|---|
| $16.84 / sf | N/A / Unit |
| $733,333.33 / ac | N/A / Allowable Bldg. Units |
| | N/A / Building Area |

### Financial

**No information recorded**

### Map & Comments



This comparable represents a 1.50-acre redevelopment site located at the southwest corner of Ridgeland Avenue and 111th Street in Worth, Illinois.  The site is irregular and zoned B-2, General Business  The site is situated at a signalized intersection with traffic counts of 29,700 vehicle per day. This property sold in May 2019 for $1,100,000 or $16.84 per square foot.  The reported buyer will develop a gas station/c-store.



## Sale — Land - Retail / Commercial — No. 2

| | |
|---|---|
| Property Name | Commercial Land (Proposed Thorntons Site) |
| Address | 14840 Western Avenue |
| | Posen, IL 60469 |
| | United States |

| | |
|---|---|
| Government Tax Agency | Cook |
| Govt./Tax ID | Multiple |



### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 10.030 | 436,907 |
| Land Area Gross | 10.030 | 436,907 |

| | |
|---|---|
| Site Development Status | Raw |
| Shape | Irregular |
| Topography | Generally Level |
| Utilities | All |

| | |
|---|---|
| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| | | |
|---|---|---|
| Frontage Distance/Street | N/A | 147th Street |
| Frontage Distance/Street | N/A | Western Avenue |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | G, Industrial District |
| Entitlement Status | N/A |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Thorntons Inc. | Marketing Time | 6 Month(s) |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | Chicago Title Land Trust T#5260 | Seller Type | N/A |
| True Seller | N/A | Primary Verification | County records |
| | | | |
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | Vacant Land | Date | 12/7/2018 |
| Proposed Use | Thornton Gas Station | Sale Price | $3,350,000 |
| Listing Broker | N/A | Financing | N/A |
| Selling Broker | N/A | Cash Equivalent | $3,350,000 |
| Doc # | 1900834040 | Capital Adjustment | $0 |
| | | Adjusted Price | $3,350,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 12/2018 | Sale | Thorntons Inc. | Chicago Title Land Trust T#5260 | $3,350,000 | $333,998 / $7.67 |



## Sale — Land - Retail / Commercial — No. 2

### Units of Comparison

| | |
|---|---|
| $7.67  / sf | N/A  / Unit |
| $333,998.01  / ac | N/A  / Allowable Bldg. Units |
| | N/A  / Building Area |

### Financial

**No information recorded**

### Map & Comments



This is a 10.03-acre commercial/industrial land parcel located at 14840 South Western Avenue in Posen, Cook County, Illinois.  The site is irregular shaped, has all utilities available, and is zoned G (Industrial) by Posen.  This property sold in December 2018 for $3,350,000 or $7.67/SF. Reportedly, the site will be redeveloped with a Thorntons gas station.



## Sale                    Land - Retail / Commercial                    No. 3

| Property Name | Commercial Land |
|---|---|
| Address | 16178 Chicago Road |
| | South Holland, IL 60473 |
| | United States |

| Government Tax Agency | Cook |
|---|---|
| Govt./Tax ID | 29-15-404-001 thru -007 |

**Site/Government Regulations**

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 0.919 | 40,032 |
| Land Area Gross | N/A | N/A |

| Site Development Status | N/A |
|---|---|
| Shape | L Shaped |
| Topography | N/A |
| Utilities | N/A |

| Maximum FAR | N/A |
|---|---|
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| General Plan | N/A |
|---|---|
| Specific Plan | N/A |
| Zoning | TCD |
| Entitlement Status | N/A |



### Sale Summary

| Recorded Buyer | Ralph Edgar Properties | Marketing Time | 31 Month(s) |
|---|---|---|---|
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | Village of South Holland | Seller Type | N/A |
| True Seller | N/A | Primary Verification | CCRD |

| Interest Transferred | Fee Simple/Freehold | Type | Sale |
|---|---|---|---|
| Current Use | N/A | Date | 8/11/2017 |
| Proposed Use | N/A | Sale Price | $520,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $520,000 |
| Doc # | 1727247097 | Capital Adjustment | $0 |
| | | Adjusted Price | $520,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 08/2017 | Sale | Ralph Edgar Properties | Village of South Holland | $520,000 | $565,832 / $12.99 |

CBRE

## Sale | Land - Retail / Commercial | No. 3

### Units of Comparison

| | |
|---|---|
| $12.99 / sf | N/A / Unit |
| $565,832.43 / ac | N/A / Allowable Bldg. Units |
| | N/A / Building Area |

### Financial

**No information recorded**

### Map & Comments



This 0.92-acre site at the NE corner of 162nd and South Park Avenue (16178 Chicago Road is corner mailing address) in South Holland, IL sold for $520,000 or $12.99 per SF on August 11, 2017. The site was "L" shaped and vacant at the time of sale.



## Sale — Land - Retail / Commercial — No. 4

| | |
|---|---|
| Property Name | Commercial Land (Gas Station Site) |
| Address | 1111 East 162nd Street |
| | South Holland, IL 60473 |
| | United States |
| Government Tax Agency | Cook |
| Govt./Tax ID | 29-23-109-040-0000 |



### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 2.223 | 96,829 |
| Land Area Gross | N/A | N/A |

| | |
|---|---|
| Site Development Status | N/A |
| Shape | Rectangular |
| Topography | N/A |
| Utilities | N/A |

| | |
|---|---|
| Maximum FAR | N/A |
| Min Land to Bldg Ratio | N/A |
| Maximum Density | N/A |

| | |
|---|---|
| General Plan | N/A |
| Specific Plan | N/A |
| Zoning | GB |
| Entitlement Status | N/A |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Thortons, Inc. | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | End User |
| Recorded Seller | N/A | Seller Type | N/A |
| True Seller | GW Properties | Primary Verification | Deed |

| | | | |
|---|---|---|---|
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 1/27/2017 |
| Proposed Use | N/A | Sale Price | $1,500,000 |
| Listing Broker | N/A | Financing | All Cash |
| Selling Broker | N/A | Cash Equivalent | $1,500,000 |
| Doc # | 1703044005 | Capital Adjustment | $0 |
| | | Adjusted Price | $1,500,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Price/ac and /sf |
|---|---|---|---|---|---|
| 01/2017 | Sale | Thortons, Inc. | N/A | $1,500,000 | $674,794 / $15.49 |



## Sale | Land - Retail / Commercial | No. 4

### Units of Comparison

| | |
|---|---|
| $15.49 / sf | N/A / Unit |
| $674,794.19 / ac | N/A / Allowable Bldg. Units |
| | N/A / Building Area |

### Financial

**No information recorded**

### Map & Comments



This 2.22 acre land parcel at 1111 East 162nd Street in South Holland, IL sold on January 27, 2017 for $1,500,000 or $15.49 per SF. The site was purchased by Thorton's for the construction of a new gas station.



**Addendum B**

# IMPROVED SALE DATA SHEETS

## Sale — Retail - Convenience Store / Service Station — No. 1

| Property Name | Lake Station Travel Center |
|---|---|
| Address | 1201 Ripley Street |
| | Lake Station, IN 46405 |
| | United States |



| Government Tax Agency | Lake |
|---|---|
| Govt./Tax ID | 45-09-09-100-019.000-021 |

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 23.216 | 1,011,289 |
| Land Area Gross | 23.216 | 1,011,289 |
| Excess Land Area | N/A | N/A |

| Site Development Status | Finished |
|---|---|
| Shape | Rectangular |
| Topography | Generally Level |
| Utilities | All |

| Maximum Floor Area | N/A |
|---|---|
| Maximum FAR | N/A |
| Actual FAR | 0.03 |

| Frontage Distance/Street | N/A | Ripley Street |
|---|---|---|

| Zoning | N/A |
|---|---|
| General Plan | N/A |

### Improvements

| Net Rentable Area (NRA) | 31,884 sf | Floor Count | 1 |
|---|---|---|---|
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 13.24/1,000 sf |
| Year Built | 1988 | Condition | Average |
| Year Renovated | N/A | Exterior Finish | Masonry |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

### Sale Summary

| Recorded Buyer | TA Operating LLC | Marketing Time | 12 Month(s) |
|---|---|---|---|
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | Hospitality Properties Trust | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Buyer and county records |

| Interest Transferred | Fee Simple/Freehold |
|---|---|
| Current Use | N/A |
| Proposed Use | N/A |
| Listing Broker | N/A |
| Selling Broker | N/A |
| Doc # | 2019005005 |

| Type | Sale |
|---|---|
| Date | 1/15/2019 |
| Sale Price | $15,120,000 |
| Financing | N/A |
| Cash Equivalent | $15,120,000 |
| Capital Adjustment | $0 |
| Adjusted Price | $15,120,000 |



## Sale — Retail - Convenience Store / Service Station — No. 1

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 01/2019 | Sale | TA Operating LLC | Hospitality Properties Trust | $15,120,000 | $474.22 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | N/A | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | N/A | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | N/A | Adjusted Price / sf | $474.22 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

**No information recorded**

### Map & Comments



On January 15, 2019, the travel center located at 1201 Ripley Street in Lake Station, Indiana sold for confirmed sale price of 15,120,000. The asset was purchased by Travel Centers of America from Hospitality Properties Trust. The building is a total of 31,884 SF and includes a c-store, a dine-in restaurant, a Popeyes Chicken, and truck service center with six repair bays. The property has four regular fuel dispensers and fifteen disel fuel dispensers. The entire center sits on 23.22-acres.The site is just south of site right off the Interstate-90 exit with average traffic counts of 32,024 VPD.



## Sale  Retail - Convenience Store / Service Station  No. 2

| | |
|---|---|
| Property Name | Shell Gas Station/Convenience Store/Car Wash |
| Address | 17100 West Laraway Road |
| | Joliet, IL 60433 |
| | United States |



| | |
|---|---|
| Government Tax Agency | Will |
| Govt./Tax ID | 30-07-25-400-008 |

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 11.250 | 490,050 |
| Land Area Gross | 11.250 | 490,050 |
| Excess Land Area | N/A | N/A |

| | |
|---|---|
| Site Development Status | Finished |
| Shape | Triangular |
| Topography | N/A |
| Utilities | N/A |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.02 |

| | | |
|---|---|---|
| Frontage Distance/Street | N/A | Laraway Road |
| Frontage Distance/Street | N/A | Manhattan Road |

| | |
|---|---|
| Zoning | N/A |
| General Plan | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 8,776 sf | Floor Count | 1 |
| Status | Existing | Parking Type | Surface |
| Occupancy Type | Multi-tenant | Parking Ratio | 2.96/1,000 sf |
| Year Built | 1998 | Condition | Average |
| Year Renovated | 2006 | Exterior Finish | Brick |
| Total Anchor Rentable Area | N/A | Number of Buildings | 2 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Minit Mart LLC | Marketing Time | 12 Month(s) |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | TA Operating LLC | Seller Type | N/A |
| True Seller | N/A | Primary Verification | Buyer and county records |

| | | | |
|---|---|---|---|
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 12/5/2018 |
| Proposed Use | N/A | Sale Price | $5,836,862 |
| Listing Broker | N/A | Financing | N/A |
| Selling Broker | N/A | Cash Equivalent | $5,836,862 |
| Doc # | R2018085639 | Capital Adjustment | $0 |
| | | Adjusted Price | $5,836,862 |



## Sale — Retail - Convenience Store / Service Station — No. 2

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 12/2018 | Sale | Minit Mart LLC | TA Operating LLC | $5,836,862 | $665.09 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | N/A | Adjusted Price / sf | $665.09 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

**No information recorded**

### Map & Comments



This 8,776 Shell Gas Station/C-Store/Car Wash sold in December 2018 for $5,836,862. The station was comprised of 6,685 SF c-store and a 2,091 square foot car wash. The station included 8 double sided gasoline MPD's and 3 diesel MPD's. The gross profit at the time of sale was $1,765,746 (rd) for a GPM of 3.31. The c-store included a Subway and there is a small garden center on-site.



## Sale      Retail - Convenience Store / Service Station     No. 3

| | |
|---|---|
| Property Name | O'Hare BP/Car Wash |
| Address | 4111 N. Mannheim |
| | Schiller Park, IL 60176 |
| | United States |



| | |
|---|---|
| Government Tax Agency | Cook |
| Govt./Tax ID | 12-16-307-035 |

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 1.330 | 57,930 |
| Land Area Gross | N/A | N/A |
| Excess Land Area | N/A | N/A |

| | |
|---|---|
| Site Development Status | N/A |
| Shape | N/A |
| Topography | N/A |
| Utilities | N/A |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.13 |

| | |
|---|---|
| Zoning | N/A |
| General Plan | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 7,283 sf | Floor Count | N/A |
| Status | Existing | Parking Type | N/A |
| Occupancy Type | N/A | Parking Ratio | 0.00/1,000 sf |
| Year Built | 2010 | Condition | N/A |
| Year Renovated | N/A | Exterior Finish | N/A |
| Total Anchor Rentable Area | N/A | Number of Buildings | 1 |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | West Town B & T | Marketing Time | 26 Month(s) |
| True Buyer | N/A | Buyer Type | End User |
| Recorded Seller | O'Hare Shell Partners LLC | Seller Type | N/A |
| True Seller | N/A | Primary Verification | N/A |

| | | | |
|---|---|---|---|
| Interest Transferred | Fee Simple/Freehold | Type | Sale |
| Current Use | N/A | Date | 1/15/2015 |
| Proposed Use | N/A | Sale Price | $6,000,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $6,000,000 |
| Doc # | N/A | Capital Adjustment | $0 |
| | | Adjusted Price | $6,000,000 |



# Sale · Retail - Convenience Store / Service Station · No. 3

## Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 01/2015 | Sale | West Town B & T | O'Hare Shell Partners LLC | $6,000,000 | $823.84 |

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | N/A | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | N/A | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | N/A | Adjusted Price / sf | $823.84 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | N/A | | |

## Financial

| Revenue Type | Vacant at Zero |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $6,000,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | $1,990,000 |
| Expenses | N/A |
| Net Operating Income | $696,500 |
| NOI / sf | $95.63 |
| NOI / Unit | N/A |
| EGIM | 3.02 |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 11.61% |

## Map & Comments



This 7,238 BP Gas Station/Car Wash sold in January, 2015 for $6,000,000. The station was comprised of 4,953 SF c-store, a 1170 square foot office area (not included in GBA) and a 2332 square foot car wash. The station included 12 double sided MPD's. The seller reportedly had an alternate offer for $6,300,000 but sold the property for $6,000,000 to one of the principal members.The gross profit at the time of sale was $1,990,000 (rd) for a GPM for a GPM of 3.02. The c-store included a Dunkin Donuts and Subway. Surrounding improvements include hotel properties such as Four Points by Sheraton to the northeast, O'Hare Inn & Suites and Candlewood Suites Chicago-O'Hare International to the south of the subject. A new 1,200 car parking garage is under construction to the east of the subject, providing for additional Airport parking. O'Hare Blue Sky Parking is located just west of the subject and Easy Airport Parking is located southwest. There is also rental car agencies located nearby such as Thrifty and Ace.



## Sale — Retail - Convenience Store / Service Station — No. 4

| | | |
|---|---|---|
| Property Name | Circle K/ Shell | |
| Address | 11900 Route 59<br>Plainfield, IL 60585<br>United States | |



| | |
|---|---|
| Government Tax Agency | Will |
| Govt./Tax ID | 01-28-201-069 |

### Site/Government Regulations

| | Acres | Square feet |
|---|---|---|
| Land Area Net | 2.010 | 87,556 |
| Land Area Gross | N/A | N/A |
| Excess Land Area | N/A | N/A |

| | |
|---|---|
| Site Development Status | N/A |
| Shape | N/A |
| Topography | N/A |
| Utilities | N/A |

| | |
|---|---|
| Maximum Floor Area | N/A |
| Maximum FAR | N/A |
| Actual FAR | 0.17 |

| | |
|---|---|
| Zoning | N/A |
| General Plan | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Gross Leasable Area (GLA) | 15,207 sf | Floor Count | N/A |
| Status | Existing | Parking Type | N/A |
| Occupancy Type | N/A | Parking Ratio | 0.00/1,000 sf |
| Year Built | 2007 | Condition | N/A |
| Year Renovated | N/A | Exterior Finish | N/A |
| Total Anchor Rentable Area | N/A | Number of Buildings | N/A |
| Total In Line Rentable Area | N/A | | |
| Anchor | N/A | | |
| Junior Anchor | N/A | | |
| National | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | NA | Marketing Time | 15 Month(s) |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | N/A | Seller Type | N/A |
| True Seller | 421 Duffield, LLC | Primary Verification | Offering Memorandum, Broker |

| | | | |
|---|---|---|---|
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | N/A | Date | 3/10/2017 |
| Proposed Use | N/A | Sale Price | $6,300,000 |
| Listing Broker | Sean Sharko, Marcus & Millichap | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $6,300,000 |
| Doc # | N/A | Capital Adjustment | $0 |
| | | Adjusted Price | $6,300,000 |



## Sale     Retail - Convenience Store / Service Station    No. 4

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 03/2017 | Sale | NA | N/A | $6,300,000 | $414.28 |

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | N/A |
| Buyer's Primary Analysis | N/A | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 7.23% | Adjusted Price / sf | $414.28 |
| Projected IRR | N/A | Wtd. Avg. Lease Expiry | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $6,300,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | N/A |
| Expenses | N/A |
| Net Operating Income | $455,729 |
| NOI / sf | $29.97 |
| NOI / Unit | N/A |
| EGIM | N/A |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 7.23% |

### Map & Comments



This Circle K/ Shell at 11900 Route 59 in Plainfield, IL sold on March 10, 2017 for $6,300,000. The property is managed by a regional Circle K operator and guaranteed by Shell Oil Company. The property is one of Shell's "multi-brand concept builds", constructed in 2007, and includes a freestanding Firestone Complete Auto Care facility, a Dunkin Donuts with a drive thru, and a Circle K convenience store with gas service. The Dunkin Donuts and Firestone are sublease tenants to the Shell Oil Company lease. The landlord holds zero responsibilities under the Shell Oil Company guaranteed lease. The property has seven years of base term remaining on a 15 year lease, with five, five-year options. In June of 2017 the base rent will increase by 15 percent, increasing the Cap Rate to 7.42 percent, in addition to 10 percent bumps each option period.The property has non-recourse debt in place, at a rate of five percent, which balloons November of 2022, and will need to be assumed by a new purchaser. The station had 6 double sided, MPD's and average traffic counts of 46,950 VPD. The offering price was $6,510,000.



## Sale — Special - Truck Stop — No. 5

| | |
|---|---|
| Property Name | Goetz Truck Stop |
| Address | N5800 Kinney Road |
| | Portage, WI 53901 |
| | United States |
| Government Tax Agency | Columbia |
| Govt./Tax ID | 11004-795.A |



**Unit Mix Detail**

| | | | | | |
|---|---|---|---|---|---|
| Rate Timeframe | N/A | | | | |
| Unit Type | No. | % | Size | Rent | Rent / Area |
| | | No information recorded | | | |
| Totals/Avg | N/A | | | N/A | N/A |

### Improvements

| | | | | |
|---|---|---|---|---|
| Land Area | 28.522 ac | | Status | Existing |
| Net Rentable Area (NRA) | 28,875 sf | | Year Built | 1986 |
| Total # of Units | 0 Units | | Year Renovated | N/A |
| Floor Count | N/A | | Condition | N/A |
| Parking Type | N/A | | Exterior Finish | N/A |
| General Amenities | N/A | | | |

### Sale Summary

| | | | | |
|---|---|---|---|---|
| Recorded Buyer | Travels Center of America | | Marketing Time | N/A |
| True Buyer | N/A | | Buyer Type | End User |
| Recorded Seller | N/A | | Seller Type | N/A |
| True Seller | James Goetz | | Primary Verification | Assessor, Deed |
| Interest Transferred | Fee Simple/Freehold | | Type | Sale |
| Current Use | N/A | | Date | 8/2/2017 |
| Proposed Use | N/A | | Sale Price | $8,120,000 |
| Listing Broker | N/A | | Financing | Market Rate Financing |
| Selling Broker | N/A | | Cash Equivalent | $8,120,000 |
| Doc # | 894796 | | Capital Adjustment | $0 |
| | | | Adjusted Price | $8,120,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 08/2017 | Sale | Travels Center of America | N/A | $8,120,000 | $281.21 |



## Sale                    Special - Truck Stop                    No. 5

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 3.25 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 11.08% | Adjusted Price / sf | $281.21 |
| Projected IRR | N/A | Adjusted Price / Unit | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Pro Forma Stabilized |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $8,120,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | $2,500,000 |
| Expenses | N/A |
| Net Operating Income | $900,000 |
| NOI / sf | $31.17 |
| NOI / Unit | N/A |
| EGIM | 3.25 |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 11.08% |

### Map & Comments



On August 2, 2017, the truck stop located at N5800 Kinney Rd in Portage WI sold for confirmed sale price $8.12 million. The asset was purchased by Travel Centers of America from local investor or had owned the truck stop for over 30 years. The building includes single story c-store/restaurant that totals 17,375 sqft and single story repair building that totals 11,500 sqft allowing with pumping stations. The entire center sits on 28 acres.The site site right off the I90/94 exit with average traffic counts of 33,100 VPD.



## Sale/Leaseback — Special - Truck Stop — No. 6

| | |
|---|---|
| Property Name | TravelCenters of America- Wilmington |
| Address | 24225-24263 W Lorenzo Rd |
| | Wilmington, IL 60481 |
| | United States |
| Government Tax Agency | Will |
| Govt./Tax ID | 17-16-103-002 |



**Unit Mix Detail**

| | | | | | |
|---|---|---|---|---|---|
| Rate Timeframe | N/A | | | | |
| Unit Type | No. | % | Size | Rent | Rent / Area |
| **No information recorded** | | | | | |
| Totals/Avg | N/A | | | N/A | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 22.850 ac | Status | Existing |
| Net Rentable Area (NRA) | 23,024 sf | Year Built | 2016 |
| Total # of Units | Units | Year Renovated | N/A |
| Floor Count | 1 | Condition | Average |
| Parking Type | Surface | Exterior Finish | N/A |
| General Amenities | Surface Parking | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | HPT TA Properties LLC | Marketing Time | N/A |
| True Buyer | Hospitality Properties Trust | Buyer Type | REIT |
| Recorded Seller | TA Operating LLC | Seller Type | Private Investor |
| True Seller | TravelCenters of America | Primary Verification | Costar report and Public Record |
| Interest Transferred | Leased Fee | Type | Sale/Leaseback |
| Current Use | Retail Truck Stop | Date | 6/30/2016 |
| Proposed Use | N/A | Sale Price | $22,300,000 |
| Listing Broker | N/A | Financing | Cash to Seller |
| Selling Broker | N/A | Cash Equivalent | $22,300,000 |
| Doc # | R16052599 | Capital Adjustment | $0 |
| | | Adjusted Price | $22,300,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/sf |
|---|---|---|---|---|---|
| 06/2016 | Sale/Leaseback | HPT TA Properties LLC | TA Operating LLC | $22,300,000 | $968.55 |



## Sale/Leaseback — Special - Truck Stop — No. 6

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 11.74 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | N/A |
| Net Initial Yield/Cap. Rate | 8.52% | Adjusted Price / sf | $968.55 |
| Projected IRR | N/A | Adjusted Price / Unit | N/A |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $22,300,000 |
| Potential Gross Income | N/A |
| Economic Occupancy | N/A |
| Economic Loss | N/A |
| Effective Gross Income | $1,900,000 |
| Expenses | N/A |
| Net Operating Income | $1,900,000 |
| NOI / sf | $82.52 |
| NOI / Unit | N/A |
| EGIM | 11.74 |
| OER | N/A |
| Net Initial Yield/Cap. Rate | 8.52% |

### Map & Comments



This newly constructed travel center in Wilmington, Illinois sold as part of a sale leaseback scenario for $22,300,000 or $968.55. According to the SEC filing, the annual rent was $1,900,000 indicating a cap rate of 8.52%. This property was built in 2016 and includes 229 angled and generously sized truck parking spaces and over 120 car parking spaces; Eight diesel lanes, all equipped to pump bulk DEF, and 12 Shell-branded gasoline fueling points; a five-bay Petro:Lube facility, and RoadSquad™ emergency roadside service, available 24/7/365; a 140-seat Iron Skillet® full-service restaurant with a buffet and StayFit® menu options; an 18-seat Charleys Philly Steak® quick-service restaurant; A 4,900 square-foot Minit Mart® travel store stocked with driver merchandise, Minit Mart's refreshing Cool Cup® fountain beverages, World Blends® Coffee, and to-go offerings featuring fried chicken, pizza and a variety of healthy options, prepared fresh daily on site; Nine driver showers operated by a fully automated reservation system, also accessible through the TA/Petro TruckSmart® mobile app; a FREE StayFit® fitness room (free to professional drivers who are UltraONE® Driver Rewards Program members) and an outdoor walking trail for continued dedication to fitness and a laundry facility with machines that accept credit/debit card payments.This travel center is located off of I-55.



**Addendum C**

# LEGAL DESCRIPTION

Lots 1 to 40, both inclusive, in Block 2 in Butterfield's Subdivision of Lots 1, 2, 3 and 6 in Krueger's Subdivision of the Northeast 1/4 of Section 30, Township 37 North, Range 14, East of the Third Principal Meridian, According to the plat of subdivision recorded March 5, 1875 as Document Number 16626; Together with Lots 1 to 6, inclusive, in Miller's Resubdivision of Lots 41 to 44, inclusive, in the West 1/2 of Block 2 in Butterfield's Subdivision of Lots 1, 2, 3 and 6 in Krueger's Subdivision of the Northeast 1/4 of Section 30, Township 37 North, Range 14, East of the Third Principal Meridian, According to the plat

thereof recorded May 17, 1888 as Document Number 958597; Together with All of the Vacated Alley lying between 119th and 120th Streets between Paulina and Marshfield Avenues, which adjoins the above described Lots; Except that part described as follows: BEGINNING at the Northeast corner of said Lot 1 in said Butterfield's Subdivision; THENCE South 01 degrees 22 minutes 12 seconds East, along an assumed bearing, being the East line of said Lot 1, a distance of 4.52 feet; THENCE South 89 degrees 46 minutes 26 seconds West, 213.66 feet to the South line of said 119th Street; THENCE North 88 degrees 33 minutes 45 seconds East along the last described line, 213.62 feet to point of BEGINNING; all in Cook County, Illinois.

**Addendum D**

# CLIENT CONTRACT INFORMATION

Greg Navagh
Account Platform Director - Appraisal Management
Valuation & Advisory



Cushman & Wakefield Global Services, Inc.
1900 Rand Building
Buffalo, NY 14203
716-929-7382- Tel
- Fax
gregory.navagh@cushwake.com- Email

Date: July 19, 2019

Lesley J. Linder (P), MAI CCIM.
CBRE
321 N. Clark, 34th Floor
Chicago, IL60654

REFERENCE:        19-001590-01-01
                 Mubark Ibraham/ Loan #: 235078-904995 NBL
                 Retail-Commercial - Convenience Store/Gas Station
                 11900 S Marshfield Ave
                 Calumet Park, IL60827

AMC INFORMATION:        AMC Name:      Cushman & Wakefield of Illinois
                        AMC Number:    558.000147

This letter will confirm your engagement to prepare an appraisal of the above referenced property on behalf of Newtek Small Business Finance, LLC. Your estimate(s) of market value must conform to the following valuation scenario(s) and corresponding property rights to be appraised:

## Scope of Work

**Intended Use:**          The intended use of this appraisal is for loan underwriting and-or credit decisions.

**Intended User:**         The intended users of this report are Newtek Small Business Finance, LLC., Newtek Business Lending, LLC., NBL SPV I, LLC and Cushman and Wakefield Global Services, Inc.

**Inspection Requirement:**  An interior and exterior inspection of the subject property, as well as an inspection of all comparable properties utilized.

**Approaches to Value:**   Income Approach

                           Sales Comparison Approach

**Report Addressing and Uploads:**   Please address the report to:Cushman & Wakefield Global Services Inc.Appraisal Management Firm for Newtek Small Business Finance, LLC1377 Motor Parkway - Suite 203Islandia, NY 11749Attn: Clarke LewisPlease include the RIMS Project # on the cover of the report.At completion of the report please upload two files (appraisal report and invoice) to the system.PDF document security must be set to allow commenting and copying of text, images and other content.

**Sale and Rental Photographs:**   Photographs of the comparable sales are required.

**Invoicing:**            The invoice should be addressed to the Account Officer at Newtek Small Business Finance, LLC, not Cushman & Wakefield.  In addition it must contain the loan name and number.

v.1.3014.0

**W-9:** Please be sure to include your W-9 within the addenda of the report. This will facilitate payment.

**Competency:** If you feel you are not competent (geographic/property type/etc.) to bid on this rfp please decline to bid.

**Engagement Letter/License:** Please be sure that a copy of the engagement letter and the appraiser's appropriate license is in the addenda.

**Independence/Conflicts:** Maintaining the independence and objectivity of the appraisal process is of utmost importance to the financial institution. If an appraiser has a current or prospective interest in the subject property, transaction, or parties involved, the appraiser must decline the assignment. If the appraiser (1) has previously appraised the subject property, or (2) previously performed a consulting assignment related to the subject property, the appraiser must be able to remain unbiased by the previous assignment, or decline the current assignment. The appraiser must disclose the previous appraisal or consulting assignment to the job manager. If during the course of an assignment, the appraiser becomes aware of a potential conflict of interest, the appraiser should contact the Job Manager immediately. Any communication between the appraiser and the financial institution should be through the Job Manager.

**Loan Name/Number:** The loan name and number must be included on cover page of the appraisal and the invoice.

**Other:** None

**Report Type:** Appraisal (self contained format)
**Report Format:** Narrative

**Valuation Scenario(s):**

| Premise | Qualifier | Interest | Comment |
|---|---|---|---|
| Insurable Cost | As-Is | Fee Simple | |
| Market Value | As-Is | Fee Simple | |

**Award Comments:**

**RFP Comments:**

**Address Questions to the Job Manager:** Greg Navagh
Valuation & Advisory
1900 Rand Building
Buffalo, NY 14203
Phone: 716-929-7382
Fax:
Email: gregory.navagh@cushwake.com

It is mutually agreed that your completed appraisal report, in the specified number of copies, will be delivered to the undersigned on or before the date specified below, and that the total appraisal fee will not exceed the fee specified below.

Date Appraisal Due:     08/08/2019          Appraisal Fee:        $4,000

The appraisal and report are to be prepared in conformance with the requirements of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA); the Interagency Appraisal and Evaluation Guidelines; and the Uniform Standards of Professional Practice (USPAP). The appraisal should include an estimate of exposure time as

v.1.3014.0

required in Statement 6 (USPAP) and clearly state the reporting option used under Standard 2-2 (USPAP). The purpose of the appraisal is to estimate market value as defined by the Board of Governors of the Federal Reserve System, in accordance with Title XI of FIRREA (1989). The appraisal will be utilized by Newtek Small Business Finance, LLC as an aid in proper underwriting, loan classification and/or disposition of the asset.

The report should contain sufficient data and analysis to enable the reader to follow the appraiser to the final value conclusions. Representatives of Cushman & Wakefield Global Services, Inc. or Newtek Small Business Finance, LLC may perform an administrative or technical review of the report. Your full cooperation in the review process is deemed to be an integral part of this appraisal assignment.

Newtek Small Business Finance, LLC reserves the right to provide a copy of the appraisal to the borrower, the borrower's representative or any third party Newtek Small Business Finance, LLC may deem appropriate. Further, Cushman & Wakefield Global Services, Inc. and Newtek Small Business Finance, LLC reserves the right to terminate this appraisal assignment at any time without any further liability or obligation owed to you, if in Cushman & Wakefield Global Services, Inc.'s judgment you have failed to perform in accordance with the terms and conditions set forth in this engagement letter. The appraiser will maintain the confidentiality and privacy of customer information obtained in the course of this assignment in compliance with USPAP and Regulation P, Title V of the Gramm-Leach-Bliley Financial Modernization Act.

For access to the property, please contact:

Name:    Mubark Ibraham                              Phone: 708-824-0004

Upon completion of the assignment, please deliver the required number of copies of the report, the invoice, and all property specific documentation provided by Cushman & Wakefield Global Services, Inc. and/or Newtek Small Business Finance, LLC to:

0 Copy to:
Paul Hoo-Fong
Newtek Small Business Finance, LLC
1981 Marcus Avenue
Lake Success, NY 11042

In addition, please upload an electronic copy of your appraisal report and *invoice* to **RIMSCentral** at https://www.onlinerimscentral.com.

Include a signed copy of this letter as an addendum to the completed report.

Sincerely,

*Greg Navagh*                                Accepted By: _____

Account Platform Director - Appraisal Management  Printed Name: Les Linder
Valuation & Advisory
Cushman & Wakefield Global Services, Inc.    Date: 07/19/2019

v.1.3014.0

**Addendum E**

# QUALIFICATIONS

# Les Linder, MAI, CCIM, MRICS

*Senior Managing Director, North Central Region-Chicago, IL*

**CBRE**



T +1 312 233 8665
F +1 312 233 8660
les.linder@cbre.com

321 N. Clark Street
34th Floor
Chicago, IL 60654

## Experience

Les Linder is the Senior Managing Director of CBRE Valuation & Advisory Services for the North Central Region which includes Illinois, Wisconsin, Indiana and the eastern half of Missouri and comprises over 50 professional appraisers. He has over 30 years of real estate valuation and consulting experience throughout the Midwest United States.  Mr. Linder is a Designated Member (MAI) of the Appraisal Institute, a Member of The Royal Institute of Chartered Surveyors (MRICS) and a Certified Commercial Investment Member (CCIM).  Valuation & Advisory Services provides appraisals and consulting services to a broad based national and local clientele including investors, property owners, commercial and investment banks, insurance companies and REITs. Mr. Linder has expertise in the appraisal of multi-family, retail, industrial, office, hotel and special purpose properties.

Mr. Linder also represents CBRE Valuation & Advisory Services as the National Practice Leader for Manufactured Housing.  He is a past President of the Great Lakes Chapter of the Appraisal Institute and has testified as an expert witness in US Bankruptcy Court.

Prior to joining CBRE, Inc. in 2004, Mr. Linder was a Senior Review Appraiser and Vice President at Bank One Corporation, Detroit, Michigan, for over seven years. During this time, he was responsible for a wide range of real estate valuation functions including procuring and reviewing real estate appraisals of complex properties throughout the United States, risk assessment of existing portfolio assets, and participation in the development and evaluation of appraisal policies and procedures.

Mr. Linder has successfully worked with many of our most important clients including State Farm Insurance, Torchlight Investors, PGIM, Walker & Dunlop, Fifth Third Bank, CIBC, and KOHLS.

## Professional Affiliations / Accreditations

- Designated Member (MAI), Appraisal Institute
- Member (MRICS), The Royal Institute of Chartered Surveyors
- Certified Commercial Investment Member (CCIM)
- State Certified General Appraiser
    - Illinois (553.001947)
    - Indiana (CG40801085)
    - Michigan (1201003343)
    - Wisconsin (1852-10)

## Education

Mr. Linder holds a Bachelor's of Science Degree, Business – Real Estate Administration from Indiana University, Bloomington, Indiana.



### State of Illinois

**Department of Financial and Professional Regulation**

Division of Real Estate

LICENSE NO.
553.001947

The person, firm, or corporation whose name appears on this certificate has complied with the provisions of the Illinois Statutes and/or rules and regulations and is hereby authorized to engage in the activity as indicated below:

EXPIRES:
09/30/2019

CERTIFIED GENERAL REAL ESTATE APPRAISER

LESLEY JOHN LINDER

Bryan A. Schneider

BRYAN A. SCHNEIDER
SECRETARY

KREG T. ALLISON
DIRECTOR

The official status of this license can be verified at www.idfpr.com

11880896

# Clayton P. Conn, MAI

*Senior Appraiser, Chicago, Illinois*

**CBRE**



T + 1-630-573-7098

F + 1-630-573-7018

Clayton.Conn@cbre.com

700 Commerce Drive, Suite 450

## Clients Represented

- First National Bank
- Resource Bank
- The Salvation Army
- Morton Community Bank
- Midlands State Bank

## Experience

Clayton is a Senior Appraiser in the Valuation and Advisory Services Group's North Central region. He works out of CBRE's Oak Brook, Illinois office with his primary geographical concentration being the greater Chicagoland area and the State of Illinois. Clay has over fifteen years of real estate appraisal and consulting experience with his experience encompassing a wide variety of property types including retail, industrial, office, medical office, multi-family residential, subdivisions, and other special purpose properties.

Clayton is a member of the Office/Institutional Property Specialty Group which provide timely and reliable counsel regarding property valuations, market conditions, and product trends. The Chicago Office/Institutional Property Specialty Group consists of four professionals having an average of 20+ years of valuation experience, with a long-term focus and involvement in the office sector.  The team has the knowledge and expertise to provide the reliable analysis and counsel associated with most all valuation related needs.  The understanding of the property markets is critical in the compilation of the general due diligence associated with local and regional market areas and investments.

Clayton is also a member of CBRE's National Healthcare Valuation Group, specializing in the valuation and analysis of non-institutional and institutional-grade medical office properties. He has experience providing appraisal reports for institutions, investors, special servicers, developers, individual and corporate property owners with regard to acquisitions, litigation, mortgage lending and portfolio purposes. In addition, his experience includes third-party appraisal reviews, market studies, and rent analyses.

Apart from his Chicago office and medical office sector focuses, Clay also specializes in the valuation of development land; specifically, residential subdivision projects as well as commercial and industrial use developments. His extensive knowledge in these fields makes him a substantial resource for CBRE's Valuation and Advisory Services Group.

## Professional Affiliations / Accreditations

- Designated Member (MAI), Appraisal Institute
- State of Illinois Certified General Real Estate Appraiser (License No. 553.001771)
- State of Wisconsin Certified General Real Estate Appraiser (License No. 1978-10)
- State of Indiana Certified General Real Estate Appraiser (License No. CG41300035)

## Education

- Bachelor of Science in Business Management
    - University of Phoenix, Phoenix, AZ



# State of Illinois

## Department of Financial and Professional Regulation
### Division of Real Estate

LICENSE NO.
553.001771

The person, firm, or corporation whose name appears on this certificate has complied with the provisions of the Illinois Statutes and/or rules and regulations and is hereby authorized to engage in the activity as indicated below:

EXPIRES:
09/30/2019

### CERTIFIED GENERAL REAL ESTATE APPRAISER

CLAYTON P CONN
1250 BRISTOL DR W
SYCAMORE, IL  60178

BRYAN A. SCHNEIDER
SECRETARY

KREG T. ALLISON
DIRECTOR

The official status of this license can be verified at www.idfpr.com

11913099

**Addendum F**

# W-9

| Form **W-9** (Rev. October 2018) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** ▶ Go to *www.irs.gov/FormW9* for instructions and the latest information. | **Give Form to the requester. Do not send to the IRS.** |

**1** Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

**CBRE, INC.**

**2** Business name/disregarded entity name, if different from above

**3** Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only **one** of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC  ☑ C Corporation  ☐ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

**Note:** Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is **not** disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

**4** Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any)  **5**

Exemption from FATCA reporting code (if any) _____

*(Applies to accounts maintained outside the U.S.)*

**5** Address (number, street, and apt. or suite no.) See instructions.

**PO BOX 281620, LOCATION CODE 4252**

**6** City, state, and ZIP code

**ATLANTA, GA  30384-1620**

Requester's name and address (optional)

**7** List account number(s) here (optional)

---

**Part I**  **Taxpayer Identification Number (TIN)**

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN,* later.

**Note:** If the account is in more than one name, see the instructions for line 1. Also see *What Name and Number To Give the Requester* for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

**or**

**Employer identification number**

9 5 – 2 7 4 3 1 7 4

---

**Part II**  **Certification**

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and

3. I am a U.S. citizen or other U.S. person (defined below); and

4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign Here | Signature of U.S. person ▶ *Bella Gay* | Date ▶ 3/1/2019 |

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to *www.irs.gov/FormW9.*

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See* What is backup withholding, *later.*

Cat. No. 10231X  Form **W-9** (Rev. 10-2018)

# EXHIBIT F

**CHICAGO TITLE & TRUST**

**Chicago Title and Trust Company**
5 Westbrook Corporate Center, Suite 100
Westchester, IL 60154
Phone: (708)409-9039 Fax: (708)409-9914

**Master Statement**

| | |
|---|---|
| **Settlement Date:** | January 31, 2022 |
| **Disbursement Date:** | January 31, 2022 |
| **Order Number:** | 21LS02000LFE |
| **Escrow Officer:** | Alysia Kramme |
| **Buyer:** | Petroleum Investments Properties, LLC<br>11900-11901 S. Marshfield Ave.<br>Calumet Park, IL 60827 |
| **Seller:** | 11900 Marshfield, LLC<br>11900-11901 S. Marshfield Ave.<br>Calumet Park, IL 60827 |
| **Lender:** | Ameris Bank, its successors and assigns as their interest may appear |
| **Property:** | Ameris Bank, its successors and assigns as their interest may appea<br>11900-11901 S. Marshfield Ave.<br>Calumet Park, IL 60827 |

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Total Consideration** | | |
| | 5,500,000.00 | Purchase Price | 5,500,000.00 | |
| | | Principal Amount of New Loan | | 2,757,500.00 |
| | | Principal Amount of New Loan | | 1,930,250.00 |
| | | Deposit or earnest money<br>Robert D. Loncar | | 10,000.00 |
| | | **Prorations/Adjustments** | | |
| 114,414.31 | | Tax Prorations<br>7/1/21-12/31/21 | | 114,414.31 |
| 18,165.26 | | Tax Prorations<br>1/1/22-1/31/22 | | 18,165.26 |
| 5,000.00 | | Security Deposits<br>Boost Mobil Lease | | 5,000.00 |
| 14,366.58 | | Rent Credit | | 14,366.58 |
| | | **Payoffs** | | |
| 5,079,935.36 | | Payoff to Newteck | | |
| | | **Loan Charges $(678,024.00)** | | |
| | | Appraisal<br>P.O.C.$6,500.00(B)* | | |
| | | Credit Report to Ameris Bank, its successors and<br>assigns as their i | 25.00 | |
| | | Flood Certification to Ameris Bank, its successors<br>and assigns as their i | 10.00 | |
| | | FedEx to Ameris Bank, its successors and assigns<br>as their i | 100.00 | |

Printed on 2/1/2022 3:07:37 PM

21LS02000LFE
Page 1 of 7

## Master Statement

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Loan Charges (continued)** | | |
| | | Balance of Borrower Deposit with Lender | | 1,700.00 |
| | | Tax Verifcations to Ameris Bank, its successors and assigns as their i | 90.00 | |
| | | Interim Loan to Ameris Bank, its successors and assigns as their i | 126,844.00 | |
| | | Tax Monitoring to Ameris Bank, its successors and assigns as their i | 102.00 | |
| | | Borrower Equity | | 816,000.00 |
| | | Phase I    P.O.C.$1,600.00(B)* | | |
| | | Appraisal Review    P.O.C.$200.00(B)* | | |
| | | Pre-closing UCC/Judgement Lien Search to Cogency Global | 2,505.00 | |
| | | Estimated Post-closing UCC/Judemnt Lien Search to Cogency Global | 350.00 | |
| | | Costs and Out of Pocket Expenses UCC Filing,courier, copies, faxes to Davis, Pickren,Seydel & Sneed, LLP | 650.00 | |
| | | Lender Attorney to Davis, Pickren,Seydel & Sneed, LLP    Permanent Loan | 6,500.00 | |
| | | Lender Attorney to Davis, Pickren,Seydel & Sneed, LLP    Interim Loan | 2,500.00 | |
| | | **Title/Escrow Charges $22,813.50** | | |
| 8,850.00 | | Owner's Policy Premium to Chicago Title Insurance Company    Coverage: $5,500,000.00    Version: ALTA Owner's Policy 2006 | | |
| 2,212.50 | | Escrow Fees to Chicago Title and Trust Company | 2,212.50 | |
| | | Escrow Fees - 2nd loan to Chicago Title and Trust Company | 225.00 | |
| 300.00 | | GAP Coverage (NYS Closing Fee) to Chicago Title Insurance Company | 300.00 | |
| | | Email Package Fee to Chicago Title Insurance Company | 50.00 | |
| | | Wire Fee to Buyer to Chicago Title and Trust Company | 100.00 | |
| 50.00 | | Wire Fee to Seller to Chicago Title and Trust Company | | |
| | | Overnight/Express Delivery Service Fee to Chicago Title Insurance Company | 50.00 | |
| 150.00 | | Commitment Update Fee to Chicago Title Insurance Company | | |
| | | Policy Update Fee to Chicago Title Insurance | 150.00 | |

## Master Statement

| Seller | | | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Title/Escrow Charges (continued)** | | |
| | | Company | | |
| 100.00 | | Schedule B Documents to Chicago Title Company, LLC | | |
| 3.00 | | State of Illinois Policy Registration Fee to Chicago Title Insurance Company | 3.00 | |
| | | ProForma Fee to Chicago Title Company, LLC | 350.00 | |
| | | Loan Policy Premium to Chicago Title Insurance Company<br>Coverage: $1,930,250.00<br>Version: 2nd ALTA Loan Policy 2006 | 525.00 | |
| | | Money Lender Escrow in conjuction with Deed and Money Escrow to Chicago Title Company, LLC | 1,039.50 | |
| | | Loan Policy Premium to Chicago Title Insurance Company<br>2nd Loan<br>Coverage: $2,757,500.00<br>Version: ALTA Loan Policy 2006 | 525.00 | |
| 1,750.00 | | Tax Payment Service Fee to Chicago Title Insurance Company | | |
| | | IL APLD Certificate Service Fee to Chicago Title Insurance Company | 50.00 | |
| | | Recording Service Fee to Chicago Title Company, LLC | 15.00 | |
| 2,400.00 | | Additional PIN Charge to Chicago Title Company, LLC | | |
| | | Email Package Fee - 2nd Loan to Chicago Title Insurance Company | 50.00 | |
| | | Overnight/Express Delivery Service Fee - 2nd Loan to Chicago Title Insurance Company | 50.00 | |
| | | Wire Fee to Buyer - 2nd Loan to Chicago Title and Trust Company | 50.00 | |
| | | IL APLD Certificate Service Fee - 2nd Loan to Chicago Title Insurance Company | 50.00 | |
| | | ALTA 9-06 - Restrictions, Encroachments, Minerals to Chicago Title Insurance Company | 300.00 | |
| | | ALTA 8.2-06 - Commercial Environmental Protection Lien to Chicago Title Insurance Company | 300.00 | |
| | | State of Illinois Policy Registration Fee - 2nd Loan to Chicago Title Insurance Company | 3.00 | |
| | | ALTA 9.3-06 - Covenants, Conditions and Restrictions to Chicago Title Insurance Company | 300.00 | |
| | | ALTA 8.2-06 - Commercial Environmental Protection Lien to Chicago Title Insurance Company | 300.00 | |

## Master Statement

| Seller Debit | Seller Credit | Description | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Recording Charges $9,236.00** | | |
| 2,750.00 | | County Transfer Tax to MYDEC Cook County Transfer Stamps | 686.00 | |
| 5,500.00 | | State Transfer Tax to MYDEC Cook County Transfer Stamps | | |
| | | Recording Fee to Cook County Recorder | 300.00 | |
| | | **Additional Charges** | | |
| 4,000.00 | | Seller Attorney Fee to Loncar Law LTD | | |
| 1,847.95 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-001-0000 | | |
| 1,420.87 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-002-0000 | | |
| 1,417.29 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-003-0000 | | |
| 1,413.83 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-004-0000 | | |
| 1,403.54 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-005-0000 | | |
| 1,925.99 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-006-0000 | | |
| 237.19 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-020-0000 | | |
| 237.19 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-021-0000 | | |
| 227.58 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-022-0000 | | |
| 227.58 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-023-0000 | | |
| 231.19 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-024-0000 | | |
| 395.05 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-041-0000 | | |
| 395.05 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-042-0000 | | |

## Master Statement

| Seller | | | Buyer | |
|---|---|---|---|---|
| Debit | Credit | | Debit | Credit |
| | | **Additional Charges (continued)** | | |
| 395.05 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-043-0000 | | |
| 395.05 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-044-0000 | | |
| 395.05 | | 2nd Installment 2020 Taxes + P to ACH Cook County Taxes 25-30-204-045-0000 | | |
| 114,575.19 | | 1st & 2nd Installment 2020 Taxes + Penalty to ACH Cook County Taxes 25-30-204-046-0000 | | |
| 144.00 | | Duplicate Tax Bill to ACH Cook County Taxes | | |
| 1,637.66 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-001-0000 | | |
| 1,224.61 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-002-0000 | | |
| 1,221.59 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-003-0000 | | |
| 1,310.67 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-004-0000 | | |
| 1,210.79 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-005-0000 | | |
| 1,700.96 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-006-0000 | | |
| 250.60 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-020-0000 | | |
| 250.60 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-021-0000 | | |
| 240.52 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-022-0000 | | |
| 240.52 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-023-0000 | | |
| 244.26 | | 2021 1st Installment prepayment to Cook County Collector 25-30-204-024-0000 | | |
| 417.42 | | 2021 1st Installment prepayment to Cook County Collector | | |

## Master Statement

| Seller Debit | Seller Credit | | Buyer Debit | Buyer Credit |
|---|---|---|---|---|
| | | **Additional Charges (continued)** | | |
| | | 25-30-204-041-0000 | | |
| 417.42 | | 2021 1st Installment prepayment to Cook County Collector | | |
| | | 25-30-204-042-0000 | | |
| 417.42 | | 2021 1st Installment prepayment to Cook County Collector | | |
| | | 25-30-204-043-0000 | | |
| 417.42 | | 2021 1st Installment prepayment to Cook County Collector | | |
| | | 25-30-204-044-0000 | | |
| 417.42 | | 2021 1st Installment prepayment to Cook County Collector | | |
| | | 25-30-204-045-0000 | | |
| 100,413.29 | | 2021 1st Installment prepayment to Cook County Collector | | |
| | | 25-30-204-046-0000 | | |
| 85.00 | | Duplicate Tax Bill to Cook County Collector | | |
| | | Partial Refund to Borrower for Tax Proration to Petroleum Investments Properties, LLC | 19,736.15 | |
| 5,499,349.82 | 5,500,000.00 | **Subtotals** | 5,667,396.15 | 5,667,396.15 |
| | | **Balance Due FROM Buyer** | | 0.00 |
| 650.18 | | **Balance Due TO Seller** | | |
| | | **S - 650.18** | | |
| 5,500,000.00 | 5,500,000.00 | **Totals** | 5,667,396.15 | 5,667,396.15 |

*Paid outside of closing by buyer (B)

I have carefully reviewed the Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the Settlement Statement.

BUYER

Petroleum Investments Properties, LLC

BY:_____
    Nasr Ali


SELLER

11900 Marshfield, LLC

BY:_____
Robert D. Lancer under Power of Attorney
And LLC Resolution

## Master Statement

To the best of my knowledge, the Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Chicago Title and Trust Company

BY:_____

Chicago Title and Trust Company

# EXHIBIT G

9

MR. WEISSBERG:  Your Honor, I just wanted to make sure you had the more condensed exhibit books that I had brought in yesterday.

What had happened was, I was too ambitious originally when I did my exhibit books as to what exhibits I was going to use, but I pared them down so that you don't have to struggle with a lot of papers.

But I did leave the exhibit numbers in there so that it's easier for you to go through.

THE COURT:  All right.  I think I have two exhibit books.

MR. FOSTER:  And then you should have one for us.  Ours is the white book.

THE COURT:  I have all three.

MR. FOSTER:  Okay.  Are you ready, Your Honor?

THE COURT:  Yes.

NASR ALI, WITNESS, SWORN

DIRECT EXAMINATION

BY MR. FOSTER:

Q    Sir, would you state your name, please.

A    My name is Nasr Ali.

Q    Mr. Ali, could you try to speak up a little louder?  I have a hearing problem.

10

A     Sure.

Q     I apologize.  Thank you.

Mr. Ali, are you familiar with a gas station that is located at 11900 Marshfield Avenue, Calumet, Illinois?

A     Yes.

Q     And with your permission --

THE COURT:  Calumet or Calumet Park?

MR. FOSTER:  Calumet Park.  I'm sorry.

BY MR. FOSTER:

Q     It's Calumet Park, isn't it?

A     Yes.

MR. FOSTER:  Thank you, Your Honor.

BY MR. FOSTER:

Q     I will refer to that as the Marshfield gas station, if you will.

And are you familiar with the LLC known as 11900 Marshfield LLC?

A     Yes.

Q     And did that LLC once own the property on which the Marshfield gas station operated?

A     Yes.

Q     And with your permission, I would like to refer to that real estate that was owned by Marshfield, LLC, as the Marshfield property; is that

11

okay?

A    Sure.

Q    Okay.  And then, lastly, are you familiar with an Illinois corporation known as 11900 Marshfield Station, Inc.?

A    Yes.

Q    And is that the -- is that the Illinois corporation that operated the gas station, the Marshfield gas station on the Marshfield property?

A    Yes.

Q    With your permission, may I refer to that as Marshfield Station?

A    Yes.

Q    Thank you.

Did you at one time have an ownership interest in Marshfield, LLC?

A    Yes.

Q    And in 2018, did the -- the first one.

Are you familiar with the defendant in this case, Mubarak Ibrahim?

A    Yes.

Q    And did you and Mr. Ibrahim share ownership of Marshfield, LLC, in 2018?

A    Yes.

Q    And is it correct that in 2018, Mr. Ibrahim

12

owned 95 percent, and you owned 5 percent of the LLC?

A    Yes.

Q    And is it also correct that Mr. Ibrahim owned all of Marshfield Station in 2018?

A    Yes.

Q    Okay.  Are you familiar with a certain carwash known as Bubble Splash Car Wash, located on the Marshfield property?

A    Yes.

Q    What, if any, relationship do you have to the company that owns that carwash?

A    I started the company, Bubble Splash Car Wash, Inc.

Q    Do you remember when that happened?

A    2020.

Q    Did you form the corporation?

A    Yes.

Q    And for what purpose did you form the corporation?

A    To operate a car wash business.

Q    At the Marshfield station?

A    Yes.

Q    If you would -- if you would take a look at the white book over there, and I would ask you to turn to Exhibit No. 42.

13

I'm not going to ask you to read it. If you just look at it when you get to it.

While you're doing that, I will read the title of the document. It's a document that reads, "Lease and Construction Agreement By and Between 11900 Marshfield, LLC, owner, slash, lessor, and Bubble Splash Car Wash, Inc., developer, lessee."

Let me know when you get there.

A    I got there.

Q    And is that an agreement that Bubble Splash Car Wash, Inc., entered into with Marshfield, LLC?

A    Yes.

Q    And is that the agreement that was entered into pursuant to which you built the car wash, the Bubbles Car Wash at the Marshfield station?

A    Yes, that is correct.

Q    And if you will quickly turn to the next exhibit, which is Exhibit No. 23, and you will see it's a document that purports to be a UCC financing statement which was recorded with the Cook County Clerk in March of 2021 by Bank of George.

And if you look at -- where it says "secured party, Bank of George," do you see that, about three-quarters of the way there?

A    Yes.

14

Q     What, if any, involvement did Bank of George have are Bubbles Splash Car Wash?

A     They were the lender.

Q     Am I correct by your answer to understand that you borrowed money from Bank of George to build a car wash?

A     Yes, that's correct.

Q     Next question:  Did Mr. Mubarak at any time have any ownership interest in Bubbles Car Wash?

A     No.

Q     Did there come a time when you or a company that you owned purchased the Marshfield property from Marshfield, LLC?

A     Yes.

Q     Do you remember when that took place, approximately?

A     The beginning of 2022.  The closing was February 1st, I believe.

Q     If you look at Exhibit No. 34 -- make it 35.  Exhibit 35 --

             THE COURT:  In the white book?

             MR. FOSTER:  Pardon?

             THE COURT:  In the white book?

             MR. FOSTER:  In the white book.  Yes, ma'am.  I'm sorry.

15

BY MR. FOSTER:

Q    Exhibit 35 -- and while you're doing that, I'll read into the record, it purports to be a master statement, Chicago Title & Trust master statement, concerning the sale of the Marshfield property.

Do you recognize this document?

A    Yes.

Q    And is that the closing statement pursuant to which your company purchased the Marshfield property from Marshfield, LLC?

A    Yes.

Q    And I see --

MR. WEISSBERG:  Object.  I've got Exhibit 35.  It's the motion to approve the sale.

MR. FOSTER:  No.  Not in my -- it's 35 in my book.

THE COURT REPORTER:  Excuse me, Your Honor.

THE COURT:  Yes.

THE COURT REPORTER:  When counsel are objecting from the table, I can't hear them as well as if they would stand up and speak closer to the microphone at the podium.

THE COURT:  Okay.  Mr. Weissberg, you need to stand up.

16

(Inaudible colloquy.)

THE COURT: Do you have access to that document, Mr. Weissberg?

MR. WEISSBERG: No, I don't. My exhibits are numbered differently. I remember that there was a renumbering of the exhibits.

Your Honor, can we take a brief recess, and I'll call my office and have that downloaded?

THE COURT: Or how many pages is it?

MR. FOSTER: Do you have --

THE COURT: We have it. How many pages is this exhibit?

MR. WEISSBERG: That's all I need.

MR. FOSTER: Well, if he just has access to the second exhibit book, that will alleviate the problem.

THE COURT: All right. We'll check. Let's just make sure Mr. Weissberg has it. Just a second.

MR. WEISSBERG: I have it.

MR. FOSTER: While he's doing that --

THE COURT: Hold on. Let's just make sure. Hold on.

(Brief pause.)

17

MR. WEISSBERG: Yep, I'm there. Thank you.

THE COURT: All right. Let's proceed.

MR. FOSTER:

BY MR. FOSTER:

Q   On that same document, it lists -- the closing statement, it lists the buyer as Petroleum Investments Properties, LLC.

Is that your company that purchased the real estate?

A   Yes, sir.

Q   Okay. So in January of 2022, your company, Petroleum Investment Properties, purchased the Marshfield property.

Did you or a company you own simultaneously purchase the Marshfield -- the Marshfield Station Corporation at the same time?

A   Yes.

Q   Let's go back to when you originally -- let's go back in time a little bit.

The parties to the case have stipulated that in April of 2019, Marshfield Station acquired a gaming license from the State of Illinois to allow it to operate gaming machines, video gaming machines, at the gas station.

18

Are you aware of that?

A    I'm aware of the gaming machines at the gas station, yes.

Q    And the party that owns the gaming license was Marshfield Station, correct?

A    Correct.

Q    If you will turn to Exhibit No. 5 in the white book.

A    Okay.  I'm there.

Q    For the record, the document purports -- it reads it is a stock purchase agreement relating to Calumet Fuel, Inc., an Illinois corporation, purchaser, and 11900 Marshfield Station, Inc., an Illinois corporation, acquired corporation, dated December 3, 2021.

Do you recognize this document, sir?

A    Yes.

Q    What is it?

A    It's a stock purchase agreement for Marshfield Station.

Q    Is Calumet Fuel, Inc., a corporation that you own?

A    Yes.

Q    And pursuant to this agreement, did Calumet Fuel, Inc., purchase all of the stock of Marshfield

19

Station, Inc.?

A    I'm sorry.  Can you repeat the question?

Q    Pursuant to this agreement, did Calumet Fuel, Inc., purchase all of the stock of Marshfield Station?

A    Yes.

Q    What was the reason that you purchased through your company the stock of Marshfield Station, Inc., in conjunction with Petroleum Investment Properties' purchase of the Marshfield property?

Why did you buy the stock at the same time you bought the real estate?

A    The reason I bought the stock was to also acquire the gas station business.

Q    Okay.  And what did you acquire with the gas station business?

A    The gas station business included all of the stock, including the video gaming license.

Q    Okay.  Did you also acquire the inventory that the station had at the convenience mart?

A    Yes.

Q    Okay.  By acquiring -- when Marshfield -- when Petroleum Investments Properties acquired the real estate, did you continue -- and you and Calumet Fuel, Inc., acquired the stock of Marshfield Station,

20

Inc., did you continue to operate the gas station as Marshfield Station, Inc., as 119 Marshfield Station, Inc.?

A    Yes.

Q    And did you continue to operate the gaming proceeds under the gaming -- to operate the gaming license as had previously been done by Marshfield Station, Inc.?

A    Yes.

Q    And since 20- -- January of 2022, has your company continued to operate the gas station, operate the gaming machines, and receive the revenues that are generated from the State of Illinois from operating the gaming machines, correct?

A    Correct.

Q    During the -- starting in January of 2022 to the present, was there anytime that any portion of the revenues that Marshfield Station, Inc., received from the State of Illinois in connection with its operation of the gaming machines, was there anytime that any portion of those gaming proceeds were remitted to Mr. Ibrahim's wife, Sawsan Homsi?

A    No.

          MR. WEISSBERG:  That question was after the sale?

21

MR. FOSTER:  I'm sorry?

MR. WEISSBERG:  Was that after the sale?

MR. FOSTER:  After.

BY MR. FOSTER:

Q    For completeness, what I would like you to do, look in the black book, Exhibit No. 54, which should be an asset purchase agreement.

Do you see it, sir?

A    Yes.

Q    The document is titled an Asset Sale Agreement, and the parties to the asset sale agreement are the purchasers, Calumet Fuel, Inc.  You signed it as president.  And the seller was 11900 Marshfield Station, Inc., signed by Badr Ali as the president of Marshfield Station, Inc.

And do you recognize this agreement?

A    Yes.

Q    Okay.  And this agreement -- was this agreement entered into on or about May of 2021, as it purports?

A    Yes.

Q    And this agreement purports that Calumet Fuels, instead of buying the stock, was going to buy certain assets of Marshfield Station, Inc., correct?

22

A    Yes.

Q    Did this agreement ever get consummated?

A    No.

Q    And was there a reason the agreement did not get consummated?

A    We decided to do a stock purchase agreement instead of the asset sale.

Q    So this was signed first.  In December you did the stock purchase agreement, and the transaction closed this January, simultaneous with the sale of the -- for your purchase of the Marshfield property, correct?

A    Correct.

Q    Thank you very much.

Can you turn to, in the white book, Exhibit No. 48.  It purports to be a lawsuit.

A    Okay.  I'm there.

Q    Are you familiar with the lawsuit where Gas Depot sued you, Mubarak Ibrahim and Calumet Fuel, Inc.?

A    Yes.

Q    What was the lawsuit about?

A    We were -- we had a fuel supply contract with Gas Depot, and we --

Q    Could you try to talk a little bit louder?

A    So we had a fuel supply contract with Gas Depot, and I rebranded the gas station with World Fuel Services from Citgo to Mobil.

Q    And did that cause Gas Depot to sue you?

A    Yes.

Q    What was it claiming?  Was it allegedly a breach of the agreement that you previously referred to?

A    Yes.

Q    Did this take place after you had -- the lawsuit and your rebranding and the events that give rise to the lawsuit, did that all take place after you had acquired ownership of the Marshfield Station and the Marshfield property and Marshfield, LLC?

A    Yes.

Q    I see that Mr. Ibrahim was named as a party.

Do you know why?

MR. WEISSBERG:  Objection.  Speculation.

MR. FOSTER:  That's okay.

BY MR. FOSTER:

Q    Turn to the next --

THE COURT:  You abandon the question?

MR. FOSTER:  I withdraw the question,

24

Judge.

BY MR. FOSTER:

Q    Turn to Exhibit 59 -- 49, I'm sorry.  It's an agreed order.

A    I'm on 49.

Q    Before I get to that, to your knowledge, did Mr. Ibrahim get at all involved in the Gas Depot lawsuit?

Did he file an appearance?  Did he hire a lawyer?  Did he have any activity at all in the lawsuit, to the best of your knowledge?

MR. WEISSBERG:  Objection, form. That's, like, five questions.

THE COURT:  That's what?  I'm sorry.

MR. WEISSBERG:  Objection, form.  He just asked five questions, Your Honor.

THE COURT:  I'll overrule the objection.

BY MR. FOSTER:

Q    You can answer.

A    What was the question?

Q    Did Mr. Ibrahim have any involvement with the Gas Depot lawsuit after it was filed?

A    No.

Q    What was the resolution of the Gas Depot

25

lawsuit?

A    We settled.

Q    And did the case get dismissed?

A    Yes.

Q    And is Exhibit No. 49 a copy of the agreed order that was entered dismissing the case?

A    Yes.

Q    And it was dismissed with prejudice?

A    Yes.

Q    Turn to the next exhibit, which is Exhibit No. 50.  Another lawsuit.

Are you there, sir?

A    Yes, I'm there.

Q    And it's a small claim complaint in the case where the plaintiff is Brandy Garner, and the defendants are 11900 Marshfield Station, Inc., and Ibrahim Mubarak, right?

And the case was filed, as you can see from the stamp, September 26th, 2022.

First of all, was that after you had purchased the Marshfield real estate and the Marshfield Station?

A    Yes.

Q    And if you turn to the second page of that complaint, you see in paragraph number five, that's

26

the plaintiff's handwritten recitation of the facts that she is claiming that gives rise to the lawsuit.

Can you take a quick minute to read that for me, please.

(Pause.)

BY MR. FOSTER:

Q    Have you read it, sir?

A    Yes, sir.

Q    So as document -- as that paragraph reads, it sets forth certain circumstances which allegedly took place on September 16th, 2022, correct?

A    Correct.

Q    And these events allegedly took place at Marshfield Station, correct?

A    Yes.

Q    And on the date that the plaintiff claims these allegations took place, you owned Marshfield Station, correct?

A    Yes.

Q    When was the first time you saw this complaint?

A    A couple of days ago.

Q    Where did you see it?

A    In my attorney's office.

Q    Do you know how your attorney got the copy

27

of the complaint?

A    I believe you sent it to them.

Q    Say that again.  I'm sorry.

A    I believe you sent it to them.

Q    Were you ever served with a summons in this complaint?

A    Not that I know of.

Q    Did you ever receive any notice whatsoever that this lawsuit had been filed against Marshfield Station, Inc.?

A    No.

MR. FOSTER:  I have no further questions, Your Honor.

Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Cross-examination?

MR. WEISSBERG:  Thank you.

CROSS-EXAMINATION

BY MR. WEISSBERG:

Q    Mr. Ali, I'd like to go back to Defendant's Exhibit No. 48 in the white book, which is the complaint that was filed on December 6th, 2022, by Gas Depot Oil Company against you individually, Mubarak Ibrahim, and Calumet Fuel, Inc., in the federal court case number 22 CV 06861.

28

Are you there?

A   No.  I'm sorry.

Q   Let me know when you're there.

A   I'M sorry.  What was the exhibit number?

Q   50.

Let me help you.

A   This one?

Q   Five-oh -- no, 49 -- let me get you there.

THE COURT:  What exhibit, Mr. --

MR. WEISSBERG:  48.

BY MR. WEISSBERG:

Q   So you were served with this complaint, correct?

A   Yes.

Q   And you were served shortly after it was filed in December of 2022, correct?

A   I don't remember if it was December, but after it was filed.

Q   Please keep your voice up.

Do you have an answer?

A   You said December of 2022?

Q   Shortly after December 6th, 2022.

A   I don't remember exactly when, but I remember that we did get this complaint, yes.

Q   When you say you did get this complaint,

29

you were served with a summons and a copy of the complaint, correct?

A    Yes.

Q    And your company was also served, Calumet Fuel, Inc., correct?

A    Correct.

Q    Now, correct me if I'm wrong, but this complaint alleges that there was a fuel supply agreement with Gas Depot Oil Company that somehow was violated by Calumet Fuel, Inc., and yourself, correct?

A    Correct.

Q    All right.  And not only there was a change from the gas station from a Citgo to a Mobil, isn't that what happened?

A    Yes.

Q    But that it was done without the consent of Gas Depot Oil Company, correct?

A    Correct.

Q    Now, hadn't Gas Depot Oil Company recorded a copy of some restrictive covenants to stop the property from selling fuel other than through Gas Depot Oil Company?

         I'm talking about the Marshfield property, if you know.

30

A    I'm sorry.  I -- can you repeat the question?

Q    Yeah.  Hadn't Gas Depot Oil Company recorded with the Recorder of Deeds against the Marshfield property documents showing that Gas Depot Oil Company had rights as the fuel supplier?

A    I'm not sure if they did record it or not.

Q    Okay.  But at the time of the purchase of the assets of Station, Inc., and the purchase by your company, that company being Petroleum Investments Property, LLC, of the Marshfield property in January 2022, you knew that there was an existing fuel supply agreement with Gas Depot Oil Company, correct?

A    Yes, that is correct.

Q    Now, when you received this complaint, you saw that it was a multi-count complaint, you know, seeking substantial damages, and, basically, also asking that you rebrand back to a Citgo and enter -- that you comply with the Gas Depot fuel supply agreement, correct?

A    Correct.

Q    Now, you've subsequently hired a lawyer, didn't you?

A    Correct.

31

Q    Mr. Kaberon, Seth N. Kaberon, K-a-b-e-r-o-n?

A    Correct.

Q    Did he represent Mr. Mubarak too?

A    I do not know.

Q    Did Mr. Mubarak have a lawyer in this lawsuit?

A    When we attended the hearing, it was just me and Seth and another attorney named Steve.

Q    Steve?

A    He's an injunction attorney.

Q    A what type of attorney?

A    To get the injunction.  They tried to get injunction on the gas station.

        Mubarak was not at the trial.

Q    No, but these lawyers represented all the defendants, correct?

A    I hired them to represent me and my company.

Q    Okay.  But once you received this lawsuit, I mean, you contacted Mr. Ibrahim to tell him that this lawsuit was pending, didn't you?

A    I do not recall contacting him.

Q    So you don't recall ever letting Mr. Mubarak, or Mr. Ibrahim know that this quite

32

sizeable federal court lawsuit seeking injunctive relief and damages was even existing against him?

A    I had assumed the contract at the closing, the Gas Depot contract.

So I thought it was my responsibility.

Q    So it was your responsibility to indemnify Mr. Ibrahim?

A    No.

Q    And you didn't feel that it was as a matter of caution to let Mr. Ibrahim know that he had been sued by Gas Depot Oil Company?

A    I don't remember.

I'm sorry.  Can you repeat the question?

Q    So you didn't think as a matter of caution you should tell your friend, Mr. Ibrahim, that he was sued for a sizable amount of money in this lawsuit?

A    No, I did not.

MR. FOSTER:  Your Honor, we'll stipulate that in December, Mr. Ibrahim had knowledge of the lawsuit.

We're not saying he didn't know about the lawsuit.  Mr. Ibrahim knew about the -- he got notice of the lawsuit in December of whatever year it was.

MR. WEISSBERG: 2022.

MR. FOSTER: 2022.

THE COURT: Will you accept that stipulation?

MR. WEISSBERG: I certainly do, Your Honor.

THE COURT: All right. Let me just make a note.

All right.

MR. WEISSBERG: Just taking a note, Your Honor, the same one you're taking.

THE COURT: I'm sorry?

MR. WEISSBERG: I'm taking the same note you're taking.

BY MR. WEISSBERG:

Q So on direct examination, Mr. Foster walked you through the transactional documents, and you had a stock purchase agreement whereby your company, Calumet Fuel, Inc., bought all of the shares of Marshfield Station, Inc., correct?

A Correct.

Q Okay. And, basically, within the same overall transaction, there was a purchase of the Marshfield property by your company, Petroleum Investments Property, LLC, correct?

34

A    Correct.

Q    So after that -- and I just want to understand your testimony, Mubarak Ibrahim had no further involvement, either in the Marshfield property or in the operations of the Marshfield gas station, correct?

A    Correct.

Q    And you had no reason to communicate with Ibrahim about the operations of the Marshfield property or the -- or Marshfield Station, correct?

A    There's always communication between a new owner and an old owner after the purchase or sale of a property.

Q    Okay.  Now, there was at the time, and correct me if I'm wrong, an SBA loan that was -- where Marshfield Station was the borrower, correct?

A    Correct.

Q    And why don't you direct your attention to my Exhibit No. 56.

        Are you there?  In the black book.

A    Oh, the black book.

        Okay, 56.  I'm there.

Q    Have you seen these documents before?

A    Yes.

Q    Okay.  When was the first time you saw this

35

document?

A First time I saw this document was sometime in 2022.

Q Was that before or after you purchased the Marshfield property?

A Before.

Q Were you aware that none of the proceeds from this SBA loan, the $350,000 SBA loan, was used by Marshfield Station, Inc.?

A No.

Q Today's the first time you're hearing this?

A Yes.

Q So you didn't know that all of the proceeds from this loan went from Marshfield Station to Marshfield Properties, LLC?

A No.

Q In your examination of the books and records, it didn't reflect that there was money that was owed -- strike that.

What's the status of this SBA loan? Is it paid off?

A No.

Q Who's making the payments?

A Marshfield Station.

Q Is Mr. Ibrahim -- does he owe Marshfield

36

Station any money by virtue of this SBA loan?

Let me say it differently.

Is Marshfield Station asserting any claims against Mr. Ibrahim by virtue of this loan?

A    No.

Q    So after the sales of the Marshfield property -- and correct me if I'm wrong -- after the sales of the Marshfield property and the purchase of the stock, there was really no business relationship between Marshfield -- 11900 Marshfield LLC and 1100 (sic) Marshfield Station, Inc., correct?

A    Correct.

Q    All right.  And there was no business relationship between Mr. Ibrahim and your company, Petroleum Investments Property, LLC, either, right?

A    Correct.

Q    And there was no relationship between Mr. Ibrahim and your company, Calumet Fuel, Inc., correct?

A    Correct.

Q    Direct your attention to Exhibit No. forty- -- my 42, please.

Does Marshfield Station's account number end in 6366 at Fifth Third?

THE COURT:  I'm sorry, what number did

37

you say?

MR. WEISSBERG:  Exhibit No. 42.

BY MR. WEISSBERG:

Q    Well, first of all, are you at Exhibit No. 42.

A    Yes, I am.

Q    Why don't you go to the last bank statement, all the way at the end of that exhibit. That's the July bank statement.

First of all, this exhibit happens to be the bank statement from Fifth Third Bank for 11900 Marshfield, LLC.

I'm sure you've never seen it before, right?

A    Correct.

Q    And it shows a transfer on July 6th in the amount of 1600 from the account ending 6366.

That's Marshfield Station, Inc.s account, correct?

THE COURT:  I'm sorry.  July 6th?

MR. WEISSBERG:  Yes.  It's highlighted, Your Honor.

THE COURT:  Okay.  Go ahead.

BY MR. WEISSBERG:

Q    That's Marshfield Station's account,

38

correct?

A    Correct.

Q    And if you go back -- you controlled that account, right, after the sale in January?

A    Yes.

Q    And you're making a payment of $1600 to Marshfield, LLC, correct, from Station, Inc.?

A    Yes, that's what the statement says.

Q    And if you go to the statement just prior to that, which is statement dated --

THE COURT:  I'm sorry, Mr. Weissberg. The July 6th transfer --

MR. WEISSBERG:  So that's Bates stamp 0358 at the bottom, Your Honor.

The witness testified that the account ending 6366 is the bank account of Marshfield Station, Inc.

THE COURT:  All right.  Go ahead.

MR. WEISSBERG:  And that there was a transfer from Marshfield Station, Inc., to Marshfield, LLC, which at the time was owned by Mr. Mubarak.

THE COURT:  All right.

BY MR. WEISSBERG:

Q    So let's go to the Bates stamp 0356 and

39

0357, which is the bank statements for January of 2022.

Do you see those?

A    Yes.

Q    Now, you testified that -- and I'll find the closing statement.  I have it also --

MR. WEISSBERG:  Chet, which is your closing statement so I don't have to go back -- I got it.  Number 35.

MR. FOSTER:  35, yeah.

MR. WEISSBERG:  I even had it marked.

BY MR. WEISSBERG:

Q    So in the white book, this closing -- okay.  I'm going to withdraw that question.

MR. WEISSBERG:  Excuse me, Your Honor.

BY MR. WEISSBERG:

Q    Direct your attention, please, to Plaintiff's Exhibit 101.

THE COURT:  Is that in book two or --

MR. WEISSBERG:  That's Plaintiff's Exhibit.  That's in the black book.

BY MR. WEISSBERG:

Q    Tell me when you're there, Mr. Ali.

A    Yes, I'm there.

Q    Direct your attention to Bates stamp --

40

well, first of all, do you recognize these texts on page 0641?

A    Yes.

Q    Okay.  And those were texts that you actually sent, correct?

A    Yes.

Q    And correct me if I'm wrong.

This is a text that was in April of 2024, correct?

A    Yes.

Q    And, specifically, on April 9th, 2024, you were communicating with Badr Ali?

A    Correct.

Q    And you were telling Badr Ali to have Mr. Mubarak take care of the slot room at the gas station, correct?

A    No.

Q    It says, "Nasr.  The gas station operator needs to take care of the slot room."

"Nasr.  This was the deal I had with Mubarak in the past."

"I do my best, and I did in the security ass --"

I don't know what that means.

"-- since I came."

41

"Nasr. This is the deal you had with Mubarak."

What was that conversation about?

A     This conversation was about the slot room.

I was upset that there were people in there smoking. So I told Badr that -- and Badr's the manager of the gas station -- that he has -- the gas station operator needs to take care of the slot room.

And I told him this was the deal that I had with Mubarak in the past. When I was the gas station operator, I had to take care of the slot room as well.

And he also, when he was the owner of the gas station, he had to take care of the slot room while he was operating the gas station.

Q     So there was -- if you turn to the next page, there's an exchange in reference to Petroleum Investment Properties, LLC.

And those are your texts, correct?

A     Correct.

Q     And you stated that there was a -- there was money that came in in February of 2024, correct?

A     Sure.

Q     And, specifically, there was $29,000?

A     Correct.

42

Q    What was that money?

A    That was profits generated from the gas station.

Q    Wasn't that from the gaming?

A    No.

Q    Okay.  And why are you saying no need to give it to Ibrahim?

A    Ibrahim is a manager I have at the car wash.  His name is Ibrahim Syed.  That's his first name.

MR. WEISSBERG:  I might be done, Your Honor.  Let me confirm with Mr. Spyropoulos.

(Pause.)

BY MR. WEISSBERG:

Q    Does Badr Ali have an interest in the gaming room?

A    Badr Ali, no, he does not.

Q    Does Badr Ali have an involvement in the Marshfield Gas Station?

A    Yes.

Q    What's his involvement?

A    He's the manager.

Q    Does he have any ownership interest?

A    Of the?

Q    Of either the gas station, or the real

43

property, or the entities that own the gas station or the real property?

A    No.

MR. WEISSBERG:  No further questions, Your Honor.

THE COURT:  Any other examination.

MR. FOSTER:  One quick question, Judge.

REDIRECT EXAMINATION

BY MR. FOSTER:

Q    When Calumet Fuels purchased Marshfield Station, Inc., it didn't purchase Marshfield Station, Inc., from Mr. Ibrahim, did it, Mubarak Ibrahim?

It purchased it from Mr. Badr Ali and Sawsan Homsi, correct?

A    Correct.

MR. FOSTER:  No further questions.

MR. WEISSBERG:  Just one quick follow-up, Your Honor, that I didn't ask, if I might.

RECROSS-EXAMINATION

BY MR. WEISSBERG:

Q    As it relates to the gaming license, the gaming license is owned by who?

A    Marshfield Station, Inc.

Q    Was there any action by you after the

44

purchase of the stock of Marshfield Station, Inc., to communicate in writing to the Illinois Gaming Commission on the change of ownership of Marshfield Station, Inc.?

A    Yes.  So when I took over, I had to go get fingerprinted, and it was a process.  There was a Gaming Board inspector who came out as well.  I met with him, if that answers your question.

Q    So when did Mr. Mubarak get removed from the licensing as -- of the gaming license?

A    I do not know when he got removed, but I know that I had to get approved before the purchase went through so that I could operate the gaming license.

MR. WEISSBERG:  Thank you.

MR. FOSTER:  No further questions, Your Honor.

THE COURT:  Any other questions of this witness?

MR. WEISSBERG:  No, ma'am.

THE COURT:  Thank you for testifying.

THE WITNESS:  Thank you, Your Honor.

MR. FOSTER:  Thank you, sir.

(Witness excused.)

MR. WEISSBERG:  Your Honor, can we

# Please wait...

If this message is not eventually replaced by the proper contents of the document, your PDF viewer may not be able to display this type of document.

You can upgrade to the latest version of Adobe Reader for Windows®, Mac, or Linux® by visiting  http://www.adobe.com/go/reader_download.

For more assistance with Adobe Reader visit  http://www.adobe.com/go/acrreader.

Windows is either a registered trademark or a trademark of Microsoft Corporation in the United States and/or other countries. Mac is a trademark of Apple Inc., registered in the United States and other countries. Linux is the registered trademark of Linus Torvalds in the U.S. and other countries.

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>          Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>          Plaintiff,<br><br>     v.<br><br>SAWSAN HOMSI, *et al.*,<br><br>          Defendants. | Adv. No. 25-168<br><br>Hon. Jacqueline P. Cox<br><br>Hearing date:  March 10, 2026<br>Hearing time:  1:30 P.M.<br>Place:  Courtroom 680 or Zoom |

**NOTICE OF CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF AN**
**ORDER (A) AUTHORIZING EXPEDITED DISCOVERY IN CONNECTION**
**WITH HIS MOTION FOR TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTION AND (B) EXTENDING THE**
**TIME TO REPLEAD COUNT 1 OF THE COMPLAINT AGAINST BADR ALI**

PLEASE TAKE NOTICE that on **March 10, 2026, at 1:30 P.M.**, I will appear before the Honorable Jacqueline Cox, or any judge sitting in her place, **either** in courtroom 680 of the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, **or** electronically as described below, and present the **Chapter 7 Trustee's Motion for Entry of an Order (A) Authorizing Expedited Discovery in Connection with His Motion for Temporary Restraining Order and Preliminary Injunction and (B) Extending the Time to Replead Count 1 of the Complaint Against Badr Ali**, a copy of which is attached.

**Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

1

**To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

**To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1-646-828-7666. Then enter the meeting ID and passcode.

**Meeting ID and passcode.** The meeting ID for this hearing is 161 273 2896, and the passcode is 778135. The meeting ID and passcode can also be found on the judge's page on the court's web site.

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

Dated: February 18, 2026

GUS A. PALOIAN, in his capacity as the Chapter 7 Trustee of the Debtor's Estate

By: _____/s/ *Steven C. Moeller*_____
Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

2

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

3

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on February 18, 2026, he caused a true and correct copy of each of the **Notice of Chapter 7 Trustee's Motion for Entry of an Order (A) Authorizing Expedited Discovery in Connection with the Trustee's Motion for Temporary Restraining Order and Preliminary Injunction and (B) Extending the Time to Replead Count 1 of the Complaint Against Badr Ali** and **Chapter 7 Trustee's Motion for Entry of an Order (A) Authorizing Expedited Discovery in Connection with the Trustee's Motion for Temporary Restraining Order and Preliminary Injunction and (B) Extending the Time to Replead Count 1 of the Complaint Against Badr Ali**, to be served via the Court's CM/ECF electronic noticing system upon all registered participants in this proceeding.

                                   */s/ Steven C. Moeller*
                                   Steven C. Moeller
                                   CARPENTER LIPPS LLP
                                   180 North LaSalle Street, Suite 2880
                                   Chicago, Illinois 60601
                                   312-777-486 (tel)
                                   312-777-4839 (fax)
                                   moeller@carpenterlipps.com

                                   *Special counsel to Chapter 7 Trustee Gus A. Paloian*

4

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MUBARAK H. IBRAHIM, | BK No. 23-07031 |
| Debtor, | Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM, | Adv. No. 25-168 |
| Plaintiff, | Hon. Jacqueline P. Cox |
| v. | Hearing date:  March 10, 2026<br>Hearing time:  1:30 P.M.<br>Place:  Courtroom 680 or Zoom |
| SAWSAN HOMSI, *et al.*, | |
| Defendants. | |

**CHAPTER 7 TRUSTEE'S MOTION FOR ENTRY OF AN ORDER
(A) AUTHORIZING EXPEDITED DISCOVERY IN CONNECTION
WITH HIS MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND (B) EXTENDING THE
TIME TO REPLEAD COUNT 1 OF THE COMPLAINT AGAINST BADR ALI**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), respectfully seeks, pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rules 7026, 7030, 7033, 7034, and 7036, entry of an order: (a) authorizing expedited discovery through May 4, 2026 in connection with the *Chapter 7 Trustee's Motion for a Temporary Restraining Order and a Preliminary Injunction* (the "P.I. Motion") prohibiting certain conduct by Defendants which is being filed contemporaneously with this Motion; and (b) extending the time for the Trustee to replead Count I of the Complaint against Badr Ali until May 4, 2026. A copy of a proposed order granting this Motion is attached. In support of this Motion, the Trustee respectfully represents as follows.

1

## I.      Necessity for Expedited Discovery

Bankruptcy Rule 7065 makes Federal Rule of Civil Procedure 65 applicable in adversary proceedings. Civil Rule 65(a)(1) in turn provides that a court "may issue a preliminary injunction only on notice to the adverse party." The Trustee anticipates that one or more of the parties whose conduct is sought to be enjoined by the P.I. Motion will oppose the P.I. Motion and request a hearing on their opposition.to the P.I. Motion.

It is well-established law in this Circuit that in determining whether to grant preliminary injunctive relief, a court "must determine whether the party seeking the preliminary injunction has demonstrated that: (1) it has a reasonable likelihood of success on the merits of its claim; (2) no adequate remedy at law exists; (3) it will suffer irreparable harm if preliminary injunctive relief is denied; (4) the irreparable harm it will suffer without preliminary injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the preliminary injunction is granted; and (5) the preliminary injunction will not harm the public interest." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). The question of whether these elements are satisfied at a contested hearing will almost surely involve the presentation of factual evidence.

To provide the Court with an appropriate evidentiary record for ruling on these factors at the hearing on the preliminary injunction, the Trustee requests that the Court enter an order providing for the following expedited discovery:

- That the Trustee be permitted to serve interrogatories substantially similar to those attached hereto as Exhibit A. (The Trustee may revise the interrogatories before they are issued.)

- That the Trustee be permitted to serve requests for production of documents substantially similar to those attached hereto as Exhibit B. (The Trustee may revise the requests before they are issued.)

- That the Court shorten the deadline for parties to provide responsive documents to the document requests and answer interrogatories to March 26, 2026.

- That all discovery in connection with the P.I. Motion be completed no later than May 4, 2026.

Permitting expedited discovery will allow the Court to consider the merits of the P.I. Motion with the Trustee and Defendants having an adequate opportunity to present relevant evidence regarding the various factors which must be considered under *Platinum Home*.

The Court should allow expedited discovery. Civil Rule 26(d), which is applicable in this adversary proceeding pursuant to Bankruptcy Rule 7026, allows the Court to authorize discovery *prior* to a Rule 26(f) conference. The Advisory Notes when Rule 26(d) was amended in 1993 state that "Discovery can begin earlier if authorized under Rule 30(a)(2)(C) (deposition of person about to leave the country) or by local rule, order, or stipulation. This will be appropriate in some cases, such as those involving requests for a preliminary injunction or motions challenging personal jurisdiction." Fed. R. Civ. P.26(d) advisory committee's notes to 1993 amendment. The Civil Rules also plainly authorize the Court to shorten the time periods for responding to interrogatories and document requests. Civil Rule 33, which is applicable in this adversary proceeding pursuant to Bankruptcy Rule 7033, expressly provides in subsection (B)(2) that a Court may order a shorter or longer time to respond than the default period of 30 days. Similarly, Civil Rule 34, which is made applicable to this adversary proceeding by Bankruptcy Rule 7034, provides in subsection (b)(2)(A) that the Court may set a shorter or longer time to respond to requests for production.

In the 7th Circuit, courts "evaluate a motion for expedited discovery by considering the entirety of the record and the reasonableness of the request in light of the surrounding circumstances." *Campaignzero, Inc. v. Staywoke, Inc.*, No. 20-cv-06765, 2020 WL 7123066, at *1 (N.D. Ill. Dec. 4, 2020) (citing *Ibarra v. City of Chicago*, 816 F. Supp. 2d 541, 554 (N.D. Ill 2011)). "In deciding a motion for expedited discovery, courts consider: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery sought; (3) the purpose of requesting expedited discovery; (4) the burden on the opposing party to comply with the requests; and (5) how far in advance of the typical discovery process the request was made." *See Campaignzero,* 2020 WL 7123066, at *1. Not surprisingly, Courts both in this District and elsewhere frequently approve expedited discovery in connection with preliminary injunction motions. *See Iglesiz v. Federal Bureau of Prisons,* No. 19-CV-415, 2021 WL 4820429, at *7 (S.D. Ill. Oct. 15, 2021); *Campaignzero,* 2020 WL 7123066, at *2*; see, also, Southerncare, Inc. v. Bristol Hospice-Indiana, LLC*, Case No. 4:25-cv-000150, 2025 WL 3725592, at *7 (S.D. In. Aug. 20, 2025); *Zimmer US, Inc. v. Simmons*, No. 3:19-CV-907-RLM-MGG, 2019 WL 13269548, at *3 (N.D. Ind. Dec. 19, 2019); *3M Company v. HSBC Bank USA, N.A.*, 16 Civ. 5984 (PGG), 2016 WL 8813992, at *1 (S.D.N.Y. October 21, 2016); *Centrifugal Acquisition Corp., Inc. v. Moon*, No. 09-C-327, 2009 WL 1249294, at *1-2 (E.D. Wisc. May 6, 2009).

Each of the five factors weighs in favor of expedited discovery being authorized in this case. The P.I. Motion is pending, which satisfies the first factor. As for the second factor, the document requests and interrogatories all clearly relate to conduct which is being sought to be enjoined and the ultimate merits of the Complaint, which are factors this Court considers when ruling on the P.I. Motion. The discovery is being sought on an expedited basis to allow for a full presentation of the relevant facts on the injunction, in satisfaction of the third factor. While it is

true that the discovery will impose some burdens on Defendants, this merely reflects a modest acceleration of discovery that would soon occur anyway in this adversary proceeding. Thus, the last two factors are satisfied. Because the factors weigh in favor of approving expedited discovery, the Court should authorize expedited discovery here.

II.     **Extension of Time to Replead Count I of the Complaint Against Badr Ali**

At the January 27, 2026-hearing in this adversary proceeding, the Court verbally ruled that all motions to dismiss filed by defendants in this adversary proceeding were denied other than Badr Ali's motion with respect to Count I of the Complaint. The Court also indicated that the Trustee would be given until February 18, 2026 to replead Count I of the Complaint against Badr Ali.

The Trustee respectfully requests that the deadline to replead Count 1 of the Complaint against Badr Ali be extended until May 4, 2026, so that it is coterminous with the deadline for expedited discovery with regards to the preliminary injunction motion requested here. The discovery in connection with the preliminary injunction will by necessity cover topics related to Count I of the Complaint's allegations against Badr Ali. Permitting that discovery to occur first will allow the Trustee to determine whether to replead Count I of the Complaint against Badr Ali in an orderly basis and perhaps avoid having to deal with a likely additional round of motion to dismiss briefing if the Trustee is forced to amend by February 18, 2026 like the Court directed during the February 27, 2026.

III.     **Conclusion**

Accordingly, the Trustee requests that the Court enter an order in substantially the form attached hereto: (a) authorizing expedited discovery in connection with the P.I. Motion and setting a deadline of May 4, 2026 for completion of this discovery; and (b) extending the time for the Trustee to replead Count I of the Complaint against Badr Ali.

5

Dated: February 18, 2026

GUS A. PALOIAN, in his capacity as the
Chapter 7 Trustee of the Debtor's Estate

By:      /s/ *Steven C. Moeller*
                Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A.
Paloian*

6

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>     Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>     Plaintiff,<br><br>  v.<br><br>SAWSAN HOMSI, *et al.*,<br><br>     Defendants. | Adv. No. 25-168<br><br>Hon. Jacqueline P. Cox |

**TRUSTEE'S FIRST SET OF INTERROGATORIES TO HOMSI**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Sawsan Homsi pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Homsi must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1. The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2. The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3. The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4. The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5. The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6. The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7. The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8. The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9. The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10. The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11. The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12. The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13. The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14. The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15. The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16. The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17. The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18. The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19. The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29. The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30. The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31. The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32. The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

    a. With respect to a natural person:

        i. Such person's name and present or last known address; and

        ii. The name and address of his or her present or last known employer and title or position with such employer;

    b. With respect to any person other than a natural person:

        i. Its full name and all of the names by which it is known or referred to;

       ii.      Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

      iii.     The state under whose law it is organized; and

      iv.     The present or last known address of its principal place of business or office.

c.     With respect to a meeting or conference:

      i.       The date and location thereof;

      ii.      The identity of all persons present or who participated;

      iii.     The identity of any documents which record, refer, or relate to such meeting; and

      iv.     The subject matter or matters discussed.

d.     With respect to a statement:

      i.       The date, location and medium of the statement;

      ii.      The identity of the author or declarant of such statement;

      iii.     The identity of the recipient(s) of such statement;

      iv.     The identity of all other people with knowledge of the statement; and

      v.      The identity of any document which records, refers, or relates to such statement.

e.     With respect to a communication:

      i.       The date, location and medium of communication;

      ii.      The identity of the author or declarant of such communication;

      iii.     The identity of the recipient(s) of such communication;

iv.    The identity of all other people with knowledge of the communication; and

v.    The identity of any document which records, refers, or relates to such communication.

e.    With respect to any other matter, subject, action, conduct, or fact:

i.    The date and/or location of such matter, subject, action, conduct, or fact;

ii.    A detailed description of such matter, subject, action, conduct, or fact;

iii.    The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.    The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

<div align="center"><strong><u>Instructions</u></strong></div>

1.    **<u>Word Tenses.</u>** Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa. In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.    **<u>Document Productions.</u>** If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities. If any such document was, but is no

<div align="center">8</div>

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

    a.    specify the nature of the material deleted or redacted;

    b.    specify the reason for the deletion or redaction; and

    c.    identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

        a.       The name of the sender(s) of the document;

        b.       The name of the author(s) of the document;

        c.       The name of the person(s) to whom copies were sent and those who actually received them;

        d.       The job title of every person named in (a), (b), and (c) above;

        e.       The date of the document;

        f.       The date on which the document was received by each of the persons identified in (c) above;

        g.       A brief description of the nature of the subject matter of the document; and

        h.       The statute, rule, or decision that is claimed to give rise to the privilege.

8.     **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

## INTERROGATORIES

**INTERROGATORY NO. 1.**     Identify all persons with knowledge of the facts set forth in the **Complaint**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

**INTERROGATORY NO. 2.**     Describe in complete detail your personal experience in the gas station business.

**INTERROGATORY NO. 3.** Describe in complete factual detail the alleged transaction in which you acquired 100% of the shares of **OpCo**.

**INTERROGATORY NO. 4.** Was the above-described transaction oral or was it reduced to writing? Provide a complete description of the relevant facts.

**INTERROGATORY NO. 5.** Identify in complete factual detail all consideration you provided for shares of **OpCo**.

**INTERROGATORY NO. 6.** Identify all meetings and other corporate acts of **OpCo** with which you were involved.

**INTERROGATORY NO. 7.** State in complete detail all work you performed for **OpCo**.

**INTERROGATORY NO. 8.** What was the purpose of the **Debtor's** transfer of shares of **OpCo** to you. State the complete factual basis for your answer.

**INTERROGATORY NO. 9.** Why did the **Debtor's** name continue to appear on paperwork with the Illinois Gaming Board in connection with the **Gaming License** after you acquired a controlling stake in **OpCo**? Provide the complete factual basis for your answer.

**INTERROGATORY NO. 10.** Why did you agree to the sale of 100% of **OpCo's** shares to **Calumet Fuel** for the amount paid?

11

**INTERROGATORY NO. 11.** State the complete factual circumstances of **OpCo's** agreement to the sale of 100% of **OpCo's** shares to **Calumet Fuel**. Specifically describe your involvement in the events.

**INTERROGATORY NO. 12.** Do you contend that the amount paid by **Calumet Fuel** for **OpCo's** shares was reasonably equivalent value for **OpCo**? State the complete factual basis of your answer.

**INTERROGATORY NO. 13.** Identify all employees of **OpCo** or other persons working at the gas station at the **Marshfield Property** during the time you owned shares of **OpCo**. Provide each person's name and contact information, and a complete description of the person's duties.

**INTERROGATORY NO. 14.** Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

Dated: February 3, 2026

GUS A. PALOIAN, in his capacity as the Chapter 7 Trustee of the Debtor's Estate

By: _____ /s/ *[DRAFT]* _____
Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

12

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A.
Paloian*

13

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>               Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>               Plaintiff,<br><br>     v.<br><br>SAWSAN HOMSI, *et al.*,<br><br>               Defendants. | Adv. No. 25-168<br><br>Hon. Jacqueline P. Cox |

## TRUSTEE'S FIRST SET OF INTERROGATORIES TO BADR ALI

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Badr Ali pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Badr Ali must respond in writing within 30 days after being served.

## DEFINITIONS AND INSTRUCTIONS

1. The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2.      The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3.      The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4.      The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5.      The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6.      The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7.      The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8.      The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9.      The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10.     The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11. The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12. The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13. The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14. The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15. The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16. The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17. The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18. The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19. The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20.     The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21.     The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22.     The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23.     The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24.     .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25.     The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26.     The terms "all" and "each" shall be construed as all and each.

27.     The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30.     The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31.     The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32.     The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

      a.     With respect to a natural person:

            i.     Such person's name and present or last known address; and

            ii.     The name and address of his or her present or last known employer and title or position with such employer;

      b.     With respect to any person other than a natural person:

            i.     Its full name and all of the names by which it is known or referred to;

6

      ii.      Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

      iii.      The state under whose law it is organized; and

      iv.      The present or last known address of its principal place of business or office.

c.      With respect to a meeting or conference:

      i.      The date and location thereof;

      ii.      The identity of all persons present or who participated;

      iii.      The identity of any documents which record, refer, or relate to such meeting; and

      iv.      The subject matter or matters discussed.

d.      With respect to a statement:

      i.      The date, location and medium of the statement;

      ii.      The identity of the author or declarant of such statement;

      iii.      The identity of the recipient(s) of such statement;

      iv.      The identity of all other people with knowledge of the statement; and

      v.      The identity of any document which records, refers, or relates to such statement.

e.      With respect to a communication:

      i.      The date, location and medium of communication;

      ii.      The identity of the author or declarant of such communication;

      iii.      The identity of the recipient(s) of such communication;

iv.     The identity of all other people with knowledge of the communication; and

v.      The identity of any document which records, refers, or relates to such communication.

e.      With respect to any other matter, subject, action, conduct, or fact:

i.      The date and/or location of such matter, subject, action, conduct, or fact;

ii.     A detailed description of such matter, subject, action, conduct, or fact;

iii.    The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.     The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

## Instructions

1.      **Word Tenses.**  Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa.  In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.      **Document Productions.**  If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities.  If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

     a.     specify the nature of the material deleted or redacted;

     b.     specify the reason for the deletion or redaction; and

     c.     identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

9

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

    a.    The name of the sender(s) of the document;

    b.    The name of the author(s) of the document;

    c.    The name of the person(s) to whom copies were sent and those who actually received them;

    d.    The job title of every person named in (a), (b), and (c) above;

    e.    The date of the document;

    f.    The date on which the document was received by each of the persons identified in (c) above;

    g.    A brief description of the nature of the subject matter of the document; and

    h.    The statute, rule, or decision that is claimed to give rise to the privilege.

8.    **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

## INTERROGATORIES

**INTERROGATORY NO. 1.**    Identify all persons with knowledge of the facts set forth in the **Complaint**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

**INTERROGATORY NO. 2.**    Describe in detail your relationship to the **Debtor**, stating the time you first met the **Debtor**, the frequency with which you have communicated with

the **Debtor**, and any business dealings you have had with the **Debtor** and/or any of his related entities.

**INTERROGATORY NO. 3.**   Describe in complete detail your personal experience in the gas station business.

**INTERROGATORY NO. 4.**   State in complete factual detail the factual circumstances in which you expressed interest in acquiring **OpCo**. If another party contacted you, provide the complete factual detail of any such communications, identifying the date(s), time(s), and person(s) involved.

**INTERROGATORY NO. 5.**   Identify any portion of the testimony provided by Iftekhar Syed in the transcript attached as **Exhibit 1** that you disagree with. State the complete factual basis for your disagreement.

**INTERROGATORY NO. 6.**   Describe in complete factual detail the alleged transaction in which you acquired shares of **OpCo**.

**INTERROGATORY NO. 7.**   Was the above-described transaction oral or was it reduced to writing? Provide a complete description of the relevant facts.

**INTERROGATORY NO. 8.**   Identify in complete factual detail all consideration you provided for shares of **OpCo**.

11

**INTERROGATORY NO. 9.** Identify all meetings and other corporate acts of **OpCo** with which you were involved.

**INTERROGATORY NO. 10.** State in complete detail all work you performed for **OpCo**.

**INTERROGATORY NO. 11.** What was the purpose of the **Homsi's** transfer of shares of **OpCo** to you? State the complete factual basis for your answer.

**INTERROGATORY NO. 12.** Why did the **Debtor's** name continue to appear on paperwork with the Illinois Gaming Board in connection with the **Gaming License** after you acquired a controlling stake in **OpCo**? Provide the complete factual basis for your answer.

**INTERROGATORY NO. 13.** Describe the complete factual circumstances surrounding the May 2020 lease between **OpCo** and **PropCo** that was never performed. Your answer should state, among other things, what was the lease's purpose and why it was not performed.

**INTERROGATORY NO. 14.** State the complete factual circumstances of **OpCo's** agreement to the sale of 100% of **OpCo's** shares to **Calumet Fuel**. Specifically describe your involvement in the events.

12

**INTERROGATORY NO. 15.** Do you contend that the amount paid by **Calumet Fuel** for **OpCo's** shares was reasonably equivalent value for **OpCo**? State the complete factual basis of your answer.

**INTERROGATORY NO. 16.** Do you contend that the amount paid by **Calumet Fuel** for **OpCo's** shares was reasonably equivalent value for **OpCo**? State the complete factual basis of your answer.

**INTERROGATORY NO. 17.** Identify all employees of **OpCo** or other persons working at the gas station at the **Marshfield Property** during the time you owned shares of **OpCo**. Provide each person's name and contact information, and a complete description of the person's duties.

**INTERROGATORY NO. 18.** Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

Dated: February 3, 2026

GUS A. PALOIAN, in his capacity as the Chapter 7 Trustee of the Debtor's Estate

By: _____ /s/ *[DRAFT]* _____
Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A.*
*Paloian*

14

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MUBARAK H. IBRAHIM, | BK No. 23-07031 |
| Debtor, | Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM, | Adv. No. 25-168 |
| | Hon. Jacqueline P. Cox |
| Plaintiff, | |
| v. | |
| SAWSAN HOMSI, *et al.*, | |
| Defendants. | |

### TRUSTEE'S FIRST SET OF INTERROGATORIES TO NASR ALI

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Nasr Ali pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Nasr Ali must respond in writing within 30 days after being served.

### DEFINITIONS AND INSTRUCTIONS

1.      The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2.      The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3.      The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4.      The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5.      The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6.      The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7.      The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8.      The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9.      The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10.     The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11.     The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12.     The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13.     The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14.     The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15.     The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16.     The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17.     The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18.     The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19.     The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

4

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29. The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30. The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31. The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32. The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

    a.    With respect to a natural person:

        i.    Such person's name and present or last known address; and

        ii.    The name and address of his or her present or last known employer and title or position with such employer;

    b.    With respect to any person other than a natural person:

        i.    Its full name and all of the names by which it is known or referred to;

6

    ii.      Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

    iii.      The state under whose law it is organized; and

    iv.      The present or last known address of its principal place of business or office.

c.      With respect to a meeting or conference:

    i.      The date and location thereof;

    ii.      The identity of all persons present or who participated;

    iii.      The identity of any documents which record, refer, or relate to such meeting; and

    iv.      The subject matter or matters discussed.

d.      With respect to a statement:

    i.      The date, location and medium of the statement;

    ii.      The identity of the author or declarant of such statement;

    iii.      The identity of the recipient(s) of such statement;

    iv.      The identity of all other people with knowledge of the statement; and

    v.      The identity of any document which records, refers, or relates to such statement.

e.      With respect to a communication:

    i.      The date, location and medium of communication;

    ii.      The identity of the author or declarant of such communication;

    iii.      The identity of the recipient(s) of such communication;

iv.    The identity of all other people with knowledge of the communication; and

v.    The identity of any document which records, refers, or relates to such communication.

e.    With respect to any other matter, subject, action, conduct, or fact:

i.    The date and/or location of such matter, subject, action, conduct, or fact;

ii.    A detailed description of such matter, subject, action, conduct, or fact;

iii.    The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.    The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

## Instructions

1.    **Word Tenses.**  Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa.  In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.    **Document Productions.**  If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities.  If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

  a. specify the nature of the material deleted or redacted;

  b. specify the reason for the deletion or redaction; and

  c. identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

9

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

      a.      The name of the sender(s) of the document;

      b.      The name of the author(s) of the document;

      c.      The name of the person(s) to whom copies were sent and those who actually received them;

      d.      The job title of every person named in (a), (b), and (c) above;

      e.      The date of the document;

      f.      The date on which the document was received by each of the persons identified in (c) above;

      g.      A brief description of the nature of the subject matter of the document; and

      h.      The statute, rule, or decision that is claimed to give rise to the privilege.

8.      **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

## INTERROGATORIES

**INTERROGATORY NO. 1.**      Identify all persons with knowledge of the facts set forth in the **Complaint**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

**INTERROGATORY NO. 2.**      Describe in detail your relationship to the **Debtor**, stating the time you first met the **Debtor**, the frequency with which you have communicated with

10

the **Debtor**, and any business dealings you have had with the **Debtor** and/or any of his related entities.

**INTERROGATORY NO. 3.** Describe in complete detail your personal experience in the gas station business.

**INTERROGATORY NO. 4.** State in complete factual detail the factual circumstances in which you expressed interest in acquiring the **Marshfield Property**. If another party contacted you, provide the complete factual detail of any such communications, identifying the date(s), time(s), and person(s) involved.

**INTERROGATORY NO. 5.** Identify all meetings and other corporate acts of **OpCo** with which you were involved.

**INTERROGATORY NO. 6.** State in complete detail all work you performed for **OpCo**.

**INTERROGATORY NO. 7.** Why did you own 35% of **PropCo** at its inception? State the complete factual basis for your answer.

**INTERROGATORY NO. 8.** State the complete factual circumstances surrounding your conveying 30% (or any other amount) of the membership interest of **PropCo** to the Debtor in 2019. Your answer should among other things identify the date of the transaction, its purpose, and how it was documented.

11

**INTERROGATORY NO. 9.**      Identify all employees of **OpCo** or other persons working at the gas station at the **Marshfield Property** during the time **Calumet Fuel** owned shares of **OpCo**. Provide each person's name and contact information, and a complete description of the person's duties.

**INTERROGATORY NO. 10.**      Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

**INTERROGATORY NO. 11.**      State with specificity what **PIP** and/or **Nasr Ali** did with any and all funds received as a result of the sale of the **Marshfield Property** to **Calumet Park Mobil** and any and all funds received as a result of the **Purchase Money Mortgage**.

**INTERROGATORY NO. 12.**      Identify all employees of Bubbles Car Wash.

Dated: February 3, 2026                          GUS A. PALOIAN, in his capacity as the
                                                 Chapter 7 Trustee of the Debtor's Estate

                                                 By: _____/s/ *[DRAFT]*_____
                                                          Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300

12

Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A.*
*Paloian*

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MUBARAK H. IBRAHIM, | BK No. 23-07031 |
| Debtor, | Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM, | Adv. No. 25-168 |
| | Hon. Jacqueline P. Cox |
| Plaintiff, | |
| v. | |
| SAWSAN HOMSI, *et al.*, | |
| Defendants. | |

**TRUSTEE'S FIRST SET OF INTERROGATORIES TO CALUMET FUEL**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Calumet Fuel, Inc. pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Calumet Fuel, Inc. must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1. The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2. The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3. The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4. The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5. The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6. The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7. The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8. The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9. The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10. The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11.     The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12.     The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13.     The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14.     The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15.     The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16.     The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17.     The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18.     The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19.     The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30.     The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31.     The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32.     The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

      a.    With respect to a natural person:

            i.    Such person's name and present or last known address; and

            ii.    The name and address of his or her present or last known employer and title or position with such employer;

      b.    With respect to any person other than a natural person:

            i.    Its full name and all of the names by which it is known or referred to;

6

    ii.    Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

    iii.    The state under whose law it is organized; and

    iv.    The present or last known address of its principal place of business or office.

c.    With respect to a meeting or conference:

    i.    The date and location thereof;

    ii.    The identity of all persons present or who participated;

    iii.    The identity of any documents which record, refer, or relate to such meeting; and

    iv.    The subject matter or matters discussed.

d.    With respect to a statement:

    i.    The date, location and medium of the statement;

    ii.    The identity of the author or declarant of such statement;

    iii.    The identity of the recipient(s) of such statement;

    iv.    The identity of all other people with knowledge of the statement; and

    v.    The identity of any document which records, refers, or relates to such statement.

e.    With respect to a communication:

    i.    The date, location and medium of communication;

    ii.    The identity of the author or declarant of such communication;

    iii.    The identity of the recipient(s) of such communication;

iv.   The identity of all other people with knowledge of the communication; and

v.   The identity of any document which records, refers, or relates to such communication.

e.   With respect to any other matter, subject, action, conduct, or fact:

i.   The date and/or location of such matter, subject, action, conduct, or fact;

ii.   A detailed description of such matter, subject, action, conduct, or fact;

iii.   The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.   The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

### Instructions

1.   **Word Tenses.**  Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa.  In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.   **Document Productions.**  If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities.  If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3.     **Deletions from Documents.**  Where anything has been deleted or redacted from a document identified or produced:

a.     specify the nature of the material deleted or redacted;

b.     specify the reason for the deletion or redaction; and

c.     identify the person responsible for the deletion or redaction.

4.     **Organization of Production.**  Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5.     **Identification of Production.**  Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6.     **Time Period.**  Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7.     **Privilege.**  With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

9

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

    a.    The name of the sender(s) of the document;

    b.    The name of the author(s) of the document;

    c.    The name of the person(s) to whom copies were sent and those who actually received them;

    d.    The job title of every person named in (a), (b), and (c) above;

    e.    The date of the document;

    f.    The date on which the document was received by each of the persons identified in (c) above;

    g.    A brief description of the nature of the subject matter of the document; and

    h.    The statute, rule, or decision that is claimed to give rise to the privilege.

8.    **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

## <u>INTERROGATORIES</u>

**<u>INTERROGATORY NO. 1.</u>** Identify all persons with knowledge of the facts set forth in the **<u>Complaint</u>**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

10

**INTERROGATORY NO. 2.**        Describe the complete ownership of **Calumet Fuel** from 2016 to present. If **Calumet Fuel** is owned by another entity, identify the person(s) for whose benefit **Calumet Fuel** is ultimately owned.

**INTERROGATORY NO. 3.**        Describe in complete factual detail the transaction in which you acquired shares of **OpCo**.

**INTERROGATORY NO. 4.**        Identify in complete factual detail all consideration you or another party provided for shares of **OpCo**.

**INTERROGATORY NO. 5.**        State the complete factual circumstances surrounding the SBA loan assumption of which you contend entitles you to claim credit for the entire value of the loan in a fraudulent transfer analysis. In your answer, specifically identity the loan number, the date or the loan, the parties to the loan, the purpose of the loan, the terms of the loan, and the balance of the loan on the date of the alleged assumption.

**INTERROGATORY NO. 6.**        What was the value of **OpCo** on the date **Calumet Fuel** acquired its shares? Provide the complete factual basis for your answer.

**INTERROGATORY NO. 7.**        Do you contend that the amount paid by **Calumet Fuel** for **OpCo's** shares was reasonably equivalent value for **OpCo**? State the complete factual basis of your answer.

11

**INTERROGATORY NO. 8.** State the complete reasons why the **Debtor** signed the addendum related to the sale of the **OpCo** shares to **Calumet Fuel**. Your answer among other things should explain why the **Debtor** was involved in the sale if he had long since divested himself of ownership of **OpCo**.

**INTERROGATORY NO. 9.** Identify all meetings and other corporate acts of **OpCo** with which you were involved.

**INTERROGATORY NO. 10.** State in complete detail all work you performed for **OpCo**.

**INTERROGATORY NO. 11.** Identify all employees of **OpCo** or other persons working at the gas station at the **Marshfield Property** during the time you owned shares of **OpCo**. Provide each person's name and contact information, and a complete description of the person's duties.

**INTERROGATORY NO. 12.** Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

Dated: February 3, 2026

GUS A. PALOIAN, in his capacity as the Chapter 7 Trustee of the Debtor's Estate

By:   _____/s/ *[DRAFT]*_____
Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880

12

Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

13

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MUBARAK H. IBRAHIM, | BK No. 23-07031 |
| Debtor, | Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM, | Adv. No. 25-168 |
| Plaintiff, | Hon. Jacqueline P. Cox |
| v. | |
| SAWSAN HOMSI, *et al.*, | |
| Defendants. | |

**TRUSTEE'S FIRST SET OF INTERROGATORIES TO PIP**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Petroleum Investment Properties, LLC pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Petroleum Investment Properties, LLC must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1.      The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2.      The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3.      The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4.      The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5.      The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6.      The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7.      The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8.      The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9.      The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10.     The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11. The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12. The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13. The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14. The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15. The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16. The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17. The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18. The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19. The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

20.     The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21.     The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22.     The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23.     The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24.     .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25.     The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26.     The terms "all" and "each" shall be construed as all and each.

27.     The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

28.    The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30.     The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31.     The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32.     The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

        a.     With respect to a natural person:

            i.     Such person's name and present or last known address; and

            ii.     The name and address of his or her present or last known employer and title or position with such employer;

        b.     With respect to any person other than a natural person:

            i.     Its full name and all of the names by which it is known or referred to;

    ii.    Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

    iii.    The state under whose law it is organized; and

    iv.    The present or last known address of its principal place of business or office.

c.    With respect to a meeting or conference:

    i.    The date and location thereof;

    ii.    The identity of all persons present or who participated;

    iii.    The identity of any documents which record, refer, or relate to such meeting; and

    iv.    The subject matter or matters discussed.

d.    With respect to a statement:

    i.    The date, location and medium of the statement;

    ii.    The identity of the author or declarant of such statement;

    iii.    The identity of the recipient(s) of such statement;

    iv.    The identity of all other people with knowledge of the statement; and

    v.    The identity of any document which records, refers, or relates to such statement.

e.    With respect to a communication:

    i.    The date, location and medium of communication;

    ii.    The identity of the author or declarant of such communication;

    iii.    The identity of the recipient(s) of such communication;

iv.     The identity of all other people with knowledge of the communication; and

v.     The identity of any document which records, refers, or relates to such communication.

e.     With respect to any other matter, subject, action, conduct, or fact:

i.     The date and/or location of such matter, subject, action, conduct, or fact;

ii.     A detailed description of such matter, subject, action, conduct, or fact;

iii.     The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.     The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

## Instructions

1.    **Word Tenses.** Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa. In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.    **Document Productions.** If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities. If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

    a. specify the nature of the material deleted or redacted;

    b. specify the reason for the deletion or redaction; and

    c. identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

9

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

        a.      The name of the sender(s) of the document;

        b.      The name of the author(s) of the document;

        c.      The name of the person(s) to whom copies were sent and those who actually received them;

        d.      The job title of every person named in (a), (b), and (c) above;

        e.      The date of the document;

        f.      The date on which the document was received by each of the persons identified in (c) above;

        g.      A brief description of the nature of the subject matter of the document; and

        h.      The statute, rule, or decision that is claimed to give rise to the privilege.

8. **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

## INTERROGATORIES

**INTERROGATORY NO. 1.** Identify all persons with knowledge of the facts set forth in the **Complaint**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

10

**INTERROGATORY NO. 2.** Describe the complete ownership of **PIP** from 2016 to present. If **PIP** is owned by another entity, identify the person(s) for whose benefit **PIP** is ultimately owned.

**INTERROGATORY NO. 3.** Describe in complete factual detail the transaction in which you acquired the **Marshfield Property**.

**INTERROGATORY NO. 4.** Identify in complete factual detail all consideration you or another party provided for the **Marshfield Property**.

**INTERROGATORY NO. 5.** What was the value of the **Marshfield Property** on the date **PIP** acquired it? State the complete factual basis of your answer.

**INTERROGATORY NO. 6.** Do you contend that the amount paid by **PIP** for the **Marshfield Property** was reasonably equivalent value for the **Marshfield Property**? State the complete factual basis of your answer.

**INTERROGATORY NO. 7.** Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

**INTERROGATORY NO. 8.** State with specificity what **PIP** and/or **Nasr Ali** did with any and all funds received as a result of the sale of the **Marshfield Property** to **Calumet Park Mobil** and any and all funds received as a result of the **Purchase Money Mortgage**.

11

**INTERROGATORY NO. 9.**     Identify all employees of Bubbles Car Wash.


Dated: February 3, 2026                    GUS A. PALOIAN, in his capacity as the
                                           Chapter 7 Trustee of the Debtor's Estate

                                           By:   _____/s/ *[DRAFT]*_____
                                                     Steven C. Moeller


Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A.
Paloian*

12

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>                              Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>                              Plaintiff,<br><br>          v.<br><br>SAWSAN HOMSI, *et al.*,<br><br>                              Defendants. | Adv. No. 25-168<br><br>Hon. Jacqueline P. Cox |

**TRUSTEE'S FIRST SET OF INTERROGATORIES TO CALUMENT PARK MOBIL**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Calumet Park Mobil, LLC pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33.  Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Calumet Park Mobil, LLC must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1.     The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2.     The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3.     The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4.     The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5.     The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6.     The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7.     The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8.     The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9.     The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10.    The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11. The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12. The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13. The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14. The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15. The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16. The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17. The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18. The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19. The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29. The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30. The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31. The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32. The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

    a. With respect to a natural person:

        i. Such person's name and present or last known address; and

        ii. The name and address of his or her present or last known employer and title or position with such employer;

    b. With respect to any person other than a natural person:

        i. Its full name and all of the names by which it is known or referred to;

6

    ii.    Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

    iii.    The state under whose law it is organized; and

    iv.    The present or last known address of its principal place of business or office.

c.    With respect to a meeting or conference:

    i.    The date and location thereof;

    ii.    The identity of all persons present or who participated;

    iii.    The identity of any documents which record, refer, or relate to such meeting; and

    iv.    The subject matter or matters discussed.

d.    With respect to a statement:

    i.    The date, location and medium of the statement;

    ii.    The identity of the author or declarant of such statement;

    iii.    The identity of the recipient(s) of such statement;

    iv.    The identity of all other people with knowledge of the statement; and

    v.    The identity of any document which records, refers, or relates to such statement.

e.    With respect to a communication:

    i.    The date, location and medium of communication;

    ii.    The identity of the author or declarant of such communication;

    iii.    The identity of the recipient(s) of such communication;

iv. The identity of all other people with knowledge of the communication; and

v. The identity of any document which records, refers, or relates to such communication.

e. With respect to any other matter, subject, action, conduct, or fact:

i. The date and/or location of such matter, subject, action, conduct, or fact;

ii. A detailed description of such matter, subject, action, conduct, or fact;

iii. The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv. The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

## Instructions

1. **Word Tenses.** Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa. In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2. **Document Productions.** If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities. If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

      a.      specify the nature of the material deleted or redacted;

      b.      specify the reason for the deletion or redaction; and

      c.      identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

9

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

     a.     The name of the sender(s) of the document;

     b.     The name of the author(s) of the document;

     c.     The name of the person(s) to whom copies were sent and those who actually received them;

     d.     The job title of every person named in (a), (b), and (c) above;

     e.     The date of the document;

     f.     The date on which the document was received by each of the persons identified in (c) above;

     g.     A brief description of the nature of the subject matter of the document; and

     h.     The statute, rule, or decision that is claimed to give rise to the privilege.

8.     **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

<div align="center">

**INTERROGATORIES**

</div>

**INTERROGATORY NO. 1.**     Identify all persons with knowledge of the facts set forth in the **Complaint**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

<div align="center">

10

</div>

**INTERROGATORY NO. 2.**        Describe the complete ownership of **Calumet Park Mobil** from 2016 to present. If **Calumet Park Mobil** is owned by another entity, identify the person(s) for whose benefit **Calumet Park Mobil** is ultimately owned.

**INTERROGATORY NO. 3.**        Describe in complete factual detail the transaction in which you acquired the **Marshfield Property**.

**INTERROGATORY NO. 4.**        Identify in complete factual detail all consideration you or another party provided for the **Marshfield Property**.

**INTERROGATORY NO. 5.**        What was the value of the **Marshfield Property** on the date **Calumet Park Mobil** acquired it? State the complete factual basis of your answer.

**INTERROGATORY NO. 6.**        Do you contend that the amount paid by **Calumet Park Mobil** for the **Marshfield Property** was reasonably equivalent value for the **Marshfield Property**? State the complete factual basis of your answer.

**INTERROGATORY NO. 7.**        Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

Dated: February 3, 2026                    GUS A. PALOIAN, in his capacity as the
                                           Chapter 7 Trustee of the Debtor's Estate

                                           By: _____ /s/ *[DRAFT]* _____
                                                     Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller

11

CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

12

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>                Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>                Plaintiff,<br><br>      v.<br><br>SAWSAN HOMSI, *et al.*,<br><br>                Defendants. | Adv. No. 25-168<br><br>Hon. Jacqueline P. Cox |

**TRUSTEE'S FIRST SET OF INTERROGATORIES TO ZAHDAN**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant Ahmad Zahdan pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, Ahmad Zahdan must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1. The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2.      The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3.      The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4.      The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5.      The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6.      The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7.      The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8.      The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9.      The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10.     The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11. The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12. The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13. The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14. The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15. The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16. The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17. The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18. The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19. The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

4

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30.     The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31.     The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32.     The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

      a.     With respect to a natural person:

            i.     Such person's name and present or last known address; and

            ii.     The name and address of his or her present or last known employer and title or position with such employer;

      b.     With respect to any person other than a natural person:

            i.     Its full name and all of the names by which it is known or referred to;

6

       ii.       Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

       iii.       The state under whose law it is organized; and

       iv.       The present or last known address of its principal place of business or office.

c.       With respect to a meeting or conference:

       i.       The date and location thereof;

       ii.       The identity of all persons present or who participated;

       iii.       The identity of any documents which record, refer, or relate to such meeting; and

       iv.       The subject matter or matters discussed.

d.       With respect to a statement:

       i.       The date, location and medium of the statement;

       ii.       The identity of the author or declarant of such statement;

       iii.       The identity of the recipient(s) of such statement;

       iv.       The identity of all other people with knowledge of the statement; and

       v.       The identity of any document which records, refers, or relates to such statement.

e.       With respect to a communication:

       i.       The date, location and medium of communication;

       ii.       The identity of the author or declarant of such communication;

       iii.       The identity of the recipient(s) of such communication;

iv.     The identity of all other people with knowledge of the communication; and

v.     The identity of any document which records, refers, or relates to such communication.

e.     With respect to any other matter, subject, action, conduct, or fact:

i.     The date and/or location of such matter, subject, action, conduct, or fact;

ii.     A detailed description of such matter, subject, action, conduct, or fact;

iii.     The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.     The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

### Instructions

1.     **Word Tenses.** Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa. In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.     **Document Productions.** If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities. If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

    a. specify the nature of the material deleted or redacted;

    b. specify the reason for the deletion or redaction; and

    c. identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

9

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

     a.     The name of the sender(s) of the document;

     b.     The name of the author(s) of the document;

     c.     The name of the person(s) to whom copies were sent and those who actually received them;

     d.     The job title of every person named in (a), (b), and (c) above;

     e.     The date of the document;

     f.     The date on which the document was received by each of the persons identified in (c) above;

     g.     A brief description of the nature of the subject matter of the document; and

     h.     The statute, rule, or decision that is claimed to give rise to the privilege.

8.     **Requests.** Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

<div align="center">

**INTERROGATORIES**

</div>

**INTERROGATORY NO. 1.**     Identify all persons with knowledge of the facts set forth in the **Complaint**. For each person or entity identified, provide the person or entity's: (a) name; and (b) last known address, phone number, and email address.

**INTERROGATORY NO. 2.**     Describe in detail your relationship to the **Debtor**, stating the time you first met the **Debtor**, the frequency with which you have communicated with

<div align="center">10</div>

the **Debtor**, and any business dealings you have had with the **Debtor** and/or any of his related entities.

**INTERROGATORY NO. 3.**     Do you contend that gaming revenues were not a substantial component of the value of the **Marshfield Property** at the time that **Calumet Park Mobil** acquired it? State the complete factual basis of your answer.

**INTERROGATORY NO. 4.**     State the complete reasons why you pursued the acquisition of the **Marshfield Property** by **Calumet Park Mobil** if you were unwilling to permit gambling to occur on the property.

**INTERROGATORY NO. 5.**     Why did AZ SPE LLC pay the cash portion of the purchase price of the **Marshfield Property** to **PIP**? State the complete factual basis of your answer.

**INTERROGATORY NO. 6.**     Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

Dated: February 3, 2026

GUS A. PALOIAN, in his capacity as the
Chapter 7 Trustee of the Debtor's Estate

By: _____/s/ *[DRAFT]*_____
        Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)

11

312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A.
Paloian*

12

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>MUBARAK H. IBRAHIM,<br><br>               Debtor, | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>               Plaintiff,<br><br>     v.<br><br>SAWSAN HOMSI, *et al.*,<br><br>               Defendants. | Adv. No. 25-168<br><br>Hon. Jacqueline P. Cox |

**TRUSTEE'S FIRST SET OF INTERROGATORIES TO AJ 119th**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following interrogatories to Defendant AJ 119th, Inc. to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33. Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33, AJ 119th, Inc. must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1.	The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2.      The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3.      The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4.      The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5.      The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6.      The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7.      The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8.      The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9.      The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10.     The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11. The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12. The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13. The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14. The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15. The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16. The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17. The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18. The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19. The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

4

28. The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form. The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original. For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document. If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29. The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30. The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31. The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

32. The terms or phrases "describe," "identify," and "state," either alone or when used in connection with any other terms mean and require you to describe:

    a. With respect to a natural person:

        i. Such person's name and present or last known address; and

        ii. The name and address of his or her present or last known employer and title or position with such employer;

    b. With respect to any person other than a natural person:

        i. Its full name and all of the names by which it is known or referred to;

6

    ii.    Its form of organization, *e.g.*, corporation, partnership, or sole proprietorship;

    iii.    The state under whose law it is organized; and

    iv.    The present or last known address of its principal place of business or office.

c.    With respect to a meeting or conference:

    i.    The date and location thereof;

    ii.    The identity of all persons present or who participated;

    iii.    The identity of any documents which record, refer, or relate to such meeting; and

    iv.    The subject matter or matters discussed.

d.    With respect to a statement:

    i.    The date, location and medium of the statement;

    ii.    The identity of the author or declarant of such statement;

    iii.    The identity of the recipient(s) of such statement;

    iv.    The identity of all other people with knowledge of the statement; and

    v.    The identity of any document which records, refers, or relates to such statement.

e.    With respect to a communication:

    i.    The date, location and medium of communication;

    ii.    The identity of the author or declarant of such communication;

    iii.    The identity of the recipient(s) of such communication;

iv.   The identity of all other people with knowledge of the communication; and

v.   The identity of any document which records, refers, or relates to such communication.

e.   With respect to any other matter, subject, action, conduct, or fact:

i.   The date and/or location of such matter, subject, action, conduct, or fact;

ii.   A detailed description of such matter, subject, action, conduct, or fact;

iii.   The identity or identities of all persons who participated in such matter, subject, action, conduct, or fact and how each person was involved in the matter subject, action, conduct, or fact; and

iv.   The identity or identities of all persons with knowledge of such matter, subject, action, conduct, or fact.

## Instructions

1.   **Word Tenses.**   Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa.  In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2.   **Document Productions.**   If you elect to respond to any interrogatories by producing documents, these interrogatories shall cover all documents in your possession, custody, or control, whether located at any of your offices, at the offices of predecessors/successors or assigns, accountants, attorneys, agents, assistants, bankers, affiliates, or partners or at any other place, including storage facilities.  If any such document was, but is no

8

longer, in your possession or subject to your control, or in existence, describe the document, including its date, author(s), recipient(s), and contents, and state whether it: (a) is missing or lost; (b) has been destroyed; (c) has been transferred, voluntarily or involuntarily, to others; or (d) has been disposed of in some other manner. This instruction is without prejudice to the Trustee's right to seek relief because an interrogatory cannot properly be answered by a production of documents.

3. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

    a. specify the nature of the material deleted or redacted;

    b. specify the reason for the deletion or redaction; and

    c. identify the person responsible for the deletion or redaction.

4. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

5. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

6. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2006 to the present.

7. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity

from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim.  Specifically, state the following:

        a.      The name of the sender(s) of the document;

        b.      The name of the author(s) of the document;

        c.      The name of the person(s) to whom copies were sent and those who actually received them;

        d.      The job title of every person named in (a), (b), and (c) above;

        e.      The date of the document;

        f.      The date on which the document was received by each of the persons identified in (c) above;

        g.      A brief description of the nature of the subject matter of the document; and

        h.      The statute, rule, or decision that is claimed to give rise to the privilege.

8.     **Requests.**  Pursuant to Federal Rule of Bankruptcy Procedure 7033 and Federal Rule of Civil Procedure 33(b)(2), all Defendants served with these interrogatories must respond in writing within 30 days after being served.

## INTERROGATORIES

**INTERROGATORY NO. 1.**     Identify all persons with knowledge of the facts set forth in the **Complaint**.  For each person or entity identified, provide the person or entity's:  (a) name; and (b) last known address, phone number, and email address.

**INTERROGATORY NO. 2.**     Identify all persons working at the gas station at the **Marshfield Property** from January 1, 2025 to present. Provide each person's name and contact information, and a complete description of the person's duties.

**INTERROGATORY NO. 3.**     Identify all bank and financial accounts in which you have, directly or indirectly, deposited funds or other property.

Dated: February 3, 2026

GUS A. PALOIAN, in his capacity as the
Chapter 7 Trustee of the Debtor's Estate

By:        /s/ *[DRAFT]*
            Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)
beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re: | Chapter 7 |
| MUBARAK H. IBRAHIM, | BK No. 23-07031 |
| Debtor, | Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM, | Adv. No. 25-168 |
| | Hon. Jacqueline P. Cox |
| Plaintiff, | |
| v. | |
| SAWSAN HOMSI, *et al.*, | |
| Defendants. | |

**TRUSTEE'S FIRST SET OF DOCUMENT REQUESTS**

Gus Paloian ("Trustee"), in his capacity as duly appointed chapter 7 trustee for the estate ("Estate") of Mubarak H. Ibrahim ("Debtor"), propounds the following requests for production of documents and tangible things pursuant to Federal Rule of Bankruptcy Procedure 7034 and Federal Rule of Civil Procedure 34. Pursuant to Federal Rule of Bankruptcy Procedure 7034 and Federal Rule of Civil Procedure 34, all Defendants served with these Requests must respond in writing within 30 days after being served.

**DEFINITIONS AND INSTRUCTIONS**

1. The term "**Complaint**" means and refers to the Complaint filed the above-captioned action and any prior versions or subsequent amendments of that Complaint.

2. The terms "**Plaintiff**" and/or "**Trustee**" mean and refer Gus Paloian, in his capacity as duly appointed chapter 7 trustee for the estate of Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

3. The term "**Estate**" means and refers to the bankruptcy **Estate** of the **Debtor** and its agents, representatives, subsidiaries, affiliated entities, and trusts.

4. The term "**Debtor**" means and refers to the debtor in the above-captioned action, Mubarak H. Ibrahim and his agents, representatives, subsidiaries, affiliated entities, and trusts.

5. The term "**Spyropoulos Loan**" means and refers to the loan evidenced by the **Note**.

6. The term "**Spyropoulos**" means and refers to the deceased Theodore G. Spyropoulos and his agents, representatives, subsidiaries, affiliated entities, and trusts.

7. The term "**Spyropoulos Trust**" means and refers to the common law inter vivos trust created by **Spyropoulos** known as the Theodore G. Spyropoulos Trust and its agents, representatives, subsidiaries, affiliated entities, and trusts.

8. The term "**Note**" means and refers to the Demand Note executed by the **Debtor** on January 15, 2010, attached as Exhibit A to the Complaint in the **Note Lawsuit**.

9. The term "**Note Lawsuit**" means and refers to *Erika Spyropoulos, successor Trustee of the Theodore G. Spyropoulos Trust v. Mubarak Ibrahim*, Case No. 2017L003151, in the Circuit Court of Cook County, Illinois, along with any supplementary proceedings such as citations to discovery assets and any related matters such as mediations.

10. The term "**Marshfield Property**" means and refers to the real estate commonly known as 11900 South Marshfield Avenue in Calumet Park, Illinois, Permanent Index Nos. 25-30-204-001-0000, 25-30-204-002-0000, 25-30-204-003-0000, 25-30-204-004-0000, 25-30-204-

2

005-0000, 25-30-204-006-0000, 25-30-204-020-0000, 25-30-204-021-0000, 25-30-204-022-0000, 25-30-204-023-0000, 25-30-204-024-0000, 25-30-204-041-0000, 25-30-204-042-0000, 25-30-204-043-0000, 25-30-204-044-0000, 25-30-204-045-0000, and 25-30-204-046-0000.

11.     The term "**Gaming License**" means and refers to Video Gaming Establishment License 181002758 with the Illinois Gaming Board, and any subsequence license number applicable to the **Marshfield Property**.

12.     The term "**OpCo**" means and refers to 11900 Marshfield Station Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

13.     The term "**Homsi**" means and refers to Defendant Sawsan Homsi and her agents, representatives, subsidiaries, affiliated entities, and trusts.

14.     The term "**Badr Ali**" means and refers to Defendant Badr Ali and his agents, representatives, subsidiaries, affiliated entities, and trusts.

15.     The term "**Calumet Fuel**" means and refers to Defendant Calumet Fuel, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

16.     The term "**AJ 119th**" means and refers to Defendant AJ 119th, Inc. and its agents, representatives, subsidiaries, affiliated entities, and trusts.

17.     The term "**Zahdan**" means and refers to Defendant Ahmad Zahdan and his agents, representatives, subsidiaries, affiliated entities, and trusts.

18.     The term "**Calumet Park Mobil**" means and refers to Defendant Calumet Park Mobil, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

19.     The term "**PropCo**" means and refers to 11900 Marshfield LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

3

20. The term "**PIP**" means and refers to Defendant Petroleum Investment Properties, LLC and its agents, representatives, subsidiaries, affiliated entities, and trusts.

21. The term "**Ameris Mortgage**" means and refers to the mortgage recorded as Doc# 2204910052 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

22. The term "**Ameris Appraisal**" means and refers to the appraisal represented by the October 5, 2021 Appraisal Report provided to Ameris Bank, File No. 36122, by Newmark Knight Frank.

23. The term "**Purchase Money Mortgage**" means and refers to the mortgage recorded as Doc# 2507127015 with the Cook County Recorder and any related documents and transactions, such as, for example, a loan agreement.

24. .The term "**Defendants**" means and refers to all or any one or more of the defendants in the above-captioned action, as well as any or one or more of their agents, representatives, subsidiaries, affiliated entities, and trusts.

25. The term "relate to," including its various forms such as "relating to" and similar terms such as "referring to," "concerning," and "in connection with," means consist of, refer to, reflect, reference, or be in any way legally, logically, or factually connected with the matter discussed.

26. The terms "all" and "each" shall be construed as all and each.

27. The term "person" means and refers to both natural persons and legal persons of every kind, including (but not limited to) guardians, trustees, receivers, corporations, partnerships, limited liability companies, and every other kind of entity or business organization.

4

28.     The terms "document" or "documents" shall have the broadest possible meaning under Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of Civil Procedure 26 and include, but are not limited to, written or graphic matter of every kind and description, however produced or reproduced, whether draft or final, original or reproduction, including but not limited to letters, correspondence, memoranda, contracts, agreements, letter agreements, surveys, appraisals, notes, transcripts, microfilms, telegrams, analyses, books, periodicals, news releases, notices, reports, bulletins, newspapers, advertisements, prospectuses, regulations, directives, teletype messages, minutes and records of meetings, electronic mail, other data stored on computers or computer diskettes, interoffice communications, financial statements, ledgers, books of account, proposals, orders, receipts, bills, invoices, accounting work sheets, working papers, desk calendars, appointment books, diaries, time sheets, logs, checks, promissory notes, movies, tapes for visual or audio reproduction, recordings or materials similar to any of the foregoing, however denominated and including writings, drawings, graphs, charts, photographs, phone records and data processing results, printouts and computations (both in existence and stored in memory components), and other compilations from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form.  The terms "document" or "documents" also shall mean and refer to all copies of each document if the copies contain any additional writing or are not identical copies of the original.  For purposes of these interrogatories, a document is deemed to be in your possession, custody or control if you have actual possession or the right to secure the document or a copy thereof from another person or entity having actual possession of the document.  If any document responsive to these interrogatories was at one time, but is no longer, within your possession, custody, or control,

5

state what disposition was made of the document, by whom, the approximate date of the disposition, and the reason for the disposition.

29. The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these Interrogatories any documents that might otherwise be construed to be outside their scope.

30. The term "statement," or any variant thereof, shall mean and refer to all oral, written or recorded utterances, assertions, exclamations, interjections, questions, or remarks of any kind.

31. The term "communication," or any variant thereof, shall mean and refer to all inquiries, discussions, interviews, conversations, negotiations, agreements, understandings, meetings, telephone conversations, letters, correspondence, emails, voice mails, notes, telegrams, advertisements, memoranda, or any and all other forms of exchange or dialogue, whether written or oral.

### Instructions

1. **Word Tenses.** Whenever appropriate, the masculine form of a word shall be interpreted as feminine and vice versa. In addition, whenever appropriate, the singular form of a word should be interpreted as plural and vice versa.

2. **Deletions from Documents.** Where anything has been deleted or redacted from a document identified or produced:

    a. specify the nature of the material deleted or redacted;

    b. specify the reason for the deletion or redaction; and

    c. identify the person responsible for the deletion or redaction.

3. **Organization of Production.** Documents produced shall be produced in their original file folders, or, in lieu thereof, any writing on the file folders from which documents are taken shall be copied and appended to such documents, and the persons for whom, or department, division or office for which, such file folders are maintained shall be identified.

4. **Identification of Production.** Documents produced shall be identified by the number of the interrogatory in response to which they are produced or produced as they are kept in the normal course of business.

5. **Time Period.** Unless otherwise specified in a particular interrogatory, the period of time encompassed by the following Requests shall be from 2015 to the present.

6. **Privilege.** With respect to any document that is withheld on a claim of the attorney-client privilege, the work-product privilege or any other privilege or immunity from discovery, provide an explanation of the basis for the assertion of privilege or other immunity from discovery that is sufficient to enable all parties and the Court to assess the validity of the claim. Specifically, state the following:

    a. The name of the sender(s) of the document;

    b. The name of the author(s) of the document;

    c. The name of the person(s) to whom copies were sent and those who actually received them;

    d. The job title of every person named in (a), (b), and (c) above;

    e. The date of the document;

    f. The date on which the document was received by each of the persons identified in (c) above;

       g.     A brief description of the nature of the subject matter of the document; and

       h.     The statute, rule, or decision that is claimed to give rise to the privilege.

7.     **Requests.**  Pursuant to Federal Rule of Bankruptcy Procedure 7034 and Federal Rule of Civil Procedure 34, all Defendants served with these requests must respond in writing within 30 days after being served.

<div align="center">

**DOCUMENT REQUESTS**

</div>

**DOCUMENT REQUEST NO. 1.**  All documents related to the **Spyropoulos Loan**.

**DOCUMENT REQUEST NO. 2.**  All documents related to communications with **Spyropoulos**, the **Spyropoulos Trust**, or any party that is related to either of them.

**DOCUMENT REQUEST NO. 3.**  All documents related to the **Note**.

**DOCUMENT REQUEST NO. 4.**  All documents related to the **Note Lawsuit**, including supplementary proceedings such as citations to discover assets and turnover motions, and other matters such as settlement negotiations and mediations. This includes but is not limited to the case file in the **Note Lawsuit** and documents related to communications between the parties.

**DOCUMENT REQUEST NO. 5.**  All documents in which the **Debtor** represented his net worth, assets, liabilities, wealth, etc. to any third party, such as an actual or potential lender.

<div align="center">

8

</div>

**DOCUMENT REQUEST NO. 6.** All appraisals of the **Marshfield Property**, any part of the **Marshfield Property**, or any business conducted in whole or in part on the **Marshfield Property**.

**DOCUMENT REQUEST NO. 7.** All documents related to any loan application related to the **Marshfield Property**, including documents related to communications with any lender or potential lender relating to the acquisition of the **Marshfield Property** by any party, the refinancing in whole or in part of any debt related to the **Marshfield Property**, or any business conducted in whole or in part on the **Marshfield Property**.

**DOCUMENT REQUEST NO. 8.** All documents related to any effort to market the **Marshfield Property** from 2016 to present.

**DOCUMENT REQUEST NO. 9.** All documents related to retail or other business operations conducted on any part of the **Marshfield Property** from 2016 to present. This includes retail sales from the gas station, gasoline and diesel sales, the car wash, rent from any tenant, and any other business.

**DOCUMENT REQUEST NO. 10.** All leases with tenants at the **Marshfield Property** from 2010 to present.

**DOCUMENT REQUEST NO. 11.** All employment records for and documents related to any payments to any person working on any part of the **Marshfield Property** from 2016 to present.

**DOCUMENT REQUEST NO. 12.** All documents related to revenues of any business conducted on the **Marshfield Property**.

**DOCUMENT REQUEST NO. 13.** All documents related to revenues generated by gaming operations on the **Marshfield Property**.

**DOCUMENT REQUEST NO. 14.** All documents related to the sale of lottery tickets and similar items at the **Marshfield Property**.

**DOCUMENT REQUEST NO. 15.** All documents related to the **Gaming License**.

**DOCUMENT REQUEST NO. 16.** All documents related to applications and other documents submitted to the Illinois Gaming Board in connection with the **Gaming License** and any operations at the **Marshfield Property**.

**DOCUMENT REQUEST NO. 17.** All documents related to communications involving you and the Illinois Gaming Board.

**DOCUMENT REQUEST NO. 18.** All corporate records of **OpCo**.

**DOCUMENT REQUEST NO. 19.** All documents related to the initial capitalization of **OpCo**.

**DOCUMENT REQUEST NO. 20.** All documents reflecting the owners of shares of **OpCo** at any time.

10

**DOCUMENT REQUEST NO. 21.** All documents showing the assets and liabilities of **OpCo** at any time.

**DOCUMENT REQUEST NO. 22.** All documents related to any lease between **OpCo** and **PropCo** for any part of the **Marshfield Property**.

**DOCUMENT REQUEST NO. 23.** All documents related to the alleged transfer of shares in OpCo from the **Debtor** to **Homsi**. This includes but is not limited to any written agreement or other evidence of the transaction, corporate resolutions, share certificates, other records, etc.

**DOCUMENT REQUEST NO. 24.** All documents reflecting consideration provided by **Homsi** for shares of **OpCo**.

**DOCUMENT REQUEST NO. 25.** All documents reflecting the value of OpCo at the time of the transfer of shares to **Homsi**.

**DOCUMENT REQUEST NO. 26.** All documents related to corporate acts of **OpCo** Homsi participated in.

**DOCUMENT REQUEST NO. 27.** All documents related to the alleged transfer of shares in OpCo from the **Homsi** to **Badr Ali**. This includes but is not limited to any written agreement or other evidence of the transaction, corporate resolutions, share certificates, other records, etc.

11

**DOCUMENT REQUEST NO. 28.** All documents reflecting consideration provided by **Badr Ali** for shares of **OpCo**.

**DOCUMENT REQUEST NO. 29.** All documents reflecting the value of OpCo at the time of the transfer of shares to **Badr Ali**.

**DOCUMENT REQUEST NO. 30.** All documents related to corporate acts of **OpCo** Badr Ali participated in.

**DOCUMENT REQUEST NO. 31.** All documents related to **OpCo's** decision to agree to a 100% share sale to **Calumet Fuel**.

**DOCUMENT REQUEST NO. 32.** All documents related to communications between **OpCo** and any associated person and **Calumet Fuel** and any associated person.

**DOCUMENT REQUEST NO. 33.** All documents related to the shareholder or board vote to approve the share sale to **Calumet Fuel** of 100% of **OpCo's** shares. This includes but is not limited to any written agreement or other evidence of the transaction, corporate resolutions, share certificates, other records, etc.

**DOCUMENT REQUEST NO. 34.** All documents reflecting consideration provided by **Calumet Fuel** or any other party for associated with **Calumet Fuel** shares of **OpCo**.

12

**DOCUMENT REQUEST NO. 35.** All documents related to the $400,000 (or $900,000) consideration supposedly paid for **OpCo's** shares.

**DOCUMENT REQUEST NO. 36.** All documents showing what was done with the $400,000 (or $900,000) consideration supposedly paid for **OpCo's** shares.

**DOCUMENT REQUEST NO. 37.** All documents related to any SBA loan that has any connection with the **Marshfield Property**.

**DOCUMENT REQUEST NO. 38.** All documents reflecting the value of OpCo at the time of the transfer of shares to **Calumet Fuel**.

**DOCUMENT REQUEST NO. 39.** All documents related to corporate acts of **OpCo** Calumet Fuel or any related person participated in.

**DOCUMENT REQUEST NO. 40.** All documents related to **AJ 119th's** application for a gaming license.

**DOCUMENT REQUEST NO. 41.** All documents related to the reasons why any application for a gaming license by **AJ 119th** was withdrawn.

**DOCUMENT REQUEST NO. 42.** All communications with **Zahdan** or **Calumet Park Mobil** related to whether gambling is permitted at the **Marshfield Property**.

13

**DOCUMENT REQUEST NO. 43.** All documents related to any lease between **AJ 119th** and **Calumet Park Mobil**.

**DOCUMENT REQUEST NO. 44.** All documents related to **AJ 119th's** occupation of any part of the **Marshfield Property**.

**DOCUMENT REQUEST NO. 45.** All corporate records of **AJ 119th**.

**DOCUMENT REQUEST NO. 46.** All corporate records of **PropCo**.

**DOCUMENT REQUEST NO. 47.** All documents related to the initial capitalization of **PropCo**.

**DOCUMENT REQUEST NO. 48.** All documents reflecting the owners of membership interest of **PropCo** at any time.

**DOCUMENT REQUEST NO. 49.** All documents showing the assets and liabilities of **PropCo** at any time.

**DOCUMENT REQUEST NO. 50.** All documents related to the alleged transfer of membership interest in **PropCo** in 2019 as a result of which the Debtor allegedly owned 95% of the membership of **PropCo**.

**DOCUMENT REQUEST NO. 51.** All documents related to the **Ameris Mortgage**.

14

**DOCUMENT REQUEST NO. 52.** All documents related to communications with Ameris Bank in connection with the **Ameris Mortgage**.

**DOCUMENT REQUEST NO. 53.** All documents related to the **Ameris Appraisal**.

**DOCUMENT REQUEST NO. 54.** All documents related in any way to the transaction in which **PropCo** conveyed the **Marshfield Property** to **PIP**.

**DOCUMENT REQUEST NO. 55.** All documents reflecting consideration provided by **PIP** or any other party for the **Marshfield Property**.

**DOCUMENT REQUEST NO. 56.** All documents reflecting the value of the **Marshfield Property** at the time of its transfer to **PIP**.

**DOCUMENT REQUEST NO. 57.** All payroll records of Bubbles Car Wash.

**DOCUMENT REQUEST NO. 58.** All documents related to the transaction on or about February 15, 2025 in which **PIP** conveyed the **Marshfield Property** to **Calumet Park Mobil**.

**DOCUMENT REQUEST NO. 59.** All documents related to communications between the seller and the buyer, and any related persons or entities, in the transaction on or about February 15, 2025 in which **PIP** conveyed the **Marshfield Property** to **Calumet Park Mobil**.

**DOCUMENT REQUEST NO. 60.** All documents related in any way to the **Purchase Money Mortgage** and any related loan agreement(s).

15

**DOCUMENT REQUEST NO. 61.** All documents related to payments made in connection with the **Purchase Money Mortgage**.

**DOCUMENT REQUEST NO. 62.** All documents reflecting consideration provided by **Calumet Park Mobil** or any other party for the **Marshfield Property**.

**DOCUMENT REQUEST NO. 63.** All documents reflecting the value of the **Marshfield Property** at the time of its transfer to **Calumet Park Mobil**.

**DOCUMENT REQUEST NO. 64.** All documents related to communications with Chet Foster, Robert Loncar, Loncar Law Ltd. (or any predecessor firm or practice), or any lawyer working on behalf of the **Debtor**, **PropCo**, or **OpCo**.

**DOCUMENT REQUEST NO. 65.** All documents related to communications between or involving **Nasr Ali**, **PIP**, the **Debtor**, Robert Loncar, and/or Loncar Law Ltd. (or any predecessor firm or practice).

**DOCUMENT REQUEST NO. 66.** All documents related to communications that are in any way related to the transfer of the **Marshfield Property** from **PropCo** to **PIP** and/or shares of **OpCo** to **Calumet Fuel**. This includes, but is not limited to, communications with the buyer and related parties, the seller and related parties, any lawyers involved in the transaction, any real estate agents or brokers involved in the transaction, and lenders or other parties providing any sort of financing, escrow agents, persons and entities facilitating the closing, inspectors, and governmental agencies and officials.

16

**DOCUMENT REQUEST NO. 67.** All documents related to communications between or involving **Nasr Ali**, **PIP**, **Calumet Fuel**, **Calumet Park Mobil**, **Zahdan**, AZ SPE LLC, Adam Kandah, any person associated with Akram Zanayed & Associates, Shijo Mullappallil, and Mullappallil Law Group.

**DOCUMENT REQUEST NO. 68.** All documents related to communications that are in any way related to the transfer of the **Marshfield Property** from **PIP** to **Calument Park Mobil**. This includes, but is not limited to, communications with the buyer and related parties, the seller and related parties, any lawyers involved in the transaction, any real estate agents or brokers involved in the transaction, and lenders or other parties providing any sort of financing, escrow agents, persons and entities facilitating the closing, inspectors, and governmental agencies and officials.

**DOCUMENT REQUEST NO. 69.** All documents related to Case No. 23-393 in the U.S. Bankruptcy Court for the Northern District of Illinois. This includes but is not limited to all documents related to communications concerning the production of documents or witness testimony in Case No. 23-393 in the U.S. Bankruptcy Court for the Northern District of Illinois (except for communications between Chet Foster and **Homsi**).

**DOCUMENT REQUEST NO. 70.** All tax returns, including schedules, of the following persons and entities:

    a. the **Debtor**
    b. **Homsi**
    c. **Badr Ali**
    d. **Nasr Ali**
    e. **PIP**

17

  f.  **Calumet Fuel**
  g.  **Zahdan**
  h.  **Calumet Park Mobil**
  i.  **Joy**
  j.  **AJ 119th**

**DOCUMENT REQUEST NO. 71.** All bank statements for accounts of the following

persons and entities:

  a.  the **Debtor**
  b.  **Homsi**
  c.  **Badr Ali**
  d.  **Nasr Ali**
  e.  **PIP**
  f.  **Calumet Fuel**
  g.  **Zahdan**
  h.  **Calumet Park Mobil**
  i.  **Joy**
  j.  **AJ 119th**

Dated: February __, 2026

GUS A. PALOIAN, in his capacity as the
Chapter 7 Trustee of the Debtor's Estate

By:      /s/ *[DRAFT]*
       Steven C. Moeller

Jonathan M. Cyrluk
Steven C. Moeller
CARPENTER LIPPS LLP
180 North LaSalle Street, Suite 2880
Chicago, Illinois 60601
312-777-4300 (tel)
312-777-4839 (fax)
cyrluk@carpenterlipps.com
moeller@carpenterlipps.com

David A. Beck (member of N.D. Ill. Bar)
CARPENTER LIPPS LLP
280 North High Street, Suite 1300
Columbus, Ohio 43215
614-365-4100 (tel)
614-365-9145 (fax)

18

beck@carpenterlipps.com

*Special counsel to Chapter 7 Trustee Gus A. Paloian*

19

**IN THE UNITED STATES BANKRUPTCY COURT NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>    MUBARAK H. IBRAHIM,<br><br>    Debtor. | Chapter 7<br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>    Plaintiff,<br><br>v.<br><br>SAWSAN HOMSI, BADR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CALUMET PARK MOBILE, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>    Defendants. | <br><br><br>Adv. No. 25-00168<br><br>Hon. Jacqueline P. Cox |

## DEFENDANTS, NASR AL, PETROLEUM INVESTMENT PROPERTIES, LLC, AND CALUMATE FUEL, INC., RESPONSE TO CHAPTER 7 TRUSTEE'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

NOW COME Defendants Nasr Ali ("Nasr Ali"), Petroleum Investment Properties, LLC ("PIP"), and Calumet Fuel, Inc. (individually "Calumet Fuel" and collectively with Nasr Ali and PIP, the "Ali Defendants"), by and through their undersigned counsel, in response to Chapter 7 Trustee's Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion"), state as follows:

### INTRODUCTION

The Motion is styled as a TRO and preliminary injunction, but it does not comply with the procedural requirements for either. There is no showing of immediacy, no evidentiary record, and no effort to narrowly tailor the relief. What is sought is effectively a prejudgment attachment of

1

non-debtor assets, which the Rules and controlling precedent do not allow—especially when pursued through motion practice rather than an adversary proceeding.

The Trustee is not seeking to preserve a specific, identified estate asset. He is seeking to restrain and divert non-debtor cash and payment streams to secure a possible money judgment. That is not ancillary relief. It is dispositive, coercive relief, and the Rules do not permit it to be obtained by motion.

## **ARGUMENT**

This objection is straightforward. Although portions of the Trustee's complaint survived Rule 12 scrutiny, the relief he now seeks is not authorized by law. What the Trustee asks for is a prejudgment restraint and diversion of non-debtor money to secure a potential money recovery. That remedy is barred. The Trustee is not attempting to preserve specific property pending adjudication. He does not seek to enjoin the transfer of real estate, preserve a gaming license, or maintain the status quo of any identified asset allegedly belonging to the estate. He cannot do so, because the Court lacks jurisdiction over those assets. Instead, the Trustee asks to freeze millions of dollars in cash held by non-debtors, to freeze mortgage payments already received by non-debtors, and to compel a third party to divert future contractual payments into escrow.

In substance, that is a prejudgment attachment or garnishment. Labeling it an injunction does not alter its effect.

The Supreme Court has made clear that federal courts lack inherent equitable authority under Rule 65 to issue prejudgment injunctions freezing assets where the plaintiff seeks money relief. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999). The Seventh Circuit has adhered to that line. An asset restraint may be appropriate where a plaintiff asserts a real and specific equitable interest in identifiable property; it is not appropriate where the

2

plaintiff seeks to secure funds to satisfy a potential money judgment. *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 998 (7th Cir. 2002).

The Trustee does not identify any specific funds subject to a constructive trust, lien, or other adjudicated equitable interest. He cannot do so. The property at issue changed hands multiple times after the debtor ceased to hold any interest in it, and in several instances the Trustee has failed to establish that the debtor ever held a cognizable interest at all. For the same reason, the Trustee cannot trace the restrained money to an estate asset already determined to belong to the estate. He cannot establish ownership, and he cannot establish a fraudulent conveyance.

The Trustee narrowly avoided dismissal of certain causes of action at the pleading stage. He now seeks to bypass the proof problems he represented to this Court he intended to address through discovery, and instead seize money simply because money would be useful if he ultimately prevails. That is exactly what *Grupo Mexicano* forbids.

Section 105 does not alter the analysis. Section 105 authorizes orders necessary to carry out the Bankruptcy Code; it does not create substantive rights, relax Rule 65 standards, or authorize remedies the Code itself does not permit. The Seventh Circuit has cautioned that § 105 is not a blank check. *Caesars Entm't Operating Co., Inc. v. BOKF, N.A.*, 808 F.3d 1186, 1188 (7th Cir. 2015). Allowing a trustee to seize or immobilize non-debtors' cash before judgment, without a lien, judgment, or adjudicated equitable interest, would convert § 105 into a general attachment statute. That is not the law. Nor does the bankruptcy context eliminate due process or proof requirements. Courts in this District have recognized that fraudulent transfer claims seeking recovery of money are often predominantly legal for purposes of prejudgment asset restraints, particularly where the trustee seeks cash rather than specific property. See *In re Teknek, LLC*, 343 B.R. 850 (Bankr. N.D. Ill. 2006). The Trustee's disagreement with that authority does not permit

him to ignore it, and citation to out-of-circuit cases does not override controlling Supreme Court and Seventh Circuit precedent.

The Trustee also fails to satisfy the Rule 65 factors. Surviving a motion to dismiss does not establish entitlement to prejudgment seizure of assets. Rule 12 tests pleadings; Rule 65 requires proof. During Rule 12 oral argument, the Trustee's own counsel acknowledged that he did not need to—and could not—prove the allegations at that stage. That concession makes Rule 65 relief unavailable by his own admission.

The Trustee's claimed harm is difficulty collecting a future judgment, if one is ever awarded. Concerns about collectability do not constitute irreparable harm sufficient to justify emergency injunctive relief, particularly where the restraints sought are sweeping and punitive in effect. The Bankruptcy Code and Rules provide mechanisms to litigate avoidance claims, conduct discovery, and seek relief after adjudication. The Trustee has not shown why those remedies are inadequate.

Finally, the requested relief is not narrowly tailored. Freezing non-debtor cash and diverting payment streams would impose immediate and substantial harm on third parties based on allegations that barely survived Rule 12 review, and would effectively grant the Trustee a significant portion of his ultimate relief in advance—despite the substantial proof problems exposed during Rule 12 briefing and argument.

THERFORE, the Chapter 7 Trustee's Motion for Temporary Restraining Order and Preliminary Injunction should be denied with prejudice.

Respectfully submitted,

Nasr Ali, Petroleum Investment Properties, LLC, and Calumet Fuel, Inc.

By: /s/ *Kurt M. Carlson*
         One of their attorneys

4

Kurt M. Carlson (IL Bar No. 6236568)
Mona Naser (IL Bar No. 6278114)
**Carlson Dash, LLC**
216 S. Jefferson Street, Ste. 303
Chicago, Illinois 60661
Tel: 312-382-1600
kcarlson@carlsondash.com
mnaser@carlsondash.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>    MUBARAK H. IBRAHIM,<br><br>                 Debtor. | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>               Plaintiff,<br><br>v.<br><br>SAWSAN HOMSI, BADR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CALUMET PARK MOBILE, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>               Defendants. | Adv. No. 25-00168<br><br>Hon. Jacqueline P. Cox |

**NOTICE OF MOTION**

TO:    See certificate of service

       PLEASE TAKE NOTICE that on **March 24, 2026** at **1:00 p.m.**, I will appear before the Honorable Judge Jacqueline P. Cox, or any judge sitting in that judge's place, **either** in courtroom 680, in the Everett McKinley Dirksen United States Courthouse at 219 S. Dearborn Street, Chicago, Illinois, or electronically as described below, and present **Defendants' Motion for Protective Order and Sanctions** (the "**Motion**"), a copy of which is attached.

       **Important: Only parties and their counsel may appear for presentment of the motion electronically using Zoom for Government. All others must appear in person.**

       **To appear by Zoom using the internet**, go to this link: https://www.zoomgov.com/. Then enter the meeting ID and passcode.

       **To appear by Zoom using a telephone**, call Zoom for Government at 1-669-254-5252 or 1- 646-828-7666. Then enter the meeting ID and passcode.

       **Meeting ID and passcode**. The meeting ID for this hearing is: 161 273 2896. The passcode is: 778135.

1

**If you object to this motion** and want it called on the presentment date above, you must file a Notice of Objection no later than two (2) business days before that date. If a Notice of Objection is timely filed, the motion will be called on the presentment date. If no Notice of Objection is timely filed, the court may grant the motion in advance without calling it.

Respectfully submitted,

Nasr Ali, Petroleum Investment Properties, LLC, and Calumet Fuel, Inc.

By: /s/  Morgan I. Marcus
One of their attorneys

Kurt M. Carlson ARDC No. 6236568
Morgan I. Marcus ARDC No. 6309607
Mona Naser ARDC No. 6278114
**CARLSON DASH, LLC**
216 S. Jefferson St., Suite 303
Chicago, Illinois 60661
Telephone: 312-382-1600
E-mail: kcarlson@carlsondash.com
E-mail: mnaser@carlsondash.com
E-mail: mmarcus@carlsondash.com

## CERTIFICATE OF SERVICE

I, Morgan I. Marcus, an attorney, certify that on **March 12, 2026**, I caused complete copies of the foregoing Notice of Motion and the Motion, to be electronically served upon all parties registered CM/ECF users through the Court's ECF system.

/s/ Morgan I. Marcus

2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>    MUBARAK H. IBRAHIM,<br><br>                              Debtor. | Chapter 7<br><br>BK No. 23-07031<br><br>Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM,<br><br>                              Plaintiff,<br><br>v.<br><br>SAWSAN HOMSI, BADR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CALUMET PARK MOBILE, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY,<br><br>                              Defendants. | Adv. No. 25-00168<br><br>Hon. Jacqueline P. Cox |

**DEFENDANTS', NASR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC AND CALUMET FUEL, INC., MOTION FOR PROTECTIVE ORDER AND SANCTIONS**

Defendants, Nasr Ali ("Nasr Ali"), Petroleum Investment Properties, LLC ("PIP"), Calumet Fuel, Inc. (individually as "Calumet Fuel" and collectively with Nasr Ali and PIP as the "Ali Defendants"), by their counsel Carlson Dash, LLC, respectfully moves for entry of a protective order and sanctions arising from the Trustee's issuance and service of a subpoena directed to Fifth Third Bank seeking financial records before discovery was permitted under the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure and before the Court had any opportunity to rule on the Trustee's motion for expedited discovery. The Trustee's conduct represents a misuse of subpoena power, a circumvention of the discovery rules governing

1

adversary proceedings, and a procedural ambush that deprived both the Court and the parties of the opportunity to determine whether such discovery should have been allowed in the first instance.

1.     This adversary proceeding was commenced by the Chapter 7 Trustee seeking relief against multiple defendants.

2.     On February 18, 2026, the Trustee filed a motion seeking expedited discovery.

3.     The Trustee did not notice that motion for presentment until March 10, 2026.

4.     As a result, neither the Court nor the parties were afforded an opportunity to respond to or obtain a ruling on the motion for expedited discovery before the events described below occurred.

5.     As of the filing of this motion, the Court has not granted the Trustee's request for expedited discovery.

6.     Accordingly, discovery in this adversary proceeding remained governed by the ordinary discovery provisions of the Federal Rules of Civil Procedure as incorporated by the Federal Rules of Bankruptcy Procedure.

7.     Federal Rule of Civil Procedure 26(d)(1), made applicable by Bankruptcy Rule 7026, provides that a party may not seek discovery from any source before the parties have conferred under Rule 26(f) unless authorized by court order.

8.     No Rule 26(f) conference had occurred when the subpoena described below was issued.

9.     No order authorizing early discovery had been entered.

10.     Nevertheless, on February 25, 2026, the Trustee issued a subpoena duces tecum directed to Fifth Third Bank, National Association.

2

11. The subpoena sought financial records relating to a non-debtor adversary defendant.

12. The subpoena was issued pursuant to Bankruptcy Rule 9016 incorporating Federal Rule of Civil Procedure 45.

13. The subpoena required production of documents by March 9, 2026.

14. The Trustee served notice of the subpoena upon counsel for the parties by email.

15. Defendant received the emailed notice in late February 2026.

16. Defendant did not immediately move to quash because counsel reasonably believed that the Trustee would not serve a subpoena before the Court had an opportunity to rule on the pending motion for expedited discovery.

17. That belief proved mistaken.

18. The Trustee proceeded to serve the subpoena and obtain documents from Fifth Third Bank before the Court had ruled on the motion seeking permission to conduct expedited discovery.

19. The sequence of events created a procedural ambush in which discovery was executed first and judicial review was postponed until later.

20. By filing the motion for expedited discovery on February 18, issuing the subpoena on February 25, and delaying presentment of the motion until March 10, the Trustee ensured that discovery would occur before the Court could determine whether such discovery should be allowed.

21. The emailed notice of the subpoena compounded that procedural ambush by creating the appearance that the subpoena was procedurally proper when the Court had not yet authorized any discovery.

3

22. Rule 26(d)(1) expressly prohibits a party from seeking discovery from any source before the parties conduct a Rule 26(f) conference absent a court order.

23. Courts consistently hold that subpoenas issued under Rule 45 constitute discovery subject to Rule 26(d).

24. The Seventh Circuit has emphasized that courts must carefully police misuse of subpoenas seeking confidential records. See *Northwestern Memorial Hospital v. Ashcroft*, 362 F.3d 923 (7th Cir. 2004).

25. Courts within the Northern District of Illinois likewise recognize that Rule 45 subpoenas remain subject to the discovery limitations imposed by Rule 26. See *DeGeer v. Gillis*, 755 F.Supp.2d 909 (N.D. Ill. 2010).

26. *DeGeer* specifically warns that subpoenas may not be used as an end run around discovery restrictions or scheduling requirements imposed by the Federal Rules.

27. The conduct at issue here represents precisely the type of circumvention the *DeGeer* court warned against.

28. Bankruptcy courts also recognize the importance of protecting third-party rights where discovery seeks confidential financial information.

29. In *In re Teknek, LLC*, 343 B.R. 850 (Bankr. N.D. Ill. 2006), the court emphasized the need to respect procedural protections when actions affect the rights and interests of third parties.

30. The subpoena issued here sought sensitive financial records maintained by a banking institution.

31. Financial account records implicate significant privacy interests.

32. Courts recognize that individuals possess legitimate privacy interests in their banking records and therefore have standing to challenge subpoenas directed to financial institutions seeking those records.

33. The acquisition of such records through a subpoena issued before discovery was permitted and before the Court ruled on the motion for expedited discovery constitutes a serious misuse of the subpoena process.

34. Federal Rule of Civil Procedure 26(c), incorporated by Bankruptcy Rule 7026, authorizes courts to issue protective orders to prevent misuse of discovery and to protect parties from annoyance, embarrassment, oppression, or undue burden.

35. Rule 45(d)(3) likewise authorizes courts to quash or modify subpoenas that are improperly issued or that seek protected information.

36. Courts possess broad authority to prohibit the use of discovery materials obtained through improper means.

37. Even where documents have already been produced, courts may restrict their use or require sequestration pending further order.

38. Courts within the Seventh Circuit recognize that abuse of Rule 45 subpoenas may warrant sanctions.

39. Federal courts also possess inherent authority to impose sanctions for litigation conduct that abuses the judicial process. See *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

40. The Trustee's actions here demonstrate a deliberate decision to obtain discovery first and seek judicial approval later.

41. Such conduct undermines the authority of the Court and the orderly administration of discovery.

5

42.     Defendants therefore seeks entry of a protective order prohibiting the Trustee from using, disseminating, or relying upon the documents produced in response to the Fifth Third Bank subpoena.

43.     Defendant further seeks an order requiring the Trustee and Trustee's counsel to sequester those materials pending further order of this Court.

44.     Defendants further requests that the Court establish clear parameters governing any future subpoenas directed to financial institutions or other third parties in this adversary proceeding.

45.     Defendants also requests that the Court impose appropriate sanctions for the Trustee's misuse of subpoena power and circumvention of the discovery rules.

WHEREFORE, Defendants respectfully requests that the Court enter an order granting this Motion for Protective Order and Sanctions, prohibiting use or dissemination of the documents obtained through the subpoena issued to Fifth Third Bank, requiring sequestration of those materials pending further order of the Court, imposing appropriate sanctions against the Trustee and Trustee's counsel, and granting such other and further relief as the Court deems just and proper.

<div style="margin-left:50%">

Respectfully submitted,
Nasr Ali, Petroleum Investment Properties, LLC, and Calumet Fuel, Inc.

By: /s/  Morgan I. Marcus
        One of their attorneys

</div>

Kurt M. Carlson ARDC No. 6236568
Morgan I. Marcus ARDC No. 6309607
Mona Naser ARDC No. 6278114
**CARLSON DASH, LLC**
216 S. Jefferson St., Suite 303
Chicago, Illinois 60661
Telephone: 312-382-1600
E-mail: kcarlson@carlsondash.com
E-mail: mnaser@carlsondash.com
E-mail: mmarcus@carlsondash.com

6

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re:<br>MUBARAK H. IBRAHIM | | ) BK No.:    23-07031 |
| | | ) |
| | | ) Chapter: 7 |
| | | ) Honorable Jacqueline P Cox |
| | | ) |
| | Debtor(s) | ) |
| PALOIAN, et al., | | ) Adv. No.: 25-00168 |
| | | ) |
| | Plaintiff(s) | ) |
| HOMSI, et al. | | ) |
| | | ) |
| | | ) |
| | Defendant(s) | ) |

**TEMPORARY RESTRAINING ORDER**

This matter coming to be heard on the Chapter 7 Trustee's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 72) and the Chapter 7 Trustee's Motion for Entry of an Order (A) Authorizing Expedited Discovery in Connection with His Motion for Temporary Restraining Order and Preliminary Injunction and (B) Extending the Time to Replead Count I of the Complaint Against Badr Ali (Dkt. 85), the parties being heard, and the Court being advised in the premises, it is hereby ordered that:

1.       On March 12, 2026, the Court GRANTED the Trustee's request for a temporary restraining order ("TRO"). The TRO will expire at midnight on March 31, 2026 unless the Court enters an order extending it under Federal Rule of Civil Procedure 65, made applicable by Federal Rule of Bankruptcy Procedure 7065.

2.       The principal issue disputed by the Trustee and Defendants Nasr Ali, Petroleum Investment Properties, LLC ("PIP"), and Calumet Fuel, Inc. (collectively, "Respondents") is whether the Court has the authority to restrain the dissipation of the assets at issue under Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999). The Court finds that it does. The general prohibition on asset-freeze injunctions in claims for money damages where no lien or equitable interest is asserted does not apply here. The Debtor stands in the shoes of a judgment creditor. See Grupo Mexicano, 527 U.S. at 319-23 (remedies available in pre-revolutionary creditor's bill are available under Rule 65). Moreover, Grupo Mexicano does not apply where the party seeking an injunction asserts an equitable claim and does not apply to bankruptcy cases. In re Owens Corning, 419 F.3d 195, 208 n.14 (3d Cir. 2005) (does not apply to bankruptcy cases) In re Focus Media, 387 F.3d 1077, 1084-85 (9th Cir. 2004) (does not apply to either category); CSC Holdings, Inc. v. Redisi, 309 F.3d 988, 996 (7th Cir. 2002) (does not apply to equitable claims); EHT US1, Inc., Nos. 21-10036 & 21-50476, 2021 WL 3828556, *1 (D. Del. Aug. 27, 2021) (does not apply to fraudulent transfer actions in bankruptcy). Here, in addition to the fact that this is a bankruptcy case, the Trustee is pursuing equitable relief in his fraudulent transfer claims and is pursuing relief on alter ego theories, and alter ego is an equitable theory of relief. Finally, in In re Caesars Entertainment Operating Co., Inc., 808 F.3d 1186, 1188-89

(7th Cir. 2015) (Posner, J.), the Seventh Circuit held that 11 U.S.C. § 105(a) gives a bankruptcy court broad authority to preserve estate assets and effectuate a successful resolution of the bankruptcy in which assets are available for the creditors. Here, the evidence has shown that the funds at issue are a significant source of the potential recovery for the creditors.

3. The Court finds that the Trustee has demonstrated a probability of success on the merits of his claims against Respondents and that it is necessary to issue the TRO to prevent dissipation of proceeds from the sale of sale of 11900 Marshfield Avenue to Defendant Calumet Park Mobil, LLC ("CPM"). The Court further finds that the balance of harms favors the Trustee and the estate and that the public interest weighs in favor of a TRO.

The court notes that it is alleged that the operating company transfer to Defendant Homsi, the Debtor's wife, for no consideration occurred close in time, November of 2019, to the litigation involving the Spyropoulos Trust which ended in a judgment in December of 2019. Adversary Proceeding 25-00168, Adversary Complaint ("A.C."), Docket 1, paragraph 61.

It is alleged that soon thereafter Homsi transferred a large percentage of the shares of the operating company to Badr Ali for $60,000 to be paid over two years as wages. A.C., paragraph 71.

The court also notes that it is alleged that in December of 2021 the the operating company agreed to sell 100% of its shares to Defendant Calumet Fuel for $400,000, a sum alleged to be less than the annual profit generated by the gaming operation. A.C., paragraphs 84-85.

The court also notes that it is alleged that in 2021 the Debtor decided to sell the property holding company to an entity controlled by Nasr Ali, who allegedly obtained an initial 35% interest in it for no consideration. A.C., paragraphs 41-43.

It is alleged that the real esate was appraised to be worth $9,600,000. A.C., paragraph 98. It was sold, allegedly, for $5.5 million. A.C., paragraph 100.

The Trustee also alleges that the Debtor signed a document in connection with a transaction even though he no longer owned the asset. A.C., paragraph 103.

4. Respondents and Defendants Ahmad Zahdan and Calumet Park Mobil, LLC ("CPM" and, collectively with Zahdan, "Payors") shall reach an agreement with the Trustee as to an escrow agent for the funds subject to this order. The escrow agent may open as many separate accounts as the parties direct or, failing agreement, as the escrow agent deems necessary and reasonable, to hold the funds subject to this order.

5. Respondents and Payors are directed to do the following:

a. CPM (or any designee) is directed to make all future payments under the purchase-money mortgage dated February 15, 2025 (the "Mortgage") and associated loan agreement into an account with the agreed escrow agent as they become due, and not to pay any amounts to PIP under the Mortgage to Defendant PIP. CPM will receive credit for the payments.

b. Respondents shall freeze and provide an accounting of the $1,410,758.58 PIP and Calumet Fuel netted in the sale of 11900 Marshfield Avenue to CPM.

c. Respondents shall freeze and provide an accounting of the $1,500,235.20 already paid

by CPM and/or AZ SPE LLC under the Mortgage.

6.        This matter is set for status, including any extension of the TRO, discovery to be taken in connection with any preliminary injunction, and a preliminary injunction, on March 31, 2026 at 2:00 PM.

7.        Pursuant to Federal Rule of Bankruptcy Procedure 7065, the Court is not requiring the Trustee to post a bond to secure this TRO.

8.        All other matters raised in Dkt. 85 will be addressed by separate order.

Enter:        *Jacqueline P. Cox*

_____

Honorable Jacqueline P. Cox

Dated:  March 24, 2026        United States Bankruptcy Judge

**Prepared by:**

Steven C. Moeller
Carpenter Lipps LLP
180 N. LaSalle St., Suite 2880
Chicago, IL 60601
312-777-4826
moeller@carpenterlipps.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: <br><br>     MUBARAK H. IBRAHIM, <br><br>                  Debtor. | Chapter 7 <br><br> BK No. 23-07031 <br><br> Hon. Jacqueline P. Cox |
| GUS PALOIAN, not personally but solely in his capacity as the duly appointed chapter 7 trustee for the estate of MUBARAK H. IBRAHIM, <br><br>              Plaintiff, <br><br> v. <br><br> SAWSAN HOMSI, BADR ALI, PETROLEUM INVESTMENT PROPERTIES, LLC, CALUMET FUEL, INC., NASR ALI, CALUMET PARK MOBILE, LLC, AHMAD ZAHDAN, AJ 119TH, INC., and AJOMON JOY, <br><br>              Defendants. | Adv. No. 25-00168 <br><br> Hon. Jacqueline P. Cox |

**ANSWER AND AFFIRMATIVE DEFENSES**

NOW COME Defendants Nasr Ali ("Nasr Ali"), Petroleum Investment Properties, LLC ("PIP"), and Calumet Fuel, Inc. (individually "Calumet Fuel" and collectively with Nasr Ali and PIP, the "Ali Defendants"), by and through their undersigned counsel, and hereby submit their Answer to the Adversary Complaint filed by Gus Paloian, not personally but solely in his capacity as the duly appointed Chapter 7 Trustee for the estate of Mubarak H. Ibrahim (the "Trustee") (the "Complaint"), assert their Affirmative Defenses, and file their Counterclaims, and in response thereto state as follows:

**Statement Regarding Core/Non-Core Status**

Pursuant to Federal Rule of Bankruptcy Procedure 7012(b), the Ali Defendants state that this proceeding is not a core proceeding in which the Bankruptcy Court has constitutional authority to enter final orders under *Stern v. Marshall*, 564 U.S. 462 (2011), and *Executive Benefits Insurance Agency v. Arkison*, 573 U.S. 25 (2014). The Ali Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court. The Ali Defendants have filed a jury trial demand and a Motion to Withdraw the Reference pursuant to 28 U.S.C. § 157(d).

1

**GENERAL DENIAL**

The Ali Defendants deny each and every allegation of the Complaint not expressly admitted herein pursuant to FRCP 8(b).

**Answer to Specific Allegations**

## I. Introduction

1. The Debtor owned a gas station and connected retail space located on the real property at 11900 Marshfield Avenue in Calumet Park, Illinois (the "Property").

**ANSWER:** The Ali Defendants admit that the Property is located at 11900 Marshfield Avenue, Calumet Park, Illinois. The Ali Defendants further state that the Property was a multi-unit commercial center with various businesses operating as tenants, including a service station, hair gallery, donut and coffee shop, insurance agency, and cell phone store. The service station included a gas station, mini-mart, full-service car wash, oil-lube change, and auto repair and tire shop (the "Station"). The Ali Defendants deny the characterization that the Debtor "owned" the gas station in his individual capacity.

2. By 2016, however, it was apparent to the Debtor that he faced significant liabilities in connection with a loan made to the Debtor by Theodore Spyropoulos ("Spyropoulos"). Spyropoulos had died in 2014, but his trust (the "Trust"), which had acquired the promissory note related to the loan, was pressing its claim.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

3. In response to the Trust's collection efforts, the Debtor split ownership and control over the gas station between two entities. In December 2016, the Debtor formed 11900 Marshfield Station Inc. (the "OpCo"), to conduct the business at that location. This complaint will refer to all operations generating revenue at the Property as the "Business." At formation, the Debtor owned 100% of the OpCo. Separately, in December 2016, the Debtor formed the 11900 Marshfield LLC (the "PropCo") to take title to the Property. The OpCo and the PropCo were alter egos of the Debtor.

**ANSWER:** The Ali Defendants deny that the Debtor formed 11900 Marshfield, LLC or that 11900 Marshfield LLC was an alter ego of the Debtor. The Ali Defendants further answer that the purchasers formed 11900 Marshfield LLC. On or about December 14, 2016, the Members of Marshfield LLC were: Nasr Ali holding 35%, Hussein Munassar holding 17.5%, Ali Musa holding 15%, Nabil Hussain holding 17.5%, and Mubarak Ibrahim holding 15%. The Manager of Marshfield LLC was Nasr Ali. On or about December 23, 2016, Marshfield LLC purchased the Property from Standard Bank & Trust Co. as trustee for a total purchase price of $4,500,000. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph

4. In 2017, the Spyropoulos Trust filed a suit on the promissory note in state court.

2

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

5.     In April 2019, the Illinois Gaming Board issued Video Gaming Establishment License 181002758 (the "Gaming License") to the OpCo. This license entitles the gas station to conduct gambling operations and now produces $400,000-$500,000 in profit annually (apart from other business revenues generated at the gas station). The Illinois Gaming Board views a gaming license as running with the associated property. The Business included revenues from activities conducted under the Gaming License.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

6.     In November and December 2019, the note case went to trial. On December 4, 2019, the Spyropoulos Trust obtained a judgment against the Debtor for $11,082,995.50.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

7.     In anticipation of and in response to the judgment, the Debtor fraudulently transferred the OpCo's stock, the Business, and the Property to other Defendants. As a result, the Debtor transferred millions of dollars of assets in fraud of his creditors. The recipients of these transfers, in turn, fraudulently transferred the assets to still other Defendants. The Trustee seeks, in the alternative, to have these assets declared to be assets of the Estate or to avoid these transfers and subsequent transfers or recover the value of the assets (believed to more than $5 million). The chain of transfers for the OpCo, the Business, and the Property are described herein.

**ANSWER:** The Ali Defendants deny that the transfer of the stock, business, or the Property was fraudulent when transferred to the Ali Defendants. The Ali Defendants state that all transactions involving the Ali Defendants were arm's-length transactions for fair value, documented by written agreements, supported by independent appraisals, and represented by separate counsel on each side. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

## II. Parties and Other Relevant Persons and Entities

8.     The Debtor is a resident of the Northern District of Illinois. He filed the chapter 7 case identified in the caption on May 28, 2023.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

9.     The OpCo is an Illinois corporation. It was dissolved but has been reinstated. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. Its registered agent is John Mraibie, 14497 John Humphrey Drive, Suite 200, Orland Park, Illinois, 60462-2632.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

3

10. The PropCo is an Illinois LLC. It was involuntarily dissolved on June 14, 2024. Its principal place of business was 11900 Marshfield Avenue, Calumet Park, Illinois. Its registered agent at dissolution was the Debtor.

**ANSWER:** The Ali Defendants admit the allegations in this paragraph.

11. Defendant Homsi is the Debtor's wife and a resident of the Northern District of Illinois.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

12. Defendant Badr Ali is a resident of the Northern District of Illinois.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

13. Defendant PIP is an Illinois LLC. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Nasr Ali, who is PIP's registered agent.

**ANSWER:** The Ali Defendants admit the allegations in this paragraph.

14. Defendant Calumet Fuel is an Illinois corporation. Its principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Nasr Ali, who is Calumet Fuel's registered agent.

**ANSWER:** The Ali Defendants admit the allegations in this paragraph.

15. Defendant Nasr Ali is a resident of the Northern District of Illinois. He has been involved in multiple businesses owned, operated, or controlled by the Debtor.

**ANSWER:** The Ali Defendants admit that Nasr Ali is a resident of the Northern District of Illinois. The Ali Defendants deny that Nasr Ali "has been involved in multiple businesses owned, operated, or controlled by the Debtor." Nasr Ali is an independent businessman. He was a founding 35% member and Manager of 11900 Marshfield LLC from its formation in December 2016. He separately owns and operates Bubbles Splash Car Wash, Inc., which invested over $1,500,000 in developing the car wash at the Property, partially financed by a $1,032,000 loan from Bank of George personally guaranteed by Nasr Ali.

16. "Syed" is Iftekhar Syed, a confederate and longtime employee of the Debtor and his companies.

**ANSWER:** The Ali Defendants object to and do not know the meaning of the term "confederate" or how it is being used in this allegation, and because of the conjunctive use of the term it is necessary therefore that the entirety of this allegation be and is denied.

4

17.     Defendant Calumet Mobil is a Nevada corporation, whose principal place of business is 11900 Marshfield Avenue, Calumet Park, Illinois. On information and belief, it is owned by Defendant Zadan.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

18.     Defendant Zahdan is a resident of the Northern District of Illinois. On information and belief, he owns Defendant Calumet Mobil.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

19.     Defendant AJ 119th is a tenant of Defendant Calumet Mobil. It now conducts the business operations at the Property. It has applied for a gaming license.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

20.     Defendant Joy, on information and belief, is the owner of Defendant AJ 119th.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

21.     The Spyropoulos Trust is the Debtor's largest creditor.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

22.     Spyropoulos is the settlor of the Spyropoulos Trust.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

### III. Jurisdiction and Venue

23.     The Court has subject-matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is being heard by the Court pursuant to 28 U.S.C. § 157(a) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.

**ANSWER:** The Ali Defendants admit that the Court has subject-matter jurisdiction under 28 U.S.C. §§ 157 and 1334.

24.     This is a core proceeding under 28 U.S.C. § 157(b)(2).

**ANSWER:** The Ali Defendants deny that this is a core proceeding in which the Bankruptcy Court has constitutional authority to enter final orders. See *Stern v. Marshall*, 564 U.S. 462 (2011); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). The Ali Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court.

25.     If proceedings to avoid and recover fraudulent transfers are found to be core proceedings in which the Bankruptcy Court is unable to constitutionally enter final orders due to the holding in *Stern v. Marshall*, 564 U.S. 462 (2011), this matter may be heard by the Bankruptcy Court under 28 U.S.C. § 157(c). See *Exec. Benefits Ins. Agency, Inc. v. Arkinson*, 573 U.S. 25 (2014).

**ANSWER:**  This paragraph contains legal conclusions to which no response is required. The Ali Defendants agree that the Bankruptcy Court may hear this proceeding under 28 U.S.C. § 157(c) but may not enter final orders without the Ali Defendants' consent, which has not been and will not be given.

26.     The Trustee consents to the entry of a final order by this Court.

**ANSWER:**  The Trustee's consent does not bind the Ali Defendants. The Ali Defendants do not consent.

27.     Pursuant to 28 U.S.C. §§ 1408 & 1409, this district is the proper venue for this adversary proceeding. The events from which this case arises occurred in the Northern District of Illinois.

**ANSWER:**  The Ali Defendants admit that venue is proper.

## IV. Facts Applicable to All Counts

28.     On January 15, 2010, Spyropoulos loaned the debtor $5,170,299, evidenced by a demand note with 8% annual interest. The note required payment within 30 days of demand on pain of default. The note had a default rate of 10%.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

29.     In September 2014, Spyropoulos died.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

30.     In or about November 2014, the Spyropoulos Trust demanded performance on the note.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

31.     The Debtor defaulted and did not pay within 30 days of demand.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

6

32.     Later, the Spyropoulos Trust continued to demand payment and sought to collect on the note.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

33.     As of 2016, the Property was owned by an entity called AHM Properties, Inc., which the Trustee believes was owned and controlled by the Debtor and/or was the Debtor's alter ego.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

34.     The Trustee also believes the gas station operating at the Property as of 2016 was owned or controlled by the Debtor and managed by Syed.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

35.     The Debtor, however, had ultimate management and control of the gas station.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

36.     In December 2016, the Debtor split ownership of the Property and the Business into two separate entities.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

37.     On or about December 14, 2016, the Debtor formed the OpCo as an Illinois corporation to operate the gas station located at the Property. The OpCo is the entity that would come to own the Gaming License.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

38.     At formation, the Debtor owned 100% of the shares of the OpCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

39.     After the establishment of the OpCo, the gas station was controlled and managed by Debtor, with the day-to-assistance of Syed, the Debtor's longtime agent and employee.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

7

40.     Also on December 14, 2016, the same day the Debtor formed the OpCo, the Debtor formed the PropCo as an Illinois LLC.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

41.     At formation, the Debtor owned 15%, Hussein Munasser owned 17.5%, Nabil Hussein owned 17.5%, Defendant Nasr Ali owned 35%, and Ali Musa owned 15% of the PropCo.

**ANSWER:**  The Ali Defendants admit the membership percentages as stated. The Ali Defendants further state that Nasr Ali served as Manager of Marshfield LLC and that Marshfield LLC purchased the Property on December 23, 2016, from Standard Bank & Trust Co. as trustee for a total purchase price of $4,500,000.

42.     On information and belief, the individuals identified in the preceding paragraph were confederates of the Debtor and did not provide any consideration to the Debtor or AHM Properties, Inc. for their interest in the PropCo.

**ANSWER:**  The Ali Defendants object to and do not know the meaning of the term "confederate" or how it is being used in this allegation, and because of the conjunctive use of the term it is necessary therefore that the entirety of this allegation be and is denied. In further answer, the Ali Defendants deny any lack of consideration implied by this allegation.

43.     Other than the Debtor, the individuals identified in paragraph 41 did not exercise genuine control over the PropCo.

**ANSWER:**  Denied. Nasr Ali, as Manager of Marshfield LLC, exercised genuine control over the entity and the Property.

44.     On December 23, 2016, AHM Properties, Inc. conveyed the Property to the PropCo.

**ANSWER:**  Denied. The Ali Defendants admit that the Property was conveyed to Marshfield LLC on December 23, 2016.

45.     Several facts regarding the OpCo and the PropCo indicate that the Debtor did not intend these entities to exercise genuine control or authority over the Business or the Property and that both were alter egos of the Debtor from inception:

**ANSWER:**  Denied. The Ali Defendants deny that the OpCo and PropCo were alter egos of the Debtor.

a. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced documents showing that the OpCo was capitalized at formation.

**ANSWER**:  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

b. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced documents showing that assets were transferred to the OpCo at its formation, either formally via an asset sale agreement or otherwise.

**ANSWER**: The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

c. The gas station continued to operate without change. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the respondents to those subpoenas have not produced any documents to show, for example, that supply contracts, business licenses, and the like were amended or updated to reflect that the OpCo now owned the gas station business and would assume the liabilities of any prior operators.

**ANSWER**: The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

d. Despite multiple Rule 2004 subpoenas to relevant persons and entities, the has not been able to substantiate that $2,500,000 was paid to AHM Properties, Inc. by the purported owners of the PropCo.

**ANSWER:** The Ali Defendants deny the allegations in this paragraph to the extent that they vary from the relevant dates provided for the document production or the jurisdictional dates relevant to the proceedings.

e. Neither the OpCo nor the PropCo kept even minimal corporate records and neither respected the corporate form.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph as they relate to OpCo. The Ali Defendants deny the allegations in this paragraph as they relate to PropCo.

f. The Debtor continued to control and manage the gas station as the Property as his personal property, through his longtime employee Syed.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

46. On March 28, 2017, the Spyropoulos Trust filed suit against the debtor in the Circuit Court of Cook County, seeking to collect on the note.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

47. In March 2019, the Debtor explored the possibility of refinancing the Property.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

9

48. On March 22, 2019, the court in the note action filed by the Spyropoulos Trust denied summary judgment, making it likely that the case would go to trial.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

49. On April 18, 2019, the Illinois Gaming Board issued the Gaming License to the OpCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

50. The OpCo hired a third-party vendor, Accel Entertainment Gaming, LLC ("Accel"), to provide video poker machines and collect revenue.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

51. Accel operated machines, gathered funds, and gave the OpCo its share of video poker profits.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

52. After entering the relationship with Accel, the OpCo began conducting video poker operations on the Property.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

53. The OpCo immediately began realizing substantial profits from gaming operations, which generally increased from year to year.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

54. The OpCo's video poker operations now generate approximately $400,000-$500,000 in profits annually.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

55. The Illinois Gaming Board regards video poker licenses as running with the retail establishment. That is, when an establishment with a video poker license is sold to a new owner, the Illinois Gaming Board regularly reissues the license in the name of the new owner, provided that the new owner is not disqualified from holding a license.

10

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

56. In November and December 2019, the note case went to trial.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

57. On December 4, 2019, the Spyropoulos Trust obtained a judgment against the Debtor in the amount of $11,082,995.50.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

58. Around November 2019, the Debtor purportedly transferred 100% of the shares of the OpCo to his wife, Defendant Homsi.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

59. There was no written agreement, board action, share certificates, or shareholder vote under which the shares were transferred from the Debtor to Defendant Homsi.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

60. As far as the Trustee has been able to discover, the only document reflecting the Debtor-to-Homsi transaction is an unsigned K-1 that was to be attached to the OpCo's 2019 tax return.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

61. Defendant Homsi did not pay any consideration for the shares of the OpCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

62. The license paperwork for the Gaming License (which discloses the name of the owner of the licensee) was not changed after the entirety of the stock in the OpCo was purportedly conveyed to Defendant Homsi.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

63. Defendant Homsi did not play any role in the operation or management of the OpCo after the purported transfer.

11

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

64. The gas station continued to operate without change. The Debtor continued to manage the gas station through his longtime employee, Syed.

**ANSWER:** Denied. In further answer, the Ali Defendants do not believe that to be the case and deny having sufficient knowledge or information to form a belief as to the actual truth of the allegations contained in this paragraph.

65. On December 20, 2019, the OpCo signed a 10-year lease with the PropCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

66. Pursuant to the lease, the OpCo agreed to the pay the PropCo monthly rent of $17,500.00, plus additional monthly rent in an "amount which is the equivalent of the monthly revenue of the Lessee for the ATM commissions and Video Gaming." The base rent was to increase by $500.00 each year after that.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

67. At trial in Adversary No. 23-393 (discussed below), Syed testified that around January 2020, Defendant Badr Ali walked into the gas station without prior contact and told Syed that he wanted to buy the Business.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

68. Defendant Badr Ali did not have experience in the gas station business.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

69. Defendant Badr Ali did not request any documents about the gas station, the OpCo, its arrangement with the PropCo or the Debtor.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

70. Defendant Badr Ali did not conduct any diligence.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

12

71.     In or about late 2019 or early 2020, Defendant Homsi purportedly transferred 85% of the shares of the OpCo to Defendant Badr Ali for $60,000, to be paid not as cash but over the next two years as wage payments from the OpCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

72.     Defendant Badr Ali did not immediately pay any cash consideration for the shares of the OpCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

73.     There was no written agreement, board action, share certificates, or shareholder vote under which shares were transferred from Defendant Homsi to Defendant Badr Ali.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

74.     The supposed transaction was completely oral.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

75.     In response to numerous Rule 2004 subpoenas issued by the Trustee, the only document produced that reflects the Homsi-to-Badr Ali transaction is the K-1 attached to the OpCo's 2020 tax return.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

76.     Defendant Badr Ali did not control the operation or management of the OpCo after the purported transfer.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

77.     It appears that the Business continued to operate without change. The Debtor continued to manage the Business through his longtime employee, Syed.

**ANSWER:** Denied. The Ali Defendants do not believe this allegation to be true and in further answer deny having sufficient knowledge or information to form a belief as to the actual truth of the allegations contained in this paragraph.

78.     The licensee paperwork (which discloses the owner of the licensee) with the Illinois Gaming Board was not changed to Defendant Badr Ali after the purported transfer of 85% of the shares of the OpCo to Defendant Badr. Instead, the licensee paperwork continued to show the Debtor as the owner of the licensee.

13

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

79. On May 26, 2020, the OpCo signed a new lease with the PropCo.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

80. The new lease purported to change the base rent to $12,500 for June 2020, $15,000 for July 2020, $17,500 from August 1, 2020 to May 31, 2022, and $18,000 from June 1, 2022 to May 31, 2023. Each subsequent year rent rises by $500. The additional rent obligation is equal to the amount of the income derived from the gaming license was deleted.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

81. The lease was signed by Defendant Homsi, Walid Ali, and Ammar Alesayi. It was not signed by Defendant Badr Ali, even though there is a signature line for him.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

82. The second lease was never performed.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

83. The parties acted as if it had not been signed and instead continued under the first Lease.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

84. On December 3, 2021, the OpCo executed an agreement to sell 100% of its shares to Defendant Calumet Fuel—an entity controlled by Defendant Nasr Ali—for a purported price of $400,000 (or less than the annual profit generated by gaming operations).

**ANSWER:** The Ali Defendants admit that the OpCo executed an agreement to sell 100% of its shares to Calumet Fuel. The Ali Defendants deny that the consideration was merely "$400,000" or that it was "less than the annual profit generated by gaming operations." The transaction was a stock purchase for $400,000 plus assumption of all pre-closing liabilities of the OpCo, including an SBA loan of approximately $500,000 and all other known and unknown liabilities—total consideration exceeding $900,000. Under 11 U.S.C. § 548(d)(2)(A), assumption of debt and unknown liabilities constitutes additional value.

85. $400,000 was not a reasonable value for the OpCo or the Business.

14

**ANSWER:** Denied. Total consideration of over $900,000 (purchase price plus assumed liabilities) was a reasonable value for the shares of the OpCo based on the financial information available to the parties at the time.

86. Defendant Nasr Ali signed as president of Defendant Calumet Fuel, and Defendant Badr Ali signed as president of the OpCo and Defendant Homsi as its secretary.

**ANSWER:** The Ali Defendants admit the allegations in this paragraph.

87. Under the sale agreement, Defendant Calumet Fuel supposedly obtained the gas station's inventory and the Gaming License.

**ANSWER:** The Ali Defendants admit that Calumet Fuel obtained the gas station's inventory. The Gaming License is issued by the Illinois Gaming Board to the entity operating the business and follows the gaming establishment. The Ali Defendants deny any characterization that the Gaming License was independently transferred "property."

88. Defendant Nasr Ali's testimony in the trial of Adversary No. 23-393 indicates that the Debtor and Defendant Nasr Ali regarded the Gaming License as transferable property.

**ANSWER:** Denied. Nasr Ali's testimony is accurately reflected in the transcript attached to the Ali Defendants' Motion to Dismiss and does not support the characterization alleged.

89. In May 2023, the Debtor filed this chapter 7 case.

**ANSWER:** The Ali Defendants admit that the Debtor filed a chapter 7 case in May 2023—over a year after the Closing.

90. On information and belief, on or about February 15, 2024, Defendant Calumet Fuel transferred the operations of the Business to Defendant AJ 119th, which has occupied the Property under a lease with Defendant Calumet Mobil (which, as described below purportedly acquired the Property) and began conducting the gaming operations.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

91. On March 21, 2025, Defendant AJ 119th applied for a gaming license for the Property.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

92. To conceal the transfer, Calumet Fuel's purported owner, Nasr Ali, falsely testified on March 26, 2025 at the trial in Adversary No. 23-393 that Calumet Fuel continued to operate the Business and receive the revenues from the gaming license.

**ANSWER:** Denied. Nasr Ali did not attempt to conceal any transfer and did not"falsely testify." At the time of his testimony, Calumet Fuel was still receiving gaming license proceeds because

15

the transfer of the license to AJ 119th was still in process. The Trustee's counsel failed to lay a proper foundation, failed to ask appropriate questions and failed to ask appropriate and follow up questions that would have provided additional context and detail. Nasr Ali truthfully answered the exact questions asked of him. Furthermore, the reference to "Ibrahim" in Nasr Ali's text messages was to Ibrahim Syed, a manager employed by Nasr Ali's companies—not the Debtor Mubarak Ibrahim.

93.     In 2019, the Debtor acquired the aggregate 50% of the PropCo that was owned by Munasser, Hussein, Musa, and all but 5% of Defendant Nasr Ali's 35% interest in the PropCo. As a result, at the end of 2019, the Debtor owned 95% of the PropCo and Defendant Nasr Ali owned 5% of the PropCo.

**ANSWER:**  The Ali Defendants admit that in approximately 2018, the Debtor purchased additional interests in Marshfield LLC, leaving the Debtor at 95% and Nasr Ali at 5%. The parties agreed to use the 2016 purchase price of $4,500,000 because the Property's income was not performing as originally anticipated.

94.     Neither the Debtor nor any Rule 2004 subpoena respondent has produced a written agreement documenting this transaction or evidence of consideration paid to Munasser, Hussein, Musa and Defendant Nasr Ali for these interests.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

95.     As far as the Trustee is aware, the only documentation of the transfers is the K-1 attached to the PropCo's 2019 tax return.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

96.     In late 2021, the Debtor decided to sell the Property to an entity controlled by Defendant Nasr Ali.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

97.     The contemplated transaction was to be partially funded by a mortgage loan from Ameris Bank.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

98.     On October 5, 2021, in connection with the planned sale, Ameris Bank obtained an appraiser, who appraisal valuing the Property alone at $9,600,000.

**ANSWER:**  The Ali Defendants admit that an appraisal was conducted in connection with the Ameris Bank loan. The Ali Defendants deny that the $9,600,000 figure accurately reflects the fair market value of the Property when transferred. The appraisal included: (a) the value of the car

16

wash (approximately $1,500,000), which was built, financed (via a $1,032,000 loan from Bank of George personally guaranteed by Nasr Ali), and owned by Bubbles Splash Car Wash, Inc.—a separate entity not part of the transaction; (b) the value of equipment, fixtures, and restaurant equipment constituting personal property not conveyed with the real estate; and (c) valuation methodology that may have incorporated income from gaming operations conducted by a third-party vendor (Accel Entertainment) using gaming machines not owned by the property owner. Three independent appraisals conducted closer to the time the purchase agreement was executed valued the Property at $4,370,000 (Retail Petroleum, June 2018), $5,870,000 (JLL, May 2019), and $5,535,000 (Cushman & Wakefield, July 2019).

99.     Based on the Gaming License alone, however, the value of the Property is significantly higher than $9,600,000.

**ANSWER:** Denied. The Gaming License was not transferred to PIP. The allegation that the Property is worth "significantly higher than $9,600,000" based on the Gaming License is speculative and unsupported.

100.     On or about May 2, 2021, the PropCo agreed to sell the Property to Defendant PIP for $5.5 million.

**ANSWER:** The Ali Defendants admit that Marshfield LLC agreed to sell the Property to PIP for $5,500,000, consistent with the three independent appraisals then available.

101.     On January 27, 2022, Defendant Calumet Fuel and the PropCo executed an addendum to the sale agreement for the Property.

**ANSWER:** The Ali Defendants admit the allegations in this paragraph.

102.     The addendum stated that out of $5.5 million sales price, $400,000 would be apportioned to the gas station Business and the rest to the PropCo.

**ANSWER:** The Ali Defendants admit the allegations in this paragraph.

103.     The Debtor signed the addendum, even though he supposedly had given away the Business at that point.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

104.     On January 31, 2022, at the same time as the sale of the shares of the OpCo, the PropCo sold the Property to Defendant PIP for $5,500,000, or $4,100,000 less than its appraised value.

**ANSWER:** The Ali Defendants admit that the closing occurred on January 31, 2022 and that the purchase price was $5,500,000. The Ali Defendants deny that the price was "$4,100,000 less than its appraised value" for the reasons stated in their response to Paragraph 98. In addition to the $5,500,000 purchase price, PIP assumed delinquent real estate property taxes exceeding $174,000 and equipment leases of approximately $460,000.

17

105.    $400,000 of the proceeds were purportedly diverted to the OpCo under the sale agreement with Defendant Calumet Fuel.

**ANSWER:**  The Ali Defendants admit that $400,000 was allocated to the Business under the addendum. The Ali Defendants deny and object to the term 'diverted' and to the extent that term is being relied upon in this allegation to characterize anything other than an appropriate apportionment of proceeds, the allegation is wholly denied.

106.    Not only were the transactions interrelated because of the addendum, Defendant Nasr Ali admitted in testimony in the trial in Adversary No. 23-393 that he regarded the two transactions as a singular transaction.

**ANSWER:**  The Ali Defendants admit that the 2 transactions were contingent on each other in that Ali, through his entities, would not close on one without the other.  The Ali Defendants deny the allegations in this paragraph to the extent they differ from Ali's testimony.

107.    To conceal the fraudulent transfer of the Property and Business from the Trustee, on June 9, 2023, the Debtor's counsel sent a letter to the Trustee trying to explain that certain transactions were not fraudulent, including the transfer of the OpCo's stock to Defendant Calumet Fuel and the Property to PIP.

**ANSWER:**  The Ali Defendants deny that the purchase and sale of the Property and Business were fraudulent and deny any attempt was made at  concealment. This transaction was arms-length with all parties represented by counsel and through the use of a title company.  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

108.    In the letter, the Debtor's counsel cited an appraisal from July 2019 in the amount of $5,535,000 of the Property, plus furniture, fixtures, and equipment, and failed to disclose that the Property had been appraised for $9,600,000 a few months before the January 2022 transactions.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

109.    In December 2023, the Spyropoulos Trust filed a petition seeking denial of discharge, which was filed as an adversary action in this case under Adversary No. 23-393. The gravamen of the Spyropoulos Trust's complaint was that the Debtor was attempting to fraudulently conceal assets—namely the Property and its associated business—from creditors to frustrate collection of the judgment in the note case.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

110.    On September 25, 2024, this Court entered an order in Adversary No. 23-393 directing the parties to provide final exhibit lists by March 3, 2025 and setting the final pretrial conference for March 12, 2025.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

111. On February 14, 2025, as the Debtor and the Spyropoulos Trust were preparing for trial of Adversary No. 23-393, Defendant PIP purported to sell the Property to Defendant Calumet Mobil.

**ANSWER:** The Ali Defendants admit that PIP sold the Property to Calumet Park Mobil, LLC on February 14, 2025.

112. On February 14, 2025, Defendant PIP purported to transfer the Property to Defendant Calumet Mobil for $6,500,000.00 plus a $5,000,000.00 mortgage loan from Defendant Nasr Ali (the owner of the seller in the transaction).

**ANSWER:** The Ali Defendants admit the consideration as stated—$6,500,000 plus a $5,000,000 purchase-money mortgage—for total consideration of $11,500,000. The Ali Defendants deny that the transfer was for less than reasonably equivalent value.

113. The purported sale occurred "as is" and Calumet Mobil has produced documents indicating no inspections of the Property were done before the purported transfer.

**ANSWER:** Denied. Calumet Park Mobil, LLC conducted due diligence appropriate for the transaction.

114. Defendant PIP did not receive reasonably equivalent value for the Property.

**ANSWER:** Denied. PIP received total consideration of $11,500,000.

115. Defendant PIP was insolvent at the time of the transfer of the Property or rendered insolvent because of the transfer of the Property.

**ANSWER:** The Ali Defendants deny the allegations in this paragraph.

116. The Spyropoulos Trust filed its exhibit list in Adversary No. 23-393 on February 21, 2025.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

117. The Court held the final pretrial conference in Adversary No. 23-393 on March 11, 2025.

**ANSWER:** The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

118. PIP and Calumet Mobil waited until March 12, 2025 (the day after the final pretrial conference and only 14 days before the trial) to record the sale documents with the Cook County Recorder of Deeds.

19

**ANSWER:** The Ali Defendants admit the recording date. The Ali Defendants deny that the timing was intended to hinder, delay, or defraud anyone.

119.    On information and belief, the recording was delayed with the purpose of hindering, delaying, and defrauding the Debtor's creditors.

**ANSWER:** The Ali Defendants deny the allegations in this paragraph.

<div style="text-align: center">

**COUNT I**
**Declaratory Judgment**
**(Against all Defendants)**

</div>

120.    The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

**ANSWER:** The Ali Defendants repeat their responses to the allegations in paragraphs 1-119 as if fully set forth herein.

121.    Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th were and are straw purchasers possessing mere naked title to the Business while the Debtor continues to exercise powers and responsibilities associated with the Business.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

122.    Defendants Nasr Ali, PIP, and Calumet Mobil were and are straw owners possessing mere naked title to the Property while the Debtor continues to exercise power and responsibilities associates with the Property.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

123.    Under Illinois law when a title holder holds title to property for the benefit of someone else, the title holder holds such property in a resulting trust.

**ANSWER:** The allegations in this paragraph sets forth a legal conclusion to which no answer is required. To the extent an answer is deemed to be required, the Ali Defendants deny the allegations in this paragraph.

124.    Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th operate the Business solely for the Debtor's benefit.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

125.    Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th did not pay fair value for the Business.

<div style="text-align: center">20</div>

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

126. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th advanced no or minimal funds for the Business in comparison to its value.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

127. Defendants Homsi, Badr Ali, Calumet Fuel, and AJ 119th's intent was to hold legal title to the Business, while the Debtor continues to retain all equitable interests.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

128. Defendants Nasr Ali, PIP, and Calumet Mobil hold the Property solely for the Debtor's benefit.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

129. Defendants Nasr Ali, PIP, and Calumet Mobil did not pay fair value for the Property (or a share of ownership of the PropCo).

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

130. Defendants Nasr Ali, PIP, and Calumet Mobil's intent was and is to hold legal title to the Property, while the Debtor continues to retain all equitable interests.

**ANSWER:** The Ali Defendants deny both the characterizations and the allegations in this paragraph as they relate to the Ali Defendants.

131. On the Petition Date, the Debtor had equitable interests in the Business and the Property that allowed him to make decisions and receive distributions.

**ANSWER:** Denied. On the Petition Date, the Debtor had no equitable interest in the Business or the Property. The Ali Defendants purchased those assets for value in arm's-length transactions that closed on January 31, 2022—over a year before the Petition Date.

132. Under Section 541 of the Bankruptcy Code, the Business and the Property are property of the Estate.

**ANSWER:** Denied. The Business and the Property are not property of the Estate.

**COUNT II**
**Avoidance of Actual Fraudulent Transfers Pursuant to**

21

**740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544**
**(Against Homsi)**

COUNT II of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 133 – 135.

**COUNT III**
**Avoidance of Constructive Fraudulent Transfer Pursuant to**
**740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544**
**(Against Homsi)**

COUNT III of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 136 – 138.

**COUNT IV**
**Avoidance of Actual Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(A)(1) and 11 U.S.C. § 544(b)**
**(Against Badr Ali)**

COUNT IV of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 139 – 144.

**COUNT V**
**Avoidance of Constructive Fraudulent Transfer Pursuant to**
**740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544**
**(Against Badr Ali)**

COUNT V of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 145-148.

**COUNT VI**
**Avoidance of Actual Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544**
**(Against Calumet Fuel)**

149. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

**ANSWER:** The Ali Defendants repeat their responses to the allegations in paragraphs 1-119 as if fully set forth herein.

150. At all relevant times, the OpCo was the alter ego of the Debtor, meaning that any conveyances of shares in the OpCo from Homsi to Badr Ali and from Badr Ali to Calumet Fuel was the transfer of property directly from the Debtor.

22

**ANSWER:** Denied. The OpCo was not the alter ego of the Debtor.

151. In the alternative, the transfers of shares in the OpCo from the Debtor to Homsi and from Homsi to Badr Ali did not happen—as a factual matter, under the Business Corporation Act, 802 ILCS 5/, and/or under the Statute of Frauds, 820 ILCS 5/2-201. In all cases, the Debtor remained the owner of 100% of shares in the OpCo until the transfer to Calumet Fuel.

**ANSWER:** The allegations in this paragraph sets forth a legal conclusion to which no answer is required. To the extent an answer is deemed to be required, the Ali Defendants deny the allegations in this paragraph.

152. In all events, in purportedly conveying shares in the OpCo to Badr Ali, the Debtor and/or Homsi acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

**ANSWER:** Denied. Calumet Fuel did not act with actual intent to hinder, delay, or defraud any creditor. Calumet Fuel purchased the shares in an arm's-length transaction, for value (over $900,000 including assumption of liabilities), with separate counsel, and without knowledge of the avoidability of any prior transfer.

   a. the Debtor retained complete control of the gas station (badge 2);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

   b. the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

   c. the gas station business was the only asset owned by the OpCo (badge 5);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

   d. the Debtor and Homsi and, on information and belief, Badr Ali were aware of the danger of a veil-piercing action by his creditors because they transferred the OpCo to third parties (badge 7);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

   e. Badr Ali obtained very little for the transfer in comparison to the value of the gaming license alone (badge 8);

23

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

  f. the Debtor, Homsi, and, on information and belief, Badr Ali were insolvent at the time of the transaction (badge 9); and

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

  g. the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

153. Therefore, any transfer to Calumet Fuel was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

**ANSWER:** The allegations in this paragraph set forth a legal conclusion to which no answer is required. To the extent an answer is deemed to be required, the Ali Defendants deny the allegations in this paragraph.

154. In the alternative, Calumet Fuel is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the shares from an initial transferee (Badr Ali) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

**ANSWER:** Denied. Calumet Fuel did not take with knowledge that any prior transaction was fraudulent. Calumet Fuel provided reasonably equivalent value. Calumet Fuel is exempt under 11 U.S.C. § 550(b)(1).

<div align="center">

**COUNT VII**
**Avoidance of Constructive Fraudulent Transfer Pursuant to**
**740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544**
**(Against Calumet Fuel)**

</div>

155. The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

**ANSWER:** The Ali Defendants repeat their responses to the allegations in paragraphs 1-119 as if fully set forth herein.

<div align="center">24</div>

156.     Calumet Fuel did not provide the Debtor and/or Badr Ali with reasonably equivalent value in exchange for shares of the OpCo.

**ANSWER:**    Denied. Calumet Fuel provided reasonably equivalent value: $400,000 plus assumption of all pre-closing liabilities including an SBA loan of approximately $500,000—total consideration exceeding $900,000.

157.     Both the Debtor and, on information and belief, Badr Ali, were insolvent at the time of the transfer or became insolvent because of the transfer.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

158.     Calumet Fuel is liable as a subsequent transferee under 740 ILCS 160/9 and 11U.S.C. § 550 because it took from the initial transferee with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the shares.

**ANSWER:**  Denied. Calumet Fuel is exempt under 11 U.S.C. § 550(b)(1).

<div align="center">

**COUNT VIII**
**Avoidance of Actual Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544**
**(Against AJ 119th)**

</div>

COUNT VIII of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 159 – 163.

<div align="center">

**COUNT IX**
**Avoidance of Constructive Fraudulent Transfer Pursuant to**
**740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544**
**(Against AJ 119th)**

</div>

COUNT IX of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 164 – 167.

<div align="center">

**COUNT X**
**Avoidance of Actual Fraudulent Transfers Pursuant to**
**740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544**
**(Against PIP)**

</div>

168.     The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

**ANSWER:**  The Ali Defendants repeat their responses to the allegations in paragraphs 1-119 as if fully set forth herein.

<div align="center">25</div>

169. At all relevant times, the PropCo was the alter ego of the Debtor, meaning that any conveyance of the Property from the PropCo to PIP was directly from the Debtor.

**ANSWER:** Denied. The PropCo was not the alter ego of the Debtor. Nasr Ali was a founding member and Manager of the PropCo from 2016.

170. In all events, in conveying the Property to PIP, the PropCo acted with actual intent to hinder, delay, or defraud the Debtor's creditors. This allegation is supported by the facts that:

**ANSWER:** Denied. Neither PIP nor the PropCo acted with actual intent to hinder, delay, or defraud any creditor. PIP purchased the Property in an arm's-length transaction at a price consistent with three independent appraisals ($4,370,000; $5,870,000; and $5,535,000), funded in part by an institutional mortgage from Ameris Bank, with separate counsel, and without knowledge of the avoidability of any prior transfer. PIP also assumed delinquent real estate taxes exceeding $174,000 and equipment leases of approximately $460,000.

    a. the transfer was to an insider (PIP was owned by Nasr Ali, who was a part owner of the PropCo) (badge 1)

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

    b. the Debtor retained complete control of the gas station (badge 2);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

    c. the Debtor was being pursued by a substantial creditor, the Spyropoulos Trust (badge 4);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

    d. the Property was the only asset that the PropCo owned (badge 5);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

    e. the Debtor and by extension the PropCo were clearly aware of the danger of a veil-piercing action by his creditors because they transferred the Property to a related third party (Nasr Ali's company) (badge 7);

**ANSWER:** The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

26

f.  PIP paid millions less than fair value for the Property (badge 8);

**ANSWER:**  The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.

g.  the PropCo was insolvent at the time of the transaction or became insolvent because of the transaction (badge 9); and

**ANSWER:**  The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

h.  the purported transfer occurred around the time that the Spyropoulos Trust obtained a significant judgment (badge 10).

**ANSWER:**  The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants.  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

171.  Therefore, any transfer to PIP was an avoidable transfer within the meaning of 740 ILCS 160/5(a)(l), is subject to avoidance by the Trustee under 11 U.S.C. § 544, and the Trustee may recover, for the benefit of the Debtor's estate, the amount of the transfers if it is avoided, under 740 ILCS 160/5 and 11 U.S.C. § 544.

**ANSWER:**  The allegations in this paragraph set forth a legal conclusion to which no answer is required. To the extent an answer is deemed to be required, the Ali Defendants deny the allegations in this paragraph.

172.  PIP is also liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (the PropCo) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

**ANSWER:**  Denied. PIP did not take from the initial transferee with knowledge that the transaction was fraudulent. PIP provided reasonably equivalent value. PIP is exempt under 11 U.S.C. § 550(b)(1).

<div style="text-align:center">

**COUNT XI**
**Avoidance of Constructive Fraudulent Transfer Pursuant to**
**740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544**
**(Against PIP)**

</div>

173.  The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

**ANSWER:**  The Ali Defendants repeat their responses to the allegations in paragraphs 1-119 as if fully set forth herein.

<div style="text-align:center">27</div>

174.     PIP did not provide the PropCo with reasonably equivalent value in exchange for the Property.

**ANSWER:**  Denied. PIP provided reasonably equivalent value as described in the response to Paragraph 170.

175.     The PropCo was insolvent at the time of the transfer or became insolvent because of the transfer.

**ANSWER:**  The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the allegations contained in this paragraph.

176.     PIP is liable as a subsequent transferee under 740 ILCS 160/9 and 11 U.S.C. § 550 because it took the Property from the initial transferee (the PropCo) with knowledge that the transaction was fraudulent and did not provide reasonably equivalent value for the Property.

**ANSWER:**  The allegations in this paragraph set forth a legal conclusion to which no answer is required. To the extent an answer is deemed to be required, the Ali Defendants deny the allegations in this paragraph.

## COUNT XII
### Avoidance of Actual Fraudulent Transfers Pursuant to
### 740 ILCS 160/5(A)(1) and 11 U.S.C. §§ 550 & 544
### (Against Calumet Mobil)

COUNT XII of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 177 – 181.

## COUNT XIII
### Avoidance of Constructive Fraudulent Transfer Pursuant to
### 740 ILCS 160/6 and 11 U.S.C. §§ 550 & 544
### (Against Calumet Mobil)

COUNT XIII of the Complaint is not directed to the Ali Defendants therefore the Ali Defendants deny having sufficient knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 182 – 185.

## COUNT XIV
### Aiding and Abetting Fraudulent Transfer
### (Against Homsi, Badr Ali, Nasr Ali, Joy, and Zahdan)

186.     The Trustee repeats and realleges the allegations in paragraphs 1 to 119 as if fully set forth herein.

**ANSWER:**  The Ali Defendants repeat their responses to the allegations in paragraphs 1-119 as if fully set forth herein.

28

187.    Homsi, Badr Ali, Nasr Ali, Ahmad Zahdan, and Ajomon Joy knowingly aided and abetted the Debtor, Badr Ali, Calumet Fuel, and AJ 119th in fraudulently transferring shares of the OpCo and/or the Business or possession of the Property from the Debtor and/or Badr Ali to Calumet Fuel and/or AJ 119th.

**ANSWER:**  Denied. Nasr Ali did not knowingly aid or abet any person or entity in fraudulently transferring any property. Furthermore, aiding and abetting a fraudulent transfer is not a cognizable cause of action under Illinois law. See *Audette v. Kasemir (In re Concepts America, Inc.)*, Nos. 14 B 34232, 16 A 691, 2018 Bankr. LEXIS 602 (Bankr. N.D. Ill. Mar. 1, 2018) (Judge Hollis: "there is no such thing as a claim for aiding and abetting a fraudulent transfer"); *Gierum v. Glick (In re Glick)*, 568 B.R. 634, 670, 677–78 (Bankr. N.D. Ill. 2017). Count XIV fails as a matter of law.

188.    Nasr Ali and Ahmad Zahdan knowingly aided and abetted the Debtor, PIP, and Calumet Mobil in fraudulently transferring the Property to PIP and/or Calumet Mobil.

**ANSWER:**  The Ali Defendants deny the allegations in this paragraph as they relate to the Ali Defendants. The Ali Defendants deny having sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

The following affirmative defenses are pleaded in the alternative and without assuming any burden where the burden is legally the Trustee's.  While "Ali Defendants' is used throughout, the specific transfers were tied to specific corporate entities, none of which were in the person of Nasr Ali. The Ali Defendants reserve the right to amend these defenses as discovery and further investigation proceed, consistent with applicable rules and orders.

## I.    First Affirmative: Defense Good Faith Transferee for Value—11 U.S.C. § 548(c)

1. Ali Defendants received the transfer at issue, which was the purchase of the real property and associated business assets at issue, for value and in good faith within the meaning of 11 U.S.C. § 548(c), and therefore has a lien on and may retain the interest transferred to the extent of the value given in exchange. In support of this defense, Ali Defendants states as follows:

2. Ali Defendants paid reasonably equivalent value for the property. At or prior to closing, and wired $816,000 of its funds and obtained a Small Business Administration ("SBA")-backed mortgage loan to finance the balance of the purchase price. The SBA underwriting process constitutes independent, government-supervised due diligence confirming that the purchase price bore a reasonable relationship to the value of the collateral at the time of closing.

3. The purchase price paid by Ali Defendants reflected the fair market value of the property as of the date of the transaction. At the time Ali Defendants contracted to purchase the property, the applicable appraisal supported the purchase price. A subsequent, post-contract bank appraisal obtained by a third party after the contract was already signed—and not disclosed to Ali Defendant prior to closing—cannot retroactively redefine the economics of an arm's-length transaction negotiated and consummated in good faith.

29

4. The Trustee's claimed aggregate value of the transferred assets is inflated and does not reflect fair market value for several independent reasons. The gaming license associated with the property is non-transferable, is operationally contingent on compliance with Illinois Gaming Board regulations, and is subject to revocation for violations including underage gambling, alcohol and tobacco consumption on premises, and breach of operational conditions. The license generates revenue only if continuously and lawfully operated, and is therefore not susceptible to a gross-revenue multiple valuation. The property further carries substantial operating liabilities and risk factors that the Trustee's valuation does not account for.

5. Ali Defendants had no knowledge, actual or constructive, that the underlying transfers in the chain of title preceding his purchase were made with actual intent to hinder, delay, or defraud any creditor of the Debtor. Ali Defendants dealt at arm's length with the seller, conducted customary due diligence, obtained institutional financing, executed recorded closing instruments, and took title in the ordinary course of a commercial real estate transaction.

6. No badges of fraud existed as to Ali Defendant's acquisition. The transaction was not concealed; it was publicly recorded. The purchase price was not nominal; it was supported by appraisal and SBA financing. Ali Defendants were not an insider of the Debtor. The transaction was not made in anticipation of litigation against Ali Defendants; Ali Defendants had no knowledge of the Spyropoulos Trust judgment or any prior litigation at the time he contracted to purchase the property.

7. To the extent the Court finds that any component of the transfer constituted less than reasonably equivalent value, Ali Defendants are entitled under § 548(c) to retain the transfer to the extent of the value actually given, including his $816,000 cash contribution, the full principal amount of the SBA loan proceeds paid to the seller at closing, all assumed liabilities, and all other consideration exchanged. Any recovery by the Trustee, if any, must be limited to the net difference after full credit for all value provided by Ali Defendants, and cannot exceed that net differential.

## II.     Second Affirmative Defense: Good Faith Subsequent Transferee (11 U.S.C. § 550(b)(1))

Under 11 U.S.C. § 550(b)(1), a trustee may not recover an avoided transfer from a subsequent transferee that takes for value, in good faith, and without knowledge of the voidability of the transfer avoided. PIP took the Property for $5,500,000 plus assumption of delinquent real estate taxes exceeding $174,000 and equipment leases of approximately $460,000, in good faith, and without knowledge of avoidability. Calumet Fuel took the Station for $400,000 plus assumption of all pre-closing liabilities including an SBA loan of approximately $500,000 and all other known and unknown liabilities (total consideration exceeding $900,000), in good faith, and without knowledge of avoidability. Under 11 U.S.C. § 548(d)(2)(A), assumption of debt constitutes value. This defense is statutory and absolute.

## III.    Third Affirmative Defense: Good Faith Transferee Under the Illinois Uniform Fraudulent Transfer Act (740 ILCS 160/9)

30

Under 740 ILCS 160/9(a), a transfer is not avoidable against a person who took in good faith and for reasonably equivalent value. To the extent any prior transfer is avoided, PIP and Calumet Fuel are entitled to a lien on, or may retain, the property transferred to the extent of the value given. 740 ILCS 160/9(d).

## IV.　　Fourth Affirmative Defense: Bona Fide Purchaser for Value

PIP is a bona fide purchaser for value. The purchase was arm's-length, documented by a written agreement, funded in part by a mortgage from Ameris Bank, supported by three independent appraisals ($4,370,000, $5,870,000, and $5,535,000), and closed with separate counsel. Calumet Fuel is a bona fide purchaser on similar grounds.

## V.　　Fifth Affirmative Defense: Reasonably Equivalent Value

1. To the extent the Trustee proceeds under 11 U.S.C. § 548(a)(1)(B), the Trustee cannot establish that the Debtor received less than reasonably equivalent value in exchange for the transfer.

2. The purchase price paid by Ali Defendants constituted, or substantially approximated, reasonably equivalent value for the property and assets conveyed at the time of the transaction, as evidenced by:

   a. the contemporaneous appraisal of the property at a value consistent with the purchase price;

   b. the approval of SBA financing by a federal agency based on independent collateral underwriting;

   c. Ali Defendant's payment of $816,000 in cash equity;

   d. the non-transferable, operationally contingent, and legally revocable character of the gaming license, which substantially limits its fair market value below the Trustee's claimed figure; and

   e. the substantial operational liabilities and deferred obligations associated with the property assumed by Ali Defendants at closing.

3. The Trustee's reliance on a post-contract, third-party bank appraisal obtained after the purchase contract was executed does not establish the value of the property as of the date of the transfer for purposes of § 548(a)(1)(B).

## VI.　　Sixth Affirmative Defense: No Actual Fraudulent Intent

The Ali Defendants did not act with actual intent to hinder, delay, or defraud any creditor. The transactions were arm's-length, documented, and represented by separate counsel. There are no facts indicating actual intent alleged.

## VII.　　Seventh Affirmative Defense: No Knowledge of Fraud

The Ali Defendants had no knowledge that any prior transfer was fraudulent.

## VIII.   Eighth Affirmative Defense: Independent Entities / No Alter Ego

1. The OpCo and PropCo were independent legal entities, not alter egos of the Debtor.

2. Under Illinois law, piercing the corporate veil requires:

   a. such a unity of interest that separate personalities no longer exist, and

   b. adherence to separate existence would sanction fraud or produce inequitable consequences. *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503 (2005).

## IX.   Ninth Affirmative Defense: Failure to Plead Fraud with Particularity

Counts VI, X, and XIV fail to comply with Fed. R. Civ. P. 9(b). See *In re Jacobs*, 403 B.R. 565, 573 (Bankr. N.D. Ill. 2009).

## X.   Tenth Affirmative Defense: Aiding and Abetting Is Not a Cause of Action

Count XIV fails as a matter of law. *In re Concepts America, Inc.*, 2018 Bankr. LEXIS 602 (Bankr. N.D. Ill. 2018); *In re Glick*, 568 B.R. 634, 670, 677–78 (Bankr. N.D. Ill. 2017).

## XI.   Eleventh Affirmative Defense: Statute of Limitations

One or more claims are barred by 740 ILCS 160/10(a).

## XII.   Twelfth Affirmative Defense: Laches

The Trustee delayed filing for two years after the petition and did not seek injunctive relief until 2026.

## XIII.   Thirteenth Affirmative Defense: No Insolvency

The Debtor was not insolvent at the time of the transfers to PIP and Calumet Fuel.

## XIV.   Fourteenth Affirmative Defense: No Transfer of Debtor Property

The transfers complained of were not property of the Debtor.

## XV.   Fifteenth Affirmative Defense: Setoff and Recoupment

If any transfer is avoided, the Ali Defendants are entitled to setoff. 740 ILCS 160/9(d).

## XVI.   Sixteenth Affirmative Defense: Failure to Mitigate

The Spyropoulos Trust could have pursued fraudulent transfer actions in state court after entry of the judgment in December 2019. The Trustee waited two years to file.

**XVII. Seventeenth Affirmative Defense: Reservation of Rights**

The Ali Defendants reserve the right to assert additional affirmative defenses as warranted by discovery.

   **WHEREFORE**, the Ali Defendants respectfully request that this Court: (a) dismiss the Complaint as to the Ali Defendants with prejudice; (b) enter judgment in favor of the Ali Defendants on all Counts; (d) award attorneys' fees and costs; and (e) grant such other relief as the Court deems just.

             Respectfully submitted,

             Nasr Ali, Petroleum Investment Properties, LLC, and Calumet Fuel, Inc.

             By: /s/ *Kurt M. Carlson*
               One of their attorneys

Kurt M. Carlson ARDC No. 6236568
Mona Naser ARDC No. 6278114
Morgan Marcus ARDC No. 6309607
Lina Toma ARDC No. 6333468
**CARLSON DASH, LLC**
216 S. Jefferson St., Suite 303
Chicago, Illinois 60661
Telephone: 312-382-1600
kcarlson@carlsondash.com
mnaser@carlsondash.com
mmarcus@carlsondash.com
ltoma@carlsondash.com

33

Form G6 (20210922_apo)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

In Re:
MUBARAK H. IBRAHIM

                          Debtor(s)

PALOIAN, et al.,

                          Plaintiff(s)

HOMSI, et al.

                          Defendant(s)

BK No.: 23-07031

Chapter: 7

Honorable Jacqueline Cox

Adv. No.: 25-00168

## ORDER EXTENDING TRO BY AGREEMENT AND RE-SETTING PRELIMINARY INJUNCTION HEARING

This matter coming to be heard on the TRO entered at Dkt. 117, the parties appearing, and the Court being advised in the premises, IT IS HEREBY ORDERED THAT:

1. The TRO entered at Dkt. 117 is extended by agreement of the Trustee, Nasr Ali, Petroleum Investment Properties, LLC, Calumet Fuel, Inc., Ahmad Zahdan, and Calumet Park Mobil, LLC to May 21, 2026.

2. The parties' agreement to extend the TRO does not waive any defendant's argument that the TRO should not be entered or that a preliminary injunction should not be granted.

3. By agreement of the parties, the preliminary injunction hearing originally set for May 7, 2026 is reset to May 20, 2026 at 10:00 AM. The parties shall exchange witness and exhibit lists in connection with the preliminary injunction hearing by May 13, 2026.

4. The motion to amend the TRO filed by Ahmad Zahdan and Calumet Park Mobil, LLC (Dkt. 132) is entered and ocntinued to May 20, 2026 at 10:00 AM.

Enter:

*Jacqueline P. Cox*

United States Bankruptcy Judge

Dated: April 16, 2026

**Prepared by:**

Steven C. Moeller
Carpenter Lipps LLP
180 N. LaSalle St., Suite 2880
Chicago, IL 60601

Form G6 (20210922_apo)

312-777-4826

moeller@carpenterlipps.com